XAVIER BECERRA
Attorney General of California
CHERYL FEINER
MICHAEL NEWMAN
Senior Assistant Attorneys General
CHRISTINE CHUANG
Supervising Deputy Attorney General
JULIA HARUMI MASS
JASLEEN SINGH
SHUBHRA SHIVPURI
JOSHUA SONDHEIMER
LEE I. SHERMAN (SBN 272271)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6404
  Fax: (213) 897-7605
  E-mail: Lee.Sherman@doj.ca.gov.
*Attorneys for Plaintiffs Eloy Ortiz Oakley and Board of*
*Governors of the California Community Colleges*

(List of other Plaintiffs' counsel continued on next page)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **ELOY ORTIZ OAKLEY, in his official capacity as Chancellor of California Community Colleges; BOARD OF GOVERNORS OF THE CALIFORNIA COMMUNITY COLLEGES; FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT; LOS RIOS COMMUNITY COLLEGE DISTRICT; LOS ANGELES COMMUNITY COLLEGE DISTRICT; STATE CENTER COMMUNITY COLLEGE DISTRICT; SAN DIEGO COMMUNITY COLLEGE DISTRICT,** | Civil Case No. **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |
| Plaintiffs, | |
| **v.** | |
| **BETSY DEVOS, in her official capacity as the United States Secretary of Education; U.S. DEPARTMENT OF EDUCATION,** | |
| Defendants. | |

1    JOHN SHUPE
     Lynch and Shupe, LLP
2      316 Mid Valley Center # 180
       Carmel, CA 93923-8516
3      Telephone: (650) 579-5950
       Fax: (650) 579-0300
4      E-mail: jshupe@lynchshupelaw.com
     *Attorney for Plaintiff Foothill-De Anza Community College District*
5
     JEFFREY M. PRIETO
6    General Counsel
     Los Angeles Community College District
7      770 Wilshire Boulevard
       Los Angeles, CA 90017
8      Telephone: (213) 891-2188
       Fax: (213) 891-2138
9      E-mail: prietojm@laccd.edu
     *Attorney for Plaintiff Los Angeles Community College District*
10
     JP SHERRY
11   General Counsel
     Los Rios Community College District
12     1919 Spanos Court
       Sacramento, CA 95825
13     Telephone: (916) 568-3042
       E-mail: sherryj@losrios.edu
14   *Attorney for Plaintiff Los Rios Community College District*

15   MATTHEW T. BESMER
     General Counsel
16   State Center Community College District
       1171 Fulton Street
17     Fresno, CA 93721
       Telephone: (559) 243-7121
18     E-mail: matthew.besmer@scccd.edu
     *Attorney for Plaintiff State Center Community College District*
19
     LJUBISA KOSTIC
20   General Counsel
     San Diego Community College District
21     3375 Camino del Rio South, Room 385
       San Diego, CA 92108
22     Telephone: (619) 388-6877
       Fax: (619) 388-6898
23     E-mail: lkostic@sdccd.edu
     *Attorney for Plaintiff San Diego Community College District*
24

25

26

27

28

---

1.      Plaintiffs Chancellor Eloy Ortiz Oakley, the Board of Governors of the California Community Colleges, Foothill-De Anza Community College District, Los Rios Community College District, Los Angeles Community College District, State Center Community College District, and San Diego Community College District (Plaintiffs) bring this lawsuit to stop the U.S. Department of Education (DoE) from arbitrarily placing eligibility restrictions on emergency relief funds that Congress intended to help students defray additional educational costs resulting from the COVID-19 pandemic, which exclude hundreds of thousands of students, including undocumented students, Deferred Action for Childhood Arrival (DACA) recipients, and many students who are U.S. citizens or permanent residents.  On March 27, 2020, in response to an unprecedented worldwide pandemic that has disrupted every aspect of the economy and everyday life, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020) was signed into law.  In the CARES Act, Congress created a $14 billion Higher Education Emergency Relief Fund (HEERF), from which the DoE Secretary is required to disburse approximately $12.56 billion by a precise formula set by Congress to institutions of higher education to prevent, prepare for, and respond specifically to the coronavirus.  Pursuant to the statutory formula, approximately $580 million is allocated to community colleges throughout California.[1]

2.      Congress authorized higher education institutions to use these grants to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus (HEERF Assistance), and required that at least half of each institution's allocation be used to provide emergency relief to students for expenses related to campus disruptions (HEERF Student Assistance).  In doing so, Congress provided higher education institutions with unfettered flexibility to distribute the relief to affected students as they deemed appropriate, imposing no eligibility limitations on this emergency relief for students.

3.      Indeed, DoE at first recognized Congress's intent and acknowledged that HEERF

---

[1] California Community Colleges Allocations for Section 18004(a)(1) of the CARES Act, California Community Colleges (Apr. 9, 2020), https://tinyurl.com/y8lskhzg; *see also* Allocations for Section 18004(a)(1) of the CARES Act, U.S. Dep't of Educ., https://tinyurl.com/rt8hdze (last visited May 9, 2020).

Assistance funds are available to all students.  Likewise, in the certification that higher education institutions are required to sign in order to receive HEERF Assistance funds, DoE confirmed that HEERF Assistance funds do not constitute financial aid under Title IV of the Higher Education Act (Title IV).  Eligibility rules for aid under Title IV would exclude not only certain categories of residents who are not U.S. citizens from receiving assistance, but also citizens who do not meet other eligibility criteria unrelated to immigration status.

4.     Then, on or about April 21, 2020, after a number of colleges within the Plaintiff Districts submitted that required certification, DoE suddenly and inexplicably changed its position.  In guidance documents directed to higher education institutions (April 21 HEERF Assistance Guidances), DoE said that HEERF Assistance funds are subject to Title IV's eligibility limitations, and specifically stated that higher education institutions cannot use these funds for non-citizens who are ineligible to receive aid under Title IV.  As a result, many students who may be most in need of relief will be deprived of assistance during this public health crisis, including non-citizen students who are DACA recipients, Temporary Protected Status recipients, and asylum applicants, as well as substantial numbers of U.S. citizens in the California community college system.  DoE's change in position likely excludes more than *half* of all students in the California community college system, including many identified as economically disadvantaged.

5.     The DoE Secretary and a spokesperson for DoE have since reaffirmed DoE's position that only students eligible for financial aid under Title IV may receive emergency HEERF Assistance.  There is, however, no provision of the CARES Act that limits the eligibility of students who may receive HEERF Assistance funds, that incorporates Title IV's eligibility requirements into the HEERF, or that confers discretion to the DoE Secretary to set eligibility requirements.  Rather, by not placing any limitations on student eligibility for HEERF Assistance, by leaving to the discretion of each institution how to distribute emergency assistance to students, and by requiring that the DoE Secretary allocate HEERF Assistance pursuant to a specific formula that accounts for all students who were not previously enrolled in distance (online) learning before the COVID-19 related shutdowns—not just students who are eligible under Title

2

IV—Congress restricted DoE's authority to set eligibility requirements on that funding.  And although Congress imposed Title IV limitations and set other eligibility limitations on some funding sources described in the CARES Act, it did not do so with respect to HEERF Assistance.

6.     Accordingly, DoE's imposition of eligibility requirements on HEERF Assistance violates separation of powers principles, is *ultra vires*, and is in excess of statutory authority in violation of the Administrative Procedure Act (APA).  DoE's unexplained inconsistent interpretations, disregard of congressional intent, and failure to consider the ramifications of its eligibility limitations also violate the APA's prohibition on arbitrary and capricious agency action.  Finally, DoE's HEERF eligibility conditions violate the Spending Clause of the U.S. Constitution as they: (a) are not related to Congress's purpose for HEERF Assistance; (b) were not unambiguously imposed by Congress; (c) have not provided recipients with a knowing choice of what is required to comply with the conditions; and (d) were imposed by DoE after a number of colleges in the Plaintiff Districts accepted the terms and conditions of the Certification.

7.     These eligibility requirements will irreparably harm Plaintiffs and their students at a time when emergency relief is needed immediately.  Under HEERF's formula, Plaintiff Districts have collectively been allocated approximately $114 million, with at least $57 million of that amount allocated for students.  Students within the Plaintiff Districts, and at community colleges throughout California, are incurring increased pecuniary and systemic costs as a result of the sudden and disruptive shift to almost exclusively online learning mandated by the pandemic. Plaintiffs' already strained resources are further challenged by the burdens of finding alternative sources of assistance, not subject to DoE's unlawful preclusions, and distributing much needed assistance to its students consistent with its principles of equity and inclusivity.  Plaintiffs are also facing an overall decrease in funding due to the necessity to re-direct aid to students unlawfully deemed ineligible for HEERF Assistance, and an increase in costs due to demand for services needed by current students.  DoE's actions only serve to increase the likelihood of student dis-enrollment, which not only harms Plaintiffs' classrooms in the short term, but also their budgets in the long term—undermining their academic missions.

8.     For these reasons, and those discussed below, the Court should declare that the

3

eligibility requirements stated in DoE's April 21 HEERF Assistance Guidances are unlawful and unconstitutional and enjoin their imposition and enforcement.

**JURISDICTION AND VENUE**

9.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises under the Constitution and the laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal government founded upon the U.S. Constitution and acts of Congress.  Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706.  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory injunctive, mandamus, and other relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act), the Mandamus Statute, 28 U.S.C. § 1361, and the APA.

10.     Under 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of California because Plaintiff Foothill-De Anza Community College District has a business address at 12345 El Monte Road., Los Altos Hills, CA 94022.

**INTRADISTRICT ASSIGNMENT**

11.     Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because Defendant DoE maintains an office in the San Francisco Division located at 50 United Nations Plaza, San Francisco, CA 94102.

**PARTIES**

12.     The California Community Colleges system represents the largest postsecondary system in the United States, with more than 2.1 million students attending one of 114 college campuses annually, and 1.5 million students who enrolled in the Spring 2020 semester.  With low tuition and a longstanding policy of full and open access, California's community colleges were established around the principle that higher education should be available to everyone.  The community colleges are the most common entry point into collegiate degree programs in California, the primary system for delivering career technical education and workforce training, a major provider of adult education, apprenticeship, and English as a Second Language courses, and a source of lifelong learning opportunities for California's diverse communities.

4

13.     The principle of free public education is enshrined in the Constitution of California, which mandates a system of free public schools.  Cal. Const. art. IX, § 5.  The California Constitution also sets a minimum funding level for "the moneys to be applied by the state for the support of school districts and community college districts."  *Id.* art. XVI, § 8(b); *see also* Cal. Educ. Code § 84750.4 (establishing process for calculating a community college district's base and supplemental allocations).  The California Community Colleges are "postsecondary schools" and are "part of the public school system" of California.  Cal. Educ. Code, § 66700.

14.     Further, the California Equity in Higher Education Act establishes the policy of the State of California to afford all persons equal rights and opportunities in postsecondary educational institutions, including the California Community Colleges.  Cal. Educ. Code §§ 66251, 68130.5.

**Plaintiffs Chancellor Eloy Ortiz Oakley and Board of Governors of the California Community Colleges**

15.     The Board of Governors of the California Community Colleges (Board) sets policy and provides guidance for the 73 districts that constitute the postsecondary education system of community colleges.  *Id.* § 70900.  Board members are appointed by the Governor and formally interact with state and federal officials, and other state organizations.  The Board has legislatively-granted authority to develop and implement standards for classes, student academic requirements, and employment of academic and administrative staff.  *Id.* §§ 70900; 70901(b).

16.     The Board appoints a chief executive officer, who is known as the Chancellor, and who exercises the duties and responsibilities that are delegated to him by the Board.  *Id.* § 71090(b).  Plaintiff Eloy Ortiz Oakley has served as Chancellor since December 2016.

17.     The Chancellor's Office is responsible for carrying out the policies of the Board, including the development of fiscal plans, a legislative agenda, a budget for the community college system, and the execution of grants to community college districts to carry out statewide programs in furtherance of the Board's policies.  The Chancellor's delegated authority includes authority to enter into contracts and grants of up to $100,000 and three years duration without

5

Board approval.  If there are exigent circumstances, he may enter contracts or grants that exceed these limitations without prior Board approval.

18.     The Board's responsibilities include oversight and fiscal affairs leadership over California Community Colleges, including: providing general supervision over community college districts; providing representation, advocacy, and accountability for the community colleges before state and national legislative and executive agencies; and administering state and federal support programs.  *Id.* § 70901(b), (b)(4)(A), & (b)(5)(A).  The Board is responsible for approving the system's budget, identifying total revenue needs in order to properly serve the educational system, and identifying expenditures for the state general apportionment and for categorical programs, new programs, and budget improvements.  *Id.* § 70901(b)(5)(A)(I).  The Board also advises and assists governing boards of community college districts on the implementation and interpretation of state and federal laws affecting community colleges.  *Id.* § 70901(b)(14).

19.     The Board's strategic mission states in part: "All people have the opportunity to reach their full educational potential . . . . The Colleges embrace diversity in all its forms . . . . All people have the right to access quality higher education."[2]  It is the objective of the California Community Colleges to "mak[e] sure students from all backgrounds succeed in reaching their goals and improving their families and communities."[3]  In furtherance of these missions, the Chancellor's Office has reassured students and colleges that its campuses will remain safe, welcoming places for students of all backgrounds to learn and has defended the right of all students to obtain a higher education in California.

20.     The Board and the Chancellor's Office has had to devote significant time and resources to address the DoE's imposition of Title IV eligibility requirements on federal emergency student assistance.  The Chancellor's Office executive team, research team, Government Relations Division, College Finance and Facilities Planning Division, and

---

[2] Resolution of the Board of Governors No. 2017-01 [January 17, 2017], https://tinyurl.com/yc8bw6z9 (quoting from strategic plan).

[3] *Vision for Success*, California Community Colleges, https://tinyurl.com/y7dqtcnz (last visited May 9, 2020).

Communications Division have all been required to respond to the DoE action by analyzing the impact of the DoE's restrictions; providing technical assistance and guidance to community colleges, policy-makers, and stakeholders; and conducting research and analysis to develop mechanisms to assist the hundreds of thousands of students deprived of the possibility of receiving federal assistance under the DoE's April 21 HEERF Assistance Guidances.  Staff time has been and will continue to be diverted from other organizational responsibilities to develop responses to the changed DoE position.

21.     The Board and the Chancellor's Office have worked and continue to work with community college districts to alter their disbursement plans in response to the DoE's April 21 HEERF Assistance Guidances and to determine alternative funding for emergency student aid for those students deemed ineligible under those Guidances.  As an example, the Chancellor's Office College Finance and Facilities Planning Division, consulted with one college district that was forced, after release of the April 21 DoE Frequently Asked Questions document on HEERF Student Assistance (April 21 HEERF Student Assistance Guidance), to divert portions of its Student Equity and Achievement (SEA) Program funds from other uses in order to keep commitments it had already made to students based on the text of the CARES Act.

22.     Because of the mission and mandate of the California Community Colleges to support and provide guidance for low cost postsecondary education to all, many of its students are among the most financially vulnerable in California.  In light of this, the Legislature enacted the SEA Program, the funding for which the Board administers and distributes.  In administering SEA Program funding, the Board provides local districts with the vast majority of the appropriations to utilize at their discretion, consistent with the Program's conditions.  The Legislature sets aside five percent of SEA Program funds for discretionary use by the Chancellor's Office to promote system-wide initiatives to achieve the goals of the California Community Colleges,[4] such as increasing the percentage of students who succeed in achieving

---

[4] Assembly Bill 74 (Budget Act of 2019) appropriated $475,220,000 for the SEA Program.  2019 Cal. Legis. Serv. Ch. 23 (West).  Under California Education Code, section 78222(c)(5)(A), "[t]he chancellor may allocate up to 5 percent of the total funds appropriated for the purpose of this program for state administrative operations to carry out the intent of this

7

their educational goals, including graduation, transfer to four-year colleges, or obtaining a certificate, and reducing achievement gaps across various demographic metrics.[5]

23.     The purpose of the SEA Program in particular is to ensure funding to eliminate achievement gaps for students from traditionally underrepresented groups to meet the goals set out in California Community Colleges' Vision for Success. *See id.* In implementing the SEA Program, the California Community Colleges must ensure students complete their educational goals and a defined course of study; provide quality curriculum, instruction, and support services to students who enter college deficient in English or math; and provide student matriculation services and assistance in developing an education plan, amongst other requirements. Cal. Educ. Code § 78222(a) & (b). The Legislature's intent in creating the SEA Program was to prioritize funding for high-need and disadvantaged students enrolled in the California Community College system. *Id.* § 78222(c).

24.     Funding for the SEA Program may be used for the provision of emergency student financial assistance to help eligible students overcome unforeseen financial challenges that would directly impact students' ability to persist in their course of study. *Id.* § 78220(e)(1). Emergency student financial assistance includes direct aid in the form of emergency grants, as well as housing and food assistance, textbook grants, and transportation assistance. *Id.* This assistance is available to any student who has experienced an unforeseen financial challenge, who is making satisfactory academic progress (as defined by the college the student attends), and who is at risk of not persisting in the student's course of study due to the unforeseen financial challenge. *Id.* § 78220(3)(A).

25.     Due to the inexplicable change in DoE's position regarding the distribution of HEERF Assistance, hundreds of thousands of California's community college students are barred from federal emergency relief. The Board, as the entity tasked with administering the SEA Program, expects that local districts will need to access SEA Program funds for emergency

---

section."

[5] *See Vision for Success*, Foundation for California Community Colleges, https://vision.foundationccc.org/ (last visited May 10, 2020).

assistance, causing their depletion and preventing their use for other critical educational and strategic missions.  The Chancellor's Office is currently engaged in an assessment of grants of set-aside funds to identify whether funds are available to provide support to community college districts in response to the April 21 HEERF Assistance Guidances.  The Chancellor's Office Educational Services and Support is evaluating and will likely re-scope grants to community college districts to alleviate some of the impacts of college district diversions of SEA and other funds to provide direct emergency aid to non-Title IV eligible students impacted by COVID-19 to cover the gap in funding caused by DoE's unlawful interpretation of the CARES Act.  The Chancellor's Office, with Board approval, has designated these funds toward other priorities, including reducing equity gaps in achievement among traditionally underrepresented student groups, reducing regional achievement gaps among colleges located in regions with the lowest educational attainment of adults, and increasing the percent of exiting students who report being employed in their field of study.  While the use of SEA Program funds by the Board, Chancellor's Office, or Districts is necessary to provide emergency relief to students, including basic housing and food needs that have arisen during this global health pandemic, these funds are not enough to cover the gap caused by DoE's HEERF eligibility restrictions, and use of this resource will undermine California Community Colleges' Vision for Success objectives, which is what prompted the creation of the SEA Program.

**Plaintiff Foothill-De Anza Community College District**

26.     Foothill-De Anza Community College District (FDCCD) has provided education for students in the South Bay area for over 50 years.  Each year, approximately 64,000 students are enrolled at FDCCD's two colleges: Foothill College and De Anza Community College. FDCCD is committed to student success through equity, inclusion, and innovation. Approximately 80 percent of students at FDCCD are non-white, and almost 25 percent of students receive financial aid.

27.     Based on the statutory formula, $9.6 million in HEERF Assistance funding is allocated to FDCCD's colleges, with a minimum allocation of $4.8 million for students. Specifically, $2.4 million in HEERF Assistance funding is allocated to Foothill College, with a

9

minimum allocation of $1.2 million for students; $7.2 million in HEERF Assistance funding is allocated to De Anza College, with a minimum allocation of $3.6 million for students.

28.    In accordance with the text of the CARES Act, the initial letter guidance issued by the DoE on April 9, and the Certification all higher education institutions must complete in order to access HEERF Student Assistance funds, Foothill College developed a plan to ensure that its entire student body was eligible to receive assistance.  Foothill College created a short questionnaire asking students to identify their needs.  To date, 1,317 students have completed the questionnaire.  Foothill College planned to award amounts based on students' identified needs.

29.    On April 18, before DoE issued its April 21 HEERF Assistance Guidances, Foothill College accepted the Certification required to access HEERF Assistance funds in reliance of the plain text of the CARES Act, the representations made in DoE's April 9 letter, and the language of the Certification, with the expectation that it would be broadly distributing HEERF Student Assistance funds to its students.

30.    Once the eligibility restrictions were imposed, Foothill College was limited to providing HEERF Assistance to only 89 students to date.  The eligibility restrictions excluded the majority of students who had completed Foothill College's simple application, but did not have a Free Application for Student Aid (FAFSA) on file, or because they were strictly enrolled in online classes.  Foothill College has distributed funding to these students, but will have the majority of its HEERF Student Assistance funding left in reserve, which is available to provide to those students excluded by the HEERF eligibility requirements if those restrictions are enjoined.

31.    Foothill College has used and will continue to redirect other sources of state funding and use fundraising efforts to provide some relief for students excluded by the DoE's imposition of Title IV eligibility criteria.  However, these alternative funding sources may not be sufficient to meet the needs of excluded students.

32.    In accordance with the text of the CARES Act, the initial letter guidance issued by the DoE on April 9, and the Certification all higher education institutions must complete in order to access HEERF Student Assistance funds, De Anza College developed a plan to distribute HEERF Student Assistance to all students who were affected by disruption to campus operations

10

because of the coronavirus.  De Anza College created a short application asking students to identify their needs.  De Anza College planned to award amounts based on students' identified needs.

33.    De Anza College completed the Certification required of all higher education institutions to access HEERF Student Assistance.

34.    Once the eligibility restrictions were imposed, De Anza College was limited to providing HEERF Assistance to only those students who had submitted an application and have a FAFSA on file.  De Anza College is conducting a manual review of Title IV eligibility for all other students who have completed the application.  De Anza College has started distributed funding to these students, but will have the majority of its HEERF Student Assistance funding left in reserve, part of which will be available to provide to those students excluded by the HEERF eligibility requirements if those restrictions are enjoined.

35.    De Anza College has used and will continue to redirect other sources of state funding and use fundraising efforts to provide some relief for students excluded by the DoE's imposition of Title IV eligibility criteria.   However, these alternative sources of funding are not sufficient to meet the needs of excluded students.

36.    Both of FDCCD's colleges have an interest in disbursing HEERF Student Assistance equitably among its student body, so that its students may continue their education and FDCCD may continue to fulfill its academic mission.

**Plaintiff Los Angeles Community College District**

37.    Los Angeles Community College District (LACCD) has provided an education to more than three million students over the past 77 years and is affordable and accessible to all. LACCD includes nine colleges: Los Angeles Mission College, Pierce College, Los Angeles Valley College, Los Angeles City College, East Los Angeles College, West Los Angeles College, Los Angeles Southwest College, Los Angeles Trade-Technical College, and Los Angeles Harbor College.  LACCD welcomes a diverse student population and provides them with the skills, knowledge, and upward mobility to succeed.  Over 55 percent of students enrolled in LACCD are Hispanic and nearly 10 percent of students are African American.  Eighty percent of LACCD

students are from underserved populations.  Over half of students enrolled in LACCD are either low income or below the poverty line and a 2016 survey indicated that 55 percent of students are experiencing housing insecurity and 63 percent face food insecurity.

38.    Based on the statutory formula, $45.2 million in HEERF Assistance funding is allocated to LACCD's colleges, with a minimum allocation of $22.6 million for students.  In accordance with the text of the CARES Act and the initial letter guidance issued by the DoE on April 9, LACCD developed a plan for its nine colleges to distribute HEERF Student Assistance grants to all recipients of the California Promise Grant (CPG) enrollment fee waiver.  Cal. Educ. Code § 76300(g).  This plan would have provided support to nearly 60,000 students and focused on those with demonstrated financial need.  This group of students represents more than half of LACCD's total student enrollment, and includes citizens and noncitizens alike.

39.    All of LACCD's colleges have completed the Certification required of all higher education institutions to access HEERF Student Assistance.

40.    Once the eligibility restrictions were imposed, LACCD shifted its eligibility model from CPG recipients to FAFSA eligible students under Title IV, reducing the number of students eligible for HEERF Assistance by approximately 9,000.  Since the April 21 HEERF Assistance Guidances indicated that students enrolled in online programs were ineligible, an additional 7,000 students were eliminated for support.  In total, based on the April 21 HEERF Assistance Guidances, LACCD reduced the number of students potentially receiving support from nearly 60,000 students to less than 44,000, with approximately 16,000 low-income students being eliminated for support.

41.    LACCD will distribute HEERF Student Assistance awards in the amount of $300 to each of these approximately 44,000 students.  LACCD and its nine colleges have used and will continue to use private fundraising efforts to provide some relief for students excluded by the DoE's imposition of Title IV eligibility criteria.  Because these alternative funding sources are not predictable revenue streams and are not sufficient to meet the needs of excluded students, LACCD colleges will set aside a portion of their HEERF Student Assistance funds while LACCD seeks immediate relief from DoE's eligibility restrictions through this litigation.

42. LACCD has an interest in disbursing HEERF Student Assistance equitably among its student body, so that its students may continue their education and LACCD may continue to fulfill its academic mission.

**Plaintiff Los Rios Community College District**

43. Los Rios Community College District (LRCCD) is the second-largest community college district in California, serving nearly 75,000 students throughout the Sacramento region. LRCCD consists of American River College, Cosumnes River College, Folsom Lake College, and Sacramento City College. LRCCD offers a wide array of degree, transfer, and certificate programs at its four colleges and six resource centers. Nearly two-thirds of LRCCD's student body is non-white and qualify as either low income or below the poverty line.

44. Based on the statutory formula, approximately $27 million in HEERF Assistance funding is allocated to LRCCD's colleges, with a minimum allocation of $13.5 million for students. In accordance with the text of the CARES Act, the initial letter guidance issued by the DoE on April 9, and the Certification all higher education institutions must complete in order to access HEERF Student Assistance funds, LRCCD developed an initial plan for its four colleges to distribute HEERF Student Assistance grants to all recipients of the CPG enrollment fee waiver. This plan would have provided support to approximately 58,000 students, about 70 percent of the district's total student enrollment, and focused on those with demonstrated financial need. This group of students included undocumented students, DACA recipients, foster youth, single parents, veterans, and students who were not able to meet academic progress metrics, among others.

45. In order to serve these students, following DoE's direction in the April 9 letter, all of LRCCD's colleges completed the required Certification as soon as possible, before DoE issued its April 21 HEERF Student Assistance Guidance. Each of the colleges accepted the Certification required to access HEERF Assistance funds in reliance of the plain text of the CARES Act, representations made in DoE's April 9 letter and the language of the Certification, with the expectation that the colleges would follow LRCCD's plan for broadly distributing HEERF Assistance funds to its students, without regard to Title IV's eligibility limitations.

13

46.     Once the eligibility restrictions were imposed, LRCCD shifted its eligibility model from CPG recipients to only FAFSA recipients.  This effort limited the number of students eligible for HEERF Assistance to approximately 21,000 students.  LRCCD will distribute half of its HEERF Student Assistance funding to these students, but has reserved the other half of the funding.  If the HEERF eligibility restrictions are timely enjoined, LRCCD intends to use a significant portion of that funding for students excluded by the eligibility requirements.

47.     LRCCD has used and will continue to redirect other sources of state funding and use philanthropic fundraising efforts to provide some relief for students excluded by the DoE's imposition of Title IV eligibility criteria.  These alternative funding sources, however, are not sufficient to meet the needs of excluded students.

48.     LRCCD has an interest in disbursing HEERF Student Assistance equitably among its student body, so that its students may continue their education and LRCCD may continue to fulfill its academic mission.

**Plaintiff State Center Community College District**

49.     State Center Community College District (SCCCD) serves more than 5,743 square miles of urban and rural communities, including most of Fresno and Madera counties, and portions of Kings and Tulare counties.  SCCCD currently includes three colleges: Fresno City College, Reedley College, and Clovis Community College.  Over 67,000 students are enrolled in SCCCD and approximately 78 percent of the SCCCD student population is non-white.  Over 59 percent of SCCCD's student population is Hispanic and 10 percent of the student population is Asian/Pacific Islander.  The four counties in SCCCD's service area include a higher percentage of low income population than statewide.  The SCCCD's mission is to provide safe, inclusive, and supporting learning environments that is accessible to all students within the region.  SCCCD is committed to providing an environment that cultivates, embraces, and celebrates diversity.

50.     Based on the statutory formula, $18.33 million in HEERF Assistance funding is allocated to SCCCD's colleges, with a minimum allocation of $9.17 million for students.  Specifically, $11.22 million in HEERF Assistance funding is allocated to Fresno City College, with a minimum allocation of $5.61 million for students; $4.24 million in HEERF Assistance

14

1   funding is allocated to Reedley College, with a minimum allocation of $2.12 million for students;

2   $2.87 million in HEERF Assistance funding is allocated to Clovis Community College, with a

3   minimum allocation of $1.43 million for students.

4         51.    SCCCD directed each of its three colleges to create their own criteria to administer

5   the HEERF Student Assistance funding.  In accordance with the text of the CARES Act, the

6   initial letter guidance issued by the DoE on April 9, and the Certification all higher education

7   institutions must complete in order to access HEERF Student Assistance funds, each of SCCCD's

8   colleges created extensive plans for distributing HEERF Student Assistance grants in an equitable

9   manner.

10        52.    Fresno City College initially identified 16,457 students to whom it would provide

11  HEERF Student Assistance after conducting extensive research that took into account whether a

12  student received Pell grants or is otherwise Pell-grant eligible, family income, student income,

13  and impact based on zip code.  Indeed, Fresno City College prepared reports on how best to

14  distribute funds to the most needful students.

15        53.    Fresno City College completed the Certification required of all higher education

16  institutions to access HEERF Student Assistance.

17        54.    Once DoE's HEERF eligibility restrictions were imposed, Fresno City College

18  was limited to providing HEERF Assistance to only 8,149 students.  Fresno City College will

19  distribute HEERF Student Assistance grants to these students, but will reserve funding, which

20  would be available to provide to those students excluded by the HEERF eligibility requirements if

21  those restrictions are enjoined.

22        55.    Fresno City College has used and will continue to use fundraising efforts to

23  provide some relief for students excluded by the DoE's imposition of Title IV eligibility

24  criteria.  However, these alternative funding sources are not sufficient to meet the needs of

25  excluded students.

26        56.    Reedley College initially identified 7,100 students to whom it would provide

27  HEERF Student Assistance grants without regard to whether they qualify for Title IV.  On April

28  13, before DoE issued its April 21 HEERF Assistance Guidances, Reedley College accepted the

1    Certification required to access HEERF Assistance funds in reliance of the plain language in the

2    CARES Act, representations made in DoE's April 9 letter, and the language of the Certification,

3    with the expectation that it would follow this plan for broadly distributing HEERF Assistance

4    funds to its students, without regard to Title IV's eligibility limitations.

5         57.    Once the eligibility restrictions were imposed, Reedley College was not only

6    delayed by approximately two weeks in disbursing HEERF Student Assistance grants, but was

7    limited to providing HEERF Student Assistance to only 3,600 students.  It is additionally

8    conducting a manual review of all other students for FAFSA-eligibility in an attempt to assist

9    more students.  Reedley College will distribute HEERF Student Assistance to the students they

10   have identified, but will have reserve funds, which is available to provide to those students

11   excluded by the HEERF eligibility requirements if those restrictions are enjoined.

12        58.    Reedley College has used and will continue to use fundraising efforts to provide

13   some relief for students excluded by the DoE's imposition of Title IV eligibility criteria.

14   However, the alternative funding sources are not sufficient to meet the needs of excluded

15   students.

16        59.    Clovis Community College initially developed a three-tier plan through which it

17   identified approximately 6,500 students to whom it would provide HEERF Student Assistance

18   grants.  This plan would have provided support to all students without regard to whether they

19   would qualify for Title IV

20        60.    On April 16, before DoE issued its April 21 HEERF Assistance Guidances,

21   Clovis Community College accepted the Certification required to access HEERF funds in reliance

22   of the plain language in the CARES Act, representations made in DoE's April 9 letter, and the

23   language of the Certification, with the expectation that it would follow this plan for broadly

24   distributing HEERF Assistance funds to its students, without regard to Title IV's eligibility

25   limitations.

26        61.    Once the eligibility restrictions were imposed, Clovis Community College was

27   limited to providing HEERF Student Assistance to only 2,700 students.  Clovis Community

28   College will distribute HEERF Student Assistance to these students, but will have limited reserve

16

1    funding, which is available to provide to those students excluded by the HEERF eligibility

2    requirements if those restrictions are enjoined.

3         62.    Clovis Community College has used and will continue to use fundraising efforts to

4    provide some relief for students excluded by the DoE's imposition of Title IV eligibility

5    criteria.  However, these alternative funding sources are not sufficient to meet the needs of

6    excluded students.

7         63.    SCCCD's colleges have an interest in disbursing HEERF Student Assistance

8    equitably among its student body, so that its students may continue their education and SCCCD

9    may continue to fulfill its academic mission.

10                        **San Diego Community College District**

11        64.    San Diego Community College District (SDCCD) serves approximately 100,000

12   students annually.  SDCCD is a multicultural institution committed to access and success for all

13   students.  SDCCD includes three colleges: San Diego City College, Mesa College, and Miramar

14   College, and has seven campuses that provide Continuing Education.  SDCCD offers associate

15   degrees and career technical certificates, as well as a bachelor's degree in Health Information

16   Management.  SDCCD and its graduates have a combined economic benefit to its region of $5.5

17   billion annually and 98 percent of the District's students remain in the region after completing

18   their education.  Within SDCCD's colleges, approximately 69 percent of students enrolled in

19   SDCCD are non-white; 39 percent are Latinx.  Twenty-eight percent are first generation college

20   students.  Over half of SDCCD's students report income of less than $33,000 a year, with at least

21   17 percent reporting less than $3,000 a year.  In the Continuing Education program,

22   approximately 61 percent are non-white; 25 percent identified as Latinx or Mexican; and 34

23   percent have a primary language other than English.  Seventy-six percent of Continuing

24   Education students report income less than $33,000, 46 percent report less than $3,000 and 37

25   percent record an income of zero.

26        65.    Based on the statutory formula, $13.7 million in HEERF Assistance funding is

27   allocated to SDCCD's colleges, with a minimum allocation of $6.87 million for students.  In

28   accordance with the text of the CARES Act and the initial letter guidance issued by the DoE on

April 9, SDCCD developed a plan for its three colleges and Continuing Education program to distribute HEERF Student Assistance grants to a range of students, specifically including students enrolled in no-credit continuing education programs, as well as undocumented and DACA students.

66.     After SDCCD decided on an allocation plan for HEERF Assistance, it became aware of DoE's April 21 HEERF Assistance Guidances imposing new eligibility restrictions on students' access to HEERF Student Assistance, which caused confusion in the District.  As a result of this change, SDCCD colleges will be unable to disburse HEERF student emergency assistance to many of its most impacted students.

67.     SDCCD's colleges submitted the Certification required to obtain their shares of HEERF Assistance funds while attempting to understand the impact of DoE's April 21 HEERF Assistance Guidances on their plans for disbursing student emergency assistance.

68.     SDCCD and its colleges have used and will continue to use fundraising efforts to provide some relief for students excluded by the DoE's imposition of Title IV eligibility criteria. Because these alternative funding sources are not sufficient to meet the needs of excluded students, SDCCD colleges will set aside a portion of their HEERF Student Assistance funds while SDCCD seeks immediate relief from DoE's HEERF eligibility restrictions through this litigation.

69.     Conditions related to the novel coronavirus have negatively impacted students' ability to participate in their courses.  SDCCD's colleges and programs have seen increased withdrawals compared to last year.  SDCCD fears that its inability to assist all of its students will result in more of the excluded students dis-enrolling, which will in turn impact SDCCD's revenues.

70.     SDCCD has an interest in disbursing HEERF Assistance equitably among its student body, so that its students may continue their education and SDCCD may continue to fulfill its academic mission.

### Defendants

71.     Defendant DoE is an executive department of the United States of America

pursuant to 5 U.S.C. § 101, a federal agency within the meaning of 28 U.S.C. § 2671, and engages in agency action within the meaning of 5 U.S.C. § 702.  DoE is responsible for administering the HEERF.

72.     Defendant Betsy DeVos is the Secretary of the Department of Education.  She is sued in her official capacity pursuant to 5 U.S.C. § 702.  Secretary DeVos is required to distribute HEERF Assistance in accordance with the CARES Act.

**FACTUAL ALLEGATIONS**

**I.     THE COVID-19 PANDEMIC HAS CAUSED AN IMMEDIATE NEED FOR ADDITIONAL FINANCIAL ASSISTANCE FOR THE DISTRICT'S DIVERSE STUDENT BODY**

73.     COVID-19 is a public health emergency that has caused devastating impacts on all aspects of everyday life.  Every facet of daily American life has been disrupted.  Our country's educational institutions have had to respond urgently to the crisis and take drastic measures to protect the health and safety of their students and staff.  Colleges and universities throughout the country, including in California, have closed their campuses and shifted to remote learning.  More than 4,000 institutions of higher education nationwide have as of this date been impacted and over 25 million students are affected by COVID-19.[6]

74.     Like other educational institutions, all of the California community colleges have transitioned to online delivery or have implemented social distancing guidelines for services that cannot be provided online.  The Chancellor's Office and the community colleges have made significant efforts to address the severe disruptions experienced by students to enable them to meaningfully participate in online instruction.  For instance, the Chancellor's Office has been working with the telecommunications industry to provide internet services at no, or reduced, cost and computers for students who need them.  There remains, however, unmet technology needs.

75.     The uncertainty and economic stress caused by COVID-19 has impacted California's community college students particularly acutely.  Because of the California Community College system's commitment to free and low cost tuition, many of its students do not have resources needed to adapt to the changes the crisis has wrought.  These conditions hinder

---

[6] *Covid-19: Higher Education Resource Center*, Entangled Solutions, https://www.entangled.solutions/coronavirus-he/ (last visited May 9, 2020).

students' efforts to continue their education and put them at higher risk for dis-enrollment.

76.     Because of campus closures, students find themselves in remote learning environments in spaces that often are overcrowded and unusual classroom settings, such as shared bedrooms or family kitchens.  The shift to remote learning also presents additional costs, beginning with access to robust internet connections and laptop computers, and extending to day-to-day costs resulting from increased time at home.

77.     Away from their college communities, students are also struggling to receive the instructional support they need to learn.  Negotiating these challenges in a household that may be grappling with significant economic challenges of its own can be overwhelming for students.

78.     The sudden closures separate students from their communities—friends, faculty, and advisors who have been part of their support network.  These experiences compound the already difficult circumstances faced by low income students as they lose access to mental health resources they might have had on their campuses, without the extra finances to afford outside mental health treatment.

79.     The challenging circumstances faced by students have only been exacerbated by the promise of help first presented by the CARES Act, followed by DoE's arbitrary withdrawal of it.  DoE's actions have prevented students in dire need from accessing funds that will help them bridge the gap of unforeseen expenses as a result of the pandemic and continue their education despite significant obstacles.  These students are now in a state of uncertainty, hoping for other sources of funding to be disbursed—which, if the funds come through, may have future consequences on the quality and availability of their education (see Section IV, *infra*).

80.     Students who cannot afford to wait and cannot bridge the gap themselves may have to withdraw or dis-enroll from college altogether.  These students (and their families) have invested effort and financial resources into building their lives and potential futures.  They are being forced into momentous decisions about their educational and professional paths that will have lasting effects on their lives.

**II.  CONGRESS CREATED THE HEERF IN THE CARES ACT AS A FORMULA GRANT TO PROVIDE HIGHER EDUCATION INSTITUTIONS WITH FUNDS TO ADDRESS THEIR STUDENTS' EMERGENCY COSTS INCURRED DURING THIS PUBLIC HEALTH CRISIS**

81.     To respond to these needs, Congress appropriated $30.75 billion in the CARES Act toward the Education Stabilization Fund "to prevent, prepare for, and respond to coronavirus, domestically or internationally."  134 Stat. at 564.  These funds were designated as "emergency requirement[s]" under section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1965.  *Id.*

82.     Within the Education Stabilization Fund, Congress created a new program: the Higher Education Emergency Relief Fund (HEERF).  As part of that fund, Congress reserved approximately $12.56 billion to be allocated to colleges and universities in accordance with a specific funding formula.  *Id.* at 564, § 18001 & 566, § 18004(a)(1).  The HEERF Assistance funding formula requires the Secretary to allocate 90 percent of these funds to each higher education institution as follows: 75 percent based on its relative share of the full-time equivalent (FTE) enrollment of Pell Grant recipients and 25 percent based on its relative share of FTE enrollment of all other students, excluding in both categories students enrolled before the coronavirus emergency only in distance (online) learning.  *Id.* at 567, § 18004(a)(1).  Thus, the latter part of the formula accounts for *all* students not previously enrolled in online learning, including those students who are not eligible for financial aid under Title IV of the Higher Education Act.  Congress directed that the DoE Secretary "shall allocate" this $12.56 billion to "each institution of higher education to prevent, prepare for, and respond to coronavirus" based on this formula.  *Id.* at 566, § 18004(a)(1).

83.     The CARES Act broadly allows higher education institutions to use HEERF Assistance "to cover *any* costs associated with significant changes to the delivery of instruction due to the coronavirus," subject to two conditions.  *Id.* § 18004(c) (emphasis added).  First, the funds cannot be used for "payments to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship."  *Id.*  Second, at least 50 percent of the funds must be used "to provide emergency financial aid grants to students for expenses related to the disruption of

21

1  campus operations due to coronavirus (including eligible expenses under a student's cost of

2  attendance, such as food, housing, course materials, technology, health care, and child care)"—

3  referred to here as HEERF Student Assistance.  *Id.*  A higher education institution may use the

4  remaining funds for any purpose associated with the "significant changes to the delivery of

5  instruction due to the coronavirus," which could include reimbursement for expenses incurred by

6  the institution or additional assistance to students (HEERF Institution Assistance, with HEERF

7  Student Assistance, HEERF Assistance defined *supra* at 1).

8         84.     Other than those provisions, the CARES Act does not provide any requirements on

9  how each institution must allocate HEERF Assistance funds.  Congress spoke clearly when it

10  intended to set eligibility criteria for other programs in the CARES Act.  *See, e.g.*, *id.* at 335,

11  § 6428(d) (excluding "nonresident alien[s]" and other enumerated individuals from receiving

12  rebates).  In contrast, no provision of the CARES Act limits the eligibility of students who may

13  receive HEERF Assistance, or restricts eligibility for HEERF Assistance funds to only those

14  students who are eligible for Title IV financial aid.  The only HEERF provision mentioning Title

15  IV refers only to utilization of DoE's existing grant management system to distribute aid.  *Id.* at

16  567, § 18004(b).  Moreover, Congress treated HEERF Student Assistance differently from other

17  student financial aid funding sources in the CARES Act, which are subject to Title IV's eligibility

18  requirements.  *See id.* at 396-97, § 3504 (permitting the use of an institution's allotment under

19  Title IV to issue emergency financial aid grants to students); *see also id.* at 397, § 3505

20  (authorizing higher education institutions to use Title IV funds to make payments to affected

21  work-study students).

**III.  DOE ISSUED CONFLICTING INTERPRETATIONS ON HEERF ASSISTANCE
ELIGIBILITY, AND ULTIMATELY, RESTRICTED ELIGIBILITY IN A MANNER NOT
INTENDED BY CONGRESS**

24        85.     At first, after the CARES Act became law, DoE implemented the HEERF

25  consistent with Congress's intent.  On April 9, 2020, DoE announced the availability of $12.56

26  billion in HEERF Assistance funds, including $6.28 billion for HEERF Student Assistance

27

28

formula grants.[7]  DoE announced that the formula allocations were based on data from the

Integrated Postsecondary Education System (IPEDS) and Federal Student Aid (FSA).[8]  In

determining allocations pursuant to the portion of the formula involving non-Federal Pell Grant

recipients, DoE correctly utilized enrollment data that includes undocumented students, and did

not exclude other students who are otherwise ineligible for Title IV.[9]

86.    On that same day, the DoE Secretary wrote a letter to colleges and universities

explaining that the institutions have "significant discretion" on how to allocate the HEERF

Student Assistance to students, and that "each institution may develop its own system and process

for determining how to allocate these funds, which may include distributing the funds to *all*

students or only to students who demonstrate significant need."[10]  Relying directly on the text of

the CARES Act, the Secretary stated that "[t]he only statutory requirement is that the funds be

used to cover expenses related to the disruption of campus operations due to coronavirus

(including eligible expenses under a student's cost of attendance, such as food, housing, course

materials, technology, health care, and child care)."  *Id.*

87.    According to the letter, in order to access both the HEERF Student Assistance and

Institutions funds, each higher education institution would be required to sign and return a

Certification acknowledging and certifying that the institution will comply with the terms and

conditions of funding.  *Id.*  The Certification for the HEERF Student Assistance grants, also made

available on April 9, 2020, provides that recipient institutions must allocate the funding in a

manner "consistent with all applicable laws," but also states, consistent with Congress's intent

---

[7] *Secretary DeVos Rapidly Delivers More Than $6 Billion in Emergency Cash Grants for College Students Impacted by Coronavirus Outbreak*, U.S. Dep't of Educ. (April 9, 2020), https://tinyurl.com/y73bnxd4.

[8] *Id.*; *see also* Allocations for Section 18004(a)(1) of the CARES Act, U.S. Dep't of Educ., https://tinyurl.com/rt8hdze (last visited May 9, 2020).

[9] *See* Methodology for Calculating Allocations per Section 18004(a)(1) of the CARES Act, U.S. Dep't of Educ., https://tinyurl.com/ybvxuzu8 (identifying use of data from Integrated Postsecondary Education Data System (IPEDS) system) (last visited May 9, 2020); IPEDS Data Explorer, National Center for Education Statistics, https://tinyurl.com/yaonr6cq (aggregate IPEDS data, including category for "nonresident alien" students) (last visited May 9, 2020).

[10] Secretary DeVos Letter to College and University Presidents, U.S. Dep't of Educ. (April 9, 2020), https://tinyurl.com/y7f9tlrk (emphasis added).

1  and the Secretary's April 9 letter, that the "Secretary does not consider these individual

2  emergency financial aid grants to constitute Federal financial aid under Title IV of the HEA."[11]

3  By distinguishing HEERF Student Assistance from regular federal financial aid, the Certification

4  indicates that requirements under Title IV are inapplicable to HEERF Student Assistance.

5         88.     On or about April 21, 2020, DoE drastically changed its interpretation of the

6  CARES Act without acknowledging its prior position.  DoE published a Frequently Asked

7  Questions document on HEERF Student Assistance Guidance.[12]  This April 21 HEERF Student

8  Assistance Guidance imposes a limitation on eligibility for HEERF Student Assistance, stating,

9  "[o]nly students who are or could be eligible to participate in programs under Section 484 in Title

10  IV of the Higher Education Act of 1965, as amended (HEA), may receive emergency financial

11  aid grants." *Id.* at 4.  The April 21 HEERF Student Assistance Guidance expressly mentions that

12  only U.S. citizens or "eligible noncitizens" may receive funding.  *Id.*  A similar guidance for the

13  HEERF Institution Assistance funds issued on or about the same date (April 21 HEERF

14  Institution Assistance Guidance, with April 21 HEERF Student Assistance Guidance, the April 21

15  HEERF Assistance Guidances defined *supra* at 2), contains the same limitations on eligibility for

16  emergency financial assistance grants to students.[13]

17         89.     By seeking to incorporate Title IV, *see* 20 U.S.C. § 1091, these eligibility

18  requirements exclude, among other non-citizens, students who are DACA recipients, Temporary

19  Protected Status recipients, and asylum applicants.  DoE's eligibility requirements also exclude,

20  among others, students who: (a) are "dual-enrollment," *i.e.* still completing high school; (b) do

21  not meet academic progress standards; (c) are in default on a federal student loan or owe any

22  ―――――――――――

23     [11] Recipient's Funding Certification and Agreement: Emergency Financial Aid Grants to
Students under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, U.S. Dep't of
24  Educ., https://tinyurl.com/y8j7m8t3 (last visited May 9, 2020).

25     [12] *Higher Education Emergency Relief*, Frequently Asked Questions about the Emergency
Financial Aid Grants to Students under Section 18004 of the Coronavirus Aid, Relief, and
26  Economic Security (CARES) Act, U.S. Dep't of Educ., https://tinyurl.com/yajnjpr2 (last visited
May 9, 2020).

27     [13] *Higher Education Emergency  Relief*, Frequently Asked Questions about the
Institutional Portion of the Higher Education Emergency Relief Funds under Section 18004(a)(1)
28  and 18004(c) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, U.S. Dep't of
Educ., https://tinyurl.com/ya25f2k7 (last visited May 9, 2020)

1    refund relating to a federal student grant; or (d) are without a high school diploma, General

2    Educational Development (GED) certification or recognized equivalent or exception; or (e) are

3    enrolled only as non-credit students.  These limitations apply to citizens and non-citizens alike,

4    and likely exclude more than 800,000 community college students in California—more than half

5    of the estimated 1.5 million students enrolled in the Spring 2020 semester when the coronavirus

6    pandemic upended campus operations.  These include many students identified as economically

7    disadvantaged.  Those rendered ineligible are estimated to include: more than 150,000

8    economically disadvantaged students; more than 26,000 students with disabilities; over 12,000

9    veterans and 1,750 active duty service members; approximately 100,000 students training for

10    essential work in health services; and over 80,000 students training to be first responders.

11        90.    DoE has since reaffirmed this new position.  A spokesperson for DoE insisted that

12    "the CARES Act makes clear that this taxpayer funded relief should be targeted to U.S.

13    citizens."[14]  On April 27, the Secretary said that DACA recipients are not eligible for HEERF

14    Student Assistance because they are not eligible for financial aid under Title IV.[15]  This new

15    position cannot be reconciled with the prior DoE April 9 letter guidance on HEERF Assistance,

16    the HEERF Student Assistance Certification, DoE's HEERF formula methodology, or

17    congressional intent reflected in the CARES Act.

18    **IV.   DoE's UNLAWFUL RESTRICTIONS ON HEERF ASSISTANCE ELIGIBILITY IRREPARABLY HARM PLAINTIFFS AND STUDENTS ATTENDING COMMUNITY**

19    **COLLEGES THROUGHOUT CALIFORNIA**

20        91.    DoE's unlawful eligibility requirements unfairly and erroneously limiting which

21    students may receive emergency assistance during a global pandemic inflicts irreparable harm on

22    Plaintiffs and their students by damaging students' access to education (and their well-being) for

23    which Plaintiffs are responsible.  To mitigate this damage, Plaintiffs are required to identify

24    immediate additional resources to determine how to disburse funding to the many students

25    rendered ineligible for relief, thus depleting Plaintiffs' resources intended for other programs and

26

27    [14] Brendan Cole, *Who Is Eligible for the Emergency Financial Aid Grant From the Department of Education*, Newsweek (Apr. 24, 2020), https://tinyurl.com/y86qn83j.

28    [15] *Education Secretary Betsy Devos says CARES Act funding will go to students*, Full Court Press Now (Apr. 27, 2020), https://tinyurl.com/yaaawjtz.

services.  DoE's limitations also serve to place students already in need at a higher risk of dis-enrolling, which threatens Plaintiffs' overall budget and revenues, and undermines their academic missions and the character and diversity of their student bodies.  Failure to follow DoE's April 21 HEERF Assistance Guidances would subject Plaintiff Districts to the threat of suspension or debarment, and the attendant loss of unrelated federal funding.

92.     The DoE's confusing and conflicting guidances regarding student eligibility has placed a significant administrative burden on Plaintiff Districts' financial aid offices, in a time when staff is working remotely and without access to resources available in their offices. Plaintiff Districts have had to re-direct staff or revise plans to disburse HEERF Assistance in as equitable and expedient a manner as possible given DoE's current restrictions, which has entailed long hours and substantial resources.  Imposing the same requirements as federal student aid entails the consideration of a long list of conditions, from not having defaulted on student loan payments to making sufficient satisfactory academic progress.  While the FAFSA application contains information regarding Title IV eligibility, many students, including low-income students, have not filled out a FAFSA.  That means a manual review of each student's records is the only way to ensure that assistance is distributed to the greatest number of students possible while complying with DoE's restrictive eligibility requirements.  Many colleges do not have the time and resources to undertake this review.  This extra burden comes at a time when Plaintiffs are already devoting considerable resources to support their students' emerging needs during this crisis, including increased demand for academic counseling, mental health services, and food services.

93.     Because the HEERF Assistance eligibility restrictions imposed by DoE leave thousands of students enrolled in Plaintiff Districts' institutions without relief, Plaintiffs' staff have been working around the clock to determine how to provide ineligible students with alternative sources of emergency aid.  This has required them to consider re-directing funds from other grants or programs (such as the SEA Program, discussed *supra*) to cover the costs.  While this will address students' immediate needs, it will decrease the amount of funding available to Plaintiffs for educational programs and services overall, and in any event, these alternative

26

sources do not provide enough funds to bridge the gap caused by DoE's HEERF eligibility requirements.

94.    DoE's eligibility restrictions also increase the risk of student dis-enrollment that Plaintiffs face as a result of the COVID-19 pandemic.  And dis-enrollment has both short and long term deleterious effects.  The immediate impact of dis-enrollment will be felt in allocations of funds to community college districts for categorical programs, which total hundreds of millions of dollars, and are apportioned based solely upon fulltime equivalent attendance (FTE).  General apportionment funding is based upon a recently-enacted funding formula that includes FTE, and other metrics of success.  Dis-enrollments will adversely impact college district revenues under this formula by decreasing three-year average attendance figures, and lowering college success metrics—which are weighted toward vulnerable student populations who are most likely in need of the CARES Act emergency relief in order to remain enrolled.  Student drop-outs also affect the diversity of the student population, the robustness and quality of classroom participation, and the overall academic climate.

95.    Because Plaintiff Districts' budgets are determined, in large part, by the number of students enrolled, decreases in enrollment have a significant effect on the types of academic courses Plaintiffs are able to provide, the staff they are able to hire, and the educational programs and services they are able to offer.  It also affects the level of financial assistance Plaintiff Districts are able to provide students in the future.

96.    Before the April 21 HEERF Assistance Guidances, the four colleges in Plaintiff LRCCD, and Clovis and Reedley Colleges in Plaintiff SCCCD executed the required Certification certifying compliance with all terms and conditions of funding, in reliance of the plain text of the CARES Act, the representations made in DoE's April 9 letter, and the language of the Certification, with the intention and plan of using HEERF Assistance to be available across their entire student population, without regard to Title IV's eligibility requirements.  None of these colleges had any knowledge that they would be required to exclude HEERF Assistance from non-Title IV eligible students when they executed the Certification.

97.    Now, after the April 21 HEERF Assistance Guidances, because of the

27

1    Certification, all of the Plaintiff Districts risk future penalties and liabilities if they proceed with

2    their original plans for distributing HEERF Assistance funds.  The Recipient's Funding

3    Certification and Agreement, which all educational institutions were required to sign as a

4    condition of receiving CARES Act funding, incorporates federal regulations concerning

5    suspension and debarment, among other legal authorities.  These regulations threaten the loss of

6    not just DoE funding, but all federal funding, if they are found to have willfully failed to comply

7    with the terms of the certification.  2 C.F.R. § 180.800.  Thus, Plaintiff Districts are faced with an

8    impossible choice: deny thousands of students needed assistance in order to comply with

9    eligibility requirements imposed *after* some of their colleges signed the certification, or risk their

10   federal funding in its entirety.

11                              **FIRST CLAIM FOR RELIEF**

12                 **VIOLATION OF SEPARATION OF POWERS PRINCIPLES**

13        98.     Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

14        99.     Article I, Section I of the U.S. Constitution enumerates that "[a]ll legislative

15   Powers here granted shall be vested in [the] Congress."

16        100.    Article I, Section VIII of the U.S. Constitution vests exclusively in Congress the

17   spending power to "provide for . . . the general Welfare of the United States."

18        101.    The executive branch's authority to act "must stem either from an act of Congress

19   or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585

20   (1952).

21        102.    By imposing Title IV eligibility requirements on HEERF Assistance despite

22   Congress delegating no authority for Defendants to impose such restrictions on these funds,

23   Defendants have violated these constitutional separation of powers principles.  "Absent

24   congressional authorization, the Administration may not redistribute or withhold properly

25   appropriated funds in order to effectuate its own policy goals."  *See City & Cty. of San Francisco*

26   *v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  Nor may it impose conditions on funds

27   appropriated by Congress without authorization by Congress.  *See id.* at 1233-34.

28        103.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the

                                          28

eligibility requirements stated in DOE's April 21 HEERF Assistance Guidances are unconstitutional, and thus, should be set aside under 28 U.S.C. § 2201; and (b) an injunction prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandate under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts not subject to the eligibility requirements set forth in the April 21 HEERF Assistance Guidances.

## SECOND CLAIM FOR RELIEF

## ULTRA VIRES

104.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

105.    An agency acts *ultra vires* when it exceeds its statutory authority conferred by Congress.

106.    There is no provision of the CARES Act that imposes eligibility requirements on the students who may receive HEERF Assistance.  Further, Congress has not delegated to Defendants the authority to impose such eligibility requirements.

107.    Nothing in the CARES Act imposes Title IV's limitations on HEERF Assistance. Moreover, Congress did explicitly limit eligibility for other forms of assistance in the CARES Act, while not doing the same for HEERF Assistance.

108.    The CARES Act requires Defendants to issue HEERF Assistance funds to Plaintiff Districts based on a funding formula and without conditioning funding on Plaintiffs' agreement to impose Title IV eligibility requirements.

109.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the eligibility requirements stated in DOE's April 21 HEERF Assistance Guidances are *ultra vires* under the CARES Act, and thus, should be set aside under 28 U.S.C. § 2201; and (b) an injunction prohibiting the imposition and enforcement of those eligibility requirements. Additionally, the Plaintiff Districts are entitled to a writ of mandate under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts not subject to the eligibility requirements set forth in the April 21 HEERF Assistance Guidances.

## THIRD CLAIM FOR RELIEF

Complaint for Declaratory, Injunctive, and Mandamus Relief

1          **SPENDING CLAUSE**

2          110.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

3          111.    The Constitution affords the spending power to Congress.  U.S. Const., art. I, § 8,

4    cl. 1.  Congress's spending power is not unlimited.  When "Congress desires to condition the

5    States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to

6    exercise their choice knowingly, cognizant of the consequences of their participation," and by

7    placing conditions that are related '"to the federal interest in particular national projects or

8    programs."'  *Dole v. South Dakota*, 483 U.S. 203, 207 (1987) (internal citations omitted, brackets

9    in original).

10         112.    To the extent that Congress delegated its authority to DoE to impose its own

11   eligibility conditions on HEERF Assistance (which it has not), the April 21 HEERF Assistance

12   Guidances violate the Spending Clause of the U.S. Constitution.

13         113.    The eligibility requirements set in the April 21 HEERF Assistance Guidances

14   violate the relatedness requirement under the Spending Clause because they are contrary to

15   Congress's intent in the CARES Act to confer maximum flexibility for higher education

16   institutions to provide financial assistance in the manner that best serves each of their respective

17   student populations during this public health crisis.

18         114.    The eligibility requirements set forth in the April 21 HEERF Assistance

19   Guidances, and the required Certification, violate the unambiguous requirement under the

20   Spending Clause for three reasons.  First, Congress has not "unambiguously" imposed the

21   eligibility requirements.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

22   Second, DoE's conflicting interpretations fail to provide the Districts with the requisite notice

23   enabling them to "knowingly decide" how to use HEERF Assistance funds.  *Id.* at 24.  Third, for

24   at least six colleges in Plaintiff Districts, Defendants have surprised them with "post acceptance .

25   . . conditions" by imposing the eligibility requirements *after* those colleges executed the required

26   Certification.  *Id.* at 25.

27         115.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the

28   eligibility requirements stated in DOE's April 21 HEERF Assistance Guidances violate the

30

1    Spending Clause, and thus, should be set aside under 28 U.S.C. § 2201; and (b) an injunction

2    prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the

3    Plaintiff Districts are entitled to a writ of mandate under 28 U.S.C. § 1361 to compel Defendants

4    to issue HEERF Assistance funds to the Plaintiff Districts not subject to the eligibility

5    requirements set forth in the April 21 HEERF Assistance Guidances.

6                              **FOURTH CLAIM FOR RELIEF**

7                   **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

8               **(Constitutional Violations and Excess of Statutory Authority)**

9          116.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

10         117.    Defendant DoE is an "agency" under the APA, 5 U.S.C. § 551(1), and the April 21

11   HEERF Assistance Guidances and the imposition of HEERF eligibility requirements stated in

12   those Guidances are "agency action[s]" under the APA, *id.* § 551(13).

13         118.    The imposition of the eligibility requirements in the April 21 HEERF Assistance

14   Guidances constitute "[a]gency action[s] made reviewable by statute and final agency action for

15   which there is no other adequate remedy in a court."  *Id.* § 704.

16         119.    The APA requires that a court "hold unlawful and set aside agency action,

17   findings, and conclusion found to be . . . contrary to constitutional right, power, privilege, or

18   immunity," or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory

19   right."  *Id.* § 706(2)(B)-(C).

20         120.    As explained above, the eligibility requirements set in the April 21 HEERF

21   Assistance Guidances: (a) are unconstitutional because Defendants overstepped their powers by

22   imposing funding conditions without any authority to do so; (b) are in excess of statutory

23   authority under the CARES Act; and (c) violate the Spending Clause because they are unrelated

24   to the federal purpose of the CARES Act and/or fail the Clause's unambiguous requirement.

25         121.    For the reasons stated herein, because Defendants acted in excess of their statutory

26   authority and unconstitutionally, Plaintiffs are entitled to: (a) a declaration that the eligibility

27   requirements stated in DOE's April 21 HEERF Assistance Guidances are unlawful, and thus,

28   should be set aside under 5 U.S.C. § 706; and (b) an injunction prohibiting the imposition and

                                              31

enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts not subject to the eligibility requirements set forth in the April 21 HEERF Assistance Guidances.

## FIFTH CAUSE OF ACTION

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT

### (Arbitrary and Capricious)

122.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

123.    Defendant DoE is an "agency" under the APA, 5 U.S.C. § 551(1), and the April 21 HEERF Assistance Guidances and the imposition of HEERF eligibility requirements stated in those Guidances are "agency action[s]" under the APA, *id.* § 551(13).

124.    The imposition of eligibility requirements in the April 21 HEERF Assistance Guidances constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

125.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

126.    The eligibility requirements set forth in the April 21 HEERF Assistance Guidances are arbitrary and capricious and an abuse of discretion.  Defendants have engaged in "[u]nexplained inconsistency" in first stating that HEERF Assistance is available to all students, to only change their view without showing any awareness of its changed position. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).  In addition, Defendants have relied on factors that Congress did not intend, failed to consider an important aspect of the problem of the harm that would incur if HEERF Assistance were limited only to students eligible for Title IV financial aid, and failed to provide an explanation for the April 21 HEERF Assistance Guidances that is consistent with the evidence that is before the agency. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm. Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  Neither of the conflicting statutory interpretations offered by the Secretary and a DoE spokesperson supports the

32

agency action, which must therefore be set aside as based on an incorrect legal premise.  *See Safe Air for Everyone v. U.S. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007).

127.     For the reasons stated herein, because Defendants acted in excess of their statutory authority and unconstitutionally, Plaintiffs are entitled to: (a) a declaration that the eligibility requirements stated in DOE's April 21 HEERF Assistance Guidances are unlawful, and thus, should be set aside under 5 U.S.C. § 706; and (b) an injunction prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts not subject to the eligibility requirements set forth in the April 21 HEERF Assistance Guidances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, and grant the following relief:

1.     Issue a declaration that the eligibility requirements set in DOE's April 21 HEERF Assistance Guidances are unlawful and/or unconstitutional because they: (a) violate the separation of powers; (b) exceed congressional authority conferred to the executive branch and is ultra vires; (c) violate the Spending Clause; and (d) violates the APA;

2.     Set aside the eligibility requirements set forth in the April 21 HEERF Assistance Guidances under 28 U.S.C. § 2201 and 5 U.S.C. § 706;

3.     Permanently enjoin Defendants from imposing and enforcing the eligibility requirements identified in the April 21 HEERF Assistance Guidances or otherwise restricting eligibility for HEERF Assistance to only those who are eligible under Title IV of the Higher Education Act of 1965;

4.     Permanently enjoin Defendants from penalizing Plaintiff Districts for distributing assistance to students who are not eligible under Title IV of the Higher Education Act of 1965;

5.     Issue a writ of mandate compelling Defendants to issue the Plaintiff Districts' HEERF Assistance funds not subject to the eligibility requirements set forth in the April 21 HEERF Assistance Guidances; and

33

6.      Grant such other relief as the Court may deem just and proper.

Dated:  May 11, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
CHERYL FEINER
MICHAEL NEWMAN
Senior Assistant Attorneys General
CHRISTINE CHUANG
Supervising Deputy Attorney General
JULIA HARUMI MASS
JASLEEN SINGH
SHUBHRA SHIVPURI
JOSHUA SONDHEIMER

*/s/ Lee I. Sherman*

LEE I. SHERMAN
Deputy Attorneys General
*Attorneys for Plaintiffs Eloy Ortiz Oakley*
*and Board of Governors of the California*
*Community Colleges*

*/s/ John Shupe*

JOHN SHUPE
Lynch and Shupe, LLP
*Attorney for Plaintiff Foothill-De Anza*
*Community College District*

*/s/ JP Sherry*

JP SHERRY
General Counsel
*Attorney for Plaintiff Los Rios*
*Community College District*

*/s/ Jeffrey M. Prieto*

JEFFREY M. PRIETO
General Counsel
*Attorney for Plaintiff Los Angeles*
*Community College District*

*/s/ Matthew T. Besmer*

MATTHEW T. BESMER
General Counsel
*Attorney for Plaintiff State Center*
*Community College District*

*/s/ Ljubisa Kostic*

LJUBISA KOSTIC
General Counsel
*Attorney for Plaintiff San Diego*
*Community College District*

Complaint for Declaratory, Injunctive, and Mandamus Relief

1

**ATTESTATION OF SIGNATURES**

2

     I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

3

District of California that concurrence in the filing of this document has been obtained from each

4

signatory hereto.

5

                           */s/ Lee I. Sherman*

6

7

                           LEE I. SHERMAN
Deputy Attorney General
*Attorney for Plaintiffs Eloy Ortiz*

8

*Oakley and Board of Governors of*
*the California Community Colleges*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory, Injunctive, and Mandamus Relief