1   XAVIER BECERRA
    Attorney General of California
2   CHERYL FEINER
    MICHAEL NEWMAN
3   Senior Assistant Attorneys General
    CHRISTINE CHUANG
4   Supervising Deputy Attorney General
    JULIA HARUMI MASS
5   JASLEEN SINGH
    SHUBHRA SHIVPURI
6   JOSHUA SONDHEIMER
    LEE I. SHERMAN (SBN 272271)
7   Deputy Attorneys General
    300 S. Spring St., Suite 1702
8     Los Angeles, CA 90013
      Telephone: (213) 269-6404
9   Fax: (213) 897-7605
      E-mail: Lee.Sherman@doj.ca.gov
10  *Attorneys for Plaintiffs Eloy Ortiz Oakley and Board of
    Governors of the California Community Colleges*

11  (List of other Plaintiffs' counsel continued on next page)

12

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                     OAKLAND DIVISION

16

| | |
|---|---|
| **ELOY ORTIZ OAKLEY, in his official capacity as Chancellor of California Community Colleges et al.,** | Case No. 20-cv-03215-YGR |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| **BETSY DEVOS, in her official capacity as the United States Secretary of Education; U.S. DEPARTMENT OF EDUCATION,** | Date:        June 23, 2020<br>Time:        2:00 p.m.<br>Dept:        Courtroom 1<br>Judge:       Honorable Yvonne Gonzalez Rogers |
| Defendants. | Trial Date:  None Set<br>Action Filed: May 11, 2020 |

17

18

19

20

21

22

23

24

25

26

27

28

1    JOHN SHUPE
     Lynch and Shupe, LLP
2      316 Mid Valley Center # 180
     Carmel, CA 93923-8516
3      Telephone: (650) 579-5950
     Fax: (650) 579-0300
4      E-mail: jshupe@lynchshupelaw.com
     *Attorney for Plaintiff Foothill-De Anza Community College District*
5

    JEFFREY M. PRIETO
6    General Counsel
     Los Angeles Community College District
7      770 Wilshire Boulevard
     Los Angeles, CA 90017
8      Telephone: (213) 891-2188
     Fax: (213) 891-2138
9      E-mail: prietojm@laccd.edu
     *Attorney for Plaintiff Los Angeles Community College District*
10

    JP SHERRY
11   General Counsel
     Los Rios Community College District
12      1919 Spanos Court
     Sacramento, CA 95825
13      Telephone: (916) 568-3042
     E-mail: sherryj@losrios.edu
14    *Attorney for Plaintiff Los Rios Community College District*

15   MATTHEW T. BESMER
     General Counsel
16   State Center Community College District
     1171 Fulton Street
17      Fresno, CA 93721
     Telephone: (559) 243-7121
18      E-mail: matthew.besmer@scccd.edu
     *Attorney for Plaintiff State Center Community College District*
19

    LJUBISA KOSTIC
20   Director, Legal Services & EEO
     San Diego Community College District
21      3375 Camino del Rio South, Room 385
     San Diego, CA 92108
22      Telephone: (619) 388-6877
     Fax: (619) 388-6898
23      E-mail: lkostic@sdccd.edu
     *Attorney for Plaintiff San Diego Community College District*
24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION..........................1

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................3

I.     THE PANDEMIC'S EFFECT ON CALIFORNIA COMMUNITY COLLEGES AND STUDENTS ................................................................................................3

II.    CONGRESS ESTABLISHED HEERF TO MAKE EMERGENCY ASSISTANCE AVAILABLE TO ALL STUDENTS ...............................................................4

III.   DOE ISSUED CONFLICTING INTERPRETATIONS REGARDING HEERF ELIGIBILITY ..................................................................................5

IV.   THE IMPACT OF THE HEERF ELIGIBILITY REQUIREMENTS ON PLAINTIFFS..............6

    A.    The HEERF Eligibility Requirements Likely Exclude a Majority of California Community College Students ....................................6

    B.    The HEERF Eligibility Requirements Undermine Students' Ability to Participate in Remote Learning and Will Lead to Dis-enrollment ........8

    C.    The HEERF Eligibility Requirements Harm the California Community College System and Its Missions............................9

    D.    Plaintiff Districts Face Legal Jeopardy If They Do Not Comply with the HEERF Eligibility Requirements that Were Imposed After Some Colleges Accepted the Terms of the Grant..................................11

LEGAL STANDARD........................................................................................................11

ARGUMENT ..................................................................................................................12

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT THE HEERF ELIGIBILITY REQUIREMENTS ARE UNLAWFUL AND UNCONSTITUTIONAL ..............12

    A.    Because Congress Has Not Authorized the HEERF Eligibility Requirements, They Are Ultra Vires and Violate the Separation of Powers ...................................................................................12

        1.    The CARES Act Does Not Impose or Incorporate Title IV's Eligibility Requirements to HEERF............................................12

        2.    The CARES Act Does Not Delegate Authority to DoE to Impose the HEERF Eligibility Requirements.............................14

        3.    The HEERF Eligibility Requirements Are Inconsistent with the Grant's Formula Structure and Intended Flexibility for Higher Education Institutions .....................................15

    B.    The HEERF Eligibility Requirements Violate the APA........................17

    C.    The HEERF Eligibility Requirements Violate the Spending Clause........19

II.    PLAINTIFFS SATISFY THE REMAINING FACTORS NECESSARY TO OBTAIN A PRELIMINARY INUNCTION...................................................................22

    A.    Plaintiffs Will Suffer Irreparable Harm .................................22

    B.    The Public Interest Weighs Heavily in Favor of Provisional Relief ........24

i

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3    CONCLUSION ................................................................................................................. 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Alcoa S.S. Co. v. Fed. Maritime Com.*
348 F.2d 756 (D.C. Cir. 1965).............................................................................. 15

*All. For the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011).............................................................................. 12

*Am. Trucking Ass'ns, Inc. v. Los Angeles*
559 F.3d 1046 (9th Cir. 2009)..........................................................................22, 24

*Amalgamated Transit Union v. Skinner*
894 F.2d 1362 (D.C. Cir. 1990)............................................................................ 17

*Ariz. Dream Act Coal. v. Brewer*
855 F.3d 957 (9th Cir. 2017)................................................................................ 22

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
548 U.S. 291 (2006).............................................................................................. 21

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*
840 F.2d 701 (9th Cir. 1988)................................................................................ 22

*Chicago v. Barr*
No. 19-3290, 2020 WL 2078395 (7th Cir. Apr. 30, 2020) ..............................16, 20

*Chicago v. Sessions*
888 F.3d 272 (7th Cir. 2018)................................................................................ 17

*Clinton v. City of New York*
524 U.S. 417 (1998).............................................................................................. 16

*E. Bay Sanctuary Covenant v. Trump*
932 F.3d 742 (9th Cir. 2018)................................................................................ 25

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009)..........................................................................................17, 18

*Gen. Chem. Corp. v. United States*
817 F.2d 844 (D.C. Cir. 1987).............................................................................. 18

*In re Aiken Cty.*
725 F.3d 255 (D.C. Cir. 2013).............................................................................. 12

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001) ........................................................................... 23

iii

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

1
2

### TABLE OF AUTHORITIES
#### (continued)

Page

3       *Kollaritsch v. Mich. State Univ. Bd. of Trs.*
4           944 F.3d 613 (6th Cir. 2019) ................................................................. 20

5       *La. Pub. Serv. Comm'n v. FCC*
            476 U.S. 355 (1986) ............................................................................. 12

6       *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*
7           752 F.3d 755 (9th Cir. 2014) ................................................................. 24

8       *Los Angeles v. Barr*
            941 F.3d 931 (9th Cir. 2019) ................................................................. 15
9

10      *Los Angeles v. McLaughlin*
            865 F.2d 1084 (9th Cir. 1989) ............................................................... 15

11      *Meyer v. Nebraska*
12          262 U.S. 390 (1923) ............................................................................. 25

13      *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
            463 U.S. 29 (1983) .........................................................................17, 19
14

15      *Nat'l Parks Conservation Ass'n v. EPA*
            788 F.3d 1134 (9th Cir. 2015) ............................................................... 18

16      *Navajo Nation v. HHS*
17          325 F.3d 1133 (9th Cir. 2003) ...........................................................13, 14

18      *New York v. HHS*
            414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..................................................... 21
19

20      *Nken v. Holder*
            556 U.S. 418 (2009) ............................................................................. 24

21      *Norsworthy v. Beard*
22          87 F. Supp. 3d 1164 (N.D. Cal. 2015) ................................................... 22

23      *Pennhurst State Sch. & Hosp. v. Halderman*
            451 U.S. 1 (1981) .......................................................................12, 20, 21
24

25      *Philadelphia v. AG of the U.S.*
            916 F.3d 276 (3rd Cir. 2019) ................................................................. 15

26      *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*
27          699 F.3d 962 (7th Cir. 2012) ................................................................. 16

28

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Providence v. Barr*

4
    954 F.3d 23 (1st Cir. 2020) ........................................................................ 15

*Regents of the Univ. of Cal. v. DHS*

5
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ..................................................... 23

6

*Rodriguez v. Cuomo*

7
    953 F.2d 33 (2d Cir. 1992) ........................................................................ 16

8

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013) .................................................................. 25

9

*Rural Alaska Cmt. Action Program v. Smith*

10
    847 F.2d 535 (9th Cir. 1988) .................................................................... 16

11

*Safe Air for Everyone v. EPA*

12
    488 F.3d 1088 (9th Cir. 2007) .................................................................. 19

13

*San Francisco v. Sessions*
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ................................................20, 21

14

*San Francisco v. Trump*

15
    897 F.3d 1225 (9th Cir. 2018) ...............................................................12, 25

16

*Santa Clara v. Trump*

17
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................23, 24

18

*Santa Clara v. Trump*
    275 F. Supp. 3d 1196 (N.D. Cal. 2017) .................................................... 21

19

*SEC v. Chenery Corp.*

20
    318 U.S. 80 (1943) .................................................................................... 19

21

*South Dakota v. Dole*

22
    483 U.S. 203 (1987) .................................................................................. 19

23

*State Highway Com. v. Volpe*
    479 F.2d 1099 (8th Cir. 1973) .................................................................. 15

24

*Texas v. United States*

25
    809 F.3d 134 (5th Cir. 2015) .................................................................... 24

26

*Trump v. Int'l Refugee Assistance Project*

27
    137 S. Ct. 2080 (2017) .............................................................................. 11

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Util. Air Regulatory Grp. v. EPA*
  573 U.S. 302 (2014).............................................................................. 14

*Washington v. Trump*
  847 F.3d 1151 (9th Cir. 2017) ........................................................22, 23

*Winter v. NRDC*
  555 U.S. 7 (2008)................................................................................. 11

**FEDERAL STATUTES**

5 United States Code
  § 706.................................................................................................. 17

20 United States Code
  § 1002................................................................................................ 14
  § 1011a.............................................................................................. 13
  § 1011i............................................................................................... 13
  § 1011m............................................................................................. 13
  § 1018................................................................................................ 14
  § 1066................................................................................................ 14
  § 1072................................................................................................ 14
  § 1078................................................................................................ 14
  § 1082................................................................................................ 14
  § 1087................................................................................................ 14
  § 1091............................................................................................ 7, 13
  § 1416................................................................................................ 14

Pub. L. No. 116-136, 134 Stat. 281 (2020) ....................................... *passim*

**STATE STATUTES**

California Education Code
  § 66010.4........................................................................................... 10
  § 66251.............................................................................................. 23
  § 68130.5........................................................................................... 23
  §§ 69430-460 .................................................................................... 23
  § 70901............................................................................................... 9
  § 76396.3........................................................................................... 23
  § 78211.5........................................................................................... 23

vi

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

**FEDERAL REGULATIONS**

2 Code of Federal Regulations
    § 180.700 ................................................................................................................ 11
    § 180.800 ............................................................................................................11, 24

34 Code of Federal Regulations
    § 668.14 ................................................................................................................. 18
    § 668.32 ................................................................................................................... 7
    § 668.33 ................................................................................................................... 7

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 65 ...................................................................................................................... 1

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE THAT ON June 23, 2020, at 2:00 p.m. or as soon therefore as it may be heard before the Honorable Yvonne Gonzalez Rogers, Plaintiffs Chancellor Eloy Ortiz Oakley, the Board of Governors of the California Community Colleges, Foothill-De Anza Community College District, Los Rios Community College District, Los Angeles Community College District, State Center Community College District, and San Diego Community College District (Plaintiffs) will and do hereby move the Court pursuant to Fed. R. Civ. P. 65 for a preliminary injunction prohibiting Defendants from imposing eligibility restrictions on students who may receive Higher Education Emergency Relief Funds that were appropriated by Congress for higher education institutions in the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020). This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the declarations, the Request for Judicial Notice, and any other written or oral evidence or argument as may be presented.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiffs bring this motion to seek necessary provisional relief to stop the U.S. Department of Education's (DoE) unlawful and arbitrary attempt to exclude hundreds of thousands of community college students across the State of California, including Deferred Action for Childhood Arrival (DACA) recipients, undocumented students, and many students who are U.S. citizens or permanent residents, from receiving the emergency assistance intended by Congress to enable them to continue their education at Plaintiffs' community colleges during the COVID-19 pandemic. In the CARES Act, Congress directed DoE to disburse approximately $12.56 billion from the newly created Higher Education Emergency Relief Fund (HEERF) by a specific formula set by Congress to institutions of higher education to prevent, prepare for, and respond to the coronavirus, with $580 million allocated to community colleges throughout the State of California. *See* Req. for Jud. Notice (RJN) Exs. A-B. Congress conferred nearly unfettered flexibility for higher education institutions to use these grants for any costs related to the coronavirus, only requiring that at least half of each institution's allocation be used to provide

1

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

1   emergency relief to students for expenses related to campus disruptions caused by the pandemic.

2   At least initially, DoE recognized this congressional intent. Soon after the enactment of the

3   CARES Act, Defendants stated that: (a) each higher education institution could distribute HEERF

4   assistance to students in a manner that it sought fit to meet the needs of its students; (b) funds

5   could be distributed to *all students*; and (c) HEERF assistance would not constitute financial aid

6   under Title IV of the Higher Education Act (Title IV), hence, not limiting student eligibility.

7       Inexplicably, on April 21, Defendants changed course. In guidance documents directed to

8   higher education institutions (April 21 HEERF Guidances), DoE said that HEERF assistance is

9   subject to Title IV's eligibility limitations, and specifically stated that higher education

10  institutions cannot use these funds for non-citizens who are ineligible to receive aid under Title

11  IV. These eligibility restrictions (HEERF Eligibility Requirements) exclude, among others,

12  DACA recipients, other non-citizens with temporary immigration status, and some of the more

13  financially disadvantaged citizens and permanent resident students enrolled in California

14  community colleges. Meanwhile, Defendants' conflicting interpretations, occurring after some

15  colleges signed certifications attesting to compliance with the terms and conditions of HEERF,

16  have caused substantial confusion throughout the California community college system.

17      The HEERF Eligibility Requirements are *ultra vires* and violate separation of powers

18  principles because there is no provision of the CARES Act that imposes the HEERF Eligibility

19  Requirements or delegates authority to Defendants to impose any eligibility requirements. Rather,

20  the HEERF Eligibility Requirements are directly inconsistent with Congress's intent to: (a)

21  prescribe a formula, which accounted for *all students* not previously enrolled only in online

22  (distance) learning before the coronavirus, not just Title IV recipients, and (b) confer discretion to

23  higher education institutions to set the criteria for distributing HEERF assistance. The HEERF

24  Eligibility Requirements violate the Administrative Procedure Act (APA) because they are in

25  excess of statutory authority, violate the U.S. Constitution, and are arbitrary and capricious. The

26  HEERF Eligibility Requirements also violate the Spending Clause of the Constitution because,

27  among other reasons, Congress has not unambiguously imposed them, DoE's conflicting

28  guidances have created irreconcilable ambiguities, and the requirements were imposed only after

2

1  some colleges executed certifications to comply with the grant's terms and conditions—

2  certifications that explicitly stated that assistance would not constitute financial aid under Title

3  IV.

4       These eligibility requirements will irreparably harm Plaintiffs and their students at a time

5  when emergency relief is needed immediately. This is evident by the very nature of these funds,

6  which is to respond urgently to the fallout caused by the COVID-19 pandemic. Because of this

7  crisis, students at Plaintiff Districts, and at community colleges throughout California, are

8  incurring increased costs of living and educational expenses as a result of the sudden and

9  disruptive shift to remote learning and adjustments to living conditions. Plaintiffs' already

10  strained resources are further burdened by having to find alternative sources of assistance to

11  provide to their unlawfully excluded students, in order to remain true to the principles of equity

12  and inclusivity at the heart of the community college system. DoE's actions only serve to increase

13  the likelihood of student dis-enrollment, which harms Plaintiffs' classrooms in the short term,

14  their budgets in the long term, and their students' lives forever. Plaintiffs respectfully request that

15  the Court grant their motion to prevent this unconscionable outcome.

16  **BACKGROUND**

17  **I.   THE PANDEMIC'S EFFECT ON CALIFORNIA COMMUNITY COLLEGES AND STUDENTS**

18       The effect of COVID-19 on higher education has been swift, multifaceted, and unsparing.

19  The impact on Plaintiffs has been no exception. The communities that comprise the community

20  college system represent diversity in all respects—from their geography (ranging from the

21  metropolis of Los Angeles to the agricultural town of Reedley) to their student populations

22  (among the most diverse of all California's higher education institutions). They have all shared,

23  however, in the dramatic disruption inflicted by the virus. To keep their students and staff safe,

24  and to comply with the statewide shelter in place order effective on March 19, 2020, Plaintiffs

25  closed campuses and made virtually all of their education remote. Bennett Decl. ¶ 7; Cervantes

26  Decl. ¶ 7; Dixon Decl. ¶ 9; Cornner Decl. ¶ 8; Knox Decl. ¶ 11. The transition has required the

27  mobilization of an entire infrastructure—in addition to training faculty on remote instruction, staff

28  had to immediately procure laptop devices and increase access to broadband internet connections;

3

these efforts that are ongoing. Knox Decl. ¶ 16; Cervantes Decl. ¶ 8; Bennett Decl. ¶ 8; Goldsmith Decl. ¶¶ 12-13; Cornner Decl. ¶ 9; Dixon Decl. ¶¶ 11-12. The transition has entailed the creation of a virtual community, with Plaintiffs attempting to provide core student services that were previously provided in person, such as instructional support, counseling, and peer support, either telephonically or online. Knox Decl. ¶¶ 12-13; Dixon Decl. ¶ 17; Goldsmith Decl. ¶ 17; Cervantes Decl. ¶ 8; Cornner Decl. ¶ 9. Plaintiffs have also had to marshal resources to address their students' most basic needs, such as health care and adequate food. Bennett Decl. ¶ 9; Goldsmith Decl. ¶¶ 15, 17; Dixon Decl. ¶¶ 14, 17; Cervantes Decl. ¶ 10. This all while staff themselves are working remotely. Mandy Decl. ¶ 10; Cornner Decl. ¶ 8; Cervantes Decl. ¶ 7.

During this unprecedented crisis, the mental and physical health of community college students has deteriorated. Students have reported extremely high levels of stress and anxiety. Knox Decl. ¶¶ 17-18; Cervantes Decl. ¶ 11; Goldsmith Decl. ¶ 16; Bennett Decl. ¶ 7; Dixon Decl. ¶ 16; Cornner Decl. ¶ 12. Campus closures isolate students, preventing them from accessing the peer and other supports they need to succeed. Dixon Decl. ¶ 18. The lack of opportunity to interact with faculty, struggles with time management, and the lack of a quiet environment have inhibited students' ability to learn. *Id.* ¶¶ 13, 18; Bennett Decl. ¶ 7; Goldsmith Decl. ¶ 14; Cervantes Decl. ¶ 9; Cornner Decl. ¶ 10; Knox Decl. ¶ 14. Faculty members have reported seeing students in homes with multiple people in the background while in virtual classes. Goldsmith Decl. ¶ 14. Domestic violence incidents involving students have increased. *Id.*; Dixon Decl. ¶ 8. The number of students who are seeking mental health services has also increased, along with reports of students experiencing depression and suicidal thoughts. Goldsmith Decl. ¶ 16; *see also* Knox Decl. ¶¶ 17-18; Cervantes Decl. ¶ 11; Dixon Decl. ¶¶ 16-17; Cornner Decl. ¶ 12. These accounts indicate that even if students have been spared infection by the virus, its harms to students' well-being have been nonetheless injurious.

## II.   CONGRESS ESTABLISHED HEERF TO MAKE EMERGENCY ASSISTANCE AVAILABLE TO ALL STUDENTS

To address these needs, on March 27, Congress enacted the CARES Act, under which it appropriated $30.75 billion to DoE "to prevent, prepare for, and respond to coronavirus,

4

domestically or internationally." 134 Stat. at 564. Within that amount, Congress created a new program, the Higher Education Emergency Relief Fund (HEERF), for which Congress reserved approximately $12.56 billion to be allocated to colleges and universities in accordance with a specific funding formula. *Id.* §§ 18001(a)(1), 18004, at 564, 567-68. The HEERF formula requires that the Secretary "shall" allocate funding to each institution as follows: 75 percent based on its relative share of the full-time equivalent (FTE) enrollment of Pell Grant recipients and 25 percent based on its relative share of the FTE enrollment of all other students, excluding in both categories students enrolled only in distance (online) learning before the coronavirus emergency began. *Id.* § 18004(a)(1), at 567. Thus, the latter part of the formula accounts for all students not previously enrolled exclusively in online learning, including those students who are not eligible for financial relief under Title IV.

The CARES Act broadly allows higher education institutions to use HEERF "funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus" (HEERF Assistance), subject to two conditions. *Id.* § 18004(c), at 568. First, the funds cannot be used for "payments to contactors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship." *Id.* Second, at least 50 percent of the funds must be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)" (HEERF Student Assistance). *Id.* The remaining 50 percent (HEERF Institution Assistance), may be used for any costs related to the changes to delivery of instruction due to the coronavirus, *id.*, which could include additional student assistance.

### III.   DoE Issued Conflicting Interpretations Regarding HEERF Eligibility

Once the CARES Act became law, DoE initially implemented the HEERF consistent with Congress's intent with a series of three actions on or about April 9. First, when it allocated $12.56 billion in HEERF Assistance formula grants, including $6.28 billion in HEERF Student Assistance funds, DoE correctly utilized student enrollment data without excluding students who

5

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

are ineligible for Title IV. *See* RJN Exs. A, C. Second, the DoE Secretary wrote a guidance letter emphasizing that higher education institutions have "significant discretion" on how to allocate the HEERF Assistance funds to students, and that "each institution may develop its own system and process for determining how to allocate these funds, which may include distributing the funds to *all* students or only to students who demonstrate significant need." RJN Ex. D (emphasis added). Third, in the Recipient's Funding Certification and Agreement (Certification) each higher education institution was required to complete in order to access HEERF Student Assistance funds, DoE stated that the "Secretary does not consider these individual emergency financial aid grants to constitute Federal financial aid under Title IV of the HEA." RJN Ex. E.

On or about April 21, DoE drastically changed its interpretation of the CARES Act, with no acknowledgment of its prior position. In its guidance for HEERF Student Assistance, DoE announced that "[o]nly students who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965, as amended (HEA), may receive emergency financial aid grants," and highlighted non-citizens among other categories of students excluded. RJN Ex. G at 4. Guidance for the HEERF Institution Assistance (collectively with the HEERF Student Assistance guidance, the April 21 HEERF Guidances), contains the same eligibility limitations. RJN Ex. H. The DoE Secretary has since publicly reaffirmed DoE's new position to exclude certain students from receiving HEERF Assistance. *See* RJN Ex. I.

**IV.    THE IMPACT OF THE HEERF ELIGIBILITY REQUIREMENTS ON PLAINTIFFS**

Before April 21, 2020, Plaintiff Districts planned to distribute HEERF Assistance funding to broad segments of their population in order to stem the harms caused to their campuses as a result of the pandemic. Cornner Decl. ¶ 14; Bennett Decl. ¶¶ 11-12; Buckley Decl. ¶¶ 10-12; Goldsmith Decl. ¶¶ 19-20, 23; Rodriguez Decl. ¶¶ 6-7; Nguyen Decl. ¶ 10; Knox Decl. ¶ 20; Mandy Decl. ¶ 8. As discussed below, DoE's changed position has substantially disrupted those plans, and has caused both short-term and long-term injuries to all Plaintiffs and their students.

**A.    The HEERF Eligibility Requirements Likely Exclude a Majority of California Community College Students**

DoE's imposition of eligibility requirements for financial aid under Title IV to HEERF

6

Student Assistance excludes broad categories of students, including citizens and non-citizens alike, from the possibility of receiving emergency relief. Based on enrollment data for Spring 2019 students, a *majority* of the approximately 1.5 million California community college students enrolled at the time of campus closures during the Spring 2020 session would be ineligible for HEERF Student Assistance, *apart* from financial need. Hetts Decl. ¶ 19. These numbers include students whose parents brought them into the United States as minors—"Dreamers"—and other immigrant residents, disabled students, veterans, and active duty service members, many of whom the Chancellor's Office has identified as economically disadvantaged. *Id.* ¶ 22.

First, in connection with immigration status, Title IV excludes from eligibility all non-U.S. citizens who are not able to provide evidence from the federal government of presence in the United States for more than a temporary purpose and "the intention of becoming a citizen or permanent resident." 20 U.S.C. § 1091(a)(5); *see also* 34 C.F.R. § 668.33(a) (same).  Plaintiffs understand that DoE's application of these requirements to HEERF Student Assistance excludes broad classes of immigrant students residing in the State, including among others: (a) Dreamers with or without DACA status; (b) other students with undocumented status; (c) students with pending asylum applications; (d) students with Temporary Protected Status or Deferred Enforced Departure (DED) status; and (e) students with U-visas (relating to victims of crime who provide assistance to law enforcement agencies). Relatedly, Title IV eligibility requires possession of a valid Social Security Number, unavailable to most undocumented students other than DACA recipients. 20 U.S.C. § 1091(a)(4)(B); *see also* 34 C.F.R. § 668.32(i).

DoE's imposition of Title IV's eligibility requirements on HEERF similarly bars large numbers of other community college students from receiving HEERF Assistance. These include students who, among others: (a) do not have a high school diploma, General Education Development (GED) certificate or equivalent, or recognized exception to these requirements; (b) are enrolled only in non-credit courses; (c) have not registered with Selective Service (males 18-25); (d) are also enrolled in high school; (e) have not maintained a "C" average or above by the end of their second year; or (f) are in default on a federal student loan or owe any refund amount on a federal student grant. *See* 20 U.S.C. § 1091(a)(1)-(3), (c), (d); 34 C.F.R. § 668.32.

7

The Chancellor's Office estimates that over 800,000 students are actually or effectively precluded from obtaining HEERF Assistance. Hetts Decl. ¶ 19. Approximately 523,000 of these students are likely ineligible due to at least one Title IV eligibility restriction. *Id.* Up to 5,500 additional students will likely have declined to provide a social security number, *id.* ¶ 21, without which they are ineligible under DoE's HEERF Eligibility Requirements, RJN Ex. G at 4. An estimated 275,000 additional students who may be eligible for federal financial aid but have not submitted the required Free Application for Federal Student Aid (FAFSA) are also likely precluded, as a practical matter, from receiving HEERF Student Assistance. Hetts Decl. ¶ 20. Although DoE has suggested that those who are "eligible" to apply for federal financial aid but have not submitted a FAFSA are eligible for HEERF Student Assistance, DoE does not specify what responsibility the colleges have to validate certain information, such as Selective Service registration, or what means they have to do so. *See* RJN Exs. G, H; *see also, e.g.*, Knox Decl. ¶ 21. Staff also often lack the time and resources to make independent eligibility determinations in time to distribute the emergency relief grants, and, thus, may err on the side of denying eligibility to not run afoul of DoE's restrictive requirements. *See* Knox Decl. ¶¶ 21, 25; Cornner Decl. ¶ 16; Rodriguez Decl. ¶ 8. The Chancellor's Office estimates that the total number of California community college students excluded by these HEERF Eligibility Requirements include more than 26,000 students with disabilities, 12,000 veterans, 1,700 active duty service members, approximately 100,000 students training for essential work in health services, and over 80,000 students training to be first responders. Hetts Decl. ¶ 22.

**B.    The HEERF Eligibility Requirements Undermine Students' Ability to Participate in Remote Learning and Will Lead to Dis-enrollment**

The hundreds of thousands of students who have been rendered ineligible for critical emergency assistance by DoE's unlawful eligibility requirements are among California's most economically disadvantaged and in most need of assistance. *See id.* (at least 150,000 students estimated to be ineligible for HEERF Student Assistance are likely to qualify as economically disadvantaged). Indeed, approximately half of Plaintiff Los Rios Community College District's student body qualifies as either low-income or below the poverty line. Dixon Decl. ¶ 6. Plaintiff

8

State Center Community College District enrolls first generation college attendees, single mothers, formerly incarcerated individuals, and at-risk foster youth, many of whom live in areas where the type of internet connection needed to support remote learning does not exist. Goldsmith Decl. ¶¶ 7, 13, 24; Buckley Decl. ¶ 9. Almost twenty percent of students surveyed in Plaintiff Los Angeles Community College District still primarily access classes through their cell phones. Cornner Decl. ¶ 9. Many California community college students face severe food and housing insecurity. Knox Decl. ¶ 8; Goldsmith Decl. ¶ 15; Dixon Decl. ¶¶ 14, 15; Bennett Decl. ¶ 9; Cervantes Decl. ¶ 10; Cornner Decl. ¶ 6. These students, who chose to pursue education despite significant hardship and obstacles, would most benefit from each dollar of the emergency relief from which they have been excluded by DoE.

DoE's eligibility restrictions, thus, substantially increase the risk that many low-income students will need to dis-enroll from college. In order to support themselves and their families, many of Plaintiffs' students are employed in hourly jobs outside of school, some of which have been lost due to the economic devastation of the pandemic. *See* Bennett Decl. ¶ 7; Cervantes Decl. ¶ 10. At the same time, Plaintiffs have seen rising levels of student withdrawals. Dixon Decl. ¶ 19; Cornner Decl. ¶ 13; Knox Decl. ¶ 19; Goldsmith Decl. ¶ 18. While committed to keeping their students engaged, Plaintiffs face the real prospect that students will dis-enroll from school altogether due to financial instability, harming both the students' personal and economic opportunities, and Plaintiffs' academic mission. Hetts Decl. ¶¶ 29-31; Goldsmith Decl. ¶ 18; Dixon Decl. ¶ 20; Cornner Decl. ¶ 19; Knox Decl. ¶¶ 19, 30.

### C. The HEERF Eligibility Requirements Harm the California Community College System and Its Missions

The Board of Governors (Board) of the California Community Colleges "provide[s] leadership and direction in the continuing development of the California Community Colleges as an integral and effective element in the structure of public higher education in the state." Cal. Educ. Code § 70901(a). The community colleges' mission includes offering academic and vocational instruction at a lower division level to a diverse student population to enable those students to advance California's economic growth and global competitiveness, with a particular

9

commitment—and expenditures—to promote equity and inclusion without regard to race,

ethnicity, national origin, or immigration status. *Id.* § 66010.4(a); Hetts Decl. ¶¶ 7-8.

The Chancellor's Office estimates that community colleges in California stand to lose $60

to $80 million in enrollment fees due to the disruptions caused by the COVID-19 pandemic, *id.*

¶ 29, which makes emergency relief to students critical to blunting the impact of anticipated loss

enrollment revenue. Because 70 to 90 percent of community college funding is based on student

enrollment factors, dis-enrollment affects the types of courses, educational programs, services,

and instruction Plaintiffs are able to offer future students. *Id.* ¶ 30; *see also* Cornner Decl. ¶ 19;

Dixon Decl. ¶ 21; Knox Decl. ¶ 30. This dis-enrollment will not only cause financial harm to the

community college system at a time when its resources are strained to respond to the disruption

caused by COVID-19, but it will deprive Plaintiffs' classrooms of a robust and diverse student

body and undermine the California community college system's goal of reducing equity gaps in

education and vocational readiness. Hetts Decl. ¶¶ 29-31. The Chancellor's Office and the Board,

as well as districts and community colleges across the State, have and will continue to expend

significant administrative effort to mitigate these harms. *See, e.g., id.* ¶¶ 24-27.

In order to further the California community college system's statewide mission to

promote educational opportunity for all Californians, and to foster the investment that has already

been made to non-Title IV eligible students, community colleges will need to divert funds toward

supporting those excluded students, including state funds from the Student Equity and

Achievement (SEA) Program. *See, e.g.*, *id.* ¶¶ 32-33; Nguyen Decl. ¶ 17; Mandy Decl. ¶ 12;

Rodriguez Decl. ¶ 10. In turn, the Board has redirected, and may continue to redirect, funds that

would have been used for other educational and administrative purposes, to alleviate the impact

of diversions from SEA and other funding sources to provide direct emergency assistance to non-

Title IV eligible students. Hetts Decl. ¶ 33. Any redirection of these resources risks causing long-

term harm to the community college system. *Id.* ¶¶ 31-32. Moreover, while those and other

alternative sources will help in the short-term, they are not sufficient or predictable enough to

address the gap in relief caused by DoE's eligibility restrictions. Cornner Decl. ¶ 17; Bennett

Decl. ¶ 17; Buckley Decl. ¶ 15; Goldsmith Decl. ¶ 28; Nguyen Decl. ¶¶ 17-18; Knox Decl. ¶ 15;

10

1   Mandy Decl. ¶ 12. And, while at least one college is considering using a portion of the HEERF

2   Institution Assistance funds to supplement the HEERF Student Assistance, Bennett Decl. ¶ 16,

3   those funds are also subject to the same HEERF Eligibility Restrictions, RJN Ex. H.

### D. Plaintiff Districts Face Legal Jeopardy If They Do Not Comply with the HEERF Eligibility Requirements that Were Imposed After Some Colleges Accepted the Terms of the Grant

6       As a condition of receiving HEERF Assistance, colleges within Plaintiff Districts are

7   required to sign a Certification that subjects the signatories to liability under enumerated statutes

8   and regulations. RJN Exs. E-F. These include regulations governing Suspension and Debarment

9   from federal funding, 2 C.F.R. §§ 180.700, 180.800. The Certifications require compliance with

10  "this Certification and Agreement, its terms and conditions, and/or all relevant provisions and

11  requirements of the CARES Act or any other applicable law." RJN Exs. E ¶ 4(g), F ¶ 4(i).

12      At least eight colleges in Plaintiffs' Districts executed Certifications before the April 21

13  HEERF Guidances, and—in reliance on the text of the CARES Act, DoE's April 9 letter

14  guidance, and the language in the Certification itself—planned to make HEERF Student

15  Assistance broadly available to their student body without any DoE imposed eligibility

16  limitations. Rodriguez Decl. ¶ 7 & Exs. A-D; Bennett Decl. ¶ 13 & Ex. A; Buckley Decl. ¶ 10 &

17  Ex. A; Goldsmith Decl. ¶ 19 & Ex. A; Nguyen Decl. ¶ 10 & Ex. A. Now, however, because of the

18  HEERF Eligibility Requirements, Plaintiffs are unable to distribute HEERF Assistance to all

19  students who have been affected by campus disruptions due to the COVID-19 pandemic without

20  risking a significant loss of federal funding. *See* 2 C.F.R. § 180.800(b)(3) (stating federal agency

21  may debar participant based on "willful violation of a . . . requirement applicable to a public

22  agreement or transaction").

### LEGAL STANDARD

24       A preliminary injunction is appropriate when the plaintiffs establish that they are likely to

25  succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary

26  relief, the balance of equities tips in plaintiffs' favor, and an injunction is in the public interest.

27  *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A preliminary injunction is "often dependent as much on

28  the equities of [the] case as the substance of the legal issues it presents." *Trump v. Int'l Refugee*

11

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

*Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction," so long as the other preliminary injunction factors are met. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

## ARGUMENT

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS THAT THE *HEERF* ELIGIBILITY REQUIREMENTS ARE UNLAWFUL AND UNCONSTITUTIONAL

   A.    Because Congress Has Not Authorized the HEERF Eligibility Requirements, They Are *Ultra Vires* and Violate the Separation of Powers

The Constitution "exclusively grants the power of the purse to Congress, not the President." *San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "[B]ecause Congress has the exclusive power to spend," if Congress "has not delegated authority to the Executive to [impose funding] condition[s]," the executive branch lacks the authority to impose the conditions. *Id.* at 1233. Also, when "Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The executive branch, thus, cannot coopt Congress's spending power by imposing a condition that Congress did not unambiguously impose or delegate authority to impose. *Cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). Furthermore, the executive branch "may not decline to follow a statutory mandate . . . simply because of policy objections." *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). As discussed below, the HEERF Eligibility Requirements cannot survive under these foundational constitutional principles.

      1.    The CARES Act Does Not Impose or Incorporate Title IV's Eligibility Requirements to HEERF

There is no provision in the CARES Act that either imposes eligibility requirements on the receipt of HEERF Assistance or incorporates Title IV's eligibility requirements. Instead, the CARES Act requires that the DoE Secretary *shall* allocate funds to higher education institutions by the formula prescribed by Congress for the institutions to use "to cover *any* costs associated with significant changes to the delivery of instruction due to the coronavirus," subject to only two

12

limitations. § 18004(a)(1), (c), 134 Stat. at 567-68 (emphasis added). First, the funds must not be used for specified prohibited purposes—and there is no mention of Title IV ineligible students being a prohibited use. *Id.* § 18004(c), at 568 (emphasis added). Second, at least half of the funds must be distributed to students. *Id.* Besides those limitations, as DoE recognizes, the CARES Act provides higher education institutions with the discretion to use HEERF Assistance in any way they see fit to address the disruption of campus operations caused by coronavirus. *See* RJN Ex. D.

Congressional intent to not limit eligibility for HEERF is even more evident when compared with other programs in the CARES Act where Congress *did* set eligibility criteria or explicitly incorporated Title IV's requirements. Congress, for instance, excluded certain categories of individuals, including "nonresident alien individual[s]," from receiving recovery rebates. § 6428(d), 134 Stat. at 335. For other programs in the CARES Act, Congress incorporated Title IV's requirements in authorizing higher education institutions to use select grants authorized by Title IV to provide "emergency financial aid grants" to students with unexpected expenses as a result of the COVID-19 pandemic. *Id.* § 3504, at 396-97. Congress similarly allowed higher education institutions to make payments to affected work-study students eligible under Title IV. *Id.* § 3505, at 397. Outside of the CARES Act, Congress has also been clear when it wanted conditions to apply to all funds to higher education institutions. *See, e.g.*, 20 U.S.C. §§ 1011, 1011a, 1011i, 1011m. But the Title IV eligibility requirements that DoE seeks to impose on HEERF only apply to assistance authorized under Title IV. *See id.* § 1091(a) (only applying to the Title IV student assistance programs in that subchapter).

Congress's recognition of Title IV eligibility elsewhere in the CARES Act, § 3504, 134 Stat. at 396-97, but not with respect to HEERF, is particularly telling as it evidences an awareness of those eligibility requirements that it consciously declined to adopt for HEERF. In *Navajo Nation v. HHS*, 325 F.3d 1133 (9th Cir. 2003), by analogy, plaintiff Navajo Nation argued that the Temporary Assistance for Needy Families (TANF) block grant program was subject to the provisions surrounding self-determination contracts in the earlier enacted Indian Self-Determination and Education Assistance Act (ISDEAA). The Ninth Circuit affirmed the district court's dismissal of plaintiff's claim because the provisions in TANF referencing the ISDEAA

13

demonstrated that "Congress was fully aware of the ISDEAA," but nonetheless, "specifically chose to invoke only the fiscal provisions of the ISDEAA rather than the section allowing tribes to apply for self-determination contracts." *Id.* at 1139. Likewise, here, the "incorporation of [Title IV] was done with surgical precision," *id.* at 1140; the only HEERF provision that mentions Title IV refers just to utilizing DoE's existing grant management "systems" to distribute aid. § 18004(b), 134 Stat. at 568. The code provision describing those administrative systems, which exists outside of Title IV, does not encompass or even mention Title IV's eligibility requirements. *See* 20 U.S.C. §§ 1018(b)(1)(C)(I) (describing "systems used to administer the Federal student financial assistance programs authorized under title IV"); § 1018(b)(2)(A)(ii) & (iv), (c)(1)(C)(iv), (c)(3) (similar). The inclusion of Title IV's grant management system within section 18004, without any mention of Title IV's eligibility requirements, shows that Congress intended that the latter not be incorporated into HEERF. *See Navajo Nation*, 325 F.3d at 1139-40.

**2.    The CARES Act Does Not Delegate Authority to DoE to Impose the HEERF Eligibility Requirements**

There is also no provision in the CARES Act that delegates authority to the DoE Secretary to impose her own eligibility requirements on HEERF. Congress has been explicit when it intended to provide the DoE Secretary with authority to establish eligibility criteria[1] or impose conditions[2] for other higher education programs, grants, or loans. If Congress intended to delegate authority to the DoE Secretary to set eligibility criteria, or for that matter limit certain students from receiving HEERF Assistance, it knew how to do so, and it did not do so with respect to HEERF. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decision of vast economic and political

---

[1] *See, e.g.*, 20 U.S.C. §§ 1002(a)(2)(B)(IV) (Secretary to issue regulations "establishing criteria for the eligibility of graduate medical schools" to participate in loan programs); 1078-2(a)(3) (students or parents are subject to "such other eligibility criteria as the Secretary may establish by regulation" for loan program); 1087c(b)(2) (Secretary may require higher education institutions "meet such other eligibility requirements as the Secretary shall prescribe" for loan program).

[2] *See, e.g.*, 20 U.S.C. §§ 1066b(b)(11) (Secretary may make loans to institutions "in accordance with conditions prescribed by the Secretary"); 1072(a)(3) & (c)(7) (Secretary may make advances subject to "terms and conditions" which "the Secretary determines will best carry out the purposes of this section" or are "satisfactory to the Secretary"); 1082(a)(3) (Secretary may add conditions that "the Secretary determines to be necessary" to achieve the purposes of that part); *see also id.* § 1416(e)(1)(C) (Secretary may impose special conditions for high risk grantees).

14

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

significance.") (internal quotations omitted); *Alcoa S.S. Co. v. Fed. Maritime Com.*, 348 F.2d 756, 758 (D.C. Cir. 1965) ("Where Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power.").

### 3.   The HEERF Eligibility Requirements Are Inconsistent with the Grant's Formula Structure and Intended Flexibility for Higher Education Institutions

DoE's eligibility requirements are further inconsistent with the structure of HEERF as a formula grant intended to provide higher education institutions with nearly unfettered flexibility in how they may use the funds. "[F]ormula grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989); *see also Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (recognizing that under a formula grant, an agency "is *obliged* to distribute funding pursuant to a statutory formula") (emphasis added). The formula "circumscribe[s] [the agency's] discretion and only an analysis of the statute itself can dictate the latitude of the questioned discretion." *State Highway Com. v. Volpe*, 479 F.2d 1099, 1109 (8th Cir. 1973). Even then, the terms of the statute must be read narrowly to preserve the grant's formula structure. *See Los Angeles v. Barr*, 941 F.3d 931, 942-43 (9th Cir. 2019).

Since there is no provision granting authority to DoE to impose eligibility requirements or conditions on HEERF, DoE's authority to do so is completely restricted. *See Volpe*, 479 F.2d at 1109. What is more, DoE's actions here directly *contradict* the formula, in which Congress accounted for *all* students who were not exclusively enrolled in online distance education prior to the COVID-19 pandemic. § 18004(a)(1), 134 Stat. at 567. At the very minimum, DoE lacks the authority to effectively upend that formula by imposing eligibility requirements that would categorically exclude large segments of students that Congress expressly intended to be included as part of that formula. *See Philadelphia v. AG of the U.S.*, 916 F.3d 276, 290 (3rd Cir. 2019) (holding immigration condition added to criminal justice formula grant unlawful when it "destabilize[d] the formula nature of the grant"). Congress's "statutory formula is not so elastic; it simply does not allow," in this case, DoE, "to impose by brute force conditions" of eligibility that were not contemplated by Congress. *Providence*, 954 F.3d at 34-35. More fundamentally, reading

15

DoE's authority under the CARES Act so broadly would raise serious separation of powers concerns, as the Constitution prohibits an agency from effectively undoing the formula mandated by Congress to advance its own priorities. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (the Constitution does not authorize the President "to enact, to amend, or to repeal statutes"); *Chicago v. Barr*, No. 19-3290, 2020 WL 2078395, at *17 (7th Cir. Apr. 30, 2020) (agency could not "transform the highly-structured formula grant into one that vested total in the Attorney General to impose barriers to the grant through his choice as to which other federal laws to target as grant conditions").

Not only did Congress restrict the agency's discretion, but as DoE acknowledges, Congress provided the higher education institutions with "significant discretion" to develop [their] own system and process for determining how to allocate [HEERF] funds," RJN Ex. D; *see also* § 18004(a)(1), 134 Stat. at 567 (allowing HEERF to be used for "any costs"). In this way, Congress structured HEERF in a manner typically associated with a block grant, which "permits the states to administer the programs with minimal federal involvement and few procedural requirements." *Rural Alaska Cmt. Action Program v. Smith*, 847 F.2d 535, 536 (9th Cir. 1988); *see also Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 985 (7th Cir. 2012) ("As a general matter, flexible block grants devolve control to the states over the disbursement of federal funds."); *Rodriguez v. Cuomo*, 953 F.2d 33, 38 (2d Cir. 1992) (the "desire to allocate funds to the states in the form of block grants" was intended so that the grants "could be used efficiently in meeting the different needs of local communities").

Since Congress attached minimal "strings" on how HEERF Assistance may be used, besides for those explicit limits set by Congress, DoE's authority to add its own conditions or eligibility requirements to HEERF are limited, at most, to conditions that "the block-granted money be used for the stated purposes." *Planned Parenthood*, 699 F.3d at 984. And for grants like these that provide maximum flexibility for the grantees, it is the grant recipients, *not the federal government*, that set the eligibility requirements. *Id.* at 985 ("[I]f the federal law allows room for state-imposed eligibility conditions, then the recipient state is free to establish its own eligibility criteria"); *Cuomo*, 953 F.2d at 38 ("Consistent with the block grant nature of the . . .

16

1   program, interpretive authority was placed not as it usually is in the Secretary, but instead in the

2   states themselves."). DoE's one-size, fits all eligibility requirements, not set by Congress, cannot

3   be squared with the HEERF grant structure that allows each grant recipient "increased flexibility

4   enabling state and local officials to devise their own . . . programs to meet their unique, local

5   needs." *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1371 (D.C. Cir. 1990); *see also*

6   *Chicago v. Sessions*, 888 F.3d 272, 285 (7th Cir. 2018) (the imposition of uniform immigration

7   conditions on a formula grant was "inconsistent with the goal of the statute to support the needs

8   of law enforcement while providing flexibility to state and local governments").

9         **B.    The HEERF Eligibility Requirements Violate the APA**

10         Even if Congress had given discretion to the Secretary to impose eligibility requirements on

11   HEERF (it did not), the imposition of those requirements through the April 21 HEERF Guidances

12   must be set aside under the APA as agency actions that are "arbitrary, capricious, [and] an abuse

13   of discretion." 5 U.S.C. § 706(2)(A).[3] Under the APA, an agency must "examine the relevant data

14   and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

15   *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). DoE has failed even these minimal

16   requirements for agency action. It has offered no reasoned explanation, announced incompatible

17   explanations of student eligibility, imposed criteria unintended by Congress, failed to consider the

18   impacts of its actions, and offered a legally erroneous *post hoc* rationalization for its misconduct.

19         DoE has failed even to acknowledge its change in position regarding the HEERF Eligibility

20   Requirements, much less provide a "reasoned explanation." *FCC v. Fox Television Stations, Inc.*,

21   556 U.S. 502, 516 (2009) (where agency changes policy, "a reasoned explanation is needed for

22   disregarding facts and circumstances that . . . were engendered by the prior policy"). On April 9,

23   DoE announced that higher education institutions have "significant discretion" to develop their

24   own process of distributing HEERF Assistance "to all students," RJN Ex. D, and directed

25   institutions to sign a Certification to receive HEERF Assistance funds which clearly states "[t]he

26   Secretary does not consider these individual emergency financial aid grants to constitute Federal

27   ---

    [3] As discussed *supra* at 12-17, these eligibility requirements violate the APA also because they

28   are "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)-(C).

17

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

1   financial aid under Title IV of the HEA," RJN Ex. E. In the April 21 HEERF Guidances, DoE

2   dramatically changed its position by stripping away the flexibility promised earlier and creating

3   eligibility requirements on HEERF that are tied to Title IV. RJN Exs. G, H.

4          "An agency may not . . . depart from a prior policy *sub silentio*." *Fox Television*, 556 U.S.

5   at 515. Instead, it must "show that there are good reasons for the new policy." *Id*. Where, as here,

6   the prior policy engendered "serious reliance interests"—such as the signing of certifications

7   based on the Secretary's April 9, 2020 letter—an agency must provide "a more detailed

8   justification than what would suffice for a new policy created on a blank slate." *Id.* at 515; *see*

9   *also, e.g.*, Rodriguez Decl. ¶ 7; Buckley Decl. ¶ 10; Bennett Decl. ¶ 13, Goldsmith Decl. ¶ 19;

10  Nguyen Decl. ¶ 10 (all relying on prior DoE representations in signing Certification). The April

11  21 HEERF Guidances, however, provide no explanation or even acknowledgement of DoE's

12  change from its prior position in its April 9 letter that higher education institutions had flexibility

13  to decide how to distribute HEERF Assistance to all of their students. *See* RJN Exs. G, H.

14         Even putting aside the Secretary's April 9 letter, DoE's own documents for implementing

15  HEERF are internally inconsistent as to whether Title IV applies. As discussed above, the

16  Certification higher education institutions must sign in order to receive HEERF Student

17  Assistance clearly states that those funds are not federal financial aid under Title IV. RJN Ex. E.

18  Moreover, the same HEERF Student Assistance Guidance that makes Title IV eligibility a

19  condition for students to receive payments states that the funds received by higher education

20  institutions will not be considered Title IV revenue for Title IV reporting requirements. RJN Ex.

21  G at 4 ("Funds paid directly to institutions by the Department through the HEERF will not be

22  included as revenue for 90/10 purposes."); 34 C.F.R. § 668.14(b)(16) (requiring that any private

23  institution participating in a Title IV program receive no more than 90 percent of its revenue from

24  Title IV funds). Thus, DoE treats HEERF as governed by Title IV for purposes of student

25  eligibility but not for any other purposes. Under the APA, Defendants cannot "have it both ways."

26  *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 854 (D.C. Cir. 1987). Such "internal[]

27  inconsistent analys[es]" is the hallmark of arbitrary and capricious actions. *See Nat'l Parks*

28  *Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

18

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

DoE's imposition of the HEERF Eligibility Requirements is also "arbitrary and capricious" because it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," and "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm,* 463 U.S. at 43. In requiring students to be eligible under Title IV, Defendants entirely failed to consider "important aspect[s] of the problem," such as the burden on students and higher education institutions to establish such eligibility prior to disbursing emergency relief, as well as the impact on institutions that must independently support excluded students or risk their dis-enrollment. *Supra* at 8-11. Further, the imposition of this burden runs contrary to the evidence of Congress's intent that was before the agency. The DoE Secretary's awareness of Congress's intent was made manifest in her April 9 letter, advising college and university presidents that "the only statutory requirement is that funds be used to cover expenses related to the disruption of campus operations due to coronavirus," and that each institution "may develop its own system and process for determining how to allocate these funds." RJN D. DoE's imposition of Title IV eligibility requirements also runs counter to the formula methodology that DoE itself created for HEERF, which accounts for *all* students not previously enrolled in online (distance) learning before the COVID-19 pandemic, not just those who are eligible under Title IV. *See* RJN Ex. C.

Finally, Defendants' *post hoc* justification—that Congress imposed the eligibility requirements, RJN Ex. I—is inconsistent with the CARES Act. *Supra* at 12-17. Because "that flawed premise is fundamental" to DoE's agency action, the action must be set aside regardless of whether the action *could* have been justified as an exercise of discretion. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("an order may not stand" if based on agency's mistake of law).

### C.    The HEERF Eligibility Requirements Violate the Spending Clause

Under the Spending Clause of the U.S. Constitution, funding conditions may only be imposed if they are "unambiguous[]" and related "to the federal interest in particular . . . programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal quotations omitted). The HEERF Eligibility Requirements violate both of these criteria.

19

The HEERF Eligibility Requirements violate the Spending Clause's unambiguous requirement for three reasons. First, as discussed *supra* at 12-17, the eligibility requirements were not "unambiguously" imposed by Congress. *Pennhurst*, 451 U.S. at 17; *see also Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 629 (6th Cir. 2019) ("Congress ha[s] to identify any conditions on its funding 'unambiguously.'"). The HEERF statute "in no way suggests that the grant of…funds is 'conditioned'" on use of funds for Title IV eligible students. *Pennhurst*, 451 U.S. at 23. Congress, therefore, did not in "clear terms" authorize the imposition of the HEERF Eligibility Requirements to satisfy the Spending Clause. *Id.*; *Chicago*, 2020 WL 2078395, at *19 (Congress must "speak with a clear voice" to impose conditions under the Spending Clause).

Second, the inconsistencies between the April 9 and April 21 guidances do not "enable the [Plaintiffs] to exercise their choice knowingly, cognizant of the consequences of their participation" in HEERF. *Pennhurst*, 451 U.S. at 17. While at first, DoE said that colleges can make HEERF funds available to "all" students and that the funds are not financial aid under Title IV, RJN Exs. D, E, now DoE has said that colleges cannot make HEERF available to those students who are not eligible under Title IV, RJN Exs. G, H. These inconsistencies have created considerable confusion among community colleges throughout the State, Hetts Decl. ¶¶ 24, 27, requiring Plaintiff Districts and their colleges to reassess whether they have to change their distribution plans to comply with DoE's eligibility conditions, Knox Decl. ¶ 21; Cornner Decl. ¶ 16; Bennett Decl.¶ 14; Buckley Decl. ¶ 13; Goldsmith Decl. ¶ 24; Rodriguez Decl. ¶ 8; Nguyen Decl. ¶ 13; Mandy Decl. ¶¶ 9-10. This confusion is magnified by DoE's suggestion that students are eligible for Title IV although they have not submitted a FAFSA, RJN Ex. Ex. G at 4, because colleges lack reliable means to verify students' Title IV eligibility themselves, *see* Knox Decl. ¶ 21. DoE's "evolving interpretations" of what is required under HEERF underscore the ambiguities of DoE's imposed conditions. *San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018), *appeal docketed*, No. 18-17311 (9th Cir. Dec. 4, 2018).

Third, at least eight colleges encompassing three Plaintiff Districts have an additional Spending Clause claim that the HEERF Eligibility Requirements violate the Spending Clause's prohibition on "post acceptance" conditions. *Pennhurst*, 451 U.S. at 25. "[L]egislation enacted

20

pursuant to the spending power is much in the nature of a contract." *Id.* at 17. Like with contracts, grant recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As such, the federal government cannot "surpris[e]" grant recipients with funding conditions after acceptance. *Pennhurst*, 451 U.S. at 25. That is exactly what DoE has done here. It announced that HEERF Assistance was available to all students, RJN Ex. D, and asked colleges to sign certifications that expressly stated that HEERF *did not* "constitute Federal financial under Title IV of the HEA," RJN Ex. E. At least eight colleges in Plaintiff Districts signed those certifications in reliance of the prior representations made by DoE. Rodriguez Decl. ¶ 7; Bennett Decl. ¶ 13; Buckley Decl. ¶ 10; Goldsmith Decl. ¶ 19; Nguyen Decl. ¶ 10. Only after doing so, did Defendants release the April 21 HEERF Guidances that imposed the restrictive eligibility requirements. RJN Exs. G, H. Those colleges "had no way to know at the time [they] accepted such funds" that DoE would later condition HEERF on Title IV's eligibility requirements. *New York v. HHS*, 414 F. Supp. 3d 475, 568 (S.D.N.Y. 2019) *appeal docketed*, No. 20-32 (2nd Cir. Jan. 3, 2020). Under *Pennhurst* and basic contract principles, DoE's bait and switch is invalid under the Spending Clause. *See id.*

Separately, the HEERF Eligibility Requirements violate the Spending Clause's relatedness requirement because they do not have any "nexus," to HEERF's purpose to allow higher education institutions to cover any costs associated with the disruption of student learning due to the COVID-19 pandemic. *Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1214 (N.D. Cal. 2017), *aff'd in part, vacated in part for unrelated reasons, remanded sub. nom, San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); § 18004(a)(1), (c), 134 Stat. at 567-68. Instead, the eligibility requirements are directly inconsistent with the purpose of HEERF, which is to provide flexibility to higher education institutions to distribute assistance to their students as they deem fit to respond to this emergency. *Supra* at 15-17; RJN Ex. D; *see also San Francisco*, 349 F. Supp. 3d at 959 (immigration requirements were unrelated to grant's purpose to provide flexibility to the states through formula grants).

21

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

**II.** **PLAINTIFFS SATISFY THE REMAINING FACTORS NECESSARY TO OBTAIN A PRELIMINARY INJUNCTION**

    **A.**    **Plaintiffs Will Suffer Irreparable Harm**

The HEERF Eligibility Requirements will have an immediate and detrimental impact on Plaintiffs' academic missions, commitment to serving all student populations, and limited financial resources at a time when students and staff are experiencing unprecedented disruptions as a result of the COVID-19 pandemic. Plaintiffs have a strong interest in the well-being of their students, who are undeniably harmed by DoE's HEERF Eligibility Requirements. *See Washington v. Trump*, 847 F.3d 1151, 1159, 1169 (9th Cir. 2017) (states suffered irreparable injuries due, in part, to injuries to university students stemming from a ban restricting foreign nationals from seven countries from entering the United States).

DoE's unlawful actions have only caused fear, anxiety, depression, and stress for students already facing significant food, housing, and economic insecurities. *See, e.g.*, Dixon Decl. ¶¶ 8, 25; Cornner Decl. ¶¶ 6, 10-12. These emotional and psychological injuries constitute irreparable harm. *See, e.g.*, *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015). DACA recipients and students below the poverty line are among those most harmed by DoE's eligibility restrictions. Dixon Decl. ¶¶ 6, 25; Goldsmith Decl. ¶ 24; Buckley Decl. ¶ 9. DoE's actions will likely lead to a loss of enrollment of non-Title IV eligible students unable to continue their education, which will harm these vulnerable students' opportunities and long-term success. Hetts Decl. ¶¶ 29-31; Knox Decl. ¶¶ 19, 30; Dixon Decl. ¶ 20; Cornner Decl. ¶ 19. This "loss of opportunity to pursue one's chosen profession constitutes irreparable harm," and is only made worse by "young age and fragile economic status." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). Thus, the unlawful conditions imposed by the Guidances threaten to turn the existing achievement gap for the disproportionately economically disadvantaged students who comprise much of Plaintiffs' student body into an insurmountable chasm. Goldsmith Decl. ¶ 26.

Defendants' "constitutional violation alone, coupled with the damages incurred," from loss of enrollment revenue and potential future funding also "suffice to show irreparable harm." *Am.*

22

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

1   *Trucking Ass'ns, Inc. v. Los Angeles*, 559 F.3d 1046, 1058-59 (9th Cir. 2009). The scope of this

2   dis-enrollment, likely substantial, exacerbates "budget uncertainty" as Districts are left unsure of

3   their ability to offer the same number and variety of classes, educational programs and student

4   support services for the next school year. Knox Decl. ¶ 30, Cornner Decl. ¶ 19, Bennett Decl.

5   ¶ 10, Rodriguez Decl. ¶ 10; Sullivan Decl. ¶ 9; *see Santa Clara v. Trump*, 250 F. Supp. 3d 497,

6   537 (N.D. Cal. 2017) (federal executive order interfering with counties' ability to budget, plan for

7   the future, and properly serve their residents constituted a basis for irreparable harm). The injury

8   to Plaintiffs' investment in their students and their educational missions to serve as an accessible

9   low-cost higher education option for the diverse range of students is also irreparable. *See, e.g.*,

10  Hetts Decl. ¶ 35; *see also Washington*, 847 F.3d at 1159, 1168-69 (injuries that harmed "teaching

11  and research missions" of universities constituted substantial and irreparable injuries); *Regents of

12  the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1046 (N.D. Cal. 2018) (university and entity

13  plaintiffs "demonstrated that they face irreparable harm as they begin to lose valuable students . . .

14  in whom they have invested" and harm to their "organization interests" from DACA rescission).

15      Additionally, injuries to "sovereign interests and public policies" are irreparable. *Kansas

16  v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). The California Legislature has established

17  policies designed to make the community college system accessible to all students in California.

18  *See, e.g.*, Cal. Educ. Code §§ 66251 (affording all persons "equal rights and opportunities in the

19  postsecondary educational institutions of the state"), 68130.5 (exempting students from paying

20  nonresident tuition at community colleges based on in-state educational attendance rather than

21  residence or immigration status), 78211.5 (providing effective core matriculation services "to

22  increase California community college student access"). California has created programs to

23  provide financial aid to non-Title IV eligible students, including DACA recipients, reflecting their

24  commitment to provide an equal access to education for those individuals. *See, e.g.*, *id.* §§ 69430-

25  460 (provisions surrounding Cal Grant financial aid), 76396.3 (California College Promise

26  Program waives some or all fees for first-time community college students enrolled fulltime,

27  including Dreamers). Those policies are undermined if non-Title IV eligible students are unable

28  to continue enrollment due to the disruption caused by the COVID-19 pandemic, in conjunction

23

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

with a lack of relief available to them by DoE to address that disruption.

In order to try to cover the gap caused by DoE's eligibility restrictions and mitigate the harm to the community colleges' mission and interests due to loss of enrollment, Plaintiffs will have to strain limited resources, causing additional irreparable harm to Plaintiffs. *See*, *e.g.*, Hetts Decl. ¶¶ 31-35; Rodriguez Decl. ¶ 10; Cornner Decl. ¶¶ 13, 19; *see also Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (impact on state's resources caused by federal program enabling certain immigrants to obtain drivers' licenses constituted irreparable harm); *Santa Clara*, 250 F. Supp. 3d at 537 (federal executive order requiring counties to take steps to mitigate the risk of losing millions of dollars in federal funding, which included placing funds in reserve and making cuts to services, constituted irreparable harm). That redirection of resources is insufficient to provide non-Title IV eligible students with the relief that they would have been provided but for DoE's eligibility restrictions. *See*, *e.g.*, Rodriguez Decl. ¶ 10; Mandy Decl. ¶ 12. Besides, the redirection will strip funds away from other community college priorities to reduce equity and achievement gaps among traditionally underrepresented student groups. Hetts Decl. ¶¶ 32-33, 35; Nguyen Decl. ¶ 18; Mandy Decl. ¶ 12. Alternatively, if the Districts decide to provide assistance to non-Title IV eligible students in defiance of the HEERF Certification, they face legal jeopardy, including but not limited to, the debarment of receiving *all* federal funds. 2 C.F.R. § 180.800. Whatever choice Plaintiffs make, they will be harmed. *See Am. Trucking Ass'ns*, 559 F.3d at 1057-58 (a party faces an irreparable injury when it is harmed no matter what choice it makes).

**B.    The Public Interest Weighs Heavily in Favor of Provisional Relief**

The balance of the equities and the public interest merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 766 (9th Cir. 2014). The public interest in responding to the COVID-19 pandemic weighs overwhelmingly in favor of an injunction here. As discussed *supra* at 3-4, the challenges caused by the pandemic have contributed to heightened levels of stress and anxiety in California community college students who were already struggling

24

1  to meet their everyday needs, some of whom are living at or below the federal poverty line.

2  Congress specifically responded to this crisis by making HEERF Assistance available to all

3  students to mitigate the disruption that the pandemic has caused to these students' education and

4  lives. *See supra* at 4-5. An injunction is needed to preserve this congressional intent, as the

5  "public . . . has an interest in ensuring that statutes enacted by their representatives are not

6  imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir.

7  2018) (quotations omitted); *see also San Francisco*, 897 F.3d at 1244 (upholding injunction

8  against imposition of immigration conditions on federal grants because "the public interest cannot

9  be disserved by an injunction that brings clarity to all parties and to citizens dependent on public

10  services").

11       Supporting students' continued education is also in the public interest. *Meyer v. Nebraska*,

12  262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition

13  of knowledge as matters of supreme importance which should be diligently promoted."). Lack of

14  access to HEERF Student Assistance at this critical time leaves students in need of financial relief

15  with the difficult choice of having to drop out of school, resulting in overall lost economic

16  opportunity. Hetts Decl. ¶¶ 29-31; Dixon Decl. ¶ 20; Cornner Decl. ¶ 13.

17       Conversely, Defendants "cannot suffer harm from an injunction that merely ends an

18  unlawful practice . . . ." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). In fact, an

19  injunction here would only require DoE to implement HEERF in the manner that it intended

20  originally—making assistance available for all students, providing flexibility to higher education

21  institutions to distribute funds, and treating HEERF differently than Title IV. RJN Exs. D, E.

22       COVID-19 does not differentiate between those students who are eligible or ineligible for

23  particular federal student assistance; the DoE should not meet such a sweeping public health

24  crisis by imposing an unlawful and arbitrary limitation on assistance for students at a time they

25  need it most.

26                                    **CONCLUSION**

27       For the foregoing reasons, Plaintiffs request this Court grant their Motion.

28

25

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)

| | |
|---|---|
| 1 | Dated:  May 13, 2020 | Respectfully Submitted, |

Dated:  May 13, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
CHERYL FEINER
MICHAEL NEWMAN
Senior Assistant Attorneys General
CHRISTINE CHUANG
Supervising Deputy Attorney General
JULIA HARUMI MASS
JASLEEN SINGH
SHUBHRA SHIVPURI
JOSHUA SONDHEIMER

*/s/ Lee I. Sherman*

LEE I. SHERMAN
Deputy Attorneys General
*Attorneys for Plaintiffs Eloy Ortiz Oakley
and Board of Governors of the California
Community Colleges*

*/s/ John Shupe*

JOHN SHUPE
Lynch and Shupe, LLP
*Attorney for Plaintiff Foothill-De Anza
Community College District*

*/s/ JP Sherry*

JP SHERRY
General Counsel
*Attorney for Plaintiff Los Rios
Community College District*

*/s/ Jeffrey M. Prieto*

JEFFREY M. PRIETO
General Counsel
*Attorney for Plaintiff Los Angeles
Community College District*

*/s/ Matthew T. Besmer*

MATTHEW T. BESMER
General Counsel
*Attorney for Plaintiff State Center
Community College District*

*/s/ Ljubisa Kostic*

LJUBISA KOSTIC
Director, Legal Services & EEO
*Attorney for Plaintiff San Diego
Community College District*

26

1

**ATTESTATION OF SIGNATURES**

2

   I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

3

District of California that concurrence in the filing of this document has been obtained from each

4

signatory hereto.

5

                                            */s/ Lee I. Sherman*

6

                                            LEE I. SHERMAN
7                                            Deputy Attorney General
                                            *Attorney for Plaintiffs Eloy Ortiz*
8                                            *Oakley and Board of Governors of*
                                            *the California Community Colleges*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pls.' Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (20-cv-03215-YGR)