JOSEPH H. HUNT
Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch
KATHRYN L. WYER (Utah Bar No. 9846)
M. ANDREW ZEE (California Bar No. 272510)
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| ELOY ORTIZ OAKLEY, *et al*., | Case No. 4:20-cv-3215-YGR |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| BETSY DEVOS, *et al.,* | |
| Defendants. | Date:   June 9, 2020 |
| | Time:  2:00 p.m. |
| | Dept:  Courtroom 1 |
| | Judge: Hon. Yvonne Gonzalez Rogers |

1

## STATEMENT OF THE ISSUES

2

3   Although Plaintiffs' motion for preliminary injunction did not contain a statement of the

4   issues, Defendants submit that the below issues are among those the Court may need to address:

5

6   • Whether Plaintiffs may obtain emergency equitable relief to enjoin the
      Department of Education from enforcing non-binding guidance that the
      Department has already committed not to enforce;

7

8   • Whether the prohibition in 8 U.S.C. § 1611 on certain non-citizens
      receiving any Federal public benefit applies to grants from the Higher
      Education Emergency Relief Fund appropriated by Congress in the
      CARES Act;

9

10  • Whether the Department is authorized to interpret the provisions of the
      CARES Act that it administers;

11

12  • Whether the Department's non-binding interpretation of 18004(c) of the
      CARES Act violates the Administrative Procedure Act; and

13

14  • Whether Plaintiffs have established a likelihood of irreparable harm absent
      an injunction.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:20-cv-3215-YGR

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF ISSUES ................................................................................................. ii

TABLE OF AUTHORITIES .............................................................................................. iv

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................3

    I.      STATUTORY BACKGROUND.......................................................................3

          A.    Title IV of the Higher Education Act ......................................................3

          B.    The CARES Act .......................................................................................4

    II.     THE DEPARTMENT'S IMPLEMENTATION OF § 18004 THUS FAR .............5

    III.    PROCEDURAL HISTORY .............................................................................8

ARGUMENT.......................................................................................................................9

    I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ..................9

          A.    Plaintiffs' Challenge to the Guidance Is Not Ripe for Adjudication, Nor Is the Guidance Final Agency Action Subject to APA Review ................ 9

          B.    Plaintiffs' Contention That Certain Non-Citizens Are Eligible for HEERF Funding Is Unlikely To Succeed ............................................... 13

          C.    Plaintiffs Are Unlikely To Succeed on Their APA Claims .................... 15

                1.    The Department Acted Within Its Authority in Issuing the Guidance ...................................................................................... 16

                2.    The Guidance Is Not Arbitrary or Capricious ............................. 18

          D.    Plaintiffs' Constitutional Claims Are Unlikely To Succeed ................... 21

    II.     PLAINTIFFS HAVE NOT ESTABLISHED THAT IRREPARABLE HARM IS LIKELY IN THE ABSENCE OF AN INJUNCTION .................................... 23

    III.    THE REMAINING EQUITABLE FACTORS WEIGH AGAINST PLAINTIFFS ............................................................................................... 24

CONCLUSION.................................................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>CASES</u>

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967) ...............................................................10

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ......................23, 24

*Ariz. Libertarian Party v. Reagan*, 798 F.3d 723 (9th Cir. 2015) ....................................6

*Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770 (9th Cir. 2000) ("*AAMC*") ......10, 11, 12

*Barnes v. Berryhill*, 895 F.3d 702 (9th Cir. 2018) .......................................................21

*Basiente v. Glickman*, 242 F.3d 1137 (9th Cir. 2001) ................................................14

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................10, 11

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ................................23

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701 (9th Cir. 1988) ...............24

*Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D. Va. 2017),
     *aff'd in part, vacated in part*, 896 F.3d 615 (4th Cir. 2018) ...............................13

*Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10 (1993) ..................................................14

*City & Cty. of S.F. v. Sessions*, 349 F. Supp. 3d 924 (N.D. Cal. 2018) ........................22

*City & Cty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ......................................21

*City of L.A. v. Barr*, 941 F.3d 931 (9th Cir. 2019) ...............................................17, 18

*City of L.A. v. McLaughlin*, 865 F.2d 1084 (9th Cir. 1989)........................................17

*Ctr. for Biological Diversity v. Esper*, --- F.3d ---, 2020 WL 2182175 (9th Cir. 2020) ..............21

*Dep't of Revenue v. ACF Indus.*, 510 U.S. 332 (1994) ...............................................18

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ...............................24

*DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9 (D.D.C. 2014) ..........................11

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .......................................................11

*Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010) ....................13

*Ill. Nat'l Guard v. FLRA*, 854 F.2d 1396 (D.C. Cir. 1988) ...................................14, 15

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ..........................................................21

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ...............................................9

*Ledezma-Galicia v. Holder*, 636 F.3d 1059 (9th Cir. 2010) ......................................15

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ................................................9

*Mashiri v. Dep't of Educ.*, 724 F.3d 1028 (9th Cir. 2013) .......................................14

*Munaf v. Geren*, 553 U.S. 674 (2008) ...........................................................9

*N.J. Air Nat'l Guard v. FLRA*, 677 F.2d 276 (3d Cir. 1982) .................................14, 15

*Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660 (9th Cir. 1998) ...............................10

*NRDC v. EPA*, 706 F.3d 428 (D.C. Cir. 2013) ...................................................11

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) .................................22

*Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012) ............................................14

*Price v. Stevedoring Servs.*, 697 F.3d 820 (9th Cir. 2012) (en banc) ...........................21

*Rent–A–Ctr., Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) .......23

*Rural Alaska Cmty. Action Program v. Smith*, 847 F.2d 535 (9th Cir. 1988) ......................17

*SEC v. Morgan, Lewis & Bockius*, 209 F.2d 44 (3d Cir. 1953) ..................................15

*Sierra Club v. Trump*, 379 F. Supp. 3d 883 (N.D. Cal. 2019),
    *appeal filed,* No. 19-16102 (9th Cir. May 29, 2019) ...................................23, 24

*Skidmore v. Swift*, 323 U.S. 134 (1944) ........................................................21

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
    --- F.3d ---, 2020 WL 2464926 (9th Cir. 2020) ..........................................12

*State Hwy. Comm'n v. Volpe*, 479 F.2d 1099 (8th Cir. 1973) ...................................17

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ......................................11

*United States v. Novak*, 476 F.3d 1041 (9th Cir. 2007) .........................................14

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) .........................................................9, 23

**STATUTES**

Pub. L. No. 104-193, 110 Stat. 2260 ........................................................................................13

Pub. L. 105–33, 111 Stat. 638 ...................................................................................................15

Pub. L. 105–306, 112 Stat. 2926.................................................................................................15

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),
    Pub. L. No. 116-136, 134 Stat. 281 (2020) ............................................................ *passim*

CARES Act § 3504 ................................................................................................................18, 19

CARES Act §§ 18001-18004 .........................................................................................................4

CARES Act § 18004 ........................................................................................................... *passim*

CARES Act § 18007 ......................................................................................................................5

Title IV of the Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965) ........1, 3

Administrative Procedure Act, 5 U.S.C. §§ 701-706 ...................................................................2

5 U.S.C. § 704 ............................................................................................................................10

8 U.S.C. § 1611 .................................................................................................................. *passim*

8 U.S.C. § 1621 ...........................................................................................................................14

8 U.S.C. § 1641 ...............................................................................................................13, 14, 15

Title I of the Higher Education Act of 1965, 20 U.S.C. §§ 1001 *et seq.* ......................................5

20 U.S.C. § 1070 ...........................................................................................................................3

20 U.S.C. § 1070a ..........................................................................................................................3

20 U.S.C. §§ 1087-51 to -58 ..........................................................................................................3

20 U.S.C. §§ 1087a-1087ii .............................................................................................................3

20 U.S.C. § 1087kk .........................................................................................................................4

20 U.S.C. § 1087*ll* ...................................................................................................4, 19

20 U.S.C. § 1091 ...................................................................................................4, 7, 20

20 U.S.C. § 1094 ..........................................................................................................4

20 U.S.C. § 1221e-3 ......................................................................................................16

20 U.S.C. § 3474 ..........................................................................................................16

**LEGISLATIVE MATERIALS**

HEROES Act, H.R. 6800, § 150110(a)(1)-(2) ...................................................5, 15, 19

**EXECUTIVE & ADMINISTRATIVE MATERIALS**

U.S. Dep't of Education, *Notice of Guidance Portal*, 85 Fed. Reg. 11,056 (Feb. 26, 2020) ...6, 11

34 C.F.R. § 668.14 .....................................................................................................4, 20

34 C.F.R. § 668.28 .....................................................................................................4, 20

34 C.F.R. § 676.20 ........................................................................................................4

34 C.F.R. § 685.203 ......................................................................................................4

34 C.F.R. § 690.62 ........................................................................................................4

## **INTRODUCTION**

On March 27, 2020, in response to an unprecedented public health and economic crisis caused by the coronavirus pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). Among its many provisions, the CARES Act enlists defendants the U.S. Department of Education and Secretary of Education Betsy DeVos (collectively, "Defendants" or the "Department") to distribute several appropriations of emergency funding, including a $14.2 billion appropriation designated as the Higher Education Emergency Relief Fund ("HEERF"). Congress directed the Secretary to make HEERF funds available to eligible institutions of higher education ("IHEs") across the country. Within weeks, the Department had calculated the amount of HEERF funds to be allocated to each IHE, created participation agreements for IHEs to submit, and issued preliminary guidance on various aspects of the aid distribution process. The Department has thus done what it can to allow funding to flow as quickly as possible even though it has not yet had the opportunity to issue final, binding rules to govern this process.

Plaintiffs, a group of community college districts, together with the Chancellor and Board of Governors of California Community Colleges, focus their challenge on § 18004(c) of the CARES Act, which requires IHEs to use at least fifty percent of the funds they receive to provide "emergency financial aid grants to students." On April 21, 2020, less than a month after the CARES Act was enacted, the Department posted guidance (the "Guidance") to its Guidance Portal indicating its preliminary views on a number of issues concerning its ongoing implementation of the Act. The Guidance explained that the emergency financial aid grants contemplated by § 18004(c) are not Federal financial aid under any particular program established under Title IV of the Higher Education Act of 1965 ("HEA"), and thus, for example, do not count toward a student's annual Title IV aid limit. But the Guidance further indicated the Department's view that Congress intended to incorporate the same general criteria set forth in Title IV to identify students who are eligible to receive HEERF emergency financial aid grants.

Plaintiffs fail to establish an entitlement to emergency relief. First, Plaintiffs are unlikely to succeed on the merits. As an initial matter, Plaintiffs' claims are unripe, and the injunction

they seek is both unnecessary and unavailable. As is generally the case for Guidance Portal postings, the Guidance is non-binding, and the Department has indicated that, in the absence of a final determination issued with the force and effect of law, the Department cannot, and will not, enforce the Guidance against any IHE. Plaintiffs thus ask for a Court order that would allow them to do what they already can do—distribute the portion of HEERF funds designated for emergency financial aid grants to students in the manner they choose, subject to other applicable law. An injunction is also inappropriate because, far from being "preliminary," it would grant Plaintiffs the ultimate relief they seek in their lawsuit, and essentially set in stone Plaintiffs' interpretation of the CARES Act before the Department has the opportunity to put forth its own reasoned interpretation in a final determination. Plaintiffs also ignore that, even if the Court took the empty step of enjoining the Department from enforcing guidance that the Department has already recognized it cannot, and will not, enforce, Plaintiffs' ability to provide HEERF funds to non-citizens—a goal that they particularly emphasize—is already significantly limited by another statute, 8 U.S.C. § 1611, which prohibits ineligible non-citizens from receiving any Federal public benefit, including appropriated funds.

Despite Plaintiffs' attempt to invoke the specter of constitutional violations, their claims amount to nothing more than a challenge to the Department's interpretation of statutory language—albeit an interpretation that has not been set forth in any final agency action properly subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Contrary to Plaintiffs' claims of executive overreach, there are clear indicia in the text of § 18004(c), and elsewhere in the CARES Act, that Congress had the Title IV framework in mind when designing methods to provide supplemental emergency financial aid grants to help students manage expenses related to the disruption of campus operations. Furthermore, the Act permits institutions to provide their own share of HEERF funds to students not eligible for Title IV aid, so long as those students are not independently barred from receiving Federal benefits, notwithstanding Plaintiffs' erroneous reading to the contrary.

Plaintiffs also fail to show irreparable harm caused by the Department that their requested injunction could forestall.  Fundamentally, the harm Plaintiffs identify is attributable to the

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:20-cv-3215-YGR

2

upheaval caused by the pandemic rather than this isolated non-binding interpretation by the Department. In this circumstance, the balance of equities tips towards Defendants because an injunction would irrevocably cut short the Department's ongoing consideration of the interpretive issues surrounding HEERF funding, and instead enshrine Plaintiffs' preferred interpretation before the Department has a chance to complete its process.

Plaintiffs' request for an emergency injunction therefore should be denied.

## **BACKGROUND**

### I.    STATUTORY BACKGROUND

#### A.    Title IV of the Higher Education Act

The HEA, as amended, Pub. L. No. 89-329, 79 Stat. 1219 (1965), is a comprehensive statutory scheme under which the federal government supports eligible institutions of higher education and their students. Title IV of the HEA, devoted to student assistance, is intended "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education," including by providing for payments to States and assistance to IHEs themselves. 20 U.S.C. § 1070(a). Title IV thus includes the major federal student financial aid programs such as Pell Grants, 20 U.S.C. § 1070a; federal work-study programs, *id.* §§ 1087-51 to -58; and a system of federally-insured loans, *id.* §§ 1087a-1087ii.

Although any particular Title IV program may have specific eligibility criteria, Title IV sets forth certain general eligibility requirements for students, including that a student (1) "be enrolled or accepted for enrollment in a degree, certificate, or other program . . . leading to a recognized educational credential" at an eligible IHE and "not be enrolled in an elementary or secondary school"; (2) if presently enrolled, "be maintaining satisfactory progress in the[ir] course of study"; (3) "not owe a refund on [Title IV] grants previously received . . . or be in default on any [Title IV] loan"; (4) certify that any Title IV money received "will be used solely for expenses related to attendance or continued attendance" at their IHE, and provide their social security number; (5) be a United States citizen, national, or permanent resident, or be able to provide evidence "that he or she is in the United States for other than a temporary purpose of the

intention of becoming a citizen or permanent resident"; and (6) have repaid any funds for which the student was convicted or pled nolo contendere or guilty to a crime involving fraud. 20 U.S.C. § 1091(a). The Department uses the Free Application for Federal Student Aid ("FAFSA") to assess students' satisfaction of Title IV's eligibility criteria and to assist IHEs in calculating a student's need. *See id.* § 1090. Students filing a FAFSA must also include a statement of educational purpose, stating that any Title IV funds received "will be used solely for expenses related to attendance or continued attendance" at the IHE. *Id.* § 1090(a)(4)(A). Need is calculated by subtracting the expected family contribution, together with the amount of assistance obtained elsewhere, from a student's "cost of attendance." *Id.* § 1087kk. Title IV sets forth a detailed definition of "cost of attendance" in 20 U.S.C. § 1087*ll.*

Title IV identifies annual and cumulative caps on the amount of aid a student can receive under each Title IV program. *E.g.*, 34 C.F.R. §§ 676.20, 685.203, 690.62. Proprietary schools participating in Title IV also must demonstrate that they derive at least ten percent of their revenue from sources other than Title IV. *See id.* §§ 668.14(b)(16), 668.28. Title IV also requires participating IHEs to enter into program participation agreements with the Department, which incorporate the Department's regulations and require the IHEs to, among other things, administer students' aid applications, determine students' eligibility for specific aid programs, maintain records necessary to administer the funds, and submit reports to the Secretary as the Secretary may require. 20 U.S.C. § 1094(a).

### B.       The CARES Act

On March 27, 2020, the President signed the CARES Act into law, which Congress passed to provide an unprecedented package of emergency economic assistance and other support to help individuals and various sectors of society cope with the enormous economic and public health crises triggered by the coronavirus pandemic. Congress appropriated $30.75 billion, to remain available through September 30, 2021, for the Department to allocate among governors, elementary and secondary schools, as well as IHEs and their students. Of that amount, the Act designates approximately $14.2 billion for the HEERF, to be allocated by the Secretary to higher education. CARES Act §§ 18001-18004.

The Act sets forth a formula by which the Department is to allocate ninety percent of the HEERF funding (approximately $12.8 billion) among "institutions of higher education," within the meaning of Title I of the HEA, 20 U.S.C. §§ 1001 *et seq.* CARES Act §§ 18004(a), 18007(2).[1] Under this formula, seventy-five percent of an institution's allocation relies on its share of "full-time equivalent enrollment" ("FTE") of Federal Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(A), while twenty-five percent relies on its share of FTE of non-Pell Grant recipients who were not exclusively enrolled in distance education courses prior to the coronavirus emergency, *id.* § 18004(a)(1)(B). The Act specifies that the funds made available to each institution "shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under [HEA's] title IV." *Id.* § 18004(b).

Of particular relevance in this case, the Act requires that no less than fifty percent of HEERF funds received by an IHE under § 18004(a)(1) (the "Student Aid Portion") be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)." *Id.* § 18004(c). The Act leaves the terms "emergency financial aid grants" and "student" undefined. An IHE may use the remaining amount of its § 18004(a)(1) allocation (the "Institutional Portion") "to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus." *Id.* (identifying exceptions not relevant here).[2]

## II. THE DEPARTMENT'S IMPLEMENTATION OF § 18004 THUS FAR

Almost immediately after the CARES Act was enacted, the Department began its effort

---

[1] The Act allocates the other ten percent of HEERF funding for specific purposes. Section 18004(a)(2) designates approximately $1 billion for additional awards to IHEs for programs under Titles III and VII of the HEA. Section 18004(a)(3) designates approximately $355 million for IHEs "that the Secretary determines have the greatest unmet needs related to coronavirus."

[2] On May 15, 2020, the House of Representatives passed legislation, referred to as the "HEROES Act," that (1) would prohibit the Department from restricting a student's eligibility for HEERF funds for any reason other than "a restriction based solely on the student's enrollment at the [IHE]"; and (2) would expressly exempt HEERF funds from 8 U.S.C. § 1611's bar. *See* HEROES Act, H.R. 6800, 116th Cong. § 150110(a)(1)-(2) (2020).

to get HEERF funds to IHEs and students as quickly as possible. In order to keep IHEs and others informed of its progress, the Department designated a page on its Guidance Portal as a centralized repository of information about HEERF funding ("HEERF Guidance page").[3] As the Department indicated earlier this year, all guidance documents posted on its Guidance Portal, including those posted on the HEERF Guidance page, "lack the force and effect of law, except as authorized by law or as incorporated into a contract." *See* U.S. Dep't of Education, *Notice of Guidance Portal*, 85 Fed. Reg. 11,056 (Feb. 26, 2020).

Among the information on the HEERF Guidance page is an April 9, 2020 letter, notifying IHEs of the availability of the Student Aid Portion of their allocation and directing IHEs to sign and return a Certificate of Funding and Agreement ("Certificate") in order to access the funds. *See* Pl. Request for Judicial Notice ("RJN") [ECF 16-2] ex.D. The letter indicates that the Department had prioritized the distribution of these funds "in order to get money in the hands of students in need as quickly as possible." *Id.* at 1. The letter also recognizes that the CARES Act does not specify how the Student Aid Portion should be allocated among "students," and that IHEs therefore could distribute funds "to all students or only to students who demonstrate significant need," but that IHEs were encouraged to consider a maximum amount per student of $6,195, the annual maximum for Federal Pell grant awards. *Id.*

Through the Certificate, IHEs agree to use the Student Aid Portion of their allocation to provide emergency financial aid to students, "consistent with all applicable laws including non-discrimination laws." RJN ex.E, at 1. The Certificate encourages IHEs to exclude any distributed HEERF funds from students' expected family contributions for purposes of Title IV need calculations and also clarifies that the Department does not consider HEERF funds to constitute Federal financial aid under Title IV. *Id.* These amounts thus would not count against students' Title IV aid caps or proprietary institutions' 90/10 funding requirements. The Certificate requires periodic reports to the Secretary on how IHEs have distributed their HEERF funds. *Id.* at 2.

---

[3] *See* https://www2.ed.gov/about/offices/list/ope/caresact.html (pdf as it existed on May 25, 2020 attached hereto as ex.A). The Court may take judicial notice of such official and undisputed information posted on the Department's website. *See, e.g.*, *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015).

Also on April 9, 2020, the Department published information on how it calculated the amounts to be allocated to each eligible IHE pursuant to the formula in § 18004(a)(1). As explained in its methodology description, the Department necessarily relied on approximations for the factors specified in the statutory formula, using various combinations of past years' FTE enrollment and headcount data for IHEs in its Integrated Postsecondary Education Data System ("IPEDS") (excluding IHEs ineligible for or not participating in Title IV) together with Pell Grant Volume data provided by the Federal Student Aid office. RJN ex.C.

On April 21, 2020, the Department notified IHEs of the availability of and procedures for accessing the Institutional Portion of their § 18004(a)(1) allocation. The Department also posted to its HEERF Guidance page preliminary guidance on various HEERF-related issues in the form of Frequently Asked Questions ("FAQs"). The FAQs covered IHEs' use of the Student Aid Portion of HEERF funds to provide emergency financial aid grants to students ("Student Aid FAQs"), RJN ex.G, as well as IHEs' use of the Institutional Portion of their allocated HEERF funds ("Institutional FAQs"), RJN ex.H. These documents (the "Guidance") are the subject of Plaintiffs' lawsuit and their preliminary injunction motion. The Guidance indicates that "[o]nly students who are or could be eligible to participate in programs under Section 484 [(20 U.S.C. § 1091)] in Title IV of the [HEA], as amended . . . , may receive emergency financial aid grants." Student Aid FAQ No. 9; Institutional FAQ No. 5. The Guidance further indicates that the same Title IV eligibility requirements apply to the extent an IHE wishes to use its HEERF allocation to provide "additional emergency financial aid grants" beyond the fifty percent minimum required by § 18004(c). Institutional FAQ No. 5. Nothing in the Guidance, however, suggested that IHEs cannot use their Institutional Portion to provide other assistance, monetary or otherwise, to individuals who are ineligible for emergency financial aid grants, so long as doing so would be consistent with applicable law.

Finally, on May 21, 2020, the Department added further advisory guidance on its HEERF Guidance page that directly addresses some of the issues Plaintiffs raise in this action. The Department restated that its guidance documents, including the April 21 Guidance, "lack the force and effect of law" and "do not impose any requirements beyond those required under

applicable law and regulations." The Department further stated that, in light of the non-binding nature of its April 21 Guidance and specifically highlighting the FAQ questions described above, it "will not initiate any enforcement action based solely on these statements." The Department contrasted the Guidance with statutory requirements and prohibitions, including the terms of the CARES Act and general eligibility requirements for Federal public benefits, *see* 8 U.S.C. § 1611 (generally excluding non-qualified aliens from eligibility for "any Federal public benefit"). While reiterating that only students eligible for Title IV programs may receive emergency financial aid grants under § 18004(c), the Department "emphasize[d] that that guidance . . . does not apply to the use of HEERF institutional allocations to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus."

In sum, the Department's implementation to date of the HEERF funding directives in the CARES Act has consistently adhered to several important principles, albeit not in binding form: (1) HEERF funds do not constitute Title IV Federal financial aid and therefore do not count towards caps or limits on total Title IV aid; (2) emergency financial aid grants may be given only to students who are or could be eligible for Title IV aid; (3) IHEs may provide funds from the Institutional Portion to individuals who do not meet Title IV eligibility to cover costs associated with significant changes to the delivery of instruction; and (4) any use of HEERF funds is subject to otherwise applicable federal law. Although *the Department* has made this fourth point in non-binding guidance, applicable federal laws *themselves* are of course binding by their own terms.

## III.   PROCEDURAL HISTORY

Plaintiffs filed their complaint on May 11, 2020, seeking declaratory and injunctive relief in regard to the April 21 Guidance relating to emergency financial aid grants to students. Compl. [ECF 1]. The Complaint asserts five claims: (1) that the Department's issuance of the Guidance violates separation of powers principles, *id.* ¶¶ 99-103; (2) that the Department's issuance of the Guidance is *ultra vires*, *id.* ¶¶ 105-09; (3) that the Department's issuance of the Guidance violates the Spending Clause, *id.* ¶¶ 111-15; (4) that the Guidance should be set aside pursuant to the APA because it was issued in excess of statutory authority and in violation of the Constitution, Compl. ¶¶ 117-21; and (5) that the Guidance should be set aside pursuant to the

APA because it is arbitrary and capricious, Compl. ¶¶ 123-27.

On May 13, 2020, Plaintiffs filed a motion for preliminary injunction, seeking to enjoin the Department from "imposing eligibility restrictions on students who may receive [HEERF]" funds—a reference to the April 21 Guidance. Pl. Mot. at 1 [ECF 16]. On May 22, 2020, Defendants' counsel conferred with counsel for Plaintiffs. Counsel inquired whether, in light of the non-binding nature of the challenged Guidance and the Department's clearly stated commitment not to enforce it, Plaintiffs would be willing to withdraw their motion for preliminary injunction without prejudice to renewing it upon any subsequent action by the Department. Defendants explained to Plaintiffs that doing so would conserve the Court's and the parties' resources by avoiding the need for judicial review of a non-binding agency interpretation. Even after Defendants agreed to file a stipulation confirming the non-binding nature of the Guidance, Plaintiffs refused to withdraw their motion, claiming perceived uncertainty notwithstanding the Department's clear statement on the HEERF Guidance page.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial, difficult, and doubtful" questions). Plaintiffs fail to meet any of these requirements.

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiffs' Challenge to the Guidance Is Not Ripe for Adjudication, Nor Is the Guidance Final Agency Action Subject to APA Review

When a plaintiff challenges administrative action, courts are "reluctant" to award injunctive or declaratory relief against "administrative determinations unless the[y] arise in the

context of a controversy 'ripe' for judicial resolution." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779 (9th Cir. 2000) ("*AAMC*") (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148 (1967)) (quotation marks omitted). "The basic purpose of the ripeness doctrine 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (quoting *Abbott Labs*, 387 U.S. at 148-49). To evaluate ripeness, courts assess "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 779-80.

Similarly, to constitute "final agency action" within the meaning of § 704 of the APA, two conditions must be satisfied: "First, the action must mark the 'consummation' of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Where an action includes APA claims, the Ninth Circuit has acknowledged that the ripeness and final agency action questions are "inter-related." *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998). The challenged Guidance bears none of the hallmarks of reviewable administrative action, under principles of either ripeness (which of course applies to Plaintiffs' constitutional claims) or the APA, and Plaintiffs' claims are therefore unlikely to succeed on threshold jurisdictional grounds.

*First*, the Department has not completed its decisionmaking process and arrived at a final interpretation of § 18004(c). Instead, it has offered only preliminary guidance, which it made available as expeditiously as possible while working to distribute billions of appropriated dollars and to prioritize the multiple congressional objectives set forth in the CARES Act. What is more, the Department has explicitly stated that it *continues to consider* the issue of eligibility for HEERF emergency financial aid grants under the CARES Act and intends to take *further action* shortly." HEERF Guidance page (emphases added). It thus cannot be said to have "consummat[ed]," *Bennett*, 520 U.S. at 177-78, or "completed" its decisionmaking process,

*Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). Rather, the Guidance was issued as quickly as practicable to provide IHEs with the Department's initial views on the question of who is eligible to receive emergency financial aid grants, as it continues to develop further agency action on this question.

*Second*, the Guidance is also not fit for review because it does not have the "status of law" or otherwise demand "immediate compliance with its terms." *AAMC*, 217 F.3d at 780. And because it lacks such binding legal effect, the Guidance is not cognizable final agency action "by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Bennett*, at 177-78. To the contrary, the Department made clear, even before the April 21 Guidance was issued, that such "guidance documents lack the force and effect of law, except as authorized by law or as incorporated into a contract." 85 Fed. Reg. at 11,056. It later updated its HEERF Guidance page to reinforce this point with specific reference to all HEERF guidance documents it has made available, including the Guidance at issue here. The Ninth Circuit has explained "that even final agency rules may not be fit for review unless the rule has been concretely applied to the plaintiff." *AAMC*, 217 F.3d at 780. The court has also held unripe a challenge to an agency interpretation when "no enforcement action against plaintiffs is concrete or imminent or even threatened." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1125 (9th Cir. 2009). Here, not only has the challenged action, which is *not* a final rule, never been concretely enforced against Plaintiffs, but the Department has forsworn any intent to do so, announcing that it "will not initiate any enforcement action based solely on these statements." HEERF Guidance page.

The situation here resembles that in *NRDC v. EPA*, 706 F.3d 428, 433 (D.C. Cir. 2013), where the D.C. Circuit rejected, on final agency action grounds, a challenge to an EPA statutory interpretation that "represent[ed] EPA's preliminary views . . . which d[id] not bind the States and public as a matter of law." Reinforcing the D.C. Circuit's decision was "EPA's expressed intent to issue a final, binding notice-and-comment rule on the issue." *Id.*; *see also DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 15 (D.D.C. 2014) (agency's "subsequent

approval" of a final rule "underscores the fact" that its earlier withdrawal of FAQs on the same issue "was not a final agency action"). Given the Department's stated intent to take further action interpreting § 18004, the non-final nature of the Guidance could not be more clear.[4]

*Third*, withholding review at this juncture will not impose any hardship on the parties. The Department has confirmed that IHEs may distribute funds to non-Title IV eligible individuals from their own HEERF Institutional Portions, so long as such funds are to cover "costs associated with significant changes to the delivery of instruction due to the coronavirus," § 18004(c), and the recipient of funds is not independently barred from receiving them. HEERF Guidance page. And again, although the Guidance contains a preliminary interpretation that § 18004(c) permits emergency financial aid grants only to students eligible for Title IV programs, the Department has stated that it "will not initiate any enforcement action based solely on these statements." HEERF Guidance page. The only hardship that Plaintiffs could support is thus one that results not from the Guidance but from their own decisions to "err on the side of denying eligibility to not run afoul of DoE's restrictive requirements." Pl. Mem. 8. But Plaintiffs do so of their own volition based on a flawed understanding of what the Department has said on the matter. In any event, if the Department issues a binding interpretation of the relevant language in the CARES Act that does carry the force of law, Plaintiffs may elect to bring a new challenge—and to renew their preliminary injunction motion—if they wish to contest it. The Department has indicated it plans to take further action "shortly" so any claimed hardship in the interim—assuming Plaintiffs disagree with a future action—would be minimal, if cognizable at all. Indeed, if deciding Plaintiffs' challenge to the interlocutory Guidance harms any party, it is the Department by cutting short its process of issuing a final interpretation of § 18004(c). *See AAMC*, 217 F.3d at 779 (ripeness requirements intended to "protect the agencies from judicial

---

[4] For the same reasons—the Guidance is non-binding and the Department has forsworn any enforcement action based upon it—Plaintiffs also lack Article III standing. Their asserted injuries are not fairly traceable to the non-binding Guidance, but arise solely from their own voluntary decisions. Even if Plaintiffs harbor some misplaced concern about future enforcement or have misread the Department's Guidance as somehow binding, such alleged harms are either speculative or self-inflicted and inadequate to support standing. *Cf. Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, --- F.3d ---, 2020 WL 2464926, at *8 (9th Cir. 2020).

interference until an administrative decision has been formalized").

*Finally*, other courts addressing agency FAQ responses have recognized that advisory interpretations such as the Guidance do not meet ripeness or final agency action standards. FAQs which are "intended 'to give [regulated entities] further *guidance* on the [relevant federal] laws," which "do not impose new legal requirements," and which "simply . . . *inform[]* [regulated entities] of what the law, previously enacted or adopted, is" do not constitute final agency action. *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010). By contrast, when an agency has for years "attempted to enforce" its FAQ response and has relied on it as "the legal basis for the . . . recovery from the Plaintiff of tens of millions of dollars," it has been held to be final agency action. *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672, 684 (E.D. Va. 2017), *aff'd in part, vacated in part*, 896 F.3d 615 (4th Cir. 2018). Here, far from "submit[ting] the Plaintiff to an entirely new legal regime governing" HEERF funding, *id.*, the Department has explicitly stressed the advisory nature of the Guidance and committed not to enforce it.

## B.   Plaintiffs' Contention That Certain Non-Citizens Are Eligible for HEERF Funding Is Unlikely To Succeed

Plaintiffs assert that, by interpreting § 18004(c) as providing for emergency financial aid grants only to students who meet Title IV eligibility criteria, the Department is unlawfully excluding certain non-citizens from access to such aid. *See* Compl. ¶¶ 89, 90; Pl. Mem. 1, 7. But even apart from Title IV's eligibility criteria, most non-citizens are ineligible to receive Federal public benefits under an independent statutory bar, 8 U.S.C. § 1611, which has been in effect since 1996. Pub. L. No. 104-193, 110 Stat. 2260. Plaintiffs thus cannot prevail insofar as they seek relief permitting them to distribute HEERF funds to such individuals.

Section 1611 states that, "[n]otwithstanding any other provision of law," aliens who are not "qualified aliens," as defined in 8 U.S.C. § 1641(b) and (c), are not "eligible for any Federal public benefit." 8 U.S.C. § 1611(a). The HEERF funds at issue in this case, provided by the Department of Education from United States funds appropriated by Congress, are indisputably "Federal public benefits" for purposes of § 1611. *See id.* § 1611(c)(1) (defining "Federal public

benefit" to include "any grant . . . provided by an agency of the United States or by appropriated funds of the United States; and . . . any . . . postsecondary education . . . benefit, or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency of the United States or by appropriated funds of the United States").[5] Accordingly, non-citizens who are not "qualified aliens" within the meaning of 8 U.S.C. § 1641(b) or (c) are categorically ineligible to receive HEERF funds, whether as emergency financial aid grants or otherwise.

The fact that the CARES Act does not itself restate the prohibition Congress created in 8 U.S.C. § 1611 is of no moment. Section 1611 was enacted nearly twenty-five years ago, and the Ninth Circuit has recognized the broad reach of its prohibition, *see Basiente v. Glickman*, 242 F.3d 1137, 1140 (9th Cir. 2001), including as to federal educational aid, *see Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032 (9th Cir. 2013).

Moreover, Congress's statement that the eligibility prohibition of § 1611 was to apply "[n]otwithstanding any other provision of law," 8 U.S.C. § 1611(a), makes clear its intent to subsume any potentially conflicting provision of federal aid. Indeed, when the question is whether § 1611 overrides a non-qualified alien's claim to HEERF funds, "[a] clearer statement is difficult to imagine." *Ill. Nat'l Guard v. FLRA*, 854 F.2d 1396, 1403 (D.C. Cir. 1988) (quoting *N.J. Air Nat'l Guard v. FLRA*, 677 F.2d 276, 283 (3d Cir. 1982)). As the Supreme Court has explained, "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). Here, "taking into account the whole of the statutory context in which [the notwithstanding clause] appears," *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007), the broad reach of § 1611 could hardly be clearer: Congress stated that, subject only to carefully enumerated exceptions, a non-qualified alien "is *not eligible* for *any* Federal public benefit." 8 U.S.C. § 1611(a) (emphases

---

[5] This is true even though IHEs participate in distributing the funds, and even if the funds are intermixed with funds from other sources. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1099 n.4 (9th Cir. 2012) ("[A] federally funded benefit is still considered a 'federal public benefit' even if administered by a state or local agency. . . . [and] even if the state contributes its own funds."); *see also* 8 U.S.C. § 1621(c)(3).

added). There is, by contrast, no evidence in the text or structure of the education relief provisions of the CARES Act that Congress intended to reverse its longstanding policy and extend the Federal public benefits provided in § 18004(c) to non-qualified aliens.

Furthermore, when courts have confronted similar "notwithstanding" clauses, they have generally applied the relevant legal rule that follows such language, even with respect to a later-enacted provision such as the CARES Act. *Ill. Nat'l Guard*, 854 F.2d 1403-04; *N.J. Air Nat'l Guard*, 677 F.2d at 283 (applying rule of earlier statute when later statute "does not contain any explicit language overriding all statutes with which it may conflict"). Even were there any conflict, both the Ninth Circuit and Supreme Court refuse to find an "[implied repeal] where, by creating minor exceptions to later-enacted statutes based on earlier ones, both statutes can be preserved." *Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1070 (9th Cir. 2010) (quotation omitted, alteration in original). Where Congress appropriated over $12 billion dollars in HEERF funds for IHEs' and students' use nationwide, § 1611 creates what in context is a limited exception for a comparatively smaller number of non-citizens. Section 18004(c), even if read to allow HEERF grants to non-citizens, *but see infra*, can be readily harmonized with § 1611.

In any event, when Congress in the past has chosen to extend a federal benefit to non-qualified aliens, it has done so not by ambiguous statements in the later-enacted law but by amending § 1611 itself. *See* Pub. L. 105–306, § 2, 112 Stat. 2926, 2927 (Supplemental Security Income benefits); Pub. L. 105–33, tit. V, § 5561, 111 Stat. 638 (Medicare benefits, Railroad Retirement Act benefits). No such amendment has occurred here. If anything, subsequent congressional action on the HEROES Act shows that Congress both knows how to override § 1611's broad prohibition when it wishes to and did not intend to do so in the CARES Act. *See* H.R. 6800 § 150110(a)(2) (explicitly stating that § 1611 "shall not apply" to HEERF funds); *cf. SEC v. Morgan, Lewis & Bockius*, 209 F.2d 44, 47-48 (3d Cir. 1953) (post-enactment bills showed issue remained unresolved). Given § 1611, Plaintiffs are unlikely to succeed insofar as they seek to distribute HEERF funds to non-qualified aliens, as defined in 8 U.S.C. § 1641.

### C.    Plaintiffs Are Unlikely To Succeed on the Merits of Their APA Claims

Plaintiffs challenge the Guidance under the APA as in excess of statutory authority as

well as arbitrary and capricious, Compl. ¶¶ 116-27 (counts 4 & 5), while essentially duplicating the same assertions in the guise of constitutional challenges, *id.* ¶¶ 98-115 (counts 1-3, asserting separation of powers, *ultra vires*, and Spending Clause claims). While in their motion Plaintiffs highlight their constitutional challenges, their claims boil down to an administrative challenge to the Guidance—an agency action to be sure, but not a final one properly subject to APA review. Even if APA review were appropriate, the Department acted within its authority in issuing the Guidance, and the Guidance is a reasonable interpretation of the CARES Act.

### 1.    The Department Acted Within Its Authority in Issuing the Guidance

The Secretary has broad authority to "make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *see id.* § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). Unquestionably, Congress delegated to the Department the responsibility to administer the HEERF program under the CARES Act, not only by calculating and distributing allocations of funds to each IHE using "the same systems" used for Title IV, § 18004(b), but also by requiring any IHE receiving funds to "submit a report to the Secretary, at such time and in such manner as the Secretary may require, that describes the use of [HEERF] funds," § 18004(e). The authority to review such reports gives the Department an oversight role as to whether IHEs' use of HEERF funds appropriately falls within the limits of § 18004(c). Indeed, Plaintiffs do not challenge the Department's authority, following Title IV practices, to require IHEs to certify their commitment to use such funds in accord with the CARES Act and to submit reports to the Secretary. *E.g.*, RJN ex.E, at 2. Providing guidance about how funds can be used gives IHEs notice—at this stage non-binding—of how the Department intends to conduct oversight and ensures consistency in the use of funds among IHEs. Far from exceeding the Department's authority, issuing the Guidance is a natural component of its role in distributing HEERF funds and overseeing their use.

Plaintiffs also argue that § 18004 contains no express delegation to the Secretary to

develop student aid eligibility criteria. Pl. Mem. 14. But the Department's Guidance did not create any new eligibility criteria; rather, it merely interpreted § 18004(c) consistent with its understanding of Congress's intention that the "emergency financial aid grants" referenced therein fall within the general financial aid framework that Title IV provides, and that Title IV's existing eligibility criteria logically apply.

Plaintiffs' reliance on the nature of HEERF funding as a formula grant gets them nowhere. The Department has done exactly what is required under the cases that they cite—distribute formula grant funds according to the formula that Congress sets forth. *Cf. City of L.A. v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) (recognizing that "the 'formula' is a statutory device for allocating the appropriated funds among the designated recipients" (internal quotation omitted)); *State Hwy. Comm'n v. Volpe*, 479 F.2d 1099, 1109 (8th Cir. 1973) (appropriations act is not discretionary insofar as it "constitutes a mandate to expend funds"). These cases do not suggest that statutes providing for formula grants can never contain ambiguous terms that the implementing agency might need to interpret. To the contrary, *City of Los Angeles v. Barr*, also cited by Plaintiffs, applied "normal rules of statutory construction" to a formula grant statute. 941 F.3d 931, 941-42 (9th Cir. 2019). As discussed below, those rules of construction support the interpretation that the Department set forth in its April 21 Guidance.

Importantly, the formula set forth in § 18004 governs only the allocation of HEERF funds *among IHEs*. *See* § 18004(a)(1) (apportioning funding "to each [IHE]"). Plaintiffs' suggestion that the Department has contravened the statutory formula in limiting the use of funds after those allocations have been made, Pl. Mem. 15, thus lacks any basis. Nor does their further attempt to analogize emergency HEERF funding to an ongoing block grant program in any way bolster the notion that the Department was somehow precluded from setting forth its interpretation of ambiguous statutory terms. *Cf. Rural Alaska Cmty. Action Program v. Smith*, 847 F.2d 535, 536 (9th Cir. 1988) (describing block grant program that similarly enlisted federal agency in ensuring grants were used as Congress intended). In sum, Plaintiffs point to nothing in § 18004 that precludes the Department from exercising its usual discretion to interpret ambiguities and provide guidance regarding statutory programs and funding that it oversees.

## 2. The Guidance Is Not Arbitrary or Capricious

As explained above, the Department has made clear that guidance posted on its Guidance Portal is not intended to have—and does not have—the force or effect of law. Plaintiffs' complaint that the Department did not provide a "reasoned explanation" for its interpretation must be assessed accordingly. Indeed, the Department has indicated its intent to take further action in regard to its interpretation of § 18004(c), which presumably will comport with any applicable APA requirements. The Department cannot be faulted for issuing guidance, even if in abbreviated non-binding form, in order to share its preliminary interpretation as expeditiously as possible with IHEs as it attempts to disburse HEERF funds as quickly as possible. Simply put, the Department was not required to provide a fulsome explanation of non-binding guidance, particularly under these extraordinary circumstances.

Although judicial review of the Department's interpretation should properly await a final binding action, if the Court reaches the question now, it should hold that the Department did not act arbitrarily or capriciously by giving preliminary guidance that the emergency financial aid grants authorized by § 18004(c) are meant to go to those already eligible for Title IV financial aid. In contrast to the allocations to IHEs, § 18004 provides no similar formula for how an IHE's funding should be allocated among its enrollees, nor does it define who qualifies as a "student."

At the same time, despite Plaintiffs' assertions to the contrary, § 18004 contains numerous indicia suggesting that Congress was referencing and intended the Department to use the existing Title IV framework in order to understand, and explain to IHEs, how HEERF funds may appropriately be used to provide "emergency financial aid grants" to "students." For one thing, the phrase "emergency financial aid grants" is itself a clear reference to Title IV's system of financial aid. The same term is used in CARES Act § 3504(a), which Plaintiffs acknowledge is governed by Title IV eligibility criteria. *Cf. Barr*, 941 F.3d at 941 ("Under the 'normal rule of statutory construction,' we presume that 'identical words used in different parts of the same act are intended to have the same meaning.'" (quoting *Dep't of Revenue v. ACF Indus.*, 510 U.S. 332, 342 (1994))). The only difference between the provisions is that grants under § 3504(a) derive from an IHE's existing Title IV allocation while grants under § 18004(c) derive from

HEERF funds. The HEERF funds thus act as a supplemental source of funding for additional or larger emergency financial aid grants that IHEs could not make under § 3504(a).

But § 18004(c) contains no suggestion that Congress intended to expand the pool of student *recipients* of such grants beyond those eligible under Title IV. Indeed, Congress further referenced Title IV standards in § 18004(c) itself when it specified that HEERF emergency financial aid grants can be used for "eligible" "cost of attendance" expenses—clearly invoking Title IV's "cost of attendance" provision, 20 U.S.C. § 1087*ll*.[6] Individuals ineligible for Title IV aid can have no "eligible" cost of attendance expenses. Finally, as Plaintiffs concede, § 18004(b) directs the Secretary to distribute HEERF funds to IHEs through Title IV systems.

Plaintiffs heavily rely on the notion that the April 21 Guidance reflects a change from the Department's earlier statements. *See* Pl. Mem. 17. However, nothing in the Department's earlier guidance addressed "student" eligibility for emergency financial aid grants under § 18004(c), let alone in a way contrary to the interpretation posted on April 21. Indeed, it remains the case, as the Department previously stated, that IHEs have significant discretion over how to allocate HEERF funds among students. There is no set dollar minimum or maximum for emergency financial aid grants provided to eligible students. And although the Guidance provides a preliminary interpretation that students eligible for emergency financial aid grants are those who are generally eligible for financial aid under Title IV, there remains no barrier to IHEs using their Institutional Portion to provide coronavirus-related aid to others, provided such aid is not precluded by other applicable law. *See* 8 U.S.C. § 1611. In addition, the statement in the Certificate that the Secretary "does not consider these individual emergency financial aid grants to constitute Federal financial aid under Title IV," was simply meant to inform IHEs and eligible students that any emergency financial aid that eligible students receive from HEERF funds will not be counted toward their annual maximums, nor would it affect a proprietary IHE's 90/10

---

[6] The link between "cost of attendance" and Title IV is made explicit earlier in § 18004(a)(2) and (3), which allow for additional awards for, among other things, "grants to students for any component of the student's cost of attendance *(as defined under section 472 of the Higher Education Act)*." (emphasis added). Meanwhile, the House's recent passage of the HEROES Act, which would remove the Title IV eligibility criteria for HEERF funds, undermines Plaintiffs' premise that Congress already did so in the CARES Act. *See* H.R. 6800 § 150110(a)(1).

funding obligation. *See* 34 C.F.R. §§ 668.14(b)(16), 668.28. The Certificate statement is no different from what the Department later said in Student Aid FAQ No. 10: that HEERF funds paid to IHEs "will not be included as revenue for 90/10 purposes."

Plaintiffs suggest that the Department failed to consider relevant factors, such as the difficulty of determining Title IV eligibility for those students who have not submitted a FAFSA, and the needs of ineligible students. Pl. Mem. 19.[7] But again, the April 21 Guidance was a non-binding, preliminary first step, taken in the midst of working out many other issues in the implementation of § 18004 and other CARES Act provisions. Any final determination by the Department on HEERF funds may well provide a mechanism to assist IHEs in verifying Title IV eligibility for students not already identified as eligible, or the Department may yet otherwise address this issue. In addition, while the Department surely recognizes that individuals who are not eligible for financial aid under Title IV have financial needs, the Department was also entitled to consider the statutory framework and terminology of § 18004(c), which evinces an intent that Federal financial aid should be limited to those meeting the general eligibility requirements set forth in Title IV. Congress did not provide in § 18004 that everyone enrolled at an IHE should be given emergency relief as a means of providing financial assistance for general living expenses. Rather, emergency financial aid grants are to support students in their effort to continue their studies while facing "expenses related to the disruption of campus operations due to coronavirus." § 18004(c). Individuals ineligible for emergency financial aid grants may well be eligible for other assistance under other sections of the CARES Act—awards from the Institutional Portion, for example—unless some other legal bar applies.  The Guidance is at least reasonable under the circumstances, and is certainly not arbitrary or capricious.

While the Department's interpretation of § 18004(c) set forth in the Guidance is logical and consistent with the CARES Act text and structure, and can be upheld on that basis alone, it is

---

[7] In at least some instances, Plaintiffs' declarations mischaracterize the Title IV eligibility restrictions, suggesting that they exclude those solely enrolled in distance learning (which is instead an exclusion under § 18004(c)), *see* Cornner Decl. ¶ 16 (ECF 16-4, at 37); Goldsmith Decl. ¶ 24 (ECF 16-4, at 90), or anyone with a conviction (instead of only those convicted of fraud with respect to Title IV itself, 20 U.S.C. § 1091(a)(6)), *see* Goldsmith Decl. ¶ 24.

also entitled to judicial deference. When reviewing an informal interpretation that lacks the force and effect of law, a court considers "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Ctr. for Biological Diversity v. Esper*, --- F.3d ---, 2020 WL 2182175, at *6 n.7 (9th Cir. 2020) (quoting *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)). The Department's expansion on that interpretation in this brief, meanwhile, does not foreclose deference. "An agency's interpretation of a statute it administers may be entitled [to] deference even when it appears in a legal brief," *Barnes v. Berryhill*, 895 F.3d 702, 705 n.5 (9th Cir. 2018), and the Ninth Circuit defers to such interpretations when they are "persuasive," *Price v. Stevedoring Servs.*, 697 F.3d 820, 832 & n.8 (9th Cir. 2012) (en banc). *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.6 (2019) (declining to "foreclose[]" "deference to agency interpretations [of regulations] advanced *for the first time* in legal briefs" (emphasis added)).

Here, although the Department has moved quickly to announce preliminary guidance on HEERF funding, there is no evidence that its consideration of the question has not been thorough. Further, its reasoning for limiting eligibility for emergency financial aid grants to Title IV-eligible students is wholly valid and supported by traditional tools of statutory construction. Notwithstanding Plaintiffs' contentions, there is also no inconsistency between the Guidance and the Department's earlier statements in the April 9 letter and Certificate, neither of which purported to interpret the phrase "emergency financial aid grants to students." The Department's interpretation has at least "the power to persuade" and is entitled to deference, particularly since the Department is not seeking to enforce the Guidance against Plaintiffs or any other entity.

### D. Plaintiffs' Constitutional Claims Are Unlikely To Succeed

Plaintiffs' constitutional claims fare no better, for the same reasons discussed above, and because Plaintiffs otherwise rely on cases that bear no relation to the situation here. In regard to their *ultra vires* and separation of powers claims, Plaintiffs rely on a case where the plaintiffs challenged an Executive Order that conditioned cities' receipt of *any* federal grant on compliance with a specific law, 8 U.S.C. § 1373, regardless of whether the grant had any connection to implementation of the law. *See City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1232-35 (9th Cir.

2018) (concluding that an Executive Order that directs agencies "to withhold funding that Congress *has not tied to compliance with § 1373*" exceeded the President's authority (emphasis added)). The Court in *Pennhurst State School & Hospital v. Halderman* held that a statute appropriating funds to assist states did not confer enforceable rights against the states absent express language conditioning funding on recognition of such rights. 451 U.S. 1, 13, 17-18, 27 (1981) (distinguishing between "congressional 'encouragement' of state programs and the implementation of binding obligations on the States"). Here, in contrast, the Department has made no attempt to impose a condition on IHEs that Congress did not; rather, it simply provided an advisory interpretation of a statutory provision it was expressly charged to administer and that indisputably *does* condition the provision of federal funds for specific purposes. § 18004(c) (requiring that HEERF funds be used only in certain ways).

In regard to their Spending Clause claim, Plaintiffs argue that any conditions placed on the provision of HEERF funds must be placed unambiguously by Congress. However, Plaintiffs fail to cite any case where an agency's mere interpretation of ambiguous statutory language, in a program established through Congress's exercise of its Spending Power, has been deemed to violate the Spending Clause. To the contrary, federal agencies commonly provide interpretations of the Spending Clause legislation they are charged with implementing. As with their *ultra vires* claim, Plaintiffs again rely on a case, *City & County of San Francisco v. Sessions*, where the condition that an agency attempted to impose was found far removed from Congress's purpose in appropriating the funds in the first place. *See* 349 F. Supp. 3d 924, 959-60 (N.D. Cal. 2018) (describing attempt to condition Byrne JAG grant funding on local law enforcement's acceptance of certain immigration law enforcement tasks). That is not so here.

Plaintiffs also fault the Department for "evolving interpretations" and an attempt to impose "post acceptance" conditions. Pl. Mem. 20. Of course, to the extent the Department's interpretation has evolved (which the Department submits has not occurred), it has done so over a matter of mere weeks during a pandemic. IHEs, whether they have already signed Certificates or not, can claim no longstanding reliance on the Department's initial lack of guidance on who would be eligible for emergency financial aid grants under § 18004(c) when they were well

aware that the Department was attempting to disburse HEERF funds as quickly as possible in the midst of a national emergency, while setting up the HEERF Guidance page for the very purpose of adding additional guidance as it became available. Moreover, the language of § 18004(c), in referring to "emergency financial aid grants," at least raised a clear possibility to IHEs—no strangers to the Higher Education Act and its eligibility criteria—that such grants, like other financial aid, are only available to Title IV-eligible students.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THAT IRREPARABLE HARM IS LIKELY IN THE ABSENCE OF AN INJUNCTION

A plaintiff seeking a preliminary injunction bears the burden of demonstrating that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (plaintiffs must show irreparable harm is likely, not just possible). To establish a likelihood of irreparable harm, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Plaintiffs must also show that the threatened harm would *not* occur if an injunction is granted. *See Winter*, 555 U.S. at 20; *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925-26 (N.D. Cal. 2019) (preliminary injunction warranted only if it "will *prevent* some irreparable injury that is likely to occur before the Court has time to decide the case on the merits") (emphasis added), *appeal filed,* No. 19-16102 (9th Cir. May 29, 2019).

Here, Plaintiffs seek an injunction to allow IHEs to disburse money as they see fit. It is well established that, ordinarily, economic injury does not qualify as irreparable harm. *See Rent–A–Ctr., Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Here, Plaintiffs can claim no economic injury because, even without an injunction, nothing currently prevents IHEs from disbursing HEERF funds without regard to the Guidance, which the Department has acknowledged is not binding and cannot form the basis for any enforcement action. But even under Plaintiffs' theory, such an injury is not irreparable because, if Plaintiffs were ultimately to prevail in their challenge to the Guidance, IHEs could at that point allocate HEERF funds among students according to Plaintiffs' interpretation of § 18004(c).

Apparently recognizing that they cannot obtain an injunction based on an asserted economic injury, Plaintiffs attempt to identify harm on their own behalf in the form of lost enrollments, which they claim will not only cost them money but will reduce the diversity of their student populations. Pl. Mem. 10. But to the extent Plaintiffs rely on the notion that non-citizens will withdraw their enrollments because of their ineligibility for emergency financial aid grants under § 18004(c), the Department's interpretation of that provision is not the only bar on such individuals' receipt of HEERF financial assistance. As explained above, 8 U.S.C. § 1611 operates independent of any Department guidance or rule to prohibit most non-citizens from receiving Federal public benefits, including HEERF funds. Plaintiffs fail to show that enjoining the Guidance would alleviate their asserted harm from lost enrollments.

Plaintiffs also allege non-Title IV-eligible students suffer from "fear, anxiety, depression, and stress." Pl. Mem. 22. But the situation here is not like that in the case they cite, *Chalk v. U.S. District Court*, where the court found that a teacher's psychological distress due to his removal from classroom teaching was irreparable harm. 840 F.2d 701, 710 (9th Cir. 1988). Even assuming third-party harm can support a preliminary injunction, here, of course, the real source of individual distress is the pandemic itself and its ongoing impacts on multiple facets of everyday life. *E.g.*, Hetts Decl. ¶ 15 [ECF 16-3] ("The California Community College System cannot fully achieve its mission when its own resources and those of the State of California are stretched thin during the COVID-19 pandemic."). Thus, in regard to all of their asserted noneconomic harms, Plaintiffs fail to provide a "persuasive counterfactual analysis showing a likelihood that irreparable harm would occur absent an injunction, *but would not occur if an injunction is granted*." *Sierra Club*, 379 F. Supp. 3d at 925-26 (emphasis added). Plaintiffs' request for an emergency injunction should be denied on this basis alone.

## III.   THE REMAINING EQUITABLE FACTORS WEIGH AGAINST PLAINTIFFS

Plaintiffs must also make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors an injunction. *All. for the Wild Rockies*, 632 F.3d at 1135. These two factors merge when the federal government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Plaintiffs fail to support an injunction on

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:20-cv-3215-YGR

either ground. Plaintiffs assert generally that their students have been harmed by "the challenges caused by the pandemic." Pl. Mem. 24. However, for the same reasons discussed above, that harm, common to many throughout the country, does not justify a preliminary injunction with respect to Plaintiffs' particularized challenge to the Department's non-binding Guidance. The public interest here is in allowing the Department to continue implementing the sections of the CARES Act that Congress assigned to it to administer, and to give the Department the opportunity to finalize its own reasoned decision interpreting § 18004(c) before undercutting through judicial intervention on the Guidance any final conclusion it might reach.

Moreover, Plaintiffs tacitly admit that they and other IHEs in their Districts can allay some of their asserted harms through grants made from non-HEERF sources. Pl. Mem. 10-11. Even if the April 21 Guidance were binding, which it is not, it is undisputed that IHEs may use their HEERF Institutional Portion to disburse funds to individuals who are not eligible for Title IV aid, but are not otherwise prohibited from receiving Federal public benefits, in order to cover "costs associated with significant changes to the delivery of instruction due to the coronavirus." § 18004(c). Alternatively, IHEs can use their Institutional Portion to repay other funding sources if the latter are used to make grants to individuals who are not eligible under Title IV (but are eligible to receive Federal public benefits). Such shifting of fungible dollars that are ultimately paid by HEERF funds weighs little, if at all, in the balance of hardships.

An injunction, by contrast, would prematurely and irrevocably foreclose the Department's efforts to administer HEERF funds.  If the Court were to enjoin the Guidance, but then later reverse itself in a final decision on the merits that endorses the Department's interpretation, any HEERF funds distributed to non-eligible recipients would have been distributed contrary to congressional intent, an outcome that could not be undone. Regardless of which party's interpretation of § 18004(c) the Court accepts, that outcome would moreover prejudice eligible Title IV students, since an IHE which distributes funds to non-Title IV individuals would necessarily tend to decrease its individual grant amounts.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied.

DATED:  May 25, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
KATHRYN L. WYER (Utah Bar No. 9846)
M. ANDREW ZEE (California Bar No. 272510)
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov

*Attorneys for Defendants*