Nicholas Espíritu (SBN 237665)
Sarah Kim Pak (SBN 324674)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: 213-639-3900
Email: espiritu@nilc.org
Email: kimpak@nilc.org

Kevin Herrera*
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 32358
Chicago, IL 60632-0358
Telephone: 213-770-1325
Email: herrera@nilc.org

Tanya Broder (SBN 136141)
NATIONAL IMMIGRATION LAW CENTER
2030 Addison Street, Suite 420
Berkeley, CA 94704
(510) 663-8282
Email: broder@nilc.org

Attorneys for *Amici Curiae*
*Admitted to practice in Illinois, Tennessee, and New York

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| **ELOY ORTIZ OAKLEY, in his official capacity as Chancellor of California Community Colleges et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**BETSY DEVOS, in her official capacity as the United States Secretary of Education; U.S. DEPARTMENT OF EDUCATION,**<br><br>Defendants. | Case No. 20-cv-03215-YGR<br><br>**BRIEF OF NATIONAL IMMIGRATION LAW CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       June 23, 2020<br>Time:       2:00 p.m.<br>Dept:        Courtroom 1<br>Judge:      The Honorable Yvonne Gonzalez Rogers<br>Trial Date:   None Set<br>Action Filed: May 11, 2020 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES -------------------------------------------------------------------------------- ii

INTEREST OF AMICI ------------------------------------------------------------------------------------1

SUMMARY OF ARGUMENT----------------------------------------------------------------------------1

ARGUMENT ---------------------------------------------------------------------------------------------------2

    I.    CONGRESS ESTABLISHED HEERF TO EQUIP HIGHER EDUCATION INSTITUTIONS TO ADDRESS THEIR EDUCATIONAL COMMUNITIES' NEEDS DURING THE PANDEMIC ------2

        A. Congress Intended to Provide Educational Institutions Flexibility to Meet the Needs of Their Communities---------------------------------------------------------------------3

        B. Congress Intended the HEERF Program to be Available to the Entire Educational Community ---------------------------------------------------------------------------6

    II.    NEITHER PRWORA NOR TITLE IV APPLY TO HEERF FUNDS -------------------------7

        A. Congress Did Not Anticipate the Application of Title IV Eligibility Restrictions to CARES and Associated HEERF Funds ----------------------------------------------8

        B. Congress Did Not Intend to Apply Immigrant Eligibility Restrictions to HEERF Funds ----------------------------------------------------------------------------------------------9

        C. Funds Available to Community Colleges Through HEERF are Different from the Specific "Federal Public Benefits" Restricted By PRWORA ----------------- 10

            1. The Term "Federal Public Benefit" Is Limited by Statute and Longstanding Agency Interpretation ----------------------------------------- 10

            2. Block Grant Funds Generally Have Been Deemed not to Be "Federal Public Benefits" under PRWORA ----------------------------------------- 12

            3. HEERF Funds, Like Other Block Grants, are Not Federal Public Benefits Under PRWORA ------------------------------------------------------------- 13

        D. Imposition of an Earlier Law's Restrictions Should Not Undermine the Critical Purposes of a Later Enacted and More Specific Statute----------------------------14

CONCLUSION ------------------------------------------------------------------------------------ 15

# TABLE OF AUTHORITIES

**CASES**

*Abramski v. United States*,
    573 U.S. 169 (2014) ........................................................................................................3

*Acosta v. Gonzales*,
    439 F.3d 550 (9th Cir. 2006 ......................................................................................... 14

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..................................................................................................... 12

*Kucana v. Holder*,
    558 U.S. 233 (2010) ........................................................................................................9

*Morales-Izquierdo v. Gonzales*,
    486 F.3d 484 (9th Cir. 2007) ....................................................................................... 12

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ..................................................................................................... 12

Nken v. Holder,
    556 U.S. 418 (2009) ........................................................................................................9

*Rural Alaska Cmty. Action Program v. Smith*,
    847 F.2d 535 (9th Cir. 1988) ..........................................................................................4

*U.S. v. Juvenile Male*,
    670 F.3d 999 (9th Cir. 2012) ....................................................................................... 14

**STATUTES**

20 U.S.C. § 1091 ....................................................................................................................8

26 U.S.C. § 6428 ....................................................................................................................9

42 U.S.C. § 701.................................................................................................................... 12

42 U.S.C. § 5103 ................................................................................................................. 12

42 U.S.C. § 6861 ................................................................................................................. 12

8 U.S.C. § 1611............................................................................................................... 10-12

8 U.S.C. § 1642................................................................................................................10, 11

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134
    Stat. 281 (2020)......................................................................................................passim

Higher Education Emergency Relief Fund,
 134 Stat. § 18004 (2020) ------------------------------------------------------------------------------passim

**REGULATIONS**

62 Fed. Reg. 61344 (Nov. 17, 1997) ----------------------------------------------------------------12, 13

63 Fed. Reg 41,658 (Aug. 4, 1998) ------------------------------------------------------------------ 10-13

**OTHER AUTHORITIES**

166 Cong. Rec. (Mar. 27, 2020)----------------------------------------------------------------------passim

Peter Barbatis, *Underprepared, Ethnically Diverse Community College Students: Factors Contributing to Persistence*, 33 J. DEV. EDUC. 16 (2010)------------------------------------------5, 6

Muzaffar Chishti & Jessica Bolter, *Vulnerable to COVID-19 and in Frontline Jobs, Immigrants Are Mostly Shut Out of U.S. Relief*, MIGRATION POLICY INST. (Apr. 24, 2020),-------------------9

Melinda M. Karp et al., *An Exploration of Tinto's Integration Framework for Community College Students*, (Columbia Univ. Cmty. College Research Ctr., Working Paper No. 12, 2008) ----------------------------------------------------------------------------------------------------------6

Kevin M. Lewis, *Eligibility Requirements for Emergency Financial Aid Grants to Students Under Section 18004 of the CARES Act,* Cong. Research Serv. (May 20, 2020) ------------------3

Office of Community Services, U.S. Dep't of Health & Human Serv. LIHEAP IM 1999-10 on Federal Public Benefits Under the Welfare Reform Law – Revised Guidance (1999), https://www.acf.hhs.gov/ocs/resource/federal-public-benefits-under-the-welfare-reform-law-revised-guidance ---------------------------------------------------------------------------------------- 12

Dick Startz, *Coronavirus Poses Serious Financial Risks to US Universities*, Brookings Brown Center Chalkboard (Apr. 21, 2020)-------------------------------------------------------------------5

U.S. Dep't of Justice et al., Joint Letter on Immigrant Access to Housing and Services (Aug. 5, 2016), https://www.hhs.gov/sites/default/files/Joint-Letter-August-2016.pdf. ------------------ 15

WITT ET AL., AMERICA'S COMMUNITY COLLEGES: THE FIRST CENTURY (1994) ---------------------5

## INTEREST OF AMICI

The National Immigration Law Center ("NILC") is the primary national organization in the United States exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families. Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and has advanced policies that reinforce the nation's values of equality, opportunity, and justice. We focus on issues that affect the well-being and economic security of immigrant communities: health care and safety net programs; education and training; workers' rights; and other federal and state policies affecting immigrants. NILC is recognized for its expertise in public benefits laws and policies affecting low-income immigrants, including the implementation of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). Defendants' misapplication of the laws governing restrictions of federal funds on the basis of immigration status will undermine the ability of educational institutions to fulfill their missions during this unprecedented health crisis and will increase the risks to public health and safety.

## SUMMARY OF ARGUMENT

This case involves Betsy DeVos and the United States Department of Education's ("Defendants'") attempts to impose restrictions on emergency funds that Congress did not intend. Through the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020), Congress appropriated $12.56 billion to create the Higher Education Emergency Relief Fund (HEERF), so that institutions of higher education (hereinafter "institutions") could "prevent, prepare for, and respond to coronavirus." 134 Stat. § 18004 (a), (c) at 567-68. Congress, in establishing the HEERF funds, did not incorporate any limitations on the use of these funds based on immigration status. Contrary to the specific goals of the 2020 legislation, Defendants improperly attempt to import the limited restrictions imposed on certain federal public benefits by a more general 1996 law. As detailed below, Congress intended to grant broad discretion and flexibility to institutions to address disruptions to their campus operations and their educational communities due to this pandemic. Defendants' subsequent actions undermine these goals as well as the educational mission of these institutions. The Secretary and Department

1

of Education's (DoE's) actions were *ultra vires* and in violation of congressional intent. *See* Pl. Mem. at 12–14 [ECF 16].

## ARGUMENT

### I. Congress Established HEERF to Equip Higher Education Institutions to Address Their Educational Communities' Needs During the Pandemic

On March 27, 2020, Congress enacted the bipartisan CARES Act. 134 Stat. 281. Of the $30.75 billion appropriated to the DoE, Section 18004 of the CARES Act allocates $12.56 billion to create the HEERF program to help educational institutions "prevent, prepare for, and respond to coronavirus." CARES Act, 134 Stat. §§ 18001, (a), (b)(3); §18004(1) at 567.

Despite Congress' intent to provide educational institutions flexibility to meet the needs of their entire educational community, on April 21, 2020, Defendants issued guidance that imposed new exclusions[1] limiting the students who are eligible to receive emergency assistance under the HEERF funding. *See* Pl. Request for Judicial Notice ("RJN") Ex. G at 4 [ECF 16-2] ("Only students who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act . . . may receive emergency financial aid grants.").[2] Defendants' briefing also announces a new position by DoE—which was never expressed prior to the filing of this litigation—that PRWORA's restrictions on immigrant access to "federal public benefits" applies to *all* HEERF funds distributed to educational institutions under the CARES Act. *See* Defs. Opp'n Mem. at 13–16 [ECF 20].

///

///

///

---

[1] DoE's current position contradicts their April 9, 2020 notice to recipients that the funds were not restricted based on a student's immigration status, ***see*** Pl. Request for Judicial Notice ("RJN") Exs. A, C.

[2] The statute does not delegate to the DoE any authority to limit eligibility, but instead gives it a more limited role related to distribution of these funds to recipient institutions. 134 Stat. § 18004(b), at 568.

### A. Congress Intended to Provide Educational Institutions Flexibility to Meet the Needs of Their Communities

Congress' intent to grant broad discretion to educational institutions to address disruptions to their campus operations and their educational communities is evidenced by the plain text of the CARES Act. In Section 18004(c), Congress expressly allows educational institutions to use the HEERF assistance "to cover *any* costs associated with significant changes to the delivery of instruction due to the coronavirus" subject to only two requirements. 134 Stat. at 568 (emphasis added); *see also* Pl. Mem. at 5. First, institutions must not use HEERF funds to make "payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship." 134 Stat. at 568. Second, institutions must distribute at least half of their HEERF allocated funds directly to students to help cover expenses related to the disruption of campus operations due to coronavirus. *Id.* Beyond these two requirements, Section 18004 does not place any other restrictions on the institutions' use of funds. *See* Pl. RJN ex. D (indicating that the Secretary once held the view that regarding the use of funds, "[t]he only statutory requirement is that the funds be used to cover expenses related to the disruption of campus operations due to coronavirus"). The requirements in Section 18004(c) govern only *how* HEERF funds may be used, not *which* students an institution may assist. *See* Kevin M. Lewis, *Eligibility Requirements for Emergency Financial Aid Grants to Students Under Section 18004 of the CARES Act,* Cong. Research Serv. 4 (May 20, 2020), https://hechingerreport.org/wp-content/uploads/2020/05/CRS-MEMORANDUM.pdf.

The legislative record of the CARES Act confirms Congress' intent to grant broad discretion and flexibility to educational institutions. *See Abramski v. United States*, 573 U.S. 169, 179, (2014) (explaining that when interpreting a statute, for which there are conflicting textual interpretations, the court must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'"). On March 22, as Senator Lamar

3

Alexander (R-TN) underscored the critical need for the legislation, he explained that the bill included "money for block grants . . . for higher education . . . which will provide immediate assistance." 166 Cong. Rec. S1895. On March 25, Senator Susan Collins (R-ME), emphasized that "direct aid to colleges and universities is needed to help these institutions offset these sudden revenue losses and unexpected costs." *Id.* at S2057. On March 27, after describing that schools in her district "need[ed] funding flexibility due to disruption in the academic year from COVID–19," Congresswoman Lauren Underwood (D-IL) remarked that she is "pleased that the CARES Act begins to deliver." *Id.* at H1856. Congress structured the HEERF program similar to that of a block grant, *see* Pl. Mem. at 16, to give educational institutions the flexibility and decision-making authority, without federal intervention, to address COVID-19's disruptions to their campus operations, activities, and communities. *See Rural Alaska Cmty. Action Program v. Smith*, 847 F.2d 535, 536 (9th Cir. 1988) ("the block grant system . . . permits [federal fund grantees] to administer the program[] with minimal federal involvement and few federal procedural requirements.").

Congress understood that local institutions, communities, and state and local governments occupy a key role in combatting the pandemic on the front lines, and that they require flexibility to achieve these goals. For example, on March 25, Senator Tom Cotton (R-AR), pointed to the expertise of local authorities with regard to stay-at-home orders, and argued that "decisions must be based on local conditions" and not by "arbitrary" nationally mandated timelines. 166 Cong. Rec. at S2033. During the House floor debate on March 27, Congressman Anthony Gonzalez (R-OH) voted in support because the CARES Act "provides critical resources for those who need it most: . . . our local leaders who are fighting this virus on the front lines." *Id.* at H1832. Congressman Steny Hoyer (D-MD) agreed and pointing to Section 5001's Coronavirus Relief Fund, commented on "the importance of providing this funding to states quickly, flexibly, and with a minimum of paperwork." *Id.* at H1849.

Understanding this, Congress directed the HEERF funds to flow directly to educational institutions, § 18004(a)-(b), 134 Stat. at 567-68, to enable them to fulfill their educational mission, while protecting the health and safety of their student community. In a speech submitted on March 27, Congressman Peter DeFazio (D-OR) explained that emergency relief is provided to educational institutions "to help defray costs, such as lost revenue, to support social distancing and distance education, and to issue emergency grants to impacted students for food, housing, course materials, tech, and healthcare and childcare." 166 Cong. Rec. E345. Congresswoman Pramila Jayapal (D-WA) also submitted a speech in which she clarified that the CARES Act "invests . . . [in] institutions of higher education to help alleviate the challenges educators, students, and families are struggling with in light of school and childcare center closures." *Id.* at E340.

Congress created the HEERF funding to serve as a community benefit, recognizing that colleges and universities would be best situated to understand and respond to the complex and localized needs of their educational communities. These needs include limiting financial losses as a result of student disenrollment. *See* Dick Startz, *Coronavirus Poses Serious Financial Risks to US Universities*, Brookings Brown Center Chalkboard (Apr. 21, 2020), https://www.brookings.edu/blog/brown-center-chalkboard/2020/04/21/coronavirus-poses-serious-financial-risks-to-us-universities/. Universities are also tasked with limiting harms related to the disenrollment of students who can no longer afford to attend. For community colleges, which have been dubbed "the most important higher education innovation of the twentieth century,"[3] attrition of these students causes serious disruptions to the social fabric of an institution and the entire community of learners. Studies demonstrate that feelings of integration in a stable community of learners is one critical aspect of student well-being. *See, e.g.* Peter Barbatis, *Underprepared, Ethnically Diverse Community College Students: Factors Contributing to*

---

[3] WITT *ET AL.*, AMERICA'S COMMUNITY COLLEGES: THE FIRST CENTURY, 1 (1994)

*Persistence*, 33 J. Dev. Educ. 16, 24 (2010) (describing challenges experienced by students experiencing changes to social environments); Melinda M. Karp et al., *An Exploration of Tinto's Integration Framework for Community College Students*, (Columbia Univ. Cmty. College Research Ctr., Working Paper No. 12, 2008) (explaining higher likelihood of multi-year persistence among community college students who were more integrated into college through networks). Constraining educational institutions' ability to address these concerns flexibly is incompatible with Congress' understanding that they are best positioned to decide how to help their academic community survive this pandemic.

### B. Congress Intended the HEERF Program to be Available to the Entire Educational Community

Section 18004(c) provides that institutions must use at least half of their HEERF allocated funds "to provide emergency financial aid grants *to students*," without qualifying or otherwise expressly limiting who would be eligible. 134 Stat. at 568 (emphasis added).

Indeed, in Section 18004(a)(1), Congress sets out a funding formula that accounts for *all* students who are not exclusively enrolled in distance education courses prior to the coronavirus emergency. Under the HEERF funding formula, Congress requires the Secretary to allocate 90% of the HEERF funds to educational institutions; of this 90% amount, the Secretary must apportion the 75% to educational institutions based on the each institution's relative share of enrolled students who were Federal Pell Grant recipients under Title IV of the Higher Education Act, and 25% to institutions based on each institution's relative share of all "students who were not Federal Pell Grant Recipients." *Id.* § 18004(a)(1), 134 Stat. at 567.[4] The basis of allocation depends on two

---

[4] Section 18004(a)(1) of the CARES Act, provides that the Secretary shall allocate the HEERF funding as follows:
> 90 percent to each institution of higher education to prevent, prepare for, and respond to coronavirus, by apportioning it—(A) 75 percent according to the relative share of full-time equivalent enrollment of Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency; and (B) 25 percent

categories: students who are Federal Pell Grant recipients (i.e. students who are eligible for federal financial aid under Title IV), and those who are not (i.e. all other students). Congress' accounting for students who are ineligible for federal financial aid under Title IV, into the HEERF funding formula is a striking indication that Congress had *all* students whose education was disrupted by the crisis in mind when it set up the HEERF program. *See* 166 Cong. Rec. H1856 (daily ed. Mar. 27, 2020) (statement of Rep. Underwood) (remarking that the grants would "support[] college students whose semesters were disrupted due to COVID-19"); *id.* at H1823 (daily ed. Mar. 27, 2020) (statement of Rep. Scott) (stating that the grants would go to students "displaced" by the COVID-19 crisis). It would make no sense to include students for funding formula and allocation purposes, but to categorically exclude them from the relief that the program was intended to provide.

## II. NEITHER PRWORA NOR TITLE IV APPLY TO HEERF FUNDS

The CARES Act does not impose any immigration-based limits on the use of HEERF by recipient institutions. Where Congress has intended to limit grants awarded to institutions based on immigration status, it has done so explicitly, including in other sections of the CARES Act. The formal agency action defining the contours of PRWORA's restrictions requires a nuanced and careful analysis of the program and should not be applied in an *ad hoc* manner, as Defendants have done. Defendants' position would frustrate the specific purpose for which HEERF funds were allocated through the CARES Act, subverting this Congress' intent to enable educational institutions to respond effectively to a disaster.

///

///

///

---

according to the relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency.

### A. Congress Did Not Anticipate the Application of Title IV Eligibility Restrictions to CARES and Associated HEERF Funds

Student "emergency financial aid grants" under the HEERF program, created in Section 18004(c), do not constitute federal financial aid under Title IV of the Higher Education Act and therefore are not subject to the eligibility criteria under Title IV at 20 U.S.C. § 1091.[5] *See* Pl. Mem. at 12–13. Defendants contend, however, that Section 18004 contains "numerous indicia" and suggestions referencing the existing Title IV framework's applicability to the HEERF program, such as the phrase "emergency financial aid grants" which appears in both Sections 18004(c) and 3504. *See* Defs. Opp'n Mem. at 18 [ECF 20]. But Section 18004(c) does not expressly create, or otherwise refer to the Title IV program, the Higher Education Act, or any other eligibility criteria[6]—such as an age, income, or resource threshold—to serve as a basis in determining who qualifies for HEERF assistance. 134 Stat. at 567. And the CARES Act does not prohibit educational institutions from awarding HEERF funds to Title-IV ineligible students.[7] Section 3504 of the CARES Act allows for "emergency financial aid grants" to be disbursed by educational institutions from *existing* federal fund allocations under Title IV of the Higher Education Act. 134 Stat. at 396-97. Section 3504 of the CARES Act applies the definition of "emergency financial aid grants" — and the Title IV constraints that are attached thereto— "*under this section"* only. *See* § 3504(b)-(c) 134 Stat. at 396-97 (emphasis added). This selective inclusion demonstrates that Congress acted intentionally to exclude any Title IV-based restrictions from the HEERF program. *See* Pl. Mem at 12–14.

---

[5] The Secretary of Education acknowledged as much in the Recipient's Funding Certification and Agreement that educational institutions executed to accept funds. *See* Pl. RJN ex. E ("The Secretary does not consider these individual emergency financial aid grants to constitute Federal financial aid under Title IV of the HEA").

[6] *See* Section I.B, *supra* (discussing how the text of Sections 18004(a) and (c) accounted for all students in the broadest sense).

[7] *See* Section I.A, *supra* (discussing how Section 18004(c) only restricts *how* the funds should be used, rather than *which* students an institution, in its broad grant of discretion, can assist through the HEERF program).

**B. Congress Did Not Intend to Apply Immigrant Eligibility Restrictions to HEERF Funds**

While Congress did not impose immigration status eligibility restrictions on HEERF assistance, it did restrict other assistance provided under the CARES Act. Where one section of a statute explicitly states parameters for its application, but another section is silent, those parameters should be presumed to not apply to the latter. *See* Pl. Mem. at 13–14; *see also Kucana v. Holder*, 558 U.S. 233, 249 (2010) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Nken v. Holder,* 556 U.S. 418, 430 (2009)).

In Section 2201 of the CARES Act, Congress provided for the issuance of an advanced recovery rebate, in the amount of $1,200 for an eligible individual and $2,400 for married eligible individuals who filed a joint tax return, to help taxpayers recover from the impacts of the coronavirus. CARES Act, 134 Stat. § 2201(a), at 335. In setting up the recovery rebate's parameters, Congress explicitly denied credits to any eligible individual (and spouse if filing jointly) who does not file taxes with a social security number. *Id.* at 337 (codifying these changes in 26 U.S.C. § 6428(g)).[8] Thus, Section 2201 demonstrates that Congress knew how to—and in fact did—restrict eligibility on the basis of immigration status for some assistance under the CARES Act but did not do so with respect to HEERF assistance. No restrictions based on immigration status or Social Security Numbers, or mention of Title IV or PRWORA is included in the statutory text establishing the HEERF Program. *See*, 134 Stat. § 18004 at 567. Congress' inclusion of eligibility criteria related to immigration status in Section 2201 of the CARES Act but

---

[8] The social security number requirement excludes the vast majority of undocumented immigrants in this country, roughly estimated to be around 9.9 million individuals. *See* Muzaffar Chishti & Jessica Bolter, *Vulnerable to COVID-19 and in Frontline Jobs, Immigrants Are Mostly Shut Out of U.S. Relief*, MIGRATION POLICY INST. (Apr. 24, 2020), https://www.migrationpolicy.org/article/covid19-immigrants-shut-out-federal-relief.

omission of any such criteria in Section 18004, provides further proof that Congress acted intentionally to exclude immigration status-based restrictions from the HEERF program.

### C. Funds Available to Community Colleges Through HEERF are Different from the Specific "Federal Public Benefits" Restricted By PRWORA

Funds made available to educational institutions through HEERF were not intended to be restricted based on immigration status, whether they are used to address disruptions in instruction, or distributed to members of the academic community. Given the longstanding agency interpretation described below, Congress would have no reason to assume that a program like HEERF would be restricted. The emergency community benefits flowing from HEERF funds — structured as a block grant—place those funds outside of the parameters of the "federal public benefits" restricted under PRWORA.

#### 1. The Term "Federal Public Benefit" Is Limited by Statute and Longstanding Agency Interpretation

PRWORA restricts immigrants' eligibility for certain "federal public benefits," which are defined in general terms by the statute. *See* 8 U.S.C. § 1611(c) (listing categories of benefits "provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States"). The definition does not include all federal programs and includes several exceptions to the meaning of federal public benefit. *Id.* at § 1611 (b), (c)(2). And, "nonprofit charitable organizations," are exempted from the requirement of determining, verifying or requiring proof of an immigrant's eligibility for federal public benefits. *Id.* at § 1642(d).

The limited scope of PRWORA's restrictions on immigrants' eligibility was clarified shortly after its passage, through formal agency action by the U.S. Department of Health and Human Services ("HHS").[9] *See* Office of the Sec'y, HHS, *Personal Responsibility and Work*

---

[9] PRWORA designated HHS as the agency responsible for assisting the Attorney General in promulgating its implementing regulations, *see* 8 U.S.C. §1642(a)(1)–(2).

*Opportunity Reconciliation Act of 1996 (PRWORA): Interpretation of "Federal Public Benefit"*, 63 Fed. Reg. 41,658 (Aug. 4, 1998). Its interpretation of "federal public benefit" was based in part on its conclusion that "PRWORA does not identify the specific benefits that are 'Federal public benefits,' and the definition in section 401(c), standing alone, does not provide sufficient guidance for benefit providers to make that determination." *Id.* at 41,659.[10] Critically, HHS noted that "[a]lthough the litany of categories in 401(c)(1)(B) is broad, it is not comprehensive . . . ." *Id.*

In interpreting PRWORA's federal public benefit definition, HHS emphasized that for a program to qualify as such under § 1611(c)(1)(B), which includes "postsecondary education," it must be provided to "an individual, household or family eligibility unit." *Id.* The agency explained that this requires both that a benefit be provided to individuals, households, or families *and* that the "authorizing statute must be interpreted to mandate ineligibility for individuals, households, or families that do not meet certain criteria, such as specified income level or a specified age." *Id.* For this reason, "benefits that are generally targeted to communities or specified sectors of the population (e.g. people with particular physical conditions . . . [or] general age groups such as youth or the elderly)" would not be included. *Id.*[11] HHS established that "unless the authorizing statutes require that the characteristics . . . form the basis for denial of services or benefits, these are not benefits that go to 'eligibility units'" and are thus not "federal public benefits" for the purpose of PRWORA. *Id.* at 41,659.[12]

---

[10] The 1998 HHS interpretation of federal public benefits was offered (1) by an agency designated in the authorizing statute; (2) close in time to the passage of the statute; (3) through detailed legal analysis of the proper interpretation of the statute; and (4) after offering the public notice and reviewing comments. *See* 63 Fed. Reg 41,658, 41,659 (Aug. 4, 1998) (detailing canons of statutory interpretation used to establish the meaning of "federal public benefit" and assessing its definition against other comparable terms).

[11] Based on these and other considerations, HHS listed 33 HHS programs providing "federal public benefits," but noted that not "all benefits or services provided by these programs are 'Federal public benefits.'" *Id*. at 41,660.

[12] HHS' limited interpretation of "federal public benefits" under PRWORA illustrates the fallacy of any assumption that PRWORA restricts HEERF funds automatically, without any reasoning or

### 2. Block Grant Funds Generally Have Been dDemed not to Be "Federal Public Benefits" under PRWORA

Several classes of benefits—especially those that are "generally targeted to communities," *id.* at 41,659—have been determined to fall outside of PRWORA's federal public benefit restrictions. For example, the Maternal and Child Health Services Block Grant, *see* 42 U.S.C. § 701, which makes access to health care services for mothers and children available to low-income women and families is "a benefit targeted to certain populations based on their characteristics," rather than a benefit intended for individual eligibility units, and is therefore "*not* a 'Federal public benefit.'" 63 Fed. Reg. at 41,660 (emphasis in original). Similarly, funds distributed through the Low-Income Home Energy Assistance Program ("LIHEAP") that are used to weatherize structures that house immigrants of all statuses are a community benefit, with no immigration status verification of residents required. 42 U.S.C. §§ 6861 *et seq*; *see also* Office of Community Services, U.S. Dep't of Health & Human Serv. LIHEAP IM 1999-10 on Federal Public Benefits Under the Welfare Reform Law – Revised Guidance (1999), https://www.acf.hhs.gov/ocs/resource/federal-public-benefits-under-the-welfare-reform-law-revised-guidance. Community Development Block Grant programs administered by HUD, 42 U.S.C. §§ 5103 *et seq.,* also have not been determined to be subject to restrictions under PRWORA. Each of these programs direct their benefits to communities of recipients, rather than to

---

explanation. It does, however, help to explain the DoE's initial position making HEERF funds broadly available in accordance with the plain language of the CARES Act. Reversals of that position—whether pursuant to Title IV restrictions or any other existing eligibility scheme related to immigration status—are not based in any legitimate legal rationale. *See Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) ("An '[u]nexplained inconsistency is . . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.'") (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (requiring "a reasoned explanation" for disregarding facts underlying an earlier agency position).

individuals, households, or family units based on particularized eligibility criteria. For this reason, they are not subject to PRWORA's immigration status restrictions.[13]

### 3. HEERF Funds, Like Other Block Grants, are Not Federal Public Benefits Under PRWORA

Like other federally allocated block grant monies not subject to PRWORA, HEERF funds are intended to benefit educational communities as a whole, allowing colleges and their populations to "prevent, prepare for, and respond to coronavirus." *See* Section 1.A. *supra*. Although funds awarded based on non-specific characteristics do not qualify as federal public benefits, "mixed-benefits" programs, where some federal funds are provided to broad communities and others flow directly to individuals or families, are *also* not necessarily "federal public benefits." *See* 63 Fed. Reg. at 41,660 ("Programs that are primarily designed to target and provide services to communities should not be burdened with new verification procedures merely because they may include some services that flow more directly to the individual, household or family.") Even if some portion of the HEERF funds goes to individuals who are not "qualified" immigrants, those funds would advance the institution's academic goals and the assistance would not lose its community-oriented nature. The funds therefore would fall outside of the federal public benefits definition.

//

//

//

//

---

[13] This reasoning is consistent with the exemption for "nonprofit charitable organizations" engaged in "relief of the poor and distressed or the underprivileged" as a larger social project. *See* Dep't of Justice, *Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 62 Fed. Reg. 61344, 61345–46 (Nov. 17, 1997) (defining non-profit charitable organization exemption).

### D. Imposition of an Earlier Law's Restrictions Should Not Undermine the Critical Purposes of a Later Enacted and More Specific Statute

Where a narrow congressional purpose in passing legislation is clear, broader legislation enacted earlier in time should not be read to subvert that purpose.[14] Here, the CARES Act post-dates PRWORA, is grounded in a very specific context, and responds to a very specific moment. Congress' specified goal in allocating HEERF funds to educational institutions is to protect their communities from the ravages of the COVID-19 pandemic.

The HEERF funds are critical to educational institutions' viability during the period of economic and social instability that has accompanied the COVID-19 pandemic. *See* 166 Cong. Rec. H1862 (daily ed. Mar. 27, 2020) (statement of Rep. Angie Craig) (explaining that the CARES Act would "support[] our teachers, paraprofessionals, and school administrators who are working tirelessly to continue to educate all students in our communities"). Congress allocated these funds to community colleges and other universities to create an economic safety net that may serve as the only resource that keeps colleges afloat during the current and ensuing period of instability. *id.* at H1823 (daily ed. Mar. 27, 2020) (statement of Rep. Bobby Scott) (emphasizing that "the CARES Act is not a stimulus package; it is a disaster relief effort . . . to ensure that students . . . can survive this crisis."); *id.* at H1856 (daily ed. Mar. 27, 2020) (statement of Rep. Underwood) ("the [CARES Act] bill offers much-needed *temporary* relief"). Congress also recognized that educational institutions are most intimately familiar with their operations, structures, and student bodies and are therefore best positioned to act on those needs, justifying the flexibility written into the CARES Act. *See* 166 Cong. Rec. S2056 (daily ed. Mar. 25, 2020) (statement of Sen. Susan Collins) (noting

---

[14] PRWORA's restrictions are inapplicable to HEERF funds, based on the limited reach of the term "federal public benefit," and the statutes therefore do not conflict. Even if they did, the CARES Act's intent should govern the outcome in this case. "Where two statutes conflict, the later-enacted, more specific provision generally governs." *U.S. v. Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (citing *Acosta v. Gonzales*, 439 F.3d 550, 555 (9th Cir. 2006) (declining to apply earlier statutory time bars to later passed immigration benefits where application would frustrate congressional intent to prevent the needless separation of loved ones)).

"the very tough decision[s]" by colleges and universities and the various "steps they were taking to make sure that their students could still receive a quality education").

Applying PRWORA's restrictions to the HEERF funds made available under the CARES Act would defeat their purpose by limiting educational institutions' ability to preserve their academic communities. Given their makeup and students served, community colleges like Plaintiffs stand to lose significant portions of their academic populations who cannot afford to continue their education due to economic hardships stemming from COVID-19, causing serious disruptions to student communities. A corresponding loss of emergency operating funding would severely limit educational institutions' ability to mitigate deficits in student services and instruction, further eroding those institutions. Congress established emergency aid such as the HEERF funds to support institutions in protecting the integrity of their communities during a crisis. *See, e.g.* U.S. Dep't of Justice et al., Joint Letter on Immigrant Access to Housing and Services, at 2–3 (Aug. 5, 2016), https://www.hhs.gov/sites/default/files/Joint-Letter-August-2016.pdf. (clarifying the joint position of the U.S. Department of Justice, U.S. Department of Housing and Urban Development, and U.S. Department of Health and Human Services that immigration status verification requirements under PRWORA do not restrict access to specified short-term measures which stabilize recipients' lives "by providing basic needs and safety while they seek to rebuild their lives"). Allowing Defendants to import PRWORA improperly into the HEERF program at this late stage would severely compromise that intent.

## CONCLUSION

For the reasons stated above, this Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated: June 1, 2020                           Respectfully submitted,

                                              /s/ Nicholas Espíritu

                                              Attorneys for *Amici Curiae*

Nicholas Espíritu (SBN 237665)
Sarah Kim Pak (SBN 324674)
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: 213-639-3900
Facsimile: 213-639-3900
Email: espiritu@nilc.org

Tanya Broder (SBN 136141)
NATIONAL IMMIGRATION LAW CENTER
2030 Addison Street, Suite 420
Berkeley, CA 94704
Telephone: (510) 663-8282
Email: broder@nilc.org

Kevin Herrera*
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 32358
Chicago, Illinois 60632-0358
Telephone: 213-770-1325
Facsimile: 213-770-1325
Email: herrera@nilc.org


Attorneys for *Amici Curiae*
*Admitted in Illinois, Tennessee, and New York