1

2

3                    **UNITED STATES DISTRICT COURT**

4                  **NORTHERN DISTRICT OF CALIFORNIA**

5

6    **ELOY ORTIZ OAKLEY, ET AL.,**              CASE NO.  20-cv-03215-YGR

7                        Plaintiffs,            **ORDER GRANTING PLAINTIFFS' MOTION**
                                                **FOR PRELIMINARY INJUNCTION; MOTIONS**
8            vs.                                **FOR LEAVE TO FILE AMICUS BRIEFS**

9    **BETSY DEVOS, ET AL.,**                    Re: Dkt. Nos. 16, 24, 27, 29, 30

10                       Defendants.

11          Plaintiffs Chancellor Eloy Ortiz Oakley, the Board of Governors of the California

12   Community Colleges, Foothill-De Anza Community College District, Los Rios Community

13   College District, Los Angeles Community College District, State Center Community College

14   District, and San Diego Community College District bring this action against defendants Betsy

15   DeVos, in her official capacity as United States Secretary of Education, and the United States

16   Department of Education ("DoE"), challenging DoE's interpretation and implementation certain

17   provisions of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L.

18   No. 116-136, 134 Stat. 281 (2020).  Plaintiffs' complaint seeks declaratory and injunctive relief on

19   the grounds that DoE's actions are *ultra vires* and violate separation of powers principles; the

20   Spending Clause, U.S. Const. art. I, § 8, cl. 1; and the Administrative Procedure Act ("APA"), 5

21   U.S.C. §§ 702-706.

22          Now before the Court is plaintiffs' motion for a preliminary injunction prohibiting

23   defendants from imposing or enforcing eligibility restrictions on students who may receive Higher

24   Education Emergency Relief Funds ("HEERF") appropriated by Congress in the CARES Act.

25   Having carefully considered the arguments of the parties at the June 9, 2020 hearing; the papers

26   submitted, including the supplemental filings on June 11, 13, and 14, 2020; and the pleadings in

27   this action, and for the reasons set forth below, the Court hereby **GRANTS** plaintiffs' motion for a

28   preliminary injunction.

United States District Court
Northern District of California

# I.  BACKGROUND[1]

## A.  California Community Colleges and the COVID-19 Pandemic

The California Community College system represents the largest postsecondary system in the United States, with more than 2.1 million students attending one of 114 college campuses annually, and 1.5 million students enrolled in the Spring 2020 semester.  The community colleges' mission includes offering academic and vocational instruction at a lower division level to a diverse student population to enable those students to advance California's economic growth and global competitiveness.  Cal. Educ. Code § 66010.4(a).

In response to the COVID-19 pandemic and the related statewide shelter-in-place order issued March 19, 2020, plaintiffs closed their campuses and transitioned to majority remote learning.  The transition required these institutions to mobilize their entire infrastructure, including by training faculty on remote instruction; procuring laptop devices and access to broadband internet connections for students; and creating virtual communities to provide core student services, such as instructional support, guidance counseling, and peer support.  Plaintiffs also marshalled resources to help address students' needs for food and mental health services.

Despite these efforts, the COVID-19 pandemic has severely impacted students at plaintiffs' institutions, many of whom face food and housing insecurity and lack the proper environment for learning and attending virtual classes.  Students' mental and emotional health has suffered, with students reporting high levels of stress, anxiety, depression, and suicidal thoughts.  In addition, plaintiffs have seen rising levels of student withdrawals from courses.  The Chancellor's Office estimates that community colleges in California stand to lose $60 to $80

---

[1]  Plaintiffs request judicial notice of: (i) DoE memoranda, bulletins, letters, statements and opinions; (ii) documents posted to DoE's website; and (iii) a video of a news interview conducted by the Secretary.  (Dkt. Nos. 16-2, 21-1.)  Each of these exhibits is a matter of public record not subject to reasonable dispute, and thus, is judicially noticeable.  *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (court may judicially notice matters of pubic record unless the matter is a fact subject to reasonable dispute); *Brown v. Valoff*, 422 F.3d 926, 933 n.9 (9th Cir. 2005) (judicially noticing an administrative bulletin); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (judicially noticing information on a government website); *Blatt v. Pambakian*, No. 19-cv-7046, 2020 WL 821040, at *16 (C.D. Cal. Jan. 9, 2020) (taking judicial notice of video of news interview because it is publicly available and from a source whose authenticity could not be questioned).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    million in enrollment fees due to disruptions caused by the COVID-19 pandemic.  For most of

2    these colleges, 70 to 90 percent of their funding depends upon enrollment.  Thus, disenrollment

3    adversely effects the types of courses, educational programs, services, and instruction offered at

4    plaintiffs' institutions.

5        **B.    The CARES Act**

6        On March 27, 2020, in response to the extraordinary public health and economic crisis

7    caused by the COVID-19 pandemic, the CARES Act was signed into law.  Among its many

8    provisions, the CARES Act appropriates $30.75 billion to DoE "to prevent, prepare for, and

9    respond to coronavirus, domestically or internationally."  134 Stat. at 564.  The statute directs that

10   a portion of those funds be used for the creation of the Higher Education Emergency Relief Fund

11   ("HEERF") program, 90 percent of which is to be allocated to colleges and universities in

12   accordance with a specified funding formula.  *Id.* §§ 18001, 18004(a)(1), at 564, 567.[2]  The

13   formula requires the Secretary to allocate funding to each institutions of higher education ("IHEs")

14   as follows: 75 percent based on its relative share of the full-time equivalent ("FTE") enrollment of

15   Pell Grant recipients and 25 percent based on its relative share of the FTE enrollment of all other

16   students, excluding in both categories students enrolled only in distance learning before the

17   coronavirus emergency began.  *Id.* § 18004(a)(1), at 567.  The CARES Act provides that HEERF

18   funds "shall be distributed by the Secretary using the same systems as the Secretary otherwise

19   distributes funding to each institution under [t]itle IV of the Higher Education Act of 1965 (20

20   U.S.C. [§] 1001, et seq.)."  *Id.* § 18004(b), at 568.

21       The CARES Act allows IHEs to use HEERF funds "to cover any costs associated with

22   significant changes to the delivery of instruction due to the coronavirus," subject to two express

23   conditions.  *Id.* § 18004(c), at 568.  First, the funds cannot be used for "payments to contractors

24   for the provision of pre-enrollment recruitment activities; endowments; or capital outlays

25

26   _____

27       [2]  As discussed herein, Congress designated the remaining 10 percent of HEERF funds for
     additional awards under established programs in specific subparts of Titles III, V, and VII of the
28   Higher Education Act of 1965 to address needs arising from the coronavirus emergency.  *Id.* §§
     18004(a)(2), 18004(a)(3), at 567-68.

3

associated with facilities related to athletics, sectarian instruction, or religious worship." *Id.*

Second, at least 50 percent of the funds ("HEERF Student Assistance") must be used "to provide

emergency financial aid grants to students for expenses related to the disruption of campus

operations due to coronavirus (including eligible expenses under a student's cost of attendance,

such as food, housing, course materials, technology, health care, and child care)." *Id.*  The

remaining 50 percent ("HEERF Institutional Assistance") may be used for any costs related to

changes to delivery of instruction due to the coronavirus which may include additional student

assistance.

### C.  Implementation of the CARES Act

On or about April 9, 2020, DoE announced the amounts of Section 18004(a)(1) funding

allocated to eligible IHEs.  The allocations totaled approximately $12.56 billion, to be divided

equally between HEERF Student Assistance and HEERF Institutional Assistance.  Approximately

$580 million was allocated to community colleges in California.

The same day, the Secretary wrote a letter to college and university presidents across the

country, notifying them of the availability of HEERF Student Assistance, which DoE was

"prioritizing . . . in order to get money in the hands of students in need as quickly as possible."

The letter went on to state, in part:

> The CARES Act provides institutions with significant discretion on how to
> award this emergency assistance to students.  This means that each institution
> may develop its own system and process for determining how to allocate these
> funds, which may include distributing the funds to all students or only to
> students who demonstrate significant need.  The only statutory requirement is
> that the funds be used to cover expenses related to the disruption of campus
> operations due to coronavirus (including eligible expenses under a student's
> cost of attendance, such as food, housing, course materials, technology, health
> care, and child care).  With that said, I would like to encourage the leadership of
> each institution to prioritize your students with the greatest need, but at the same
> time consider establishing a maximum funding threshold for each student to
> ensure that these funds are distributed as widely as possible.

The letter also provided a link to a Certificate of Funding and Agreement ("Certification").  In

order to access the funds, each institution was required to sign and return the Certification,

"acknowledging the terms and conditions of the funding," after which the institution could "draw

1   down their emergency assistance funds using the Department's G5 system."[3]

2   The Certification expressly required compliance with its terms and conditions, as well as

3   "all relevant provisions and requirements of the CARES Act or any other applicable law."  Failure

4   to comply with such conditions may subject an IHE to liability under enumerated statutes and

5   regulations, including regulations governing suspension and debarment from receiving federal

6   funding.  2 C.F.R. §§ 180.700, 180.800.  Further, the Certification encouraged IHEs to exclude

7   HEERF funds from students' expected family contributions for purposes of title IV need

8   calculations and stated that the Secretary "does not consider these individual emergency financial

9   aid grants to constitute Federal financial aid under [t]itle IV of the HEA."  At least eight colleges

10   in plaintiffs' districts executed Certifications shortly after receiving the Secretary's letter.[4]

11   On April 21, 2020, DoE posted to its website guidance on various HEERF-related issues in

12   the form of responses to "Frequently Asked Questions."  With respect to HEERF Student

13   Assistance, the guidance stated that "[o]nly students who are or could be eligible to participate in

14   programs under [S]ection 484 in title IV of the Higher Education Act of 1965, as amended (HEA),

15   may receive emergency financial aid grants."  Guidance for the HEERF Institutional Assistance

16   provided that funds could be used to make additional emergency financial aid grants to students,

17   subject to the same title IV eligibility requirements.

18   Title IV of the Higher Education Act was established "to assist in making available the

19   benefits of postsecondary education to eligible students . . . in institutions of higher education,"

20   and authorizes federal student financial aid programs, such as Pell Grants, 20 U.S.C. § 1070a, and

21   federal work-study programs, *id.* §§ 1087-51 to -58.  Relevant here, title IV provides that an

22   eligible student must "be a citizen or national of the United States, a permanent resident of the

23   United States, or be able to provide evidence from the Immigration and Naturalization Service that

24   he or she is in the United States for other than a temporary purpose of the intention of becoming a

25

26   [3] With respect to HEERF Institutional Assistance, the Secretary's letter stated that DoE
    was "working expeditiously to allocate the remaining funding" and would "provide details . . . in
27   the coming days."

28   [4] As of the date of the hearing on this motion, all California community colleges now have
    signed Certifications.

United States District Court
Northern District of California

citizen or permanent resident." *Id*. § 1091(a)(5); *see also* 34 C.F.R. § 668.33(a) (same).  Title IV also requires that eligible students possess a valid social security number.  20 U.S.C. § 1091(a)(4)(B); *see also* 34 C.F.R. § 668.32(i).  Consequently, the following categories of students, among others, are not eligible for title IV assistance: (a) Dreamers with or without Deferred Action for Childhood Arrival status; (b) other students with undocumented status; (c) students with pending asylum applications; (d) students with Temporary Protected Status or Deferred Enforced Departure status; and (e) students with U-visas.  Among citizens and non-citizens alike, title IV also excludes from eligibility students who: (a) do not have a high school diploma, General Education Development certificate or equivalent, or recognized exception to these requirements; (b) are enrolled only in non-credit courses; (c) have not registered with Selective Service (males 18-25); (d) are also enrolled in high school; (e) have not maintained a "C" average or above by the end of their second year; or (f) are in default on a federal student loan or owe any refund amount on a federal student grant.  *See* 20 U.S.C. § 1091(a)(1)-(3), (c), (d); 34 C.F.R. § 668.32.  Plaintiffs assert that the imposition of title IV eligibility requirements would preclude approximately 800,000 of the 1.5 million California community college students enrolled at the time of the recent campus closures from receiving HEERF Student Assistance.  Of this number, plaintiffs estimate that 523,000 students are ineligible because they will not meet one of the above-listed eligibility criteria.  Plaintiffs estimate that an additional 275,000 students are likely eligible for title IV but effectively precluded from receiving HEERF Student Assistance because they did not previously apply for federal financial aid.

On April 27, 2020, while appearing on the news program "Full Court Press," the Secretary reiterated DoE's position regarding eligibility requirements for HEERF funds.  While discussing the eligibility of Dreamers for CARES Act assistance, the Secretary stated that "[t]hey are not [eligible for such assistance], because they are not eligible for [t]itle IV funds, and so that's kind of the distinction that Congress was explicit about in the law[.]"

On May 21, 2020, following the filing of the instant motion, DoE posted an updated statement regarding HEERF funds to its website.  In the statement, DoE clarified that its previously posted guidance "lack[ed] the force and effect of law," and thus, DoE would "not

United States District Court
Northern District of California

initiate any enforcement action based solely on these statements." By contrast, the statement noted that the "underlying statutory terms in the CARES Act are legally binding, as are any other applicable statutory terms, such as the restriction in 8 U.S.C. § 1611 on eligibility for Federal public benefits including such grants." DoE then "reiterate[d] its guidance" that only students eligible for [t]itle IV programs may receive HEERF Student Assistance.

On June 11, 2020, eleven weeks after the passage of the CARES Act, DoE published on its website an unofficial copy of a forthcoming Interim Final Rule ("IFR") addressing the eligibility of students at IHEs for HEERF funds.[5] Therein, DoE stated that it had "concluded that *Congress intended* the category of those eligible for 'emergency financial aid grants to students' in [S]ection 18004 of the CARES Act to be limited to those individuals eligible for title IV assistance." (Emphasis supplied.) The IFR further stated that DoE had "not identified any specific language in Section 18004, or elsewhere in the CARES Act, that suggests Congress intended to include aliens who are not 'qualified' for purposes of Section 1611 among the recipients of HEERF funds[.]" Additionally, the IFR states that it is effective as of the date of its publication in the Federal Register, which DoE anticipated would occur within days.

## II.    LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking preliminary injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiffs'] favor," provided that the plaintiffs can also demonstrate the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

---

[5]  Department of Education, Office of Postsecondary Education, "CARES Act: Higher Education Emergency Relief Fund" (unofficial copy of Interim Final Rule on eligibility) Available at https://www2.ed.gov/about/offices/list/ope/caresact.html (last visited June 15, 2020).

1131-32 (9th Cir. 2011) (citation and internal quotation marks omitted).

III.   DISCUSSION

    A.   **Likelihood of Success on the Merits**

        1.   *Ripeness*

The parties focused much of their briefing on the threshold issues of ripeness and finality of agency action.  In assessing whether an action is ripe for review, a court must evaluate both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).  In an action brought under the APA, questions of ripeness and final agency action are interrelated.  *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998).  An agency action is final if it "amounts to a definitive statement of the agency's position,[] has a direct and immediate effect on the day-today operations of the subject party, or if immediate compliance with the terms is expected."  *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotation marks and citation omitted).  However, "[a]n agency's characterization of its action as being provisional or advisory is not necessarily dispositive, and courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled."  *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094-95 (9th Cir. 2014).

Despite considerable briefing and argument on these threshold issues,[6] DoE has since published on its website an unofficial copy of the forthcoming IFR, reiterating for at least the sixth time its "conclu[sion] that Congress intended the category of those eligible for 'emergency financial aid grants to students' in Section 18004 of the CARES Act to be limited to those individuals eligible for [t]itle IV assistance."  The IFR also repeats DoE's position that it has "not identified any specific language . . . suggest[ing] Congress intended to include aliens who are not

---

[6] Defendants argued that plaintiffs' claims were not ripe for adjudication because DoE's previous statements regarding HEERF constitute "preliminary guidance" and "initial views," which "lack the force and effect of law."  Plaintiffs countered that DoE's May 21 statement, which reiterated that HEERF Student Assistance may be distributed only to title IV eligible students and stated that DoE would enforce any perceived statutory requirements on eligibility, constituted a definitive statement that renders defendants' actions ripe for review.

United States District Court
Northern District of California

'qualified' for purposes of section 1611 among the recipients of HEERF funds[.]"  The Court evaluates the issue in its most current context.

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989).  These factors are met easily here.  Whether DoE's interpretation of the CARES Act, as set forth mostly recently in the IFR, violates the Constitution or APA presents a purely legal question.  Moreover, no likely future events would bring this legal question into greater focus or assist the Court in reaching a decision.  Defendants' position regarding eligibility for HEERF Student Assistance is known.  It has been reiterated publicly on at least six occasions and is now codified as part of a rule making process: students may not receive HEERF Student Assistance if they do not satisfy certain eligibility requirements. *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000) ("[W]e have recognized that final agency action may result 'from a series of agency pronouncements rather than a single edict.' . . .  Hence, a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position into final agency action[.]") (internal quotations and citation omitted).  The IFR doubles-down on this interpretation, in a manner courts have recognized as a final agency action. *See Public Citizen v. DOT*, 316 F.3d 1002, 1019 (9th Cir. 2003) (interim final rule was final agency action because "the term 'interim' refers 'only to the Rule's intended duration—not its tentative nature'" (quoting *Career Coll. Ass'n v. Riley,* 74 F.3d 1265, 1268-69 (D.C. Cir. 1996)), *rev'd on other grounds*, 541 U.S. 752 (2004); *Beverly Enters. v. Herman*, 50 F. Supp. 2d 7, 17 (D.D.C. 1999) (concluding interim final rule was final agency action subject to challenge under the APA).

DoE's assertion that the IFR will not be effective until the date of its publication in the Federal Register does not warrant further delay of judicial review.  The document already has been sent to the Office of the Federal Register, rendering its publication a mere formality.  Nor does the fact that the IFR invites public comment, which DoE states it will "consider" "in determining whether to revise the rule," preclude a finding of ripeness. The possibility that an agency may change a prior decision "is a common characteristic of agency action, and does not make an

United States District Court
Northern District of California

otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S.Ct.

1807, 1814 (2016); *see also Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 529-30 (N.D. Cal.

2017) ("[T]he possibility that the Government 'may' choose to interpret the Order's broad

language narrowly or 'may' choose not to enforce it against the Counties does not justify deferring

review.  This is especially true here because . . . the uncertainty concerning how the Government

will enforce the Order is currently causing them injury.").[7]

> "To meet the hardship requirement, a litigant must show that withholding review would

result in direct and immediate hardship and would entail more than possible financial loss."

*Winter*, 900 F.2d at 1325 (internal quotation marks and citation omitted).  A more "direct and

immediate" hardship is difficult to imagine given the *emergency* nature of the funding at issue and

the challenges resulting from an unprecedented global pandemic.  Without resolution of this legal

dispute, plaintiffs are delayed in distributing emergency funding, affecting hundreds of thousands

of students at plaintiffs' institutions who need those funds.  Indeed, in publishing the IFR, DoE

itself found good cause to waive its normal rulemaking processes and delayed effective date

because of the "urgent economic crisis" and because certain IHEs "have refrained from

distributing some of all of their HEERF funds until a final rule is issued clarifying this point

[regarding eligibility] in a legally binding manner."  Further, absent resolution, plaintiffs would be

left in an untenable position: distribute HEERF funds notwithstanding the IFR and risk

enforcement, or abide by the IFR, continue withholding emergency funds from certain students,

and expend considerable time and resources diverting funds away from other programs to assist

these students, even if that leads to increased disenrollment.  *See Santa Clara*, 250 F. Supp. 3d at

530 (finding claims ripe where "[w]ithout clarity the Counties do not know whether they should

---

[7] The cases discussed by defendants do not compel a different result.  *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 781 (9th Cir. 2000), concerned audits performed by the Office of the Inspector General which were "quintessentially non-final as a form of agency action."  Here, the agency action at issue is its policy position, often-repeated and now formalized in an IFR.  Defendants citation to *Nat. Res. Def. Council v. E.P.A.*, 706 F.3d 428 (D.C. Cir. 2013) is likewise distinguishable.  Unlike defendants' action here, the EPA's statutory interpretation clearly "represent[ed] [its] preliminary views," as to which the agency "expressed intent to issue a final, binding notice-and-comment rule" and had not taken additional steps to implement them. *Id.* at 433-34.

start slashing essential programs or continue to spend millions of dollars and risk a financial crisis in the near future"). The hardship factor is satisfied.

Accordingly, plaintiffs' claims are ripe for review.[8]

### 2.      Constitutional Claims

The Court next proceeds to consider plaintiffs' likelihood of succeeding on the merits of their claims that DoE's actions are an unconstitutional exercise of authority not permitted under the CARES Act. The Court begins by addressing plaintiffs' inter-related claims that defendants' actions are *ultra vires*, violating separation of powers principles and the Spending Clause.[9]

As the Ninth Circuit has noted, the separation of powers is an integral part of the Founders' design, expressing a "determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). The Founders committed the spending power to Congress. *Id*. at 1233. Indeed, the Spending Clause "exclusively grants the power of the purse to Congress, not the President" or the executive branch. *Id*. at 1231 (citing U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)). Thus, if Congress "has not delegated authority to the Executive to [impose funding] condition[s]," the executive branch lacks the authority to do so. *Id*. at 1233. Where "Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). As Justice Kennedy observed, if "the decision to spend [is] determined by the Executive alone,

---

[8]   The IFR contains the same eligibility restrictions as previously imposed by DoE, and thus, plaintiffs' prior challenges to DoE's guidance remain at issue in this dispute. *Massachusetts v. HHS*, 923 F.3d 209, 220 (1st Cir. 2019) (citing *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 & n.3 (1993)) (substantive challenges to interim final rule were not rendered moot when final rules published during the course of litigation were "sufficiently similar" to the challenged interim final rules); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 824-25 (9th Cir. 2019) (challenge to ordinance was not mooted by an amendment to the ordinance where the "gravamen of [plaintiff's] complaint and the irreparable harm that [plaintiff] alleges remain unaffected by the amendments" and courts are "particularly wary of legislative changes made in direct response to litigation").

[9]   The Court recognizes the general rule that federal courts must consider non-constitutional grounds for decision prior to addressing constitutional questions. *Jean v. Nelson*, 472 U.S. 846, 854 (1985). However, given the focus of the parties' briefing on questions of ripeness and the separation of powers, the decision here "unavoidably" must consider the constitutional claims to determine likelihood of success. *Id*.

without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).

Here, the parties dispute the appropriateness of DoE's imposition of conditions on the distribution of the emergency funds.  Plaintiffs argue the CARES Act does not incorporate title IV's eligibility requirements with respect to HEERF funds, nor does it delegate authority to DoE to apply such restrictions.  Rather, the CARES Act requires the Secretary to allocate funds to IHEs, which in turn have broad discretion to use the funds to "cover any costs associated with significant changes to the delivery of instruction due to the coronavirus."  § 18004(a)(1), (c), 134 Stat. at 567-68.  Defendants counter that Congress delegated administration of the HEERF program under the CARES Act to DoE, and that its interpretation not only is consistent with its oversight role, but also does not create any new eligibility criteria.  DoE claims "merely [to] *interpret* § 18004(c) consistent with its understanding of Congress's intention that the 'emergency financial aid grants' referenced therein fall within the general financial aid framework that [t]itle IV provides, and that [t]itle IV's existing eligibility criteria *logically apply*."  (Emphasis supplied.)

A cardinal canon of statutory interpretation requires that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Id*. at 254 (quoting *Rubin v. United States,* 449 U.S. 424, 430 (1981)); *see also Bostock v. Clayton Cty., Georgia*, No. 17-1618, __ S.Ct.__, 2020 WL 3146686 at *14 (U.S. June 15, 2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.  The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration.") (citing cases).  Thus, the Court begins its analysis of the CARES Act by examining the text of the statute itself.

Section 18004 of the CARES Act, which establishes HEERF, provides, in relevant part:

(a) IN GENERAL.—The Secretary shall allocate funding under this section as follows:
    (1) 90 percent to each institution of higher education to prevent, prepare for, and respond to coronavirus, by apportioning it—

United States District Court
Northern District of California

(A) 75 percent according to the relative share of fulltime equivalent enrollment of Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency; and

(B) 25 percent according to the relative share of fulltime equivalent enrollment of students who were not Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency.

\* \* \* \* \*

(b) DISTRIBUTION.—The funds made available to each institution under subsection (a)(1) shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under title IV of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.).

(c) USES OF FUNDS.—Except as otherwise specified in subsection (a), an institution of higher education receiving funds under this section may use the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus, so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship. Institutions of higher education shall use no less than 50 percent of such funds to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care).

*Id.* § 18004, at 567-68.

The entirety of Section 18004 contains a single explicit reference to title IV.  Namely, Section 18004(b) requires that HEERF funds be distributed by the Secretary using the "same systems" as the Secretary uses to distribute funding under title IV.  *Id.* § 18004(b), at 568.  The statutory provision cited in the CARES Act which describes those "systems" only refers to operational systems used for administration of funds, not eligibility requirements.  *See* 20 U.S.C. § 1018(b)(1)(C) (authorizing Secretary to assist with "the administration of the systems used to administer the Federal student financial assistance programs authorized under [title] IV" and "the updating of such systems to current technology"); *id.* § 1018(b)(2)(A)(ii), (iv) (describing "software development and procurement for systems supporting" title IV); *id.* § 1018(c)(1)(C), (c)(3) (similar).  The Ninth Circuit has held that, where "Congress was fully aware of" a statute but nonetheless "specifically chose to invoke only" a provision, a court should not interpret the

13

United States District Court
Northern District of California

statute to extend beyond the portion cited.  *Navajo Nation v. HHS*, 325 F.3d 1133, 1139-40 (9th Cir. 2003) (by "ch[o]os[ing] to invoke only the fiscal provisions of the ISDEAA," Congress incorporated it "with surgical precision" and did not intend to incorporate other provisions in the same statute).  Here, the only express reference to title IV contained in Section 18004 is unrelated to eligibility requirements.

Congress has demonstrated consistently that it knows how to impose conditions on funding and delegate to the Secretary the authority to impose such conditions when intended.  Indeed, Congress specified eligibility criteria in other provisions of the CARES Act.[10]  Moreover, outside of the CARES Act, Congress has been explicit when previously imposing conditions on federal funds to IHEs in the Higher Education Act.[11]  Congress has not equivocated when it intends to extend authority to the Secretary, using terms such as "may establish," "may require," "shall prescribe," "determines will best carry out," or "determines to be necessary."[12]  Likewise, Congress has been explicit when it intended to provide the Secretary with authority to establish eligibility criteria or impose conditions for other higher education programs, grants, or loans, again, using such terms as "establishing criteria."[13]

Here, no such language exists in section 18004.  While Congress has the power to extend authority to the Secretary, it is not required to express proactively that such authority does *not*

---

[10]  *See, e.g.,* § 6428(d), 134 Stat. at 335 (excluding "nonresident alien individual[s]" from receiving recovery rebates).

[11]  *See, e.g.*, 20 U.S.C. §§ 1011, 1011a, 1011i, 1011m (limiting use of federal funding by IHEs for discriminatory purposes, on the basis of participation in protected speech or activity, and in the absence of drug and alcohol abuse prevention programs).

[12] *See, e.g.,* 20 U.S.C. § 1078-2(a)(3) (students or parents are subject to "such other eligibility criteria as the Secretary may establish by regulation" for loan program); *id.* § 1087c(b)(2) (Secretary may require higher education institutions "meet such other eligibility requirements as the Secretary shall prescribe" for loan program); *id.* § 1066(b)(11) (Secretary may make loans to institutions "in accordance with conditions prescribed by the Secretary"); *id.* § 1072(a)(3), (c)(7) (Secretary may make advances subject to "terms and conditions" which "the Secretary determines will best carry out the purposes of this section" or are "satisfactory to the Secretary"); *id.* § 1082(a)(3) (Secretary may add conditions that "the Secretary determines to be necessary" to achieve the purposes of that part); *id.* § 1416(e)(1)(C) (Secretary may impose special conditions for high risk grantees).

[13]  *See, e.g.,* 20 U.S.C. § 1002(a)(2)(B)(IV) (Secretary to issue regulations "establishing criteria for the eligibility of graduate medical schools" to participate in loan programs).

14

1  exist.  The Court interprets the absence of any explicit reference to title IV eligibility requirements

2  or related grant of authority to the Secretary in Section 18004 as intentional.  *See Util. Air*

3  *Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it

4  wishes to assign to an agency decision of vast economic and political significance.") (internal

5  quotations omitted); *Alcoa S.S. Co. v. Fed. Maritime Com.*, 348 F.2d 756, 758 (D.C. Cir. 1965)

6  ("Where Congress has consistently made express its delegation of a particular power, its silence is

7  strong evidence that it did not intend to grant the power.") (internal quotations and citation

8  omitted).  The language of the statute itself is the strongest evidence that Congress did not intend

9  for title IV eligibility requirements to apply to HEERF.

10  Defendants' arguments to the contrary rely on three strained interpretations of Section

11  18004 arising from the terms "cost of attendance," "emergency financial aid grants," and

12  "students."  The Court considers each argument in turn.

13  *a.*  *"Cost of Attendance"*

14  First, defendants claim that Congress was "clearly invoking" title IV eligibility limitations

15  when it used the term "cost of attendance" in Section 18004(c).  Section 18004(c) states that

16  HEERF funds shall be used to provide emergency financial aid grants to students for "expenses

17  related to the disruption of campus operations due to coronavirus (including eligible expenses

18  under a student's cost of attendance, such as food, housing, course materials, technology, health

19  care, and child care)."

20  Defendants' attempt to bootstrap a grant of authority to the Secretary based upon Section

21  18004(c)'s use of the term "cost of attendance" is tenuous at best.  The term "cost of attendance"

22  is used three times in section 18004.  The first two uses are Subsections 18004(a)(2)[14] and

---

24  [14] Subsection (a)(2) reads: 7.5 percent for additional awards under parts A and B of title III,
25  parts A and B of title V, and subpart 4 of part A of title VII of the Higher Education Act to address
   needs directly related to coronavirus, that shall be in addition to awards made in section
26  18004(a)(1) of this title, and allocated by the Secretary proportionally to such programs based on
   the relative share of funding appropriated to such programs in the Further Consolidated
27  Appropriations Act, 2020 (Public Law 116–94) and which may be used to defray expenses
   (including lost revenue, reimbursement for expenses already incurred, technology costs associated
   with a transition to distance education, faculty and staff trainings, payroll) incurred by institutions
28  of higher education and for grants to students for any component of the student's *cost of*
   *attendance* (as defined under section 472 of the Higher Education Act), including food, housing,

18004(a)(3)[15] which concern the allocation of the 10 percent of HEERF funds to existing programs under specific portions of the Higher Education Act (parts A and B of title III, parts A and B of title V, and subpart 4 of part A and part B of title VII), which provide assistance to IHEs serving a high proportion of students with significant need, and particularly students of color. These subsections of the HEERF allocations provide that funds in this 10% of the total can be used for "any component of a student's cost of attendance (as defined under section 472 of the Higher Education Act)," or 20 U.S.C. section 1087*ll*, a part of title IV.

Section 18004(c), on the other hand, uses the term "cost of attendance" but includes no such explicit cross-reference.[16]  Further, it uses the term "cost of attendance" simply to refer to a subset of expenses that may be covered in the broader category of "expenses related to the disruption of campus operations due to coronavirus."

Thus, the use of the term "cost of attendance" in Section 18004(c) is hardly an "unambiguous" indication of Congress' intent to superimpose title IV's eligibility restrictions on distribution of HEERF funds.  Even in its cross-reference to the Higher Education Act, Congress specifically only mentioned the definition of "cost of attendance" which lists the *types of expenses* associated with student attendance at IHEs, such as tuition, books, and room and board.  It did not

---

course materials, technology, health care, and child care. (Term italicized for reader's convenience.)

[15] Subsection (a)(3) reads: 2.5 percent for part B of title VII of the Higher Education Act for institutions of higher education that the Secretary determines have the greatest unmet needs related to coronavirus, which may be used to defray expenses (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll) incurred by institutions of higher education and for grants to students for any component of the student's *cost of attendance* (as defined under section 472 of the Higher Education Act), including food, housing, course materials, technology, health care, and child care. (Term italicized for reader's convenience.)

[16] (c) USES OF FUNDS.—Except as otherwise specified in subsection (a), an institution of higher education receiving funds under this section may use the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus, so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship. Institutions of higher education shall use no less than 50 percent of such funds to provide *emergency financial aid grants* to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's *cost of attendance,* such as food, housing, course materials, technology, health care, and child care). (Terms italicized for reader's convenience.)

United States District Court
Northern District of California

incorporate the entire Higher Education Act, nor the portions of title IV related to eligibility requirements.  Nowhere does Section 18004(c) mention or otherwise incorporate restrictions on the *types of students* eligible for aid.

      *b.*     *"Emergency Financial Aid Grants"*

      Defendants' next textual argument is grounded in Section 18004(c)'s use of the term "emergency financial aid grants."  Defendants assert that, because this term is used in a separate provision of the CARES Act that expressly incorporated the eligibility requirements of title IV (Section 3504), the use of the same term in 18004(c) indicates Congress' intent to incorporate title IV requirements there as well.  This argument, too, fails to persuade.  Section 3504 of the CARES Act, entitled "Use of Supplemental Educational Opportunity Grants for Emergency Aid," authorizes IHEs to use their "allocation" of funds *previously awarded under title IV* to provide "emergency financial aid grants to students."[17]  Section 3504 thus concerns funds allocated under an existing title IV program, to which title IV's eligibility requirements already attach.  By contrast, Section 18004 establishes a distinctly separate source of emergency funding and is silent as to any eligibility requirements.[18]  Nothing in Section 18004(c) suggests eligibility requirements that may attach to Section 3504's title IV funding reallocation should also apply to the additional, new emergency funds established in the HEERF program.

      *c.*     *"Students"*

      Finally, defendants suggest that because the CARES Act does not define the term "students," they must impose one using title IV.  The Court disagrees.  The meaning of the word "student" is plain as is shown by defendants' own actions.  Section 18004(a) mandates that the Secretary "shall allocate" HEERF funds according to a specific formula that counts *all* of an institution's students, excluding only those enrolled exclusively in distance education courses prior to the COVID-19 emergency.  Indeed, the statutory formula expressly provides for the

---

[17] Section 3504 falls within Division A of the CARES Act entitled "Keeping Workers Paid and Employed, Health Care System Enhancements, and Economic Stabilization."

[18] Section 18004 is in Division B of CARES Act entitled "Emergency Appropriations for Coronavirus Health Response and Agency Operations."

1  inclusion of FTE students who were not Federal Pell Grant recipients, *i.e.*, students who would be

2  ineligible for title IV aid.  Defendants' had information and made allocations based on the plain

3  meaning of the term in the legislation.  Nothing more was needed.

4      Instead, defendants have manufactured ambiguity where none exists by imposing their

5  own restrictions on the definition of "student," thereby rendering the meaning of the term

6  inconsistent within HEERF itself.  Under defendants' interpretation of the CARES Act,

7  subsections (a) and (c) would give two different meanings to the term "students," where

8  subsection (a) would include all students for purposes of funding allocation and subsection (c)

9  would exclude non-title IV eligible students for purposes of student distributions.  Such an

10  interpretation makes little sense and violates fundamental tenets of statutory interpretation.  *See*

11  *Los Angeles v. Barr*, 941 F.3d 931, 941 (9th Cir. 2019) ("Under the normal rule of statutory

12  construction, we presume that identical words used in different parts of the same act are intended

13  to have the same meaning.") (internal quotation marks omitted).  Based on these principles, the

14  term "students" in Section 18004(c) governing HEERF Student Assistance must have the same

15  meaning as the term "students" in Section 18004(a)(1)(B) governing the HEERF funding formula.

16      Accordingly, based on the language of the statute, the Court finds for purposes of this

17  motion that DoE likely exceeded its authority by imposing eligibility requirements on the

18  distribution of HEERF Student Assistance, thereby violating separation of powers principles and

19  the Spending Clause.[19]  Plaintiffs are likely to prevail on the merits of their constitutional claims.

20          *3.    The Administrative Procedure Act*

21      While the parties' consideration of the APA focused largely on the ripeness and finality

22  question, plaintiffs also argue that they will succeed on the merits here because the Secretary's

23  _____

24      [19]  Eight schools who signed Certifications based on the DOE's initial guidance, indicating
    title IV would not apply.  This further supports a likelihood of success on plaintiffs' claim under
    the Spending Clause which prohibits imposition of  "post acceptance" conditions.  *Pennhurst*, 451

25  U.S. at 25 (holding that grant recipients "cannot knowingly accept conditions of which they are
    'unaware' or which they are 'unable to ascertain'"; "the federal government cannot 'surpris[e]'

26  grant recipients with funding conditions after acceptance").  DoE changed its position after they
    entered into these agreements, within just a few weeks of the original guidance, during a time of

27  grave uncertainty for plaintiffs and their students.  These IHEs were not able "to exercise their
    choice knowingly, cognizant of the consequences of" accepting HEERF funds.  *Pennhurst*, 451

28  U.S. at 17.

18

actions violate the APA.  First, similar to their constitutional arguments, plaintiffs contend that the Secretary's imposition of eligibility requirements violates the APA as "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," 5 U.S.C. § 706(2)(B)-(C).  For the reasons stated above, the Court finds that plaintiffs have demonstrated a likelihood of success on the merits of their claim that defendants exceed their limited authority under the CARES Act by imposing eligibility restrictions, and therefore violate the APA as well.  *See also Los Angeles v. Barr*, 941 F.3d at 942 (interpretation of a statute as giving agency broad authority to impose conditions would be "antithetical to the concept of a formula grant" lacking express authority for such conditions).

Second, in further support of their APA claim, plaintiffs contend DoE's shifting and ambiguous positions regarding eligibility restrictions on HEERF funds should be enjoined as "arbitrary, capricious, [and] an abuse of discretion" pursuant to 5 U.S.C. § 706(2)(A), citing, *e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).[20]  Because the Court finds that plaintiffs have established a likelihood of success on their other claims, it need not and does not reach this secondary question.

4.    *Eligibility Limitations Based Upon 8 U.S.C. Section 1611*

Finally, in opposing the motion, defendants raise the argument that plaintiffs cannot prevail on the relief they seek here for the independent reason that, regardless of whether title IV's eligibility criteria apply, 8 U.S.C. section 1611 bars most non-citizens (*i.e.*, those not considered "qualified aliens" under the statute) from receiving "Federal public benefits."  Defendants contend that HEERF Student and Institutional Assistance both "indisputably" constitute "Federal public benefits."[21]  The Secretary posted new guidance to that effect on DoE's website on May 21, 2020,

---

[20]  While focused largely on ripeness, defendants also made a passing reference to her non-binding interpretation being entitled to deference. briefly referencing *Skidmore* and completely silent as to *Chevron*.  (*See* Oppo., Dkt. No. 20, at 20:4-21:5, 21:19-21 [defendants' interpretation is "entitled to deference, particularly since the Department is not seeking to enforce the Guidance against Plaintiffs or any other entity"].)  Under the present record, this suggestion of deference is not sufficient to negate plaintiffs' showing of likely success on the merits.

[21]  Though not argued in the preliminary injunction motion itself nor stated in the complaint specifically, plaintiffs' complaint challenges the Secretary's efforts to impose eligibility

19

United States District Court
Northern District of California

four days prior to filing an opposition to the instant motion.[22]  Further, the Secretary's IFR states that both emergency financial aid grants to students and the use of HEERF Institutional Assistance funds to cover "costs associated with significant changes to the delivery of instruction due to the coronavirus" would constitute "Federal public benefits" under section 1611.

Plaintiffs and their amici[23] counter defendants' argument, contending that HEERF funds are not "Federal public benefits" restricted by section 1611(a).  Plaintiffs contend that the term "Federal public benefit" is limited by statute and long-standing agency interpretation such that it has no application to the allocations in the HEERF provisions.  Further, even if HEERF funds were construed to fall within the benefits barred by section 1611(a), Congress's direction that HEERF funds be provided to *all* students supersedes the earlier, more general statute in section 1611, even if it purports to apply "notwithstanding" other enactments.

The Court begins with the text of section 1611 (a), which states:

> Notwithstanding any other provision of law and except as provided in subsection (b), [a non-citizen] who is not a ["]qualified alien["] (as defined in section 1641 of this title) is not eligible for any Federal public benefit (as defined in subsection (c)).

8 U.S.C. § 1611(a).  In subsection (b), the statute expressly excepts certain federally funded benefits from the definition of "Federal public benefit,"[24] including:

---

limitations on HEERF funds broadly.  The Court therefore reaches the Section 1611 argument here and has considered the parties' arguments raised in the opposition and reply briefing and at the hearing on this matter, and in the post-hearing IFR.

[22]  *See* Defendant's Opposition Exh A, Office of Postsecondary Education, "CARES Act: Higher Education Emergency Relief Fund," updated statement 5/21/20 (Secretary's Guidance to date lacks the force of law, "except as authorized by law or as incorporated into a contract," but "the underlying statutory terms in the CARES Act are legally binding, as are any other applicable statutory terms, such as the restriction in 8 U.S.C. § 1611 on eligibility for Federal public benefits including such grants.")

[23]  The National Immigration Law Center filed a motion for leave to file a brief as *amicus curiae*.  (Dkt. No. 29.)  Given the Court's "broad discretion" to permit amicus briefs, *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995), as well as proposed *amici curiae*'s perspectives on the statute at issue in this case, the motion is **GRANTED**.

[24]  The term "Federal public benefit" is, in turn, defined in 8 U.S.C. § 1611(c)(1) as:

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

- public health assistance for immunization, testing, and treatment of communicable diseases;
- treatment under Medicare for emergency medical conditions, and
- "[s]hort-term, non-cash, in-kind emergency disaster relief."

*See* 8 U.S.C. §§ 1611(b)(1)(A)-(C), (E).[25]

In addition to these exceptions, other federally funded programs, services, and assistance may be exempted by the Attorney General if those programs:

> (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety[.]

8 U.S.C.A. § 1611(b)(1)(D).  In 2001, the Attorney General issued a final specification regarding programs exempt under subsection (b)(1)(D).  *Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation*, 66 Fed. Reg. 3613-02, 2001 WL 31994 (FR) (January 16, 2001).[26]  The Attorney General further added criteria for programs exempted from general bar, including:

> (a) Crisis counseling and intervention programs; services and assistance relating to child protection, adult protective services, violence and abuse prevention, victims of domestic violence or other criminal activity; or treatment of mental illness or substance abuse;
>
> (b) Short-term shelter or housing assistance for the homeless, for victims of domestic violence, or for runaway, abused, or abandoned children;
>
> (c) Programs, services, or assistance to help individuals during periods of heat, cold, or other adverse weather conditions;
>
> (d) Soup kitchens, community food banks, senior nutrition programs such as meals

---

> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

[25]  In addition, "nonprofit charitable organizations," are exempted from the requirement to determine or verify an immigrant's eligibility for federal public benefits. 8 U.S.C. § 1642(d).

[26] Therein, the Attorney General deferred to program exceptions already issued by certain federal agencies under this provision, finding it was in those agencies' discretion to specify their own programs that met the statutory criteria.  *Id.* at 3614.

on wheels, and other such community nutritional services for persons requiring special assistance;

(e) Medical and public health services (including treatment and prevention of diseases and injuries) and mental health, disability, or substance abuse assistance necessary to protect life or safety;

(f) Activities designed to protect the life or safety of workers, children and youths, or community residents; and

(g) Any other programs, services, or assistance necessary for the protection of life or safety.

*Id.* at 3616.

The Department of Health and Human Services ("DHSS") also issued its own interpretation of the Section 1611(b)(1)(D) exemption for programs under its authority. DHSS found that "Federal public benefits" did not encompass benefits targeted to certain *communities* or *sectors of the population* rather than particular "*eligibility units*" (*i.e.*, an individual, household, or family "unit" that met specified qualifications. *See Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit,"* 63 Fed. Reg. 41,658, at 41,659, 1998 WL 435846 (August 4, 1998) (emphasis supplied). Thus, federal funds in a block grant for providing health care services to low-income mothers, children, and families were not considered a "Federal public benefit" but instead a "a benefit targeted to *certain populations* based on their characteristics," and exempt from Section 1611(a). *Id.* (emphasis supplied). As stated therein, "[p]rograms that are primarily designed to target and provide services to communities should not be burdened with new verification procedures merely because they may include some services that flow more directly to the individual, household or family." *Id.*

These examples by no means exhaust all the federal programs exempt from Section 1611(a)'s bar despite the superficial appearance that they constitute "Federal public benefits" within the statute's reach.[27] Thus, contrary to the Secretary's argument, Section 1611(a)'s

---

[27] For example, see Dep't of Justice, *Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 62 Fed. Reg. 61344, 61345–46 (Nov. 17, 1997) (defining exemption for "nonprofit charitable organizations" engaged in "relief of the poor and distressed or the underprivileged" as a larger social project).

applicability to the HEERF program is far from automatic or "indisputable."[28]

Here, the CARES Act and HEERF program were enacted in response to an unprecedented national emergency and public health crisis caused by COVID-19.  Not unlike other federally funded programs exempted from Section 1611(a)'s restrictions—*i.e.*, programs addressed to public health, medical emergencies, disaster relief, or otherwise "necessary for the protection of life or safety"—HEERF funds are directed to IHEs in order to provide relief both to the IHEs themselves and to their students due to significant changes and disruption associated with the coronavirus.  § 18004(c), 134 Stat. at 568.  The IHEs are given broad discretion as to how the funds may be used, including covering students' costs for food, housing, technology, heath care and childcare occasioned by this national emergency.  *Id*.  HEERF relief is targeted toward IHEs to provide aid to their students, not directed to individual eligibility units.  These characteristics suggest that HEERF does not meet the definition of "Federal public benefit" in Section 1611(a).

Further, as discussed above, the statute mandates that the Secretary "shall allocate" HEERF funds according to a specific formula that counts *all* of an IHE's students, excluding only those enrolled exclusively in distance education courses prior to the COVID-19 emergency.  As previously stated, it would be contrary to the canons of statutory construction, common sense, and logic to find that the same students included in the calculation of an IHE's allocation nevertheless would be excluded from receipt of such funds pursuant to Section 1611(a).  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (statutory construction "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency"); *Bostock,* __ S.Ct.__, 2020 WL 3146686 at 14.[29]  Moreover, long-standing Supreme Court and Ninth Circuit

---

[28]  *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032 (9th Cir. 2013), cited by the Secretary, is distinguishable.  There, in a per curiam decision, the Ninth Circuit assumed that section 1611 governed eligibility for a federal student loan, but denied pro se appellant's petition to compel the Department to provide him a federal student loan on these grounds when appellant conceded at oral argument that he was not an "eligible alien" for purposes of section 1611.

[29]  As discussed at length above, Congress specifically addressed eligibility criteria in other provisions of the CARES Act, including eligibility of "aliens" for funds established thereunder, but did not mention section 1611(a) or similar eligibility restrictions at all in the HEERF provisions.  *Compare* §§ 1102(a)(2)(36)(A), 134 Stat. at 286 (paycheck protection program); 2107(b)(1), 134 Stat. at 325 (describing unemployment compensation as being available "for each

United States District Court
Northern District of California

precedent hold that a later, more specific statement may take priority over an earlier, broader statutory provision, even if it is prefaced by a "notwithstanding any other laws" clause. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (relying on long-standing canon of construction that a more specific provision is construed as an exception to a general one); *Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996) (limiting "notwithstanding any other law" clause to relevant categories of other law, stating "[w]e have repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally.") Here, plaintiffs argue persuasively that the specific, one-time emergency disbursement of HEERF Assistance in the CARES Act is not subject to the more general prohibition in the earlier statute.

Based on the foregoing, the Court is not persuaded by the Secretary's argument that HEERF funds would constitute "Federal public benefits" from which most non-citizens would be denied eligibility, nor that the Secretary's election to apply 1611(a)'s restrictions to these funds as an eligibility condition would be lawful. Consequently, the Court finds that the Secretary's argument does not preclude a finding of plaintiffs' likely success on the merits.[30]

### B.  Irreparable Harm

To establish a likelihood of irreparable harm, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must demonstrate immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Plaintiffs also must show that the threatened harm would not occur if an injunction is granted. *Winter*, 555 U.S. at 20; *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925-26 (N.D. Cal. 2019) (preliminary injunction warranted only if it "will prevent some irreparable injury that is likely to occur before the Court

---

eligible individual"), 6428(d), 134 Stat. at 335 (recovery rebates are available for "eligible individuals," and excludes "nonresident alien individual[s]"), 18003(d)(8), 134 Stat. at 566 (can use funds "to provide meals to *eligible* students") *with* § 18004, 134 Stat. at 567-68.

[30]  Moreover, section 1611 and the PRWORA were enacted with the objective of decreasing *long-term* dependency on public benefits, "remov[ing] the incentive for illegal immigration provided by the availability of public benefits," 8 U.S.C. § 1601(6), and "limit[ing] *lifetime* welfare benefits," H.R. Rep. No. 104-651 at 3 (1996) (emphasis supplied). That objective would not apply to HEERF, a one-time federal funding allocation to address emergency needs during a national public health crisis. *See Chao v. Bremerton Metal Trades Council, AFL-CIO*, 294 F.3d 1114, 1119 (9th Cir. 2002) (when there is a potential conflict between two federal statutes the ultimate resolution of that conflict depends on an analysis of congressional intent).

United States District Court
Northern District of California

1   has time to decide the case on the merits"), *appeal filed,* No. 19-16102 (9th Cir. May 29, 2019).

2   Plaintiffs contend that the imposition of title IV eligibility requirements on distribution of

3   HEERF Student Assistance will have an immediate and detrimental impact on plaintiffs' academic

4   missions, commitment to serving all student populations, and limited financial resources at a time

5   when students and staff are experiencing unprecedented disruptions as a result of the COVID-19

6   pandemic.  Defendants assert two counter-arguments: one, that these purported harms are

7   attributable to the pandemic itself and to plaintiffs' own decisions about how to allocate funding,

8   not DoE's guidance; and two, that the effect, if any, is on third parties to this action—the

9   students—since the IHEs function merely as a pass-through of the funds.

10   Defendants do not persuade.  As explained in section III.A.1., *supra*, plaintiffs have

11   demonstrated an immediate threatened injury arising out of DoE's interpretation of the CARES

12   Act, as now set forth in the (proposed) IFR.  In the absence of a preliminary injunction, the IHEs

13   face irreparable injury arising from the loss of future federal funding for violation of their

14   Certifications, as well as budget uncertainty and harm to their ability to carry out their institutional

15   missions.  *See Washington v. Trump*, 847 F.3d 1151, 1168-69 (9th Cir. 2017) (federal Executive

16   Order caused injury to students and faculty subject to restrictions but also caused budgetary

17   uncertainty and harm to plaintiff universities' mission); *Cty. of Santa Clara v. Trump*, 250 F.

18   Supp. 3d 497, 537 (N.D. Cal. 2017) (Executive Order and uncertainty arising from it created

19   irreparable harm to counties due to inability to "budget, plan for the future, and properly serve

20   their residents.").

21   Moreover, the Supreme Court and Ninth Circuit have affirmed repeatedly the principle that

22   entities may assert injuries of third parties with whom their interests are "inextricably bound,"

23   most especially in the case of schools asserting the rights of their students.  *Id.* at 1160 (*citing*

24   *Singleton v. Wulff*, 428 U.S. 106, 114–16 (1976) *Runyon v. McCrary*, 427 U.S. 160, 175 & n.13

25   (1976); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925); *Parks Sch. of Bus., Inc. v. Symington*,

26   51 F.3d 1480, 1487–88 (9th Cir. 1995)).  Thus, harms attributable both to the IHEs and to their

27   students are relevant to the balance of hardships here.  *See Washington v. Trump*, 847 F.3d at

28   1168-69.

United States District Court
Northern District of California

United States District Court
Northern District of California

With respect to the students, the harm is significant.[31]  Congress intended for HEERF Student Assistance to be used for basic necessities, such as food, housing, health care, and childcare, as well as essential tools for learning, such as course materials and technology.  DoE's interpretation of the CARES Act would exclude hundreds of thousands of students—including those in low-income communities and communities of color, which have been affected disproportionately by COVID-19—from receiving HEERF Student Assistance.  DoE's interpretation also excludes students who are the lifeblood of the state's economy and are on the frontlines of the pandemic.  Among those excluded would be 150,000 students who likely qualify as economically disadvantaged; 100,000 students training for essential work in health services; 80,000 students training to be first responders; 26,000 students with disabilities; 12,000 veterans; 1,700 active duty service members; and many more first generation college attendees, single mothers, formerly incarcerated individuals, at-risk foster youth, hourly-wage workers, and students facing job loss and severe food and housing insecurity.[32]

The Court finds that plaintiffs have established they are likely to suffer irreparable harm in the absence of a preliminary injunction.

## C.    Balance of Equities and Public Interest

Plaintiffs contend that the public interest in responding to the COVID-19 pandemic and supporting students' continued education weighs in favor of an injunction.  In response, defendants primarily argue that if the Court enjoins DoE's guidance now, and later reverses itself

---

[31] The Student Senate for California Community Colleges filed a motion for leave to file an *amicus curiae* brief underscoring the impact of DoE's interpretation on California community colleges, their students, and the community at large.  (Dkt. No. 30.)  Similarly, nine California community colleges and community college districts educating over 325,000 Californians filed a motion for leave to file a brief as *amici curiae* highlighting the diverse composition of their student body and amplifying plaintiffs' argument that DoE's eligibility requirements will cause harm to the most vulnerable.  (Dkt. No. 24.)  Given the Court's "broad discretion" to permit amicus briefs, *Hoptowit*, 682 F.2d at 1260, as well as proposed *amici curiae*'s perspectives in relation to this case, the motions are GRANTED.

[32] Additionally, injuries to "sovereign interests and public policies" may constitute irreparable harm.  *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).  Here, plaintiffs and certain of their amici emphasize that the California Legislature has established policies and financial aid designed to make the community college system accessible to all students, and those policy goals are compromised by DoE's implementation of the CARES Act.

1  in a final decision on the merits, any HEERF funds distributed to students ineligible under title IV

2  or Section 1611 would have been distributed already, which could not be undone.[33]

3      The fundamental question before the Court is not whether there is any potential for harm to

4  defendants should a preliminary injunction issue.  Rather, the Court must consider whether public

5  interests in favor of granting an injunction "outweigh other public interests that cut in favor of not

6  issuing the injunction." *Cottrell*, 632 F.3d at 1131.

7      Here, the Court finds the balance of equities tips sharply in plaintiffs' favor.  As explained

8  in Section III.B., *supra*, in light of the emergency nature of the funding at issue and the public

9  health and economic circumstances in which this case arises, the public interest in an injunction is

10  significant.  *See City & Cty. Of San Francisco*, 897 F.3d at 1244 (upholding injunction against

11  imposition of immigration conditions on federal grants because "the public interest cannot be

12  disserved by an injunction that brings clarity to all parties and to citizens dependent on public

13  services").[34]  Moreover, the facts and law strongly favor plaintiffs with respect to the merits of

14  their claims.  Although preliminary injunctive relief would, to a certain extent, allow for a change

15  to the status quo, the Ninth Circuit has recognized "the infinite variety of situations in which a

16  court of equity may be called upon for interlocutory injunctive relief requires that the court have

17  considerable discretion in fashioning such relief."  *P. v. Riles*, 502 F.2d 963, 965 (9th Cir. 1974)

18  (affirming issuance of preliminary injunction that granted limited change to status quo).  The

19

20      [33]  In their briefing, defendants also argued that an injunction would cut short DoE's
ongoing process of administering HEERF aid, specifically by finalizing its interpretation of the
21  CARES Act with respect to HEERF Student Assistance.  As explained, because DoE has
published the IFR, rendering this dispute ripe for judicial review, the Court finds this argument
22  carries no weight with respect to balancing of the equities and considering the public interest.

23      [34]  Twenty-five counties, cities, and municipalities filed a motion for leave to file an *amici
curiae* brief.  (Dkt. No. 27.)  Given the Court's "broad discretion" to permit amicus briefs,
24  *Hoptowit*, 682 F.2d at 1260, as well as proposed *amicus curiae*'s perspective in relation to this
case, the motion is **GRANTED.**.  In the motion, proposed *amici curiae* emphasize that without
25  HEERF Student Assistance to help obtain essential services, immigrant students will be more
likely to disenroll, harming *amici*'s economies and communities, to which college-educated
26  immigrants are significant contributors.  *Amici curiae* further assert that immigrant graduates work
in some of the community's most critical industries, including industries that are essential to
27  fighting the COVID-19 pandemic and sustaining the economy through this public health
emergency.  These college-educated immigrants also spend more money in the local economy,
28  volunteer in higher numbers, and lift *amici*'s economies, workforces, and communities as a whole.
Without them, the public interest will suffer.

Court finds this case warrants an order granting the relief requested.[35]

**IV.   CONCLUSION**

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is **GRANTED**. Defendants' officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, **ARE HEREBY RESTRAINED AND ENJOINED** from committing, or performing directly or indirectly, any and all of the following acts during the pendency of this action with respect to any community college in California:

1.   Imposing or enforcing any eligibility requirement for students to receive HEERF assistance, including those requirements asserted and set forth in: (*i*) DoE's guidance document issued on or about April 21, 2020, entitled "Frequently Asked Questions about the Emergency Financial Aid Grants to Students under Section 18004 of the Coronavirus Aid, Relief and Economic Security (CARES) Act"; (*ii*) DoE's guidance document issued on or about April 21, 2020, entitled "Frequently Asked Questions about the Institutional Portion of the Higher Education Emergency Relief Fund under Section 18004(a)(1) and 18004(c) of the CARES Act"; (*iii*) DoE's May 21, 2020 updated statement; and (*iv*) DoE's June 11, 2020 Interim Final Rule entitled "CARES Act: Higher Education Emergency Relief Fund."

---

[35] Defendants point out that Congress is considering legislation to prohibit DOE from imposing eligibility restrictions on receipt of HEERF funds whether based on title IV, Section 1661(a), or any reason other than enrollment at the IHE.  *See* HEROES Act, H.R. 6800, 116th Cong. § 150110(a)(1)-(2) (2020).  One may, as the Secretary does, view such pending legislation as confirmation that the Congress intended to impose those restrictions in the CARES Act.  One may just as easily adopt the less tortured explanation that the proposed legislation is intended to be corrective and was occasioned by misreadings of what should have been obvious from start—that the agencies were to implement the CARES Act "quickly and faithfully" (P's RJN, Exh. D [Secretary's April 9, 2020 letter]), without imposing restrictions not otherwise stated in the original legislation.  Nevertheless, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Further, as the United States Supreme Court just reiterated, Congress' consideration or rejection of later amendments to legislation is not a proper basis for interpreting the statute as written.  *See Bostock*, __ S.Ct.__, 2020 WL 3146686, at *20 ("[S]peculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."), *citing Sullivan* v. *Finkelstein*, 496 U. S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote").  The Court must interpret the statute before it, not one that may be enacted in the future.

2. Requiring that any California community college accept the eligibility restrictions set forth in the documents identified in paragraph 1 above as part of the terms and conditions in the Certification that institutions are required to submit in order to access HEERF funds; and

3. Penalizing any California community college, including by withholding, terminating, or taking any action to recover HEERF funds or any other federal funds, on the basis of any alleged failure to comply with the eligibility restrictions set forth in the documents identified in paragraph 1.

This Order terminates Docket Numbers 16, 24, 27, 29, 30.

**IT IS SO ORDERED.**

Dated: June 17, 2020

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

29