

H. R. 748

Public Law 116-136
March 27, 2020
134 Stat. 281

# One Hundred Sixteenth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Friday,
the third day of January, two thousand and twenty*

# An Act

To amend the Internal Revenue Code of 1986 to repeal the excise tax on high
cost employer-sponsored health coverage.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Coronavirus Aid, Relief, and
Economic Security Act" or the "CARES Act".

**SEC. 2. TABLE OF CONTENTS.**

The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE
SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION

TITLE I—KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT

Sec. 1101. Definitions.
Sec. 1102. Paycheck protection program.
Sec. 1103. Entrepreneurial development.
Sec. 1104. State trade expansion program.
Sec. 1105. Waiver of matching funds requirement under the women's business cen-
ter program.
Sec. 1106. Loan forgiveness.
Sec. 1107. Direct appropriations.
Sec. 1108. Minority business development agency.
Sec. 1109. United States Treasury Program Management Authority.
Sec. 1110. Emergency EIDL grants.
Sec. 1111. Resources and services in languages other than English.
Sec. 1112. Subsidy for certain loan payments.
Sec. 1113. Bankruptcy.
Sec. 1114. Emergency rulemaking authority.

TITLE II—ASSISTANCE FOR AMERICAN WORKERS, FAMILIES, AND
BUSINESSES

Subtitle A—Unemployment Insurance Provisions

Sec. 2101. Short title.
Sec. 2102. Pandemic Unemployment Assistance.
Sec. 2103. Emergency unemployment relief for governmental entities and nonprofit
organizations.
Sec. 2104. Emergency increase in unemployment compensation benefits.
Sec. 2105. Temporary full Federal funding of the first week of compensable regular
unemployment for States with no waiting week.
Sec. 2106. Emergency State staffing flexibility.
Sec. 2107. Pandemic emergency unemployment compensation.
Sec. 2108. Temporary financing of short-time compensation payments in States
with programs in law.
Sec. 2109. Temporary financing of short-time compensation agreements.

134 Stat. 382

# H. R. 748—2

Sec. 2110. Grants for short-time compensation programs.
Sec. 2111. Assistance and guidance in implementing programs.
Sec. 2112. Waiver of the 7-day waiting period for benefits under the Railroad Unemployment Insurance Act.
Sec. 2113. Enhanced benefits under the Railroad Unemployment Insurance Act.
Sec. 2114. Extended unemployment benefits under the Railroad Unemployment Insurance Act.
Sec. 2115. Funding for the DOL Office of Inspector General for oversight of unemployment provisions.
Sec. 2116. Implementation.

Subtitle B—Rebates and Other Individual Provisions

Sec. 2201. 2020 recovery rebates for individuals.
Sec. 2202. Special rules for use of retirement funds.
Sec. 2203. Temporary waiver of required minimum distribution rules for certain retirement plans and accounts.
Sec. 2204. Allowance of partial above the line deduction for charitable contributions.
Sec. 2205. Modification of limitations on charitable contributions during 2020.
Sec. 2206. Exclusion for certain employer payments of student loans.

Subtitle C—Business Provisions

Sec. 2301. Employee retention credit for employers subject to closure due to COVID–19.
Sec. 2302. Delay of payment of employer payroll taxes.
Sec. 2303. Modifications for net operating losses.
Sec. 2304. Modification of limitation on losses for taxpayers other than corporations.
Sec. 2305. Modification of credit for prior year minimum tax liability of corporations.
Sec. 2306. Modifications of limitation on business interest.
Sec. 2307. Technical amendments regarding qualified improvement property.
Sec. 2308. Temporary exception from excise tax for alcohol used to produce hand sanitizer.

TITLE III—SUPPORTING AMERICA'S HEALTH CARE SYSTEM IN THE FIGHT AGAINST THE CORONAVIRUS

Subtitle A—Health Provisions

Sec. 3001. Short title.

PART I—ADDRESSING SUPPLY SHORTAGES

SUBPART A—MEDICAL PRODUCT SUPPLIES

Sec. 3101. National Academies report on America's medical product supply chain security.
Sec. 3102. Requiring the strategic national stockpile to include certain types of medical supplies.
Sec. 3103. Treatment of respiratory protective devices as covered countermeasures.

SUBPART B—MITIGATING EMERGENCY DRUG SHORTAGES

Sec. 3111. Prioritize reviews of drug applications; incentives.
Sec. 3112. Additional manufacturer reporting requirements in response to drug shortages.

SUBPART C—PREVENTING MEDICAL DEVICE SHORTAGES

Sec. 3121. Discontinuance or interruption in the production of medical devices.

PART II—ACCESS TO HEALTH CARE FOR COVID–19 PATIENTS

SUBPART A—COVERAGE OF TESTING AND PREVENTIVE SERVICES

Sec. 3201. Coverage of diagnostic testing for COVID–19.
Sec. 3202. Pricing of diagnostic testing.
Sec. 3203. Rapid coverage of preventive services and vaccines for coronavirus.

SUBPART B—SUPPORT FOR HEALTH CARE PROVIDERS

Sec. 3211. Supplemental awards for health centers.
Sec. 3212. Telehealth network and telehealth resource centers grant programs.
Sec. 3213. Rural health care services outreach, rural health network development, and small health care provider quality improvement grant programs.

134 Stat. 283

H. R. 748—3

Sec. 3214. United States Public Health Service Modernization.
Sec. 3215. Limitation on liability for volunteer health care professionals during COVID–19 emergency response.
Sec. 3216. Flexibility for members of National Health Service Corps during emergency period.

SUBPART C—MISCELLANEOUS PROVISIONS

Sec. 3221. Confidentiality and disclosure of records relating to substance use disorder.
Sec. 3222. Nutrition services.
Sec. 3223. Continuity of service and opportunities for participants in community service activities under title V of the Older Americans Act of 1965.
Sec. 3224. Guidance on protected health information.
Sec. 3225. Reauthorization of healthy start program.
Sec. 3226. Importance of the blood supply.

PART III—INNOVATION

Sec. 3301. Removing the cap on OTA during public health emergencies.
Sec. 3302. Priority zoonotic animal drugs.

PART IV—HEALTH CARE WORKFORCE

Sec. 3401. Reauthorization of health professions workforce programs.
Sec. 3402. Health workforce coordination.
Sec. 3403. Education and training relating to geriatrics.
Sec. 3404. Nursing workforce development.

Subtitle B—Education Provisions

Sec. 3501. Short title.
Sec. 3502. Definitions.
Sec. 3503. Campus-based aid waivers.
Sec. 3504. Use of supplemental educational opportunity grants for emergency aid.
Sec. 3505. Federal work-study during a qualifying emergency.
Sec. 3506. Adjustment of subsidized loan usage limits.
Sec. 3507. Exclusion from Federal Pell Grant duration limit.
Sec. 3508. Institutional refunds and Federal student loan flexibility.
Sec. 3509. Satisfactory academic progress.
Sec. 3510. Continuing education at affected foreign institutions.
Sec. 3511. National emergency educational waivers.
Sec. 3512. HBCU Capital financing.
Sec. 3513. Temporary relief for federal student loan borrowers.
Sec. 3514. Provisions related to the Corporation for National and Community Service.
Sec. 3515. Workforce response activities.
Sec. 3516. Technical amendments.
Sec. 3517. Waiver authority and reporting requirement for institutional aid.
Sec. 3518. Authorized uses and other modifications for grants.
Sec. 3519. Service obligations for teachers.

Subtitle C—Labor Provisions

Sec. 3601. Limitation on paid leave.
Sec. 3602. Emergency Paid Sick Leave Act Limitation.
Sec. 3603. Unemployment insurance.
Sec. 3604. OMB Waiver of Paid Family and Paid Sick Leave.
Sec. 3605. Paid leave for rehired employees.
Sec. 3606. Advance refunding of credits.
Sec. 3607. Expansion of DOL Authority to postpone certain deadlines.
Sec. 3608. Single-employer plan funding rules.
Sec. 3609. Application of cooperative and small employer charity pension plan rules to certain charitable employers whose primary exempt purpose is providing services with respect to mothers and children.
Sec. 3610. Federal contractor authority.
Sec. 3611. Technical corrections.

Subtitle D—Finance Committee

Sec. 3701. Exemption for telehealth services.
Sec. 3702. Inclusion of certain over-the-counter medical products as qualified medical expenses.
Sec. 3703. Increasing Medicare telehealth flexibilities during emergency period.
Sec. 3704. Enhancing Medicare telehealth services for Federally qualified health centers and rural health clinics during emergency period.

134 Stat. 284

H. R. 748—4

Sec. 3705. Temporary waiver of requirement for face-to-face visits between home dialysis patients and physicians.
Sec. 3706. Use of telehealth to conduct face-to-face encounter prior to recertification of eligibility for hospice care during emergency period.
Sec. 3707. Encouraging use of telecommunications systems for home health services furnished during emergency period.
Sec. 3708. Improving care planning for Medicare home health services.
Sec. 3709. Adjustment of sequestration.
Sec. 3710. Medicare hospital inpatient prospective payment system add-on payment for COVID–19 patients during emergency period.
Sec. 3711. Increasing access to post-acute care during emergency period.
Sec. 3712. Revising payment rates for durable medical equipment under the Medicare program through duration of emergency period.
Sec. 3713. Coverage of the COVID–19 vaccine under part B of the Medicare program without any cost-sharing.
Sec. 3714. Requiring Medicare prescription drug plans and MA–PD plans to allow during the COVID–19 emergency period for fills and refills of covered part D drugs for up to a 3-month supply.
Sec. 3715. Providing home and community-based services in acute care hospitals.
Sec. 3716. Clarification regarding uninsured individuals.
Sec. 3717. Clarification regarding coverage of COVID–19 testing products.
Sec. 3718. Amendments relating to reporting requirements with respect to clinical diagnostic laboratory tests.
Sec. 3719. Expansion of the Medicare hospital accelerated payment program during the COVID–19 public health emergency.
Sec. 3720. Delaying requirements for enhanced FMAP to enable State legislation necessary for compliance.

Subtitle E—Health and Human Services Extenders

PART I—MEDICARE PROVISIONS

Sec. 3801. Extension of the work geographic index floor under the Medicare program.
Sec. 3802. Extension of funding for quality measure endorsement, input, and selection.
Sec. 3803. Extension of funding outreach and assistance for low-income programs.

PART II—MEDICAID PROVISIONS

Sec. 3811. Extension of the Money Follows the Person rebalancing demonstration program.
Sec. 3812. Extension of spousal impoverishment protections.
Sec. 3813. Delay of DSH reductions.
Sec. 3814. Extension and expansion of Community Mental Health Services demonstration program.

PART III—HUMAN SERVICES AND OTHER HEALTH PROGRAMS

Sec. 3821. Extension of sexual risk avoidance education program.
Sec. 3822. Extension of personal responsibility education program.
Sec. 3823. Extension of demonstration projects to address health professions workforce needs.
Sec. 3824. Extension of the temporary assistance for needy families program and related programs.

PART IV—PUBLIC HEALTH PROVISIONS

Sec. 3831. Extension for community health centers, the National Health Service Corps, and teaching health centers that operate GME programs.
Sec. 3832. Diabetes programs.

PART V—MISCELLANEOUS PROVISIONS

Sec. 3841. Prevention of duplicate appropriations for fiscal year 2020.

Subtitle F—Over-the-Counter Drugs

PART I—OTC DRUG REVIEW

Sec. 3851. Regulation of certain nonprescription drugs that are marketed without an approved drug application.
Sec. 3852. Misbranding.
Sec. 3853. Drugs excluded from the over-the-counter drug review.
Sec. 3854. Treatment of Sunscreen Innovation Act.
Sec. 3855. Annual update to Congress on appropriate pediatric indication for certain OTC cough and cold drugs.

134 Stat. 285

H. R. 748—5

Sec. 3856. Technical corrections.

PART II—USER FEES

Sec. 3861. Finding.
Sec. 3862. Fees relating to over-the-counter drugs.

TITLE IV—ECONOMIC STABILIZATION AND ASSISTANCE TO SEVERELY
DISTRESSED SECTORS OF THE UNITED STATES ECONOMY

Subtitle A—Coronavirus Economic Stabilization Act of 2020

Sec. 4001. Short title.
Sec. 4002. Definitions.
Sec. 4003. Emergency relief and taxpayer protections.
Sec. 4004. Limitation on certain employee compensation.
Sec. 4005. Continuation of certain air service.
Sec. 4006. Coordination with Secretary of Transportation.
Sec. 4007. Suspension of certain aviation excise taxes.
Sec. 4008. Debt guarantee authority.
Sec. 4009. Temporary Government in the Sunshine Act relief.
Sec. 4010. Temporary hiring flexibility.
Sec. 4011. Temporary lending limit waiver.
Sec. 4012. Temporary relief for community banks.
Sec. 4013. Temporary relief from troubled debt restructurings.
Sec. 4014. Optional temporary relief from current expected credit losses.
Sec. 4015. Non-applicability of restrictions on ESF during national emergency.
Sec. 4016. Temporary credit union provisions.
Sec. 4017. Increasing access to materials necessary for national security and pandemic recovery.
Sec. 4018. Special Inspector General for Pandemic Recovery.
Sec. 4019. Conflicts of interest.
Sec. 4020. Congressional Oversight Commission.
Sec. 4021. Credit protection during COVID–19.
Sec. 4022. Foreclosure moratorium and consumer right to request forbearance.
Sec. 4023. Forbearance of residential mortgage loan payments for multifamily properties with federally backed loans.
Sec. 4024. Temporary moratorium on eviction filings.
Sec. 4025. Protection of collective bargaining agreement.
Sec. 4026. Reports.
Sec. 4027. Direct appropriation.
Sec. 4028. Rule of construction.
Sec. 4029. Termination of authority.

Subtitle B—Air Carrier Worker Support

Sec. 4111. Definitions.
Sec. 4112. Pandemic relief for aviation workers.
Sec. 4113. Procedures for providing payroll support.
Sec. 4114. Required assurances.
Sec. 4115. Protection of collective bargaining agreement.
Sec. 4116. Limitation on certain employee compensation.
Sec. 4117. Tax payer protection.
Sec. 4118. Reports.
Sec. 4119. Coordination.
Sec. 4120. Direct appropriation.

TITLE V—CORONAVIRUS RELIEF FUNDS

Sec. 5001. Coronavirus Relief Fund.

TITLE VI—MISCELLANEOUS PROVISIONS

Sec. 6001. COVID–19 borrowing authority for the United States Postal Service.
Sec. 6002. Emergency designation.

DIVISION B—EMERGENCY APPROPRIATIONS FOR CORONAVIRUS HEALTH
RESPONSE AND AGENCY OPERATIONS

**SEC. 3. REFERENCES.**

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

134 Stat. 286

# DIVISION A—KEEPING WORKERS PAID AND EMPLOYED, HEALTH CARE SYSTEM ENHANCEMENTS, AND ECONOMIC STABILIZATION

## TITLE I—KEEPING AMERICAN WORKERS PAID AND EMPLOYED ACT

**SEC. 1101. DEFINITIONS.**

In this title—

(1) the terms "Administration" and "Administrator" mean the Small Business Administration and the Administrator thereof, respectively; and

(2) the term "small business concern" has the meaning given the term in section 3 of the Small Business Act (15 U.S.C. 636).

**SEC. 1102. PAYCHECK PROTECTION PROGRAM.**

(a) IN GENERAL.—Section 7(a) of the Small Business Act (15 U.S.C. 636(a)) is amended—

(1) in paragraph (2)—

(A) in subparagraph (A), in the matter preceding clause (i), by striking "and (E)" and inserting "(E), and (F)"; and

(B) by adding at the end the following:

"(F) PARTICIPATION IN THE PAYCHECK PROTECTION PROGRAM.—In an agreement to participate in a loan on a deferred basis under paragraph (36), the participation by the Administration shall be 100 percent."; and

(2) by adding at the end the following:

"(36) PAYCHECK PROTECTION PROGRAM.—

"(A) DEFINITIONS.—In this paragraph—

"(i) the terms 'appropriate Federal banking agency' and 'insured depository institution' have the meanings given those terms in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813);

"(ii) the term 'covered loan' means a loan made under this paragraph during the covered period;

"(iii) the term 'covered period' means the period beginning on February 15, 2020 and ending on June 30, 2020;

"(iv) the term 'eligible recipient' means an individual or entity that is eligible to receive a covered loan;

"(v) the term 'eligible self-employed individual' has the meaning given the term in section 7002(b) of the Families First Coronavirus Response Act (Public Law 116–127);

"(vi) the term 'insured credit union' has the meaning given the term in section 101 of the Federal Credit Union Act (12 U.S.C. 1752);

"(vii) the term 'nonprofit organization' means an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and that is exempt from taxation under section 501(a) of such Code;

134 Stat. 313

H. R. 748—33

# TITLE II—ASSISTANCE FOR AMERICAN WORKERS, FAMILIES, AND BUSINESSES

## Subtitle A—Unemployment Insurance Provisions

**SEC. 2101. SHORT TITLE.**

This subtitle may be cited as the "Relief for Workers Affected by Coronavirus Act".

**SEC. 2102. PANDEMIC UNEMPLOYMENT ASSISTANCE.**

(a) DEFINITIONS.—In this section:

(1) COVID–19.—The term "COVID–19" means the 2019 Novel Coronavirus or 2019-nCoV.

(2) COVID–19 PUBLIC HEALTH EMERGENCY.—The term "COVID–19 public health emergency" means the public health emergency declared by the Secretary of Health and Human Services on January 27, 2020, with respect to the 2019 Novel Coronavirus.

(3) COVERED INDIVIDUAL.—The term "covered individual"—

(A) means an individual who—

(i) is not eligible for regular compensation or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 2107, including an individual who has exhausted all rights to regular unemployment or extended benefits under State or Federal law or pandemic emergency unemployment compensation under section 2107; and

(ii) provides self-certification that the individual—

(I) is otherwise able to work and available for work within the meaning of applicable State law, except the individual is unemployed, partially unemployed, or unable or unavailable to work because—

(aa) the individual has been diagnosed with COVID–19 or is experiencing symptoms of COVID–19 and seeking a medical diagnosis;

(bb) a member of the individual's household has been diagnosed with COVID–19;

(cc) the individual is providing care for a family member or a member of the individual's household who has been diagnosed with COVID–19;

(dd) a child or other person in the household for which the individual has primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID–19 public health emergency and such school or facility care is required for the individual to work;

(ee) the individual is unable to reach the place of employment because of a quarantine imposed as a direct result of the COVID–19 public health emergency;

134 Stat. 335

H. R. 748—55

General Act of 1978 (5 U.S.C. App.) that are related to the provisions of, and amendments made by, this subtitle, to remain available without fiscal year limitation.

### SEC. 2116. IMPLEMENTATION.

(a) NON-APPLICATION OF THE PAPERWORK REDUCTION ACT.— Chapter 35 of title 44, United States Code (commonly referred to as the "Paperwork Reduction Act of 1995"), shall not apply to the provisions of, and the amendments made by, this subtitle.

(b) OPERATING INSTRUCTIONS OR OTHER GUIDANCE.—Notwithstanding any other provision of law, the Secretary of Labor may issue any operating instructions or other guidance necessary to carry out the provisions of, or the amendments made by, this subtitle.

## Subtitle B—Rebates and Other Individual Provisions

### SEC. 2201. 2020 RECOVERY REBATES FOR INDIVIDUALS.

(a) IN GENERAL.—Subchapter B of chapter 65 of subtitle F of the Internal Revenue Code of 1986 is amended by inserting after section 6427 the following new section:

### "SEC. 6428. 2020 RECOVERY REBATES FOR INDIVIDUALS.

"(a) IN GENERAL.—In the case of an eligible individual, there shall be allowed as a credit against the tax imposed by subtitle A for the first taxable year beginning in 2020 an amount equal to the sum of—

"(1) $1,200 ($2,400 in the case of eligible individuals filing a joint return), plus

"(2) an amount equal to the product of $500 multiplied by the number of qualifying children (within the meaning of section 24(c)) of the taxpayer.

"(b) TREATMENT OF CREDIT.—The credit allowed by subsection (a) shall be treated as allowed by subpart C of part IV of subchapter A of chapter 1.

"(c) LIMITATION BASED ON ADJUSTED GROSS INCOME.—The amount of the credit allowed by subsection (a) (determined without regard to this subsection and subsection (e)) shall be reduced (but not below zero) by 5 percent of so much of the taxpayer's adjusted gross income as exceeds—

"(1) $150,000 in the case of a joint return,

"(2) $112,500 in the case of a head of household, and

"(3) $75,000 in the case of a taxpayer not described in paragraph (1) or (2).

"(d) ELIGIBLE INDIVIDUAL.—For purposes of this section, the term 'eligible individual' means any individual other than—

"(1) any nonresident alien individual,

"(2) any individual with respect to whom a deduction under section 151 is allowable to another taxpayer for a taxable year beginning in the calendar year in which the individual's taxable year begins, and

"(3) an estate or trust.

"(e) COORDINATION WITH ADVANCE REFUNDS OF CREDIT.—

"(1) IN GENERAL.—The amount of credit which would (but for this paragraph) be allowable under this section shall be

134 Stat. 346

(ii) CARRYOVER.—If the aggregate amount of qualified contributions made in the contribution year (within the meaning of section 170(d)(1) of such Code) exceeds the limitation of clause (i), such excess shall be added to the excess described in section 170(b)(1)(G)(ii).

(B) CORPORATIONS.—In the case of a corporation—

(i) LIMITATION.—Any qualified contribution shall be allowed as a deduction only to the extent that the aggregate of such contributions does not exceed the excess of 25 percent of the taxpayer's taxable income (as determined under paragraph (2) of section 170(b) of such Code) over the amount of all other charitable contributions allowed under such paragraph.

(ii) CARRYOVER.—If the aggregate amount of qualified contributions made in the contribution year (within the meaning of section 170(d)(2) of such Code) exceeds the limitation of clause (i), such excess shall be appropriately taken into account under section 170(d)(2) subject to the limitations thereof.

(3) QUALIFIED CONTRIBUTIONS.—

(A) IN GENERAL.—For purposes of this subsection, the term "qualified contribution" means any charitable contribution (as defined in section 170(c) of the Internal Revenue Code of 1986) if—

(i) such contribution is paid in cash during calendar year 2020 to an organization described in section 170(b)(1)(A) of such Code, and

(ii) the taxpayer has elected the application of this section with respect to such contribution.

(B) EXCEPTION.—Such term shall not include a contribution by a donor if the contribution is—

(i) to an organization described in section 509(a)(3) of the Internal Revenue Code of 1986, or

(ii) for the establishment of a new, or maintenance of an existing, donor advised fund (as defined in section 4966(d)(2) of such Code).

(C) APPLICATION OF ELECTION TO PARTNERSHIPS AND S CORPORATIONS.—In the case of a partnership or S corporation, the election under subparagraph (A)(ii) shall be made separately by each partner or shareholder.

(b) INCREASE IN LIMITS ON CONTRIBUTIONS OF FOOD INVENTORY.—In the case of any charitable contribution of food during 2020 to which section 170(e)(3)(C) of the Internal Revenue Code of 1986 applies, subclauses (I) and (II) of clause (ii) thereof shall each be applied by substituting "25 percent" for "15 percent."

(c) EFFECTIVE DATE.—This section shall apply to taxable years ending after December 31, 2019.

## SEC. 2206. EXCLUSION FOR CERTAIN EMPLOYER PAYMENTS OF STUDENT LOANS.

(a) IN GENERAL.—Paragraph (1) of section 127(c) of the Internal Revenue Code of 1986 is amended by striking "and" at the end of subparagraph (A), by redesignating subparagraph (B) as subparagraph (C), and by inserting after subparagraph (A) the following new subparagraph:

134 Stat. 347

H. R. 748—67

"(B) in the case of payments made before January 1, 2021, the payment by an employer, whether paid to the employee or to a lender, of principal or interest on any qualified education loan (as defined in section 221(d)(1)) incurred by the employee for education of the employee, and".

(b) CONFORMING AMENDMENT; DENIAL OF DOUBLE BENEFIT.— The first sentence of paragraph (1) of section 221(e) of the Internal Revenue Code of 1986 is amended by inserting before the period the following: ", or for which an exclusion is allowable under section 127 to the taxpayer by reason of the payment by the taxpayer's employer of any indebtedness on a qualified education loan of the taxpayer".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to payments made after the date of the enactment of this Act.

## Subtitle C—Business Provisions

**SEC. 2301. EMPLOYEE RETENTION CREDIT FOR EMPLOYERS SUBJECT TO CLOSURE DUE TO COVID–19.**

(a) IN GENERAL.—In the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 50 percent of the qualified wages with respect to each employee of such employer for such calendar quarter.

(b) LIMITATIONS AND REFUNDABILITY.—

(1) WAGES TAKEN INTO ACCOUNT.—The amount of qualified wages with respect to any employee which may be taken into account under subsection (a) by the eligible employer for all calendar quarters shall not exceed $10,000.

(2) CREDIT LIMITED TO EMPLOYMENT TAXES.—The credit allowed by subsection (a) with respect to any calendar quarter shall not exceed the applicable employment taxes (reduced by any credits allowed under subsections (e) and (f) of section 3111 of the Internal Revenue Code of 1986 and sections 7001 and 7003 of the Families First Coronavirus Response Act) on the wages paid with respect to the employment of all the employees of the eligible employer for such calendar quarter.

(3) REFUNDABILITY OF EXCESS CREDIT.—

(A) IN GENERAL.—If the amount of the credit under subsection (a) exceeds the limitation of paragraph (2) for any calendar quarter, such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b) of the Internal Revenue Code of 1986.

(B) TREATMENT OF PAYMENTS.—For purposes of section 1324 of title 31, United States Code, any amounts due to the employer under this paragraph shall be treated in the same manner as a refund due from a credit provision referred to in subsection (b)(2) of such section.

(c) DEFINITIONS.—For purposes of this section—

(1) APPLICABLE EMPLOYMENT TAXES.—The term "applicable employment taxes" means the following:

(A) The taxes imposed under section 3111(a) of the Internal Revenue Code of 1986.

134 Stat. 360

H. R. 748—80

# TITLE III—SUPPORTING AMERICA'S HEALTH CARE SYSTEM IN THE FIGHT AGAINST THE CORONAVIRUS

## Subtitle A—Health Provisions

**SEC. 3001. SHORT TITLE.**

This subtitle may be cited as the "Coronavirus Aid, Relief, and Economic Security Act".

## PART I—ADDRESSING SUPPLY SHORTAGES

### Subpart A—Medical Product Supplies

**SEC. 3101. NATIONAL ACADEMIES REPORT ON AMERICA'S MEDICAL PRODUCT SUPPLY CHAIN SECURITY.**

(a) IN GENERAL.—Not later than 60 days after the date of enactment of this Act, the Secretary of Health and Human Services shall enter into an agreement with the National Academies of Sciences, Engineering, and Medicine (referred to in this section as the "National Academies") to examine, and, in a manner that does not compromise national security, report on, the security of the United States medical product supply chain.

(b) PURPOSES.—The report developed under this section shall—

(1) assess and evaluate the dependence of the United States, including the private commercial sector, States, and the Federal Government, on critical drugs and devices that are sourced or manufactured outside of the United States, which may include an analysis of—

(A) the supply chain of critical drugs and devices of greatest priority to providing health care;

(B) any potential public health security or national security risks associated with reliance on critical drugs and devices sourced or manufactured outside of the United States, which may include responses to previous or existing shortages or public health emergencies, such as infectious disease outbreaks, bioterror attacks, and other public health threats;

(C) any existing supply chain information gaps, as applicable; and

(D) potential economic impact of increased domestic manufacturing; and

(2) provide recommendations, which may include a plan to improve the resiliency of the supply chain for critical drugs and devices as described in paragraph (1), and to address any supply vulnerabilities or potential disruptions of such products that would significantly affect or pose a threat to public health security or national security, as appropriate, which may include strategies to—

(A) promote supply chain redundancy and contingency planning;

(B) encourage domestic manufacturing, including consideration of economic impacts, if any;

(C) improve supply chain information gaps;

134 Stat. 395

H. R. 748—115

(B) by striking "$338,000,000 for fiscal year 2010, and such sums as may be necessary for each of the fiscal years 2011 through 2016" and inserting "$137,837,000 for each of fiscal years 2021 through 2025"; and

(C) by adding at the end the following:

"(b) PART E.—For the purpose of carrying out part E, there are authorized to be appropriated $117,135,000 for each of the fiscal years 2021 through 2025.".

(b) EVALUATION AND REPORT ON NURSE LOAN REPAYMENT PROGRAMS.—

(1) EVALUATION.—The Comptroller General shall conduct an evaluation of the nurse loan repayment programs administered by the Health Resources and Services Administration. Such evaluation shall include—

(A) the manner in which payments are made under such programs;

(B) the existing oversight functions necessary to ensure the proper use of such programs, including payments made as part of such programs;

(C) the identification of gaps, if any, in oversight functions; and

(D) information on the number of nurses assigned to facilities pursuant to such programs, including the type of facility to which nurses are assigned and the impact of modifying the eligibility requirements for programs under section 846 of the Public Health Service Act (42 U.S.C. 297n), such as the impact on entities to which nurses had previously been assigned prior to fiscal year 2019 (such as federally qualified health centers and facilities affiliated with the Indian Health Service).

(2) REPORT.—Not later than 18 months after the enactment of this Act, the Comptroller General shall submit to the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Energy and Commerce of the House of Representatives, a report on the evaluation under paragraph (1), which may include recommendations to improve relevant nursing workforce loan repayment programs.

## Subtitle B—Education Provisions

**SEC. 3501. SHORT TITLE.**

This subtitle may be cited as the "COVID–19 Pandemic Education Relief Act of 2020".

**SEC. 3502. DEFINITIONS.**

(a) DEFINITIONS.—In this subtitle:

(1) CORONAVIRUS.—The term "coronavirus" has the meaning given the term in section 506 of the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (Public Law 116–123).

(2) FOREIGN INSTITUTION.—The term "foreign institution" means an institution of higher education located outside the United States that is described in paragraphs (1)(C) and (2) of section 102(a) of the Higher Education Act of 1965 (20 U.S.C. 1002(a)).

134 Stat. 3396

H. R. 748—116

(3) INSTITUTION OF HIGHER EDUCATION.—The term "institution of higher education" has the meaning of the term under section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002).

(4) QUALIFYING EMERGENCY.—The term "qualifying emergency" means—

(A) a public health emergency related to the coronavirus declared by the Secretary of Health and Human Services pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d);

(B) an event related to the coronavirus for which the President declared a major disaster or an emergency under section 401 or 501, respectively, of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170 and 5191); or

(C) a national emergency related to the coronavirus declared by the President under section 201 of the National Emergencies Act (50 U.S.C. 1601 et seq.).

(5) SECRETARY.—The term "Secretary" means the Secretary of Education.

**SEC. 3503. CAMPUS-BASED AID WAIVERS.**

(a) WAIVER OF NON-FEDERAL SHARE REQUIREMENT.—Notwithstanding sections 413C(a)(2) and 443(b)(5) of the Higher Education Act of 1965 (20 U.S.C. 1070b–2(a)(2) and 1087–53(b)(5)), with respect to funds made available for award years 2019–2020 and 2020–2021, the Secretary shall waive the requirement that a participating institution of higher education provide a non-Federal share to match Federal funds provided to the institution for the programs authorized pursuant to subpart 3 of part A and part C of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070b et seq. and 1087–51 et seq.) for all awards made under such programs during such award years, except nothing in this subsection shall affect the non-Federal share requirement under section 443(c)(3) that applies to private for-profit organizations.

(b) AUTHORITY TO REALLOCATE.—Notwithstanding sections 413D, 442, and 488 of the Higher Education Act of 1965 (20 U.S.C. 1070b–3, 1087–52, and 1095), during a period of a qualifying emergency, an institution may transfer up to 100 percent of the institution's unexpended allotment under section 442 of such Act to the institution's allotment under section 413D of such Act, but may not transfer any funds from the institution's unexpended allotment under section 413D of such Act to the institution's allotment under section 442 of such Act.

**SEC. 3504. USE OF SUPPLEMENTAL EDUCATIONAL OPPORTUNITY GRANTS FOR EMERGENCY AID.**

(a) IN GENERAL.—Notwithstanding section 413B of the Higher Education Act of 1965 (20 U.S.C. 1070b–1), an institution of higher education may reserve any amount of an institution's allocation under subpart 3 of part A of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070b et seq.) for a fiscal year to award, in such fiscal year, emergency financial aid grants to assist undergraduate or graduate students for unexpected expenses and unmet financial need as the result of a qualifying emergency.

(b) DETERMINATIONS.—In determining eligibility for and awarding emergency financial aid grants under this section, an institution of higher education may—

<div align="center">

<div style="border:1px solid red; color:red; display:inline-block; padding:4px;">134 Stat. 397</div>

</div>

<div align="center">

H. R. 748—117

</div>

(1) waive the amount of need calculation under section 471 of the Higher Education Act of 1965 (20 U.S.C. 1087kk);

(2) allow for a student affected by a qualifying emergency to receive funds in an amount that is not more than the maximum Federal Pell Grant for the applicable award year; and

(3) utilize a contract with a scholarship-granting organization designated for the sole purpose of accepting applications from or disbursing funds to students enrolled in the institution of higher education, if such scholarship-granting organization disburses the full allocated amount provided to the institution of higher education to the recipients.

(c) SPECIAL RULE.—Any emergency financial aid grants to students under this section shall not be treated as other financial assistance for the purposes of section 471 of the Higher Education Act of 1965 (20 U.S.C. 1087kk).

## SEC. 3505. FEDERAL WORK-STUDY DURING A QUALIFYING EMERGENCY.

(a) IN GENERAL.—In the event of a qualifying emergency, an institution of higher education participating in the program under part C of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087–51 et seq.) may make payments under such part to affected work-study students, for the period of time (not to exceed one academic year) in which affected students were unable to fulfill the students' work-study obligation for all or part of such academic year due to such qualifying emergency, as follows:

(1) Payments may be made under such part to affected work-study students in an amount equal to or less than the amount of wages such students would have been paid under such part had the students been able to complete the work obligation necessary to receive work study funds, as a one time grant or as multiple payments.

(2) Payments shall not be made to any student who was not eligible for work study or was not completing the work obligation necessary to receive work study funds under such part prior to the occurrence of the qualifying emergency.

(3) Any payments made to affected work-study students under this subsection shall meet the matching requirements of section 443 of the Higher Education Act of 1965 (20 U.S.C. 1087–53), unless such matching requirements are waived by the Secretary.

(b) DEFINITION OF AFFECTED WORK-STUDY STUDENT.—In this section, the term "affected work-study student" means a student enrolled at an eligible institution participating in the program under part C of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087–51 et seq.) who—

(1) received a work-study award under section 443 of the Higher Education Act of 1965 (20 U.S.C. 1087–53) for the academic year during which a qualifying emergency occurred;

(2) earned Federal work-study wages from such eligible institution for such academic year; and

(3) was prevented from fulfilling the student's work-study obligation for all or part of such academic year due to such qualifying emergency.

134 Stat. 398

H. R. 748—118

**SEC. 3506. ADJUSTMENT OF SUBSIDIZED LOAN USAGE LIMITS.**

Notwithstanding section 455(q)(3) of the Higher Education Act of 1965 (20 U.S.C. 1087e(q)(3)), the Secretary shall exclude from a student's period of enrollment for purposes of loans made under part D of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.) any semester (or the equivalent) that the student does not complete due to a qualifying emergency, if the Secretary is able to administer such policy in a manner that limits complexity and the burden on the student.

**SEC. 3507. EXCLUSION FROM FEDERAL PELL GRANT DURATION LIMIT.**

The Secretary shall exclude from a student's Federal Pell Grant duration limit under section 401(c)(5) of the Higher Education Act of 1965 (2 U.S.C. 1070a(c)(5)) any semester (or the equivalent) that the student does not complete due to a qualifying emergency if the Secretary is able to administer such policy in a manner that limits complexity and the burden on the student.

**SEC. 3508. INSTITUTIONAL REFUNDS AND FEDERAL STUDENT LOAN FLEXIBILITY.**

(a) INSTITUTIONAL WAIVER.—

(1) IN GENERAL.—The Secretary shall waive the institutional requirement under section 484B of the Higher Education Act of 1965 (20 U.S.C. 1091b) with respect to the amount of grant or loan assistance (other than assistance received under part C of title IV of such Act) to be returned under such section if a recipient of assistance under title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.) withdraws from the institution of higher education during the payment period or period of enrollment as a result of a qualifying emergency.

(2) WAIVERS.—The Secretary shall require each institution using a waiver relating to the withdrawal of recipients under this subsection to report the number of such recipients, the amount of grant or loan assistance (other than assistance received under part C of title IV of such Act) associated with each such recipient, and the total amount of grant or loan assistance (other than assistance received under part C of title IV of such Act) for which each institution has not returned assistance under title IV to the Secretary.

(b) STUDENT WAIVER.—The Secretary shall waive the amounts that students are required to return under section 484B of the Higher Education Act of 1965 (20 U.S.C. 1091b) with respect to Federal Pell Grants or other grant assistance if the withdrawals on which the returns are based, are withdrawals by students who withdrew from the institution of higher education as a result of a qualifying emergency.

(c) CANCELING LOAN OBLIGATION.—Notwithstanding any other provision of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), the Secretary shall cancel the borrower's obligation to repay the entire portion of a loan made under part D of title IV of such Act (20 U.S.C. 1087a et seq.) associated with a payment period for a recipient of such loan who withdraws from the institution of higher education during the payment period as a result of a qualifying emergency.

(d) APPROVED LEAVE OF ABSENCE.—Notwithstanding any other provision of the Higher Education Act of 1965 (20 U.S.C. 1001

134 Stat. 399

H. R. 748—119

et seq.), for purposes of receiving assistance under title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.), an institution of higher education may, as a result of a qualifying emergency, provide a student with an approved leave of absence that does not require the student to return at the same point in the academic program that the student began the leave of absence if the student returns within the same semester (or the equivalent).

**SEC. 3509. SATISFACTORY ACADEMIC PROGRESS.**

Notwithstanding section 484 of the Higher Education Act of 1965 (20 U.S.C. 1091), in determining whether a student is maintaining satisfactory academic progress for purposes of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.), an institution of higher education may, as a result of a qualifying emergency, exclude from the quantitative component of the calculation any attempted credits that were not completed by such student without requiring an appeal by such student.

**SEC. 3510. CONTINUING EDUCATION AT AFFECTED FOREIGN INSTITU-TIONS.**

(a) IN GENERAL.—Notwithstanding section 481(b) of the Higher Education Act of 1965 (20 U.S.C. 1088(b)), with respect to a foreign institution, in the case of a public health emergency, major disaster or emergency, or national emergency declared by the applicable government authorities in the country in which the foreign institution is located, the Secretary may permit any part of an otherwise eligible program to be offered via distance education for the duration of such emergency or disaster and the following payment period for purposes of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.).

(b) ELIGIBILITY.—An otherwise eligible program that is offered in whole or in part through distance education by a foreign institution between March 1, 2020, and the date of enactment of this Act shall be deemed eligible for the purposes of part D of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.) for the duration of the qualifying emergency and the following payment period for purposes of title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.). An institution of higher education that uses the authority provided in the previous sentence shall report such use to the Secretary—

(1) for the 2019–2020 award year, not later than June 30, 2020; and

(2) for an award year subsequent to the 2019–2020 award year, not later than 30 days after such use.

(c) REPORT.—Not later than 180 days after the date of enactment of this Act, and every 180 days thereafter for the duration of the qualifying emergency and the following payment period, the Secretary shall submit to the authorizing committees (as defined in section 103 of the Higher Education Act of 1965 (20 U.S.C. 1003)) a report that identifies each foreign institution that carried out a distance education program authorized under this section.

(d) WRITTEN ARRANGEMENTS.—

(1) IN GENERAL.—Notwithstanding section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002), for the duration of a qualifying emergency and the following payment period, the Secretary may allow a foreign institution to enter into a written arrangement with an institution of higher education located in the United States that participates in the Federal

134 Stat. 400

H. R. 748—120

Direct Loan Program under part D of title IV of the Higher
Education Act of 1965 (20 U.S.C. 1087a et seq.) for the purpose
of allowing a student of the foreign institution who is a borrower
of a loan made under such part to take courses from the
institution of higher education located in the United States.

(2) FORM OF ARRANGEMENTS.—

(A) PUBLIC OR OTHER NONPROFIT INSTITUTIONS.—A for-
eign institution that is a public or other nonprofit institu-
tion may enter into a written arrangement under sub-
section (a) only with an institution of higher education
described in section 101 of such Act (20 U.S.C. 1001).

(B) OTHER INSTITUTIONS.—A foreign institution that
is a graduate medical school, nursing school, or a veterinary
school and that is not a public or other nonprofit institution
may enter into a written arrangement under subsection
(a) with an institution of higher education described in
section 101 or section 102 of such Act (20 U.S.C. 1001
and 1002).

(3) REPORT ON USE.—An institution of higher education
that uses the authority described in paragraph (2) shall report
such use to the Secretary—

(A) for the 2019–2020 award year, not later than June
30, 2020; and

(B) for an award year subsequent to the 2019–2020
award year, not later than 30 days after such use.

(4) REPORT FROM THE SECRETARY.—Not later than 180 days
after the date of enactment of this Act, and every 180 days
thereafter for the duration of the qualifying emergency and
the following payment period, the Secretary shall submit to
the authorizing committees (as defined in section 103 of the
Higher Education Act of 1965 (20 U.S.C. 1003)) a report that
identifies each foreign institution that entered into a written
arrangement authorized under subsection (a).

**SEC. 3511. NATIONAL EMERGENCY EDUCATIONAL WAIVERS.**

(a) IN GENERAL.—Notwithstanding any other provision of law,
the Secretary may, upon the request of a State educational agency
or Indian tribe, waive any statutory or regulatory provision
described under paragraphs (1) and (2) of subsection (b), and upon
the request of a local educational agency, waive any statutory
or regulatory provision described under paragraph (2) of subsection
(b), if the Secretary determines that such a waiver is necessary
and appropriate due to the emergency involving Federal primary
responsibility determined to exist by the President under the section
501(b) of the Robert T. Stafford Disaster Relief and Emergency
Assistance Act (42 U.S.C. 5191(b)) with respect to the Coronavirus
Disease 2019 (COVID–19).

(b) APPLICABLE PROVISIONS OF LAW.—

(1) STREAMLINED WAIVERS.—The Secretary shall create an
expedited application process to request a waiver and the Sec-
retary may waive any statutory or regulatory requirements
for a State educational agency (related to assessments, account-
ability, and reporting requirements related to assessments and
accountability), if the Secretary determines that such a waiver
is necessary and appropriate as described in subsection (a),
under the following provisions of law:

134 Stat. 401

H. R. 748—121

(A) The following provisions under section 1111 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311):

(i) Paragraphs (2) and (3) of subsection (b).

(ii) Subsection (c)(4).

(iii) Subparagraphs (C) and (D) of subsection (d)(2).

(iv) The following provisions under subsection (h) of such section 1111:

(I) Clauses (i), (ii), (iii)(I), (iv), (v), (vi), (vii), and (xi) of paragraph (1)(C).

(II) Paragraph (2)(C) with respect to the waived requirements under subclause (I).

(III) Clauses (i) and (ii) of paragraph (2)(C).

(B) Section 421(b) of the General Education Provisions Act (20 U.S.C. 1225(b)).

(2) STATE AND LOCALLY-REQUESTED WAIVERS.—For a State educational agency, local educational agency, or Indian tribe that receives funds under a program authorized under the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.) that requests a waiver under subsection (c), the Secretary may waive statutory and regulatory requirements under any of the following provisions of such Act:

(A) Section 1114(a)(1).

(B) Section 1118(a) and section 8521.

(C) Section 1127.

(D) Section 4106(d).

(E) Subparagraphs (C), (D), and (E) of section 4106(e)(2).

(F) Section 4109(b).

(G) The definition under section 8101(42) for purposes of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.).

(3) APPLICABILITY TO CHARTER SCHOOLS.—Any waivers issued by the Secretary under this section shall be implemented, as applicable—

(A) for all public schools, including public charter schools within the boundaries of the recipient of the waiver;

(B) in accordance with State charter school law; and

(C) pursuant to section 1111(c)(5) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311(c)(5)).

(4) LIMITATION.—Nothing in this section shall be construed to allow the Secretary to waive any statutory or regulatory requirements under applicable civil rights laws.

(5) ACCOUNTABILITY AND IMPROVEMENT.—Any school located in a State that receives a waiver under paragraph (1) and that is identified for comprehensive support and improvement, targeted support and improvement, or additional targeted support in the 2019–2020 school year under section 1111(c)(4)(D) or section 1111(d)(2) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6311(c)(4)(D) or (d)(2)) shall maintain that identification status in the 2020–2021 school year and continue to receive supports and interventions consistent with the school's support and improvement plan in the 2020–2021 school year.

(c) STATE AND LOCAL REQUESTS FOR WAIVERS.—

(1) IN GENERAL.—A State educational agency, local educational agency, or Indian tribe that desires a waiver from

134 Stat. 402

H. R. 748—122

any statutory or regulatory provision described under sub-
section (b)(2), may submit a waiver request to the Secretary
in accordance with this subsection.

(2) REQUESTS SUBMITTED.—A request for a waiver under
this subsection shall—

(A) identify the Federal programs affected by the
requested waiver;

(B) describe which Federal statutory or regulatory
requirements are to be waived;

(C) describe how the emergency involving Federal pri-
mary responsibility determined to exist by the President
under the section 501(b) of the Robert T. Stafford Disaster
Relief and Emergency Assistance Act (42 U.S.C. 5191(b))
with respect to the Coronavirus Disease 2019 (COVID–
19) prevents or otherwise restricts the ability of the State,
State educational agency, local educational agency, Indian
tribe, or school to comply with such statutory or regulatory
requirements; and

(D) provide an assurance that the State educational
agency, local educational agency, or Indian tribe will work
to mitigate any negative effects, if any, that may occur
as a result of the requested waiver.

(3) SECRETARY APPROVAL.—

(A) IN GENERAL.—Except as provided under subpara-
graph (B), the Secretary shall approve or disapprove a
waiver request submitted under paragraph (1) not more
than 30 days after the date on which such request is
submitted.

(B) EXCEPTIONS.—The Secretary may disapprove a
waiver request submitted under paragraph (1), only if the
Secretary determines that—

(i) the waiver request does not meet the require-
ments of this section;

(ii) the waiver is not permitted pursuant to sub-
section (b)(2); or

(iii) the description required under paragraph
(2)(C) provides insufficient information to demonstrate
that the waiving of such requirements is necessary
or appropriate consistent with subsection (a).

(4) DURATION.—A waiver approved by the Secretary under
this section may be for a period not to exceed the 2019–2020
academic year, except to carry out full implementation of any
maintenance of effort waivers granted during the 2019–2020
academic year.

(d) REPORTING AND PUBLICATION.—

(1) PUBLIC NOTICE.—A State educational agency, Indian
Tribe, or local educational agency requesting a waiver under
subsection (b)(2) shall provide the public and all local edu-
cational agencies in the State with notice of, and the oppor-
tunity to comment on, the request by posting information
regarding the waiver request and the process for commenting
on the State website.

(2) NOTIFYING CONGRESS.—Not later than 7 days after
granting a waiver under this section, the Secretary shall notify
the Committee on Health, Education, Labor, and Pensions of
the Senate, the Committee on Appropriations of the Senate,

134 Stat. 403

H. R. 748—123

the Committee on Education and Labor of the House of Representatives, and the Committee on Appropriations of the House of Representatives of such waiver.

(3) PUBLICATION.—Not later than 30 days after granting a waiver under this section, the Secretary shall publish a notice of the Secretary's decision (including which waiver was granted and the reason for granting the waiver) in the Federal Register and on the website of the Department of Education.

(4) REPORT.—Not later than 30 days after the date of enactment of this Act, the Secretary shall prepare and submit a report to the Committee on Health, Education, Labor, and Pensions and the Committee on Appropriations of the Senate, and the Committee on Education and Labor and the Committee on Appropriations of the House of Representatives, with recommendations on any additional waivers under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.), the Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.), the Elementary and Secondary Education Act of 1965 (20 U.S.C. 6301 et seq.), and the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) the Secretary believes are necessary to be enacted into law to provide limited flexibility to States and local educational agencies to meet the needs of students during the emergency involving Federal primary responsibility determined to exist by the President under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191(b)) with respect to the Coronavirus Disease 2019 (COVID–19).

(e) TERMS.—In this section, the term "State educational agency" includes the Bureau of Indian Education, and the term "local educational agency" includes Bureau of Indian Education funded schools operated pursuant to a grant under the Tribally Controlled Schools Act of 1988 (25 U.S.C. 2501 et seq.), or a contract under the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5301 et seq.).

## SEC. 3512. HBCU CAPITAL FINANCING.

(a) DEFERMENT PERIOD.—

(1) IN GENERAL.—Notwithstanding any provision of title III of the Higher Education Act of 1965 (20 U.S.C. 1051 et seq.), or any regulation promulgated under such title, the Secretary may grant a deferment, for the duration of a qualifying emergency, to an institution that has received a loan under part D of title III of such Act (20 U.S.C. 1066 et seq.).

(2) TERMS.—During the deferment period granted under this subsection—

(A) the institution shall not be required to pay any periodic installment of principal or interest required under the loan agreement for such loan; and

(B) the Secretary shall make principal and interest payments otherwise due under the loan agreement.

(3) CLOSING.—At the closing of a loan deferred under this subsection, terms shall be set under which the institution shall be required to repay the Secretary for the payments of principal and interest made by the Secretary during the deferment, on a schedule that begins upon repayment to the lender in full on the loan agreement, except in no case shall repayment

134 Stat. 404

H. R. 748—124

be required to begin before the date that is 1 full fiscal year after the date that is the end of the qualifying emergency.

(b) TERMINATION DATE.—

(1) IN GENERAL.—The authority provided under this section to grant a loan deferment under subsection (a) shall terminate on the date on which the qualifying emergency is no longer in effect.

(2) DURATION.—Any provision of a loan agreement or insurance agreement modified by the authority under this section shall remain so modified for the duration of the period covered by the loan agreement or insurance agreement.

(c) REPORT.—Not later than 180 days after the date of enactment of this Act, and every 180 days thereafter during the period beginning on the first day of the qualifying emergency and ending on September 30 of the fiscal year following the end of the qualifying emergency, the Secretary shall submit to the authorizing committees (as defined in section 103 of the Higher Education Act of 1965 (20 U.S.C. 1003)) a report that identifies each institution that received assistance under this section.

(d) FUNDING.—There is hereby appropriated, out of any money in the Treasury not otherwise appropriated, $62,000,000 to carry out this section.

**SEC. 3513. TEMPORARY RELIEF FOR FEDERAL STUDENT LOAN BOR-ROWERS.**

(a) IN GENERAL.—The Secretary shall suspend all payments due for loans made under part D and part B (that are held by the Department of Education) of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.; 1071 et seq.) through September 30, 2020.

(b) NO ACCRUAL OF INTEREST.—Notwithstanding any other provision of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), interest shall not accrue on a loan described under subsection (a) for which payment was suspended for the period of the suspension.

(c) CONSIDERATION OF PAYMENTS.—Notwithstanding any other provision of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.), the Secretary shall deem each month for which a loan payment was suspended under this section as if the borrower of the loan had made a payment for the purpose of any loan forgiveness program or loan rehabilitation program authorized under part D or B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.; 1071 et seq.) for which the borrower would have otherwise qualified.

(d) REPORTING TO CONSUMER REPORTING AGENCIES.—During the period in which the Secretary suspends payments on a loan under subsection (a), the Secretary shall ensure that, for the purpose of reporting information about the loan to a consumer reporting agency, any payment that has been suspended is treated as if it were a regularly scheduled payment made by a borrower.

(e) SUSPENDING INVOLUNTARY COLLECTION.—During the period in which the Secretary suspends payments on a loan under subsection (a), the Secretary shall suspend all involuntary collection related to the loan, including—

(1) a wage garnishment authorized under section 488A of the Higher Education Act of 1965 (20 U.S.C. 1095a) or section 3720D of title 31, United States Code;

134 Stat. 405

H. R. 748—125

(2) a reduction of tax refund by amount of debt authorized under section 3720A of title 31, United States Code, or section 6402(d) of the Internal Revenue Code of 1986;

(3) a reduction of any other Federal benefit payment by administrative offset authorized under section 3716 of title 31, United States Code (including a benefit payment due to an individual under the Social Security Act or any other provision described in subsection (c)(3)(A)(i) of such section); and

(4) any other involuntary collection activity by the Secretary.

(f) WAIVERS.—In carrying out this section, the Secretary may waive the application of—

(1) subchapter I of chapter 35 of title 44, United States Code (commonly known as the "Paperwork Reduction Act");

(2) the master calendar requirements under section 482 of the Higher Education Act of 1965 (20 U.S.C. 1089);

(3) negotiated rulemaking under section 492 of the Higher Education Act of 1965 (20 U.S.C. 1098a); and

(4) the requirement to publish the notices related to the system of records of the agency before implementation required under paragraphs (4) and (11) of section 552a(e) of title 5, United States Code (commonly known as the "Privacy Act of 1974"), except that the notices shall be published not later than 180 days after the date of enactment of this Act.

(g) NOTICE TO BORROWERS AND TRANSITION PERIOD.—To inform borrowers of the actions taken in accordance with this section and ensure an effective transition, the Secretary shall—

(1) not later than 15 days after the date of enactment of this Act, notify borrowers—

(A) of the actions taken in accordance with subsections (a) and (b) for whom payments have been suspended and interest waived;

(B) of the actions taken in accordance with subsection (e) for whom collections have been suspended;

(C) of the option to continue making payments toward principal; and

(D) that the program under this section is a temporary program.

(2) beginning on August 1, 2020, carry out a program to provide not less than 6 notices by postal mail, telephone, or electronic communication to borrowers indicating—

(A) when the borrower's normal payment obligations will resume; and

(B) that the borrower has the option to enroll in income-driven repayment, including a brief description of such options.

**SEC. 3514. PROVISIONS RELATED TO THE CORPORATION FOR NATIONAL AND COMMUNITY SERVICE.**

(a) ACCRUAL OF SERVICE HOURS.—

(1) ACCRUAL THROUGH OTHER SERVICE HOURS.—

(A) IN GENERAL.—Notwithstanding any other provision of the Domestic Volunteer Service Act of 1973 (42 U.S.C. 4950 et seq.) or the National and Community Service Act of 1990 (42 U.S.C. 12501 et seq.), the Corporation for National and Community Service shall allow an individual described in subparagraph (B) to accrue other service hours

134 Stat. 406

H. R. 748—126

that will count toward the number of hours needed for the individual's education award.

(B) AFFECTED INDIVIDUALS.—Subparagraph (A) shall apply to any individual serving in a position eligible for an educational award under subtitle D of title I of the National and Community Service Act of 1990 (42 U.S.C. 12601 et seq.)—

(i) who is performing limited service due to COVID–19; or

(ii) whose position has been suspended or placed on hold due to COVID–19.

(2) PROVISIONS IN CASE OF EARLY EXIT.—In any case where an individual serving in a position eligible for an educational award under subtitle D of title I of the National and Community Service Act of 1990 (42 U.S.C. 12601 et seq.) was required to exit the position early at the direction of the Corporation for National and Community Service, the Chief Executive Officer of the Corporation for National and Community Service may—

(A) deem such individual as having met the requirements of the position; and

(B) award the individual the full value of the educational award under such subtitle for which the individual would otherwise have been eligible.

(b) AVAILABILITY OF FUNDS.—Notwithstanding any other provision of law, all funds made available to the Corporation for National and Community Service under any Act, including the amounts appropriated to the Corporation under the headings "OPERATING EXPENSES", "SALARIES AND EXPENSES", and "OFFICE OF THE INSPECTOR GENERAL" under the heading "CORPORATION FOR NATIONAL AND COMMUNITY SERVICE" under title IV of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116–94), shall remain available for the fiscal year ending September 30, 2021.

(c) NO REQUIRED RETURN OF GRANT FUNDS.—Notwithstanding section 129(l)(3)(A)(i) of the National and Community Service Act of 1990 (42 U.S.C. 12581(l)(3)(A)(i)), the Chief Executive Officer of the Corporation for National and Community Service may permit fixed-amount grant recipients under such section 129(l) to maintain a pro rata amount of grant funds, at the discretion of the Corporation for National and Community Service, for participants who exited, were suspended, or are serving in a limited capacity due to COVID–19, to enable the grant recipients to maintain operations and to accept participants.

(d) EXTENSION OF TERMS AND AGE LIMITS.—Notwithstanding any other provision of law, the Corporation for National and Community Service may extend the term of service (for a period not to exceed the 1-year period immediately following the end of the national emergency) or waive any upper age limit (except in no case shall the maximum age exceed 26 years of age) for national service programs carried out by the National Civilian Community Corps under subtitle E of title I of the National and Community Service Act of 1990 (42 U.S.C. 12611 et seq.), and the participants in such programs, for the purposes of—

(1) addressing disruptions due to COVID–19; and

(2) minimizing the difficulty in returning to full operation due to COVID–19 on such programs and participants.

134 Stat. 407

H. R. 748—127

**SEC. 3515. WORKFORCE RESPONSE ACTIVITIES.**

(a) ADMINISTRATIVE COSTS.—Notwithstanding section 128(b)(4) of the Workforce Innovation Opportunity Act (29 U.S.C. 3163(b)(4)), of the total amount allocated to a local area (including the total amount allotted to a single State local area) under subtitle B of title I of such Act (29 U.S.C. 3151 et seq.) for program year 2019, not more than 20 percent of the total amount may be used for the administrative costs of carrying out local workforce investment activities under chapter 2 or chapter 3 of subtitle B of title I of such Act, if the portion of the total amount that exceeds 10 percent of the total amount is used to respond to a qualifying emergency.

(b) RAPID RESPONSE ACTIVITIES.—

(1) STATEWIDE RAPID RESPONSE.—Of the funds reserved by a Governor for program year 2019 for statewide activities under section 128(a) of the Workforce Innovation and Opportunity Act (29 U.S.C. 3163(a)) that remain unobligated, such funds may be used for statewide rapid response activities as described in section 134(a)(2)(A) of such Act (29 U.S.C. 3174(a)(2)(A)) for responding to a qualifying emergency.

(2) LOCAL BOARDS.—Of the funds reserved by a Governor for program year 2019 under section 133(a)(2) of such Act (29 U.S.C. 3173(a)(2)) that remain unobligated, such funds may be released within 30 days after the date of enactment of this Act to the local boards most impacted by the coronavirus at the determination of the Governor for rapid response activities related to responding to a qualifying emergency.

(c) DEFINITIONS.—Except as otherwise provided, the terms in this section have the meanings given the terms in section 3 of the Workforce Innovation and Opportunity Act (29 U.S.C. 3102).

**SEC. 3516. TECHNICAL AMENDMENTS.**

(a) IN GENERAL.—

(1) Section 6103(a)(3) of the Internal Revenue Code of 1986, as amended by the FUTURE Act (Public Law 116–91), is further amended by striking "(13), (16)" and inserting "(13)(A), (13)(B), (13)(C), (13)(D)(i), (16)".

(2) Section 6103(p)(3)(A) of such Code, as so amended, is further amended by striking "(12)," and inserting "(12), (13)(A), (13)(B), (13)(C), (13)(D)(i)".

(3) Section 6103(p)(4) of such Code, as so amended, is further amended by striking "(13) or (16)" each place it appears and inserting "(13), or (16)".

(4) Section 6103(p)(4) of such Code, as so amended and as amended by paragraph (3), is further amended by striking "(13)" each place it appears and inserting "(13)(A), (13)(B), (13)(C), (13)(D)(i)".

(5) Section 6103(l)(13)(C)(ii) of such Code, as added by the FUTURE Act (Public Law 116–91), is amended by striking "section 236A(e)(4)" and inserting "section 263A(e)(4)".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply as if included in the enactment of the FUTURE Act (Public Law 116–91).

134 Stat. 408

H. R. 748—128

### SEC. 3517. WAIVER AUTHORITY AND REPORTING REQUIREMENT FOR INSTITUTIONAL AID.

(a) WAIVER AUTHORITY.—Notwithstanding any other provision of the Higher Education Act of 1965 (U.S.C. 1001 et seq.), unless enacted with specific reference to this section, for any institution of higher education that was receiving assistance under title III, title V, or subpart 4 of part A of title VII of such Act (20 U.S.C. 1051 et seq.; 1101 et seq.; 1136a et seq.) at the time of a qualifying emergency, the Secretary may, for the period beginning on the first day of the qualifying emergency and ending on September 30 of the fiscal year following the end of the qualifying emergency—

(1) waive—

(A) the eligibility data requirements set forth in section 391(d) and 521(e) of the Higher Education Act of 1965 (20 U.S.C. 1068(d); 1103(e));

(B) the wait-out period set forth in section 313(d) of the Higher Education Act of 1965 (20 U.S.C. 1059(d));

(C) the allotment requirements under paragraphs (2) and (3) of subsection 318(e) of the Higher Education Act of 1965 (20 U.S.C. 1059(e)), and the reference to "the academic year preceding the beginning of that fiscal year" under such section 318(e)(1);

(D) the allotment requirements under subsections (b), (c), and (g) of section 324 of the Higher Education Act of 1965 (20 U.S.C. 1063), the reference to "the end of the school year preceding the beginning of that fiscal year" under such section 324(a), and the reference to "the academic year preceding such fiscal year" under such section 324(h);

(E) subparagraphs (A), (C), (D), and (E) of section 326(f)(3) of the Higher Education Act of 1965 (20 U.S.C. 1063b(f)(3)), and references to "previous year" under such section 326(f)(3)(B);

(F) subparagraphs (A), (C), (D), and (E) of section 723(f)(3) and subparagraphs (A), (C), (D), and (E) of section 724(f)(3) of the Higher Education Act of 1965 (20 U.S.C. 1136a(f)(3); 1136b(f)(3)), and references to "previous academic year" under subparagraph (B) of such sections 723(f)(3) and 724(f)(3); and

(G) the allotment restriction set forth in section 318(d)(4) and section 323(c)(2) of the Higher Education Act of 1965 (20 U.S.C. 1059e(d)(4); 1062(c)(2)); and

(2) waive or modify any statutory or regulatory provision to ensure that institutions that were receiving assistance under title III, title V, or subpart 4 of part A of title VII of such Act (20 U.S.C. 1051 et seq.; 1101 et seq.; 1136a et seq.) at the time of a qualifying emergency are not adversely affected by any formula calculation for fiscal year 2020 and for the period beginning on the first day of the qualifying emergency and ending on September 30 of the fiscal year following the end of the qualifying emergency, as necessary.

(b) USE OF UNEXPENDED FUNDS.—Any funds paid to an institution under title III, title V, or subpart 4 of part A of title VII of the Higher Education Act of 1965 (20 U.S.C. 1051 et seq.; 1101 et seq.; 1136a et seq.) and not expended or used for the purposes for which the funds were paid to the institution during the 5-year period following the date on which the funds were first paid

134 Stat. 409

H. R. 748—129

to the institution, may be carried over and expended during the
succeeding 5-year period.

(c) REPORT.—Not later than 180 days after the date of enact-
ment of this Act, and every 180 days thereafter for the period
beginning on the first day of the qualifying emergency and ending
on September 30 of the fiscal year following the end of the qualifying
emergency, the Secretary shall submit to the authorizing commit-
tees (as defined in section 103 of the Higher Education Act of
1965 (20 U.S.C. 1003)) a report that identifies each institution
that received a waiver or modification under this section.

## SEC. 3518. AUTHORIZED USES AND OTHER MODIFICATIONS FOR GRANTS.

(a) IN GENERAL.—The Secretary is authorized to modify the
required and allowable uses of funds for grants awarded under
part A or B of title III, chapter I or II of subpart 2 of part
A of title IV, title V, or subpart 4 of part A of title VII of the
Higher Education Act of 1965 (20 U.S.C. 1057 et seq.; 1060 et
seq.; 1070a–11 et seq.; 1070a–21 et seq.; 1101 et seq.; 1136a et
seq.) to an institution of higher education or other grant recipient
(not including individual recipients of Federal student financial
assistance), at the request of an institution of higher education
or other recipient of a grant (not including individual recipients
of Federal student financial assistance) as a result of a qualifying
emergency, for the period beginning on the first day of the qualifying
emergency and ending on September 30 of the fiscal year following
the end of the qualifying emergency.

(b) MATCHING REQUIREMENT MODIFICATIONS.—Notwith-
standing any other provision of the Higher Education Act of 1965
(20 U.S.C. 1001 et seq.), the Secretary is authorized to modify
any Federal share or other financial matching requirement for
a grant awarded on a competitive basis or a grant awarded under
part A or B of title III or subpart 4 of part A of title VII of
the Higher Education Act of 1965 (20 U.S.C. 1057 et seq.; 1060
et seq.; 1136a et seq.) at the request of an institution of higher
education or other grant recipient as a result of a qualifying emer-
gency, for the period beginning on the first day of the qualifying
emergency and ending on September 30 of the fiscal year following
the end of the qualifying emergency.

(c) REPORTS.—Not later than 180 days after the date of enact-
ment of this Act, and every 180 days thereafter for the duration
of the period beginning on the first day of the qualifying emergency
and ending on September 30 of the fiscal year following the end
of the qualifying emergency, the Secretary shall submit to the
authorizing committees (as defined in section 103 of the Higher
Education Act of 1965 (20 U.S.C. 1003)) a report that identifies
each institution of higher education or other grant recipient that
received a modification under this section.

## SEC. 3519. SERVICE OBLIGATIONS FOR TEACHERS.

(a) TEACH GRANTS.—For the purpose of section 420N of the
Higher Education Act of 1965 (20 U.S.C. 1070g–2), during a quali-
fying emergency, the Secretary—

(1) may modify the categories of extenuating circumstances
under which a recipient of a grant under subpart 9 of part
A of title IV of the Higher Education Act of 1965 (20 U.S.C.
1070g et seq.) who is unable to fulfill all or part of the recipient's

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 27 of 305

134 Stat. 410

service obligation may be excused from fulfilling that portion of the service obligation; and

(2) shall consider teaching service that, as a result of a qualifying emergency, is part-time or temporarily interrupted, to be full-time service and to fulfill the service obligations under such section 420N.

(b) TEACHER LOAN FORGIVENESS.—Notwithstanding section 428J or 460 of the Higher Education Act of 1965 (20 U.S.C. 1078–10; 1087j), the Secretary shall waive the requirements under such sections that years of teaching service shall be consecutive if—

(1) the teaching service of a borrower is temporarily interrupted due to a qualifying emergency; and

(2) after the temporary interruption due to a qualifying emergency, the borrower resumes teaching service and completes a total of 5 years of qualifying teaching service under such sections, including qualifying teaching service performed before, during, and after such qualifying emergency.

## Subtitle C—Labor Provisions

**SEC. 3601. LIMITATION ON PAID LEAVE.**

Section 110(b)(2)(B) of the Family and Medical Leave Act of 1993 (as added by the Emergency Family and Medical Leave Expansion Act) is amended by striking clause (ii) and inserting the following:

"(ii) LIMITATION.—An employer shall not be required to pay more than $200 per day and $10,000 in the aggregate for each employee for paid leave under this section.".

**SEC. 3602. EMERGENCY PAID SICK LEAVE ACT LIMITATION.**

Section 5102 of the Emergency Paid Sick Leave Act (division E of the Families First Coronavirus Response Act) is amended by adding at the end the following:

"(f) LIMITATIONS.—An employer shall not be required to pay more than either—

"(1) $511 per day and $5,110 in the aggregate for each employee, when the employee is taking leave for a reason described in paragraph (1), (2), or (3) of section 5102(a); or

"(2) $200 per day and $2,000 in the aggregate for each employee, when the employee is taking leave for a reason described in paragraph (4), (5), or (6) of section 5102(a).".

**SEC. 3603. UNEMPLOYMENT INSURANCE.**

Section 903(h)(2)(B) of the Social Security Act (42 U.S.C. 1103(h)(2)(B)), as added by section 4102 of the Emergency Unemployment Insurance Stabilization and Access Act of 2020, is amended to read as follows:

"(B) The State ensures that applications for unemployment compensation, and assistance with the application process, are accessible, to the extent practicable in at least two of the following: in person, by phone, or online.".

**SEC. 3604. OMB WAIVER OF PAID FAMILY AND PAID SICK LEAVE.**

(a) FAMILY AND MEDICAL LEAVE ACT OF 1993.—Section 110(a) of title I of the Family and Medical Leave Act of 1993 (29 U.S.C. 2611 et seq.) (as added by division C of the Families First

134 Stat. 414

H. R. 748—134

"(i) described in section 501(c)(3),

"(ii) who has been in existence since at least 1938,

"(iii) who conducts medical research directly or indirectly through grant making, and

"(iv) whose primary exempt purpose is to provide services with respect to mothers and children.".

(c) EFFECTIVE DATE.—The amendments made by this section shall apply to plan years beginning after December 31, 2018.

## SEC. 3610. FEDERAL CONTRACTOR AUTHORITY.

Notwithstanding any other provision of law, and subject to the availability of appropriations, funds made available to an agency by this Act or any other Act may be used by such agency to modify the terms and conditions of a contract, or other agreement, without consideration, to reimburse at the minimum applicable contract billing rates not to exceed an average of 40 hours per week any paid leave, including sick leave, a contractor provides to keep its employees or subcontractors in a ready state, including to protect the life and safety of Government and contractor personnel, but in no event beyond September 30, 2020. Such authority shall apply only to a contractor whose employees or subcontractors cannot perform work on a site that has been approved by the Federal Government, including a federally-owned or leased facility or site, due to facility closures or other restrictions, and who cannot telework because their job duties cannot be performed remotely during the public health emergency declared on January 31, 2020 for COVID–19: *Provided*, That the maximum reimbursement authorized by this section shall be reduced by the amount of credit a contractor is allowed pursuant to division G of Public Law 116–127 and any applicable credits a contractor is allowed under this Act.

## SEC. 3611. TECHNICAL CORRECTIONS.

(1) Section 110(a)(3) of the Family and Medical Leave Act of 1993 (as added by the Emergency and Medical Leave Expansion Act) is amended by striking "553(d)(A)" and inserting "553(d)(3)".

(2) Section 5111 of the Emergency Paid Sick Leave Act (division E of the Families First Coronavirus Response Act) is amended by striking "553(d)(A)" and inserting "553(d)(3)".

(3) Section 110(c) of the Family and Medical Leave Act of 1993 (as added by the Emergency and Medical Leave Expansion Act) is amended by striking "subsection (a)(2)(A)(iii)" and inserting "subsection (a)(2)(A)".

(4) Section 3104 of the Emergency Family and Medical Leave Expansion Act (division C of the Families First Coronavirus Response Act) is amended—

(A) by striking "110(a)(B)" and inserting "section 110(a)(1)(B) of the Family and Medical Leave Act of 1993"; and

(B) by striking "section 107(a) for a violation of section 102(a)(1)(F) if the employer does not meet the definition of employer set forth in Section 101(4)(A)(i)" and inserting "section 107(a) of such Act for a violation of section 102(a)(1)(F) of such Act if the employer does not meet the definition of employer set forth in section 101(4)(A)(i) of such Act".

134 Stat. 415

H. R. 748—135

(5) Section 5110(1) of the Emergency Paid Sick Leave Act (division E of the Families First Coronavirus Response Act) is amended—

(A) in the matter preceding subparagraph (A), by striking "terms" and inserting "term"; and

(B) in subparagraph (A)(i), by striking "paragraph (5)(A)" and inserting "paragraph (2)(A)".

(6) Section 5110(2)(B)(ii) of the Emergency Paid Sick Leave Act (division E of the Families First Coronavirus Response Act) is amended by striking "clause (i)(IV)" and inserting "clause (i)(III)".

(7) Section 110(a)(3) of the Family and Medical Leave Act of 1993 (as added by the Emergency and Medical Leave Expansion Act) is amended—

(A) by striking "and" after the semicolon at the end of subparagraph (A);

(B) by striking the period at end of subparagraph (B) and inserting "; and"; and

(C) by adding at the end the following:

"(C) as necessary to carry out the purposes of this Act, including to ensure consistency between this Act and Division E and Division G of the Families First Coronavirus Response Act.".

(8) Section 5104(1) of the Emergency Paid Sick Leave Act (division E of the Families First Coronavirus Response Act) is amended by striking "and" after the semicolon and inserting "or".

(9) Section 5105 of the Emergency Paid Sick Leave Act (division E of the Families First Coronavirus Response Act) is amended by adding at the end the following:

"(c) INVESTIGATIONS AND COLLECTION OF DATA.—The Secretary of Labor or his designee may investigate and gather data to ensure compliance with this Act in the same manner as authorized by sections 9 and 11 of the Fair Labor Standards Act of 1938 (29 U.S.C. 209; 211).".

## Subtitle D—Finance Committee

### SEC. 3701. EXEMPTION FOR TELEHEALTH SERVICES.

(a) IN GENERAL.—Paragraph (2) of section 223(c) of the Internal Revenue Code of 1986 is amended by adding at the end the following new subparagraph:

"(E) SAFE HARBOR FOR ABSENCE OF DEDUCTIBLE FOR TELEHEALTH.—In the case of plan years beginning on or before December 31, 2021, a plan shall not fail to be treated as a high deductible health plan by reason of failing to have a deductible for telehealth and other remote care services.".

(b) CERTAIN COVERAGE DISREGARDED.—Clause (ii) of section 223(c)(1)(B) of the Internal Revenue Code of 1986 is amended by striking "or long-term care" and inserting "long-term care, or (in the case of plan years beginning on or before December 31, 2021) telehealth and other remote care".

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on the date of the enactment of this Act.

134 Stat. 427

H. R. 748—147

"(ii) Allow not less than 12 months from the date of the first accelerated payment before requiring that the outstanding balance be paid in full.

"(3) Nothing in this subsection shall preclude the Secretary from carrying out the provisions described in clauses (i), (ii), and (iii) of paragraph (2)(B) and clauses (i) and (ii) of paragraph (2)(C) under the program under subsection (e)(3) after the period for which this subsection applies.

"(4) Notwithstanding any other provision of law, the Secretary may implement the provisions of this subsection by program instruction or otherwise.".

**SEC. 3720. DELAYING REQUIREMENTS FOR ENHANCED FMAP TO ENABLE STATE LEGISLATION NECESSARY FOR COMPLIANCE.**

Section 6008 of the Families First Coronavirus Response Act is amended by adding at the end the following new subsection:

"(d) DELAY IN APPLICATION OF PREMIUM REQUIREMENT.—During the 30 day period beginning on the date of enactment of this Act, a State shall not be ineligible for the increase to the Federal medical assistance percentage of the State described in subsection (a) on the basis that the State imposes a premium that violates the requirement of subsection (b)(2) if such premium was in effect on the date of enactment of this Act.".

# Subtitle E—Health and Human Services Extenders

## PART I—MEDICARE PROVISIONS

**SEC. 3801. EXTENSION OF THE WORK GEOGRAPHIC INDEX FLOOR UNDER THE MEDICARE PROGRAM.**

Section 1848(e)(1)(E) of the Social Security Act (42 U.S.C. 1395w–4(e)(1)(E)) is amended by striking "May 23, 2020" and inserting "December 1, 2020".

**SEC. 3802. EXTENSION OF FUNDING FOR QUALITY MEASURE ENDORSEMENT, INPUT, AND SELECTION.**

(a) IN GENERAL.—Section 1890(d)(2) of the Social Security Act (42 U.S.C. 1395aaa(d)(2)) is amended—

(1) in the first sentence, by striking "and $4,830,000 for the period beginning on October 1, 2019, and ending on May 22, 2020" and inserting "$20,000,000 for fiscal year 2020, and for the period beginning on October 1, 2020, and ending on November 30, 2020, the amount equal to the pro rata portion of the amount appropriated for such period for fiscal year 2020"; and

(2) in the third sentence, by striking "and 2019 and for the period beginning on October 1, 2019, and ending on May 22, 2020" and inserting ", 2019, and 2020, and for the period beginning on October 1, 2020, and ending on November 30, 2020,".

(b) EFFECTIVE DATE.—The amendments made by subsection (a) shall take effect as if included in the enactment of the Further Consolidated Appropriations Act, 2020 (Public Law 116–94).

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 31 of 305

134 Stat. 434

"(G) $310,000,000 for fiscal year 2020; and

"(H) $51,808,219 for the period beginning on October 1, 2020, and ending on November 30, 2020.".

(c) TEACHING HEALTH CENTERS THAT OPERATE GRADUATE MEDICAL EDUCATION PROGRAMS.—Section 340H(g)(1) of the Public Health Service Act (42 U.S.C. 256h(g)(1)) is amended by striking "and 2019, and $81,445,205 for the period beginning on October 1, 2019, and ending on May 22, 2020" and inserting "through fiscal year 2020, and $21,141,096 for the period beginning on October 1, 2020, and ending on November 30, 2020".

(d) APPLICATION OF PROVISIONS.—Amounts appropriated pursuant to the amendments made by this section for fiscal year 2020 and for the period beginning on October 1, 2020, and ending on November 30, 2020, shall be subject to the requirements contained in Public Law 116–94 for funds for programs authorized under sections 330 through 340 of the Public Health Service Act (42 U.S.C. 254 through 256).

(e) CONFORMING AMENDMENT.—Paragraph (4) of section 3014(h) of title 18, United States Code, as amended by section 401(e) of division N of Public Law 116–94, is amended by striking "section 401(d) of division N of the Further Consolidated Appropriations Act, 2020" and inserting "section 3831 of the CARES Act".

**SEC. 3832. DIABETES PROGRAMS.**

(a) TYPE I.—Section 330B(b)(2)(D) of the Public Health Service Act (42 U.S.C. 254c–2(b)(2)(D)) is amended by striking "and 2019, and $96,575,342 for the period beginning on October 1, 2019, and ending on May 22, 2020" and inserting "through 2020, and $25,068,493 for the period beginning on October 1, 2020, and ending on November 30, 2020".

(b) INDIANS.—Section 330C(c)(2)(D) of the Public Health Service Act (42 U.S.C. 254c–3(c)(2)(D)) is amended by striking "and 2019, and $96,575,342 for the period beginning on October 1, 2019, and ending on May 22, 2020" and inserting "through 2020, and $25,068,493 for the period beginning on October 1, 2020, and ending on November 30, 2020".

# PART V—MISCELLANEOUS PROVISIONS

**SEC. 3841. PREVENTION OF DUPLICATE APPROPRIATIONS FOR FISCAL YEAR 2020.**

Expenditures made under any provision of law amended in this title pursuant to the amendments made by the Continuing Appropriations Act, 2020, and Health Extenders Act of 2019 (Public Law 116–59), the Further Continuing Appropriations Act, 2020, and Further Health Extenders Act of 2019 (Public Law 116–69), and the Further Consolidated Appropriations Act, 2020 (Public Law 116–94) for fiscal year 2020 shall be charged to the applicable appropriation or authorization provided by the amendments made by this title to such provision of law for such fiscal year.

134 Stat. 501

recipients of financial assistance under this subtitle which, in the sole determination of the Secretary, provide appropriate compensation to the Federal Government for the provision of the financial assistance.

**SEC. 4118. REPORTS.**

(a) REPORT.—Not later than November 1, 2020, the Secretary shall submit to the Committee on Transportation and Infrastructure and the Committee on Financial Services of the House of Representatives and the Committee on Commerce, Science, and Transportation and the Committee on Banking, Housing, and Urban Affairs of the Senate a report on the financial assistance provided to air carriers and contractors under this subtitle, including a description of any financial assistance provided.

(b) UPDATE.—Not later than the last day of the 1-year period following the date of enactment of this Act, the Secretary shall update and submit to the Committee on Transportation and the Committee on Financial Services and Infrastructure of the House of Representatives and the Committee on Commerce, Science, and Transportation and the Committee on Banking, Housing, and Urban Affairs of the Senate the report described in subsection (a).

**SEC. 4119. COORDINATION.**

In implementing this subtitle the Secretary shall coordinate with the Secretary of Transportation.

**SEC. 4120. DIRECT APPROPRIATION.**

Notwithstanding any other provision of law, there is appropriated, out of amounts in the Treasury not otherwise appropriated, $32,000,000,000 to carry out this subtitle.

# TITLE V—CORONAVIRUS RELIEF FUNDS

**SEC. 5001. CORONAVIRUS RELIEF FUND.**

(a) IN GENERAL.—The Social Security Act (42 U.S.C. 301 et seq.) is amended by inserting after title V the following:

## "TITLE VI—CORONAVIRUS RELIEF FUND

**"SEC. 601. CORONAVIRUS RELIEF FUND.**

"(a) APPROPRIATION.—

"(1) IN GENERAL.—Out of any money in the Treasury of the United States not otherwise appropriated, there are appropriated for making payments to States, Tribal governments, and units of local government under this section, $150,000,000,000 for fiscal year 2020.

"(2) RESERVATION OF FUNDS.—Of the amount appropriated under paragraph (1), the Secretary shall reserve—

"(A) $3,000,000,000 of such amount for making payments to the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa; and

134 Stat. 502

H. R. 748—222

"(B) $8,000,000,000 of such amount for making payments to Tribal governments.

"(b) AUTHORITY TO MAKE PAYMENTS.—

"(1) IN GENERAL.—Subject to paragraph (2), not later than 30 days after the date of enactment of this section, the Secretary shall pay each State and Tribal government, and each unit of local government that meets the condition described in paragraph (2), the amount determined for the State, Tribal government, or unit of local government, for fiscal year 2020 under subsection (c).

"(2) DIRECT PAYMENTS TO UNITS OF LOCAL GOVERNMENT.— If a unit of local government of a State submits the certification required by subsection (e) for purposes of receiving a direct payment from the Secretary under the authority of this paragraph, the Secretary shall reduce the amount determined for that State by the relative unit of local government population proportion amount described in subsection (c)(5) and pay such amount directly to such unit of local government.

"(c) PAYMENT AMOUNTS.—

"(1) IN GENERAL.—Subject to paragraph (2), the amount paid under this section for fiscal year 2020 to a State that is 1 of the 50 States shall be the amount equal to the relative population proportion amount determined for the State under paragraph (3) for such fiscal year.

"(2) MINIMUM PAYMENT.—

"(A) IN GENERAL.—No State that is 1 of the 50 States shall receive a payment under this section for fiscal year 2020 that is less than $1,250,000,000.

"(B) PRO RATA ADJUSTMENTS.—The Secretary shall adjust on a pro rata basis the amount of the payments for each of the 50 States determined under this subsection without regard to this subparagraph to the extent necessary to comply with the requirements of subparagraph (A).

"(3) RELATIVE POPULATION PROPORTION AMOUNT.—For purposes of paragraph (1), the relative population proportion amount determined under this paragraph for a State for fiscal year 2020 is the product of—

"(A) the amount appropriated under paragraph (1) of subsection (a) for fiscal year 2020 that remains after the application of paragraph (2) of that subsection; and

"(B) the relative State population proportion (as defined in paragraph (4)).

"(4) RELATIVE STATE POPULATION PROPORTION DEFINED.— For purposes of paragraph (3)(B), the term 'relative State population proportion' means, with respect to a State, the quotient of—

"(A) the population of the State; and

"(B) the total population of all States (excluding the District of Columbia and territories specified in subsection (a)(2)(A)).

"(5) RELATIVE UNIT OF LOCAL GOVERNMENT POPULATION PROPORTION AMOUNT.—For purposes of subsection (b)(2), the term 'relative unit of local government population proportion amount' means, with respect to a unit of local government and a State, the amount equal to the product of—

134 Stat. 503

H. R. 748—223

"(A) 45 percent of the amount of the payment determined for the State under this subsection (without regard to this paragraph); and

"(B) the amount equal to the quotient of—

"(i) the population of the unit of local government; and

"(ii) the total population of the State in which the unit of local government is located.

"(6) DISTRICT OF COLUMBIA AND TERRITORIES.—The amount paid under this section for fiscal year 2020 to a State that is the District of Columbia or a territory specified in subsection (a)(2)(A) shall be the amount equal to the product of—

"(A) the amount set aside under subsection (a)(2)(A) for such fiscal year; and

"(B) each such District's and territory's share of the combined total population of the District of Columbia and all such territories, as determined by the Secretary.

"(7) TRIBAL GOVERNMENTS.—From the amount set aside under subsection (a)(2)(B) for fiscal year 2020, the amount paid under this section for fiscal year 2020 to a Tribal government shall be the amount the Secretary shall determine, in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government (or a tribally-owned entity of such Tribal government) relative to aggregate expenditures in fiscal year 2019 by the Tribal government (or tribally-owned entity) and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

"(8) DATA.—For purposes of this subsection, the population of States and units of local governments shall be determined based on the most recent year for which data are available from the Bureau of the Census.

"(d) USE OF FUNDS.—A State, Tribal government, and unit of local government shall use the funds provided under a payment made under this section to cover only those costs of the State, Tribal government, or unit of local government that—

"(1) are necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19);

"(2) were not accounted for in the budget most recently approved as of the date of enactment of this section for the State or government; and

"(3) were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020.

"(e) CERTIFICATION.—In order to receive a payment under this section, a unit of local government shall provide the Secretary with a certification signed by the Chief Executive for the unit of local government that the local government's proposed uses of the funds are consistent with subsection (d).

"(f) INSPECTOR GENERAL OVERSIGHT; RECOUPMENT.—

"(1) OVERSIGHT AUTHORITY.—The Inspector General of the Department of the Treasury shall conduct monitoring and oversight of the receipt, disbursement, and use of funds made available under this section.

134 Stat. 504

H. R. 748—224

"(2) RECOUPMENT.—If the Inspector General of the Department of the Treasury determines that a State, Tribal government, or unit of local government has failed to comply with subsection (d), the amount equal to the amount of funds used in violation of such subsection shall be booked as a debt of such entity owed to the Federal Government. Amounts recovered under this subsection shall be deposited into the general fund of the Treasury.

"(3) APPROPRIATION.—Out of any money in the Treasury of the United States not otherwise appropriated, there are appropriated to the Office of the Inspector General of the Department of the Treasury, $35,000,000 to carry out oversight and recoupment activities under this subsection. Amounts appropriated under the preceding sentence shall remain available until expended.

"(4) AUTHORITY OF INSPECTOR GENERAL.—Nothing in this subsection shall be construed to diminish the authority of any Inspector General, including such authority as provided in the Inspector General Act of 1978 (5 U.S.C. App.).

"(g) DEFINITIONS.—In this section:

"(1) INDIAN TRIBE.—The term 'Indian Tribe' has the meaning given that term in section 4(e) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304(e)).

"(2) LOCAL GOVERNMENT.—The term 'unit of local government' means a county, municipality, town, township, village, parish, borough, or other unit of general government below the State level with a population that exceeds 500,000.

"(3) SECRETARY.—The term 'Secretary' means the Secretary of the Treasury.

"(4) STATE.—The term 'State' means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa.

"(5) TRIBAL GOVERNMENT.—The term 'Tribal government' means the recognized governing body of an Indian Tribe.".

(b) APPLICATION OF PROVISIONS.—Amounts appropriated for fiscal year 2020 under section 601(a)(1) of the Social Security Act (as added by subsection (a)) shall be subject to the requirements contained in Public Law 116–94 for funds for programs authorized under sections 330 through 340 of the Public Health Service Act (42 U.S.C. 254 through 256).

# TITLE VI—MISCELLANEOUS PROVISIONS

**SEC. 6001. COVID–19 BORROWING AUTHORITY FOR THE UNITED STATES POSTAL SERVICE.**

(a) DEFINITIONS.—In this section—

(1) the term "COVID–19 emergency" means the emergency involving Federal primary responsibility determined to exist by the President under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191(b)) with respect to the Coronavirus Disease 2019 (COVID–19); and

134 Stat. 505

H. R. 748—225

(2) the term "Postal Service" means the United States Postal Service.

(b) ADDITIONAL BORROWING AUTHORITY.—Notwithstanding section 2005 of title 39, United States Code, or any other provision of law, if the Postal Service determines that, due to the COVID–19 emergency, the Postal Service will not be able to fund operating expenses without borrowing money—

(1) the Postal Service may borrow money from the Treasury in an amount not to exceed $10,000,000,000—

(A) to be used for such operating expenses; and

(B) which may not be used to pay any outstanding debt of the Postal Service; and

(2) the Secretary of the Treasury may lend up to the amount described in paragraph (1) at the request of the Postal Service, upon terms and conditions mutually agreed upon by the Secretary and the Postal Service.

(c) PRIORITIZATION OF DELIVERY FOR MEDICAL PURPOSES DURING COVID–19 EMERGENCY.—Notwithstanding any other provision of law, during the COVID–19 emergency, the Postal Service—

(1) shall prioritize delivery of postal products for medical purposes; and

(2) may establish temporary delivery points, in such form and manner as the Postal Service determines necessary, to protect employees of the Postal Service and individuals receiving deliveries from the Postal Service.

**SEC. 6002. EMERGENCY DESIGNATION.**

(a) IN GENERAL.—The amounts provided under this division are designated as an emergency requirement pursuant to section 4(g) of the Statutory Pay-As-You-Go Act of 2010 (2 U.S.C. 933(g)).

(b) DESIGNATION IN SENATE.—In the Senate, this division is designated as an emergency requirement pursuant to section 4112(a) of H. Con. Res. 71 (115th Congress), the concurrent resolution on the budget for fiscal year 2018.

# DIVISION B—EMERGENCY APPROPRIATIONS FOR CORONAVIRUS HEALTH RESPONSE AND AGENCY OPERATIONS

The following sums are hereby are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2020, and for other purposes, namely:

## TITLE I

### AGRICULTURAL PROGRAMS

#### OFFICE OF THE SECRETARY

For an additional amount for the "Office of the Secretary", $9,500,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus by providing support for agricultural producers impacted by coronavirus, including producers of specialty crops, producers that supply local food systems, including farmers markets, restaurants, and schools, and livestock producers, including dairy producers: *Provided*, That such amount

134 Stat. 526

H. R. 748—246

SEC. 14002. (a) Section 404 of the Bipartisan Budget Act of 2015 (42 U.S.C. 6239 note) is amended—

(1) in subsection (e), by striking "2020" and inserting "2022"; and

(2) in subsection (g), by striking "2020" and inserting "2022".

(b) Title III of division C of the Further Consolidated Appropriations Act, 2020 (Public Law 116–94) is amended in the matter under the heading "Department of Energy—Energy Programs—Strategic Petroleum Reserve" by striking the three provisos before the final period and inserting the following:

" *Provided*, That, as authorized by section 404 of the Bipartisan Budget Act of 2015 (Public Law 114–74; 42 U.S.C. 6239 note), the Secretary of Energy shall draw down and sell not to exceed a total of $450,000,000 of crude oil from the Strategic Petroleum Reserve in fiscal year 2020, fiscal year 2021, or fiscal year 2022: *Provided further*, That the proceeds from such drawdown and sale shall be deposited into the 'Energy Security and Infrastructure Modernization Fund' during the fiscal year in which the sale occurs and shall be made available in such fiscal year, to remain available until expended, for necessary expenses to carry out the Life Extension II project for the Strategic Petroleum Reserve".

(c) The amount provided by this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

SEC. 14003. Any discretionary appropriation for the Corps of Engineers derived from the Harbor Maintenance Trust Fund (not to exceed the total amount deposited in the Harbor Maintenance Trust Fund in the prior fiscal year) shall be subtracted from the estimate of discretionary budget authority and outlays for any estimate of an appropriations Act under the Congressional Budget and Impoundment Control Act of 1974 or the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided*, That the modifications described in this section shall not take effect until the earlier of January 1, 2021 or the date of enactment of legislation authorizing the development of water resources and shall remain in effect thereafter.

SEC. 14004. Section 14321(a)(2)(B)(ii) of title 40, United States Code, is amended by inserting ", except that a discretionary grant to respond to economic distress directly related to the impacts of the Coronavirus Disease 2019 (COVID–19) shall not be included in such aggregate amount" before the period at the end.

## TITLE V

## DEPARTMENT OF THE TREASURY

INTERNAL REVENUE SERVICE

ADMINISTRATIVE PROVISION—INTERNAL REVENUE SERVICE

(INCLUDING TRANSFER OF FUNDS)

SEC. 15001. In addition to the amounts otherwise available to the Internal Revenue Service in fiscal year 2020, $250,000,000, to remain available until September 30, 2021, shall be available to prevent, prepare for, and respond to coronavirus, domestically

000037

134 Stat. 533

H. R. 748—253

such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### OFFICE OF PERSONNEL MANAGEMENT

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $12,100,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including technologies for digital case management, short-term methods to allow electronic submissions of retirement application packages in support of paper-based business operations, and increased telecommunications: *Provided,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### PANDEMIC RESPONSE ACCOUNTABILITY COMMITTEE

For an additional amount for "Pandemic Response Accountability Committee", $80,000,000, to remain available until expended, to promote transparency and support oversight of funds provided in this Act to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### SMALL BUSINESS ADMINISTRATION

#### DISASTER LOANS PROGRAM ACCOUNT

##### (INCLUDING TRANSFERS OF FUNDS)

For an additional amount for the "Disaster Loans Program Account", $562,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the cost of direct loans authorized by section 7(b) of the Small Business Act and for administrative expenses to carry out the disaster loan program authorized by section 7(b) of the Small Business Act: *Provided,* That the amounts provided under this heading in this Act may be transferred to, and merged with, "Small Business Administration—Salaries and Expenses" to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided further,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## GENERAL PROVISIONS—THIS TITLE

### PANDEMIC RESPONSE ACCOUNTABILITY COMMITTEE

SEC. 15010. (a) In this section—
(1) the term "agency" has the meaning given the term in section 551 of title 5, United States Code;

134 Stat. 534

H. R. 748—254

(2) the term "appropriate congressional committees" means—

(A) the Committees on Appropriations of the Senate and the House of Representatives;

(B) the Committee on Homeland Security and Governmental Affairs of the Senate;

(C) the Committee on Oversight and Reform of the House of Representatives; and

(D) any other relevant congressional committee of jurisdiction;

(3) the term "Chairperson" means the Chairperson of the Committee;

(4) the term "Council" means the Council of the Inspectors General on Integrity and Efficiency established under section 11 of the Inspector General Act of 1978 (5 U.S.C. App);

(5) the term "Committee" means the Pandemic Response Accountability Committee established under subsection (b);

(6) the term "covered funds" means any funds, including loans, that are made available in any form to any non-Federal entity, not including an individual, under—

(A) this Act;

(B) the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (Public Law 116–123);

(C) the Families First Coronavirus Response Act (Public Law 116–127); or

(D) any other Act primarily making appropriations for the Coronavirus response and related activities; and

(7) the term "Coronavirus response" means the Federal Government's response to the nationwide public health emergency declared by the Secretary of Health and Human Services, retroactive to January 27, 2020, pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d), as a result of confirmed cases of the novel coronavirus (COVID–19) in the United States.

(b) There is established within the Council the Pandemic Response Accountability Committee to promote transparency and conduct and support oversight of covered funds and the Coronavirus response to—

(1) prevent and detect fraud, waste, abuse, and mismanagement; and

(2) mitigate major risks that cut across program and agency boundaries.

(c)(1) The Chairperson of the Committee shall be selected by the Chairperson of the Council from among Inspectors General described in subparagraphs (B), (C), and (D) of paragraph (2) with experience managing oversight of large organizations and expenditures.

(2) The members of the Committee shall include—

(A) the Chairperson;

(B) the Inspectors General of the Departments of Defense, Education, Health and Human Services, Homeland Security, Justice, Labor, and the Treasury;

(C) the Inspector General of the Small Business Administration;

(D) the Treasury Inspector General for Tax Administration; and

134 Stat. 535

H. R. 748—255

(E) any other Inspector General, as designated by the Chairperson from any agency that expends or obligates covered funds or is involved in the Coronavirus response.

(3)(A) There shall be an Executive Director and a Deputy Executive Director of the Committee.

(B)(i)(I) Not later than 30 days after the date of enactment of this Act, the Executive Director of the Committee shall be appointed by the Chairperson of the Council, in consultation with the majority leader of the Senate, the Speaker of the House of Representatives, the minority leader of the Senate, and the minority leader of the House of Representatives.

(II) Not later than 90 days after the date of enactment of this Act, the Deputy Executive Director of the Committee shall be appointed by the Chairperson of the Council, in consultation with the majority leader of the Senate, the Speaker of the House of Representatives, the minority leader of the Senate, the minority leader of the House of Representatives, and the Executive Director of the Committee.

(ii) The Executive Director and the Deputy Executive Director of the Committee shall—

(I) have demonstrated ability in accounting, auditing, and financial analysis;

(II) have experience managing oversight of large organizations and expenditures; and

(III) be full-time employees of the Committee.

(C) The Executive Director of the Committee shall—

(i) report directly to the Chairperson;

(ii) appoint staff of the Committee, subject to the approval of the Chairperson, consistent with subsection (f);

(iii) supervise and coordinate Committee functions and staff; and

(iv) perform any other duties assigned to the Executive Director by the Committee.

(4)(A) Members of the Committee may not receive additional compensation for services performed.

(B) The Executive Director and Deputy Executive Director of the Committee shall be compensated at the rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code.

(d)(1)(A) The Committee shall conduct and coordinate oversight of covered funds and the Coronavirus response and support Inspectors General in the oversight of covered funds and the Coronavirus response in order to—

(i) detect and prevent fraud, waste, abuse, and mismanagement; and

(ii) identify major risks that cut across programs and agency boundaries.

(B) The functions of the Committee shall include—

(i) developing a strategic plan to ensure coordinated, efficient, and effective comprehensive oversight by the Committee and Inspectors General over all aspects of covered funds and the Coronavirus response;

(ii) auditing or reviewing covered funds, including a comprehensive audit and review of charges made to Federal contracts pursuant to authorities provided in the Coronavirus Aid, Relief, and Economic Security Act, to determine whether wasteful spending, poor contract or grant management, or other

134 Stat. 536

H. R. 748—256

abuses are occurring and referring matters the Committee considers appropriate for investigation to the Inspector General for the agency that disbursed the covered funds, including conducting randomized audits to identify fraud;

(iii) reviewing whether the reporting of contracts and grants using covered funds meets applicable standards and specifies the purpose of the contract or grant and measures of performance;

(iv) reviewing the economy, efficiency, and effectiveness in the administration of, and the detection of fraud, waste, abuse, and mismanagement in, Coronavirus response programs and operations;

(v) reviewing whether competition requirements applicable to contracts and grants using covered funds have been satisfied;

(vi) serving as a liaison to the Director of the Office of Management and Budget, the Secretary of the Treasury, and other officials responsible for implementing the Coronavirus response;

(vii) reviewing whether there are sufficient qualified acquisition, grant, and other applicable personnel overseeing covered funds and the Coronavirus response;

(viii) reviewing whether personnel whose duties involve the Coronavirus response or acquisitions or grants made with covered funds or are otherwise related to the Coronavirus response receive adequate training, technology support, and other resources;

(ix) reviewing whether there are appropriate mechanisms for interagency collaboration relating to the oversight of covered funds and the Coronavirus response, including coordinating and collaborating to the extent practicable with State and local government entities;

(x) expeditiously reporting to the Attorney General any instance in which the Committee has reasonable grounds to believe there has been a violation of Federal criminal law; and

(xi) coordinating and supporting Inspectors General on matters related to oversight of covered funds and the Coronavirus response.

(2)(A)(i) The Committee shall submit to the President and Congress, including the appropriate congressional committees, management alerts on potential management, risk, and funding problems that require immediate attention.

(ii) The Committee shall submit to Congress such other reports or provide such periodic updates on the work of the Committee as the Committee considers appropriate on the use of covered funds and the Coronavirus response.

(B) The Committee shall submit biannual reports to the President and Congress, including the appropriate congressional committees, and may submit additional reports as appropriate—

(i) summarizing the findings of the Committee; and

(ii) identifying and quantifying the impact of any tax expenditures or credits authorized under this Act to the extent practicable.

(C)(i) All reports submitted under this paragraph shall be made publicly available and posted on the website established under subsection (g).

134 Stat. 537

H. R. 748—257

(ii) Any portion of a report submitted under this paragraph may be redacted when made publicly available, if that portion would disclose information that is not subject to disclosure under sections 552 and 552a of title 5, United States Code, or is otherwise prohibited from disclosure by law.

(3)(A) The Committee shall make recommendations to agencies on measures to prevent or address fraud, waste, abuse and mismanagement, and to mitigate risks that cut across programs and agency boundaries, relating to covered funds and the Coronavirus response.

(B) Not later than 30 days after receipt of a recommendation under subparagraph (A), an agency shall submit a report to the President and the appropriate congressional committees on—

(i) whether the agency agrees or disagrees with the recommendations; and

(ii) any actions the agency will take to implement the recommendations, which shall also be included in the report required under section 2(b) of the GAO–IG Act (31 U.S.C. 1105 note).

(e)(1) The Committee shall conduct audits and reviews of programs, operations, and expenditures relating to covered funds and the Coronavirus response and coordinate on such activities with the Inspector General of the relevant agency to avoid unnecessary duplication and overlap of work.

(2) The Committee may—

(A) conduct its own independent investigations, audits, and reviews relating to covered funds or the Coronavirus response;

(B) collaborate on audits and reviews relating to covered funds with any Inspector General of an agency; and

(C) provide support to relevant agency Inspectors General in conducting investigations, audits, and reviews relating to the covered funds and Coronavirus response.

(3)(A) In conducting and supporting investigations, audits, and reviews under this subsection, the Committee—

(i) shall have the authorities provided under section 6 of the Inspector General Act of 1978 (5 U.S.C. App.);

(ii) may issue subpoenas to compel the testimony of persons who are not Federal officers or employees; and

(iii) may enforce such subpoenas in the event of a refusal to obey by order of any appropriate United States district court as provided for under section 6 of the Inspector General Act of 1978 (5 U.S.C. App).

(B) The Committee shall carry out the powers under paragraphs (1) and (2) in accordance with section 4(b)(1) of the Inspector General Act of 1978 (5 U.S.C. App.).

(C) Whenever information or assistance requested by the Committee or an Inspector General is unreasonably refused or not provided, the Committee shall immediately report the circumstances to the appropriate congressional committees.

(D) The Committee shall leverage existing information technology resources within the Council, such as oversight.gov, to carry out the duties of the Committee.

(4)(A) The Committee may hold public hearings and Committee personnel may conduct necessary inquiries.

(B) The head of each agency shall make all officers and employees of that agency available to provide testimony to the Committee and Committee personnel.

134 Stat. 538

H. R. 748—258

(C) The Committee may issue subpoenas to compel the testimony of persons who are not Federal officers or employees at such public hearings, which may be enforced in the same manner as provided for subpoenas under section 6 of the Inspector General Act of 1978 (5 U.S.C. App.).

(5) The Committee may enter into contracts to enable the Committee to discharge its duties, including contracts and other arrangements for audits, studies, analyses, and other services with public agencies and with private persons, and make such payments as may be necessary to carry out the duties of the Committee.

(6) The Committee may establish subcommittees to facilitate the ability of the Committee to discharge its duties.

(7) The Committee may transfer funds appropriated to the Committee for expenses to support administrative support services and audits, reviews, or other activities related to oversight by the Committee of covered funds or the Coronavirus response to any Office of the Inspector General or the General Services Administration.

(f)(1)(A)(i) Subject to subparagraph (B), the Committee may exercise the authorities of subsections (b) through (i) of section 3161 of title 5, United States Code (without regard to subsection (a) of that section) to carry out the functions of the Committee under this section.

(ii) For purposes of exercising the authorities described under clause (i), the term "Chairperson" shall be substituted for the term "head of a temporary organization".

(iii) In exercising the authorities described in clause (i), the Chairperson shall consult with members of the Committee.

(iv) In addition to the authority provided by section 3161(c) of title 5, United States Code, upon the request of an Inspector General, the Committee may detail, on a nonreimbursable basis, any personnel of the Council to that Inspector General to assist in carrying out any audit, review, or investigation pertaining to the oversight of covered funds or the Coronavirus response.

(B) In exercising the employment authorities under section 3161(b) of title 5, United States Code, as provided under subparagraph (A) of this paragraph—

(i) section 3161(b)(2) of that title (relating to periods of appointments) shall not apply; and

(ii) no period of appointment may exceed the date on which the Committee terminates.

(C)(i) A person employed by the Committee shall acquire competitive status for appointment to any position in the competitive service for which the employee possesses the required qualifications upon the completion of 2 years of continuous service as an employee under this subsection.

(ii) No person who is first employed as described in clause (i) more than 2 years after the date of enactment of this Act may acquire competitive status under clause (i).

(2)(A) The Committee may employ annuitants covered by section 9902(g) of title 5, United States Code, for purposes of the oversight of covered funds or the Coronavirus response.

(B) The employment of annuitants under this paragraph shall be subject to the provisions of section 9902(g) of title 5, United States Code, as if the Committee was the Department of Defense.

(3) Upon request of the Committee for information or assistance from any agency or other entity of the Federal Government, the

134 Stat. 539

H. R. 748—259

head of such entity shall, insofar as is practicable and not in contravention of any existing law, and consistent with section 6 of the Inspector General Act of 1978 (5 U.S.C. App.), furnish such information or assistance to the Committee, or an authorized designee, including an Inspector General designated by the Chairperson.

(4) Any Inspector General responsible for conducting oversight related to covered funds or the Coronavirus response may, consistent with the duties, responsibilities, policies, and procedures of the Inspector General, provide information requested by the Committee or an Inspector General on the Committee relating to the responsibilities of the Committee.

(g)(1)(A) Not later than 30 days after the date of enactment of this Act, the Committee shall establish and maintain a userfriendly, public-facing website to foster greater accountability and transparency in the use of covered funds and the Coronavirus response, which shall have a uniform resource locator that is descriptive and memorable.

(B) The Committee shall leverage existing information technology and resources, such as oversight.gov, to the greatest extent practicable to meet the requirements under this section.

(2) The website established and maintained under paragraph (1) shall be a portal or gateway to key information relating to the oversight of covered funds and the Coronavirus response and provide connections to other Government websites with related information.

(3) In establishing and maintaining the website under paragraph (1), the Committee shall ensure the following:

(A) The website shall provide materials and information explaining the Coronavirus response and how covered funds are being used. The materials shall be easy to understand and regularly updated.

(i) The website shall provide accountability information, including findings from Inspectors General, including any progress reports, audits, inspections, or other reports, including reports from or links to reports on the website of the Government Accountability Office.

(ii) The website shall provide data on relevant operational, economic, financial, grant, subgrant, contract, and subcontract information in user-friendly visual presentations to enhance public awareness of the use of covered funds and the Coronavirus response.

(iii) The website shall provide detailed data on any Federal Government awards that expend covered funds, including a unique trackable identification number for each project, information about the process that was used to award the covered funds, and for any covered funds over $150,000, a detailed explanation of any associated agreement, where applicable.

(iv) The website shall include downloadable, machine-readable, open format reports on covered funds obligated by month to each State and congressional district, where applicable.

(v) The website shall provide a means for the public to give feedback on the performance of any covered funds and of the Coronavirus response, including confidential feedback.

(vi) The website shall include detailed information on Federal Government awards that expend covered funds, including

134 Stat. 540

H. R. 748—260

data elements required under the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note), allowing aggregate reporting on awards below $50,000, as prescribed by the Director of the Office of Management and Budget.

(vii) The website shall provide a link to estimates of the jobs sustained or created by this Act to the extent practicable.

(viii) The website shall include appropriate links to other government websites with information concerning covered funds and the Coronavirus response, including Federal agency and State websites.

(ix) The website shall include a plan from each Federal agency for using covered funds.

(x) The website shall provide information on Federal allocations of mandatory and other entitlement programs by State, county, or other geographical unit related to covered funds or the Coronavirus response.

(xi) The website shall present the data such that funds subawarded by recipients are not double counted in search results, data visualizations, or other reports.

(xii) The website shall include all recommendations made to agencies relating to covered funds and the Coronavirus response, as well as the status of each recommendation.

(xiii) The website shall be enhanced and updated as necessary to carry out the purposes of this section.

(4) The Committee may exclude posting contractual or other information on the website on a case-by-case basis when necessary to protect national security or to protect information that is not subject to disclosure under sections 552 and 552a of title 5, United States Code.

(h)(1) Nothing in this section shall affect the independent authority of an Inspector General to determine whether to conduct an audit or investigation of covered funds or the Coronavirus response.

(2) If the Committee requests that an Inspector General of an agency conduct or refrain from conducting an audit or investigation and the Inspector General rejects the request in whole or in part, the Inspector General shall, not later than 30 days after rejecting the request, submit a report to the Committee, the head of the applicable agency, and the appropriate congressional committees, that states the reasons that the Inspector General has rejected the request in whole or in part.

(i) The Committee shall coordinate its oversight activities with the Comptroller General of the United States and State auditors.

(j) For the purposes of carrying out the mission of the Committee under this section, there are authorized to be appropriated such sums as may be necessary to carry out the duties and functions of the Committee.

(k) The Committee shall terminate on September 30, 2025.

REPORTING ON USE OF FUNDS

SEC. 15011. (a) In this section—

(1) the terms "agency", "appropriate congressional committees", "Committee", "covered funds", and "Coronavirus response" have the meanings given those terms in section 15010;

(2) the term "covered recipient"—

134 Stat. 541

H. R. 748—261

(A) means any entity that receives large covered funds; and

(B) includes any State, the District of Columbia, any territory or possession of the United States; and

(3) the term "large covered funds" means covered funds that amount to more than $150,000.

(b)(1)(A) On a monthly basis until September 30, 2021, each agency shall report to the Director of the Office of Management and Budget, the Bureau of Fiscal Service in the Department of the Treasury, the Committee, and the appropriate congressional committees on any obligation or expenditure of large covered funds, including loans and awards.

(B) Not later than 90 days after the date of enactment of this Act, each agency shall submit to the Committee a plan describing how the agency will use covered funds.

(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

134 Stat. 542

H. R. 748—262

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## TITLE VI

### DEPARTMENT OF HOMELAND SECURITY

#### MANAGEMENT DIRECTORATE

##### OPERATIONS AND SUPPORT

For an additional amount for "Operations and Support", $178,300,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, which shall be for the purchase of personal protective equipment and sanitization materials: *Provided*, That funds provided under this heading in this Act may be transferred by the Secretary of Homeland Security between appropriations in the Department only for the purchase of personal protective equipment and sanitization materials to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided further*, That none of the funds made available under this heading may be transferred pursuant to the authority in section 503 of the Department of Homeland Security Appropriations Act, 2020: *Provided further*, That the Department shall provide notice of any transfer to the Committees on Appropriations of the Senate and the House of Representatives not later than 5 days after executing such transfer: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### TRANSPORTATION SECURITY ADMINISTRATION

##### OPERATIONS AND SUPPORT

For an additional amount for "Operations and Support", $100,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, which shall be for cleaning and sanitization at checkpoints and other airport common areas; overtime and travel costs; and explosive detection materials: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### UNITED STATES COAST GUARD

##### OPERATIONS AND SUPPORT

For an additional amount for "Operations and Support", $140,800,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, which shall be for mobilization of reservists and increasing the capability and capacity of Coast Guard information

134 Stat. 543

H. R. 748—263

technology systems and infrastructure: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

OPERATIONS AND SUPPORT

For an additional amount for "Operations and Support", $9,100,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, which shall be for support of interagency critical infrastructure coordination and related activities: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

FEDERAL EMERGENCY MANAGEMENT AGENCY

OPERATIONS AND SUPPORT

For an additional amount for "Operations and Support", $44,987,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, which shall be for enhancements to information technology and for facilities support: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

DISASTER RELIEF FUND

For an additional amount for "Disaster Relief Fund", $45,000,000,000, to remain available until expended: *Provided*, That of the amount provided under this heading in this Act, $25,000,000,000 shall be for major disasters declared pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.): *Provided further*, That of the amount provided under this heading in this Act, $15,000,000,000 may be used for all purposes authorized under such Act and may be used in addition to amounts designated by the Congress as being for disaster relief pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985: *Provided further*, That every 30 days the Administrator shall provide the Committees on Appropriations of the Senate and the House of Representatives both projected and actual costs for funds provided under this heading for major disasters and any other expenses: *Provided further*, That of the amounts provided under this heading, $3,000,000 shall be transferred to "Office of Inspector General" and shall remain available until expended for oversight of activities supported by funds provided under this heading: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

134 Stat. 544

H. R. 748—264

FEDERAL ASSISTANCE

For an additional amount for "Federal Assistance", $400,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That of the amount provided under this heading in this Act, $100,000,000 shall be for Assistance to Firefighter Grants for the purchase of personal protective equipment and related supplies, including reimbursements; $100,000,000 shall be for Emergency Management Performance Grants; and $200,000,000 shall be for the Emergency Food and Shelter Program: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## GENERAL PROVISIONS—THIS TITLE

SEC. 16001. Notwithstanding any other provision of law, funds made available under each heading in this title, except for "Federal Emergency Management Agency—Disaster Relief Fund", shall only be used for the purposes specifically described under that heading.

SEC. 16002. Notwithstanding any other provision of law, any amounts appropriated for "Federal Emergency Management Agency—Disaster Relief Fund" in this Act are available only for the purposes for which they were appropriated.

SEC. 16003. (a) PREMIUM PAY AUTHORITY.—If services performed during fiscal year 2020 are determined by the head of the agency to be primarily related to preparation, prevention, or response to coronavirus, any premium pay that is funded, either directly or through reimbursement, by the Federal Emergency Management Agency shall be exempted from the aggregate of basic pay and premium pay calculated under section 5547(a) of title 5, United States Code, and any other provision of law limiting the aggregate amount of premium pay payable on a biweekly or calendar year basis.

(b) OVERTIME AUTHORITY.—Any overtime that is funded for such services described in subsection (a), either directly or through reimbursement, by the Federal Emergency Management Agency shall be exempted from any annual limit on the amount of overtime payable in a calendar or fiscal year.

(c) APPLICABILITY OF AGGREGATE LIMITATION ON PAY.—In determining whether an employee's pay exceeds the applicable annual rate of basic pay payable under section 5307 of title 5, United States Code, the head of an Executive agency shall not include pay exempted under this section.

(d) LIMITATION OF PAY AUTHORITY.—Pay exempted from otherwise applicable limits under subsection (a) shall not cause the aggregate pay earned for the calendar year in which the exempted pay is earned to exceed the rate of basic pay payable for a position at level II of the Executive Schedule under section 5313 of title 5, United States Code.

(e) EFFECTIVE DATE.—This section shall take effect as if enacted on January 1, 2020.

SEC. 16004. (a) Amounts provided for "Coast Guard—Operations and Support" in the Consolidated Appropriations Act, 2020 (Public Law 116–93) may be available for pay and benefits of

134 Stat. 547

H. R. 748—266

and identification card issuance requirements under section 202(a)(1) of such Act until not earlier than September 30, 2021.

Sec. 16007. Section 5 of the Protecting and Securing Chemical Facilities from Terrorist Attacks Act of 2014 (Public Law 113–254; 6 U.S.C. 621 note) is amended by striking "the date that is 5 years and 3 months after the effective date of this Act" and inserting "July 23, 2020": *Provided*, That the amount provided by this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

# TITLE VII

## DEPARTMENT OF THE INTERIOR

### INDIAN AFFAIRS

#### BUREAU OF INDIAN AFFAIRS

##### OPERATION OF INDIAN PROGRAMS

###### (INCLUDING TRANSFERS OF FUNDS)

For an additional amount for "Operation of Indian Programs", $453,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including, but not limited to, funds for public safety and justice programs, executive direction to carry out deep cleaning of facilities, purchase of personal protective equipment, purchase of information technology to improve teleworking capability, welfare assistance and social services programs (including assistance to individuals), and assistance to tribal governments, including tribal governments who participate in the "Small and Needy" program: *Provided*, That amounts received from funds provided under this heading in this Act for welfare assistance programs shall not be included in the statutory maximum for welfare assistance funds included in Public Law 116–94, the Further Consolidated Appropriations Act, 2020: *Provided further*, That assistance received from funds provided under this heading in this Act shall not be included in the calculation of funds received by those tribal governments who participate in the "Small and Needy" program: *Provided further*, That of the amounts provided under this heading in this Act, not less than $400,000,000 shall be made available to meet the direct needs of tribes: *Provided further*, That amounts provided under this heading in this Act may be made available for distribution through tribal priority allocations for tribal response and capacity building activities: *Provided further*, That funds provided under this heading in this Act, if transferred to tribes and tribal organizations under the Indian Self-Determination and Education Assistance Act, will be transferred on a one-time basis and that these non-recurring funds are not part of the amount required by 25 U.S.C. § 5325: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

134 Stat. 547

H. R. 748—267

BUREAU OF INDIAN EDUCATION

OPERATION OF INDIAN EDUCATION PROGRAMS

For an additional amount for "Operation of Indian Education Programs", $69,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including, but not limited to, funding for tribal colleges and universities, salaries, transportation, and information technology: *Provided*, That of the amounts provided in this paragraph, not less than $20,000,000 shall be for tribal colleges and universities: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

DEPARTMENTAL OFFICES

OFFICE OF THE SECRETARY

DEPARTMENTAL OPERATIONS

(INCLUDING TRANSFERS OF FUNDS)

For an additional amount for "Departmental Operations", $158,400,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including, but not limited to, funds for purchasing equipment and supplies to disinfect and clean buildings and public areas, supporting law enforcement and emergency management operations, biosurveillance of wildlife and environmental persistence studies, employee overtime and special pay expenses, and other response, mitigation, or recovery activities: *Provided*, That funds appropriated under this heading in this Act shall be used to absorb increased operational costs necessary to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided further*, That the Secretary of the Interior may transfer the funds provided under this heading in this Act to any other account in the Department to prevent, prepare for, and respond to coronavirus, domestically or internationally, and may expend such funds directly or through cooperative agreements: *Provided further*, That the Secretary shall provide a monthly report to the Committees on Appropriations of the House of Representatives and the Senate detailing the allocation and obligation of these funds by account, beginning not later than 90 days after enactment of this Act: *Provided further*, That as soon as practicable after the date of enactment of this Act, the Secretary shall transfer $1,000,000 to the Office of the Inspector General, "Salaries and Expenses" account for oversight activities related to the implementation of programs, activities or projects funded herein: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

134 Stat. 553

H. R. 748—273

NATIONAL ENDOWMENT FOR THE HUMANITIES

GRANTS AND ADMINISTRATION

For an additional amount for "Grants and Administration", $75,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, to be distributed in grants: *Provided*, That such funds are available under the same terms and conditions as grant funding appropriated to this heading in Public Law 116–94: *Provided further*, That 40 percent of such funds shall be distributed to state humanities councils and 60 percent of such funds shall be for direct grants: *Provided further*, That notwithstanding any other provision of law, such funds may also be used by the recipients of such grants for purposes of the general operations of such recipients: *Provided further*, That the matching requirements under subsection (h)(2)(A) of section 7 of the National Foundation on the Arts and Humanities Act of 1965 may be waived with respect to such grants: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

TITLE VIII

DEPARTMENT OF LABOR

EMPLOYMENT AND TRAINING ADMINISTRATION

TRAINING AND EMPLOYMENT SERVICES

For an additional amount for "Training and Employment Services", $345,000,000, to remain available through September 30, 2022, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses for the dislocated workers assistance national reserve: *Provided*, That the funds provided under this heading in this Act may be used to replace grant funds previously obligated to the impacted areas: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

DEPARTMENTAL MANAGEMENT

SALARIES AND EXPENSES

(INCLUDING TRANSFER OF FUNDS)

For an additional amount for "Departmental Management", $15,000,000, to remain available through September 30, 2022, to prevent, prepare for, and respond to coronavirus, including to enforce worker protection laws and regulations, and to oversee and coordinate activities related to division C, division D, division E, and division F of Public Law 116–127: *Provided*, That the Secretary of Labor may transfer the amounts provided under this heading in this Act as necessary to "Employee Benefits Security Administration", "Wage and Hour Division", "Occupational Safety and Health Administration", and "Employment and Training

134 Stat. 564

H. R. 748—284

to the Committees on Appropriations of the House of Representatives and the Senate on obligation of funds, including obligations to such eligible health care providers summarized by State of the payment receipt: *Provided further*, That such reports shall be updated and submitted to such Committees every 60 days until funds are expended: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## DEPARTMENT OF EDUCATION

### EDUCATION STABILIZATION FUND

For an additional amount for "Education Stabilization Fund", $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### GENERAL PROVISIONS

### EDUCATION STABILIZATION FUND

SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—

(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;

(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and

(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.

(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:

(1) 9.8 percent to carry out section 18002 of this title.

(2) 43.9 percent to carry out section 18003 of this title.

(3) 46.3 percent to carry out section 18004 of this title.

### GOVERNOR'S EMERGENCY EDUCATION RELIEF FUND

SEC. 18002. (a) GRANTS.—From funds reserved under section 18001(b)(1) of this title, the Secretary shall make Emergency Education Relief grants to the Governor of each State with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and shall approve or deny applications not later than 30 days after receipt.

(b) ALLOCATIONS.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State as follows:

134 Stat. 565

H. R. 748—285

(1) 60 percent on the basis of their relative population of individuals aged 5 through 24.

(2) 40 percent on the basis of their relative number of children counted under section 1124(c) of the Elementary and Secondary Education Act of 1965 (referred to under this heading as "ESEA").

(c) Uses of Funds.—Grant funds awarded under subsection (b) may be used to—

(1) provide emergency support through grants to local educational agencies that the State educational agency deems have been most significantly impacted by coronavirus to support the ability of such local educational agencies to continue to provide educational services to their students and to support the on-going functionality of the local educational agency;

(2) provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus to support the ability of such institutions to continue to provide educational services and support the on-going functionality of the institution; and

(3) provide support to any other institution of higher education, local educational agency, or education related entity within the State that the Governor deems essential for carrying out emergency educational services to students for authorized activities described in section 18003(d)(1) of this title or the Higher Education Act, the provision of child care and early childhood education, social and emotional support, and the protection of education-related jobs.

(d) Reallocation.—Each Governor shall return to the Secretary any funds received under this section that the Governor does not award within one year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND

Sec. 18003. (a) Grants.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.

(b) Allocations to States.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.

(c) Subgrants to Local Educational Agencies.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965 in the most recent fiscal year.

(d) Uses of Funds.—A local educational agency that receives funds under this title may use the funds for any of the following:

134 Stat. 566

H. R. 748—286

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) ("IDEA"), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) ("the Perkins Act"), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational

134 Stat. 567

H. R. 748—287

agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

HIGHER EDUCATION EMERGENCY RELIEF FUND

SEC. 18004. (a) IN GENERAL.—The Secretary shall allocate funding under this section as follows:

(1) 90 percent to each institution of higher education to prevent, prepare for, and respond to coronavirus, by apportioning it—

(A) 75 percent according to the relative share of full-time equivalent enrollment of Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency; and

(B) 25 percent according to the relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency.

(2) 7.5 percent for additional awards under parts A and B of title III, parts A and B of title V, and subpart 4 of part A of title VII of the Higher Education Act to address needs directly related to coronavirus, that shall be in addition to awards made in section 18004(a)(1) of this title, and allocated by the Secretary proportionally to such programs based on the relative share of funding appropriated to such programs in the Further Consolidated Appropriations Act, 2020 (Public Law 116–94) and which may be used to defray expenses (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll) incurred by institutions of higher education and for grants to students for any component of the student's cost of attendance (as defined under section 472 of the Higher Education Act), including food, housing, course materials, technology, health care, and child care.

(3) 2.5 percent for part B of title VII of the Higher Education Act for institutions of higher education that the Secretary determines have the greatest unmet needs related to coronavirus, which may be used to defray expenses (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll) incurred by institutions of higher education and for grants to students for any component of the student's cost of attendance (as defined under section 472 of the Higher Education Act), including food,

134 Stat. 568

H. R. 748—288

housing, course materials, technology, health care, and child care.

(b) DISTRIBUTION.—The funds made available to each institution under subsection (a)(1) shall be distributed by the Secretary using the same systems as the Secretary otherwise distributes funding to each institution under title IV of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.).

(c) USES OF FUNDS.—Except as otherwise specified in subsection (a), an institution of higher education receiving funds under this section may use the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus, so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship. Institutions of higher education shall use no less than 50 percent of such funds to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care).

(d) SPECIAL PROVISIONS.—(1) In awarding grants under section 18004(a)(3) of this title, the Secretary shall give priority to any institution of higher education that is not otherwise eligible for funding under paragraphs (1) and (2) of section 18004(a) of this title of at least $500,000 and demonstrates significant unmet needs related to expenses associated with coronavirus.

(2) A Historically Black College and University or a Minority Serving Institution may use prior awards provided under titles III, V, and VII of the Higher Education Act to prevent, prepare for, and respond to coronavirus.

(e) REPORT.—An institution receiving funds under this section shall submit a report to the Secretary, at such time and in such manner as the Secretary may require, that describes the use of funds provided under this section.

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under "Education Stabilization Fund", shall to the greatest extent practicable,

134 Stat. 569

H. R. 748—289

continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001–18006 of this title, as used in such sections—

(1) the terms "elementary education" and "secondary education" have the meaning given such terms under State law;

(2) the term "institution of higher education" has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term "Secretary" means the Secretary of Education;

(4) the term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term "cost of attendance" has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term "Non-public school" means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and (B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term "public school" means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need-based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

SAFE SCHOOLS AND CITIZENSHIP EDUCATION

For an additional amount for "Safe Schools and Citizenship Education", $100,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, to supplement funds otherwise available for "Project SERV", including to help elementary, secondary and postsecondary schools clean and disinfect affected schools, and assist in counseling and distance learning and associated costs: *Provided*, That such amount is designated by the Congress as being for

134 Stat. 570

H. R. 748—290

an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### GALLAUDET UNIVERSITY

For an additional amount for "Gallaudet University", $7,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including to help defray the expenses directly caused by coronavirus and to enable grants to students for expenses directly related to coronavirus and the disruption of university operations: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### STUDENT AID ADMINISTRATION

For an additional amount for "Student Aid Administration", $40,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for carrying out part D of title I, and subparts 1, 3, 9 and 10 of part A, and parts B, C, D, and E of title IV of the HEA, and subpart 1 of part A of title VII of the Public Health Service Act: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### HOWARD UNIVERSITY

For an additional amount for "Howard University", $13,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally, including to help defray the expenses directly caused by coronavirus and to enable grants to students for expenses directly related to coronavirus and the disruption of university operations: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### DEPARTMENTAL MANAGEMENT

#### PROGRAM ADMINISTRATION

For an additional amount for "Program Administration", $8,000,000, to remain available through September 30, 2021 to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### OFFICE OF THE INSPECTOR GENERAL

For an additional amount for "Office of the Inspector General", $7,000,000, to remain available through September 30, 2022, to prevent, prepare for, and respond to coronavirus, domestically or

134 Stat. 571

H. R. 748—291

internationally, including for salaries and expenses necessary for oversight and audit of programs, grants, and projects funded in this Act to respond to coronavirus: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### CORPORATION FOR PUBLIC BROADCASTING

For an additional amount for "Corporation for Public Broadcasting", $75,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, including for fiscal stabilization grants to public telecommunications entities, as defined by 47 U.S.C. 397(12), with no deduction for administrative or other costs of the Corporation, to maintain programming and services and preserve small and rural stations threatened by declines in non-Federal revenues: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### INSTITUTE OF MUSEUM AND LIBRARY SERVICES

#### OFFICE OF MUSEUM AND LIBRARY SERVICES: GRANTS AND ADMINISTRATION

For an additional amount for "Institute of Museum and Library Services", $50,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, including grants to States, territories and tribes to expand digital network access, purchase internet accessible devices, and provide technical support services: *Provided*, That any matching funds requirements for States, tribes, libraries, and museums are waived for grants provided with funds made available under this heading in this Act: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### RAILROAD RETIREMENT BOARD

#### LIMITATION ON ADMINISTRATION

For an additional amount for the "Railroad Retirement Board", $5,000,000, to remain available until September 30, 2021, to prevent, prepare for, and respond to coronavirus, including the purchase of information technology equipment to improve the mobility of the workforce and provide for additional hiring or overtime hours as needed to administer the Railroad Unemployment Insurance Act: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

134 Stat. 572

H. R. 748—292

SOCIAL SECURITY ADMINISTRATION

LIMITATION ON ADMINISTRATIVE EXPENSES

For an additional amount for "Limitation on Administrative Expenses", $300,000,000, to remain available through September 30, 2021 to prevent, prepare for, and respond to coronavirus, domestically or internationally, including paying the salaries and benefits of all employees affected as a result of office closures, telework, phone and communication services for employees, overtime costs, and supplies, and for resources necessary for processing disability and retirement workloads and backlogs: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS—THIS TITLE

(INCLUDING TRANSFER OF FUNDS)

SEC. 18108. Funds appropriated by this title may be used by the Secretary of the Department of Health and Human Services to appoint, without regard to the provisions of sections 3309 through 3319 of title 5 of the United States Code, candidates needed for positions to perform critical work relating to coronavirus for which—

(1) public notice has been given; and

(2) the Secretary of Health and Human Services has determined that such a public health threat exists.

SEC. 18109. Funds made available by this title may be used to enter into contracts with individuals for the provision of personal services (as described in section 104 of part 37 of title 48, Code of Federal Regulations (48 CFR 37.104)) to support the prevention of, preparation for, or response to coronavirus, domestically and internationally, subject to prior notification to the Committees on Appropriations of the House of Representatives and the Senate: *Provided*, That such individuals may not be deemed employees of the United States for the purpose of any law administered by the Office of Personnel Management: *Provided further*, That the authority made available pursuant to this section shall expire on September 30, 2024.

SEC. 18110. (a) If services performed by an employee during fiscal year 2020 are determined by the head of the agency to be primarily related to preparation, prevention, or response to coronavirus, any premium pay for such services shall be disregarded in calculating the aggregate of such employee's basic pay and premium pay for purposes of a limitation under section 5547(a) of title 5, United States Code, or under any other provision of law, whether such employee's pay is paid on a biweekly or calendar year basis.

(b) Any overtime pay for such services shall be disregarded in calculating any annual limit on the amount of overtime pay payable in a calendar or fiscal year.

(c) With regard to such services, any pay that is disregarded under either subsection (a) or (b) shall be disregarded in calculating such employee's aggregate pay for purposes of the limitation in section 5307 of such title 5.

(d)(1) Pay that is disregarded under subsection (a) or (b) shall not cause the aggregate of the employee's basic pay and premium

134 Stat. 573

H. R. 748—293

pay for the applicable calendar year to exceed the rate of basic pay payable for a position at level II of the Executive Schedule under section 5313 of title 5, United States Code, as in effect at the end of such calendar year.

(2) For purposes of applying this subsection to an employee who would otherwise be subject to the premium pay limits established under section 5547 of title 5, United States Code, "premium pay" means the premium pay paid under the provisions of law cited in section 5547(a).

(3) For purposes of applying this subsection to an employee under a premium pay limit established under an authority other than section 5547 of title 5, United States Code, the agency responsible for administering such limit shall determine what payments are considered premium pay.

(e) This section shall take effect as if enacted on February 2, 2020.

(f) If application of this section results in the payment of additional premium pay to a covered employee of a type that is normally creditable as basic pay for retirement or any other purpose, that additional pay shall not—

(1) be considered to be basic pay of the covered employee for any purpose; or

(2) be used in computing a lump-sum payment to the covered employee for accumulated and accrued annual leave under section 5551 or section 5552 of title 5, United States Code.

SEC. 18111. Funds appropriated by this title to the heading "Department of Health and Human Services" may be transferred to, and merged with, other appropriation accounts under the headings "Centers for Disease Control and Prevention", "Public Health and Social Services Emergency Fund", "Administration for Children and Families", "Administration for Community Living", and "National Institutes of Health" to prevent, prepare for, and respond to coronavirus following consultation with the Office of Management and Budget: *Provided*, That the Committees on Appropriations of the House of Representatives and the Senate shall be notified 10 days in advance of any such transfer: *Provided further*, That, upon a determination that all or part of the funds transferred from an appropriation by this title are not necessary, such amounts may be transferred back to that appropriation: *Provided further*, That none of the funds made available by this title may be transferred pursuant to the authority in section 205 of division A of Public Law 116–94 or section 241(a) of the PHS Act.

SEC. 18112. Not later than 30 days after the date of enactment of this Act, the Secretary of Health and Human Services shall provide a detailed spend plan of anticipated uses of funds made available to the Department of Health and Human Services in this Act, including estimated personnel and administrative costs, to the Committees on Appropriations of the House of Representatives and the Senate: *Provided*, That such plans shall be updated and submitted to such Committees every 60 days until September 30, 2024: *Provided further*, That the spend plans shall be accompanied by a listing of each contract obligation incurred that exceeds $5,000,000 which has not previously been reported, including the amount of each such obligation.

134 Stat. 574

H. R. 748—294

Sec. 18113. Of the funds appropriated by this title under the heading "Public Health and Social Services Emergency Fund", up to $4,000,000 shall be transferred to, and merged with, funds made available under the heading "Office of the Secretary, Office of Inspector General", and shall remain available until expended, for oversight of activities supported with funds appropriated to the Department of Health and Human Services to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That the Inspector General of the Department of Health and Human Services shall consult with the Committees on Appropriations of the House of Representatives and the Senate prior to obligating such funds: *Provided further*, That the transfer authority provided by this section is in addition to any other transfer authority provided by law.

Sec. 18114. (a) Funds appropriated in title III of the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (Public Law 116–123) shall be paid to the "Department of Homeland Security—Countering Weapons of Mass Destruction Office—Federal Assistance"account for costs incurred, including to reimburse costs incurred prior to the enactment of this Act, under other transaction authority and related to screening for coronavirus, domestically or internationally.

(b) The term coronavirus has the meaning given the term in section 506 of the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020.

(c) The amounts repurposed in this section that were previously designated by the Congress as an emergency requirement pursuant to the Balanced Budget and Emergency Deficit Control Act of 1985 are designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

Sec. 18115. (a) In General.—Every laboratory that performs or analyzes a test that is intended to detect SARS–CoV–2 or to diagnose a possible case of COVID–19 shall report the results from each such test, to the Secretary of Health and Human Services in such form and manner, and at such timing and frequency, as the Secretary may prescribe until the end of the Secretary's Public Health Emergency declaration with respect to COVID–19 or any extension of such declaration.

(b) Laboratories Covered.—The Secretary may prescribe which laboratories must submit reports pursuant to this section.

(c) Implementation.—The Secretary may make prescriptions under this section by regulation, including by interim final rule, or by guidance, and may issue such regulations or guidance without regard to the procedures otherwise required by section 553 of title 5, United States Code.

(d) Repealer.—Section 1702 of division A of the Families First Coronavirus Response Act is repealed.

134 Stat. 575

H. R. 748—295

## TITLE IX

## LEGISLATIVE BRANCH

### SENATE

### CONTINGENT EXPENSES OF THE SENATE

#### SERGEANT AT ARMS AND DOORKEEPER OF THE SENATE

For an additional amount for "Sergeant at Arms and Door-keeper of the Senate", $1,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### MISCELLANEOUS ITEMS

For an additional amount for "Miscellaneous Items", $9,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally, subject to approval by the Committee on Appropriations of the Senate and the Senate Committee on Rules and Administration: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### HOUSE OF REPRESENTATIVES

#### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $25,000,000, to remain available until September 30, 2021, except that $5,000,000 shall remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally, to be allocated in accordance with a spend plan submitted to the Committee on Appropriations of the House of Representatives by the Chief Administrative Officer and approved by such Committee: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

### JOINT ITEMS

#### OFFICE OF THE ATTENDING PHYSICIAN

For an additional amount for "Office of the Attending Physician", $400,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

134 Stat. 577

H. R. 748—297

## GOVERNMENT ACCOUNTABILITY OFFICE

### SALARIES AND EXPENSES

For an additional amount for "Salaries and Expenses", $20,000,000, to remain available until expended, to prevent, prepare for, and respond to coronavirus, domestically or internationally, for audits and investigations and for reimbursement of the Tiny Findings Child Development Center for salaries for employees, as authorized by this Act: *Provided*, That not later than 90 days after the date of enactment of this Act, the Government Accountability Office shall submit to the Committees on Appropriations of the House of Representatives and the Senate a spend plan specifying funding estimates and a timeline for such audits and investigations: *Provided further*, That $600,000 shall be made available to the Tiny Findings Child Development Center, subject to approval by the Committees on Appropriations of the Senate and House of Representatives, the Senate Committee on Rules and Administration, and the Committee on House Administration: *Provided further*, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## GENERAL PROVISIONS—THIS TITLE

### SOURCE OF FUNDS USED FOR PAYMENT OF SALARIES AND EXPENSES OF SENATE EMPLOYEE CHILD CARE CENTER

SEC. 19001. The Secretary of the Senate shall reimburse the Senate Employee Child Care Center for personnel costs incurred starting on April 1, 2020, for employees of such Center who have been ordered to cease working due to measures taken in the Capitol complex to combat coronavirus, not to exceed $84,000 per month, from amounts in the appropriations account "Miscellaneous Items" within the contingent fund of the Senate.

### SOURCE OF FUNDS USED FOR PAYMENT OF SALARIES AND EXPENSES OF HOUSE OF REPRESENTATIVES CHILD CARE CENTER

SEC. 19002. (a) AUTHORIZING USE OF REVOLVING FUND OR APPROPRIATED FUNDS.—Section 312(d)(3)(A) of the Legislative Branch Appropriations Act, 1992 (2 U.S.C. 2062(d)(3)(A)) is amended—

(1) in subparagraph (A), by striking the period at the end and inserting the following: ", and, at the option of the Chief Administrative Officer during an emergency situation, the payment of the salary of other employees of the Center."; and

(2) by adding at the end the following new subparagraph:
"(C) During an emergency situation, the payment of such other expenses for activities carried out under this section as the Chief Administrative Officer determines appropriate.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply with respect to fiscal year 2020 and each succeeding fiscal year.

134 Stat. 579

H. R. 748—299

the case of the Commission, to waive this paragraph in the case of mailings sent in response to or to address threats to life safety.".

(b) EFFECTIVE DATE.—The amendments made by this subsection shall apply with respect to mailings sent on or after the date of the enactment of this Act.

TECHNICAL CORRECTION

SEC. 19007. In the matter preceding the first proviso under the heading "Library of Congress—Salaries and Expenses" in division E of the Further Consolidated Appropriations Act, 2020 (Public Law 116–94), strike " $504,164,000" and insert " $510,164,000".

CONFORMING AMENDMENT

SEC. 19008. Section 110(a)(1)(A) of the Family and Medical Leave Act of 1993 (as added by section 3102 of the Families First Coronavirus Response Act (Public Law 116–127)) is amended—
(1) by inserting before "In lieu of" the following:
"(i) IN GENERAL.—"; and
(2) by adding at the end the following:
"(ii) SPECIAL RULE.—For purposes of applying section 102(a)(1)(F) and this section under the Congressional Accountability Act of 1995, in lieu of the definition in section 202(a)(2)(B) of that Act (2 U.S.C. 1312(a)(2)(B)), the term 'eligible employee' means a covered employee (as defined in section 101 of that Act (2 U.S.C. 1301)) who has been employed for at least 30 calendar days by the employing office (as so defined) with respect to whom leave is requested under section 102(a)(1)(F).".

SOURCE OF FUNDS USED FOR PAYMENT OF SALARIES AND EXPENSES OF TINY FINDINGS CHILD DEVELOPMENT CENTER

SEC. 19009. The Government Accountability Office may reimburse the Tiny Findings Child Development Center for salaries for employees incurred from April 1, 2020, to September 30, 2020, for employees of such Center who have been ordered to cease working due to measures taken in the Capitol complex to combat coronavirus, not to exceed $100,000 per month, from amounts in the appropriations account "Government Accountability Office—Salaries and Expenses".

OVERSIGHT AND AUDIT AUTHORITY

SEC. 19010. (a) DEFINITIONS.—In this section—
(1) the term "appropriate congressional committees" means—
(A) the Committee on Appropriations of the Senate;
(B) the Committee on Homeland Security and Governmental Affairs of the Senate;
(C) the Committee on Health, Education, Labor, and Pensions of the Senate;
(D) the Committee on Appropriations of the House of Representatives;
(E) the Committee on Homeland Security of the House of Representatives;

134 Stat. 580

H. R. 748—300

(F) the Committee on Oversight and Reform of the House of Representatives; and

(G) the Committee on Energy and Commerce of the House of Representatives; and

(2) the term "Comptroller General" means the Comptroller General of the United States.

(b) AUTHORITY.—The Comptroller General shall conduct monitoring and oversight of the exercise of authorities, or the receipt, disbursement, and use of funds made available, under this Act or any other Act to prepare for, respond to, and recover from the Coronavirus 2019 pandemic and the effect of the pandemic on the health, economy, and public and private institutions of the United States, including public health and homeland security efforts by the Federal Government and the use of selected funds under this or any other Act related to the Coronavirus 2019 pandemic and a comprehensive audit and review of charges made to Federal contracts pursuant to authorities provided in the Coronavirus Aid, Relief, and Economic Security Act.

(c) BRIEFINGS AND REPORTS.—In conducting monitoring and oversight under subsection (b), the Comptroller General shall—

(1) during the period beginning on the date of enactment of this Act and ending on the date on which the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID–19) expires, offer regular briefings on not less frequently than a monthly basis to the appropriate congressional committees regarding Federal public health and homeland security efforts;

(2) publish reports regarding the ongoing monitoring and oversight efforts, which, along with any audits and investigations conducted by the Comptroller General, shall be submitted to the appropriate congressional committees and posted on the website of the Government Accountability Office—

(A) not later than 90 days after the date of enactment of this Act, and every other month thereafter until the date that is 1 year after the date of enactment of this Act; and

(B) after the period described in subparagraph (A), on a periodic basis; and

(3) submit to the appropriate congressional committees additional reports as warranted by the findings of the monitoring and oversight activities of the Comptroller General.

(d) ACCESS TO INFORMATION.—

(1) RIGHT OF ACCESS.—In conducting monitoring and oversight activities under this section, the Comptroller General shall have access to records, upon request, of any Federal, State, or local agency, contractor, grantee, recipient, or subrecipient pertaining to any Federal effort or assistance of any type related to the Coronavirus 2019 pandemic under this Act or any other Act, including private entities receiving such assistance.

(2) COPIES.—The Comptroller General may make and retain copies of any records accessed under paragraph (1) as the Comptroller General determines appropriate.

(3) INTERVIEWS.—In addition to such other authorities as are available, the Comptroller General or a designee of the Comptroller General may interview Federal, State, or local

134 Stat. 581

H. R. 748—301

officials, contractor staff, grantee staff, recipients, or subrecipients pertaining to any Federal effort or assistance of any type related to the Coronavirus 2019 pandemic under this or any other Act, including private entities receiving such assistance.

(4) INSPECTION OF FACILITIES.—As determined necessary by the Comptroller General, the Government Accountability Office may inspect facilities at which Federal, State, or local officials, contractor staff, grantee staff, or recipients or subrecipients carry out their responsibilities related to the Coronavirus 2019 pandemic.

(5) ENFORCEMENT.—Access rights under this subsection shall be subject to enforcement consistent with section 716 of title 31, United States Code.

(e) RELATIONSHIP TO EXISTING AUTHORITY.—Nothing in this section shall be construed to limit, amend, supersede, or restrict in any manner any existing authority of the Comptroller General.

NATIONAL EMERGENCY RELIEF AUTHORITY FOR THE REGISTER OF COPYRIGHTS

SEC. 19011. (a) AMENDMENT.—Chapter 7 of title 17, United States Code, is amended by adding at the end the following:

## "§ 710. Emergency relief authority

"(a) EMERGENCY ACTION.—If, on or before December 31, 2021, the Register of Copyrights determines that a national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) generally disrupts or suspends the ordinary functioning of the copyright system under this title, or any component thereof, including on a regional basis, the Register may, on a temporary basis, toll, waive, adjust, or modify any timing provision (including any deadline or effective period, except as provided in subsection (c)) or procedural provision contained in this title or chapters II or III of title 37, Code of Federal Regulations, for no longer than the Register reasonably determines to be appropriate to mitigate the impact of the disruption caused by the national emergency. In taking such action, the Register shall consider the scope and severity of the particular national emergency, and its specific effect with respect to the particular provision, and shall tailor any remedy accordingly.

"(b) NOTICE AND EFFECT.—Any action taken by the Register in response to a national emergency pursuant to subsection (a) shall not be subject to section 701(e) or subchapter II of chapter 5 of title 5, United States Code, and chapter 7 of title 5, United States Code. The provision of general public notice detailing the action being taken by the Register in response to the national emergency under subsection (a) is sufficient to effectuate such action. The Register may make such action effective both prospectively and retroactively in relation to a particular provision as the Register determines to be appropriate based on the timing, scope, and nature of the public emergency, but any action by the Register may only be retroactive with respect to a deadline that has not already passed before the declaration described in subsection (a).

"(c) STATEMENT REQUIRED.—Except as provided in subsection (d), not later than 20 days after taking any action that results in a provision being modified for a cumulative total of longer than 120 days, the Register shall submit to Congress a statement

134 Stat. 614

H. R. 748—334

Regulations (or successor regulations), if the Secretary determines that—

(1) the Coronavirus Disease 2019 (COVID–19) is having a substantial impact on—

(A) the ability of States to implement or carry out any grant, campaign, or program under those provisions; or

(B) the ability of the Secretary to carry out any responsibility of the Secretary with respect to a grant, campaign, or program under those provisions; or

(2) the requirements of those provisions are having a substantial impact on the ability of States or the Secretary to address the Coronavirus Disease 2019 (COVID–19).

(b) REPORT.—The Secretary shall periodically submit to the relevant committees of Congress a report describing—

(1) each determination made by the Secretary under subsection (a); and

(2) each waiver or postponement of a requirement under that subsection.

(c) EMERGENCY REQUIREMENT.—The amount provided by this section is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

## TITLE XIII

## GENERAL PROVISIONS—THIS ACT

SEC. 23001. Each amount appropriated or made available by this Act is in addition to amounts otherwise appropriated for the fiscal year involved.

SEC. 23002. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 23003. Unless otherwise provided for by this Act, the additional amounts appropriated by this Act to appropriations accounts shall be available under the authorities and conditions applicable to such appropriations accounts for fiscal year 2020.

SEC. 23004. (a) Subject to subsection (b), and notwithstanding any other provision of law, funds made available in this Act, or transferred pursuant to authorization granted in this Act, may only be used to prevent, prepare for, and respond to coronavirus.

(b) Subsection (a) shall not apply to sections 11002, 13002, and 18114 of this Act, reimbursements made pursuant to authority in this Act, or to funds made available in this Act for the Emergency Reserve Fund, established pursuant to section 7058(c)(1) of division J of Public Law 115–31, or to funds made available in this Act for the Infectious Diseases Rapid Response Reserve Fund, established pursuant to section 231 of division B of Public Law 115–245.

(c) This section shall not apply to title VI of this Act.

SEC. 23005. In this Act, the term "coronavirus" means SARS–CoV–2 or another coronavirus with pandemic potential.

SEC. 23006. Each amount designated in this Act by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985 shall be available (or rescinded or transferred,

134 Stat. 615

H. R. 748—335

if applicable) only if the President subsequently so designates all such amounts and transmits such designations to the Congress.

Sec. 23007. Any amount appropriated by this Act, designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985 and subsequently so designated by the President, and transferred pursuant to transfer authorities provided by this Act shall retain such designation.

BUDGETARY EFFECTS

Sec. 23008. (a) STATUTORY PAYGO SCORECARDS.—The budgetary effects of this division shall not be entered on either PAYGO scorecard maintained pursuant to section 4(d) of the Statutory Pay As-You-Go Act of 2010.

(b) SENATE PAYGO SCORECARDS.—The budgetary effects of this division shall not be entered on any PAYGO scorecard maintained for purposes of section 4106 of H. Con. Res. 71 (115th Congress).

(c) CLASSIFICATION OF BUDGETARY EFFECTS.—Notwithstanding Rule 3 of the Budget Scorekeeping Guidelines set forth in the joint explanatory statement of the committee of conference accompanying Conference Report 105–217 and section 250(c)(7) and (c)(8) of the Balanced Budget and Emergency Deficit Control Act of 1985, the budgetary effects of this division shall be estimated for purposes of section 251 of such Act.

(d) ENSURING NO WITHIN-SESSION SEQUESTRATION.—Solely for the purpose of calculating a breach within a category for fiscal year 2020 pursuant to section 251(a)(6) or section 254(g) of the Balanced Budget and Emergency Deficit Control Act of 1985, and notwithstanding any other provision of this division, the budgetary effects from this division shall be counted as amounts designated as being for an emergency requirement pursuant to section 251(b)(2)(A) of such Act.

This division may be cited as the "Emergency Appropriations for Coronavirus Health Response and Agency Operations".

*Speaker of the House of Representatives.*

*Vice President of the United States and President of the Senate.*

8 U.S. Code § 1611.Aliens who are not qualified aliens ineligible for Federal public benefits

**(a)In general**

Notwithstanding any other provision of law and except as provided in subsection (b), an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit (as defined in subsection (c)).

**(b)Exceptions**

**(1)**Subsection (a) shall not apply with respect to the following Federal public benefits:

**(A)**

Medical assistance under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] (or any successor program to such title) for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903(v)(3) of such Act [42 U.S.C. 1396b(v)(3)]) of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the State plan approved under such title (other than the requirement of the receipt of aid or assistance under title IV of such Act [42 U.S.C. 601 et seq.], supplemental security income benefits under title XVI of such Act [42 U.S.C. 1381 et seq.], or a State supplementary payment).

**(B)**

Short-term, non-cash, in-kind emergency disaster relief.

**(C)**

Public health assistance (not including any assistance under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.]) for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

**(D)**

Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate Federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

**(E)**

Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under title V of the Housing Act of 1949 [42 U.S.C. 1471 et seq.], or any assistance under section 1926c of title 7, to the extent that the alien is receiving such a benefit on August 22, 1996.

**(2)**

Subsection (a) shall not apply to any benefit payable under title II of the Social Security Act [42 U.S.C. 401 et seq.] to an alien who is lawfully present in the United States as determined by the Attorney General, to any benefit if nonpayment of such benefit would contravene an international agreement described in section 233 of the Social Security Act [42 U.S.C. 433], to any benefit if nonpayment would be contrary to section 202(t) of the Social Security Act [42 U.S.C. 402(t)], or to any benefit payable under title II of the Social Security Act to which entitlement is based on an application filed in or before August 1996.

**(3)**

Subsection (a) shall not apply to any benefit payable under title XVIII of the Social Security Act [42 U.S.C. 1395 et seq.] (relating to the medicare program) to an alien who is lawfully present in the United States as determined by the Attorney General and, with respect to benefits payable under part A of such title [42 U.S.C. 1395c et seq.], who was authorized to be employed with respect to any wages attributable to employment which are counted for purposes of eligibility for such benefits.

**(4)**

Subsection (a) shall not apply to any benefit payable under the Railroad Retirement Act of 1974 [45 U.S.C. 231 et seq.] or the Railroad Unemployment Insurance Act [45 U.S.C. 351 et seq.] to an alien who is lawfully present in the United States as determined by the Attorney General or to an alien residing outside the United States.

**(5)**

Subsection (a) shall not apply to eligibility for benefits for the program defined in section 1612(a)(3)(A) of this title (relating to the supplemental security income program), or to eligibility for benefits under any other program that is based on eligibility for benefits under the program so defined, for an alien who was receiving such benefits on August 22, 1996.

**(c)"Federal public benefit" defined**

**(1)**Except as provided in paragraph (2), for purposes of this chapter the term "Federal public benefit" means—

**(A)**

any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

**(B)**

any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

**(2)** Such term shall not apply—

**(A)**

to any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States, or to a citizen of a freely associated state, if section 141 of the applicable compact of free association approved in Public Law 99–239 or 99–658 (or a successor provision) is in effect;

**(B)**

with respect to benefits for an alien who as a work authorized nonimmigrant or as an alien lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.] qualified for such benefits and for whom the United States under reciprocal treaty agreements is required to pay benefits, as determined by the Attorney General, after consultation with the Secretary of State; or

**(C)**

to the issuance of a professional license to, or the renewal of a professional license by, a foreign national not physically present in the United States.

(Pub. L. 104–193, title IV, § 401, Aug. 22, 1996, 110 Stat. 2261; Pub. L. 105–33, title V, §§ 5561, 5565, Aug. 5, 1997, 111 Stat. 638, 639; Pub. L. 105–306, §§ 2, 5(a), Oct. 28, 1998, 112 Stat. 2926, 2927.)

```
[Federal Register Volume 85, Number 117 (Wednesday, June 17, 2020)]
[Rules and Regulations]
[Pages 36494-36504]
From the Federal Register Online via the Government Publishing Office [www.gpo.gov]
[FR Doc No: 2020-12965]
```

=======================================================================
-----------------------------------------------------------------------

DEPARTMENT OF EDUCATION

34 CFR Part 668

[Docket ID ED-2020-OPE-0078]
RIN 1840-ZA04


Eligibility of Students at Institutions of Higher Education for
Funds Under the Coronavirus Aid, Relief, and Economic Security (CARES)
Act

AGENCY: Office of Postsecondary Education, Department of Education.

ACTION: Interim final rule.

-----------------------------------------------------------------------

SUMMARY: The Department of Education (Department) issues this interim
final rule so that institutions of higher education may appropriately
determine which individuals attending their institution are eligible to
receive emergency financial aid grants to students under the
Coronavirus Aid, Relief, and Economic Security (CARES) Act (March 27,
2020).

DATES: These regulations are effective June 17, 2020. We must receive
your comments on or before July 17, 2020.

ADDRESSES: Submit your comments through the Federal eRulemaking Portal
or via postal mail, commercial delivery, or hand delivery. We will not
accept comments submitted by fax or by email or those submitted after
the comment period. To ensure that we do not receive duplicate copies,
please submit your comments only once. In addition, please include the
Docket ID at the top of your comments.
    If you are submitting comments electronically, we strongly
encourage you to submit any comments or attachments in Microsoft Word
format. If you must submit a comment in Adobe Portable Document Format
(PDF), we strongly encourage you to convert the

[[Page 36495]]

PDF to print-to-PDF format or to use some other commonly used
searchable text format. Please do not submit the PDF in a scanned
format. Using a print-to-PDF format allows the Department to
electronically search and copy certain portions of your submissions.
    Federal eRulemaking Portal: Go to www.regulations.gov to
submit your comments electronically. Information on using
regulations.gov, including instructions for accessing agency documents,
submitting comments, and viewing the docket, is available on the site
under ``Help.''
    Postal Mail, Commercial Delivery, or Hand Delivery: The
Department strongly encourages commenters to submit their comments
electronically. However, if you mail or deliver your comments about the
interim final rule, address them to Gaby Watts, U.S. Department of
Education, 400 Maryland Ave. SW, Room 258-02, Washington, DC 20202.
    Privacy Note: The Department's policy is to make comments received
from members of the public available for public viewing on the Federal
eRulemaking Portal at www.regulations.gov. Therefore, commenters should
include in their comments only information that they wish to make
publicly available.

FOR FURTHER INFORMATION CONTACT: For further information contact Gaby
Watts, U.S. Department of Education, 400 Maryland Ave. SW, Room 258-02,
Washington, DC 20202. Telephone: 202-453-7195. Email:
Gaby.Watts@ed.gov.
    If you use a telecommunications device for the deaf (TDD) or a text
telephone (TTY), call the Federal Relay Service (FRS), toll-free, at
(800) 877-8339.

SUPPLEMENTARY INFORMATION:

Invitation to Comment: Although the Department has decided to issue this final rule without first publishing a proposed rule for public comment, we are interested in whether you think we should make any changes to this rule. We invite your comments. We will consider these comments in determining whether to revise the rule.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from this final rule. Please let us know of any further ways we could reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect all public comments about this interim final rule by accessing Regulations.gov. Due to the current COVID-19 pandemic, the Department's buildings are currently not open. However, upon reopening, you may also inspect the comments in person at 400 Maryland Ave. SW, Washington, DC 20202, between 8:30 a.m. and 4:00 p.m., Eastern Time, Monday through Friday of each week except Federal holidays. To schedule a time to inspect comments, please contact the person listed under FOR FURTHER INFORMATION CONTACT.

Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record: On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for this interim final rule. To schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under FOR FURTHER INFORMATION CONTACT.

Background:

On March 27, 2020, Congress enacted the CARES Act, Public Law 116-136, to help Americans cope with the economic and health crises created by the novel coronavirus disease (COVID-19) outbreak. Section 18004 of the CARES Act establishes the Higher Education Emergency Relief Fund (HEERF) and instructs the Secretary to allocate funding to eligible institutions of higher education in connection with the COVID-19 outbreak. Section 18004(c) specifically allows institutions to use their HEERF allocation under Sec. 18004(a)(1) for ``any costs associated with significant changes to the delivery of instruction due to the coronavirus,'' while adding the restriction that funds cannot be used for ``payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship.'' Section 18004(c) also states that institutions must use at least 50 percent of their allocations ``to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care),'' implicitly allowing institutions to use more than 50 percent of their funds for this purpose. Thus, the first sentence of section 18004(c) generally allows an institution to use its allocated HEERF funds under section 18004(a)(1) to cover certain coronavirus-related costs, while the second sentence requires an institution to give at least half of its allocated HEERF funds as grants to students. Finally, section 18004(e) requires institutions to submit reports to the Secretary describing how the funds were used under the section and authorizes the Secretary to specify the time and manner of such reporting.

Although the second sentence of section 18004(c) states that the emergency financial aid grants are to be given to students, the CARES Act does not define the term ``student'' or the phrases ``grants to students'' or ``emergency financial aid grants to students.'' In addition to leaving these terms undefined, Congress also included an implicit reference to title IV terms immediately after the phrase ``emergency financial aid grants to students,'' 18004(c) (``including eligible expenses under a student's cost of attendance''), and explicit references to that same title IV standard following the phrase ``grants to students'' in two of the preceding subsections, 18004(a)(2) and (a)(3) (``the student's cost of attendance (as defined under section 472 of the Higher Education Act''). In determining who constitutes a ``student'' for purposes of ``emergency financial aid grants to students'' in section 18004 of the CARES Act, the Department is mindful that ``[s]tatutory construction . . . is a holistic endeavor.'' United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988). In the appropriate circumstances, the Department's construction of the CARES Act must be informed or even controlled by other relevant law. (``We assume that Congress is aware of existing law when it passes legislation,'' Hall v. United States, 566 U.S. 506, 516 (2012) quoting Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990).) In context the category of ``student'' recipients eligible for ``emergency financial aid grants'' is therefore at a minimum ambiguous.

000075

This is a critical ambiguity, requiring the Department to exercise its narrow interpretative authority under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984). (`` `The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974). . . . Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.'') Here the Secretary

[[Page 36496]]

exercises her authority under 20 U.S.C. 1221e-3 and 20 U.S.C. 3474. Relying on statutory language and context to develop a harmonious construction faithful to the entire statutory scheme, see Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (``In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning-- or ambiguity--of certain words or phrases may only become evident when placed in context.''), we have concluded that Congress intended the category of those eligible for ``emergency financial aid grants to students'' in section 18004 of the CARES Act to be limited to those individuals eligible for title IV assistance.
    The Department considered a number of factors in reaching this conclusion. For one, an interpretation of the term ``student'' in ``emergency financial aid grants to students'' that was broad enough to cover anyone engaged in learning, or anyone enrolled in any way at an institution, or anyone enrolled full-time at an institution in a program leading to a recognized postsecondary credential, would be significantly curtailed at the outset by existing law independent of title IV with regard to certain immigration statuses. 8 U.S.C. 1611(a) already prohibits certain individuals from receiving any ``Federal public benefit'' and applies ``[n]otwithstanding any other provision of law.'' This prohibition clearly applies to the HEERF funds. Section 1611(c) defines ``Federal public benefit'' to include (A) ``any grant . . . provided by an agency of the United States or by appropriated funds of the United States,'' as well as (B) ``any . . . postsecondary education . . . benefit . . . for which payments or assistance are provided to an individual . . . by an agency of the United States or by appropriated funds of the United States.'' \1\ To the extent an institution uses HEERF funds, which qualify as ``appropriated funds of the United States,'' to provide ``emergency financial aid grants to students,'' the grants would qualify as a Federal public benefit under both Section 1611(c)(1)(A) and (B) because they would be ``grant[s] . . . by appropriated funds,'' as well as ``postsecondary education'' benefits to individuals. To the extent an institution otherwise uses the funds to make payments to students for purposes of, for example, ``costs associated with significant changes to the delivery of instruction due to the coronavirus,'' these payments would also qualify as ``postsecondary education'' benefits to individuals. The Department has not identified any specific language in Section 18004, or elsewhere in the CARES Act, that suggests Congress intended to include aliens who are not ``qualified'' for purposes of Section 1611 among the recipients of HEERF funds, notwithstanding the preexisting general prohibition in Section 1611.
------------------------------------------------------------------------

    \1\ Because title IV also contains an eligibility requirement based on immigration status which is similar in most respects to the requirement in 8 U.S.C. 1611, there is little remaining application for the prohibition in 8 U.S.C. 1611 once title IV eligibility requirements have been applied.
------------------------------------------------------------------------

    On the other extreme, the Department concludes that a more narrow interpretation of the term ``student'' in the phrase ``emergency financial aid grants to students''--for example, to cover only the group that received Federal Pell Grants as referenced in section 18004(a)(1)(A)--would be overly restrictive and less supportable under the language of the CARES Act.
    Earlier in the CARES Act, in section 3504 entitled ``Use of Supplemental Educational Opportunity Grants for Emergency Aid,'' Congress expressly authorizes institutions to use money allocated to them under the Federal Supplemental Educational Opportunity Grant (FSEOG) program, 20 U.S.C. 1070b et seq., for ``emergency financial aid grants to students,'' which is the identical phrase Congress used in section 18004. Although Congress did not expressly state that these emergency financial aid grants to students must be limited to those students who are eligible for participation in programs under title IV of the HEA, the context indicates that Congress intended that

000076

restriction as a general rule. Not only was the previously planned use
of the funds conditioned upon title IV eligibility (since the FSEOG
program is part of title IV of the HEA) but also because the text of
the CARES Act allows institutions to ``waive the amount of need
calculation under section 471'' of the HEA, which is a calculation that
applies to title IV aid.
    Because ``identical words and phrases within the same statute
should normally be given the same meaning,'' Powerex Corp. v. Reliant
Energy Services, Inc., 551 U.S. 224, 232 (2007), the implicit title IV
eligibility requirement associated with ``emergency financial aid
grants to students'' in section 3504 should apply to the distribution
of ``emergency financial aid grants to students'' in section 18004.
Congress did not previously choose to provide emergency financial aid
grants through the HEA, and thus these grants, by definition, do not
constitute Federal financial student aid under the HEA, including title
IV of the HEA. However, even though it is true that all title IV aid is
subject to title IV eligibility requirements, it does not follow that
all non-title IV aid is exempt from title IV eligibility requirements.
Rather, non-title IV aid can be subject to title IV eligibility
requirements. For example, scholarships distributed under the Fund for
the Improvement of Postsecondary Education, a non-title IV program,
require that recipients meet certain title IV eligibility requirements,
as noted below. 20 U.S.C. 1138(d).
    In providing emergency financial aid grants through section 18004
of the CARES Act, Congress also used the framework under title IV of
the HEA for the distribution of these emergency financial aid grants to
students, implying that the Department and institutions adhere to the
requirements under title IV, such as using the definition of ``cost of
attendance'' under title IV of the HEA and the same systems for
distributing Federal financial student aid to institutions under title
IV of the HEA.
    Indeed, Congress specifically references title IV of the HEA in
various provisions in section 18004 of the CARES Act, including the
following provisions:
    Section 18004(a)(1) links a component of the institutional
allocation for HEERF to enrollment of Pell Grant recipients, and a
student must be eligible for Federal financial student aid under
section 484 of title IV of the HEA to receive Pell Grants. 20 U.S.C.
1070a(a) (stating Pell Grants are only for an ``eligible student
(defined in accordance with [S]ection 484 [of the HEA])''); 20 U.S.C.
1091.
    Sections 18004(a)(2) and (3) require institutions to use
funds ``for grants to students for any component of the student's cost
of attendance (as defined under Sec. 472 of [title IV of] the Higher
Education Act), including food, housing, course materials, technology,
healthcare, and child care.'' (Emphasis added.)
    Section 18004(a)(3) specifically references ``part B of
title VII of the HEA,'' and section 741(d)(1) of part B of title VII of
the HEA expressly requires students to be eligible under section 484(a)
of the HEA to receive grants or scholarships. 20 U.S.C. 1138(d).
    Section 18004(b) expressly requires the Secretary to use
the same systems that are used to distribute funding to each
institution under title IV of the HEA in order to distribute funds to
each institution under section 18004(a)(1) of the CARES Act.

[[Page 36497]]

    Section 18004(c) again expressly refers to ``a student's
cost of attendance,'' which is a defined term in section 472 of the
HEA. 20 U.S.C. 1087ll.
    The most congruent definition of ``student'' for purposes of
``emergency financial aid grants to students'' in section 18004 is a
person who is or would be eligible under section 484 of the HEA for
title IV aid. Indeed, it would be an illogical result for Congress to
require students to be eligible under section 484 of title IV of the
HEA for grants under section 18004(a)(3) of the CARES Act, which
expressly references part B of title VII of the HEA, but not for grants
under sections 18004(a)(1) and (2) of the CARES Act, especially when
Congress in section 18004(d) directs the Secretary to prioritize funds
under section 18004(a)(3) for institutions that did not receive
sufficient funding under section 18004(a)(1) and (2). ``Interpretations
of statute which would produce absurd results are to be avoided.''
Griffin v. Ocean Contractors, Inc., 458 U.S. 564, 576 (1982). To
interpret section 18004 in a holistic manner, it appears that the best
interpretation of ``student'' where section 18004 references
``emergency financial aid grants to students'' is to mean a person who
is eligible under section 484 of the HEA to receive title IV aid.\2\
--------------------------------------------------------------------------

    \2\ To calculate the HEERF allocation under section
18004(a)(1)(B), the Department ``approximated the factors using the

best available data'' by multiplying the 2017/2018 full-time
enrollment number by the fall 2018 percentage of undergraduate,
graduate, and professional students not enrolled exclusively in
distance education, as self-reported by institutions and compiled in
the Department's Integrated Postsecondary Education Data System
(IPEDS). See Methodology for Calculating Allocations per Section
18004(a)(1) of the CARES Act,
https://www2.ed.gov/about/offices/list/ope/heerf90percentformulaallocationexplanation.pdf.
    Thus, the approach taken in calculating the ``full-time
equivalent enrollment of students'' in section 18004(a)(1)(B)
differs from the approach taken in this rule in interpreting and
applying ``grants to students'' elsewhere in section 18004. The
Department intends to interpret the term ``student'' in the same way
throughout section 18004, but did not have data available on the
number of individuals enrolled at each institution who are or could
be eligible for title IV aid, so the Department had to use a
different measure based on available data. As between the available
options, the Department believed that using a broader number for
part of the baseline in establishing each institution's share under
18004(a)(1) made sense because funds used toward the first allowed
purpose in 18004(c) (to cover any costs associated with significant
changes to the delivery of instruction due to the coronavirus) apply
to the entire institution regardless of the definition of
``student.'' The Department also deemed it more important to move
expeditiously to calculate the HEERF allocation despite the
acknowledged ``limitations of th[e] data,'' rather than stopping the
HEERF process in order to gather additional data solely for purposes
of calculating the HEERF allocation.

------------------------------------------------------------------------

    Final Rule:
    For purposes of the phrases ``grants to students'' and ``emergency
financial aid grants to students'' in sections 18004(a)(2), (a)(3), and
(c) of the CARES Act, ``student'' is defined as an individual who is,
or could be, eligible under section 484 of the HEA, to participate in
programs under title IV of the HEA. We add this definition to 34 CFR
668.2.
    An important policy goal for the Department is to make emergency
financial aid grants available to students in the most efficient,
effective, and expedient way possible and consistent with Congressional
intent. At the same time, the Department has an obligation to taxpayers
to prevent waste, fraud, and abuse. The potential for waste, fraud, and
abuse is significant when institutions of higher education are given
the opportunity to quickly make cash awards to students, particularly
when institutions are rightfully concerned about declining enrollments
and the loss of ancillary revenue as a result of COVID-19. In addition,
there have been reports that the unusual circumstances caused by COVID-
19 have given rise to new efforts to defraud government programs in
other contexts.\3\

------------------------------------------------------------------------

    \3\ See, e.g., Mike Baker, Feds Suspect Vast Fraud Network Is
Targeting U.S. Unemployment Systems, New York Times,
www.nytimes.com/2020/05/16/us/coronavirus-unemployment-fraud-secret-service-washington.html (last
visited May 19, 2020).

------------------------------------------------------------------------

    The Department has considered these issues in reaching its
interpretation of the category of those eligible for ``emergency
financial aid grants to students'' in section 18004(a)(2), (a)(3), and
(c). The Department has concluded that the best approach to
interpreting ``student'' in ``emergency financial aid grants to
students'' is to mean a person who is eligible under section 484 of the
HEA to receive title IV aid, as suggested by the references to title IV
elsewhere in section 18004. This approach uses a clear, existing
standard that is familiar to the Department and to institutions and
will allow both the Department and institutions to implement the HEERF
provisions in an efficient, effective, and expedient way. The
Department has placed a high priority on getting assistance to
institutions and individuals as quickly and efficiently as possible in
light of the national emergency and the immediate needs resulting
therefrom, and the use of an existing standard here achieves that same
important goal. The title IV eligibility standard has already been
specified in great detail by the Department in its practice and its
communications with institutions with regard to title IV programs over
the years. In contrast, using a generic, broad standard would require
the Department and institutions to wade through a litany of specific
questions about which groups of potential students do or do not qualify
for ``grants to students.'' \4\

------------------------------------------------------------------------

    \4\ For example, there would need to be consideration and a
determination made regarding whether to include or exclude
individuals based on whether they are enrolled for credit, enrolled
in an off-campus program, simultaneously finishing a high school
degree, taking remedial courses, taking only zero-credit thesis
courses, enrolled exclusively in courses not applied towards a
recognized credential, enrolled only in English as a Second Language
programs or Continuing Education Units, auditing classes only,
participating residents or interns in a medical doctor practice
program after receiving their degree, studying abroad at a foreign
university, enrolled in a branch campus in a foreign country, or
participating in Experimental Sites.
---------------------------------------------------------------------------

    For the majority of students, active participation in title IV
programs will clearly demonstrate to the institution and the Department
that they are qualified as a student to receive emergency financial aid
grants. For example, with regard to the title IV eligibility
requirement related to citizenship or appropriate immigration status in
the United States, the majority of students' statuses can be verified
by the fact of their participation in title IV.\5\ And this
verification also ensures that the disbursement of grants to those
individuals occurs in compliance with the independent statutory
restriction found in 8 U.S.C. 1611.
---------------------------------------------------------------------------

    \5\ For the rest of students, qualification can be confirmed by
the method described in the May 1, 2015 Dear Colleague Letter,
entitled ``Citizenship and Immigration Status Documentation'' (DCL
ID: GEN-15-08), the Federal Student Aid Handbook
(https://ifap.ed.gov/sites/default/files/attachments/2019-08/1920FSAHbkVol1Ch2.pdf), or by
employing the electronic document
submission flexibilities provided in the Department's April 3, 2020,
``UPDATED Guidance for Interruptions of Study Related to COVID-19''
(https://ifap.ed.gov/sites/default/files/attachments/2020-
04/040320UPDATEDGuidanceInterruptStudyRelCOVID19Attach.pdf).
---------------------------------------------------------------------------

    The Department also acknowledges the efficiency of leveraging
existing processes and procedures to minimize burden on institutions
implementing this IFR. For example, institutions could encourage
students who currently do not receive title IV aid to submit the Free
Application for Federal Student Aid (FAFSA) in order to determine title
IV eligibility.
    In addition, this approach to interpreting ``student'' within the
phrase ``emergency financial aid grants to students'' also allows the
Department to prevent potential waste, fraud, and abuse. For example,
without the title IV eligibility standard, the existence of HEERF
funding could incentivize individuals who are not qualified and cannot
qualify under the title IV

[[Page 36498]]

standard to enroll as students, and it could incentivize institutions
to take advantage of this dynamic to further their bottom lines. If a
broad definition of ``student'' were employed for purposes of emergency
financial aid grants to students, unscrupulous institutions could
create cheap classes and programming that provides little or no
educational value and then use the HEERF grant funding to incentivize
individuals not qualified under title IV to enroll as paying students
in those classes and programs, thereby qualifying for a grant.
Alternatively, institutions could use the HEERF grant funding to
incentivize the re-enrollment of students cannot maintain Satisfactory
Academic Progress (SAP) due to reasons beyond the qualifying emergency,
solely for the purpose of increasing revenues via the tuition such
students would pay. Without restriction, institutions could also use
HEERF funds for students who are enrolled at the institution but do not
intend to receive a degree or certificate, thereby diverting funds from
students who are pursuing a degree or certificate in an eligible
program.
    Instead, interpreting ``student'' to track title IV eligibility for
purposes of emergency financial aid grants to students will ensure that
institutions are only providing funds to students who are enrolled in
an eligible program at an institution and are maintaining SAP in their
program, among other requirements. Each of these requirements exists
because it focuses the use of Federal resources on valuable educational
activities and excludes areas that are more open to waste, fraud, and
abuse. This approach will thereby allow the Department to reduce the
likelihood and amount of waste, fraud, and abuse in the administration
of the HEERF allocations under the CARES Act.

000079

Waiver of Notice and Comment Rulemaking, Negotiated Rulemaking, and
Delayed Effective Date Under the Administrative Procedure Act

    The Department believes its interim final rulemaking authority must
be narrowly construed and exercised only when there is a sound basis
for doing so. However, Congress enacted the CARES Act to help Americans
cope with the urgent economic and health crises created by the COVID-19
outbreak and created the HEERF to provide emergency financial aid
grants to students. In light of the urgent economic challenges facing
many students as a result of the crisis, the Department has determined
that there is good cause for interim final rulemaking and that such
action is in the public interest. In the absence of this interim final
rule, the terms defined herein will remain undefined and indefinite,
and the potential for waste, fraud, and abuse described above will not
have been unaddressed in any legally binding manner.\6\
-----------------------------------------------------------------------

    \6\ Nor will the Department enforce the title IV eligibility
interpretation announced in this rule against distribution of HEERF
funds that occurred prior to the publication of this rule.
-----------------------------------------------------------------------

    Under the Administrative Procedure Act (APA) (5 U.S.C. 553), the
Department generally offers interested parties the opportunity to
comment on proposed rules. However, the APA provides that an agency is
not required to conduct notice and comment rulemaking when the agency,
for good cause, finds that notice and public comment thereon are
impracticable, unnecessary, or contrary to the public interest (5
U.S.C. 553(b)(B)). In light of the current national emergency and the
importance of institutions properly distributing the HEERF allocations
via emergency financial aid grants to students to help with their
expenses related to the disruption of campus operations due to COVID-19
as quickly as possible, the normal rulemaking process would be
impracticable and contrary to the public interest, so good cause exists
for waiving the notice and comment requirements of the APA. Although
the Department has issued guidance to this effect already, that
guidance is not legally binding, the Department understands that
certain institutions have refrained from distributing some or all of
their HEERF funds until a final rule is issued clarifying this point in
a legally binding manner.
    The Department is not required to conduct negotiated rulemaking for
this rule. The requirement in HEA section 492 that requires the
Department to obtain public involvement in the development of proposed
regulations for title IV of the HEA does not apply to this final rule,
because it implements the CARES Act, not title IV. Moreover, even if it
did apply, section 492(b)(2) of the HEA provides that negotiated
rulemaking may be waived for good cause when doing so would be
``impracticable, unnecessary, or contrary to the public interest.''
Section 492(b)(2) of the HEA also requires the Secretary to publish the
basis for waiving negotiations in the Federal Register at the same time
as the regulations in question are first published. Even if section 492
applied to this rule, good cause would exist to waive the negotiated
rulemaking requirement, since, as explained above, notice and comment
rulemaking is not practicable or in the public interest in this case.
    The master calendar requirement in section 482 of the HEA likewise
does not apply to this rule, because the rule does not relate to the
delivery of student aid funds under title IV.
    Additionally, the APA generally requires that regulations be
published at least 30 days before their effective date, except as
otherwise provided by the agency for good cause found and published
with the rule (5 U.S.C. 553(d)(3)). As described above, good cause
exists for this rule to be effective upon publication in light of the
current national emergency and the importance of institutions properly
distributing the HEERF allocations via emergency financial aid grants
to students to help with their expenses related to the disruption of
campus operations due to COVID-19. The CRA requires a major rule may
take effect no sooner than 60 calendar days after an agency submits a
CRA report to Congress or the rule is published in the Federal
Register, whichever is later. 5 U.S.C. 801(a)(3)(A). However, the CRA
creates limited exceptions to this requirement. See id. Sec.  801(c);
Sec.  808. An agency may invoke the ``good cause'' exception under
section 808(2) in the case of rules for which the agency has found
``good cause'' under the APA, section 553(b)(B), to issue the rule
without providing the public with an advance opportunity to comment. As
stated above the Department has found good cause to issue this rule
without notice and comment rulemaking and thus we are not including the
60-day delayed effective date in this rule.

Executive Orders 12866, 13563, and 13771

Regulatory Impact Analysis

Under Executive Order 12866, it must be determined whether this regulatory action is ``significant'' and, therefore, subject to the requirements of the Executive order and subject to review by the Office of Management and Budget (OMB). Section 3(f) of Executive Order 12866 defines a ``significant regulatory action'' as an action likely to result in a rule that may--
    (1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an ``economically significant'' rule);

[[Page 36499]]

    (2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;
    (3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or
    (4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.
    OMB has determined that this regulatory action is a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.
    Under Executive Order 13771, for each new regulation that the Department proposes for notice and comment or otherwise promulgates that is a significant regulatory action under Executive Order 12866 and that imposes total costs greater than zero, it must identify two deregulatory actions. For FY 2020, any new incremental costs associated with a new regulation must be fully offset by the elimination of existing costs through deregulatory actions. This rule's designation under Executive Order 13771 will be informed by public comment.
    We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency--
    (1) Propose or adopt regulations only upon a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);
    (2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account--among other things and to the extent practicable--the costs of cumulative regulations;
    (3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);
    (4) To the extent feasible, specify performance objectives rather than the behavior or manner of compliance a regulated entity must adopt; and
    (5) Identify and assess available alternatives to direct regulation, including economic incentives--such as user fees or marketable permits--to encourage the desired behavior, or provide information that enables the public to make choices.
    Executive Order 13563 also requires an agency ``to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible.'' The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include ``identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes.''
    We are issuing this interim final rule only on a reasoned determination that its benefits would justify its costs. In choosing among alternative regulatory approaches, we selected those approaches that would maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.
    We have also determined that this regulatory action would not unduly interfere with State, local, and Tribal governments in the exercise of their governmental functions.
    Elsewhere in this section under Paperwork Reduction Act of 1995, we identify and explain burdens specifically associated with the information collection requirements.

Need for Regulatory Action

    The Department is issuing this interim final rule to clarify which students are eligible for emergency financial aid grants under section

000081

18004 of the CARES Act. This final rule is meant to balance flexibility and clarify administration for institutions so the funds can be provided to eligible students as efficiently as possible with eligibility requirements consistent with congressional intent and designed to prevent waste, fraud, and abuse. The emergency financial aid grants are meant to assist students with expenses related to the disruption of on-campus activities, so this final rule is meant to clarify any questions about eligibility so the funds can be disbursed in a timely manner.

    As detailed in the preamble of this IFR, in light of the current national emergency and the importance of institutions distributing the HEERF allocations via emergency financial aid grants to students to help with their expenses related to the disruption of campus operations due to COVID-19, the normal rulemaking process would be impracticable and contrary to the public interest. With the definition of ``student'' in ``emergency financial aid grants to students'' uncertain, institutions may be reluctant to award the full allocation for grants to students in time to assist with the COVID-19 related expenses the funds are intended to alleviate.

Costs, Benefits, and Transfers

    The emergency financial aid grants under section 18004 of the CARES Act are intended to assist eligible students with expenses related to the disruption of campus activities. In accordance with OMB Circular A-4, we are evaluating the costs and benefits of the IFR compared to a pre-statutory baseline. This IFR defines which students are eligible for the grants but does not change the amount available or the allocation formula for providing the funds to institutions. The amount of transfers available to eligible students in 2020 is a minimum of $6.25 billion and up to $12.5 billion, depending on the amount institutions retain for institutional expenses. We have not discounted or annualized this amount because it is meant to be disbursed to students as efficiently as possible in the current year.

    As described in this preamble, the eligibility requirements clarified in this final rule allow students to know if they are eligible to receive such funds from their institution. Limiting eligibility to title IV-eligible students who were enrolled and making P SAP in on-campus programs during the time of coronavirus-related disruptions to campus operations should allow the grants to be targeted for the purpose they were established. By aligning requirements with title-IV eligibility,\7\ those individuals who do not meet one or more of the title IV eligibility requirements will be unable to receive HEERF grants.

--------------------------------------------------------------------------

    \7\ An exhaustive list of student eligibility requirements can be found in Section 484 of the Higher Education Act of 1965, as amended [20 U.S.C. 1091]. They are as follows (1) enroll or be accepted for enrollment in a program leading to a recognized credential at an eligible IHE and not enrolled in elementary or secondary school (2) if presently enrolled, be maintaining satisfactory academic progress (3) not owe a refund on a Federal student grant or be in default on any Federal student loan (4) submit a Statement of Educational Purpose (5) are a U.S. citizen, National or eligible noncitizen (6) not have been convicted of, or plead nolo contendere or guilty to, a crime involving fraud in obtaining federal student aid (7) have a high school diploma or its equivalent (8) have a valid social security number (9) register with the Selective Service (if required) (10) not been convicted of any offense under any Federal or State law involving the possession or sale of a controlled substance for conduct that occurred during a period of enrollment for which the student was receiving Federal student aid. For more information visit: https://uscode.house.gov/view.xhtml?req=(title:20%20section:1091%20edition:prelim) and here https://ifap.ed.gov/federal-student-aid-handbook/08-05-2019-2019-2020-federal-student-aid-handbook-student-eligibility.

--------------------------------------------------------------------------

    As institutions will determine how they will distribute funds to their

[[Page 36500]]

students, the Department does not know the exact distribution of who will receive the grants. Table 1 shows the estimated pool of potential recipients as derived from IPEDS data for institutions that received an allocation. It is not specific to Spring 2020 enrollment but does provide an indication of the number of students who could receive funds. The primary eligibility limitations reflected in the table are the exclusion of non-resident aliens and the use of the percent of

000082

students whose programs were exclusively through distance education to estimate eligible on-campus enrollment.

Table 1--Estimated Potential Grant Recipients by Control of Institution

| | Public | Private | Proprietary |
|---|---|---|---|
| Total | | | |
| Total Enrollment \8\................ 24,359,671 | 18,527,813 | 4,778,403 | 1,053,455 |
| Undergraduate................... 20,997,216 | 16,872,158 | 3,208,336 | 916,722 |
| Graduate....................... 3,362,455 | 1,655,655 | 1,570,067 | 136,733 |
| Non-Resident Alien................. 1,126,722 | 692,123 | 408,696 | 25,903 |
| Percent All-Distance \9\........... | 11.40 | 19.20 | 59.90 |
| Estimated Potentially Eligible On- | 15,802,421 | 3,530,723 | 412,048 |
| Campus Enrollment................. 19,745,193 | | | |

It will be easier for students who have successfully completed a FAFSA and received a valid student aid report (SAR) or institutional student information record (ISIR) for the 2019-20 or 2020-21 award years to receive an emergency financial aid grant because they have already demonstrated their eligibility under title IV. While some students may choose not to fill out a FAFSA because they have other sources of funding for their education, others may lack the necessary information or familiarity with the financial aid process to have information in place already. A number of studies have examined the issue of barriers to FAFSA completion including complexity and lack of counseling. These barriers are particularly challenging for low-income, minority, and first-generation students.\10\ Another limitation that will restrict title IV eligible students' access to the emergency financial aid grants is their program's participation in title IV aid. Some programs at title-IV eligible institutions, primarily shorter training courses such as first responder training certificate programs, do not participate. Students enrolled in such programs will not be eligible for the emergency financial aid grants. Students who choose not to fill out a FAFSA but otherwise meet the title IV eligibility criteria may verify their eligibility by completing an application designed by the institution in which the student attests under the penalty of perjury to meeting the requirements of section 484 of the HEA.

--------------------------------------------------------------------

\8\ Analysis of IPEDS 2017-18 12-month enrollment file, effy2018 available at https://nces.ed.gov/ipeds/datacenter/DataFiles.aspx?goToReportId=7.
\9\ National Center for Education Statistics, Digest of Education Statistics 2019, Table 311.15. Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2017 and Fall 2018. Fall 2017 share of students taking exclusively distance education courses. Available at https://nces.ed.gov/programs/digest/d19/tables/dt19_311.15.asp.
\10\ Owen, Laura and Westlund, Erik (2016) ``Increasing College Opportunity: School Counselors and FAFSA Completion,'' Journal of College Access: Vol. 2: Iss. 1, Article 3. Available at: http://scholarworks.wmich.edu/jca/vol2/iss1/3. Literature review discusses barriers and interventions.
--------------------------------------------------------------------

In developing this IFR, the Department considered waiving some title IV eligibility requirements related to drug offenses, fraud related to title IV funds, or default. Ultimately, it was determined that eliminating some eligibility criteria and not others would not be fair across groups of students and would not allow institutions to maximize the use of their existing eligibility confirmation processes.

It is unclear how institutions will interpret the language of the CARES Act as they continue distributing emergency financial aid grants to students in the absence of the clarification contained in this rule. Some institutions may choose to continue to follow the guidance the Department has already issued on this subject, while others may adopt their own broader definition of ``student.'' At a minimum, the Department has already brought to the attention of institutions that the restrictions in 8 U.S.C. 1611 apply with regard to the distribution of grants to non-qualifying aliens as defined therein, so those

individuals would not qualify for such grants under any interpretation of ``students.'' On the other hand, within the boundaries established by the terms of the CARES Act and other applicable statutes, institutions have discretion in distributing emergency financial aid grants to students, so even if an institution decided to use a broad definition of ``students'' in the absence of this rule, the institution might not exercise its discretion to award grants to everyone who meets that broader definition. It is therefore difficult to estimate with any degree of certainty how institutions would use their HEERF allocations differently for distribution of emergency financial aid grants to students in the absence of this rule.

    Students will benefit from assistance in paying additional expenses associated with elements included in their cost of attendance, such as room and board, that changed with the disruption of campus activities. As confirmed by the Internal Revenue Service, the relief provided under section 18004 of the CARES Act will not be considered gross income, so students have no Federal tax consequences to deter them from accepting this assistance. Students will have to work with their institutions to access the funds according to whatever process the institution establishes to award the relief. As described in the Paperwork Reduction Act section of this preamble, students are expected to take 263,138 hours for a total of $4.71 million at a wage rate of $17.89 \11\ to apply for emergency relief in 2020.
---------------------------------------------------------------------------

    \11\ Students' hourly rate estimated using Bureau of Labor Statistics (BLS) for Sales and Related Workers, All Other, available at: https://data.bls.gov/cgi-bin/print.pl/oes/current/oes_nat.htm. Last accessed May 20, 2020.
---------------------------------------------------------------------------

    Institutions are also affected by this final rule. They have some flexibility in determining how they will distribute the funds they were allocated for this emergency relief. They will incur some costs in setting criteria or establishing an application process for their students. We assume the distribution of the funds can largely rely on existing processes and information involved in the disbursement of other title IV aid, but there will be some burden in confirming students' eligibility for the emergency relief, including for students who do not have an existing valid SAR or ISIR for the 2019-20 or 2020-21 award years. This could involve developing an application that includes student attestation under the penalty of

[[Page 36501]]

perjury to meeting the requirements of section 484 of the HEA. For students who knowingly misrepresent the truth in their attestation, the school may take disciplinary action against the student or require repayment of the emergency grant. As described in the Paperwork Reduction Act section of this preamble, burden on institutions is estimated to increase by 25,680 hours and $1,177,941 at a wage rate of $45.87 for postsecondary education administrators \12\ in 2020.
---------------------------------------------------------------------------

    \12\ Based on BLS 2019 median hourly wage rate for postsecondary education administrators in the BLS Occupational Outlook Handbook. Available at www.bls.gov/ooh/management/postsecondary-education-administrators.htm. Last accessed May 20, 2020.
---------------------------------------------------------------------------

    To the extent that students use their emergency financial aid grants for expenses related to elements of their cost of attendance provided by institutions, those institutions will receive some revenue students may otherwise have been unable to pay at this time. Table 2 summarizes the amounts to be allocated to institutions by sector. The full breakout of amounts allocated to individual institutions, including the maximum that can be allocated to institutional costs, is available in the Allocations for section 18004(a)(1) of the CARES Act document \13\ on the Department's CARES Act website.\14\ These allocations were made according to the formula described in the Methodology for Calculating Allocations document \15\ on the Department's CARES Act website. The allocation formula emphasizes institutions' share of Pell Grant recipients with 75 percent of the allocation based on each IHE's share of full-time equivalent (FTE) enrollment of Pell Grant recipients who were not enrolled exclusively in distance education prior to the coronavirus emergency, relative to the share of such individuals in all institutions. The remaining 25 percent is based on the institution's share of FTE enrollment of students who were not Pell Grant recipients and who were not enrolled exclusively in distance education prior to the coronavirus emergency. This formula helps direct relief to institutions that serve lower

000084

income students as part of their on-campus operations.
--------------------------------------------------------------------

    \13\ Available at www2.ed.gov/about/offices/list/ope/allocationstableinstitutionalportion.pdf.
    \14\ www2.ed.gov/about/offices/list/ope/caresact.html.
    \15\ Available at
www2.ed.gov/about/offices/list/ope/heerf90percentformulaallocationexplanation.pdf.

              Table 2--Summary of HEERF Allocations
--------------------------------------------------------------------

| Row labels | Sum of total allocation | Sum of minimum allocation to be awarded for emergency financial aid grants to students |
|---|---|---|
| Private Non-Profit <2 Yrs... | 11,121,217 | 5,560,619 |
| Private Non-Profit 2-3 Yrs.. | 31,469,853 | 15,734,951 |
| Private Non-Profit 4 Yrs or More.................... | 2,441,436,384 | 1,220,718,556 |
| Proprietary <2 Yrs.......... | 314,169,982 | 157,085,261 |
| Proprietary 2-3 Yrs......... | 415,718,070 | 207,859,135 |
| Proprietary 4 Yrs or More... | 388,802,168 | 194,401,134 |
| Public <2 Yrs............... | 40,318,527 | 20,159,318 |
| Public 2-3 Yrs.............. | 2,655,311,849 | 1,327,656,148 |
| Public 4 Yrs or More........ | 6,208,906,453 | 3,104,453,411 |
| Grand Total............. | 12,507,254,503 | 6,253,628,533 |

Net Budget Impact

    We estimate that the definition of student eligibility for the
emergency financial aid grants to students will not have an impact on
the Federal budget. The CARES Act provided a maximum of $12.5 billion,
with a minimum of $6.25 billion required to be spent on emergency
financial aid grants to students and not spent on institutional
expenses. The final rule does not impact the Federal budget because it
clarifies which students are eligible to receive emergency relief
provided by the CARES Act but do not change the amount available for
such grants. As described in the Costs, Benefits, and Transfers section
related to institutions, allocations have been determined and $11.1
billion of the funding has been disbursed to institutions already, with
$50 million held in reserve to account for data limitations in
allocating the initial amounts to eligible institutions. We anticipate
that $12.5 billion will ultimately be disbursed in 2020, and therefore
estimate $12.5 billion in transfers in 2020 relative to a pre-statutory
baseline.

Accounting Statement

    As required by OMB Circular A-4 (available at
www.whitehouse.gov/sites/default/files/omb/assets/omb/circulars/a004/a-4.pdf), in the
following table we have prepared an accounting statement showing the
classification of the impacts associated with the provisions of these
final regulations in 2020, using 3% and 7% discount rates. This table
provides our best estimate of the changes in monetized transfers in
2020 as a result of these final regulations. We note that transfers
below flow from the Federal Government to eligible students and are
processed through institutions.

[[Page 36502]]


      Table 3--Accounting Statement: Classification of Estimated Impacts in
                                    2020
                              [In millions]
--------------------------------------------------------------------

--------------------------------------------------------------------

| Category | Benefits | |
|---|---|---|
| Assistance may support students continuing in their programs........... | Not Quantified | |
| | Costs | |
| Paperwork burden on institutions to administer funds and on students to | 7% $5.9 | 3% $5.9 |

```
apply...................................
      ---------------------------------------------------------
Category................................          Transfers
      ---------------------------------------------------------
Relief for eligible students and                7%            3%
   institutions to help with additional      $12,500       $12,500
   expenses due to disruption of campus
   activities...............................
      ---------------------------------------------------------
```

Regulatory Flexibility Act Certification

    The Regulatory Flexibility Act does not apply to this rulemaking
because there is good cause to waive notice and comment under the
Administrative Procedure Act (5 U.S.C. 553).
    The Secretary certifies that this final rule will not have a
significant economic impact on a substantial number of small entities.
The U.S. Small Business Administration Size Standards define ``small
entities'' as for-profit or nonprofit institutions with total annual
revenue below $7,000,000 or, if they are institutions controlled by
small governmental jurisdictions (that are comprised of cities,
counties, towns, townships, villages, school districts, or special
districts), with a population of less than 50,000.
    However, as noted in several of the Department's recent
regulations, we believe that an enrollment-based standard for small
entity status is more applicable to institutions of higher education.
The Department recently proposed a size classification based on
enrollment using IPEDS data that established the percentage of
institutions in various sectors considered to be small entities, as
shown in Table 4. We described this size classification in the NPRM
published in the Federal Register on July 31, 2018 for the proposed
borrower defense rule (83 FR 37242, 37302). The Department discussed
the proposed standard with the Chief Counsel for Advocacy of the Small
Business Administration, and while no change has been finalized, the
Department continues to believe this approach better reflects a common
basis for determining size categories that is linked to the provision
of educational services.

Table 4--Small Entities Under Enrollment Based Definition

| Level | Type | Small | Total |
|---|---|---|---|
| 2-year (Percent 28) | Public | 342 | 1,240 |
| 2-year (85) | Private | 219 | 259 |
| 2-year (87) | Proprietary | 2,147 | 2,463 |
| 4-year (8) | Public | 64 | 759 |
| 4-year (48) | Private | 799 | 1,672 |
| 4-year (76) | Proprietary | 425 | 558 |
| Total (57) | | 3,996 | 6,951 |

    This rule will benefit those institutions of higher education that
are small entities by allowing them to use a familiar existing
eligibility framework to determine who should receive emergency
financial aid grants under HEERF. As described in the Regulatory Impact
Analysis, institutions may benefit from applying no more than 50
percent of their allocation of HEERF funds to institutional costs, so
some small entities will benefit from those revenues. They will also
have to establish a process for determining which of their students
should receive and disburse the funds accordingly. We expect that the
2,586 estimated small entities allocated funds for this purpose under
the CARES Act will spend a total of 5,172 hours totaling $237,240 at a
wage rate of $45.87 \11\ for postsecondary administrators to administer
the distribution of the relief.
    Table 5 shows the allocations of funds to small entities by sector,
with any institution for which there was no small business indicator
available considered a small entity. As for all institutions, the
allocations of funds to specific small institutions is available on the

000086

Department's CARES website.\12\

Table 5--Summary of Allocations to Small Entities by Sector

| Sector | Sum of total allocation | Sum of minimum allocation to be awarded for emergency financial aid grants to students |
| --- | --- | --- |
| Private Non-Profit <2 Yrs......... | 8,274,977 | 4,137,498 |
| Private Non-Profit 2-3 Yrs........ | 20,417,294 | 10,208,669 |

[[Page 36503]]

| Sector | Sum of total allocation | Sum of minimum allocation to be awarded for emergency financial aid grants to students |
| --- | --- | --- |
| Private Non-Profit 4 Yrs or More.. | 266,608,121 | 133,304,213 |
| Proprietary <2 Yrs................ | 239,330,457 | 119,665,488 |
| Proprietary 2-3 Yrs............... | 177,306,399 | 88,653,273 |
| Proprietary 4 Yrs or More......... | 84,269,294 | 42,134,681 |
| Public <2 Yrs..................... | 29,196,455 | 14,598,279 |
| Public 2-3 Yrs.................... | 28,278,395 | 14,139,221 |
| Public 4 Yrs or More.............. | 56,909,101 | 28,454,561 |
| Grand Total...................... | 910,590,493 | 455,295,883 |

As institutions control the distribution of the funds to eligible students and have flexibility to establish a process suitable to their circumstances, no alternatives were considered specifically for small entities.

Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information, in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that: The public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

In determining eligibility for these funds, IHEs are being directed to use the Department's interpretation of ``student,'' meaning a person who is eligible under section 484 of the HEA to receive title IV aid, as suggested by the references to title IV in the context of section 18004.

We believe that most institutions will expand their current financial aid appeals process and utilize that framework to receive requests for COVID-19 assistance from eligible students. We estimate that each institution that received an allocation would require five hours to set up any new form for students to complete and establish review and recordkeeping procedures to be able to comply with the separate reporting requirements in the Certification and Agreement between the institutions and the Secretary. The estimated burden for the 1,651 private institutions is 8,255 hours (1,651 x 5 hours). The estimated burden for the 1,641 proprietary institutions is 8,205 hours (1,641 x 5 hours). The estimated burden for the 1,844 public institutions is 9,220 (1,844 x 5 hours). The total new burden to all institutions receiving an allocation of funds is 25,680 hours (5,136 institutions x 5 hours).

Using the unique number of title IV aid recipients 10,319,154 (both Federal grant and Federal student loan) for the Award Year 2019-2020 we estimate that 15 percent, or 1,547,873, of those recipients will request additional aid from their institution based on changed circumstances due to the coronavirus. We estimate approximately 20 minutes per students to complete the request for additional aid for a total new burden of 510,798 hours (.33 hours x 1,547,873).

This is a new information collection with a total burden assessment of 536,478 hours for 1,553,009 respondents with a single response. The Department has requested an emergency clearance to allow for the immediate collection of this information. The public will be provided the ability to comment on the proposed burden assessment through the standard information collection process with notice requesting comment being published in the Federal Register.

1840-NEW--Eligibility of Students at Institutions of Higher Education for Funds Under the

CARES Act
------------------------------------------------------------------------------------------
--------------

| Estimate costs student $17.89 Affected entity institutions $45.87 | Number of respondents | Number of responses | Hours per response | Total burden |
|---|---|---|---|---|
| Individual Student.............. $9,138,176 | 1,547,873 | 1,547,873 | .33 | 510,798 |
| Private Institution............. 378,657 | 1,651 | 1,651 | 5 | 8,255 |
| Proprietary Institution......... 376,363 | 1,641 | 1,641 | 5 | 8,205 |
| Public Institution.............. 422,921 | 1,844 | 1,844 | 5 | 9,220 |
| Total...................... 10,316,117 | 1,553,009 | 1,553,009 | .............. | 536,478 |

    Intergovernmental Review: This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive order is to foster an intergovernmental partnership and a strengthened federalism. The Executive order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.
    This document provides early notification of our specific plans and actions for this program.

[[Page 36504]]

Federalism

    Executive Order 13132 requires us to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. ``Federalism implications'' means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. This interim final regulation may have federalism implications. We encourage State and local elected officials to review and provide comments on this interim final regulation.
    Accessible Format: Individuals with disabilities can obtain this document in an accessible format (e.g., braille, large print, audiotape, or compact disc) on request to the person listed under FOR FURTHER INFORMATION CONTACT.
    Electronic Access to This Document: The official version of this document is the document published in the Federal Register. You may access the official edition of the Federal Register and the Code of Federal Regulations at www.govinfo.gov. At this site you can view this document, as well as all other documents of this Department published in the Federal Register, in text or portable document format PDF. To use PDF, you must have Adobe Acrobat Reader, which is available for free on the site.
    You may also access documents of the Department published in the Federal Register by using the article search feature at www.federalregister.gov. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

List of Subjects in 34 CFR Part 668

    Administrative practice and procedure, Aliens, Colleges and universities, Consumer protection, Grant programs--education, Loan programs--education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

Betsy DeVos,
Secretary of Education.
    For the reasons discussed in the preamble, the Secretary amends title 34 of the Code of Federal Regulations as follows:

PART 668--STUDENT ASSISTANCE GENERAL PROVISIONS

000088

0
1. The authority citation for part 668 continues to read as follows:

    Authority: 20 U.S.C. 1001-1003, 1070a, 1070g, 1085, 1087b,
1087d, 1087e, 1088, 1091, 1092, 1094, 1099c, and 1099c-1, 1221e-3,
and 3474; Pub. L. 111-256, 124 Stat. 2643; unless otherwise noted.

0
 2. Section 668.2 is amended by adding the definition ``Student,'' in
alphabetical order to read as follows:


Sec.  668.2  General definitions.

* * * * *
    Student, for purposes of the phrases ``grants to students'' and
``emergency financial aid grants to students'' in sections 18004(a)(2),
(a)(3), and (c) of the Coronavirus Aid, Relief, and Economic Security
(CARES) Act, is defined as an individual who is, or could be, eligible
under section 484 of the HEA, to participate in programs under title IV
of the HEA.

(Authority: 20 U.S.C. 1221e-3 3474)
* * * * *
[FR Doc. 2020-12965 Filed 6-15-20; 4:15 pm]
BILLING CODE 4000-01-P

Skip to main content | About Us | Contact Us | FAQs | Language Assistance ▾

 **U.S. Department of Education**

| Student Loans | Grants | Laws | Data |

## OPE
Office of Postsecondary Education

- Home
- Programs/Initiatives
- Office Contacts
- Reports & Resources
- News
- Education Planning
- Student Resources
- Policy Initiatives
- Accreditation
- OPE Topics A-Z

# CARES Act: Higher Education Emergency Relief Fund

**NEW ANNOUNCEMENT** **Federal Register Notice Announcing August 1, 2020 Deadline** PDF (252K)

**Update:** On Wednesday June 17, 2020, the Department published its Interim Final Rule (IFR) regarding Eligibility of Students at Institutions of Higher Education for Funds Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act here. The IFR constitutes the Department's binding final rule regarding student eligibility for HEERF assistance, and carries the force of law except as enjoined pursuant to the following district court decisions:

- On Friday June 12, 2020, the United States District Court for the Eastern District of Washington entered an Order preliminarily enjoining the Department of Education "from implementing or enforcing the provisions in the April 21, 2020 guidance and the Interim Final Rule that restricts the discretion of higher education institutions in the State of Washington to determine which students will receive CARES Act student emergency financial assistance grants to only those students who are eligible for federal financial aid under Title IV." *Washington v. DeVos*, No. 2:20-cv-00182-TOR, Order at 36, ECF No. 31.

  In its Order the Court stated that the "preliminary injunction does not lift the restrictions of 8 U.S.C. § 1611(a)." Order at 21, 36.

## How Do I Find...

- Student loans, forgiveness
- College accreditation
- Every Student Succeeds Act (ESSA)
- FERPA
- FAFSA
- 1098, tax forms

More >

## Information About...

- Transforming Teaching
- Family and Community Engagement
- Early Learning

- On Wednesday June 17, 2020, the United States District Court for the Northern District of California entered an Order preliminarily enjoining the Department of Education "with respect to any community college in California [from] imposing or enforcing any eligibility requirement for students to receive HEERF assistance, including those requirements asserted and set forth in" the April 21 guidance documents, the May 21 updated statement, and the Interim Final Rule. *Oakley v. DeVos*, No. 4:20-cv-03215-YGR, Order at 28, ECF No. 44. Those documents had referenced Title IV's eligibility criteria and applicable restrictions under 8 U.S.C. § 1611(a).

The Department will fully comply with the Orders as long as they are in effect with regard to the entities to which they apply but will enforce the IFR and other applicable law to the extent not enjoined. The Department is considering its options in responding to these preliminary injunctions.

## Reporting and Data Collection

- CARES Act Quarterly Reporting Statement for all grantees (reporting requirements met under Federal Funding Accountability and Transparency Act of 2006 (FFATA)) (PDF, July 9, 2020)
- HEERF Public Reporting Requirement (Electronic Announcement, May 6, 2020)

## Supplemental FAQs for the CARES Act Higher Education Emergency Relief Fund

**Supplemental FAQs** PDF (186K)

## New COVID-19 FAQ's for Title III, IV, V, and VII Grantees

**COVID-19 FAQ for Grantees** PDF (250K)

## CARES Act: Higher Education Emergency Relief Fund

Unofficial copy of Interim Final Rule on eligibility PDF (345K)

Updated statement 5/21/2020: The Department has stated on its guidance portal that "guidance documents lack the force and effect of law." See U.S. Department of Education's Guidance Homepage, https://www2.ed.gov/policy/gen/guid/types-of-guidance-documents.html ("Guidance documents represent the ED's current thinking on a topic. They do not create or confer any rights for or on any person and do not impose any requirements beyond those required under applicable law and regulations. Guidance documents lack the force and effect of law."); compare, e.g., OPE Guidance Documents, https://www2.ed.gov/about/offices/list/ope/guidance.html ("Guidance documents lack the force and effect of law."). On February 26, 2020, the Department published a Federal Register notice stating this principle along with an announcement of the existence and location of its guidance portal. Notice of Guidance Portal, 85 Fed. Reg. 11056, https://www.govinfo.gov/content/pkg/FR-2020-02-26/pdf/2020-03811.pdf. The statement applies to all of the Department's guidance except as authorized by law or as incorporated into a contract.

This includes, for example, the statements in response to question 5 of the Higher Education Emergency Relief Fund Institutional Frequently Asked Question document located here and question 9 of the HEERF Student FAQ document located here explaining that only students who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965, as amended, may receive emergency financial aid grants. HEERF Institutional FAQs at 2, HEERF Student FAQs at 4. The Department will not initiate any enforcement action based solely on these statements because they lack the force and effect of law. In contrast, the underlying statutory terms in the CARES Act are legally binding, as are any other applicable statutory terms, such as the restriction in 8 U.S.C. § 1611 on eligibility for Federal public benefits including such grants.

In addition, the Department reiterates its guidance that emergency financial aid grants under Section 18004(c) of the CARES Act may only be given to those who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965, as amended (HEA), but emphasizes that that guidance is specific to the distribution of emergency financial aid grants and does not apply to the use of HEERF institutional allocations to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus. The Department continues to consider the issue of eligibility for HEERF emergency financial aid grants under the CARES Act and intends to take further action shortly.

Please refer to the posted instructions below on navigating the grants.gov website and uploading Certificates of Agreement, and please refer to the Secretary's letter below for guidance regarding distribution and usage of these funds.

| Student Aid | Institutional Portion | Historically Black Colleges and Universities |
| American Indian Tribally Controlled Colleges and Universities | *Minority Serving Institutions |
| *Strengthening Institutions Program | Fund for the Improvement of Postsecondary Education |

*Minority Serving Institutions include institutions that would be eligible to participate in the following programs: Predominantly Black Institutions, Alaska Native and Native Hawaiian-Serving Institutions, Asian American and Native American Pacific Islander-Serving Institutions, Native American-Serving Nontribal Institutions, Developing Hispanic-Serving Institutions Program, and Promoting Postbaccalaureate Opportunities for Hispanic Americans.

*Strengthening Institutions include institutions that are not participating in the other MSI programs but have at least 50 percent of their degree students receiving need-based assistance under Title IV of the Higher Education Act or have a substantial number of enrolled students receiving Pell Grants, and have low educational and general expenditures.

# Higher Education Emergency Relief Fund - Student Aid

## Information for Students

The CARES Act Higher Education Emergency Relief Fund-IHE/Student Aid

provides funding to institutions to provide emergency financial aid grants to students whose lives have been disrupted, many of whom are facing financial challenges and struggling to make ends meet. Students cannot apply for assistance directly from the U.S. Department of Education but should contact their institutions for further information and guidance. Institutions have the responsibility of determining how grants will be distributed to students, how the amount of each student grant is calculated, and the development of any instructions or directions that are provided to students about the grant.

Please note that the Department will soon be announcing a deadline by which institutions of higher education must apply for the Higher Education Emergency Relief (HEER) funding under section 18004a(1) of the CARES Act. A formal notice will be published in the Federal Register in the near future. We will update this website with the appropriate notices and information when they become available.

The funding opportunity number is ED-GRANTS-041020-003. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711.

## Guidance on How to Apply for Funding-HEERF- Student Aid

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (170K)
  - Visual aid: PDF (1.2M)
  - How to upload a Workspace PDF (101K)

## Letter from the Secretary

CARES Act grant funding cover letter: PDF (138K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (828K)

## Formula allocations

Allocations for Section 18004(a)(1) of CARES Act: PDF (1.28M)

Methodology for Calculating Allocations: PDF (138K)

## Frequently Asked Questions

Frequently Asked Questions about the Emergency Financial Aid Grants to Students under Section 18004(a)(1) and 18004(c) of the CARES Act PDF (189K) (and please see the updated statement referencing this document at the top of this page)

Internal Revenue Service FAQs regarding Grants under the CARES Act

## Student Frequently Asked Questions

Frequently Asked Questions about the Emergency Financial Aid Grants to Students PDF (106K)

# Higher Education Emergency Relief Fund-Institutional Portion

You must complete and submit the CARES HEERF Certification and Agreement Student's Portion before submitting the CARES HEERF Certification and Agreement for the Institution's Allocation of HEER Funds.

Please note that the Department will soon be announcing a deadline by which institutions of higher education must apply for the Higher Education Emergency Relief (HEER) funding under section 18004a(1) of the CARES Act. A formal notice will be published in the Federal Register in the near future. We will update this website with the appropriate notices and information when they become available.

The funding opportunity number is ED-GRANTS-042120-004. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711.

## Guidance on How to Apply for Funding-HEERF-IHEs-Institutional Portion

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (158K)
  - Visual aid: PDF (1.2M)
  - How to upload a Workspace PDF (101K)

## Letter from the Secretary

CARES Act grant funding cover letter: PDF (156K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (891K)

## Formula allocations

Allocations for Section 18004(a)(1) of CARES Act: PDF (2.01M)

Methodology for Calculating Allocations: PDF (138K)

## Frequently Asked Questions

Frequently Asked Questions about the Institutional Portion of the HEERF under Section 18004(a)(1) and 18004(c) of the CARES Act PDF (202K) (and please see the updated statement referencing this document at the top of this page)

Internal Revenue Service FAQs regarding Grants under the CARES Act

# Higher Education Emergency Relief Fund (a)(1) Reserve

## A Certificate of Agreement

Institutional Certification and Agreement: PDF (187K)

Student Certification and Agreement: PDF (202K)

## Request for an Allocation

Application for Reserve under Section 18004(a)(1) of CARES Act: PDF (203K)

# Higher Education Emergency Relief Fund-Historically Black Colleges and Universities

The funding opportunity number is ED-GRANTS-043020-001. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711📞⑤.

## Guidance on How to Apply for Funding-HEER - Historically Black Colleges and Universities

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (175K)
  - Visual aid: PDF (1.2M)
  - How to upload a Workspace PDF (101K)

## Letter from the Secretary

CARES Act grant funding cover letter: PDF (147K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (191K)

## Formula allocations

Allocations for Section 18004(a)(2) of CARES Act: EXCEL (304K)

Methodology for Calculating Allocations: PDF (167K)

# Higher Education Emergency Relief Fund-Tribally Control Colleges and Universities

The funding opportunity number is ED-GRANTS-043020-002. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711📞⑤.

## Guidance on How to Apply for Funding-HEERF-Tribally Control Colleges and Universities

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (175K)
  - Visual aid: PDF (1.2M)
  - How to upload a Workspace PDF (101K)

## Letter from the Secretary

CARES Act grant funding cover letter: PDF (147K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (191K)

## Formula allocations

Allocations for Section 18004(a)(2) of CARES Act: EXCEL (304K)

Methodology for Calculating Allocations: PDF (167K)

# Higher Education Emergency Relief Fund-Minority Serving Institutions

The funding opportunity number is ED-GRANTS-043020-003. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711.

## Guidance on How to Apply for Funding-HEERF-Minority Serving Institutions

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (174K)
  - Visual aid: PDF (1.2M)
  - How to upload a Workspace PDF (101K)

## Letter from the Secretary

CARES Act grant funding cover letter: PDF (147K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (191K)

## Formula allocations

Allocations for Section 18004(a)(2) of CARES Act: EXCEL (304K)

Methodology for Calculating Allocations: PDF (167K)

# Higher Education Emergency Relief Fund-Strengthening Institutions Program

The funding opportunity number is ED-GRANTS-043020-004. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711.

## Guidance on How to Apply for Funding-HEERF-Strengthening Institutions Program

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (174K)

- Visual aid: PDF (1.2M)
- How to upload a Workspace PDF (101K)

## Letter from the Secretary

CARES Act grant funding cover letter: PDF (147K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (191K)

## Formula allocations

Allocations for Section 18004(a)(2) of CARES Act: EXCEL (304K)

Methodology for Calculating Allocations: PDF (167K)

# Higher Education Emergency Relief Fund-FIPSE

The funding opportunity number is ED-GRANTS-043020-005. If you have questions concerning this program, please submit them via e-mail to HEERF@ed.gov., or by phone, at 202-377-3711.

## Guidance on How to Apply for Funding-HEERF-FIPSE

- Grants.gov Submission Procedures and Tips for Applicants: PDF (169K)
- A Guide for how to apply for funding in GRANTS.gov: PDF (174K)
  - Visual aid: PDF (1.2M)
  - How to upload a Workspace PDF (101K)

## A Certificate of Agreement

CARES HEERF Certification and Agreement: PDF (192K)

## Formula allocations

Allocations for Section 18004(a)(3) of CARES Act: EXCEL (106K)

Methodology for Calculating Allocations: PDF (114K)

## Budget and Expenditure Reporting

Budget and Expenditure Reporting under Section 18004(a)(3) of the CARES Act: PDF (204K)

---

Last Modified: 07/23/2020

---

Student Loans

Repaying Loans

Laws & Guidance

Every Student Succeeds Act (ESSA)

About Us

Contact Us

Defaulted Loans

Loan Forgiveness

Loan Servicers

### Grants & Programs

Apply for Pell Grants

Grants Forecast

Apply for a Grant

Eligibility for Grants

FERPA

Civil Rights

New IDEA Website

### Data & Research

Education Statistics

Postsecondary Education Data

ED Data Express

Nation's Report Card

What Works Clearinghouse

ED Offices

Jobs

Press Releases

FAQs

Recursos en español

Budget, Performance

Privacy Program

Subscribe to E-Mail Updates

  

Notices    FOIA    Privacy Policy    Accessibility    Security    Information quality    Inspector General    Whitehouse.gov    USA.gov
Benefits.gov    Regulations.gov



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

April 9, 2020

Dear College and University Presidents:

These are unprecedented and challenging times for your students and for you. I know you find yourselves grappling with issues you never imagined, and I want to assure you we are here to support you in your missions and to quickly provide the resources and flexibilities you need to continue educating your students. That's why we're focused on implementing the Coronavirus Aid, Relief, and Economic Security (CARES) Act quickly and faithfully.

I gave my team a charge as soon as the CARES Act was signed into law: get support to those most in need as quickly as possible. That starts with college students whose lives have been disrupted, many of whom are facing financial challenges and struggling to make ends meet.

As you know, the CARES Act provides several different methods for distributing roughly $14 billion in funds to institutions of higher education. The most significant portion of that funding allocation provides that $12.56 billion will be distributed to institutions using a formula based on student enrollment. Of the amount allocated to each institution under this formula, at least 50 percent must be reserved to provide students with emergency financial aid grants to help cover expenses related to the disruption of campus operations due to coronavirus. We are prioritizing this funding stream in order to get money in the hands of students in need as quickly as possible.

The CARES Act provides institutions with significant discretion on how to award this emergency assistance to students. This means that each institution may develop its own system and process for determining how to allocate these funds, which may include distributing the funds to all students or only to students who demonstrate significant need. The only statutory requirement is that the funds be used to cover expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care). With that said, I would like to encourage the leadership of each institution to prioritize your students with the greatest need, but at the same time consider establishing a maximum funding threshold for each student to ensure that these funds are distributed as widely as possible. As a point of reference, you might consider using the maximum Federal Pell grant (for the 2019-2020 academic year, $6,195) as that threshold. In addition, if you determine that your institution's students do not have significant financial need at this time, I would ask that you consider giving your allocation to those institutions within your state or region that might have significant need.

In order to access these funds, all institutions must sign and return the Certificate of Funding and Agreement via: grants.gov (https://www.grants.gov/web/grants/applicants/registration.html), acknowledging the terms and conditions of the funding. After the Department has received the

certificate, institutions may draw down their emergency assistance funds using the Department's G5 system.

The Department is also working expeditiously to allocate the remaining funding that is reserved for institutional use, and we will provide details on how institutions may apply for this institutional funding, as well as for other emergency funding, in the coming days. Thank you for your continued work on behalf of America's students.

Sincerely,

Betsy DeVos

**Methodology for Calculating Allocations per Section 18004(a)(1) of the CARES Act**

Of the funds available for the Higher Education Emergency Relief Fund, 90% ($12,557,254,500.00) of the funds will be awarded to IHEs based on two formula factors: (1) 75% of the funds will be awarded to IHEs based on each IHE's share of full-time equivalent (FTE) enrollment of Pell Grant recipients who were not enrolled exclusively in distance education prior to the coronavirus emergency, relative to the total FTE enrollment of such individuals in all IHEs; and (2) 25% of the funds will be awarded to IHEs based on each IHE's share of FTE enrollment of students who were not Pell Grant recipients and who were not enrolled exclusively in distance education prior to the coronavirus emergency, relative to the total FTE enrollment of such individuals in all IHEs.  The first factor primarily allocates funds based on undergraduate enrollment since Pell Grant eligibility is limited to undergraduates and students in postbaccalaureate teacher education programs.  The second factor allocates funds based on undergraduate and graduate enrollment.

Because limitations of available data preclude calculating precise amounts for the factors, the U.S. Department of Education (the Department) approximated the factors using the best available data from ED's Integrated Postsecondary Education Data System (IPEDS) and Pell Grant Volume data provided by the Office of Federal Student Aid (FSA).

The first factor was approximated as follows.  The number of undergraduate students awarded Pell grants as reported in IPEDS was adjusted based on the institution's share of total Pell recipients as reported by FSA for the 2018/19 award year.  The FTE enrollment of these Pell recipients was approximated by looking at the ratio in IPEDS between 2017/18 FTE undergraduate enrollment and 2017/18 undergraduate headcount enrollment.  In order to approximate FTE enrollment of Pell Grant recipients who were not enrolled exclusively in distance education, the estimated FTE enrollment of Pell Grant recipients was multiplied by the percentage of fall 2018 undergraduate degree/certificate-seeking students not enrolled exclusively in distance education as reported in IPEDS.

The second factor was estimated by subtracting the approximated FTE enrollment of Pell Grant recipients (if any) from the total 2017/18 FTE enrollment of students as reported in IPEDS and then multiplying the difference by the percentage of fall 2018 undergraduate, graduate, and professional students not enrolled exclusively in distance education as reported in IPEDS.

The Department acknowledges the limitations of this data, and therefore has reserved $50 million to be provided in a subsequent award.

Some additional points to note:

- The data used to determine distance education participation are based on a fall unduplicated enrollment which is different from FTE enrollment and, in the case of the total FTE enrollment, also different from FTE enrollment for a 12-month period. The unduplicated enrollment is a simple headcount of students enrolled in classes; whereas the FTE enrollment counts part-time students in accordance with their enrollment rate.
- Allocation amounts were calculated at the 6-digit OPEID.
- Some OPEID information was adjusted based on information provided by FSA regarding change of ownership or affiliation.
- For some IHEs, the approximated FTE enrollment of Pell Grant recipients exceeded the total FTE enrollment.  For these IHEs, the total non-Pell FTE enrollment was set to $0, making the IHE ineligible for the second factor.

- The ratio of FTE undergraduate enrollment to undergraduate headcount enrollment was capped at 100 percent.
- Schools that are currently ineligible or were not participating in Title IV per the IPEDS data are excluded.
- There may be some currently participating and eligible schools which may be excluded from this formula.  For this reason, a reserve of $50 million has been set aside in part to address such institutions.

**Recipient's Funding Certification and Agreement**
**Emergency Financial Aid Grants to Students under the Coronavirus Aid, Relief, and Economic Security (CARES) Act**

Section 18004(a)(1) of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), authorizes the Secretary of Education ("Secretary") to allocate formula grant funds in the amount of $_____ to _____("Recipient").

Section 18004(c) of the CARES Act requires Recipient to use no less than fifty percent of the funds received to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance such as food, housing, course materials, technology, health care, and child care). This Certification and Agreement solely concerns the emergency financial aid grants to students under Section 18004(c) of the CARES Act.

To address the pressing financial need of students due to the disruption of campus operations from coronavirus, and pursuant to the authority duly delegated to the Secretary under the CARES Act and associated with the coronavirus emergency, as stated in Proclamation 9994 of March 13, 2020, "Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," *Federal Register* Vol. 85, No. 53 at 15337-38, the Secretary and Recipient agree as follows:

1.	The Secretary will provide Recipient fifty (50) percent of its formula grant funds (the "advanced funds") for the sole and exclusive purpose of providing emergency financial aid grants to students for their expenses related to the disruption of campus operations due to coronavirus, such as food, housing, course materials, technology, health care, and child-care expenses.

2.	Recipient agrees to promptly make available emergency financial aid grants from the advanced funds directly to students for their expenses related to the disruption of campus operations due to coronavirus, such as food, housing, course materials, technology, health care, and child-care expenses. Recipient shall not use the advanced funds to reimburse itself for any costs or expenses, including but not limited to any costs associated with significant changes to the delivery of instruction due to the coronavirus and/or any refunds or other benefits that Recipient previously issued to students.

3.	Recipient retains discretion to determine the amount of each individual emergency financial aid grant consistent with all applicable laws including non-discrimination laws. Recipient acknowledges that the Secretary recommends the maximum Federal Pell Grant for the applicable award year as an appropriate maximum amount for a student's emergency financial aid grant in most cases, and the Recipient should be mindful of each student's particular socioeconomic circumstances in the staging and administration of these grants. The Secretary strongly encourages Recipient's financial aid administrator to exercise the use of professional judgment available under Section 479A of the Higher Education Act of 1965 (HEA), 20 U.S.C § 1087tt, to make adjustments on a case-by-case basis to exclude individual emergency financial aid grants from the calculation of a student's expected family contribution. The Secretary does not consider these individual emergency financial aid grants to constitute Federal financial aid under Title IV of the HEA.

1

4.      In consideration for the advanced funds and as conditions for their receipt, Recipient warrants, acknowledges, and agrees that:

(a) The advanced funds shall not be used for any purpose other than the direct payment of grants to students for their expenses related to the disruption of campus operations due to coronavirus, such as food, housing, course materials, technology, health care, and child-care;

(b) Recipient holds those funds in trust for students and acts in the nature of a fiduciary with respect thereto;

(c) Recipient shall promptly comply with Section 18004(e) of the CARES Act and (i) report to the Secretary thirty (30) days from the date of this Certification and Agreement and every forty-five (45) days thereafter in accordance with 2 CFR 200.333 through 2 CFR 200.337, or in such other additional form as the Secretary may specify, how grants were distributed to students, the amount of each grant awarded to each student, how the amount of each grant was calculated, and any instructions or directions given to students about the grants; and (ii) document that Recipient has continued to pay all of its employees and contractors during the period of any disruptions or closures to the greatest extent practicable, explaining in detail all specific actions and decisions related thereto, in compliance with Section 18006 of the CARES Act;

(d) Recipient shall comply with all requirements in Attachment A to this Certification and Agreement;

(e) Recipient shall promptly and to the greatest extent practicable distribute all the advanced funds in the form of emergency financial aid grants to students by one year from the date of this Certification and Agreement, and document its efforts to do so as part of the report specified in subsection (c) above;

(f) Recipient shall cooperate with any examination of records with respect to the advanced funds by making records and authorized individuals available when requested, whether by (i) the U.S. Department of Education and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority; and

(g) failure to comply with this Certification and Agreement, its terms and conditions, and/or all relevant provisions and requirements of the CARES Act or any other applicable law may result in Recipient's liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; 18 USC § 1001, as appropriate; and all of the laws and regulations referenced in Attachment A, which is incorporated by reference hereto.

RECIPIENT or Authorized Representative of Recipient        _____

OPEID Number                                             _____

DATE                                                     _____

2

**Attachment A to Recipient's CARES Funding Certification and Agreement**

*The Recipient assures and certifies the following:*

- Recipient will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; nondiscrimination; Hatch Act provisions; labor standards; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

- With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; Recipient will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and Recipient will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

- Recipient will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 75, 77, 79, 81, 82, 84, 86, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

**Paperwork Burden Statement**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1801-0005. The time required to complete this information collection is estimated to be 2,853 total burden hours. If you have any comments concerning the accuracy of the time estimate or suggestions for improving this form, please write to: Hilary Malawer, 400 Maryland Avenue, SW. Washington, D.C. 20202.

*Higher Education Emergency Relief Fund*

**Frequently Asked Questions about the Emergency Financial Aid Grants to Students under Section 18004 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act**

The CARES Act, which establishes and funds the Higher Education Emergency Relief Fund (HEERF), directs institutions of higher education ("institutions") to use no less than 50 percent of funds received under Sections 18004(a)(1) and 18004(c) of the CARES Act to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus.  These FAQs address only those funds provided by the Secretary to an institution for emergency financial aid grants to students under Sections 18004(a)(1) and 18004(c) of the CARES Act.

1) **Can institutions that have provided refunds to students for room and board, tuition, and other fees (such as activities fees) reimburse themselves from the funds for the emergency financial aid grants to students?**

No. The CARES Act requires institutions to use no less than 50 percent of HEERF funds received under Sections 18004(a)(1) and 18004(c) of the CARES Act to provide emergency financial aid grants to students.  These funds distributed by the Department represent the 50 percent minimum of each institution's HEERF funds under Section 18004(a)(1) of the CARES Act for these emergency financial aid grants to students. Section 2 of the Funding Certification and Agreement for the Emergency Financial Aid Grants to Students states: "Recipient shall not use [these] funds to reimburse itself for any costs or expenses, including but not limited to any costs associated with significant changes to the delivery of instruction due to the coronavirus and/or any refunds or other benefits that Recipient previously issued to students."

Institutions will have more flexibility in the use of the portion of the HEERF that is made available to cover an institution's costs associated with significant changes to the delivery of instruction due to the coronavirus. The Department will provide a Frequently Asked Questions (FAQ) document regarding the allowable uses of funds for an institution's costs shortly after making those funds available to institutions.

2) **Can institutions that have provided information technology hardware (such as laptops, hotspot internet devices, etc.) and other related equipment to students reimburse themselves from the funds for the emergency financial aid grants to students?**

No. The CARES Act requires institutions to provide the emergency financial aid grants to students. Section 2 of the Funding Certification and Agreement for the Emergency Financial Aid Grants to Students states: "Recipient shall not use [these] funds to reimburse itself for any costs or expenses, including but not limited to any costs associated with significant changes to the delivery of instruction due to the coronavirus and/or any refunds or other benefits that Recipient previously issued to students."

1

Institutions will have more flexibility in the use of the portion of the HEERF that is made available to cover an institution's costs associated with significant changes to the delivery of instruction due to the coronavirus. The Department will provide a FAQ document regarding the allowable uses of funds for an institution's costs shortly after making those funds available to institutions.

**3)** **Can institutions that have provided institutionally-funded emergency grants to students as a result of COVID-19 reimburse themselves from the funds for the emergency financial aid grants to students?**

The only institutionally-funded emergency grants to students that are eligible for reimbursement from the funds for emergency financial aid grants to students under the CARES Act are grants: 1) for authorized expenses related to the disruption of campus operations due to coronavirus as set forth in Section 18004(c) of the CARES Act; 2) made to students eligible to receive emergency financial aid grants under the CARES Act; and 3) made on or after March 27, 2020, the date the CARES Act was enacted. An institution must use no less than 50 percent of funds provided pursuant to Sections 18004(a)(1) and 18004(c) for emergency financial aid grants to students. An institution must document that reimbursements for institutionally-funded emergency grants to students are made in accordance with the CARES Act.

**4)** **Can institutions that have continued to pay student workers from institutional funds for campus jobs reimburse themselves from the funds for the emergency financial aid grants to students?**

No. The CARES Act requires institutions to provide the emergency financial aid grants <u>to</u> students, and institutions may not use that portion of the HEERF set aside for emergency financial aid grants to students for this purpose. The Department notes that Congress has provided additional flexibility to institutions relating to the Federal Work-Study (FWS) Program, including that institutions may continue to pay FWS wages to students for the remainder of the current academic year in instances in which those students' jobs were interrupted as a result of the national emergency due to the coronavirus, as long as those students had started employment prior to this national emergency. The CARES Act also waives the non-federal wage match requirement for institutional and non-profit employers of FWS students. Please see the Department's <u>Guidance for Interruptions of Study Related to Coronavirus</u>, which provides additional information about the FWS Program.

The Department will provide a FAQ document regarding the allowable uses of funds for an institution's costs associated with significant changes to the delivery of instruction due to the coronavirus shortly after making those funds available to institutions.

**5)** **Can institutions use the funds for the emergency financial aid grants to students to pay outstanding or overdue student bills to institutions?**

No. The CARES Act requires institutions to provide the emergency financial aid grants <u>to</u> students. The institution may not use that portion of the HEERF set aside for emergency financial aid grants to students to satisfy a student's outstanding account balance. The Department notes that the student may use his or her emergency financial aid grant for expenses related to the disruption of campus operations due to coronavirus.

**6)** **What data will the Department require institutions to report after disbursement of emergency financial aid grants to students?**

As explained in the Funding Certification and Agreement for the Emergency Financial Aid Grants to Students, each institution will report to the Secretary the following: how grants were distributed to students, how the amount of each grant was calculated, and any instructions or directions that the institution gave to students about the grant. Institutions must also comply with the reporting requirements under Section 15011 of the CARES Act. The Department will publish a notice in the Federal Register to provide instructions to institutions on these reporting requirements.

**7)** **What obligation does an institution have to continue to pay all its employees after accepting the funds for the emergency financial aid grants to students?**

The CARES Act requires each institution that accepts funds from the HEERF, including funds used to pay emergency financial aid grants, to continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of each institution; however, institutions may not use emergency financial aid grants to students to pay employees and contractors.

**8)** **Are incarcerated students participating in the Second Chance Pell Experimental Site Initiative (ESI) eligible for emergency financial aid grants to students?**

The CARES Act expressly requires that institutions provide the emergency financial aid grants to students "for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and childcare)." If an incarcerated individual who is participating in the Second Chance Pell experiment is released from incarceration as a result of the national emergency due to the coronavirus, remains enrolled as a student in the program under the Second Chance Pell experiment, and has such expenses, he or she likely qualifies for an emergency financial aid grant. A person who remains incarcerated is unlikely to incur these expenses and would thus be ineligible. Accordingly, for students participating in the Second Chance Pell ESI, institutions will need to review on a case-by-case basis what, if any, expenses an incarcerated person, or a formerly incarcerated person released due to the coronavirus, has incurred due to the disruption of campus operations.

3

9) **What students are eligible to receive emergency financial aid grants from the HEERF?**

Only students who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965, as amended (HEA), may receive emergency financial aid grants. If a student has filed a Free Application for Federal Student Aid (FAFSA), then the student has demonstrated eligibility to participate in programs under Section 484 the HEA. Students who have not filed a FAFSA but who are eligible to file a FAFSA also may receive emergency financial aid grants. The criteria to participate in programs under Section 484 of the HEA include but are not limited to the following: U.S. citizenship or eligible noncitizen; a valid Social Security number; registration with Selective Service (if the student is male); and a high school diploma, GED, or completion of high school in an approved homeschool setting.

10) **Will funds provided through the *CARES Act* be included in an institution's 90/10 calculation?**

Funds paid directly to institutions by the Department through the HEERF will not be included as revenue for 90/10 purposes.

11) **How must institutions pay the emergency financial aid grants to students?**

Institutions may provide emergency financial aid grants to students using checks, electronic transfer payments, debit cards, and payment apps that adhere to the Department's requirements for paying credit balances to students. The disbursement of the emergency financial aid grant to the student must remain unencumbered by the institution; debts, charges, fees, or other amounts owed to the institution may not be deducted from the emergency financial aid grant.  The emergency financial aid grant may not be made to students through the use of a credit card that can be used only on campus or in a retail outlet affiliated with the institution.

12) **At institutions that provide both online and ground-based education, are students who were enrolled exclusively in online programs prior to the national emergency due to the coronavirus eligible to receive emergency financial aid grants?**

At institutions that provide both online and ground-based education, those students who were enrolled exclusively in an online program on March 13, 2020, the date of the President's Proclamation, "Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," *Federal Register* Vol. 85, No. 53 at 15337-38, are not eligible for emergency financial aid grants. The formula provided by Congress for calculating the distribution of funds to institutions excludes students who were exclusively enrolled in distance education courses. Additionally, the emergency financial

4

aid grants to students are for expenses related to the disruption of campus operations due to coronavirus, and students who were enrolled exclusively in online programs would not have expenses related to the disruption of campus operations due to coronavirus.

**13)  Where can institutions locate additional resources and information related to emergency financial aid grants to students?**

CARES Act grant resources and guidance are located on the Office of Postsecondary Education's webpage: https://www2.ed.gov/about/offices/list/ope/caresact.html.

Posted Date:  April 03, 2020

Author:  Office of Postsecondary Education

Subject:  UPDATED Guidance for interruptions of study related to Coronavirus (COVID-19)

The Department appreciates that postsecondary institutions and their students face unique and urgent circumstances as a result of the novel coronavirus disease (COVID-19) pandemic.  This guidance provides updated information that expands upon the Department's March 5, 2020, guidance and provides additional regulatory flexibilities due to the lawful declaration of the COVID-19 national emergency.

On March 13, 2020, the President of the United States declared that a national emergency concerning the COVID-19 outbreak began on March 1, 2020, as stated in "Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," Proclamation 9994 of March 13, 2020, *Federal Register* Vol. 85, No. 53 at 15337-38.  The Department considers this declaration to be equivalent to a federally declared major disaster, as defined in The Robert T. Stafford Disaster Relief and Emergency Assistance Act in 42 U.S.C. § 5122(2) (Stafford Act) and provides the following information about additional emergency flexibilities and regulatory relief for institutions of higher education and their students.

In addition, on March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, which provides flexibilities beyond those captured in this document.  The Department is reviewing the Act and intends to provide additional guidance on the Department's COVID-19 webpage in the near future.

Finally, as with the March 5, 2020, guidance, this guidance document is a general statement of policy under the Administrative Procedure Act issued to advise the public prospectively of the manner in which the Department proposes to exercise its discretionary power and enforcement discretion as a result of, and in response to, the duly declared COVID-19 pandemic national emergency.  The Department does not intend for this policy statement to create a legally binding standard affirmatively determining any member of the public's legal rights and obligations *for which noncompliance may form an independent basis for action*.  As required by the Administrative Procedure Act, the Department will afford members of the public a fair opportunity to argue for lawful approaches other than those put forward in this guidance, to argue for a modification or rescission of its terms, or both.  To suggest another lawful approach or to argue for a modification or rescission of any of the flexibilities or provisions hereof, please email the Department's Regulatory Reform Officer at COVID-19@ed.gov and reference in the subject line "Attn: Regulatory Reform Officer."

We recommend that institutions document in their records, as contemporaneously as possible, any actions taken as a result of COVID-19, including those actions described in this document.

## Effective Period of Guidance

Although our March 5, 2020, guidance applied to students who had already begun their current term, more recent guidance from President Trump and the Centers for Disease Control and Prevention (CDC) suggests that social distancing may be required for a longer period.  We thus extend those flexibilities to any payment period or term beginning between March 5, 2020, and June 1, 2020, inclusive.

*Unless otherwise specifically stated in this guidance document,* the emergency flexibilities set forth below remain effective until and through June 30, 2020, unless the payment period crossover extends over award years and is attached to the 2019-2020 award year.  In that case the effective date is through the end of the crossover payment period.

The Department will extend the effective period of its guidance if circumstances warrant an extension and will inform the public of such an extension at the appropriate time.  As we continue to monitor the COVID-19 emergency and CDC guidance, the Department will adjust dates as necessary.

## Accommodating Students Whose Enrollment is Disrupted by COVID-19

In our March 5, 2020 guidance, we explained that our goal is to work with institutions seeking to accommodate students and continue their education despite interruptions caused by COVID-19. This remains unchanged, as we believe institutions know best how to protect their students, faculty, and staff.

### Academic Calendars - Standard vs. Non-standard Terms
We understand that some students may have been recalled from travel abroad programs or experiential learning opportunities after the semester began.  Therefore, institutions may offer courses to those students on a schedule that would otherwise cause the program to be considered a non-standard term or a nonterm program, if doing so enables those students to complete the term. If an institution utilizes this flexibility, it can continue to disburse aid based on its original academic calendar. These flexibilities will also be provided to institutions or their additional locations or programs that must temporarily cease academic instruction or extend scheduled breaks as a result of COVID-19.

### Approved Leaves of Absence
For students who wish to take an approved leave of absence due to COVID-19-related concerns or limitations (such as interruption of a travel-abroad program), the Department will permit them to take such leave for the purposes of Title IV fund eligibility, even if the student notifies the institution of his or her request after the date that the leave of absence has begun.  In such a case, the institution may retain the Title IV funds for that student to apply when the student resumes enrollment.

Normally, institutions are not permitted to put students on a leave of absence during the suspension of coursework, including clinicals or internships/externships; however, if the coursework suspension results from of COVID-19, in this limited circumstance the Department

will permit the institution to put the student on an approved leave of absence until the institution can resume coursework or can find another placement for the student.

### Enrollment Status Changes

We do not have the statutory authority to waive the requirement that institutions award or disburse Title IV funds based on a student's actual enrollment status.  For example, assuming an institution defines full-time enrollment as 12 credit hours, when a full-time student enrolled for 12 credit hours drops or withdraws from three credits, that student is now enrolled at three-quarter time status; however, for Direct Loans, the institution must only confirm at least half-time enrollment status as of the time of disbursement.  It is not necessary to recalculate a student's Direct Loan eligibility based on changes in enrollment status that occur after the institution originates a Direct Loan.  For enrollment status changes that occur after an institution's established Pell Grant recalculation (census) date, we do not require recalculation. The student must have begun attendance in all courses comprising the enrollment status on which the Pell Grant payment was based.

## Distance Education

### Approval to Offer Distance Education

Because of the COVID-19 national emergency, and as an emergency measure to accommodate students, the Department provides broad approval to institutions to use distance learning modalities without going through the standard Department approval process, even if the institution would normally be required to seek Departmental approval for the use or expansion of distance learning programs.  At this time, this flexibility applies only to payment periods that overlap with the Department's March 5, 2020, guidance or that begin on or between March 5 and June 1, 2020.  If an institution chooses to continue offering a new program or using distance education in a manner requiring the Department's approval after that point, it may be required to obtain approval under the Department's and its accrediting agency's applicable policies and procedures.

We also continue to permit accrediting agencies to waive their distance education review requirements; however, we encourage accreditors promptly to develop new policies and procedures for providing rapid approval of distance education programs for institutions working to accommodate students whose enrollment is otherwise interrupted as a result of COVID-19. Accrediting agencies should document the process by which their decision-making body decided to waive or provide expedited review of distance education programs.  This flexibility is not available for clock-hour courses that lead to licensure if the licensing body will not accept distance learning courses or hours or give credit for them toward the number of hours a student must complete.

For the purpose of Title IV of the Higher Education Act of 1965, as amended (HEA), distance learning does not require the use of sophisticated learning management systems or online platforms, although accreditors may have additional standards included in their review of distance learning programs; however, accreditors may waive those standards for schools implementing distance learning programs solely for the purpose of allowing currently enrolled students to complete a term interrupted by COVID-19 closures.  To meet the Department's

requirements for providing distance education, an institution must communicate to students through one of several types of technology – including email or by telephone – described under 34 CFR § 600.2, and instructors must initiate substantive communication with students, either individually or collectively, on a regular basis.  In other words, an instructor may use email to provide instructional materials to students enrolled in the instructor's class, use chat features to communicate with students, set up conference calls to facilitate group conversations, engage in email exchanges, or require students to submit work electronically that the instructor will evaluate.

The Department asks institutions to review the "FERPA and Virtual Learning Related Resources" resource list, the March 30, 2020 webinar, and related materials from the Department's Student Privacy Policy Office (SPPO).  As educators and students move to virtual learning due to the need for social distancing during the COVID-19 pandemic, SPPO has identified resources that discuss virtual learning, and the Family Educational Rights and Privacy Act (FERPA).  These resources include toolkits, letters, and Q&As on information security best practices, the use of the school official exception under FERPA, classroom observations, and the use of emails, videos, and other virtual learning tools. SPPO has also issued a FERPA and COVID-19 FAQ on the health or safety emergency exception under FERPA at https://studentprivacy.ed.gov/resources/ferpa-and-coronavirus-disease-2019-covid-19.  For additional resources on FERPA, please read SPPO's website at https://studentprivacy.ed.gov.

Institutions may provide distance learning temporarily to accommodate students as a result of a COVID-19 interruption, including in cases where students began attendance in classes offered in a brick-and-mortar setting but were transitioned to a distance education format in the middle of the term.  This includes students who are enrolled at a U.S institution but are participating in a study abroad experience in a foreign country.  In such a case, the student may participate in distance education provided by either their home institution or their foreign host institution.  In these cases, to enable students to complete the current term, we will treat institutions that were properly accredited and authorized by states as being approved by these agencies to offer distance education and will accept the accreditation and state authorization of the institution for the programs in which those students were enrolled prior to the interruption due to COVID-19.

Institutions may also enter into consortium agreements with other Title IV institutions so that students can complete courses at other institutions but allow their home institution to award credit.  Where accrediting agencies require students to complete a final number or percentage of credits in residence at the institution, accrediting agencies may also waive that requirement for students impacted by COVID-19 without objection from the Department.

The Department urges institutions to study the Department's March 17, 2020, guidance to accrediting agencies, which permits accreditors to engage in virtual site visits of institutions or programs currently under review, scheduled for renewal of recognition, or in a show-cause or probationary status.  This guidance also permits accrediting agencies to extend accreditation terms or provide additional good cause extensions, including if the institution or program has otherwise exhausted all regularly-provided good cause extensions, to enable institutions and programs to continue serving students during COVID-19 related interruptions of regular campus operations.

### Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act

Post-secondary institutions working to move programs to a distance learning format in order to continue serving students during a COVID-19 interruption may have concerns about their ability to ensure that instructions and materials meet the requirements of Section 504 of the Rehabilitation Act of 1973 (Section 504), and, for public institutions, Title II of the Americans with Disabilities Act.  The Department recognizes that in this unique and ever-changing environment, these exceptional circumstances may affect how education, including needed accommodations for students with disabilities, is provided.  Institutions should not decline to provide distance instruction, at the expense of most students, to address matters pertaining to accommodations for students with disabilities.  Rather, institutions must make decisions that take into consideration the health, safety, and well-being of all their students and staff.  Additionally, the Department understands that, during this national emergency, postsecondary institutions may not be able to provide services in the same manner as they typically would for the rest of the academic year.

Postsecondary students with disabilities must receive academic adjustments, auxiliary aids and services, and reasonable modifications to policies, practices, and procedures, where doing so would not impose an undue burden nor cause a fundamental alteration.  Some academic adjustments, auxiliary aids and services, and reasonable modifications in the postsecondary context, can be provided online, while some cannot.  Whether an institution serves students in a brick-and-mortar or an online environment, the institution must ensure that students with disabilities have an equal opportunity to access educational programs, consistent with protecting the health and safety of the student and those providing that education to the student.

Where possible, instructors should work to accommodate students with disabilities, such as by using audio technology to read documents to students who are visually impaired.  It may be appropriate to make other academic adjustments and reasonable accommodations through virtual means, such as online or telephonically.

Postsecondary students with disabilities typically work with their disability services' coordinators through an interactive process to determine appropriate academic adjustments, auxiliary aids and services, and modifications.

With respect to issues concerning website accessibility and online education, the Department urges institutions to consult its Office for Civil Rights (OCR) webinar available here or as a link on the Department's coronavirus webpage, https://www.ed.gov/coronavirus.  If you have questions for OCR or want to request additional information or technical assistance, you may contact OCR's Outreach, Prevention, Education and Non-discrimination (OPEN) Center at OPEN@ed.gov.

### Foreign Schools

Pursuant to section 3510 of the CARES Act, the Secretary permits any part of an otherwise eligible program at a foreign institution to be offered via distance education, if the applicable

government authorities in the country in which the foreign institution is located have declared a public health emergency, major disaster or emergency, or national emergency related to COVID-19.  Retroactive to March 1, 2020, institutions may use this flexibility for the duration of such emergency or disaster and the following payment period for purposes of title IV of the HEA.  The term "foreign schools" are those institutions located outside of the United States that participate in the Title IV Direct Loan program and award their credentials to U.S. students.  This term excludes study-abroad programs in which a foreign institution provides instruction to a student who remains a degree-seeking student from the student's domestic U.S. institution.  Students in this category have always been permitted to engage in distance learning.

The Secretary also permits foreign institutions to enter into written arrangements with institutions located in the United States that participate in the Federal Direct Loan Program for the purpose of allowing a student of the foreign institution who is a Federal Direct Loan borrower to take courses from the American institution.  For the purpose of this provision, foreign public or nonprofit institutions may only enter into written arrangements with public or nonprofit institutions in the United States.  Foreign medical, nursing, and veterinary institutions that are for-profit may enter into written arrangements with U.S. public, nonprofit, or for-profit institutions.

At a later date, the Department will provide guidance to institutions on how to comply with the reporting requirements under the CARES Act applicable to institutions under section 3510.

## Return of Title IV Funds (R2T4) and Reporting Requirements (34 C.F.R. § 668.22)

### *Institutional Charges, Refunds, and R2T4 Calculations*
The CARES Act makes significant changes to the requirements and flexibilities surrounding R2T4.  The Department is currently reviewing the implications of the Act and will provide appropriate guidance as soon as possible.

## General Provisions (all Title IV Programs)

### *Academic Year (§ 668.3)*
The Department is authorized to approve a reduced academic year if an institution offering credit-hour programs is unable to offer at least 30 weeks of instruction during its academic year.  If an institution determines it will temporarily cease providing instruction, extend a break, or otherwise reduce the length of its term in a manner that results in fewer than 30 weeks of instruction in the academic year as the result of COVID-19 disruptions, it should send an email to CaseTeams@ed.gov to request a temporary reduction in the length of its academic year.  The request must:

- Identify each educational program or programs for which the institution requests a reduction and the requested number of weeks of instructional time for those programs (institutions are permitted to request the waiver for all programs); and

- Demonstrate good cause for the requested reductions (which would include disruptions related to COVID-19).

Institutions should include in the subject line of the email the institution's name, OPEID, and the state where the main campus is located.  The request will be reviewed and forwarded to the appropriate School Participation Division, which will communicate its final determination to the institution.

### Agreements to Permit Study at Another Institution (§ 668.5)
If an institution is unable to continue to provide a student's eligible program because of COVID-19, it may enter into a written agreement with another institution (such as one that has a larger number of courses or programs available through distance learning than the home school can provide) to enable the student to continue his or her academic program while receiving Title IV assistance.

### Compliance audits and audited financial statements (§ 668.23)
The Office of Management and Budget (OMB) has extended its due date for submission of the single audit to the Federal Audit Clearinghouse.  The Department will provide additional guidance on this extension.

### Institutional Participation (§ 668.26(a)(1))
The temporary cessation of educational instruction due to the urgent circumstances created by the COVID-19 pandemic will not result in a loss of institutional eligibility or participation.

### Campus Security Reporting and Equity in Athletics Disclosures (§ 668.41)
The Department will provide appropriate guidance as it continues to monitor the COVID-19 national emergency.

### Notifications Regarding an Immediate Threat to Health or Safety (§ 668.46)
The Clery Act and its implementing regulations require institutions to notify the campus community upon the confirmation of a significant emergency or dangerous situation involving an immediate threat to the health or safety of students or staff occurring on campus.  The Department does not interpret the statutory language as requiring institutions to give regular, on-going updates on COVID-19 or to proactively identify positive COVID-19 cases within the campus community.  The Department also does not interpret the statutory language to apply to positive COVID-19 cases among individuals who are not attending classes, working, or residing on campus or to require notifications to such individuals.

An institution may satisfy the emergency notification requirements of the Clery Act and § 668.46 as follows: (1) provide students and employees a single notification through the regular means of communicating emergency notifications informing them about COVID-19 and necessary health and safety precautions, as well as encouraging them to obtain information from health care providers, state health authorities, and the CDC's COVID-19 website; or (2) create a banner at the top of the institution's homepage containing that same information, including a statement about the global pandemic and a link to the CDC's website.

### Cash Management (34 C.F.R. Part 668, Subpart K)

Institutions must comply with the cash management regulations unless unable to do so due to COVID-19 disruptions.  Where an institution is unable to comply, it should document the reason(s) for instances where it is unable to comply and retain the documentation in its records. These include, but are not limited to, the following regulatory requirements:

- Borrower Requests for Loan Cancellation (§ 668.165(a)(4)(ii))
- Excess Cash (§ 668.166)
- Notices and Authorizations (§§ 668.165(a)(3) and 668.165(b)(4)(iii))

### Need Analysis

Any aid (in the form of grants or low-interest loans) received by victims of an emergency from a federal or state entity for the purpose of providing financial relief is not counted as income for calculating a family's Expected Family Contribution (EFC) under the Federal Methodology or as estimated financial assistance for packaging purposes.

### Professional Judgment

Section 479A of the HEA gives an institution's financial aid administrator (FAA) the authority to use professional judgment to make adjustments on a case-by-case basis to the cost of attendance or to the values of the items used in calculating the EFC to reflect a student's special circumstances.  The Department encourages FAAs to use professional judgment to reflect more accurately the financial need of students and families affected by the COVID-19 pandemic.  In making case-by-case determinations, the FAA must obtain and retain in the affected student's file documents that supporting and substantiating the reasons for any adjustment.

Institutions must make and document professional judgment determinations on a case-by-case basis without regard to how broadly an event may affect its student population.  The use of professional judgment in the Federal Methodology need analysis is discussed in the Federal Student Aid Handbook.  Additionally, FAAs must report to the Central Processing System (CPS) as a "correction" transaction and with the "PJ" indicator any professional judgment decisions that affect a student's eligibility for a Federal Pell Grant.

### Satisfactory Academic Progress (SAP) (§ 668.34)

The CARES Act provides additional flexibilities to institutions regarding the calculation of SAP. An institution of higher education may, as a result of a qualifying emergency, exclude from the quantitative component of the calculation any attempted credits that were not completed by such student without requiring an appeal by such student. The Department intends to provide additional guidance regarding how to implement these additional flexibilities.

### Verification (Part 668 Subpart E).

### Verification Status Code "W" Warning and "Deobligation" Process Postponed

Typically in April, FSA initiates a warning and "deobligation" process for student records reported with a verification status code of "W" under which schools are warned that Pell Grant disbursements to students with this code will be regarded as "overawards" and reduced to a zero dollar amount ($0.00), even though the disbursements were previously accepted in the Common Origination and Disbursement (COD) System.  Approximately two weeks following this

warning, we systematically reduce the affected disbursements.  The warning and "deobligation" process is also repeated each July and October.  Given the occurrence of this April deadline during the COVID-19 pandemic, we are canceling the April 2020 warning and "deobligation" process to allow schools additional time to perform internal reviews and to avoid the "deobligation" of otherwise eligible Pell Grant awards.  We will re-evaluate the process scheduled for July 2020 and October 2020 as we approach those dates.

For those borrowers in verification groups V4 or V5, the flexibilities listed below apply if the institution is unable to receive the required documents in person or by mail (*e.g.,* qualified staff are not on campus to complete this task or students are not able to mail documents).  These flexibilities also apply if the applicant or student is unable to provide the required documents in person or cannot provide notarized documents by mail.

We suspend the in-person submission and notary requirements for V4 and V5 verification. The institution may allow an applicant or student to submit copies of the required verification documents electronically to the institution.  This may occur by uploading a photo of the documents (including from a smartphone), PDF, or other similar electronic document through a secure school portal, by email, etc.

We also recognize that forms of identification (such as a driver's license) may expire with no real and reasonable opportunity for renewal due to social distancing requirements.  Institutions may accept a copy of an expired document if it expired after March 1, 2020.

Further, the Department waives the requirements under § 668.57(b) and (c) that a dependent student submit a statement signed by one of the student's parents when no responsible parent can provide the required signature.  In such a situation, the institution must note and retain an explanation of why neither of the student's parents was available to provide such a statement.


## Federal Student Aid Program Information

### *Federal Pell Grant, Iraq and Afghanistan Service Grant, and Teacher Education Assistance for College and Higher Education (TEACH) Grant Programs*

### *Deadline for Reporting Initial Disbursement Records (Federal Pell Grant § 690.83 and TEACH Grant § 686.37)*
Generally, an institution must submit to the Department a Federal Pell Grant, Iraq and Afghanistan Service Grant, or TEACH Grant disbursement record for a student not later than 15 calendar days after the institution makes a disbursement to the student or becomes aware that a disbursement needs to be adjusted.

For the Federal Pell Grant program, if the institution becomes aware that previously reported payments or expected payments for a student are no longer accurate, the institution must submit an accurate disbursement record for that student no later than 15 calendar days after becoming aware of the need to make the change.  The institution should promptly contact its School Participation Division if it is unable to meet these deadlines.

Additional deadline details are included in the deadline date notice published annually in the Federal Register.  For the TEACH Grant Program, an institution must submit to the Department subsequent disbursement records, including adjustments and cancellation records not later than 15 calendar days following the date of the disbursement, adjustment, or cancellation.  The appropriate School Participation Division will address any concerns about the deadlines for submitting disbursement records (including adjustments and cancellations) for the TEACH Grant Program on a case-by-case basis.

### Final Federal Reporting Deadlines

Upon an institution's request, the Department will extend the deadline for reporting final Federal Pell Grant payments if the institution is unable to meet the published deadline. An affected institution should make the request as soon as possible by submitting a request via the Common Origination and Disbursement (COD) website (http://www.cod.ed.gov) or by contacting the COD School Relations Center at 1-800-474-7268.

### All Federal Student Loans Held by the Federal Government—Zero Interest and Suspension of Payments

In response to the COVID-19 national emergency, President Trump announced that zero interest would accrue on student loans held by federal government agencies for at least 60 days beginning on March 13, 2020.

The CARES Act extended the interest reprieve and implemented an automatic forbearance until September 30, 2020, for any borrower with a student loan held by the Department.  The Department published frequently asked questions (FAQs) with responses for borrowers on its studentaid.gov website.

### All Federal Student Loans Not Held by the Federal Government—Zero Interest and Suspension of Payments

Federal Family Education Loan (FFEL) Program lenders and institutions who hold Perkins loans may provide the same zero interest and cessation of payments benefits to the loans they hold on a voluntary basis.  Borrowers of these loans should contact their servicer (or the institution if paying the institution directly) for additional information.

### William D. Ford Federal Direct Loan (Direct Loan) Program/FFEL Program

### Borrowers in In-School Loan Status (§ 685.207) and In-School Deferment Status (§ 685.204)

The Department will continue to report to the National Student Loan Data System (NSLDS) as "in-school" for the loan status of each borrower who was in an "in-school" status on the date the borrower's attendance at the institution was interrupted due to the COVID-19 national emergency.  The Department will continue the borrower in that loan status until the institution reports the borrower as withdrawn. (Please also see above section *Enrollment Status Changes* for information about required reporting.).

***Submission of Direct Loan Payment Data (§ 685.301(c))***
This regulation requires an institution to submit Direct Loan payment data in accordance with procedures and deadlines established through a notice published in the Federal Register. An institution that is unable to meet the requirements specified in the Federal Register Notice must contact its School Participation Division to discuss its concerns.

***Collection of Defaulted Loans***
The CARES Act requires the Department of ED to cease collection activities on all defaulted loans, including administrative wage garnishment and the Treasury Offset Program until September 30, 2020.

***Satisfactory Repayment Arrangements (§ 685.102)***
The Department will not treat any payment the borrower fails to make as a missed payment in the stream of six consecutive, on-time voluntary full monthly payments required to re-establish his or her eligibility for assistance under Title IV of the HEA. If the Department does not extend the effective period for the temporary relief provided by this guidance, the required sequence of qualifying payments resumes at the point at which it was discontinued.

The Department will not treat any payment the borrower fails to make as a missed payment in the stream of three consecutive, on-time voluntary full monthly payments required to establish eligibility to consolidate a defaulted loan. If the Department does not extend the effective period for the temporary relief provided by this guidance, the required sequence of qualifying payments resumes at the point at which it was discontinued.

***Payments to Rehabilitate Defaulted Loans (§ 685.211(f))***
The Department will not treat any payment the borrower fails to make as a missed payment in the stream of nine on-time monthly payments within ten months for purposes of rehabilitating the defaulted loan through September 30, 2020 as directed in the CARES Act.

***FFEL Program:  Lenders and Guaranty Agencies and Loans held by the Department***
***Satisfactory Repayment Arrangements (§ 682.200(b))***
The FFEL loan holder should not treat any payment the borrower fails to make as a missed payment in the stream of six consecutive, on-time voluntary full monthly payments required to re-establish his or her eligibility for assistance under Title IV of the HEA.

A FFEL loan holder should not treat any payment a borrower fails to make as a missed payment in the stream of three consecutive, on-time voluntary full monthly payments required to establish eligibility to consolidate a defaulted loan.

***Borrowers in In-School Loan Status (§ 682.209(a)) and In-School Deferment Status (§ 682.210)***
The loan holder should continue to report to NSLDS as "in-school" the loan status of each borrower who was in an "in-school" status on the date the borrower's attendance at the institution was interrupted due to the COVID-19 national emergency. The loan holder should continue the borrower in that loan status until the institution reports the borrower as withdrawn.

*Collection of Defaulted Loans (§ 682.410)*
Guaranty agencies must stop collection activities on defaulted loans until September 30, 2020, on all federally held loans.  Collection activities must resume at the end of the period at the point at which they were discontinued.  The guaranty agency must document in the loan file why it suspended collection activities on the loan and is not required to obtain evidence of the borrower's status while collection activities have been suspended.

*Payments to Rehabilitate Defaulted Loans (§ 682.405)*
The FFEL loan holder should not treat any payment the borrower fails to make as an interruption in the nine on-time voluntary full monthly payments within ten months for purposes of rehabilitating the defaulted loan.

*General Campus-Based Program Issues*

*Allocation Reduction Due to Under-Utilization (§ 673.4(d)(3))*
The CARES Act makes changes to provisions relating to the allocation of campus-based program funding.  The Department intends to provide additional guidance on the allocation reduction due to under-utilization.

*Filing Deadline for Fiscal Operations Report and Application to Participate (FISAP)*
The Department will issue appropriate guidance as it continues to monitor the COVID-19 national emergency.

*Federal Work Study (FWS)*
The Department's March 5, 2020, guidance regarding FWS payments aligns with flexibilities provided under the Stafford Act, which permits FWS students to receive FWS, even if they are unable to work their scheduled hours or must perform their work in a different way (such as online rather than at a facility) as a result of COVID-19 interruptions, provided the institution is continuing to provide educational services and is paying its faculty and staff.  As explained in the March 5, 2020, guidance, for students enrolled and performing FWS at a campus that must temporarily cease providing instruction due to COVID-19, for a FWS student who is employed by an employer that temporarily or permanently closes as a result of COVID-19, or for students quarantined and unable to travel to campus or their jobsite, the institution may continue paying the student Federal work-study wages during that cessation.

Payments may be made in an amount equal to or less than the amount of FWS wages those students would have been paid had they been able to complete the work obligation necessary to receive FWS funds.

An institution may pay a student enrolled at an eligible institution who:

- Received an FWS award for the award period during which a COVID-19 related interruption occurred on the campus;
- Earned FWS wages from the institution for that award period; and
- Was prevented from fulfilling his or her FWS obligation for all or part of the award period due to a COVID-19 related interruption.

This flexibility applies only to students who have begun their FWS job prior to the declaration of the national emergency and may not exceed one academic year.

The CARES Act provides additional flexibility for institutions to provide emergency grants from their remaining Supplemental Educational Opportunity Grant (SEOG) allocations, which include grants to students who would have otherwise received FWS wages had they started their job prior to the national emergency. The Department will issue guidance on the use of remaining SEOG allocations.

The CARES Act also allows the Secretary to waive the non-federal share in certain circumstances. The Secretary will consider this waiver authority and will issue guidance on this issue.

### Community Service Requirements (§ 675.18(g))

An institution must use at least seven percent of the total amount of its FWS Federal funds granted for an award year to compensate students employed in community service. In addition, the institution must ensure that it includes at least one project for tutoring children in reading or one project for family literacy in providing community service. The HEA provides that a waiver of one or both community service requirements may be granted if the Secretary determines that enforcing the requirements would cause hardship for students at the institution. The Department considers the inability of an institution to expend at least seven percent of its total FWS Federal allocation for community service and/or to have at least one project for tutoring children in reading or family literacy due to the COVID-19 national emergency as an appropriate basis for a waiver. An institution must submit a request for a waiver along with a statement that explains the reason for its inability to comply with one or both of the community service requirements. An affected institution should request a waiver as soon as possible by using the annually published waiver submission guidelines or by contacting the Campus-Based Call Center at 1-800-848-0978.

### Flexibility in Making Certain FWS Payments (§ 675.18(i))

As explained above, the CARES Act provides additional opportunities for institutions to award grants to students using reallocated SEOG funds. The Department will publish guidance on how to administer grants made from reallocated SEOG funds.

### Federal Perkins Loan Program

### Borrowers in Repayment (§ 674.33)

The Department authorizes institutions to grant forbearance, for a period not to exceed three months, to a Federal Perkins Loan borrower who is in repayment and who is unable to make payments due to a COVID-19 related interruption.

For an institutionally held Perkins Loan, interest accrues during any period of forbearance. A borrower may request this forbearance orally or in writing and is not required to submit documentation to be considered eligible for this forbearance. An institution must document the forbearance in the borrower's file. To receive forbearance beyond the three-month period, the borrower must make a request to the institution and provide supporting documentation. (At the

expiration of the three-month period, the institution should examine the borrower's situation to determine potential eligibility for an economic hardship deferment or unemployment deferment, as appropriate.)  This period of forbearance is counted toward the three-year maximum limit on the number of years of forbearance that may be granted to a borrower.

*Collection of Defaulted Loans (Part 674, Subpart C—Due Diligence)*
The institution may stop collection activities through September 30, 2020 upon notification by the borrower, a member of the borrower's family, or another reliable source that the borrower has been affected by the COVID-19 national emergency.  Collection activities must resume when the period ends.  The institution must document in the loan file why it suspended collection activities on the loan and is not required to obtain evidence of the borrower's status while collection activities have been suspended.

*Satisfactory Repayment Arrangements on Defaulted Loans (§ 674.2)*
An institution should not treat any scheduled payment the borrower fails to make as a missed payment in the stream of six on-time, consecutive, monthly payments required for the borrower to make satisfactory repayment arrangements on a defaulted Perkins Loan and to re-establish their eligibility for assistance under Title IV of the HEA.  If the Department does not extend the effective period for the temporary relief provided by this guidance, the required sequence of qualifying payments resumes at the point at which it was discontinued.

*Payments to Rehabilitate Defaulted Loans (§ 674.39)*
An institution should not treat any scheduled payment the borrower fails to make as a missed payment in the stream of nine on-time, consecutive, monthly payments required for the borrower to rehabilitate the defaulted loan.  If the Department does not extend the effective period for the temporary relief provided by this guidance, the required sequence of qualifying payments resumes at the point at which it was discontinued.

## Conclusion

We encourage school communities to take all appropriate steps to ensure the health and well-being of students, faculty, and staff.  If you have questions about the information provided in this guidance document or you are encountering a scenario that we have not addressed, please email the Department at COVID-19@ed.gov.  In response to questions from the postsecondary community, the Department has also established FAQs that we will update periodically.

We established the webpage https://www.ed.gov/coronavirus to provide general information for school communities, including links to information posted by the CDC and Prevention, and as the location for the Department's guidance.  We encourage institutions to refer frequently to these informational resources.

Secretary DeVos Rapidly Delivers More Than $6 Billion in Emergency Cash Grants for College Students Impacted by Coronavirus Outbreak

**First wave of CARES Act funding will provide aid to students for expenses like course materials, technology, housing, food, health care, and childcare**

APRIL 9, 2020

**Contact:**   Press Office, (202) 401-1576, press@ed.gov

- 

WASHINGTON — U.S. Secretary of Education Betsy DeVos announced today more than $6 billion will be distributed immediately to colleges and universities to provide direct emergency cash grants to college students whose lives and educations have been disrupted by the coronavirus outbreak. The funding is available through the Higher Education Emergency Relief Fund authorized by the *Coronavirus Aid, Relief, and Economic Security (CARES) Act*, signed into law by President Donald J. Trump less than two weeks ago.

"What's best for students is at the center of every decision we make," said Secretary DeVos. "That's why we prioritized getting funding out the door quickly to college students who need it most. We don't want unmet financial needs due to the coronavirus to derail their learning."

The CARES Act provides nearly $14 billion to support postsecondary education students and institutions. Colleges and universities are required to utilize the $6.28 billion made available today to provide cash grants to students for expenses related to disruptions to their educations due to the COVID-19 outbreak, including things like course materials and technology as well as food, housing, health care, and childcare. In order to access the funds, the Department must receive a signed certification from the higher education institution affirming they will distribute the funds in accordance with applicable law. The college or university will then determine which students will receive the cash grants.

School allocations are set by formula prescribed in the CARES Act that is weighted significantly by the number of full-time students who are Pell-eligible but also takes into consideration the total population of the school and the number of students who were not enrolled full-time online before the coronavirus outbreak. The Department is utilizing the most recent data available from the Integrated Postsecondary Education Data System (IPEDS) and Federal Student Aid (FSA) for this calculation.

Institutions will receive allocations and guidance for the institutional share of the Higher Education Emergency Relief Fund in the coming weeks. Institutions will be able to use these funds to cover costs associated with significant changes to the delivery of instruction due to the coronavirus.

Additional information on institution-level funding for students, including data tables, can be found here. The Secretary's letter to college and university presidents with additional information on this funding allocation can be found here.

The funding allocations announced today are part of the nearly $31 billion Congress allocated to the Department to distribute to students, K-12 schools, and higher education institutions under the CARES Act. The Department, at the Secretary's urging, is working to make funds available as quickly as possible.

Under the Secretary's leadership, the Department has taken quick action to support higher education students from the start of the coronavirus outbreak. Colleges and universities were given immediate regulatory flexibility so students' educations could continue online. The Secretary also provided student loan relief to tens of millions of borrowers by setting all federally held student loan interest rates to zero percent and allowing borrowers to defer payments for 60 days without interest. The CARES Act extends those benefits to six months. The Department also stopped all federal wage garnishments and collections actions for borrowers with federally held loans in default.

The Department continues to update ed.gov/coronavirus with information for students, parents, educators and local leaders about how to prevent the spread of COVID-19.

For more information about COVID-19, please visit the following websites: coronavirus.gov, cdc.gov/coronavirus/2019-ncov/index.html, and usa.gov/coronavirus.



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION

APR 3 0 2015

GEN-15-08

Subject:    Citizenship and Immigration Status Documentation

Summary:  This letter announces a process through which an institution and affected student may
work to confirm the student's citizenship or immigration status and, thus, eligibility for Title IV,
HEA student financial assistance when the student is unable to appear in person at the institution.

Dear Colleague:

Section 484(a)(5) of the Higher Education Act of 1965, as amended (HEA), provides that in
order to be eligible for Title IV, HEA student financial assistance, a student must "be a citizen or
national of the United States, a permanent resident of the United States, or able to provide
evidence from the Immigration and Naturalization Service[1] that he or she is in the United States
for other than a temporary purpose with the intention of becoming a citizen or permanent
resident" (eligible noncitizens).

Volume 1, Chapter 2 of the Federal Student Aid (FSA) Handbook provides details on citizenship
confirmation, including the documentation students can provide to confirm their U.S. citizenship
or eligible noncitizen status when the established automated processes are not able to confirm the
students' status.

This letter announces a process through which an institution and affected student may work to
confirm the student's citizenship or immigration status and, thus, eligibility for Title IV, HEA
student financial assistance when the student is unable to appear in person at the institution.

<u>Confirmation of Eligible Noncitizen Status</u>

If a student indicated on his or her Free Application for Federal Student Aid (FAFSA®) that he or
she is an eligible noncitizen,[2] but the U.S. Department of Homeland Security-United States
Citizenship and Immigration Services (DHS-USCIS) data match did not confirm that status, the
student must present original documentation to the institution that confirms that he or she is an
eligible noncitizen.  However, some students may not be able to present the documentation to the
institution easily in person, as in the case of a student enrolled in a distance education program

---

[1] The authorities previously exercised by the Department of Justice through the Immigration and
Naturalization Service now reside with the U.S. Department of Homeland Security (DHS), which has
several component agencies, including the United States Citizenship and Immigration Services (DHS-
USCIS).

[2] Question 14 on the FAFSA® reads "Are you a U.S. Citizen?" and three answer options are given,
including "No, but I am an eligible noncitizen."

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by
fostering educational excellence and ensuring equal access.*

where the institution is located far from where the student resides. While the reproduction of certain immigration-related documents is statutorily prohibited, DHS-USCIS has informed the Department that for the limited purpose of applying for Title IV, HEA student financial assistance, DHS-USCIS does not deem reproduction of such documents to be a violation of the relevant statute. Therefore, institutional policy may permit such students to photocopy, scan, or otherwise image their immigration documents, and submit either electronic images or paper copies of the same to the institution's financial aid office to facilitate the confirmation of their status and, thus, establish their eligibility for Title IV, HEA student financial assistance. Subsequently, the institution must initiate the paper-based secondary confirmation process, using DHS-USCIS Form G-845, Document Verification Request, once confirmation documents are received from a noncitizen student.

Confirmation of U.S. Citizenship or U.S. National Status

All students who fill out a FAFSA are sent to the Social Security Administration (SSA) to determine U.S. citizenship. If a student indicated on his or her FAFSA that he or she is a U.S. citizen or U.S. national,[3] but the citizenship match with the SSA could not confirm that status, the student must present original documentation to the institution that confirms that he or she is a U.S. citizen or national. However, some students may not be able to present the documentation to the institution easily in person. Consistent with the guidance above with respect to eligible noncitizens, institutional policy may permit U.S. citizen and U.S. national students to photocopy, scan, or otherwise image their citizenship documents, and submit either electronic images or paper copies of the same to the institution's financial aid office for the purpose of determining their eligibility for Title IV, HEA student financial assistance. Note that the paper-based secondary confirmation process associated with DHS-USCIS Form G-845 is never used to confirm a student's status as a U.S. citizen or national.

Accepting Photocopies or Other Images

Consistent with the guidance that reproduction of these documents is lawful if it is for the limited purpose of applying for Title IV, HEA student financial assistance, an institution may provide additional guidance, as it deems appropriate, on how (e.g. time, place, and media) a student should submit photocopies or other images of his or her immigration or citizenship documentation. If the institution chooses to allow a student to submit a hard copy or electronic image of an original document, the institution should have a process in place to ensure that a student is submitting an exact copy, such as an affidavit. We are providing a sample copy of an affidavit with this letter that schools may choose to use for this purpose.

The institution must maintain, in the student's financial aid file, copies of the documentation provided by the student, including any affidavit, and, for eligible noncitizens, the completed DHS-USCIS Form G-845.

---

[3] Question 14 on the FAFSA® reads "Are you a U.S. Citizen?" and three answer options are given, including "Yes, I am a U.S. citizen (U.S. national)."

Additional Steps

If a student submits to an institution documentation which purports to establish his or her eligible noncitizen or U.S. citizen status, but the receiving institution has reasons to question the validity of the documents submitted, there are additional steps an institution may take.

If an institution suspects that the documents submitted are fraudulent or counterfeit, it may require the student to provide a true copy of the documentation as certified by the issuing authority. The student could visit his or her local DHS-USCIS field office to obtain a certified copy of the student's entire immigration file, or as much of it as necessary to confirm their status. The institution could also submit a copy of the suspicious document(s) during the paper-based secondary confirmation process, Form G-845, and note in the comment section of the form that they suspect the document(s) may be fraudulent.

If an institution is able to discern that a document is patently fraudulent, (e.g., does not relate to the applicant, contains misspellings, misaligned text, altered dates) the institution must deny that student Title IV, HEA student financial assistance. Also, if an institution has conflicting information about a student's immigration or citizenship status or has any reason to believe information on the FAFSA is incorrect, the institution must resolve such discrepancies before disbursing Title IV, HEA student financial assistance. Where an institution is unable to get a response from DHS-USCIS, or an institution receives an item 13 response ("USCIS is searching indices for further information") on Form G-845 from DHS-USCIS, the institution may choose to not disburse Title IV, HEA student financial assistance.

We remind institutions that if they suspect that a student or other individual has misreported information or altered documentation to obtain Title IV, HEA student financial assistance, such institutions must report those suspicions, and provide any evidence of the same to the Department's Office of Inspector General (OIG) at 1-800-MIS-USED or by visiting the OIG's Web site at http://www2.ed.gov/about/offices/list/oig/index.html.

If you have any questions regarding this letter, please contact Aaron Washington via e-mail at Aaron.Washington@ed.gov and Rene Tiongquico via e-mail at Rene.Tiongquico@ed.gov.

Sincerely,

Lynn B. Mahaffie
Deputy Assistant Secretary for
Policy, Planning, and Innovation

Attachments/Enclosures:
Sample affidavit

**CERTIFICATION OF TRUE, EXACT, AND COMPLETE COPY OF THE ORIGINAL DOCUMENTS**

This form is for the collection of DHS or other U.S. citizenship/nationality documents from students unable to present their documents in person.

I certify that I, _____, am the individual
                              (Print student's full name)
signing this statement, and I am providing a copy of my documents along with a copy of a valid government-issued photo identification card bearing my portrait (or likeness).

I certify that the attached documents and government issued photo identification are the true, exact, and complete copies of the originals issued to me.

List of document(s):

| NAME OF VALID PHOTO ID | EXPIRATION DATE OF VALID PHOTO ID | ISSUING AUTHORITY OF VALID PHOTO ID |
|---|---|---|
|  |  |  |

| NAME OF CITIZENSHIP AND/OR IMMIGRATION DOCUMENT(S) | EXPIRATION DATE (IF ANY) OF CITIZENSHIP AND/OR IMMIGRATION DOCUMENT(S) |
|---|---|
|  |  |
|  |  |
|  |  |

**SAMPLE AFFIDAVIT**

Page 2

I understand that providing false or misleading information or
documents is punishable by fine or imprisonment and may make me
liable for repayment of any funds received on the basis of the
information and documents I have provided.



_____          _____
Student's Signature                  Student's ID Number

_____
Date

*Sign in the presence of a notary public

# U.S. Citizenship & Eligible Noncitizens



*A student has to be a U.S. citizen, a citizen of the Freely Associated States, or an eligible noncitizen to be potentially eligible for federal student aid. In this chapter we describe how the student's FAFSA information is matched with other agencies to determine citizenship status. We also describe the immigration documents that you may need to collect to ensure the student's eligibility.*

## ELIGIBLE CATEGORIES

A student must be one of the following to be eligible to receive federal student aid:

- **A U.S. citizen or national**;

- **A citizen of the Freely Associated States: the Federated States of Micronesia and the Republics of Palau and the Marshall Islands**. (These students can only receive aid from some of the FSA programs and do not have an A-number/ARN, see "Citizens of the Freely Associated States" section later in this chapter); or

- **A U.S. permanent resident or other eligible noncitizen.**

The Department of Education (The Department) matches all applications with the Social Security Administration (SSA) on U.S. citizenship status. If the status cannot be confirmed, the student must provide documents proving U.S. citizenship, citizenship of the Freely Associated States, or eligible non-citizen status in order to be potentially Title IV aid-eligible. If the student provides an alien registration number (ARN) on the FAFSA, his record is also sent to DHS to check noncitizen immigration status. The results of both matches appear on the Institutional Student Information Report (ISIR), and a failed match with either agency will produce a "C code" on the student's ISIR.

A student's U.S. citizenship (or eligible noncitizen) status only needs to be checked once for the award year; if the status is eligible at that time, it remains so for the rest of the award year (with the exception of parolees and VAWA prima facie cases; see the "Third Step Verification (Formerly Form G-845)" section below).

If a parent wants to take out a PLUS loan for a dependent undergraduate student, both the parent and the student must be a U.S. citizen or national or eligible noncitizens.

**Citizenship issues**

➔ All applications are matched with the Social Security Administration (SSA) on U.S. citizenship status. The SSA citizenship field on the ISIR shows the match result.

➔ Applications containing an Alien Registration Number (ARN) are also matched against Department of Homeland Security (DHS) records. The DHS Primary and DHS Secondary match fields show the DHS match results. A failed match will produce a C code.

➔ If the DHS match fails after automated primary and secondary verification, the school must conduct a third step verification (see "Third Step Verification (Formerly Form G-845)" section in this chapter).

**Citizenship**
HEA Sec. 484(a)(5),
34 CFR 668.32(d),
34 CFR 668.33,
and Subpart I of Part 668.

## U.S. citizenship

A person is a U.S. citizen by birth or by naturalization or by operation of law. Persons (except for the children of foreign diplomatic staff) born in the 50 states, the District of Columbia, and, in most cases, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands are U.S. citizens, as are most persons born abroad to parents (or a parent) who are citizens. All U.S. citizens are considered U.S. nationals, but not all nationals are citizens.  Persons whose only connection to the U.S. is through birth on American Samoa, Swains Island, or the U.S. Minor Outlying Islands are not U.S. citizens but are U.S. nationals, and therefore may also receive FSA funds.

## Example: citizenship not confirmed

Anthony is a U.S. citizen, but SSA doesn't confirm his U.S. citizenship status. The aid administrator at Epstein College asks him to submit documentation of his status. Anthony first submits a Social Security card, but the administrator explains that the card doesn't document his status because noncitizens can have Social Security cards. Anthony then brings in his Certificate of Naturalization.  The administrator makes a copy of the certificate for his file and tells Anthony his citizenship has been documented. She also advises Anthony to have the SSA correct its database so that he won't have this problem again.

## Passport cards & passports

22 CFR 51.4(b)(2)
A student may apply for a U.S. passport card, which may be considered acceptable documentation of U.S. citizenship, at the U.S. State Department website: *https://travel.state.gov/content/travel/en/passports/apply-renew-passport/card.html*

## U.S. CITIZENSHIP MATCH WITH THE SSA

All applications are matched with SSA records to verify U.S. citizenship status, name, date of birth, and Social Security number (SSN) (see *Chapter 4*). The Central Processing System (CPS) will reject the application for insufficient information if name, date of birth or SSN is not provided. The student's match result is reported in the "SSA Citizenship" field on the SAR, and on the Match Flags section of the SAR and ISIR. If the student leaves the citizenship question on the FAFSA blank, the CPS will still attempt the citizenship match with the SSA. If there is a complete match with the student's SSN, name, date of birth, and U.S. citizenship, the CPS will report the student to be a U.S. citizen.

▼ **Successful match.** The SAR and ISIR will have a match flag (but no comment) indicating that the student's U.S. citizenship status was confirmed.

▼ **Data doesn't match.** If the student's SSN, name, or date of birth doesn't match SSA records, his U.S. citizenship status can't be confirmed and a C code and a comment will appear on the output document. The student should correct the SSN, name, or date of birth (see *Chapter 4* for more on SSN match problems) and submit it. The CPS will perform the match again, and you must see if the new ISIR confirms the student's U.S. citizenship status; if it does, the C code will no longer appear.

▼ **U.S. citizenship not confirmed.** The SAR and ISIR will include a C code and a comment (**code 146**) explaining that the SSA was unable to confirm the student is a U.S. citizen and that he/she needs to provide his/her financial aid office with documents proving U.S. citizenship (see below). If the student provides eligible noncitizen documentation, you or the student must make a correction by entering his/her Alien Registration Number (ARN) on the ISIR, changing his/her citizenship status to eligible noncitizen in Question 15, clicking "yes" on the drop-down box in the "Resend Record to Matches" field and submitting it to the CPS, which will attempt a match with DHS records to confirm the student's immigration status.

Note that U.S. citizens born abroad might fail the citizenship check, unless they have updated their citizenship information with SSA (see "Updating status for U.S. citizens born abroad" later in this chapter).

### U.S. citizenship documentation

If a student must prove their status as a U.S. citizen or national, only certain types of documents are acceptable. The Department doesn't specify all of the **acceptable** documents, but here are some documents you might choose to use to prove U.S. citizenship:

- **A Certificate of Naturalization (N-550 or N-570)** issued by USCIS (or, prior to 1991, a federal or state court), or through administrative naturalization after December 1990 to those who are individually naturalized. You must copy this document for the student's file and tell the student to update their status with DHS, see *https://uscis.gov/about-us/contact-us*.

- **A Certificate of Citizenship (N-560 or N-561)** is issued by USCIS to individuals who derive U.S. citizenship through a parent.

- **A copy of the student's birth certificate** showing that the student was born in the U.S., which includes Puerto Rico (on or after January 13, 1941), Guam, the U.S. Virgin Islands (on or after January 17, 1917), American Samoa, Swains Island, or the Northern Mariana Islands, unless the person was born to foreign diplomats residing in the U.S. If a student has a birth certificate from a U.S. jurisdiction showing that the student was born abroad (i.e., not in the U.S. or its territories), that birth certificate is not acceptable documentation.

- **A U.S. passport,** current or expired, (except "limited" passports, which are typically issued for short periods such as a year and which don't receive as much scrutiny as a regular passport when applying). In the case of nationals who are not U.S. citizens, the passport will be stamped "Noncitizen National." Five-year-duration U.S. passports (commonly issued to younger students) are considered acceptable documentation, and are not considered "limited".  Passport cards are also acceptable; however, one-year-duration U.S. passports are NOT acceptable documentation.

- **A wallet-sized passport card,** issued by the State Department, is a fully valid attestation of the U.S. citizenship and identity of the bearer, but can only be used for land and sea travel between the U.S. and Canada, Mexico, the Caribbean, and Bermuda.

- **A copy of Form FS-240 (Consular Report of Birth Abroad), FS-545 (Certificate of birth issued by a foreign service post), or DS-1350 (Certification of Report of Birth).** These are State Department documents.

Before you can disburse aid, the student must present documentation that verifies he is a U.S. citizen. If the documents indicate that the student is a U.S. citizen or national, you may award and disburse aid to the student and the C-code may remain on the student's ISIR. Keep a copy of the documentation in the student's file. Unlike the case of eligible noncitizens, you don't submit the documents to the DHS/USCIS or any other agency for verification of U.S. citizenship, even though older versions of the Certificate of Citizenship and of the Certificate of Naturalization instruct the holder not to photocopy them. The student can also contact the Social Security Administration to update the student's record. This updating is not required to receive aid, but may prevent issues with SSA matching in the future.

## Mandatory name changes

Whenever a student legally changes their name because of marriage, divorce, court order or any other reason, they must tell the Social Security Administration so they can get a corrected card and have correct SSN matches in the future. The student must bring the appropriate documents to prove the change to their local SSA office. See *https://secure.ssa.gov/ICON/main.jsp*.

## Parent signature on certificate

Because documents such as a certificate of citizenship can go to minors, they may be signed by a parent or guardian instead of the minor child. This does not affect the legitimacy of the document.

## Child Citizenship Act (CCA)

The CCA became effective on February 27, 2001. As of that date, foreign-born children who are not U.S. citizens at birth become citizens once these conditions are met:

- At least one parent (biological or adoptive) is a U.S. citizen;
- the children live in the legal and physical custody of that parent;
- they are under 18 years of age; and
- they are admitted as immigrants for lawful permanent residence.

Children newly entering the country who are adopted abroad prior to the issuance of their **IR-3 visa** (for orphans) or **IH-3 visa** (for children from Hague Convention countries) become citizens upon arrival. They should receive a Certificate of Citizenship within 45 days instead of receiving a permanent resident card and then filing **Form N-600** to request a certificate. Children who are adopted after being admitted to the U.S. with an **IR-4 visa** (for orphans) or **IH-4** visa (for children from Hague Convention countries) become citizens once their adoption is full and final. Parents of these and other children who do not automatically receive a certificate of citizenship can get one by filing Form N-600.

For more information, contact the USCIS, visit the website at *www.uscis.gov*, or see the State Department's intercountry adoption website at *http://adoption.state.gov/*.

**Report of birth abroad**

*The F-240 Report of Birth Abroad form* was redesigned in January 2011, but the previous version (DS-1350) remains valid for proving U.S. citizenship for Title IV purposes.

**The Freely Associated States**

The Compact of Free Association (P.L. 99-239) created three political entities from the former Trust Territory of the Pacific Islands. Two of these entities, the Marshall Islands and the Federated States of Micronesia, voted in 1986 to end political ties with the U.S.. The third entity, Palau, voted to ratify the compact in 1994; its independence was effective October 1, 1994. These three entities are the Freely Associated States. 34 CFR 600.2

**No FSEOG and FWS/Compact Act**

The Compact of Free Association Amendments Act of 2003, or the Compact Act, eliminated eligibility for citizens of the Republic of the Marshall Islands (RMI) and the Federated States of Micronesia (FSM) for FSEOG and FWS funds. To mitigate this loss, the Compact Act authorizes Supplemental Education Grants (SEGs) that are awarded to the FSM and RMI. For more information, students of the FSM and RMI should contact their local education authority. Also under the Compact Act and the Palau Compact Review Agreement, students who are citizens of the Republic of Palau continue to be eligible for FWS and FSEOG funds through the 2019-20 award year.

*Updating status for U.S. citizens born abroad*

Students born abroad to U.S. citizen parents are U.S. citizens if they meet certain requirements, and their status is usually noted in the SSA's database when they receive an SSN. But occasionally, a student may not have provided sufficient proof of U.S. citizenship to SSA in order for the record to be updated. Therefore, these students will fail the U.S. citizenship match even if they have an SSN. If this occurs, the student must provide proof of U.S. citizenship as outlined below. The student can contact the SSA to have their record corrected. This update is not required to receive aid.

Such students can document US. citizenship by providing a **"Consular Report of Birth Abroad" (Form FS-240,** which is *proof* of U.S. citizenship), a **"Certification of Report of Birth" (Form DS-1350,** which is *evidence* of U.S. citizenship and equivalent to a birth certificate), or a **Certificate of Citizenship** issued by USCIS. If the birth of the student was registered with the American consulate or embassy in a foreign country before he turned 18, he can receive a copy of one of these by sending a written, notarized request to the USCIS.

**For pictures of the U.S. citizen documents listed above, see the end of this chapter.**

## CITIZENS OF THE FREELY ASSOCIATED STATES

**Students who are citizens of the Freely Associated States—the Federated States of Micronesia and the Republics of Palau and the Marshall Islands**—are eligible for Pell Grants (citizens of Palau are also eligible for FWS and FSEOG; see the margin note) but are not eligible for FSA loans. These students should have a passport from the Freely Associated States or an I-94.

The student should indicate on the FAFSA that he/she is an eligible noncitizen and leave the ARN item blank. If the student doesn't have an SSN, he enters 666 and ED will give him a number to use, or if he was given a number in the previous year, he must continue to use the same ED-assigned pseudo-SSN due to Pell Lifetime Eligibility Used (LEU) rules (see the November 20, 2013 Electronic Announcement for more details).

Because he isn't providing an ARN, the student's application won't go through the DHS match. Do not complete a third step verification for these students—they will fail the match. Instead, request documentation of his Freely Associated States citizenship. Once you have received the student's document establishing his status, as a citizen of the Freely Associated States, make a copy of the document and place it in the student's file. You can reuse the original document in future years if it hasn't expired.

## ELIGIBLE NONCITIZEN MATCH WITH THE DHS

The DHS assigns to all legal aliens an Alien Registration Number (ARN), which FSA uses to identify the student records that must be sent to DHS for immigration status verification. **If the applicant indicates on the FAFSA that he is an eligible noncitizen and provides an ARN, identifying information is sent to the DHS for eligible noncitizen matching.**

The results of the match are shown by a match flag in the "FAA Information" section of the output document, under the heading "DHS" on the ISIR or "DHS Match Flag" on the SAR. There will also be a comment about the results on the output document.

Because all applications are matched with the SSA, an application with an ARN will be matched with both DHS and SSA records. When results are received from both matches, a positive SSA match will indicate that the student is a U.S. citizen. If the SSA match is negative, the DHS match flag will determine the student's eligible noncitizen status.

▼ **Successful match.** (Y Flag) If the match confirms the student's immigration status as an eligible one, he can receive aid if the other eligibility criteria are also met. **Comment code 143** will appear on the SAR and ISIR, and the successful match results are documentation of the student's eligibility. Of course, if you have other information about his status that seems to contradict the successful match result, you must resolve the conflict before paying the student (see "Conflicting Information" in *Chapter 1*) by going through the third step verification process.

▼ **Record was not sent to DHS due to data entry errors.** (Blank flag) The match won't be attempted if the student left the citizenship question blank (**code 068**), if the student said they were an eligible noncitizen but provided either no ARN or an illegible or invalid one (**code 142**), or if they changed their response to the citizenship question or changed her ARN after previous verification by the DHS (**code 141**). Instead, the student will receive a C code and a comment explaining the problem and directing them to provide the school with his/her most recent immigration documentation to support their eligibility. Compare the student's immigration document with the SAR/ISIR to determine the appropriate resolution action. If you or the student corrects the ARN and resubmits it so that the match can be conducted, and his/her eligibility is confirmed as an eligible noncitizen, the C code will not appear on the new ISIR. If the student's eligibility is not confirmed, (**match flag = N**), check their DHS secondary Match Flag to determine how to proceed.

▼ **Student's noncitizen status has not yet been confirmed.** *(N Flag and C code) DHS will continue to check its records in a process called **automated** secondary verification.* The SAR and ISIR will have comment **code 144** and a DHS match flag of "P" (indicating that the procedure is still in process). Within three to five days, the CPS should generate a SAR and ISIR indicating the result in the "DHS Secondary" Flag field. The response table in the margin explains each Flag, its translation and how to proceed.

---

**Suspect documents**

If you are able to discern that a document is fraudulent, you must deny the student Title IV aid. If the student submits conflicting information regarding immigration status on the FAFSA, you must resolve any discrepancies before disbursing Title IV aid.

Report altered or misreported information to the Department's Office of Inspector General at 1-800-MIS-USED or the OIG's website at: *www2.ed.gov/about/offices/list/oig/index.html.*

---

**DHS second step verification match flags and comment codes**

**Y, 120:** The student's eligibility has been confirmed. You can process his aid.

**C ,105:** The student's eligible noncitizen status has not yet been verified. The school is required to wait 10 business days for another ISIR with an updated match result. If there is no update, the school begins the third step verification process.

**N, 046:** The student's immigration status was not confirmed. The school begins third step verification.

**X, 109:** The DHS did not have enough information to determine the student's status. The school begins third step verification.

**Conditions requiring secondary confirmation**
34 CFR 668.133(a)

**School policies and procedures on secondary confirmation**
34 CFR 668.134–135

**Example of eligible noncitizen not confirmed**
On his original application, Theo didn't give his ARN and reported that he was a citizen.  When the SSA didn't confirm this, Theo told the aid administrator at Fowler University that he was a permanent resident. He added his ARN and changed his citizenship status to eligible noncitizen, but SAVE didn't confirm his status as an eligible noncitizen.  He explained to the aid administrator that he had applied for permanent resident status but didn't have documentation yet. The aid administrator told him that when he received documentation that his application was approved, he should bring it to Fowler so that it could be submitted to the USCIS for confirmation. The aid administrator told him to bring any information supporting his current immigration status to Fowler so that it could be submitted to the USCIS for confirmation. Depending on the documentation Theo provides, he may be considered an eligible noncitizen in a class other than permanent resident.

A correction to the student's name, date of birth, or ARN made while the DHS is conducting the automated secondary confirmation may start the process over, i.e., the correction may be sent through primary confirmation. Though unlikely, if the new primary confirmation match yields a "Y," the transaction can be used to award aid. The new transaction may have a new DHS verification number assigned. A correction made to a transaction that contains secondary confirmation results of "Y" or "C" (or a transaction with a primary confirmation result of "Y") will not be sent through the DHS match again. Otherwise the record will be re-sent for matching.

### ARN corrections and additions to the FAFSA

- **If the citizenship question is blank but there is an ARN,** the CPS will send the record to DHS for matching.

- **If both the citizenship question and the ARN are blank,** the record will not be sent to DHS. The output document will explain that SSA was unable to confirm that the student is a U.S. citizen. The student must submit a correction to the citizenship status and ARN if he/she is an eligible noncitizen.

- **If U.S. citizen or national is selected, but the student provides an eligible noncitizen document,** correct question 14 on the ISIR to "eligible noncitizen" and enter the ARN in question 15 and click "yes" on the drop-down box in the "Resend Record to Matches" field. This correction will tell CPS to send the record to the DHS Primary match (for the first time). Ignore comment code 146 from SSA on the current ISIR. Wait for the DHS Match flags on the student's next ISIR to determine if the student is an eligible noncitizen or if a third step verification is necessary.

- **If the ARN on the ISIR does not match the ARN on the student's immigration document,** correct the ARN in field 15 and click "yes" on the drop-down box in the "Resend Record to Matches" field. This will send the corrected record (which DHS considers a new record because of the new ARN) to the DHS Primary match. Ignore DHS comment codes **046**, **105**, and **109** on the current ISIR. Do not complete third step verification unless the DHS Match flags on the resulting ISIR indicate that third step verification is necessary. For more detail on these codes, see the *2019-20 SAR Comment Code and Text* guide on IFAP.

## THIRD STEP VERIFICATION (FORMERLY FORM G-845)

If the student didn't pass secondary verification or if you have conflicting information about his immigration status after receiving a primary or secondary match result, you must review the record for third step verification.

### Third step verification preparation

1. Request the student's most current, unexpired immigration document. When it is submitted, make a copy of it.

2. Carefully review the student's immigration documentation against the status and document descriptions below.

3. Determine whether the student's immigration documentation supports eligibility for Title IV aid. If it does not support an eligible status, you can tell the student that he is not eligible now, but may be eligible if/when he provides eligible noncitizen documentation. You should not complete third step verification for this student.

For more on using the SAVE system to complete third step verification, see the section titled "Using the SAVE System for third step verification" later in this chapter.

**DHS verification number on the ISIR**
When a record is processed through the CPS match with DHS, a 15-digit verification number is assigned to the student and printed in the "FAA Information" section of the SAR and ISIR.  This 15 digit number is needed to access the student's SAVE record, and to submit a third step verification request through SAVE.

## ELIGIBLE NONCITIZENS AND DOCUMENTATION

Certain non-U.S. citizens may be eligible for Title IV aid. The following types of "eligible noncitizens" are among the classes of persons who may be eligible (see bulleted list below).

For classes of eligible noncitizens other than permanent residents, evidence of their status typically is on the **I-94**, but other documentation may also be acceptable. Customs and Border Protection (CBP) no longer issues a paper I-94 form, with the exception of asylees and certain parolees. In September 2015, CBP automated the refugee admission process. Refugees will no longer receive a paper form I-94, but will have access to an electronic form. Students without paper I-94 documentation (see I-94 website sidebar) may have their status confirmed by the electronic I-94 printout and/or a CBP stamp, showing class of admission and date admitted or paroled in their passport to confirm this status.

Only when students fail the citizenship match or have conflicting information must you perform third-step verification using the SAVE system to confirm that their documentation supports one of the following noncitizen status categories:

- **Lawful permanent residents (LPRs)** are noncitizens who are legally permitted to live and work in the U.S. permanently. The standard document is the **Permanent Resident Card (Form I-551 since 1997) or Resident Alien Card (Form I-551 before 1997)**. Both forms are referred to colloquially as "green cards," though they have changed colors over the years. Possessors of the older **Alien Registration Receipt Card (Form I-151**, issued prior to June 1978) should have replaced it with a newer card, but for receiving FSA funds it is acceptable as evidence of permanent residence. In general, students whose LPR card has expired may still be considered lawful permanent residents for FSA eligibility purposes; therefore, if they submit expired documentation, submit it to SAVE and base eligibility on the response.

Permanent residents may also present an **Arrival/Departure Record (CBP Form I-94)** or the Departure Record (**Form I-94A**, with the endorsement "Processed for I-551. Temporary Evidence of Lawful Admission for Permanent Residence. Valid until _____. Employment Authorized." This is used at land border ports of entry. If available, an I-551 (also known as a "green card") is preferable to establish LPR status. The form will have an ARN annotated on it and is acceptable if the expiration date has not passed.

The U.S. Department of State issues a **machine readable immigrant visa (MRIV)** in the holder's passport. The MRIV will have a U.S. CBP inspector admission stamp, and the statement "UPON ENDORSEMENT SERVES AS TEMPORARY I-551 EVIDENCING PERMANENT RESIDENCE FOR 1 YEAR" will appear directly above the machine readable section. An MRIV with this statement, contained in an unexpired foreign passport and endorsed with the admission stamp, constitutes a temporary I-551, valid for one year from the date of endorsement on the stamp.

The USCIS issues the **U.S. Travel Document** (mint green cover),

### I-94 website

*https://i94.cbp.dhs.gov/I94*
Customs and Border Protection (CBP) creates admission records electronically. The I-94 website allows travellers (and schools, if the traveller grants permission) to access admission records online (the website contains records from April 2011 to present). Legacy paper I-94s are also still valid.

DHS-Customs and Border Patrol began issuing I-94s with an alpha character in the 10th position of the 11-character identifier beginning in May, 2019.

### Eligible noncitizen name changes

When an *eligible noncitizen* student changes his or her name, the student needs to update it with SSA and DHS. To update their name with DHS, students can call 1-800-375-5283. For the SSA update, the student may refer to *https://www.ssa.gov/agency/contact* or visit their local SSA office**.**

which contains the Reentry Permit (**Form I-327**) and the Refugee Travel Document (**Form I-571**). It is used by lawful permanent residents, as well as refugees and asylees, and is annotated with "Permit to Reenter Form I-327 (Rev. 9-2-03)."

If the student has an **I-551 with a baby picture**, they should update the I-551 with the USCIS. Permanent residents are expected to get a new picture and be fingerprinted at the age of 14. But you can submit the documents to USCIS and pay a student who has an I-551 with a baby picture as long as you can confirm that it belongs to the student. You can do this by comparing the I-551 to a current photo ID that has the student's name, date of birth, and signature. The current ID must also be consistent with any identifying information in the student's file.

A student who has an approved application for permanent residence on file with the USCIS and who is waiting for a permanent resident card should have an **I-797 Approval Notice from USCIS** indicating such, as well as an alien number, which will give notice of current status. Note that an **application** for permanent resident status alone is not sufficient for determining eligibility for FSA funds.

If a person is applying to suspend deportation, they must request a hearing before an immigration law judge who will render an oral or written decision. If that is favorable, the USCIS will give the applicant a **Form I-551**, which will certify lawful permanent resident status. There is no special category for persons who have been granted suspensions of deportation.

- **Conditional resident aliens** are eligible for aid if their documentation has not expired. They may have a valid **I-551, I-94, I-94A, or a passport with an MRIV** bearing the statement, "Upon endorsement serves as temporary I-551 evidencing permanent residence for 1 year."

The Marriage Fraud Amendments established a two-year conditional permanent resident status for alien spouses of U.S. citizens or legal immigrants whose marriage took place less than two years before the spouse applied for permanent resident status. This status may apply to any of the spouse's children who are aliens.

A **Form I-551** of a conditional permanent resident alien is the same I-551 that is issued to regular permanent residents, except that the card for a conditional permanent resident expires in two years, as opposed to 10 years for the regular card. A conditional permanent resident must file a petition for removal of this restriction in the 90 days before the end of the two years.  The USCIS will review the petition and, if the result of the review is satisfactory, drop the restriction and issue new documents.

- **Conditional entrants** are refugees who entered the U.S. under the seventh preference category of P.L. 89-236 or whose status was adjusted to lawful permanent resident alien under that category. Students may have an **I-94** with a stamp displaying "**Section 203(a)(7)**" and

**Photocopying immigration docs**
DCL GEN-15-08
In most cases you will examine and copy original immigration documents, and you must keep a copy in the student's file with the results from the third step verification/SAVE. While generally not permitted, for the purpose of applying for Title IV aid, students may legally photocopy, scan, or otherwise image immigration documents (such as Forms I-551 or I-94) to complete the third step verification process.

### SAVE Guide to Immigration Documents

The USCIS's Systematic Alien Verification for Entitlements (SAVE) Program office publishes the SAVE Guide to Immigration Documents. To access the Guide, go to: *https://save.uscis.gov/web/media/resourcesContents/SAVEGuide-CommonlyusedImmigrationDocs.pdf*

### USCIS retires red ink

U.S. Citizenship & Immigration Services (USCIS) now uses blue colored ink for its secure stamps. The old red ink previously used for such stamps has been retired and will no longer be used (note also that some stamps still use black ink).

### Use of copy of I-94 or I-94A

Note that a refugee or an asylee may apply for permanent-resident status. During the period in which the application is being reviewed, the student may have a copy of the I-94 that includes the endorsement "209a (or 209b) pending. Employment Authorized." Students with this form of documentation are eligible for FSA funds as long as the I-94 has not expired.

For more sample citizenship documents which may be used to substantiate various types of citizenship status, see the end of this chapter.

### Asylees abroad and eligibility

Asylees who leave the U.S. for an extended amount of time without USCIS approval forfeit their current immigration status, so it may thus be difficult for them to be considered an eligible noncitizen for FSA purposes.

indicating that the person was admitted to the U.S. as a conditional entrant. **Because DHS stopped using this category after enacting the Refugee Act on March 31, 1980, you should not disburse FSA funds if the student has an I-94 with conditional entrant status granted after that date.**

The stamps mentioned use blue security ink. The stamp contains three codes: the first is a two-digit code to the left of the date that designates the field office with jurisdiction over the port of entry. On most stamps, this code will be two numbers and no letters. Letters are currently only used on HQ stamps. The three-letter code located under the word "ADMITTED" shows the port of entry. The third code, to the right of the date, is the unique four-digit number. When referring to a particular stamp, the port of entry code and the stamp's unique number should be used.

The endorsement or stamp can be placed anywhere on the I-94. If the original stamp does not copy well due to the ink color, you should replicate it by hand on the photocopy. Because CBP offices don't have uniform procedures or stamps, you should contact the local office with questions regarding acceptable immigration documents.

- **Refugee** status continues unless revoked by DHS. Refugees are required to apply for Lawful Permanent Residency (LPR) status after one year, and continue to be refugees even after the grant of LPR status. In September 2015, CBP automated the refugee process. A refugee will have an electronic **I-94** showing "RE" as the class of admission and "DS" as the admit until date. The **refugee travel letter** provided by the Department of State will be annotated with a stamp showing admission under Section 207 of the Immigration and Nationality Act (INA). While the form is now automated, a refugee may be in possession of an older paper I-94 or I-94A form or be provided a paper form upon request. The paper form I-94 or **I-94A** is annotated with a stamp showing admission under Section 207 of the Immigration and Nationality Act (INA). They may also have the old **Refugee Travel Document (Form I-571)** or the newer **U.S. Travel Document** annotated with "Refugee Travel Document Form I-571 (Rev. 9-2-03)." Refugees are employment authorized and may present an employment authorization document.

- **Persons granted asylum** can apply for permanent residence after one year. Asylee status continues unless revoked by DHS or until permanent resident status is granted. Asylees will have an **I-94 or I-94A** with a stamp showing admission under Section 208 of the INA. They may also have the same travel documents described for refugees. Persons granted asylum in the U.S. are authorized for indefinite employment.

- **Persons paroled into the U.S. for at least one year** must provide documentation of their parole status (such as an I-94) and it must have a stamp indicating that the student has been paroled into the U.S. for at least one year, with a date that has not expired (federal student aid cannot be disbursed after the document has expired). They also must provide evidence (such as having filed an Application to Register

Permanent Residence or Adjust Status [**I-485**] or being the named alien relative from a petitioner, I-130) from the DHS that they are in the U.S. for other than a temporary purpose and intend to become a citizen or permanent resident. DHS will usually respond to the filing of an I-485 with an **I-797** and a parolee must provide this I-797 or any other immigration document from DHS showing the student is in the U.S. for other than a temporary purpose and intends to become a citizen or LPR. If the student does not submit an I-797, send his alternative documentation to SAVE and ensure that the SAVE comments indicate "Application Pending I-485" (Form I-485 is an application for Lawful Permanent Resident status).

- **Cuban-Haitian Entrants** as defined by Section 501(e) of the Refugee Education Assistance Act of 1980. All Cuban-Haitian entrants are potentially eligible for Federal Student Aid. Note that certain documents showing that the holder is a Cuban-Haitian entrant continue to convey CHE status even if the expiration date has passed. When submitting CHE documentation (typically an I-94 with a CHE Entrant stamp), click on the Cuban/Haitian Entrant button in SAVE for CHE status verification.

- **Victims of human trafficking** have the same eligibility for federal benefits as refugees under the Victims of Trafficking and Violence Protection Act, though the Department of Health and Human Services (HHS), rather than the DHS, is responsible for certifying this status. Because of this, these students will not pass the DHS match, and the normal paper third-step confirmation does not apply. These individuals may have an **I-94 with a T1, T2, T3, or T COA code** for principal, spouse, child, or parent, respectively. You must instead review the student's certification or eligibility letter from the HHS and call the Office on Trafficking in Persons at 1-866-401-5510, as noted on the letter, to verify its validity and confirm that the eligibility has not expired. You must note the date, time, and results of the call and retain a copy of the letter. If the student applies for federal student aid in a subsequent year at your school, you must call again to ensure that the student's status is still in force.

  The spouse, child, or parent of a trafficking victim might be eligible for aid. They will not have a certification letter but will have a **T-visa (e.g., T2 or T3)**. They will also likely fail the DHS match; if so you must call the same office as noted above, verify the validity of the T-visa as well as the victim's certification letter, note the time and results, and save a copy of both documents.

- **Battered immigrants-qualified aliens** are victims of domestic violence by their U.S. citizen or lawful permanent resident (LPR) spouses or parents. They may, with their designated children, be eligible under the **Violence Against Women Act (VAWA)** for federal public benefits, including federal student aid. Note that both men and women may be approved as victims under VAWA.

  They indicate on the FAFSA that they are eligible noncitizens, though they will not pass the automated DHS match. Instead, they will need to obtain and provide you with documentation based on their case

**Form I-797 Notice of Action**
Form I-797 is USCIS's formal communication with customers issued when an application or petition is approved or to confer an immigration benefit.

**Victims of human trafficking**
DCL GEN-06-09

**VAWA verification**
Battered immigrants-qualified aliens
DCL GEN-10-07

If the school has reservations about the documentation provided, or is unclear about the outcome reflected in the documentation, after reviewing this section of the FSA Handbook, the financial aid administrator must submit third step verification data to DHS-USCIS.

type: self-petition, suspension of deportation, or cancellation of re-moval.

Check the student's documentation carefully. If the immigration documents match the description below for an approval of petition or a prima facie case, the student should be considered an eligible noncitizen. Third-step verification through the SAVE system is not required.

In **self-petitioning cases** under VAWA, the immigrant submits an I-360 form to the USCIS, which will deny the petition, approve it, or find that a "prima facie" case has been established. Either an approval or a prima facie finding makes a student eligible for aid, though the latter has an expiration date after which the person becomes ineligible. In some cases, the USCIS will acknowledge receipt of a petition. This does not establish eligibility for aid.

With an **approval of a petition**, the USCIS will provide a **Form I-797, Notice of Action form**, that will indicate it is an approval notice for a self-petitioning spouse of a U.S. citizen or LPR. and that the petition has been approved. A separate I-797 will be issued with the names and dates of birth of children listed by the applicant, and it will indicate that they are named on the approved petition. These children are eligible for aid, and because their USCIS status continues after reaching the age of majority, their eligibility for aid continues as well. In some cases, a dependent child can petition for battered immigrant status; the I-797 would then indicate a self-petitioning child of a U.S.C. or LPR.

With a **prima facie case**, the USCIS will sometimes issue an **I-797** that indicates an establishment of prima facie case. This status is usually for a period of up to 180 days, though the USCIS may extend that period until the case is approved or denied. Petitioners can submit a written request for the extension. The DHS may also return, via the SAVE system, a result of "pending prima facie VAWA self-petition" (in the "DHS Comments" field), which indicates the applicant has established a prima facie case and therefore the applicant is eligible until the I-797 expires. If SAVE returns a response of "application filed" the applicant is not eligible. As long as the deadline has not expired, the person is eligible for FSA funds. Children may be included on the I-797, though their eligibility is subject to the same expiration date. If a spouse is ultimately denied approval, the children on the I-797 would also be denied and ineligible for aid.

Therefore, it is important to examine the notice carefully. For example, USCIS may issue a Notice of Deferred Action on an I-797, which is an administrative choice to give lower priority for removal of an immigrant from the U.S. Such a notice could pertain to cases unrelated to petitions for battered immigrant status, and it would not be sufficient for documentation of a self-petitioner. It generally will have a termination date. Be sure to examine the notice carefully to be sure it relates to the student's claim for eligible noncitizen status and that it conveys relevant information to the student's case. If a termination date is in-

dicated on the I-797, a petition approval or an establishment of prima facie case will be eligible for aid through that date and ineligible afterward.

An immigration judge may issue a **suspension of deportation** of the abused person under the VAWA. The applicant will receive a **copy of the court order**. As long as it has not expired and clearly indicates suspension of deportation by the judge, an otherwise eligible person can receive FSA funds.

An immigration judge can also issue a **cancellation of removal** of the abused person under the VAWA. The applicant will receive a **copy of the court order**. As long as that has not expired and clearly indicates cancellation of removal by the judge, an otherwise eligible person can receive FSA funds.

You must examine the USCIS document and keep a copy in the student's file. If it indicates he is eligible for aid and the expiration date has not passed, you may award aid. If the student applies for FSA funds in a subsequent year, you may rely on the original document if it has not expired, but you must have the student provide a dated, written statement that his immigration status under VAWA remains in effect without change. If his documentation has expired, he must renew it.

If you are unclear about a student's documentation, submit it for third step verification through the SAVE system. Type "requesting VAWA status review" in the "Special Comments box of the SAVE "Submit Document" screen requesting review for VAWA status verification. You will determine the student's eligibility for aid based on the result of the submission.

### Jay Treaty

**Section 289 of the Immigration and Nationality Act (INA)** gives persons with at least 50% Native American blood who were born in Canada the legal right to live and work indefinitely in the U.S. This is based on the Jay Treaty of 1794 and subsequent court decisions. Such individuals are not subject to the legal restrictions typically imposed on aliens by the DHS, are not required to obtain documentation from the DHS, and are considered "lawfully admitted for permanent residence." They must obtain an SSN for purposes of applying for Title IV aid.

Students who may be eligible for FSA funds should enter their valid ARN (or a A999999999 if they don't have an ARN) on the FAFSA and indicate they are eligible noncitizens. If they fail the DHS match, you must submit a third step verification with the documentation. If they fail third step verification, they can still be considered eligible if they meet the documentation requirements below for students without an ARN. Students who enter all 9's for their ARN will receive **comment 144** on the output document. The school must obtain proof that such a student has 50% Native American blood and was born in Canada. To do so, the student should provide one or more of the following documents:

- A **"band card"** issued by the Band Council of a Canadian Reserve, or by the Department of Indian Affairs in Ottawa;

- **Birth or baptism records;**

- **An affidavit** from a tribal official or other person knowledgeable about the applicant's or recipient's family history;

- **Identification** from a recognized Native American provincial or territorial organization.

If the student can provide this documentation and is otherwise eligible, the school must note this in the student's file and can award FSA funds.

### Ineligible statuses and documents

Several types of documentation do not prove a student's eligible noncitizen status. Below, we list a variety of forms and their related statuses which are ineligible. If a student does not provide a document that proves his eligibility for Title IV aid, he is not eligible with these documents alone. Generally, if a student has both an eligible noncitizen status as well as an ineligible status, the eligible status will trump the ineligible status, and the student will be potentially eligible for Title IV aid (pending other aspects of student eligibility as discussed in this Volume).

- A **Social Security card** or **driver's license** isn't acceptable for documenting U.S. citizenship or national status since these individuals can also have these forms of identification. "Enhanced" driver's licenses (provided by a limited number of states to permit non-air travel entry to the U.S. from Canada, Mexico, and the Caribbean) are also not acceptable.

- Someone who has only a **"Notice of Approval to Apply for Permanent Residence (I-171 or I-464)"** cannot receive FSA funds. The State Department publishes a list of nonimmigrant visas at:

  *https://travel.state.gov/content/travel/en/us-visas/tourism-visit.html*.

- **Employment authorization card.** Someone with a nonimmigrant visa isn't eligible for FSA funds unless he/she has a Form **I-94** with one of the endorsements given in the eligible document section.

- **Nonimmigrant visas** include those with work visas, students, visitors, and foreign government officials. Someone with a nonimmigrant visa isn't eligible for FSA funds unless he/she has a **Form I-94** with one of the endorsements given in the eligible document section. Nonimmigrant visas include (but are not limited to) the:

  - **F-1, F-2, or M-1 Student Visa,**
  - **NATO Visas (NATO),**
  - **A2 and A3 Visas (foreign official, including attendants),**
  - **B-1 or B-2 Visitor Visa,**

- **J-1 or J-2 Exchange Visitors Visa,**
- **H series or L series Visa (which allow temporary employment in the U.S.), or**
- **G series Visa (pertaining to international organizations).**

- Form **I-817**, Application or approval for Family Unity Benefits.

- Temporary residents are allowed to live and work in the U.S. under the Legalization or Special Agricultural Worker program. This usually is recognized on an **I-688** form.  These residents are no longer eligible for Title IV funds.

- Illegal aliens under the legalization (also called the amnesty) program established by the Immigration Reform and Control Act of 1986 (IRCA).  These individuals were given documentation that allowed them to work while their application for permanent resident status was being processed, but they aren't eligible for aid unless their application was approved.

- **I-94** forms stamped with "Temporary Protected Status."

- Deferred Action for Childhood Arrivals (DACA) status is conferred by the USCIS office of DHS. Students granted DACA often are assigned an SSN, and they are not eligible for Title IV aid, but may be eligible for state or college aid, and submitting a FAFSA can help them access those other types of aid. To complete the FAFSA, DACA status students must enter their SSN and answer the "Are you a U.S. citizen?" question as "No, I am not a U.S. citizen or eligible noncitizen." After submitting the FAFSA, the student should check with the school's financial aid office to see what types of non-federal financial aid they may be eligible to receive.

- "Withholding of removal" order issued by an immigration judge or by the Board of Immigration Appeals. This is used to protect a person from return to a country that threatens the person's life or freedom.

- "U-Visa" holders are not designated as qualified aliens under the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) and are therefore not eligible for Title IV program funds. However, U-Visa holders may convert to lawful permanent resident (LPR) status after they have physically been present in the U.S. for a continuous period of at least three years after the date of admission given on their U-Visa. Documentation is usually on an form **I-797**. It is important for you to inspect the content of the document since the **I-797** is used for a variety of purposes.

If the student becomes an LPR, he or she becomes a qualified alien under the PRWORA (see above), and thus potentially eligible for Title IV funds (assuming they meet all other eligibility requirements. U-Visa holders should be encouraged to explore non-federal aid options to help them pay for school while waiting for their application

**U-Visa information**
More information on U Visas may be found on the following website: *www.uscis.gov/green-card/other-ways-get-green-card/green-card-victim-crime-u-nonimmigrant.*

**Procedures when ineligibility is determined after disbursement**
34 CFR 668.136(c)

for LPR status (**I-485**) to be approved. FSA's studentaid website contains information to help students search for possible scholarships and other resources.

If the document a student submits is for an ineligible status, you shouldn't submit the documentation for third step verification. Unless you have conflicting information or the student compels you to do so. USCIS will only confirm current immigration status based on the document presented; it doesn't determine whether the student is eligible for FSA funds. Unless the student can submit documentation for an eligible status, as described above, or USCIS confirms the student's status as an eligible student, the student can't receive aid.

## USING THE SAVE SYSTEM FOR THIRD STEP VERIFICATION

If the student's immigration documentation appears to support an eligible noncitizen status, or if you have conflicting information after receiving a secondary match result, you must complete a third step verification request through the SAVE system.

In a collaborative effort, DHS and the Department of Education designed and implemented special functionality for schools to submit third step verification requests through the SAVE system, to check students' eligibility for Title IV aid. A unique SAVE user ID was issued to the Primary Destination Point Administrator (PDPA) at each school to access the SAVE system.

All the instructions you needed to access and navigate the SAVE system are available on the DHS-SAVE Eligible Noncitizen, DHS-SAVE Electronic Third Step Verification link on IFAP.

· SAVE Instructions for U.S. Department of Education (School) Users Available

· Volume 1-Student Eligibility of the Federal Student Aid Handbook, and

· Resend Record to Matches Functionality Available in FAA Access to CPS on Line to Streamline SAVE Third Step Process

If the student's immigration documentation appears to support that he/she is an eligible noncitizen, or if you have conflicting information after receiving a match result, you must complete a third step verification request.

### Third step verification preparation & submission

1. Request the student's most current, unexpired immigration document. When it is submitted, make a copy of it.

2. Carefully review the student's immigration documentation against the status and document descriptions below.

**"Third Step" Verification through the SAVE system**

The "Paper Secondary Confirmation" step, which required you to submit a paper form G-845, is called "third step verification." DHS-USCIS now returns the response via the SAVE system.

To access the SAVE system, go to: https://www.uscis.gov/save

3. Determine whether the student's immigration documentation supports eligibility for Title IV aid. If it does do not support an eligible status, you can tell the student that he/she is not eligible now, but may be eligible if/when they provide eligible noncitizen documentation. You should not complete third step verification for this student.

### SAVE Third Step Responses

A USCIS status verifier will search the SAVE databases, and enter the student's immigration status in the SAVE system within three to five business days of the request.

If you don't receive a response from the USCIS after **at least 15** business days from the date you sent the third step verification request, if you have sufficient documentation to make a decision, and if you have no information that conflicts with the student's documents or claimed status, you should review his file and determine whether he meets the eligible noncitizen requirements. If he does meet the requirements, make any disbursement for which he is eligible and note in his file that SAVE exceeded the time allotment and that noncitizen eligibility was determined without their verification.

**15 business day USCIS time-frame**
34 CFR 668.136(b)(3)

When third step verification results in an eligible status, you must keep a copy of the SAVE response screen. If the confirmation process indicates a discrepancy, you must ask the student to correct the discrepancy with the USCIS. No certification of loans or further disbursement of funds can be made until the discrepancy is corrected. If the discrepancy isn't reconciled, the student must repay all aid except wages earned under FWS. Whenever the student is able to provide new information, it must be submitted to the USCIS as a third step verification request.

**Lack of response example**
Javier is a refugee and received aid from Schwarber University. His status wasn't confirmed through the DHS match, so Schwarber performed third step verification. The DHS didn't respond in time, so Schwarber paid Javier without any response. When Javier applies again, the CPS still doesn't confirm his status. Even though Schwarber began third step verification for Javier last year and his documents haven't expired, because the school never received a DHS response, it must perform third step verification again.

If you have followed the procedures outlined here, including notifying the student of the discrepancy and withholding further payments and loan certifications as soon as a discrepancy is found, your school isn't liable for aid disbursed prior to third step verification. This assumes that you had no other conflicting information prior to making the disbursement and had reviewed the available documentation and concluded that the student was otherwise eligible.

### Interpreting the SAVE response

When you receive the SAVE response, you determine the student's eligibility by referencing the SAVE response against the following list. The SAVE response does not directly state whether the student is eligible for Title IV funds. If they match, but do not support an eligible status, tell the student they are ineligible until/unless they can provide documentation that supports an eligible status, and stop third step verification for the student. If the student's documentation supports an eligible noncitizen status but the SAVE system response shows an ineligible status, request a new DHS verification number (see "resend to matches" sidebar on following page) to resubmit the verification.

The following list explains whether a response means the student is eligible or ineligible for Title IV aid. For descriptions of the following immigration statuses, see the earlier sections on eligible and ineligible noncitizens and their documentation:

**Potentially eligible statuses:**

**"Lawful Permanent Resident"**

**"Conditional Resident"**

**"Asylum or refugee status"**

**"Parolee"**  The student is eligible for aid if paroled into the U.S. for one year or more. The SAVE response will include the parole expiration date which must be after the day the student starts classes **AND** has evidence from the DHS (such as a form I-797 Notice of Approval of I-485 Permanent Residence Status) that he is in the U.S. for other than a temporary purpose and intends to become a U.S. citizen or permanent resident. The SAVE response will include a note that the student's I-485 application is pending, if applicable. Note that if the student has not filed the I-485, nor had that application accepted by DHS, they are not an eligible noncitizen parolee.

**"U.S. citizen"**  Because the verification request is used to check the status of noncitizens, this box should be infrequently checked. You should not see this in the financial aid office because, as explained earlier in the chapter, you would have reviewed the student's documentation, which identified them as a U.S. citizen, and you would not have submitted it to the USCIS.

**"Cuban/Haitian Entrant" SAVE has a special box that you click to receive a Cuban-Haitian Entrant response.**

**"American Indian born in Canada"**  For details, see the Jay Treaty section earlier in this chapter.

**"Texas or Oklahoma Band of Kickapoo Indians"**  If this response is received, the financial aid administrator must contact U.S. Department of Education staff by emailing Aaron Washington (Aaron.Washington@ed.gov).

**"VAWA Self-Petitioner"**  See GEN-10-07. If you have questions about VAWA status, contact Aaron Washington at Aaron.Washington@ed.gov.

### Ineligible statuses

Each of the following statuses are by themselves insufficient to make a student eligible for FSA funds. Unless an eligible status is also submitted, or the student can provide other documentation that can be confirmed by the USCIS, the following types of student are not Title IV eligible:

---

**Resend record to matches process**
E-Announcement February 14, 2019

When you determine that third-step confirmation cannot be completed for a student, for example, when the case status is "closed," or the SAVE response doesn't match the immigration documentation provided by the student, you must complete the "resend record to matches" process in the FAA Access to CPS Online system. This replaces the "requesting a new DHS verification number" process.

**"Employment Authorized"**

**"Not Employment Authorized"**

**"Application Pending for the following USCIS benefit"**  A pending application for an immigration status doesn't by itself make the student eligible for FSA funds; he must have an eligible status indicated on the SAVE response.

*"***Nonimmigrant***"*

**"Deferred Action for Childhood Arrivals (DACA)"**

**"Family Unity"**

**"Temporary Protected Status (TPS)"**

**"Deferred Action Status"**

**"Withholding of Removal"**

**"Document Expired, Altered, or Counterfeit."** Notify the student that unless corrective action is taken with the USCIS, the case will be submitted to the Office of Inspector General (OIG). Until this is resolved, no further aid may be disbursed, awarded, or certified. If the student does not take corrective action in a timely manner, you must report the case to the OIG. If SAVE was unable to process the request you may receive one of the following error messages:

- **Resubmit request with both sides of the applicant's immigration document.** Resubmit the student's immigration documents with copies of both sides of each document.
- **Applicant's Immigration document is illegible.**  Resubmit the student's immigration documents with higher quality copies of the original documentation.

**"Unable to verify status based on the document provided."** If this is checked, DHS-USCIS was not able to verify the student's status based on the documentation provided. The student must contact the appropriate agency, i.e., USCIS, Immigration and Customs Enforcement (ICE), or Customs and Border Protection (CBP) to correct their records.

### Student rights

You must allow the student at least 30 days from the time you receive the SAVE response to provide documentation of his immigration status.  During this period and until the results of the third step verification are received, you can't deny, reduce, or terminate aid to him. Unless you can determine that the documentation doesn't support an eligible noncitizen status, you must submit the student's immigration documents within ten business days of receipt. If the documentation supports the student's status as an eligible noncitizen, and if at least 15 business days passed since the date on which the documentation was submitted to the USCIS, you can disburse aid to an oth-

erwise eligible student pending the USCIS response.

Your school isn't liable if you erroneously conclude that a student is an eligible noncitizen, provided that you had no conflicting data on file and you relied on:

- A SAR or ISIR indicating that the student meets the requirements for federal student aid;

- A USCIS determination of an eligible immigration status in response to a request for third step verification; or

- Immigration status documents submitted by the student, if the USCIS did not respond in a timely fashion.

The student (or parent borrower of a PLUS loan) is liable for any FSA funds received if he is ineligible. If you made your decision without having one of the documents above, your school is held responsible for repaying FSA funds to the Department. Your school should establish procedures to ensure due process for the student if FSA funds are disbursed but the aid office later determines (using third step verification) that the student isn't an eligible noncitizen. The student must be notified of his ineligibility and given an opportunity to contest the decision by submitting to your school any additional documents that support his claim to be an eligible noncitizen. If the documents appear to support the student's claim, you should submit them to USCIS using third step verification. You must notify the student of your office's final decision based on the third step verification results.

For every student required to undergo third step verification, you must furnish written instructions providing:

- An explanation of the documentation the student must submit as evidence of eligible noncitizen status;

- Your school's deadline for submitting documentation (which must be at least 30 days from the date your office receives the results of the primary confirmation);

- Notification that if the student misses the deadline, he may not receive FSA funds for the award period or period of enrollment; and

- A statement that you won't decide the student's eligibility until he has a chance to submit immigration status documents.

## DOCUMENTING IMMIGRATION STATUS
## IN LATER AWARD YEARS

There are several cases in which **you must document** a student's immigration status in a subsequent award year if that student is not confirmed as an eligible non citizen on the SAR/ISIR process. For example, a student who presented a **Temporary Form I-551** in a prior award year should have received a permanent I-551 by the next year and shouldn't still have a temporary card. You should refer the student to USCIS to obtain a permanent I-551 or an updated endorsement on the previous card.

You must also document the eligible noncitizen status each award year for a **conditional permanent resident, a refugee, a Cuban-Haitian entrant, or a person granted asylum**. Students in any of these categories may have been redesignated to permanent-resident status or may have had their statuses revoked.  You will have to send the documents for third step verification if the student's status isn't confirmed through the USCIS match.

**You don't have to document** a student's eligible noncitizen status in subsequent award years if you've documented that the student is:

- a U.S. citizen or national;

- a citizen of the Freely Associated States;

- has a Form I-551 or I-151; or

- if the SAVE response indicates that for the previous award year, the student was an eligible noncitizen and the documents supporting the status in question have not expired.

You must also have no conflicting information or reason to doubt the student's claim of having eligible noncitizen status. Also note that you must have confirmed the status in a previous award year. You may  disburse aid without the USCIS response if the USCIS doesn't respond in time for that award year, but you can't count that lack of response as confirmation for the following year.

**Exclusion from subsequent confirmation**
34 CFR 668.133(b)

## REPLACING LOST DHS DOCUMENTS

If a student can't locate his official USCIS documentation, the student must request that the documents be replaced because noncitizens who are 18 years and older must have immigration documentation in their possession at all times while in the United States. Requests for replacement documents should be made by the student to the nearest USCIS District Office.

The student will be asked to complete a **Form I-90**, **"Application to Replace Alien Registration Card"** or a **Form I-102, "Application for Replacement/Initial Nonimmigrant Arrival-Departure Document."** PDF versions of these forms can be downloaded from the USCIS website at *uscis.gov*. A temporary I-94 may be issued while the replacement documents are pending.

In cases of undue hardship, where the student urgently needs documentation of his status, the Freedom of Information Act (FOIA) allows him to obtain photocopies of the documents from the USCIS District Office that issued the original documents. The student can submit a Form G-639 to make this request or can simply send a letter to the district office. If he is not sure which district office issued the original documents, he can submit the request to the field office nearest to his place of residence.

A naturalized U.S. citizen student who lost documents or surrendered them when entering prison is responsible for getting copies of them before third step verification is submitted for the student (see "Replacing Lost DHS Documents"). You can request copies of immigration documents directly from penal institutions at the request of the student.

## EXAMPLES OF U.S. CITIZENSHIP AND ELIGIBLE NONCITIZEN DOCUMENTS

The next few pages show some common documents used to demonstrate citizenship for various categories/types of citizenship. Note that not all documents shown may satisfy citizenship requirements in all cases. See the specific notes on each document shown, and also refer to the discussion of citizenship requirements described in detail earlier in this chapter.

# CITIZEN NOT BORN IN U.S./NONCITIZEN NATIONAL

### *U.S. Passport*
*Can be used to document citizenship for citizen born abroad.*

*For a noncitizen national, must be stamped "Noncitizen National." (Note that a passport issued by another country may be used to document U.S. permanent resident status if it has the endorsement "Processed for I-551" and has a currently valid expiration date.)*

 



### *U.S. Passport Card*
*This resembles a credit card in size and form. Though it cannot be used for international air travel, it is, like the passport book, proof of U.S. citizenship.*

### *Certificate of Naturalization*
*The Certificate of Naturalization is issued to naturalized U.S. citizens A revised version of the Certificate of Naturalization (Form N-550) was created in 2010.*

*All previously issued certificates remain valid.*



000154

## *Certificate of Citizenship*

*The Certificate of Citizenship is issued to persons who were born abroad of U.S. parent(s), who became citizens when their parents were naturalized, or who were adopted by U.S. parents.*



## *Certification of Birth Abroad*

*Issued to U.S. citizens born abroad. Must have embossed seal of the State Department.*



# CITIZEN NOT BORN IN U.S./NONCITIZEN NATIONAL
# PERMANENT RESIDENT/OTHER ELIGIBLE NONCITIZEN

### Form CBP I-94

*Here is a sample paper form. Although such are no longer normally issued for air and sea arrivals, legacy paper forms are still valid and in use, and one may still encounter recently issued valid paper forms.*



### Form CBP I-94A

*Below, the computer-generated Form CBP I-94A replaces the paper Form I-94 that was completed manually. For eligible noncitizens, it must be annotated as described earlier in this chapter.*

*See also the I-94 website at: https://i94.cbp.dhs.gov/I94/#/home. The website allows you to look up I-94 student data, if the student grants you permission to do so.*



## I-94 Arrival-Departure Record

For permanent resident status, must be stamped "Processed for I-551" with expiration date or "Temporary Form I-551" with appropriate information filled in. For other eligible noncitizens, must be stamped as Refugee, Asylum Status, Conditional Entrant (before April 1, 1980), Parolee, or Cuban-Haitian Entrant.





## United States Travel Document
### (front cover)
This contains the Reentry Permit (Form I-327) and the Refugee Travel Document (Form I-571). It is used by lawful permanent residents, refugees, and asylees.



## I-571 Refugee Travel document
Contained in the U.S. Travel document, the I-571 helps document the status of refugees.

### CBP I-94 Website Printout

*Travelers have access to their electronic I-94 via DHS's I-94 website. The website printout serves the same purpose as any other I-94. A sample of what the printout looks like is shown here.*



### Machine Readable Immigrant Visa (MRIV)

*The MRIV will appear in the holder's (foreign) passport. If the passport is unexpired and endorsed with an admission stamp and the statement, "Upon endorsement serves as temporary I-551 evidencing permanent residence for 1 year," it serves as a temporary I-551 and as valid documentation for establishing aid eligibility.*



### Re-entry permit

*USCIS issues the Form I-327, Re-Entry Permit to permanent residents and conditional residents to allow them to re-enter the U.S. for a period of two years. The re-entry permit is found in the U.S. Travel Document.*



*Permanent residents* are issued identification cards that they are required to have in their possession at all times. The first Alien Registration Receipt Card was introduced in 1946 and through various revisions was primarily green, which caused it to be known as a "green card." This term is still used, though the cards have changed color over the years.

### Alien Registration Receipt Card I-151
*(front and back)*

*Issued prior to June 1978 to permanent residents. Note: As of March 20, 1996, Form I-151 is no longer acceptable to USCIS as evidence of permanent residence, though it may be used to receive FSA funds.*




### Resident Alien Card
### I-551 *(two versions, front only)*

*The I-551 is a revised version of the I-151. It was phased in beginning in January 1977 and was revised in 1989. The "Conditional Resident Alien Card" is identified by a "C" on the front and an expiration date on the back.*




*(1989)*

### Permanent Resident
### Card I-551 *(front only for older versions, front and back for the current version)*

*The Permanent Resident Card was introduced in December 1997 and revised in 2004. In 2010 it was again updated, with the color green used once more in the design of the front of the card.*




*(1997)*                                     *(2004)*




Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2017 and fall 2018

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 160 of 305

 IES ∶ NCES **National Center for Education Statistics**   ☰ MENU

DIGEST *of* EDUCATION STATISTICS

2019 Tables and Figures          All Years of Tables and Figures          Most Recent Full Issue of the Digest

◀ Previous Page                                                                    Download Excel  (47KB)

**Table 311.15.  Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2017 and fall 2018**

| Year, level of enrollment, and control and level of institution | Total | No distance education courses | Total, any distance education course(s) | At least one, but not all, of student's courses | Exclusively distance education courses, by location of student — Total | Same state | Different state | State not known | Outside of the United States | Location unknown | Total | No distance education courses | Total, any distance education course(s) | At least one, but not all, of student's courses | Exclusively distance education courses, by location of student — Total | Same state | Different state | State not known | Outside of the United States | Location unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| **Fall 2017** | | | | | | | | | | | | | | | | | | | | |
| All students, total | 19,778,151 | 13,155,348 | 6,622,803 | 3,515,659 | 3,107,144 | 1,775,555 | 1,251,709 | 15,777 | 45,368 | 18,735 | 100.0 | 66.5 | 33.5 | 17.8 | 15.7 | 9.0 | 6.3 | 0.1 | 0.2 | 0.1 |
| Public | 14,571,739 | 9,907,335 | 4,664,404 | 3,002,916 | 1,661,488 | 1,394,179 | 225,502 | 11,534 | 17,749 | 12,524 | 100.0 | 68.0 | 32.0 | 20.6 | 11.4 | 9.6 | 1.5 | 0.1 | 0.1 | 0.1 |
| Private | 5,206,412 | 3,248,013 | 1,958,399 | 512,743 | 1,445,656 | 381,376 | 1,026,207 | 4,243 | 27,619 | 6,211 | 100.0 | 62.4 | 37.6 | 9.8 | 27.8 | 7.3 | 19.7 | 0.1 | 0.5 | 0.1 |
| Nonprofit | 4,108,489 | 2,929,755 | 1,178,734 | 390,579 | 788,155 | 273,133 | 491,664 | 3,141 | 17,292 | 2,925 | 100.0 | 71.3 | 28.7 | 9.5 | 19.2 | 6.6 | 12.0 | 0.1 | 0.4 | 0.1 |
| For-profit | 1,097,923 | 318,258 | 779,665 | 122,164 | 657,501 | 108,243 | 534,543 | 1,102 | 10,327 | 3,286 | 100.0 | 29.0 | 71.0 | 11.1 | 59.9 | 9.9 | 48.7 | 0.1 | 0.9 | 0.3 |
| **Fall 2018** | | | | | | | | | | | | | | | | | | | | |
| All students, total | 19,645,918 | 12,713,844 | 6,932,074 | 3,674,087 | 3,257,987 | 1,869,652 | 1,293,454 | 17,083 | 44,321 | 33,477 | 100.0 | 64.7 | 35.3 | 18.7 | 16.6 | 9.5 | 6.6 | 0.1 | 0.2 | 0.2 |
| 4-year | 13,900,710 | 8,941,162 | 4,959,548 | 2,506,759 | 2,452,789 | 1,144,147 | 1,238,866 | 13,504 | 40,619 | 15,653 | 100.0 | 64.3 | 35.7 | 18.0 | 17.6 | 8.2 | 8.9 | 0.1 | 0.3 | 0.1 |
| 2-year | 5,745,208 | 3,772,682 | 1,972,526 | 1,167,328 | 805,198 | 725,505 | 54,588 | 3,579 | 3,702 | 17,824 | 100.0 | 65.7 | 34.3 | 20.3 | 14.0 | 12.6 | 1.0 | 0.1 | 0.1 | 0.3 |
| Public | 14,529,264 | 9,569,412 | 4,959,852 | 3,153,470 | 1,806,382 | 1,475,262 | 271,659 | 11,794 | 18,583 | 29,084 | 100.0 | 65.9 | 34.1 | 21.7 | 12.4 | 10.2 | 1.9 | 0.1 | 0.1 | 0.2 |
| 4-year | 8,982,560 | 5,945,224 | 3,037,336 | 2,005,490 | 1,031,846 | 755,127 | 242,105 | 8,215 | 14,997 | 11,402 | 100.0 | 66.2 | 33.8 | 22.3 | 11.5 | 8.4 | 2.7 | 0.1 | 0.2 | 0.1 |
| 2-year | 5,546,704 | 3,624,188 | 1,922,516 | 1,147,980 | 774,536 | 720,135 | 29,554 | 3,579 | 3,586 | 17,682 | 100.0 | 65.3 | 34.7 | 20.7 | 14.0 | 13.0 | 0.5 | 0.1 | 0.1 | 0.3 |
| Private | 5,116,654 | 3,144,432 | 1,972,222 | 520,617 | 1,451,605 | 394,390 | 1,021,795 | 5,289 | 25,738 | 4,393 | 100.0 | 61.5 | 38.5 | 10.2 | 28.4 | 7.7 | 20.0 | 0.1 | 0.5 | 0.1 |
| Nonprofit | 4,134,244 | 2,878,717 | 1,255,527 | 418,048 | 837,479 | 288,963 | 525,951 | 3,705 | 14,838 | 4,022 | 100.0 | 69.6 | 30.4 | 10.1 | 20.3 | 7.0 | 12.7 | 0.1 | 0.4 | 0.1 |
| 4-year | 4,089,090 | 2,857,653 | 1,231,437 | 414,132 | 817,305 | 286,033 | 508,712 | 3,705 | 14,834 | 4,021 | 100.0 | 69.9 | 30.1 | 10.1 | 20.0 | 7.0 | 12.4 | 0.1 | 0.4 | 0.1 |
| 2-year | 45,154 | 21,064 | 24,090 | 3,916 | 20,174 | 2,930 | 17,239 | 0 | 4 | 1 | 100.0 | 46.6 | 53.4 | 8.7 | 44.7 | 6.5 | 38.2 | 0.0 | # | # |
| For-profit | 982,410 | 265,715 | 716,695 | 102,569 | 614,126 | 105,427 | 495,844 | 1,584 | 10,900 | 371 | 100.0 | 27.0 | 73.0 | 10.4 | 62.5 | 10.7 | 50.5 | 0.2 | 1.1 | 0.0 |
| 4-year | 829,060 | 138,285 | 690,775 | 87,137 | 603,638 | 102,987 | 488,049 | 1,584 | 10,788 | 230 | 100.0 | 16.7 | 83.3 | 10.5 | 72.8 | 12.4 | 58.9 | 0.2 | 1.3 | 0.0 |
| 2-year | 153,350 | 127,430 | 25,920 | 15,432 | 10,488 | 2,440 | 7,795 | 0 | 112 | 141 | 100.0 | 83.1 | 16.9 | 10.1 | 6.8 | 1.6 | 5.1 | 0.0 | 0.1 | 0.1 |
| **Undergraduate** | 16,610,235 | 10,885,526 | 5,724,709 | 3,399,567 | 2,325,142 | 1,464,038 | 798,815 | 9,641 | 24,188 | 28,460 | 100.0 | 65.5 | 34.5 | 20.5 | 14.0 | 8.8 | 4.8 | 0.1 | 0.1 | 0.2 |
| 4-year | 10,865,027 | 7,112,844 | 3,752,183 | 2,232,239 | 1,519,944 | 738,533 | 744,227 | 6,062 | 20,486 | 10,636 | 100.0 | 65.5 | 34.5 | 20.5 | 14.0 | 6.8 | 6.8 | 0.1 | 0.2 | 0.1 |
| 2-year | 5,745,208 | 3,772,682 | 1,972,526 | 1,167,328 | 805,198 | 725,505 | 54,588 | 3,579 | 3,702 | 17,824 | 100.0 | 65.7 | 34.3 | 20.3 | 14.0 | 12.6 | 1.0 | 0.1 | 0.1 | 0.3 |
| Public | 13,049,326 | 8,598,151 | 4,451,175 | 3,008,133 | 1,443,042 | 1,243,404 | 155,170 | 6,914 | 10,746 | 26,808 | 100.0 | 65.9 | 34.1 | 23.1 | 11.1 | 9.5 | 1.2 | 0.1 | 0.1 | 0.2 |
| 4-year | 7,502,622 | 4,973,963 | 2,528,659 | 1,860,153 | 668,506 | 523,269 | 125,616 | 3,335 | 7,160 | 9,126 | 100.0 | 66.3 | 33.7 | 24.8 | 8.9 | 7.0 | 1.7 | # | 0.1 | 0.1 |
| 2-year | 5,546,704 | 3,624,188 | 1,922,516 | 1,147,980 | 774,536 | 720,135 | 29,554 | 3,579 | 3,586 | 17,682 | 100.0 | 65.3 | 34.7 | 20.7 | 14.0 | 13.0 | 0.5 | 0.1 | 0.1 | 0.3 |
| Private | 3,560,909 | 2,287,375 | 1,273,534 | 391,434 | 882,100 | 220,634 | 643,645 | 2,727 | 13,442 | 1,652 | 100.0 | 64.2 | 35.8 | 11.0 | 24.8 | 6.2 | 18.1 | 0.1 | 0.4 | # |
| Nonprofit | 2,821,653 | 2,044,170 | 777,483 | 298,740 | 478,743 | 141,490 | 325,964 | 1,416 | 8,527 | 1,346 | 100.0 | 72.4 | 27.6 | 10.6 | 17.0 | 5.0 | 11.6 | 0.1 | 0.3 | # |
| 4-year | 2,776,499 | 2,023,106 | 753,393 | 294,824 | 458,569 | 138,560 | 308,725 | 1,416 | 8,523 | 1,345 | 100.0 | 72.9 | 27.1 | 10.6 | 16.5 | 5.0 | 11.1 | 0.1 | 0.3 | # |
| 2-year | 45,154 | 21,064 | 24,090 | 3,916 | 20,174 | 2,930 | 17,239 | 0 | 4 | 1 | 100.0 | 46.6 | 53.4 | 8.7 | 44.7 | 6.5 | 38.2 | 0.0 | # | # |
| For-profit | 739,256 | 243,205 | 496,051 | 92,694 | 403,357 | 79,144 | 317,681 | 1,311 | 4,915 | 306 | 100.0 | 32.9 | 67.1 | 12.5 | 54.6 | 10.7 | 43.0 | 0.2 | 0.7 | # |
| 4-year | 585,906 | 115,775 | 470,131 | 77,262 | 392,869 | 76,704 | 309,886 | 1,311 | 4,803 | 165 | 100.0 | 19.8 | 80.2 | 13.2 | 67.1 | 13.1 | 52.9 | 0.2 | 0.8 | # |
| 2-year | 153,350 | 127,430 | 25,920 | 15,432 | 10,488 | 2,440 | 7,795 | 0 | 112 | 141 | 100.0 | 83.1 | 16.9 | 10.1 | 6.8 | 1.6 | 5.1 | 0.0 | 0.1 | 0.1 |
| **Postbaccalaureate** | 3,035,683 | 1,828,318 | 1,207,365 | 274,520 | 932,845 | 405,614 | 494,639 | 7,442 | 20,133 | 5,017 | 100.0 | 60.2 | 39.8 | 9.0 | 30.7 | 13.4 | 16.3 | 0.2 | 0.7 | 0.2 |
| Public | 1,479,938 | 971,261 | 508,677 | 145,337 | 363,340 | 231,858 | 116,489 | 4,880 | 7,837 | 2,276 | 100.0 | 65.6 | 34.4 | 9.8 | 24.6 | 15.7 | 7.9 | 0.3 | 0.5 | 0.2 |
| Private | 1,555,745 | 857,057 | 698,688 | 129,183 | 569,505 | 214,514 | 97,062 | 4,140 | 6,991 | 1,202 | 100.0 | 55.1 | 44.9 | 8.3 | 36.6 | 13.8 | 6.2 | 0.3 | 0.4 | 0.1 |
| Nonprofit | 1,312,591 | 834,547 | 478,044 | 119,308 | 358,736 | 147,473 | 199,987 | 2,289 | 6,311 | 676 | 100.0 | 63.6 | 36.4 | 9.1 | 27.3 | 11.2 | 15.2 | 0.2 | 0.5 | 0.1 |
| For-profit | 243,154 | 22,510 | 220,644 | 9,875 | 210,769 | 26,283 | 178,163 | 273 | 5,985 | 65 | 100.0 | 9.3 | 90.7 | 4.1 | 86.7 | 10.8 | 73.3 | 0.1 | 2.5 | # |

#Rounds to zero.

NOTE: Degree-granting institutions grant associate's or higher degrees and participate in Title IV federal financial aid programs. Some data have been revised from previously published figures.

SOURCE: U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), Spring 2018 and Spring 2019, Fall Enrollment component. (This table was prepared December 2019.)

2019 Tables and Figures          All Years of Tables and Figures          Most Recent Full Issue of the Digest

Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2017 and fall 2018

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 161 of 305

◀ Previous Page

Download Excel (47KB)



# IES ❖ NCES National Center for Education Statistics

## IPEDS Data Explorer

**Related years:** 2017-18 ▾

☐ Print   ☐ Excel   

**Twelve-month full-time-equivalent enrollment at Title IV institutions, by student level and institution sector: United States, 2017-18**

| Institution sector | All students | Undergraduate | Graduate[1] |
|---|---|---|---|
| **All institutions** | **16,043,150** | **13,965,823** | **2,077,327** |
| Public 4-year | 7,526,609 | 6,527,266 | 999,343 |
| Public 2-year | 3,689,366 | 3,689,366 | 0 |
| Public less-than-2-year | 44,024 | 44,024 | 0 |
| Private nonprofit 4-year | 3,498,999 | 2,616,367 | 882,632 |
| Private nonprofit 2-year | 52,481 | 52,467 | 14 |
| Private nonprofit less-than-2-year | 9,551 | 9,551 | 0 |
| Private for-profit 4-year | 743,312 | 547,974 | 195,338 |
| Private for-profit 2-year | 242,795 | 242,795 | 0 |
| Private for-profit less-than-2-year | 236,013 | 236,013 | 0 |

[1] One 2-year institution reported full-time-equivalent (FTE) enrollment in graduate-level courses.

NOTE: Title IV institutions are those with a written agreement with the U.S. Department of Education that allows the institution to participate in any of the Title IV federal student financial assistance programs. The four U.S. service academies that are not Title IV eligible are included in the Integrated Postsecondary Education Data System (IPEDS) universe because they are federally funded and open to the public. Data in this table cover the period from July 1, 2017 to June 30, 2018. The full-time-equivalent (FTE) enrollment displayed in this table is calculated from institutions' instructional activity over a 12-month period. For institutions following a quarter calendar system, 45 undergraduate credit hours is considered one undergraduate FTE and 36 graduate credit hours is considered one graduate FTE. For institutions following a semester, trimester, 4-1-4, or other academic year calendar system, 30 undergraduate credit hours is considered one undergraduate FTE and 24 graduate credit hours is considered one graduate FTE. For all calendar systems (both academic year-based systems and continuous enrollment systems), 900 undergraduate contact hours is considered one undergraduate FTE. Definitions for terms used in this table may be found in the IPEDS online glossary located at https://surveys.nces.ed.gov/ipeds/VisGlossaryAll.aspx.

SOURCE: U.S. Department of Education, National Center for Education Statistics, IPEDS, Fall 2018, 12-Month Enrollment component (provisional data).

Survey: Admissions (ADM);   Data Year: 2017-18   Collection Year: 2017-18
Source: *Digest of Education;*

[?] Number and percentage of degree-granting postsecondary institutions with first-year undergraduates using various selection criteria for admission by control and level of institution

Survey: Admissions (ADM);   Data Year: 2017-18   Collection Year: 2017-18
Source: *Digest of Education;*

[?] Percentage of degree-granting postsecondary institutions with first-year undergraduates offering remedial services by control and level of institution

Survey: Admissions (ADM);   Data Year: 2017-18   Collection Year: 2017-18
Source: *Digest of Education;*

[?] Number and percentage of awards conferred and students receiving awards at Title IV degree-granting institutions by control of institution, level of institution, gender, race/ethnicity, level of award

Survey: Completions (C);   Data Year: 2017-18   Collection Year: 2018-19   Source: *Tables Library;*

[?] Number of awards conferred by Title IV institutions by race/ethnicity, level of award, gender

Survey: Completions (C);   Data Year: 2017-18   Collection Year: 2018-19   Source: *Tables Library;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Degree-granting status

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Control of institution

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Level of institution

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, State

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Award level

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Race/ethnicity

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Gender

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Geographic region

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Institutional category

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Highest degree offered

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Historically Black College or University

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, Degree of urbanization (Urban-centric locale)

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Sector of institution, CIP Code

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Control of institution

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Level of institution

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, State

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Award level

Survey: Completions (C);    Data Year: 2017-18    Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by

Degree-granting status, Race/ethnicity

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Gender

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Geographic region

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Institutional category

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Highest degree offered

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Historically Black College or University

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, Degree of urbanization (Urban-centric locale)

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Degree-granting status, CIP Code

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Level of institution

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Control of institution, State

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Award level

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Race/ethnicity

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Gender

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Geographic region

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Institutional category

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Highest degree offered

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Historically Black College or University

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, Degree of urbanization (Urban-centric locale)

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Control of institution, CIP Code

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Level of institution, State

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Level of institution, Award level

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Level of institution, Race/ethnicity

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

[?] Number of degrees/certificates awarded at postsecondary institutions by Level of institution, Gender

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

 **Number of degrees/certificates awarded at postsecondary institutions by Level of institution, Geographic region**

Survey: Completions (C);   Data Year: 2017-18   Source: *Trend Generator;*

More results

# IES ⋮ NCES    **National Center for Education Statistics**

**Explore the Institute of Education Sciences**

| IES | IES Centers | IES Policies and Standards | Additional Resources |
|---|---|---|---|
| Home | NCEE | Public Access Policy | ERIC |
| About | NCER | Privacy and Security Policies | Sitemap |
| Publications | NCES | NCES Statistical Standards | Organizational Chart |
| Data |   Home | Peer Review Process | |
| Funding |   About | ED Data Inventory | |
| News |   Programs | | |
| |   Publications | **Contact Us** | |
| |   Data | | |
| |   Data Training | **U.S. Department of Education** | |
| |   School Search | | |
| |   News | | |
| |   Kids' Zone | | |
| | NCSER | | |

Sales and Related Workers, All Other

An official website of the United States government Here is how you know ⌄

United States Department of Labor
Follow Us | Release Calendar | Blog

**U.S. BUREAU OF LABOR STATISTICS**

HOME ⌄   SUBJECTS ⌄   DATA TOOLS ⌄   PUBLICATIONS ⌄   ECONOMIC RELEASES ⌄   STUDENTS ⌄   BETA ⌄

## Occupational Employment Statistics

OES 🖼 PRINT 🖶

### Occupational Employment and Wages, May 2019

### 41-9099 Sales and Related Workers, All Other

BROWSE OES
OES HOME
OES OVERVIEW
OES NEWS RELEASES
OES DATA
OES CHARTS
OES VIDEOS
OES MAPS
OES PUBLICATIONS
OES DATABASES
OES FAQS
CONTACT OES

SEARCH OES

OES TOPICS
RESPONDENTS
DOCUMENTATION
SPECIAL NOTICES
RELATED LINKS

All sales and related workers not listed separately.

National estimates for this occupation
Industry profile for this occupation
Geographic profile for this occupation

**National estimates for this occupation: Top**

Employment estimate and mean wage estimates for this occupation:

| Employment (1) | Employment RSE (3) | Mean hourly wage | Mean annual wage (2) | Wage RSE (3) |
|---|---|---|---|---|
| 118,910 | 1.7 % | $19.53 | $40,620 | 0.9 % |

Percentile wage estimates for this occupation:

| Percentile | 10% | 25% | 50% (Median) | 75% | 90% |
|---|---|---|---|---|---|
| Hourly Wage | $10.41 | $11.90 | $15.30 | $22.85 | $33.63 |
| Annual Wage (2) | $21,650 | $24,740 | $31,820 | $47,530 | $69,940 |

**Industry profile for this occupation: Top**

Industries with the highest published employment and wages for this occupation are provided. For a list of all industries with employment in this occupation, see the Create Customized Tables function.

Industries with the highest levels of employment in this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Food and Beverage Stores (4451 and 4452 only) | 6,710 | 0.23 | $15.69 | $32,630 |
| Nondepository Credit Intermediation | 5,780 | 1.01 | $15.05 | $31,310 |
| Automobile Dealers | 4,860 | 0.38 | $20.77 | $43,210 |
| Electronic Shopping and Mail-Order Houses | 4,520 | 1.16 | $24.57 | $51,100 |
| Miscellaneous Store Retailers (4532 and 4533 only) | 4,410 | 1.03 | $13.84 | $28,800 |

Industries with the highest concentration of employment in this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Vending Machine Operators | 480 | 1.21 | (8) | (8) |
| Electronic Shopping and Mail-Order Houses | 4,520 | 1.16 | $24.57 | $51,100 |
| Miscellaneous Store Retailers (4532 and 4533 only) | 4,410 | 1.03 | $13.84 | $28,800 |
| Farm Product Raw Material Merchant Wholesalers | 710 | 1.02 | $20.49 | $42,620 |
| Nondepository Credit Intermediation | 5,780 | 1.01 | $15.05 | $31,310 |

Top paying industries for this occupation:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Data Processing, Hosting, and Related Services | 570 | 0.17 | $34.94 | $72,680 |
| Petroleum and Coal Products Manufacturing | (8) | (8) | $33.25 | $69,150 |
| Software Publishers | 1,040 | 0.24 | $33.23 | $69,120 |

BLS SPEAKERS AVAILABLE!

Read more

Subscribe to the OES Update

000168

Sales and Related Workers, All Other.html[8/2/2020 3:11:37 PM]

| | | | | |
|---|---|---|---|---|
| Postal Service (federal government) | 150 | 0.03 | $34.31 | $71,360 |
| Fabricated Metal Product Manufacturing (3321, 3322, 3325, 3326, and 3329 only) | 150 | 0.03 | $32.22 | $67,020 |

**Geographic profile for this occupation: Top**

States and areas with the highest published employment, location quotients, and wages for this occupation are provided. For a list of all areas with employment in this occupation, see the Create Customized Tables function.



Employment of sales and related workers, all other, by state, May 2019

States with the highest employment level in this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| California | 29,030 | 1.67 | 2.06 | $24.71 | $51,400 |
| Texas | 13,070 | 1.05 | 1.30 | $16.26 | $33,820 |
| Florida | 8,560 | 0.97 | 1.20 | $16.93 | $35,210 |
| New Jersey | 6,310 | 1.54 | 1.91 | $27.40 | $57,000 |
| Georgia | 4,510 | 1.01 | 1.25 | $19.72 | $41,020 |

Location quotient of sales and related workers, all other, by state, May 2019



Blank areas indicate data not available.

States with the highest concentration of jobs and location quotients in this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| California | 29,030 | 1.67 | 2.06 | $24.71 | $51,400 |
| New Jersey | 6,310 | 1.54 | 1.91 | $27.40 | $57,000 |
| Colorado | 3,750 | 1.40 | 1.73 | $20.39 | $42,420 |
| Texas | 13,070 | 1.05 | 1.30 | $16.26 | $33,820 |
| Maryland | 2,810 | 1.04 | 1.28 | $18.76 | $39,020 |

000170

Annual mean wage of sales and related workers, all other, by state, May 2019



Top paying States for this occupation:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| New Jersey | 6,310 | 1.54 | 1.91 | $27.40 | $57,000 |
| Massachusetts | 1,810 | 0.50 | 0.62 | $25.14 | $52,300 |
| California | 29,030 | 1.67 | 2.06 | $24.71 | $51,400 |
| Vermont | (8) | (8) | (8) | $24.68 | $51,340 |
| Connecticut | 690 | 0.41 | 0.51 | $22.94 | $47,720 |



Employment of sales and related workers, all other, by area, May 2019

Metropolitan areas with the highest employment level in this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Los Angeles-Long Beach-Anaheim, CA | 12,940 | 2.07 | 2.56 | $24.37 | $50,690 |
| New York-Newark-Jersey City, NY-NJ-PA | 6,540 | 0.68 | 0.84 | $25.54 | $53,110 |
| Dallas-Fort Worth-Arlington, TX | 3,640 | 1.00 | 1.23 | $16.58 | $34,490 |
| Houston-The Woodlands-Sugar Land, TX | 3,020 | 0.99 | 1.22 | $16.61 | $34,550 |
| Atlanta-Sandy Springs-Roswell, GA | 2,910 | 1.06 | 1.31 | $20.83 | $43,320 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 2,600 | 0.98 | 1.21 | $16.81 | $34,960 |
| San Jose-Sunnyvale-Santa Clara, CA | 2,440 | 2.14 | 2.64 | $27.51 | $57,220 |
| Denver-Aurora-Lakewood, CO | 2,430 | 1.61 | 1.99 | $22.24 | $46,260 |
| Riverside-San Bernardino-Ontario, CA | 2,370 | 1.54 | 1.91 | $19.06 | $39,650 |
| San Diego-Carlsbad, CA | 2,350 | 1.57 | 1.94 | $23.56 | $49,000 |

000172

Location quotient of sales and related workers, all other, by area, May 2019



Metropolitan areas with the highest concentration of jobs and location quotients in this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Killeen-Temple, TX | 460 | 3.27 | 4.04 | $12.95 | $26,930 |
| Napa, CA | 200 | 2.56 | 3.16 | $28.12 | $58,480 |
| San Jose-Sunnyvale-Santa Clara, CA | 2,440 | 2.14 | 2.64 | $27.51 | $57,220 |
| Victoria, TX | 80 | 2.08 | 2.56 | $14.80 | $30,790 |
| Los Angeles-Long Beach-Anaheim, CA | 12,940 | 2.07 | 2.56 | $24.37 | $50,690 |
| Medford, OR | 170 | 2.01 | 2.48 | $19.40 | $40,350 |
| Oxnard-Thousand Oaks-Ventura, CA | 620 | 1.97 | 2.43 | $23.10 | $48,060 |
| Odessa, TX | 160 | 1.92 | 2.37 | $18.63 | $38,740 |
| McAllen-Edinburg-Mission, TX | 510 | 1.92 | 2.37 | $13.85 | $28,810 |
| Clarksville, TN-KY | 160 | 1.90 | 2.35 | $12.95 | $26,940 |



Annual mean wage of sales and related workers, all other, by area, May 2019

Top paying metropolitan areas for this occupation:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Napa, CA | 200 | 2.56 | 3.16 | $28.12 | $58,480 |
| Modesto, CA | 270 | 1.43 | 1.77 | $27.58 | $57,370 |
| San Jose-Sunnyvale-Santa Clara, CA | 2,440 | 2.14 | 2.64 | $27.51 | $57,220 |
| Boston-Cambridge-Nashua, MA-NH | 1,530 | 0.55 | 0.67 | $26.27 | $54,640 |
| Green Bay, WI | 90 | 0.49 | 0.61 | $25.56 | $53,160 |
| New York-Newark-Jersey City, NY-NJ-PA | 6,540 | 0.68 | 0.84 | $25.54 | $53,110 |
| Burlington-South Burlington, VT | 50 | 0.38 | 0.47 | $24.72 | $51,430 |
| Fresno, CA | 330 | 0.85 | 1.05 | $24.60 | $51,160 |
| Los Angeles-Long Beach-Anaheim, CA | 12,940 | 2.07 | 2.56 | $24.37 | $50,690 |
| Salinas, CA | 200 | 1.12 | 1.38 | $24.30 | $50,550 |

Nonmetropolitan areas with the highest employment in this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| North Northeastern Ohio non-metropolitan area (non-contiguous) | 230 | 0.67 | 0.83 | $14.02 | $29,160 |
| Hill Country Region of Texas nonmetropolitan area | 220 | 1.10 | 1.36 | $12.88 | $26,790 |
| Northwest Minnesota nonmetropolitan area | 210 | 1.09 | 1.35 | $17.24 | $35,860 |
| Kansas nonmetropolitan area | 200 | 0.52 | 0.64 | $13.92 | $28,950 |
| Southwest Maine nonmetropolitan area | 200 | 1.01 | 1.25 | $15.34 | $31,920 |

Nonmetropolitan areas with the highest concentration of jobs and location quotients in this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Maryland nonmetropolitan area | 100 | 1.58 | 1.96 | $12.78 | $26,580 |

000174

| | | | | Hourly mean wage | Annual mean wage |
|---|---|---|---|---|---|
| North Central Nebraska nonmetropolitan area | 170 | 1.55 | 1.92 | $15.35 | $31,920 |
| North Missouri nonmetropolitan area | 170 | 1.53 | 1.89 | $13.04 | $27,120 |
| Northwest Colorado nonmetropolitan area | 180 | 1.45 | 1.79 | $17.24 | $35,860 |
| Coast Oregon nonmetropolitan area | 160 | 1.39 | 1.72 | $18.02 | $37,480 |

Top paying nonmetropolitan areas for this occupation:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| East Central Illinois nonmetropolitan area | 80 | 0.70 | 0.87 | $21.33 | $44,360 |
| Northern Vermont nonmetropolitan area | (8) | (8) | (8) | $21.17 | $44,030 |
| South Central Wisconsin nonmetropolitan area | 170 | 0.78 | 0.97 | $20.98 | $43,650 |
| East North Dakota nonmetropolitan area | 50 | 0.73 | 0.91 | $20.94 | $43,550 |
| Central Oregon nonmetropolitan area | 30 | 0.52 | 0.64 | $20.22 | $42,070 |

About May 2019 National, State, Metropolitan, and Nonmetropolitan Area Occupational Employment and Wage Estimates

These estimates are calculated with data collected from employers in all industry sectors, all metropolitan and nonmetropolitan areas, and all states and the District of Columbia. The top employment and wage figures are provided above. The complete list is available in the downloadable XLS files.

The percentile wage estimate is the value of a wage below which a certain percent of workers fall. The median wage is the 50th percentile wage estimate--50 percent of workers earn less than the median and 50 percent of workers earn more than the median. More about percentile wages.

(1) Estimates for detailed occupations do not sum to the totals because the totals include occupations not shown separately. Estimates do not include self-employed workers.

(2) Annual wages have been calculated by multiplying the hourly mean wage by a "year-round, full-time" hours figure of 2,080 hours; for those occupations where there is not an hourly wage published, the annual wage has been directly calculated from the reported survey data.

(3) The relative standard error (RSE) is a measure of the reliability of a survey statistic. The smaller the relative standard error, the more precise the estimate.

(8) Estimate not released.

(9) The location quotient is the ratio of the area concentration of occupational employment to the national average concentration. A location quotient greater than one indicates the occupation has a higher share of employment than average, and a location quotient less than one indicates the occupation is less prevalent in the area than average.

Other OES estimates and related information:

May 2019 National Occupational Employment and Wage Estimates

May 2019 State Occupational Employment and Wage Estimates

May 2019 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates

May 2019 National Industry-Specific Occupational Employment and Wage Estimates

May 2019 Occupation Profiles

Technical Notes

**Last Modified Date:** July 6, 2020

RECOMMEND THIS PAGE USING:   Facebook   Twitter   LinkedIn

Home

Subjects

Data Tools

000175

**Publications**

**Economic Releases**

**Students**

**Beta**



**U.S. BUREAU OF LABOR STATISTICS**
Division of Occupational Employment Statistics
PSB Suite 2135 2 Massachusetts Avenue NE
Washington, DC 20212-0001
Telephone: 1-202-691-6569
www.bls.gov/OES Contact OES

**INFO**

What's New
FAQs
A-Z
Glossary
About BLS
Careers @ BLS
Find It! DOL
Join our Mailing Lists

**RESOURCES**

Inspector General (OIG)
Budget and Performance
No Fear Act
USA.gov

**ABOUT THIS SITE**

Sitemap
Freedom of Information Act
Privacy & Security Statement
Disclaimers
Linking & Copyright Info
Important Website Notices
Help & Tutorials

Connect With BLS

An official website of the United States government Here is how you know ▾

United States Department of Labor
Follow Us 🐦 | Release Calendar | Blog

**U.S. BUREAU OF LABOR STATISTICS**

🔍

HOME ▾   SUBJECTS ▾   DATA TOOLS ▾   PUBLICATIONS ▾   ECONOMIC RELEASES ▾   STUDENTS ▾   BETA ▾

OOH HOME | OCCUPATION FINDER | OOH FAQ | OOH GLOSSARY | A-Z INDEX | OOH SITE MAP

# OCCUPATIONAL OUTLOOK HANDBOOK

Occupational Outlook Handbook > Management >

## Postsecondary Education Administrators

PRINTER-FRIENDLY 🖨

| Summary | What They Do | Work Environment | How to Become One | Pay | Job Outlook | State & Area Data | Similar Occupations | More Info |

## Summary



| Quick Facts: Postsecondary Education Administrators | |
| --- | --- |
| 2019 Median Pay | $95,410 per year $45.87 per hour |
| Typical Entry-Level Education | Master's degree |
| Work Experience in a Related Occupation | Less than 5 years |
| On-the-job Training | None |
| Number of Jobs, 2018 | 192,600 |
| Job Outlook, 2018-28 | 7% (Faster than average) |
| Employment Change, 2018-28 | 13,500 |

**What Postsecondary Education Administrators Do**

Postsecondary education administrators oversee student services, academics, and faculty research at colleges and universities.

**Work Environment**

Postsecondary education administrators work for public and private schools. Most work full time.

**How to Become a Postsecondary Education Administrator**

Postsecondary education administrators typically need a master's degree. However, there will be some opportunities for those with a bachelor's degree. Employers typically prefer to hire candidates who have experience working in a postsecondary education administrative office, especially for occupations such as registrars and academic deans.

**Pay**

The median annual wage for postsecondary education administrators was $95,410 in May 2019.

**Job Outlook**

Employment of postsecondary education administrators is projected to grow 7 percent from 2018 to 2028, faster than the average for all occupations. Expected growth may result from increasing student enrollment in colleges and universities.

**State & Area Data**

Explore resources for employment and wages by state and area for postsecondary education administrators.

**Similar Occupations**

Compare the job duties, education, job growth, and pay of postsecondary education administrators with similar occupations.

**More Information, Including Links to O*NET**

Learn more about postsecondary education administrators by visiting additional resources, including O*NET, a source on key characteristics of workers and occupations.

What They Do ->

SUGGESTED CITATION:

Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook*, Postsecondary Education Administrators, on the Internet at https://www.bls.gov/ooh/management/postsecondary-education-administrators.htm (visited *July 16, 2020*).

**Last Modified Date:** Friday, April 10, 2020

RECOMMEND THIS PAGE USING:   Facebook   Twitter   LinkedIn

Home

Subjects

Data Tools

Publications

Economic Releases

Students

Beta



**U.S. BUREAU OF LABOR STATISTICS** Office of Occupational Statistics and Employment Projections PSB Suite 2135 2 Massachusetts Avenue NE Washington, DC 20212-0001 Telephone:1-202-691-5700 www.bls.gov/ooh Contact OOH

**INFO**

What's New

FAQs

A-Z

Glossary

About BLS

Careers @ BLS

Find It! DOL

Join our Mailing Lists

**RESOURCES**

Inspector General (OIG)

Budget and Performance

No Fear Act

USA.gov

**ABOUT THIS SITE**

Sitemap

Freedom of Information Act

Privacy & Security Statement

Disclaimers

Linking & Copyright Info

Important Website Notices

Help & Tutorials

Connect With BLS

000178

Postsecondary Education Administrators _ Occupational Outlook Handbook_ _ U.S. Bureau of Labor Statistics.html[8/2/2020 3:06:01 PM]



**Journal of College Access**

Volume 2 | Issue 1                                                                 Article 3

1-2016

# Increasing College Opportunity: School Counselors and FAFSA Completion

Laura Owen
*San Diego State University*, lowen@mail.sdsu.edu

Erik Westlund
*University of Iowa*, erik-westlund@uiowa.edu

Follow this and additional works at: http://scholarworks.wmich.edu/jca

Part of the Behavioral Economics Commons, Community College Leadership Commons, Counselor Education Commons, Educational Psychology Commons, Education Economics Commons, Higher Education Commons, and the Student Counseling and Personnel Services Commons

**Recommended Citation**

Owen, Laura and Westlund, Erik (2016) "Increasing College Opportunity: School Counselors and FAFSA Completion," *Journal of College Access*: Vol. 2: Iss. 1, Article 3.
Available at: http://scholarworks.wmich.edu/jca/vol2/iss1/3

This Article is brought to you for free and open access by the Office of Enrollment Management at ScholarWorks at WMU. It has been accepted for inclusion in Journal of College Access by an authorized administrator of ScholarWorks at WMU. For more information, please contact maira.bundza@wmich.edu.



# Increasing College Opportunity: School Counselors and FAFSA Completion

**Cover Page Footnote**

The authors would like to acknowledge the Albuqueque Public Schools (APS) research department providing the anonymous student level FAFSA completion and college enrollment data, all of the APS school counselors who worked with the students on the FAFSA intervention, the US Department of Education Federal Student Aid staff for training the counselors on FAFSA completion, Eric Bettinger (Stanford University) and Bridget Terry Long (Harvard) for their support on the project and the Bill and Melinda Gates Foundation for funding the summer work.

# Increasing College Opportunity:
# School Counselors and FAFSA Completion



Authored by
Laura Owen (San Diego State University)
Erik Westlund (University of Iowa)

## ABSTRACT

Closing postsecondary opportunity gaps has become a national, state and local educational priority. To help eliminate these gaps, the U.S. Department of Education initiated a project that provided real-time, student-level Free Application for Federal Student Aid (FAFSA) completion status to large, urban school districts. Leveraging this information, school counselors identified and supported students and families as they navigated the financial aid process. In this article, we discuss this initiative and document statistically significant increases in FAFSA completion and college attendance in one participating school.

Keywords: School counseling, financial aid, FAFSA completion, college matriculation, college opportunity gaps, college advising

## Acknowledgements

We are grateful for the collaboration with Albuquerque Public Schools (APS) and would like to thank Sade Bonilla, Andy Gutierrez and the school counselors who participated in the FAFSA Completion project.  We thank Eric Bettinger for his feedback and guidance in the development of the project and evaluation plan.  We appreciate the support of Bridgit Terry Long and her facilitation of financial support from the Bill & Melinda Gates Foundation to support the summer outreach. We also thank Gene Eakin and Vivian Lee for their support throughout the project.  All opinions expressed in this article and any errors or omissions are our own.

## INTRODUCTION

Opportunity gaps continue to widen in terms of who attends college and persists through graduation, with underserved and underprivileged students remaining less likely to apply and attend college than their more advantaged peers (Swail & Perna, 2002; Perna, 2002; Roderick, Nagaoka, Coca, & Moeller, 2008; Ross, Kena, Rathbun, KewalRamini, Zhang, Kristapovich, & Manning, 2012). These disparities are especially pronounced when attendance and persistence data is reported by race/ethnicity, socioeconomic status, and gender (Bailey & Dynarski, 2012). National initiatives such as the President's College Opportunity Agenda and the First Lady's Reach Higher Campaign have drawn increased attention to inequitable student educational outcomes (Hatch & Owen, 2015; Savitz-Romer & Liu, 2014).  Two recent White House Convenings held at Harvard University (July 2014) and San Diego State University (November 2014) focused specifically on the lack of adequate school counseling and college advising resources available to many students (Hatch & Owen, 2015; Savitz-Romer & Liu, 2014).   The Convenings called for renewed attention and evaluation of school counseling practices and interventions that create postsecondary pathways for all students (Hatch & Owen,

## School Counselors and FAFSA Completion

2015; Savitz-Romer & Liu, 2014).

While some individuals might argue that school counselors are not primed for this work, there are increasing numbers of researchers and practitioners who have advocated for school counseling as a means to address inequitable postsecondary opportunities.  The College Board's 2012 National Survey of School Counselors found that principals and counselors believe that school counselors should spend time building a college-going culture within schools and that extra attention should be given to supporting students from low-income, disadvantaged, and immigrant backgrounds (Heart Research Associates, 2012). Engberg and Gilbert (2013) found the number of hours school counselors spent on college counseling was a strong predictor of the school's four-year college going rates. They also noted that school counseling departments that offered financial aid assistance to students were approximately 12 percentage points higher in four-year college going rates compared to schools that did not offer that type of  assistance (Engberg & Gilbert, 2013).  Similarly, Hurwitz and Howell (2014) found the addition of one extra high school counselor increased four-year college enrollment rates by 10 percentage points.  While more research is needed to fully understand the impact of school counseling on college opportunity, these studies provide some evidence that evaluating K-12 district and higher education school counseling and college advising interventions hold promise for promoting postsecondary opportunity for all students (Hatch & Owen, 2015; Savitz-Romer & Liu, 2014).

In this article, we investigate a project initiated by the U.S. Department of Education. This project's aim was to provide real-time student-level Free Application for Federal Student Aid (FAFSA) completion status data to the largest urban school districts across the country. School counselors used this verified FAFSA completion information to provide targeted outreach and support to students and their families as they navigated the financial aid process. Prior to this project, school counselors relied on student self-reported FAFSA completion information or the Expected Family Contribution (EFC) determination to verify FAFSA completion status.

Because the U.S. Department of Education uses a completed FAFSA to determine whether a student is eligible for financial aid, FAFSA completion is a crucial action many students must undertake to be able to pay for and attend college. With this in mind, we analyzed data from a large U.S. school district that participated in the U.S. Department of Education outreach program. We found that

> **"We found that increased counselor outreach and financial aid support not only increased FAFSA completion, but also had a large impact on college attendance."**



# School Counselors and FAFSA Completion

increased counselor outreach and financial aid support not only increased FAFSA completion, but also had a large impact on college attendance.

## Literature Review

The last decade has seen a surge of initiatives and policy recommendations to increase college attendance for low-income and underrepresented groups (Holcomb-McCoy, Lee, Bryan, & Young, 2011).  As a result, a variety of college access programs have been designed to address college-going barriers (Swail & Perna, 2002; U.S. Department of Education, 2013).  Even with these programs, many students remained without access to these resources and missed out on valuable information and counseling support necessary to navigate the complex college admissions and financial aid processes (Gullatt & Jan, 2003: Simmons, 2011; Swail & Perna, 2002; Tierney, Corwin, & Colyar, 2005).

Inability to pay and misinformation regarding college costs are barriers to college-going. These barriers are especially salient for minority, low-income, and first generation students (Long, 2009; Long & Riley, 2007; Porter, 2006). Many students and families find the financial aid process confusing and cumbersome (Castleman, Arnold, & Wartman, 2012; Bettinger, Long, Oreopoulos, & Sanbonmatsu, 2012; Chen & DesJardins, 2007, Perna, 2004). This scenario is especially true for African American and Hispanic/Latino students who often lack access to adequate college counseling that supports and provides valuable information to navigate the complex college admissions and financial aid process (Bryan, Moore-Thomas, Day-Vines, & Holcomb-McCoy, 2011; Simmons, 2011).

High schools can help ensure that students take the necessary steps to obtain financial aid by educating students and their parents early in high school about college affordability and the availability of financial aid and by helping them identify potential sources of aid (Tierney, Bailey, Constantine, Finkelstein, & Hurd, 2009).  Students may also benefit from hands-on assistance in meeting financial aid deadlines and completing application forms (Bettinger et al., 2012; Tierney et al., 2009). Castleman and Page (2014c) found that many students and families have unanswered questions related to financial aid after high school graduation and may need support throughout the summer months to review financial aid award letters and navigate the tasks needed for successful on-time college matriculation.  Comprehensive programs supporting students and families through the financial aid process has significant impacts on college attendance especially for underrepresented youth who otherwise would be unable to go (Bettinger et al., 2012; Castleman & Page, 2014a, 2014b, 2014c; Castleman, Page, & Schooley, 2014; Hoxby & Turner, 2013). However, very little research has been documented on how to implement school-wide efforts to provide student and parent support through the financial aid process. Research is not clear on whether attempting to work with every student would truly improve college outcomes and receipt of



## School Counselors and FAFSA Completion

aid (Bettinger et al., 2012).

### School Counselors and College Admissions

Numerous researchers have examined the role school counselors play in college access (McDonough, 2005; Perna, 2008; Plank & Jordan, 2001; Venezia, Kirst, & Antonio, 2008). A review of the literature reveals a dichotomy of opinions.  Some authors have focused on deficits, noting that role confusion, high student-to-school counselor ratios, fiscal constraints, lack of preparation, and inadequate expertise in college admissions prevent school counselors from fulfilling the college counseling role (Dounay, 2008; Johnson & Rochkind, 2010; McDonough, 2005; McDonough & McClafferty, 2001; Oliver, Ricard, Witt, Alvarado, & Hill, 2010; Perna, Li, Anderson, Thomas, Rowan-Kenyon, & Bell, 2008; Tierney et al., 2005). Low-income, first generation, and students of color have the greatest need for access to a school counselor, yet they are often the least likely to meet with a school counselor for college admissions or financial aid support because they are more likely to attend schools where their counselors tend to be heavily focused on crisis related matters, social-emotional concerns, and other counseling and/or administrative issues (Bryan, Holcomb-McCoy, Moore-Thomas, & Day-Vines, 2009; Cabrera & La Nasa, 2001; Corwin, Venegas, Oliverez, & Colyar, 2004; McDonough, 2005; Perna et. al, 2008; Plank & Jordan, 2001; Trusty & Niles, 2003).

Given that school counselors rarely report that their program's primary goal is to help students plan and prepare for postsecondary education (Bridgeland & Bruce, 2011; Clinedinst, Hurley, & Hawkins, 2011; Engberg & Gilbert, 2013; Ross et al., 2012), these findings might lead some individuals to believe that this important task should be relegated to other parties.  However, when school counselors are available and able to provide assistance to students and families navigating the college admissions process, college attendance rates increase and opportunity gaps begin to close (Belasco, 2013; Castleman, Owen, & Page, 2015; Hurwitz & Howell, 2014; Owen, 2014).

Johnson and Rochkind (2010) found a correlation between the degree to which students had a poor relationship with their school counselor and whether they felt like they were disappointed in their college choice. Analyzing data from the Educational Longitudinal Study of 2002, Belasco (2013) found that school-based counseling made distinct and substantial contributions to the college enrollment and destinations of low socioeconomic students (SES). Engberg and Gilbert (2013), analyzing the High School Longitudinal Study of 2009, found that both school counselor norms (average caseload and hours spent on college counseling) and resources (college fairs, college course offerings, and financial aid) were important predictors of a school's four-year college-going rates.

Two recent multi-site studies utilized high school counselors or community-based financial aid advisors to help college intending seniors review their financial aid



# School Counselors and FAFSA Completion

packages, understand and complete paperwork, and negotiate social/emotional barriers to enrollment during the summer after high school graduation.  Across sites, students to whom counselors offered additional support were five to fourteen percentage points more likely to enroll in college (Castleman, Arnold, & Wartman, 2012; Castleman, Page, & Schooley, 2014).

These studies shed light on the impact school counselors may have on college attendance. However, compared to other role groups, very little research has focused on specific school-wide school counselor efforts to increase college attendance. This fact, combined with the purported underutilization of school counselors as resources for increasing college attendance, informed the design of this study.

## Method
Our primary goal was to determine if school counselor outreach and support can positively affect FAFSA completion and college attendance. We  asked the following research questions:

Does increased school counselor outreach and support increase the number of students who complete a FAFSA?

Does increased school counselor outreach and support increase the number of students who attend college the fall semester after graduation?

## Participants
The sample for this study was taken from a large urban school district in the southwestern U.S. comprising 8,655 high school graduates across 21 high schools over two years. Cohorts were similar in size, with 4,365 graduates in 2010 and 4,290 graduates in 2011. District K-12 demographics show a total population average of 56% Hispanic, 32% white, 5% Native American, 4% African American, and 3% Asian. Special education services were received by 13% of the students.

## Procedure
The U.S. Department of Education's FAFSA Completion Project was designed to encourage, support, and increase FAFSA completion in some of the largest school districts across the country (U.S. Department of Education, Office of Elementary and Secondary Education, 2011).  School districts in the pilot project were able to request and receive FAFSA completion information from the U.S. Department of Education's office of Federal Student Aid (FSA) for individual high school students. One person from each local education agency (LEA) submitted directory information (name, date of birth, and zip code) to the U.S. Department of Education and in return, the U.S. Department of Education provided the LEA with student-specific FAFSA submission information. Reports came back identifying students who had submitted a FAFSA, on what date the FAFSA was submitted, and if the expected family contribution had been calculated. This information allowed counselors to reach out to students who had not yet completed the



## School Counselors and FAFSA Completion

FAFSA or who had submitted it with errors. The pilot project encouraged the development of school-wide counselor driven outreach but allowed each district the flexibility to design how that would look.

### Actions taken to provide outreach and support

The superintendent and school district leadership team in Albuquerque, New Mexico were enthusiastic about participating in the U.S. Department of Education's FAFSA completion project and asserted the project aligned well with their district-wide focus and commitment to increase the number of students attending college.  School principals also acknowledged their support for prioritizing school counselor time and energy on the FAFSA Completion project.

The U.S. Department of Education's Federal Student Aid (FSA) office offered FAFSA training to equip school counselors with the knowledge and skills needed to properly assist students and families throughout the FAFSA completion process. Seventy-five high school counselors across the district participated in three hours of training with staff from the U.S. Department of Education Federal Student Aid office on the FAFSA. They learned about the myths surrounding financial aid, the different types of federal grants, basic eligibility requirements, the Student Aid Report (SAR), FAFSA filing options, the Estimated Family Contribution (EFC), the Internal Revenue Service (IRS) retrieval tool, and the IRS authentication process.  Each counselor then logged into the

FSA FAFSA demo test site and completed a full FAFSA application based on a fictitious student's financial information. A post-test consisting of a variety of scenarios was administered after the training to measure counselor skills and knowledge needed to adequately support families through the completion process. All counselors who attended the training passed the post-test, demonstrating proficient knowledge and understanding of information required to provide individual support to students and families.

The school district set up "trusted centers" in fourteen comprehensive high schools throughout the city. The term "trusted center" was used to encourage the students, parents, and community that the centers were places where they could safely seek help with financial aid information. Each trusted center was located in a high school computer lab where FAFSA applications could be accessed and completed. Each high school held a minimum of eight FAFSA completion events between February and March.  The FAFSA completion events lasted one to two hours and were advertised on the radio, TV, newspaper, via the web, and through the use of the individual high school's automated telephone messaging system.  Messages were sent to parents in their native language to inform them of the trusted centers and school counselor support available. When requested, counselors also worked with students and parents one on one in their offices.



# School Counselors and FAFSA Completion

FAFSA completion support was offered to the entire class of 2011 and records were maintained to monitor individual student meetings. The FAFSA match from the U.S. Department of Education's Financial Student Aid system was postponed until mid-May due to some unforeseen programming issues for the U.S. Department of Education.  This unexpected delay prevented the school counselors from having access to the Federal Student Aid FAFSA completion status during the school year.  Recognizing the importance of the student specific data, the district took advantage of the completion information that was accessible beginning in May 2011 and hired school counselors to work during the summer months of June and July.  The counselors were tasked with reaching out to students who had not completed a FAFSA as of graduation. Students and parents received calls from school counselors over the summer months to offer support with FAFSA completion and college transition issues.

## Research Design

The U.S. Department of Education (DOE) provided data on FAFSA completion. The school district submitted the names, birthdates, and zip codes for the graduating seniors in 2010 and 2011 to the DOE. The DOE then matched each student's information to their FAFSA record and returned students' FAFSA filing date and students' current completion status to the school district. When the school district received the FAFSA data, they used student records to match the data with records in the National Student Clearinghouse to determine whether students

enrolled in college. The district then eliminated all student identifiers, assigned a random identification number to each student, and provided student-level information (e.g., race/ethnicity, grade point average, receipt of special education services) to match the DOE data.

## Measures

Summary statistics for all measures used in the study are provided in Table 1.

## Table 1.
## Descriptive Statistics

| | N | Proportion/ Mean | (SD) | Percent Missing |
|---|---|---|---|---|
| **Dependent Variables** | | | | |
| FAFSA Complete | 8655 | 0.45 | 0.50 | 0 |
| College Enrollment | 8655 | 0.63 | 0.48 | 0 |
| | | | | |
| **Independent Variables** | | | | |
| Intervention | 8655 | 0.50 | 0.50 | 0 |
| White | 8655 | 0.33 | 0.47 | 0 |
| African American | 8655 | 0.04 | 0.20 | 0 |
| Hispanic | 8655 | 0.56 | 0.50 | 0 |
| Asian | 8655 | 0.03 | 0.17 | 0 |
| Native American | 8655 | 0.05 | 0.21 | 0 |
| GPA | 7113 | 2.87 | 0.59 | 17.8 |
| Receives Special Education Services | 8655 | 0.13 | 0.33 | 0 |

### Dependent variables

Two dependent variables are examined in this study: FAFSA completion and college enrollment.

FAFSA completion was coded 0 for incomplete if students did not file a FAFSA, or initiated a FAFSA but never completed it. FAFSA completion was coded 1 if students filed a complete FAFSA.

College enrollment was coded 0 for students with no record in the National Student Clearinghouse of attending college after graduating from high school. Students with a record of post-high school college attendance



# School Counselors and FAFSA Completion

are coded 1. It should be noted that 4% of colleges do not participate in the NSC, and our records cannot capture students who enroll at these colleges (National Student Clearinghouse, 2015).

### Independent variables

The primary independent variable in this analysis is whether students were in the intervention year, meaning they had access to the counselor services described above. Thus, students who graduated high school in 2010 were coded 0 for no access to intervention. Students who graduated in 2011, the year the intervention was initiated, were coded 1.

Other covariates include race/ethnicity, grade point average, and whether a student received special education services. Race/ethnicity is a categorical measure taking five possible values: white, African American, Hispanic, Asian, or Native American. Grade point average (GPA) is a continuous measure taking values from 0 to 4 of students' cumulative high school GPA. Whether a student received special education services is a categorical variable taking a value of 0 for students who never received special education services and 1 for students who received these services.

**Missing data**

Data on high school grade point average (GPA) was missing for approximately 18% of students in the data files provided to us by the school district. These missing values were not able to be recovered by the school district. Fortunately, the missing GPA values appear

to be missing at random. For example, among those who completed a FAFSA, 17% had data on GPAs missing, whereas 18% of those who completed a FAFSA had GPAs missing. This difference is not statistically significant according to a two-sample t-test ($p$=0.42). Among those who attended college, 16% are missing the GPA measure, compared to 20% of those who did not attend college. This difference is statistically significant on a two-sample t-test ($p$=0.00). However, this difference is driven by high-school level differences, not GPA itself. In a bivariate linear regression model that accounts for clustering by high school, in which the dependent variable is whether GPA is missing and the independent variable is whether a student attended college, the coefficient for college attendance is statistically non-significant ($p$=0.34). For these reasons, we feel comfortable that our data meet the assumptions required for multiple imputation procedures. The ICE package in STATA was used to impute missing GPA using a multiple imputations by chained equations procedure (Royston, 2005). Ten imputations were generated. Models using the GPA measured are estimated once for each imputation (i.e., both Model 3s in Table 3), and the coefficients and standard errors are combined using Rubin's rules (Rubin, 2004). All other data are complete and required no imputation procedures.

Our research design is a comparison of non-equivalent groups (Shadish, Cook, & Campbell, 2002). Our "control" group comprises students who graduated in 2010,



# School Counselors and FAFSA Completion

before the intervention was implemented. Our intervention, or "treatment" group, comprises students who graduated in 2011, all of whom had access to school counseling financial aid support.

The baseline differences in rates of FAFSA completion and college attendance between groups were calculated by subtracting the proportion of students in the control group who completed a FAFSA or attended college from the respective proportion of students in the intervention group. Two sample t-tests were used to determine if these differences are statistically significant.

Multivariate regression models were used to calculate differences in rates of FAFSA completion and college attendance conditional upon potentially confounding measures, such as race/ethnicity, GPA, and whether a student received special education services. All models were estimated in Stata 14 (StataCorp, 2015).

## Modeling strategy

We report the results from a linear probability model with standard errors adjusted to allow for correlation among students who attended the same high school. In this model, the coefficient of the treatment intervention tells us the marginal effect of being in the intervention group, conditional upon modeled covariates. This allows for easy comparison of rates of FAFSA completion and college attendance.

We estimate three models for each outcome. Model 1 is a bivariate regression, comparing outcome rates across intervention groups. This model, equivalent to a two-sample t-test, tells us the difference in probability of completing a FAFSA and attending college for students with access (i.e., 2011 graduates) or without access (i.e., 2010 graduates) to school counseling financial aid support. In Model 2, indicator variables for race/ethnicity are added. This model tells us the conditional difference in probability of FAFSA completion and college attendance for students who received the outcomes versus students who did not receive the outcome, controlling for race/ethnicity. In Model 3, measures of students' academic history are added to the model. This model tells us the difference in probability of FAFSA completion and college attendance for students who received the outcomes versus students who did not receive the outcome, controlling for race/ethnicity and academic history.

We reported linear probability models (LPMs) because the results obtained from these models are substantively similar to more complicated models and easier to interpret. For example, we ran logistic regression models using the same independent variables and then calculated marginal effects telling us the change in probability associated with a change in the interventions. After rounding, the probability changes for the FAFSA model were identical to the probability change indicated by an LPM. The probability change associated with college attendance and intervention participation was 0.02 smaller in

000189



# School Counselors and FAFSA Completion

the LPM than the logistic regression model, meaning that LPM gives us more conservative results. The standard errors in the LPM and the marginal effects of the logistic regression model were identical after rounding.  We estimated several other models. To model differences across high schools, we estimated three multilevel regression models: a linear probability model where intercepts are allowed to vary by high school, a logistic regression model where intercepts were allowed to vary by high school, and a population-average logistic regression model (Raudenbush & Bryk, 2002). Compared to the linear probability model reported here, the more complex models all result in the same substantive conclusions. For this reason, we opted to report only the linear probability model results. An expanded discussion of this choice is provided in Appendix A (see p. 21).

**Threats to validity and sensitivity analysis**

Our research design relies upon comparing students without access to the intervention (2010 graduates) to those students with access to the intervention (2011 graduates). If there are systematic differences between these groups, our findings may be biased. Given that we are comparing students from a later cohort to an earlier cohort, we are primarily concerned that the graduating classes of 2010 and 2011 vary systematically for reasons other than that they had access to the counseling intervention. This is not unreasonable. Every year, schools and school systems are generally trying to improve their academic outcomes compared to the prior year. If these efforts were successful, they may explain all or some

of the observed differences between years. We assess the plausibility of systematic difference between groups explaining differences in outcomes in two ways. First, we compare measures from one year to the next to see if there are systematic differences. Second, we use a tool, Konfound-It! to perform sensitivity analyses (Frank, Maroulis, Duong, & Kelcey, 2013; Frank, 2014). These analyses allow us to quantify how much bias there would need to be to change the inferences made. The results of these efforts are discussed later.

**Results**

We find strong evidence that the introduction of the school counseling financial aid intervention resulted in substantial increase in rates of FAFSA completion and college attendance. FAFSA completion rates post-intervention were 10 percentage points higher than pre-intervention. College attendance rates post-intervention were 11 percentage points higher than pre-intervention. Both of these effects are statistically significant and are robust to unobserved confounding measures.  Table 2 provides results from linear probability models of FAFSA completion and college attendance.

000190



# School Counselors and FAFSA Completion

**Table 2.**
**Linear Probability Models of FAFSA Completion and College Attendance**

| | FAFSA Completion | | | College Attendance | | |
|---|---|---|---|---|---|---|
| | Model 1 | Model 2 | Model 3^ | Model 1 | Model 2 | Model 3^ |
| | Coef./(SE) | Coef./(SE) | Coef./(SE) | Coef./(SE) | Coef./(SE) | Coef./(SE) |
| Intervention | 0.103*** | 0.104*** | 0.107*** | 0.117*** | 0.120*** | 0.122*** |
| | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) | (0.02) |
| Black | | -0.037 | 0.012 | | -0.120*** | -0.038 |
| | | (0.02) | (0.02) | | (0.03) | (0.02) |
| Hispanic | | -0.059*** | -0.008 | | -0.124*** | -0.040 |
| | | (0.01) | (0.02) | | (0.03) | (0.02) |
| Asian | | 0.037 | 0.016 | | 0.021 | -0.015 |
| | | (0.04) | (0.04) | | (0.03) | (0.02) |
| Native American | | -0.003 | 0.060 | | -0.167*** | -0.066* |
| | | (0.03) | (0.03) | | (0.03) | (0.02) |
| Receives Special Education Services | | | -0.042 | | | -0.140*** |
| | | | (0.03) | | | (0.04) |
| Grade Point Average | | | 0.161*** | | | 0.263*** |
| | | | (0.01) | | | (0.01) |
| Intercept | 0.402*** | 0.435*** | -0.055 | 0.576*** | 0.657*** | -0.135* |
| | (0.02) | (0.01) | (0.03) | (0.03) | (0.03) | (0.05) |
| R² | 0.01 | 0.02 | 0.05 | 0.015 | 0.033 | 0.137 |
| N | 8655 | 8655 | 8655 | 8655 | 8655 | 8655 |

* $p < 0.05$   ** $p < 0.01$   *** $p < 0.001$

^ Due to missing data on Grade Point Average, reported values for Model 3 are combined results from 10 imputations. Coefficients and standard errors were calculated using Rubin's rules for combining results from multiple imputed data sets (Rubin, 2004).

## Model 1

Model 1, equivalent to a two-sample t-test, tells us about the baseline differences between students who receive the intervention versus those who did not. We see that the probability of FAFSA completion is 0.103 higher for post-intervention students than for pre-intervention students. The probability of college attendance is 0.117 higher for post-intervention students than for pre-intervention students. Both differences are statistically significant ($p < 0.00$).

## Model 2

In Model 2, we add statistical controls for race/ethnicity. Adjusting for race/ethnicity does not substantially change our estimates of the marginal effect of the intervention. The coefficient for the intervention in models of both FAFSA completion and college attendance are virtually indistinguishable from those in Model 1. The FAFSA completion intervention coefficient increased from 0.103 to 0.104, a difference in only a thousandth of a point. The college completion intervention coefficient increased 0.117 to 0.120, a difference of only three-thousandths of a point. Both coefficients remain statistically significant ($p < 0.00$).

## Model 3

In Model 3, we add statistical controls for measures of academic history. Again, the coefficients on the intervention barely change. The FAFSA completion intervention coefficient increased from 0.104 to 0.107, a difference in only three-thousandths of a point. The college completion intervention coefficient increased 0.120 to 0.122, a difference of only two-thousandths of a point. Again, both coefficients remain statistically significant ($p < 0.00$).

Adding statistical controls does not substantially change our estimates of the counseling program's effect on FAFSA completion and college attendance. This is desirable because the "treatment effect" estimates should remain stable when the "treatment" and "control" groups are balanced, as they would be in a randomized controlled trial. In all, we see sizable, stable, and statistically significant differences in FAFSA completion and college attendance when comparing pre-intervention students and post-intervention students, even after controlling for background characteristics and academic performance.



# School Counselors and FAFSA Completion

It is clear that there are sizable, statistically significant differences in FAFSA completion and college attendance for pre-intervention students and post-intervention students.

## Threats to Validity from Unobserved Confounders

The above results provide strong evidence of the efficacy of the intervention *only* if we can assume that, besides the intervention, there are no systematic differences between the 2010 and 2011 graduating classes.

In Table 3, we provide summary statistics of all variables used in this analysis, cross-classified by students who had access to the intervention and those who did not.

## Table 3.
## Balance Table Comparing Means of Variables By Intervention Year

| | 2010 No Intervention | | 2011 Intervention | | T-test 2010 vs. 2011 | |
|---|---|---|---|---|---|---|
| | Mean | (SD) | Mean | (SD) | t | p |
| **Dependent Variables** | | | | | | |
| FAFSA Complete | 0.40 | 0.49 | 0.50 | 0.50 | -9.70 | <0.001*** |
| Attended College | 0.58 | 0.49 | 0.69 | 0.46 | -11.39 | <0.001*** |
| | | | | | | |
| **Independent Variables** | | | | | | |
| White | 0.34 | 0.48 | 0.32 | 0.47 | 2.14 | 0.03* |
| African American | 0.04 | 0.20 | 0.04 | 0.20 | -0.33 | 0.74 |
| Hispanic | 0.55 | 0.50 | 0.57 | 0.50 | -1.35 | 0.18 |
| Asian | 0.03 | 0.17 | 0.03 | 0.17 | 0.04 | 0.96 |
| Native American | 0.04 | 0.21 | 0.05 | 0.21 | -0.84 | 0.40 |
| Grade Point Average | 2.89 | 0.58 | 2.86 | 0.59 | 2.36 | 0.02* |
| Receives Special Educ. Services | 0.13 | 0.34 | 0.12 | 0.33 | 0.37 | 0.37 |
| | | | | | | |
| N | 4,290 | | 4,365 | | 8,655 | |

\* $p < 0.05$  \*\* $p < 0.01$  \*\*\* $p < 0.001$

There are clear differences in FAFSA completion and college attendance by intervention status, but no strong differences in other measures. Statistically significant differences from 2010 to 2011 are only observed between the proportion of white students and GPA. In both cases, these differences are not substantively meaningful. There were only two percentage points fewer white students in 2011 than in 2010, while GPAs were 0.03 points lower in 2011 than 2010. This provides some evidence that, demographically, there were no substantial differences between students in the "control" and "treatment" groups.

A more sophisticated approach to assessing potential threats to validity is to perform a sensitivity analysis where we quantify how much bias would need to exist to change the inferences made in this study. We used a method developed by Frank et al. (2013) to do this. This method, based on Rubin's Causal Model framework, lets us calculate how many cases in a data set would have to be replaced with cases for which the independent variable had zero effect to change the inference made (Rubin 1974; Rosenbaum and Rubin 1983). We calculated these values using KonFound-it!, a program written by those who developed this sensitivity analysis technique (Frank, 2014). The results of the sensitivity analysis are provided in Table 4.

## Table 4.
## Sensitivity Analyses.

| FAFSA Completion | College Attendance |
|---|---|
| Percentage of Cases with  Zero Effect Required to be Replaced to Change Inference | Percentage of Cases with  Zero Effect Required to be Replaced to Change Inference |
| 68.3 | 72.0 |

This table tells us that in order to reduce the coefficient of the effect of the intervention on FAFSA completion in Model 3 (presented in Table 3) to statistical non-significance, over 68% of students in the 2011 graduating class would have to be replaced with students for whom the intervention had no effect. To similarly reduce the coefficient of the



# School Counselors and FAFSA Completion

intervention on college attendance, 72% of students in the 2011 graduating class would have to be replaced with students for whom the intervention had no effect. Put differently, in terms of students' FAFSA completion and college attendance, the students from the intervention year (2011) are so substantially different from those in the non-intervention year (2010) that for us to remove the differences observed, we would have to remove over two-thirds of students from 2011 from the sample and replace them with students who could not have the received counseling services that are part of the intervention introduced that year.

This exercise provides us with a yardstick for understanding the likelihood that the observed causal effects is actually the result of bias. It may be useful to compare the results of our exercise to those from randomized trials, where the research design assures that the effects are not the result of confounding. As documented by Frank et al. (2013), the amount of bias required to change the inference made in this analysis is larger than the level needed to change the inferences made in Borman, Dowling, & Schneck's (2008) evaluation of the Open Court Reading intervention, Finn & Achilles' (1990) evaluation of the effect of class size on kindergarten students' standardized test scores, and Clements & Sarama's (2008) evaluation of a preschool mathematics curriculum on learning environment. We thus find it implausible that bias from unobserved measures would be strong enough to invalidate the inference made in this study

about the effect of the counseling services intervention on FAFSA completion and college attendance.

## Discussion

School counselors are an underutilized resource in preparing students to graduate college and career ready. In 2008, the Consortium on Chicago School Research at the University of Chicago released a report, *From High School to the Future: Potholes on the Road to College,* and concluded that students need more than high aspirations to go to college (Roderick, et al., 2008). The report revealed that first generation, low-income students require greater access to structured social support, mentoring, parental involvement and early college planning. They also found two critical steps are needed to improve college enrollment and success: first, creating a college-going culture in the school and, second, providing students with adequate support and guidance. They suggested that school counselors were in a unique position to do both (Roderick, et al., 2008). When students, parents, and counselors work together and communicate steps needed to navigate the college going process, student's chances of attending college significantly increase (McDonough, 2005). School counselors, as sources of extra social capital, must form collaborative strategic partnerships and develop systems that will support students and parents with the tasks needed for on time college matriculation (Bryan et al., 2009; Simmons, 2011).



## School Counselors and FAFSA Completion

Recognizing the current disparities in school counseling programs and the lack of support that many students receive with the college going process, especially those in most need, recent national attention has focused on efforts to strengthen current school counseling and school-based college and career advising practices to increase student postsecondary outcomes (Hatch & Owen, 2015; Savitz-Romer & Liu, 2014). The school counseling field must move to empirically based practices that go beyond good intentions.

Financial aid research has frequently focused on the impact of interventions and programs led by organizations and groups that function more tangentially to school systems with studies designed to evaluate interventions where students have been randomly selected to participate or receive the intervention. Few studies have concentrated on school counseling programs or interventions working with all students (Holcomb-McCoy et al., 2011). This study becomes especially helpful for conceptualizing large-scale, school counselor led interventions designed to impact financial aid receipt and college attendance and measuring the effectiveness of interventions that impact the entire graduating class.

The prospect of attending college is often ruled out due to fears concerning the ability to cover college costs and as a result, directly addressing affordability and funding options may make the difference between going to college or not (Cabrera & La Nasa, 2001; Heller, 2006; Poynton, Lapan, & Marcotte, 2015; St. John, Paulsen, & Carter, 2005; Tierney, et al., 2005; Tierney, 2006). Providing assistance with the financial aid process not only increases financial aid receipt, but it also significantly increases the chances of on-time college matriculation (Bettinger et al., 2012; Castleman & Page, 2014a, 2014b, 2014c; Castleman, Page, & Schooley, 2014; Hoxby & Turner, 2013).

The results of this study show a ten percentage point increase in the total number of submitted FAFSA applications and a twelve percentage point increase in college attendance when comparing the class of 2010 to 2011, suggesting a positive connection between school counselor outreach/FAFSA completion and college attendance. These findings are encouraging and show that large-scale, school wide, school counselor led programs and interventions can have

> **JCA**
>
> **"The results of this study show a ten percentage point increase in the total number of submitted FAFSA applications and a twelve percentage point increase in college attendance when comparing the class of 2010 to 2011, suggesting a positive connection between school counselor outreach/FAFSA completion and college attendance. "**



## School Counselors and FAFSA Completion

significant impacts on student's postsecondary decisions.

**Implications for School Counselors**
As advocates for all children, school counselors must have the vision to creatively address equitable educational access for college readiness for all students, especially those students with the most need (Pham & Keenan, 2011; Weinstein & Savitz-Romer, 2009). Delivering a seamless stream of resources supporting students through the college going process will require leadership, advocacy, consultation skills, patience, and perseverance as best practices are discovered, leveraging every possible source of social capital. Opportunities to educate school counselors, parents, and the community on issues of college readiness will be essential to advance college readiness for all students.

Professional development for practicing school counselors who have little or outdated training in financial aid counseling must be provided. Institutions of higher education could establish strong district partnerships by providing FAFSA training and financial aid updates. University financial aid offices could partner with school districts to offer FAFSA completion events. Also, pre-service training institutions could include financial aid and college admissions training as a mandatory requirement in their school counselor preparation programs.

Finally, successful interventions in one community "may" not be the most effective in the next community. Cultural competence

and a willingness to understand diverse perspectives related to the college going process are needed. Patience and perseverance will be required as best practices leveraging collaborative partnerships are discovered and evaluated for impact. A one-size all approach will likely yield disappointing outcomes.

**Implications for Researchers**
We have provided evidence of statistically significant differences in FAFSA completion and college enrollment between pre-intervention and post-intervention students. We have also provided evidence from sensitivity analyses suggesting that these differences are robust to unobserved confounders. Nevertheless, more research is needed to ascertain which supports and interventions have the greatest efficacy. Important questions to ask include: What differences, if any, exist by race, SES, and first generation status? Are there differences between two year and four year enrollment patterns for students who receive support with financial aid concerns? Do parent and student support needs differ? Will efforts such as FAFSA completion close the opportunity gap over time such that we might eventually eliminate it? What other barriers impact college going decisions? Who might school counselors form collaborative relationships with to increase FAFSA completion and college going?

Timing is also an important consideration and future research is needed to understand the K-12 practices necessary to increase college



## School Counselors and FAFSA Completion

going. This study focused on interventions that occurred during the senior year, but college readiness and financial preparedness activities must begin in kindergarten and research is needed to evaluate and better understand the most promising practices (Hillman, Gast, & George-Jackson, 2015; MacCann, Lipnevich, & Roberts, 2012; McCollough, 2011).

This study was designed to assess the potential effect of increased school counselor support on how often students completed FAFSAs and enrolled in college. It does not, however, allow us to distinguish between the relative effectiveness of different outreach activities. Future research into which aspects of outreach have the highest impact on student's postsecondary decision-making process would be beneficial to both researchers and practitioners. It would also be helpful to understand how parents and students responded to the offer for school counselor support.

Similar to findings in the H&R Block Study, it remains to be seen if the enrollment effects translate into real, long-term benefits (Bettinger et al., 2009). One concern is that the support may have encouraged students to enroll in college, but questions remain regarding persistence through college graduation. Issues of college persistence were not addressed in this study.

Finally, navigating large urban school district policies around research and program implementation is a daunting task. Thus,

planning ahead and developing a system for addressing concerns is important. We suggest that memorandums of understanding between higher education institutions and school districts would simplify the research process and encourage stronger research practitioner collaboration.

We believe the above suggestions will help researchers in their efforts to understand and devise effective practices that enable students to complete college applications, obtain financial aid, and enroll in college.

### Appendix
### Results From Other Model Specifications

In this article, we report the results from a linear probability model, where the coefficient on the intervention tells us the marginal effect —measured in probability of "success"—on the outcome of the intervention, controlling for other variables. A potential problem with this model is that the linear combination from the model for certain combinations of values can be below zero or above one, which is impossible. Furthermore, it may also be informative to model variation in the outcomes between high schools using multilevel models. (In the reported linear probably model, we did adjust standard errors to allow for correlation among students who attended the same high school.)

To account for the binary measurement of the outcomes, we estimated a logistic regression model, which tells us the log odds of "success" vs. "failure" in each outcome as a function of the intervention and other



# School Counselors and FAFSA Completion

covariates. This model constrains the probability of success or failure to fall between 0 and 1. Compared to the reported linear probability model, a logistic regression model of FAFSA completion yielded identical marginal effects after rounding. The linear probability model of college attendance has a probability 0.02 smaller than the marginal effects from the logistic regression. Thus, in comparison to a logistic regression model, the linear probability model leads us to the same substantive conclusions but provides us slightly more conservative estimates in the case of college attendance.

We also estimated multilevel models to allow the effect of the intervention to vary by high school. To do this we estimated both a linear probability model and logistic regression model where intercepts were allowed to vary by high school. We also estimated a population average logistic regression model using a generalized estimating equation. Little variation by high schools was observed. For example, the intraclass correlation of the linear probability model with random intercepts was 0.02, meaning unobserved properties of high schools explained only 2% of the overall observed variation. Likewise, compared to the linear probability model without random intercepts, there was little variation in size of the marginal effects of the intervention. For example, in the linear probability model with random intercepts, given a random effect of zero, the marginal effect of the intervention on FAFSA completion was 0.05 *lower* than in the linear probability model without random intercepts;

in the model on college attendance, this same marginal effect was 0.07 *lower*. In the population average model, however, the marginal effects were slightly *higher* than the linear probability, by 0.04 for the FAFSA completion model and 0.07 for the college attendance model. Compared to multilevel models, the linear probability model provides effect sizes about halfway between the relatively lower ones in a random intercepts model and the relatively higher ones in a population average model.

These more complex models tell the same story while providing less intuitive interpretations and requiring additional assumptions about the data-generating mechanism of the data. For these reasons, we opted to report the results of the linear probability model.

## References

Bailey, M.J., & Dynarski, S.M. (2012). *Gains and gaps; Changing inequality in U.S. college entry and completion*. Cambridge, MA: National Bureau of Economic Research. Retrieved from http://www.nber.org/papers/w17633

Belasco, A. (2013). Creating College Opportunity: School Counselors and Their influence on postsecondary enrollment. *Research in Higher Education, 54*(7), 781-804. http://dx.doi.org/10.1007/s11162-013-9297-4

Bettinger, E., Long, B. T., Oreopoulos, P., & Sanbonmatsu, L. (2012). The role of application assistance and information in college decisions: results from the H&R Block FAFSA experiment. *Quarterly Journal of Economics, 127*(3), 1205-1242. http://dx.doi.org/10.1093/qje/qjs017

Borman, G. D., Dowling, N. M., & Schneck, C. (2008). A Multisite Cluster Randomized Field Trial of Open Court Reading. *Educational Evaluation and Policy Analysis, 30*(4), 389–407. http://dx.doi.org/10.3102/0162373708326283



# School Counselors and FAFSA Completion

Bridgeland, J., & Bruce, M. (2011). *2011 national survey of school counselors: Counseling at a crossroads.* New York, NY: College Board Advocacy and Policy Center. Retrieved from http://www.civicenterprises.net/MediaLibrary/Docs/counseling_at_a_crossroads.pdf

Bryan, J., Holcomb-McCoy, C., Moore-Thomas, C., & Day-Vines, N. (2009). Who sees the school counselor for college information? A national study. *Professional School Counseling, 12*(4), 280-291. http://dx.doi.org/10.5330 / PSC .n.2010-12.280

Bryan, J., Moore-Thomas, C., Day-Vines, N. L., & Holcomb-McCoy, C. (2011). School counselors as social capital: The effects of high school college counseling on college application rates. *Journal of Counseling and Development, 89*(2), 190-199. http://dx.doi.org/10.1002/j.1556-6678.2011.tb00077.x

Cabrera, A. F., & La Nasa, S. M. (2001). On the path to college: Three critical tasks facing America's disadvantaged. *Research in Higher Education, 42*(2), 119-149. http://dx.doi.org/10.1023/A:1026520002362

Castleman, B.L., Arnold, K., & Wartman, K. (2012). Stemming the Tide of Summer Melt: An Experimental Study of the Effects of Post-High School Summer Intervention on Low-Income Students' College Enrollment. *Journal of Research on Educational Effectiveness, 5*(1), 1-17. http://dx.doi.org/10.1080/19345747.2011.618214

Castleman, B.L., Owen, L. & Page, L. (2015). Do college-ready students benefit when high schools and colleges collaborate? Experimental evidence from Albuquerque, New Mexico. *Economics of Education Review,* 47, 168-179. http://dx.doi.org/10.1016/j.econedurev.2015.05.010

Castleman, B. L. & Page, L. C. (2014a). *Summer melt: Supporting low-income students through the transition to college.* Cambridge, MA: Harvard Education Press.

Castleman, B. L. & Page, L. C. (2014b) Summer nudging: Can personalized text messages and peer mentor outreach increase college going among low-income high school graduates? *Journal of Economic Behavior & Organization* http://dx.doi.org/10.1016/j.jebo.2014.12.008

Castleman, B. L. & Page, L. C. (2014c). A trickle or a torrent? Understanding the extent of summer "melt" among college-intending high school graduates. *Social Science Quarterly, 95*(1), 202 – 220. http://dx.doi.org/10.1111/ssqu.12032

Castleman, B. L., Page, L. C. & Schooley, K. (2014). The forgotten summer: Mitigating summer attrition among college-intending, low-income high school graduates. *Journal of Policy Analysis and Management, 33*(2), 320 – 344. http://dx.doi.org/10.1002/pam.21743

Chen, R., & DesJardins, S. L. (2007). Exploring the effects of financial aid on the gap in student dropout risks by income level. *Research in Higher Education, 49*(1), 1-18. http://dx.doi.org/10.1007/s11162-007-9060-9

Clements, D. H., & Sarama, J. (2008). Experimental Evaluation of the Effects of a Research-Based Preschool Mathematics Curriculum. *American Educational Research Journal, 45*(2), 443–494. http://dx.doi.org/10.3102/0002831207312908

Clinedinst, M. E., Hurley, S. F., & Hawkins, D. A. (2011). 2011 state of college admission. Alexandria, VA: National Association for College Admission Counseling. Retrieved from http://nacacnet.org.

Corwin, Z. B., Venegas, K. M., Oliverez, P. M., & Colyar, J. E. (2004). School counsel - How appropriate guidance affects educational equity. *Urban Education, 39*(4), 442-457. http://dx.doi.org/10.1177/0042085904265107

Dounay, J. (2008). Counseling: Counseling high school students for postsecondary and workplace success. *The Progress of Education Reform, 9*(3), 2. Retrieved from http://www.eric.ed.gov/PDFS/ED512130.pdf

Engberg, M., & Gilbert, A. (2013). The Counseling opportunity structure: Examining correlates of four-year college going rates. *Research Higher in Education, 55*(3), 219-244. http://dx.doi.org/10.1007/s11162-013-9309-4

Finn, J. D., & Achilles, C. M. (1990). Answers and questions about class size: A statewide experiment. *American Educational Research Journal, 27*(3), 557–577. http://dx.doi.org/10.3102/00028312027003557

Frank, K. A., Maroulis, S. J., Duong, M. Q., & Kelcey, B. M. (2013). What would it take to change an inference? Using Rubin's causal model to interpret the robustness of causal inferences. *Educational Evaluation and Policy Analysis, 35*(4), 437. *http://dx.doi.org/10.3102/0162373713493129*

Frank, K. A. (2014). *KonFound-it!.* Retrieved from https://www.msu.edu/~kenfrank/research.htm



# School Counselors and FAFSA Completion

Gullatt, Y., & Jan, W. (2003). *How do pre-collegiate academic outreach programs impact college-going among underrepresented students*. Retrieved from http://inpathways.net/precollegiate.pdf.

Hart Research Associates. (2012). *The College Board 2012 national survey of school counselors and administrators report on survey findings: Barriers and supports to school counselor success.* New York: The College Board. Retrieved from http://media.collegeboard.com/digitalServices/pdf/nosca/Barriers-Supports_TechReport_Final.pdf

Hatch, T., & Owen, L. (2015). *Strengthening School Counseling and College Advising: San Diego State University White House Post Convening Report*. San Diego, CA. Retrieved from http://cescal.org/special-projects/white-house-convening/

Heller, D. E. (2006). Early commitment of financial aid eligibility. *American Behavioral Scientist, 49*(12), 1719-1738. http://dx.doi.org/10.1177/0002764206289136

Hillman, N. , Gast, M. , & George-Jackson, C. (2015). When to begin? socioeconomic and racial/ethnic differences in financial planning, preparing, and saving for college. *Teachers College Record, 117*(8), 1-28.

Holcomb-McCoy, C., Lee, V., Bryan, J., & Young, A. (2011). Ensuring college access for all: A call to the school counseling profession. *Counseling Online Today 53*(8) 42.

Hurwitz, M. & Howell, J. (2014). Estimating Causal Impacts of School Counselors With Regression Discontinuity Designs. *Journal of Counseling and Development 92*(3), 316-327. http://dx.doi.org/10.1002/j.1556-6676.2014.00159.x

Johnson, J., & Rochkind, J. (2010). *Can I get a little advice here? How an overstretched high school guidance system is undermining students.* Retrieved from http://www.publicagenda.org/files/pdf/can-i-get-a-little-advice-here.pdf

Lederman, D. (2012) Higher Ed Shrinks. *Inside Higher Ed*. Retrieved from http://www.insidehighered.com/news/2012/10/10/enrollments-fall-first-time-15-years

Long, B. T. (2009). Breaking the affordability barrier: How much of the college access problem is attributable to lack of information about financial aid? *National Cross Talk, 17*(2). Retrieved from http://eric.ed.gov/ERICWebPortal /detail?accno=ED524316

Long, B. T., & Riley, E. (2007). Financial aid: A broken bridge to college access? *Harvard Educational Review, 77*(1), 39-63. http://dx.doi.org/10.17763/haer.77.1.765h8777686r7357

MacCann, C., Lipnevich, A., & Roberts, R. (2012). New directions in assessing emotional competencies from kindergarten to college. *Journal of Psychoeducational Assessment, 30*(4), 315-319. http://dx.doi.org/10.1177/0734282912449438

McCollough, C. A. (2011). Creating a college-going culture. *Science Teacher, 78*(3), 51-55.

McDonough, P. M. (2005). *Counseling and college counseling in America's high schools. State of college admission.* Washington, DC: National Association for College Admission Counseling. Retrieved from http://j.b5z.net/i/u/2135872/i /McDonough_Report.pdf

McDonough, P. M., & McClafferty, K. A. (2001). *Rural college opportunity: A Shasta and Siskiyou county perspective.* Reading, CA: University of California. Retrieved from http://www .mcconnellfoundation.org/files/rural_college.pdf

McKillip, M. E. M., Rawls, A., & Barry, C. (2012). Improving college access: A review of research on the role of high school counselors. *Professional School Counseling*, 16(1), 49. http://dx.doi.org/10.5330/PSC.n.2012-16.49

National Student Clearinghouse. (2015). Counting It Right: National Student Clearinghouse® Research Center™ Releases Third Annual State-Level College Completions Numbers. Retrieved from https://nscnews.org/counting-it-right-national-student-clearinghouse-research-center-releases-third-annual-state-level-college-completions-numbers/

Mullin, C.M., & Phillippe, K. (2011) *Fall 2011: Estimated Headcount Enrollment and Pell Grant Trends.* Washington, DC: American Association of Community Colleges. Retrieved from http://www.aacc.nche.edu/Publications/Reports / Documents/Headcount_Enrollment.pdf

Oliver, M., Ricard, R. J., Witt, K. J., Alvarado, M., & Hill, P. (2010). Creating college advising connections: Comparing motivational beliefs of early college high school students to traditional first-year university students. *NACADA Journal, 30*(1), 14-22. http://dx.doi.org/10.12930/0271-9517-30.1.14

Owen, L. (2014) Prevent summer melt. *ASCA School Counselor* 52*(2)*, 10-16. Retrieved from https://www.schoolcounselor.org/magazine/blogs/november-december-2014/prevent-summer-melt



# School Counselors and FAFSA Completion

Perna, L. W. (2002). Precollege outreach programs: Characteristics of programs serving historically underrepresented groups of students. *Journal of College Student Development, 43*(1), 64-64. Retrieved from http://search.proquest.com/docview/195176874?accountid=11752

Perna, L. W. (2004). *Impact of student aid program design, operations, and marketing on the formation of family college-going plans and resulting college-going behaviors of potential students*. New York, NY: The Education Resources Institute, Inc. Retrieved from http://174.133 .199.34/pdf/research studies/ReseachReport_Perna.pdf

Perna, L. (2008). Understanding high school students' willingness to borrow to pay college prices. *Research in Higher Education, 49*(7), 589-606. http://dx.doi.org/10.1007/s11162-008-9095-6

Perna, L. W., Li, C., Anderson, R., Thomas, S. L., Rowan-Kenyon, H. T., & Bell, A. (2008). The role of college counseling in shaping college opportunity: Variations across high schools. *The Review of Higher Education, 31*(2), 131-159. http://dx.doi.org/10.1353/rhe.2007.0073

Pham, C., & Keenan, T. (2011). Counseling and college matriculation: Does the availability of counseling affect college-going decisions among highly qualified first-generation college-bound high school graduates? *Journal Of Applied Economics & Business Research*, *1*(1), 12-24.

Plank, S. B., & Jordan, W. J. (2001). Effects of information, guidance, and actions on postsecondary destinations: A study of talent loss. American Educational Research Journal, 38(4), 947. http://dx.doi.org/10.3102/00028312038004947

Porter, J. R. (2006). Financial strains keep millions out of college, panel says. *Chronicle of Higher Education*, 53(5), 25.

Poynton, T., Lapan, R., & Marcotte, A. (2015). Financial planning strategies of high school seniors: Removing barriers to career success. *The Career Development Quarterly, 63*(1), 57-73. http://dx.doi.org/10.1002/j.2161-0045.2015.00095

Raudenbush, S. W., & Bryk, A. S. (2002). *Hierarchical Linear Models: Applications and Data Analysis Methods* (2nd ed., Vol. 1). Thousand Oaks, CA: Sage Publications, Incorporated.

Roderick, M. R., Nagaoka, J., Coca, V., & Moeller, E. (2008). *From high school to the future: Potholes on the road to college*. Chicago, IL: Consortium on Chicago School Research at University of Chicago. http://dx.doi.org/10.1177/0038040 71141128

Ross, T., Kena, G., Rathbun, A., KewalRamani, A., Zhang, J., Kristapovich, P., and Manning, E. (2012). *Higher Education: Gaps in Access and Persistence Study*. Washington, DC: U.S. Department of Education, National Center for Education Statistics. Retrieved from http://nces.ed.gov/pubs2012/2012046.pdf

Royston, P. (2005). Multiple Imputation of Missing Values: Update of Ice. *Stata Journal, 5*(4), 527-536. Retrieved from http://www.stata-journal.com/article.html?article=st0067_2

Rubin, D. B. (2004). *Multiple Imputation for Nonresponse in Surveys*. Hoboken, NJ: John Wiley & Sons.

Rubin, Donald B. (2005). Causal Inference Using Potential Outcomes: Design, Modeling, Decisions. *Journal of the American Statistical Association 100*(469), 322–331. http://dx.doi.org/10.1198/016214504000001880

Savitz-Romer, M. & Liu, P. (2014). Counseling and college completion: *The road ahead. A summary report from the strengthening school counseling and college advising convening*. Cambridge, MA. Retrieved from https://www.gse.harvard.edu/sites/default/files//Counseling-and-College-Completion-The-Road-Ahead_0.pdf

Shadish, W. R., Cook, T. D., & Campbell, D. T. (2002). *Experimental and Quasi-experimental Designs for Generalized Causal Inference*. Belmont, CA: Wadsworth.

Simmons, O. S. (2011). Lost in transition: The implications of social capital for higher education access. *Notre Dame Law Review, 87*(1), 206-252. Retrieved from http://www.nd.edu/~ndlrev/archive_public/87ndlr1/Simmons.pdf

St. John, E. P., Paulsen, M. B., & Carter, D. F. (2005). Diversity, college costs, and postsecondary opportunity: An examination of the financial nexus between college choice and persistence for African Americans and Whites. *Journal of Higher Education, 76*(5), 545-569. http://dx.doi.org/10.1353/jhe.2005.0035

StataCorp. (2015). STATA (Version 14). College Station, TX: StataCorp.



## School Counselors and FAFSA Completion

Swail, W. S., & Perna, L. W. (2002). Pre-college outreach programs. A national perspective. In W. G. Tierney, & LL. S. Hagedorn (Eds.), Increasing access to college: Extending possibilities for all students (pp. 15-34). Albany, NY: State University of New York Press.

Tierney, W. G. (2006). Financial aid and access to college: The public policy challenges. *American Behavioral Scientist, 49*(12), 1601-1603. http:// dx.doi.org/10.1177/0002764206289133

Tierney, W. G., Corwin, Z. B., & Colyar, J. E. (2005). *Preparing for college: Nine elements of effective outreach*. Albany, NY: State University of New York Press.

Tierney, M. L., Bailey, T., Constantine, J., Finkelstein, N., & Hurd, N. F. (2009). *Helping students navigate the path to college: What high schools can do*. Washington, DC: U.S. Department of Education, Institute of Education Sciences. Retrieved from http://ies.ed.gov/ncee/wwc /publications/ practiceguides

Trusty, J., & Niles, S. G. (2003). High-school math courses and completion of the bachelor's degree. *Professional School Counseling, 7*(2), 99-107. Retrieved from http:// search.ebscohost.com/login.aspx? direct=true&db=a9h&AN=12075259&site=ehost-live

U.S. Department of Education (2013). *For each and every child—a strategy for education equity and excellence*. Washington, D.C.. Retrieved from https://www2.ed.gov/ about/bdscomm/list/eec/equity-excellence-commission-report.pdf

U.S. Department of Education, Office of Elementary and Secondary Education (2011). *The FAFSA Completion Project: An Annotated Bibliography*. Washington, DC. Retrieved from http://www.floridacollegeaccess.org/wp-content/ uploads/2015/02/FAFSABibliography.pdf

Venezia, A., Kirst, M. W., & Antonio, A. L. (2008). *Betraying the college dream: How disconnected K-12 and postsecondary education systems undermine student aspirations.* Stanford, CA: Stanford Institute for Higher Education Research.

Weinstein, L. A., & Savitz-Romer, M. (2009). Planning for opportunity: applying organizational and social capital theories to promote college-going cultures. *Educational Planning*, *18*(2), 1-11.

000201



104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

KeyCite Yellow Flag - Negative Treatment

Not Followed on State Law Grounds Count My Vote, Inc. v. Cox, Utah, October 10, 2019

104 S.Ct. 2778
Supreme Court of the United States

CHEVRON, U.S.A., INC., Petitioner,

v.

NATURAL RESOURCES
DEFENSE COUNCIL, INC., et al.
AMERICAN IRON AND STEEL
INSTITUTE, et al., Petitioners,

v.

NATURAL RESOURCES
DEFENSE COUNCIL, INC., et al.
William D. RUCKELSHAUS, Administrator,
Environmental Protection Agency, Petitioner,

v.

NATURAL RESOURCES
DEFENSE COUNCIL, INC., et al. *

Nos. 82-1005, 82-1247 and 82-1591.
|
Argued Feb. 29, 1984.
|
Decided June 25, 1984.

**Synopsis**

Rehearing Denied Aug. 16, 1984.

See 468 U.S. 1227, 105 S.Ct. 28, 29.

Petition was filed for review of order of the Environmental Protection Agency. The Court of Appeals, 685 F.2d 718, vacated regulations, and certiorari was granted. The Supreme Court, Justice Stevens, held that Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments.

Reversed.

**West Headnotes (7)**

**[1]** **Federal Courts** ⟶ Decisions Reviewable

Supreme Court reviews judgments, not opinions.

109 Cases that cite this headnote

**[2]** **Administrative Law and Procedure** ⟶ Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** ⟶ Permissible or reasonable construction

When court reviews agency's construction of statute which it administers, court is confronted with two questions: whether Congress has directly spoken on precise question at issue; if statute is silent or ambiguous with respect to specific issue, question for court is whether agency's answer is based on permissible construction of statute.

7026 Cases that cite this headnote

**[3]** **Administrative Law and Procedure** ⟶ Erroneous or unreasonable construction; conflict with statute

Judiciary is final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.

1782 Cases that cite this headnote

**[4]** **Administrative Law and Procedure** ⟶ Permissible or reasonable construction

Court need not conclude that agency's construction of statute which it administered was only one it permissibly could have adopted to uphold construction, or even reading the court would have reached if question initially had arisen in judicial proceeding.

2665 Cases that cite this headnote

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

**[5]** **Administrative Law and Procedure** 🔑 **Permissible or reasonable construction**

Where legislative delegation to agency on particular question is implicit rather than explicit, court may not substitute its own construction of statutory provision for reasonable interpretation made by administrator of agency.

6151 Cases that cite this headnote

**[6]** **Administrative Law and Procedure** 🔑 **Relationship of agency with statute in general**

Considerable weight should be accorded to executive department's construction of statutory scheme it is entrusted to administer.

624 Cases that cite this headnote

**[7]** **Environmental Law** 🔑 **Stationary sources in general**

Environmental Protection Agency regulation allowing states to treat all pollution-emitting devices within same industrial grouping as though they were encased within single "bubble" was based on permissible construction of term "stationary source" in Clean Air Act Amendments. Clean Air Act, §§ 111(a)(3), 172(b)(6), 302(j), as amended, 42 U.S.C.A. §§ 7411(a)(3), 7502(b)(6), 7602(j).

297 Cases that cite this headnote

*Syllabus* [a1]

The Clean Air Act Amendments of 1977 impose certain requirements on States **2779** that have not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation, including the requirement that such "nonattainment" States establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for such sources unless stringent conditions are met. EPA regulations promulgated in 1981 to implement the permit requirement allow a State to adopt a plantwide definition of the term "stationary source," under which an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the total emissions from the plant, thus allowing a State to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble." Respondents filed a petition for review in the Court of Appeals, which set aside the regulations embodying the "bubble concept" as contrary to law. Although recognizing that the amended Clean Air Act does not explicitly define what Congress envisioned as a "stationary source" to which the permit program should apply, and that the issue was not squarely addressed in the legislative history, the court concluded that, in view of the purpose of the nonattainment program to improve rather than merely maintain air quality, a plantwide definition was "inappropriate," while stating it was mandatory in programs designed to maintain existing air quality.

Held: The EPA's plantwide definition is a permissible construction of the statutory term "stationary source." Pp. 2781–2793.

(a) With regard to judicial review of an agency's construction of the statute which it administers, if Congress has not directly spoken to the precise question at issue, the question for the court is whether the **838** agency's answer is based on a permissible construction of the statute. Pp. 2781–2783.

(b) Examination of the legislation and its history supports the Court of Appeals' conclusion that Congress did not have a specific intention as to the applicability of the "bubble concept" in these cases. Pp. 2783–2786.

(c) The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas plainly discloses that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Pp. 2786–2787.

(d) Prior to the 1977 Amendments, the EPA had used a plantwide definition of the term "source," but in 1980 the EPA ultimately adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals here, precluding use of the "bubble concept" in nonattainment

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 204 of 305

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

States' programs designed to enhance air quality. However, when a new administration took office 1981, the EPA, in promulgating the regulations involved here, reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the plantwide definition in nonattainment areas. Pp. 2787–2790.

(e) Parsing the general terms in the text of the amended Clean Air Act—particularly the provisions of §§ 302(j) and 111(a)(3) pertaining to the definition of "source"—does not reveal any actual intent of Congress as to the issue in these cases. To the extent any congressional "intent" can be discerned from the statutory language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the EPA's power to regulate particular sources in order to effectuate the policies of the Clean Air Act. Similarly, the legislative history is consistent with the **2780 view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments. The plantwide definition is fully consistent with the policy of allowing reasonable economic growth, and the EPA has advanced a reasonable explanation for its conclusion that the regulations serve environmental objectives as well. The fact that the EPA has from time to time changed its interpretation of the term "source" does not lead to the conclusion that no deference should be accorded the EPA's interpretation of the statute. An agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis. Policy arguments concerning the "bubble concept" should be addressed to legislators or administrators, not to judges. The EPA's interpretation of the statute here represents a reasonable accommodation of manifestly competing interests and is entitled to deference. Pp. 2790–2793.

[222 U.S.App.D.C. 268, 685 F.2d 718 (1982),](#) reversed.

**Attorneys and Law Firms**

*Deputy Solicitor General Bator* argued the cause for petitioners in all cases. With him on the briefs for petitioner in No. 82-1591 were *Solicitor General Lee, Acting Assistant Attorney General Habicht, Deputy Assistant Attorney General Walker, Mark I. Levy, William F. Pedersen,* and *Charles S. Carter. Michael H. Salinsky* and *Kevin M. Fong* filed briefs for petitioner in No. 82-1005. *Robert A. Emmett, David Ferber, Stark Ritchie, Theodore L. Garrett, Patricia A. Barald, Louis E. Tosi, William L.*

*Patberg, Charles F. Lettow,* and *Barton C. Green* filed briefs for petitioners in No. 82-1247.

 **\*839** *David D. Doniger* argued the cause and filed a brief for respondents.†>>>

† Briefs of *amici curiae* urging reversal were filed for the American Gas Association by *John A. Myler;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat,* and *Ann P. Sheldon;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

A brief of *amici curiae* urging affirmance was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Thomas Y. Au, Duane Woodard,* Attorney General of Colorado, *Richard L. Griffith,* Assistant Attorney General, *Joseph I. Lieberman,* Attorney General of Connecticut, *Robert A. Whitehead, Jr.,* Assistant Attorney General, *James S. Tierney,* Attorney General of Maine, *Robert Abrams,* Attorney General of New York, *Marcia J. Cleveland* and *Mary L. Lyndon,* Assistant Attorneys General, *Irwin I. Kimmelman,* Attorney General of New Jersey, *John J. Easton, Jr.,* Attorney General of Vermont, *Merideth Wright,* Assistant Attorney General, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Maryann Sumi,* Assistant Attorney General.

*James D. English, Mary-Win O'Brien,* and *Bernard Kleiman* filed a brief for the United Steelworkers of America, AFL-CIO-CLC, as *amicus curiae.*

**Opinion**

Justice STEVENS delivered the opinion of the Court.

In the Clean Air Act Amendments of 1977, [Pub.L. 95–95, 91 Stat. 685,](#) Congress enacted certain requirements applicable  **\*840** to States that had not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation. The amended Clean Air Act required these "nonattainment" States to establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for a new or modified major stationary source unless several stringent conditions are met. [1] The EPA regulation promulgated to implement this permit requirement allows a State to adopt a plantwide definition of the term "stationary source." [2] Under this definition, an existing plant that contains several pollution-emitting devices may install or modify one piece of equipment without meeting the permit conditions if the alteration will not increase the

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

total emissions from the plant. The question presented by these cases is whether EPA's decision to allow States to treat all of the pollution-emitting devices within the same industrial grouping as though they were encased within a single "bubble" is based on a reasonable construction of the statutory term "stationary source."

I

The EPA regulations containing the plantwide definition of the term stationary source were promulgated on October **\*841** 14, 1981. 46 Fed.Reg. 50766. Respondents [3] filed a timely petition for review in the United States Court of Appeals for the District of Columbia Circuit pursuant to 42 U.S.C. § 7607(b)(1). [4] The Court of Appeals **\*\*2781** set aside the regulations. Natural Resources Defense Council, Inc. v. Gorsuch, 222 U.S.App.D.C. 268, 685 F.2d 718 (1982).

The court observed that the relevant part of the amended Clean Air Act "does not explicitly define what Congress envisioned as a 'stationary source, to which the permit program ... should apply," and further stated that the precise issue was not "squarely addressed in the legislative history." Id., at 273, 685 F.2d, at 723. In light of its conclusion that the legislative history bearing on the question was "at best contradictory," it reasoned that "the purposes of the nonattainment program should guide our decision here." Id., at 276, n. 39, 685 F.2d, at 726, n. 39. [5] Based on two of its precedents concerning the applicability of the bubble concept to certain Clean Air Act programs, [6] the court stated that the bubble concept was "mandatory" in programs designed merely to maintain existing air quality, but held that it was "inappropriate" in programs enacted to improve air quality. Id., at 276, 685 F.2d, at 726. Since the purpose of the permit **\*842** program—its "raison d'être," in the court's view—was to improve air quality, the court held that the bubble concept was inapplicable in these cases under its prior precedents. Ibid. It therefore set aside the regulations embodying the bubble concept as contrary to law. We granted certiorari to review that judgment, 461 U.S. 956, 103 S.Ct. 2427, 77 L.Ed.2d 1314 (1983), and we now reverse.

[1] The basic legal error of the Court of Appeals was to adopt a static judicial definition of the term "stationary source" when it had decided that Congress itself had not commanded that definition. Respondents do not defend the legal reasoning of the Court of Appeals. [7] Nevertheless, since this Court reviews judgments, not opinions, [8] we must

determine whether the Court of Appeals' legal error resulted in an erroneous judgment on the validity of the regulations.

II

[2] [3] [4] When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, **\*843** as well as the agency, must give effect to the unambiguously expressed intent of Congress. [9] If, however, **\*\*2782** the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, [10] as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. [11]

[5] "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation **\*844** of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. [12] Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. [13]

[6] We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, [14] and the principle of deference to administrative interpretations.

"has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full **\*\*2783** understanding of the force of the statutory policy in the given

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 206 of 305

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, e.g., National Broadcasting Co. v. United States, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; Labor Board v. Hearst Publications, Inc., 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170]; **\*845** Republic Aviation Corp. v. Labor Board, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; Securities & Exchange Comm'n v. Chenery Corp., [332] 322 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995]; Labor Board v. Seven–Up Bottling Co., 344 U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377].

"... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." United States v. Shimer, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 1561, 6 L.Ed.2d 908 (1961).

Accord Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984).

In light of these well-settled principles it is clear that the Court of Appeals misconceived the nature of its role in reviewing the regulations at issue. Once it determined, after its own examination of the legislation, that Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program, the question before it was not whether in its view the concept is "inappropriate" in the general context of a program designed to improve air quality, but whether the Administrator's view that it is appropriate in the context of this particular program is a reasonable one. Based on the examination of the legislation and its history which follows, we agree with the Court of Appeals that Congress did not have a specific intention on the applicability of the bubble concept in these cases, and conclude that the EPA's use of that concept here is a reasonable policy choice for the agency to make.

### III

In the 1950's and the 1960's Congress enacted a series of statutes designed to encourage and to assist the States in curtailing air pollution. See generally Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 63–64, 95 S.Ct. 1470, 1474–1475, 43 L.Ed.2d 731 (1975). The Clean Air Amendments of 1970, Pub.L. 91–604, 84 Stat. 1676, "sharply increased federal authority and responsibility **\*846** in the continuing effort to combat air pollution," 421 U.S.,

at 64, 95 S.Ct., at 1474, but continued to assign "primary responsibility for assuring air quality" to the several States, 84 Stat. 1678. Section 109 of the 1970 Amendments directed the EPA to promulgate National Ambient Air Quality Standards (NAAQS's) [15] and § 110 directed the States to develop plans (SIP's) to implement the standards within specified deadlines. In addition, § 111 provided that major new sources of pollution would be required to conform to technology-based performance standards; the EPA was directed to publish a list of categories of sources of pollution and to establish new source performance standards (NSPS) for each. Section 111(e) prohibited the operation of any new source in violation of a performance standard.

Section 111(a) defined the terms that are to be used in setting and enforcing standards of performance for new stationary sources. It provided:

"For purposes of this section:

.....

"(3) The term 'stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant." 84 Stat. 1683.

**\*\*2784** In the 1970 Amendments that definition was not only applicable to the NSPS program required by § 111, but also was made applicable to a requirement of § 110 that each state implementation plan contain a procedure for reviewing the location of any proposed new source and preventing its construction if it would preclude the attainment or maintenance of national air quality standards. [16]

In due course, the EPA promulgated NAAQS's, approved SIP's, and adopted detailed regulations governing NSPS's **\*847** for various categories of equipment. In one of its programs, the EPA used a plantwide definition of the term "stationary source." In 1974, it issued NSPS's for the nonferrous smelting industry that provided that the standards would not apply to the modification of major smelting units if their increased emissions were offset by reductions in other portions of the same plant. [17]

### Nonattainment

The 1970 legislation provided for the attainment of primary NAAQS's by 1975. In many areas of the country, particularly the most industrialized States, the statutory goals were not

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 207 of 305

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

attained. [18] In 1976, the 94th Congress was confronted with this fundamental problem, as well as many others respecting pollution control. As always in this area, the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs. The 94th Congress, confronting these competing interests, was unable to agree on what response was in the public interest: legislative proposals to deal with nonattainment failed to command the necessary consensus. [19]

In light of this situation, the EPA published an Emissions Offset Interpretative Ruling in December 1976, see 41 Fed.Reg. 55524, to "fill the gap," as respondents put it, until Congress acted. The Ruling stated that it was intended to **\*848** address "the issue of whether and to what extent national air quality standards established under the Clean Air Act may restrict or prohibit growth of major new or expanded stationary air pollution sources." Id., at 55524–55525. In general, the Ruling provided that "a major new source may locate in an area with air quality worse than a national standard only if stringent conditions can be met." Id., at 55525. The Ruling gave primary emphasis to the rapid attainment of the statute's environmental goals. [20] Consistent with that emphasis, the construction of every new source in nonattainment areas had to meet the "lowest achievable emission rate" under the current state of the art for that type of facility. See Ibid. The 1976 Ruling did not, however, explicitly adopt or reject the "bubble concept." [21]

## **\*2785** IV

The Clean Air Act Amendments of 1977 are a lengthy, detailed, technical, complex, and comprehensive response to a major social issue. A small portion of the statute—91 Stat. **\*849** 745–751 (Part D of Title I of the amended Act, 42 U.S.C. §§ 7501–7508)—expressly deals with nonattainment areas. The focal point of this controversy is one phrase in that portion of the Amendments. [22]

Basically, the statute required each State in a nonattainment area to prepare and obtain approval of a new SIP by July 1, 1979. In the interim those States were required to comply with the EPA's interpretative Ruling of December 21, 1976. 91 Stat. 745. The deadline for attainment of the primary NAAQS's was extended until December 31, 1982, and in some cases until December 31, 1987, but the SIP's were

required to contain a number of provisions designed to achieve the goals as expeditiously as possible. [23]

**\*850** Most significantly for our purposes, the statute provided that each plan shall
"(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173...." Id., 747.

Before issuing a permit, § 173 requires (1) the state agency to determine that there will be sufficient emissions reductions in the region to offset the emissions from the new source and also to allow for reasonable further progress toward attainment, or that the increased emissions will not exceed an allowance for growth established pursuant to § 172(b)(5); (2) the applicant to certify that his other sources in the State are in compliance with the SIP, (3) the agency to determine that the applicable SIP is otherwise being implemented, and (4) the proposed source to comply with the lowest achievable emission rate (LAER). [24]

**\*\*2786 \*851** The 1977 Amendments contain no specific reference to the "bubble concept." Nor do they contain a specific definition of the term "stationary source," though they did not disturb the definition of "stationary source" contained in § 111(a)(3), applicable by the terms of the Act to the NSPS program. Section 302(j), however, defines the term "major stationary source" as follows:
"(j) Except as otherwise expressly provided, the terms 'major stationary source' and 'major emitting facility' mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)." 91 Stat. 770.

## V

The legislative history of the portion of the 1977 Amendments dealing with nonattainment areas does not contain any specific comment on the "bubble concept" or the question whether a plantwide definition of a stationary source is permissible under the permit program. It does, however, plainly disclose that in the permit program Congress sought to accommodate the conflict between the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality. Indeed, the

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

House Committee Report identified the economic interest as one of the "two main purposes" of this section of the bill. It stated:

"Section 117 of the bill, adopted during full committee markup establishes a new section 127 of the Clean Air Act. The section has two main purposes: (1) to allow reasonable economic growth to continue in an area while making reasonable further progress to assure attainment of the standards by a fixed date; and (2) to allow **852** States greater flexibility for the former purpose than EPA's present interpretative regulations afford.

"The new provision allows States with nonattainment areas to pursue one of two options. First, the State may proceed under EPA's present 'tradeoff' or 'offset' ruling. The Administrator is authorized, moreover, to modify or amend that ruling in accordance with the intent and purposes of this section.

"The State's second option would be to revise its implementation plan in accordance with this new provision." H.R.Rep. No. 95–294, p. 211 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1290.[25]

The portion of the Senate Committee Report dealing with nonattainment areas states generally that it was intended to "supersede the EPA administrative approach," and that expansion should be permitted if a State could "demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards." **2787** S.Rep. No. 95–127, p. 55 (1977). The Senate Report notes the value of "case-by-case review of each new or modified major source of pollution that seeks to locate in a region exceeding an ambient standard," explaining that such a review "requires matching reductions from existing sources against **853** emissions expected from the new source in order to assure that introduction of the new source will not prevent attainment of the applicable standard by the statutory deadline." Ibid. This description of a case-by-case approach to plant additions, which emphasizes the net consequences of the construction or modification of a new source, as well as its impact on the overall achievement of the national standards, was not, however, addressed to the precise issue raised by these cases.

Senator Muskie made the following remarks:
"I should note that the test for determining whether a new or modified source is subject to the EPA interpretative regulation [the Offset Ruling]—and to the permit requirements of the revised implementation plans under the conference bill—is whether the source will emit a pollutant into an area which is exceeding a national ambient air quality standard for that pollutant—or precursor. Thus, a new source is still subject to such requirements as 'lowest achievable emission rate' even if it is constructed as a replacement for an older facility resulting in a net reduction from previous emission levels.

"A source—including an existing facility ordered to convert to coal—is subject to all the nonattainment requirements as a modified source if it makes any physical change which increases the amount of any air pollutant for which the standards in the area are exceeded." 123 Cong.Rec. 26847 (1977).

VI

As previously noted, prior to the 1977 Amendments, the EPA had adhered to a plantwide definition of the term "source" under a NSPS program. After adoption of the 1977 Amendments, proposals for a plantwide definition were considered in at least three formal proceedings.

In January 1979, the EPA considered the question whether the same restriction on new construction in nonattainment areas that had been included in its December 1976 Ruling **854** should be required in the revised SIP's that were scheduled to go into effect in July 1979. After noting that the 1976 Ruling was ambiguous on the question "whether a plant with a number of different processes and emission points would be considered a single source," 44 Fed.Reg. 3276 (1979), the EPA, in effect, provided a bifurcated answer to that question. In those areas that did not have a revised SIP in effect by July 1979, the EPA rejected the plantwide definition; on the other hand, it expressly concluded that the plantwide approach would be permissible in certain circumstances if authorized by an approved SIP. It stated:

"Where a state implementation plan is revised and implemented to satisfy the requirements of Part D, including the reasonable further progress requirement, the plan requirements for major modifications may exempt modifications of existing facilities that are accompanied by intrasource offsets so that there is no net increase in emissions. The agency endorses such exemptions, which would provide greater flexibility to sources to effectively manage their air emissions at least cost." Ibid.[26]

000208

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 209 of 305

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)
104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

**\*\*2788 \*855** In April, and again in September 1979, the EPA published additional comments in which it indicated that revised SIP's could adopt the plantwide definition of source in nonattainment areas in certain circumstances. See id., at 20372, 20379, 51924, 51951, 51958. On the latter occasion, the EPA made a formal rulemaking proposal that would have permitted the use of the "bubble concept" for new installations within a plant as well as for modifications of existing units. It explained:

" 'Bubble' Exemption: The use of offsets inside the same source is called the 'bubble.' EPA proposes use of the definition of 'source' (see above) to limit the use of the bubble under nonattainment requirements in the following respects:

"i. Part D SIPs that include all requirements needed to assure reasonable further progress and attainment by the deadline under section 172 and that are being carried out need not restrict the use of a plantwide bubble, the same as under the PSD proposal.

"ii. Part D SIPs that do not meet the requirements specified must limit use of the bubble by including a definition of 'installation' as an identifiable piece of process equipment." [27]

**\*856** Significantly, the EPA expressly noted that the word "source" might be given a plantwide definition for some purposes and a narrower definition for other purposes. It wrote:

"Source means any building structure, facility, or installation which emits or may emit any regulated pollutant. 'Building, structure, facility or installation' means plant in PSD areas and in nonattainment areas except where the growth prohibitions would apply or where no adequate SIP exists or is being carried out." Id., at 51925. [28]

The EPA's summary of its proposed Ruling discloses a flexible rather than rigid definition of the term "source" to implement various policies and programs:

"In summary, EPA is proposing two different ways to define source for different kinds of NSR programs:

"(1) For PSD and complete Part D SIPs, review would apply only to plants, with an unrestricted plant-wide bubble.

"(2) For the offset ruling, restrictions on construction, and incomplete Part D SIPs, review would apply to both plants

and individual pieces of process equipment, causing the plant-wide bubble not to apply for new and modified major pieces of equipment.

"In addition, for the restrictions on construction, EPA is proposing to define 'major modification' so as to prohibit the bubble entirely. Finally, an alternative discussed but not favored is to have only pieces of process equipment reviewed, resulting in no plant-wide bubble and allowing minor pieces of equipment to escape **\*\*2789** NSR **\*857** regardless of whether they are within a major plant." Id., at 51934.

In August 1980, however, the EPA adopted a regulation that, in essence, applied the basic reasoning of the Court of Appeals in these cases. The EPA took particular note of the two then-recent Court of Appeals decisions, which had created the bright-line rule that the "bubble concept" should be employed in a program designed to maintain air quality but not in one designed to enhance air quality. Relying heavily on those cases, [29] EPA adopted a dual definition of "source" for nonattainment areas that required a permit whenever a change in either the entire plant, or one of its components, would result in a significant increase in emissions even if the increase was completely offset by reductions elsewhere in the plant. The EPA expressed the opinion that this interpretation was "more consistent with congressional intent" than the plantwide definition because it "would bring in more sources or modifications for review," 45 Fed.Reg. 52697 (1980), but its primary legal analysis was predicated on the two Court of Appeals decisions.

In 1981 a new administration took office and initiated a "Government-wide reexamination of regulatory burdens and complexities." 46 Fed.Reg. 16281. In the context of that **\*858** review, the EPA reevaluated the various arguments that had been advanced in connection with the proper definition of the term "source" and concluded that the term should be given the same definition in both nonattainment areas and PSD areas.

In explaining its conclusion, the EPA first noted that the definitional issue was not squarely addressed in either the statute or its legislative history and therefore that the issue involved an agency "judgment as to how to best carry out the Act." Ibid. It then set forth several reasons for concluding that the plantwide definition was more appropriate. It pointed out that the dual definition "can act as a disincentive to new investment and modernization

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 210 of 305

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

by discouraging modifications to existing facilities" and "can actually retard progress in air pollution control by discouraging replacement of older, dirtier processes or pieces of equipment with new, cleaner ones." Ibid. Moreover, the new definition "would simplify EPA's rules by using the same definition of 'source' for PSD, nonattainment new source review and the construction moratorium. This reduces confusion and inconsistency." Ibid. Finally, the agency explained that additional requirements that remained in place would accomplish the fundamental purposes of achieving attainment with NAAQS's as expeditiously as possible. [30] These conclusions were **2790 expressed *859 in a proposed rulemaking in August 1981 that was formally promulgated in October. See id., at 50766.

## VII

[7]    In this Court respondents expressly reject the basic rationale of the Court of Appeals' decision. That court viewed the statutory definition of the term "source" as sufficiently flexible to cover either a plantwide definition, a narrower definition covering each unit within a plant, or a dual definition that could apply to both the entire "bubble" and its components. It interpreted the policies of the statute, however, to mandate the plantwide definition in programs designed to maintain clean air and to forbid it in programs designed to improve air quality. Respondents place a fundamentally different construction on the statute. They contend that the text of the Act requires the EPA to use a dual definition—if either a component of a plant, or the plant as a whole, emits over 100 tons of pollutant, it is a major stationary source. They thus contend that the EPA rules adopted in 1980, insofar as they apply to the maintenance of the quality of clean air, as well as the 1981 rules which apply to nonattainment areas, violate the statute. [31]

### Statutory Language

The definition of the term "stationary source" in § 111(a) (3) refers to "any building, structure, facility, or installation" which emits air pollution. See supra, at 2784. This definition is applicable only to the NSPS program by the express terms of the statute; the text of the statute does not make this definition *860 applicable to the permit program. Petitioners therefore maintain that there is no statutory language even relevant to ascertaining the meaning of stationary source in the permit program aside from § 302(j), which defines

the term "major stationary source." See supra, at 2786. We disagree with petitioners on this point.

The definition in § 302(j) tells us what the word "major" means—a source must emit at least 100 tons of pollution to qualify—but it sheds virtually no light on the meaning of the term "stationary source." It does equate a source with a facility—a "major emitting facility" and a "major stationary source" are synonymous under § 302(j). The ordinary meaning of the term "facility" is some collection of integrated elements which has been designed and constructed to achieve some purpose. Moreover, it is certainly no affront to common English usage to take a reference to a major facility or a major source to connote an entire plant as opposed to its constituent parts. Basically, however, the language of § 302(j) simply does not compel any given interpretation of the term "source."

Respondents recognize that, and hence point to § 111(a) (3). Although the definition in that section is not literally applicable to the permit program, it sheds as much light on the meaning of the word "source" as anything in the statute. [32] As respondents point out, use of the words "building, structure, facility, or installation," as the definition of source, could be read to impose the permit conditions on an individual building that is a part of a plant. [33] A "word may have a character of its own not to be submerged by its association." *861 Russell Motor Car Co. v. United States, 261 U.S. 514, 519, 43 S.Ct. 428, 429, 67 L.Ed. 778 (1923). On the other hand, the meaning of a word must be ascertained in the context of achieving particular objectives, and the words associated with it may **2791 indicate that the true meaning of the series is to convey a common idea. The language may reasonably be interpreted to impose the requirement on any discrete, but integrated, operation which pollutes. This gives meaning to all of the terms—a single building, not part of a larger operation, would be covered if it emits more than 100 tons of pollution, as would any facility, structure, or installation. Indeed, the language itself implies a "bubble concept" of sorts: each enumerated item would seem to be treated as if it were encased in a bubble. While respondents insist that each of these terms must be given a discrete meaning, they also argue that § 111(a)(3) defines "source" as that term is used in § 302(j). The latter section, however, equates a source with a facility, whereas the former defines "source" as a facility, among other items.

We are not persuaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress. [34]

000210

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

**\*862** We know full well that this language is not dispositive; the terms are overlapping and the language is not precisely directed to the question of the applicability of a given term in the context of a larger operation. To the extent any congressional "intent" can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate particular sources in order to effectuate the policies of the Act.

*Legislative History*

In addition, respondents argue that the legislative history and policies of the Act foreclose the plantwide definition, and that the EPA's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the Act.

Based on our examination of the legislative history, we agree with the Court of Appeals that it is unilluminating. The general remarks pointed to by respondents "were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire...." *Jewell Ridge Coal Corp. v. Mine Workers,* 325 U.S. 161, 168–169, 65 S.Ct. 1063, 1067–1068, 89 L.Ed. 1534 (1945). Respondents' argument based on the legislative history relies heavily on Senator Muskie's observation that a new source is subject to the LAER requirement.[35] But the full statement is ambiguous and like the text of § 173 itself, this comment does not tell us what a new source is, much less that it is to have an inflexible definition. We find that the legislative history as a whole is silent on the precise issue before us. It is, however, consistent with the view that the EPA should have broad discretion in implementing the policies of the 1977 Amendments.

**\*863** More importantly, that history plainly identifies the policy concerns that motivated the enactment; the plantwide definition is fully consistent with one of those concerns **\*\*2792** —the allowance of reasonable economic growth—and, whether or not we believe it most effectively implements the other, we must recognize that the EPA has advanced a reasonable explanation for its conclusion that the regulations serve the environmental objectives as well. See supra, at 2789–2790, and n. 29; see also supra, at 2788, n. 27. Indeed, its reasoning is supported by the public record developed in the rulemaking process,[36] as well as by certain private studies.[37]

Our review of the EPA's varying interpretations of the word "source"—both before and after the 1977 Amendments —convinces us that the agency primarily responsible for administering this important legislation has consistently interpreted it flexibly—not in a sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex arena. The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations **\*864** and the wisdom of its policy on a continuing basis. Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.

Significantly, it was not the agency in 1980, but rather the Court of Appeals that read the statute inflexibly to command a plantwide definition for programs designed to maintain clean air and to forbid such a definition for programs designed to improve air quality. The distinction the court drew may well be a sensible one, but our labored review of the problem has surely disclosed that it is not a distinction that Congress ever articulated itself, or one that the EPA found in the statute before the courts began to review the legislative work product. We conclude that it was the Court of Appeals, rather than Congress or any of the decisionmakers who are authorized by Congress to administer this legislation, that was primarily responsible for the 1980 position taken by the agency.

*Policy*

The arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the "bubble concept," but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges.[38]

**\*865** In these cases, the Administrator's interpretation represents a reasonable accommodation of manifestly competing in **\*\*2793** terests and is entitled to deference: the regulatory scheme is technical and complex,[39] the agency

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

considered the matter in a detailed and reasoned fashion,[40] and the decision involves reconciling conflicting policies.[41] Congress intended to accommodate both interests, but did not do so itself on the level of specificity presented by these cases. Perhaps that body consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so; perhaps it simply did not consider the question at this level; and perhaps Congress was unable to forge a coalition on either side of the question, and those on each side decided to take their chances with the scheme devised by the agency. For judicial purposes, it matters not which of these things occurred.

Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the **\*866** agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency —have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

We hold that the EPA's definition of the term "source" is a permissible construction of the statute which seeks to accommodate progress in reducing air pollution with economic growth. "The Regulations which the Administrator has adopted provide what the agency could allowably view as ... [an] effective reconciliation of these twofold ends...." United States v. Shimer, 367 U.S., at 383, 81 S.Ct., at 1560.

The judgment of the Court of Appeals is reversed.

It is so ordered.

Justice MARSHALL and Justice REHNQUIST took no part in the consideration or decision of these cases.

Justice O'CONNOR took no part in the decision of these cases.

**All Citations**

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, 21 ERC 1049, 14 Envtl. L. Rep. 20,507

---

Footnotes

\*     US Reports Title: Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.

a1    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     Section 172(b)(6), 42 U.S.C. § 7502(b)(6), provides:
      "The plan provisions required by subsection (a) shall—
      .....
      "(6) require permits for the construction and operation of new or modified major stationary sources in accordance with section 173 (relating to permit requirements)." 91 Stat. 747.

2     "(i) 'Stationary source' means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act.
      "(ii) 'Building, structure, facility, or installation' means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel." 40 CFR §§ 51.18(j)(1)(i) and (ii) (1983).

3     National Resources Defense Council, Inc., Citizens for a Better Environment, Inc., and North Western Ohio Lung Association, Inc.

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 213 of 305

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

4   Petitioners, Chevron U.S.A. Inc., American Iron and Steel Institute, American Petroleum Institute, Chemical Manufacturers Association, Inc., General Motors Corp., and Rubber Manufacturers Association were granted leave to intervene and argue in support of the regulation.

5   The court remarked in this regard:
"We regret, of course, that Congress did not advert specifically to the bubble concept's application to various Clean Air Act programs, and note that a further clarifying statutory directive would facilitate the work of the agency and of the court in their endeavors to serve the legislators' will." 222 U.S.App.D.C., at 276, n. 39, 685 F.2d, at 726, n. 39.

6   Alabama Power Co. v. Costle, 204 U.S.App.D.C. 51, 636 F.2d 323 (1979); ASARCO Inc. v. EPA, 188 U.S.App.D.C. 77, 578 F.2d 319 (1978).

7   Respondents argued below that EPA's plantwide definition of "stationary source" is contrary to the terms, legislative history, and purposes of the amended Clean Air Act. The court below rejected respondents' arguments based on the language and legislative history of the Act. It did agree with respondents contention that the regulations were inconsistent with the purposes of the Act, but did not adopt the construction of the statute advanced by respondents here. Respondents rely on the arguments rejected by the Court of Appeals in support of the judgment, and may rely on any ground that finds support in the record. See Ryerson v. United States, 312 U.S. 405, 408, 61 S.Ct. 656, 658, 85 L.Ed. 917 (1941); LeTulle v. Scofield, 308 U.S. 415, 421, 60 S.Ct. 313, 316, 84 L.Ed. 355 (1940); Langnes v. Green, 282 U.S. 531, 533–539, 51 S.Ct. 243, 244–246, 75 L.Ed. 520 (1931).

8   E.g., Black v. Cutter Laboratories, 351 U.S. 292, 297, 76 S.Ct. 824, 827, 100 L.Ed. 1188 (1956); J.E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940); Williams v. Norris, 12 Wheat. 117, 120, 6 L.Ed. 571 (1827); McClung v. Silliman, 6 Wheat. 598, 603, 5 L.Ed. 340 (1821).

9   The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. See, e.g., FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); SEC v. Sloan, 436 U.S. 103, 117–118, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745–746, 93 S.Ct. 1773, 1784–1785, 36 L.Ed.2d 620 (1973); Volkswagenwerk v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); FTC v. Colgate–Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965); Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946); Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 281, 76 L.Ed. 587 (1932); Webster v. Luther, 163 U.S. 331, 342, 16 S.Ct. 963, 967, 41 L.Ed. 179 (1896). If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

10  See generally, R. Pound, The Spirit of the Common Law 174–175 (1921).

11  The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. FEC v. Democratic Senatorial Campaign Committee, 454 U.S., at 39, 102 S.Ct., at 46; Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Unemployment Compensation Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946); McLaren v. Fleischer, 256 U.S. 477, 480–481, 41 S.Ct. 577, 577–578, 65 L.Ed. 1052 (1921).

12  See, e.g., United States v. Morton, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) Schweiker v. Gray Panthers, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); Batterton v. Francis, 432 U.S. 416, 424–426, 97 S.Ct. 2399, 2404–2406, 53 L.Ed.2d 448 (1977); American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 235–237, 57 S.Ct. 170, 172–173, 81 L.Ed. 142 (1936).

13  E.g., INS v. Jong Ha Wang, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981); Train v. Natural Resources Defense Council, Inc., 421 U.S., at 87, 95 S.Ct., at 1485.

14  Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 2479–2480, 81 L.Ed.2d 301 (1984); Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); Union Electric Co. v. EPA, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); Investment Company Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); Unemployment Compensation Comm'n v. Aragon, 329 U.S., at 153–154, 67 S.Ct., at 250–251; NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944); McLaren v. Fleischer, 256 U.S., at 480–481, 41 S.Ct., at 577–578; Webster v. Luther, 163 U.S., at 342, 16 S.Ct., at 967; Brown v. United States, 113 U.S. 568, 570–571, 5 S.Ct. 648, 649–650, 28 L.Ed. 1079 (1885); United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588 (1878); Edwards' Lessee v. Darby, 12 Wheat. 206, 210, 6 L.Ed. 603 (1827).

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

15  Primary standards were defined as those whose attainment and maintenance were necessary to protect the public health, and secondary standards were intended to specify a level of air quality that would protect the public welfare.

16  See §§ 110(a)(2)(D) and 110(a)(4).

17  The Court of Appeals ultimately held that this plantwide approach was prohibited by the 1970 Act, see ASARCO Inc., 188 U.S.App.D.C., at 83–84, 578 F.2d, at 325–327. This decision was rendered after enactment of the 1977 Amendments, and hence the standard was in effect when Congress enacted the 1977 Amendments.

18  See Report of the National Commission on Air Quality, To Breathe Clean Air, 3.3–20 through 3.3–33 (1981).

19  Comprehensive bills did pass both Chambers of Congress; the Conference Report was rejected in the Senate. 122 Cong.Rec. 34375–34403, 34405–34418 (1976).

20  For example, it stated:
"Particularly with regard to the primary NAAQS's, Congress and the Courts have made clear that economic considerations must be subordinated to NAAQS achievement and maintenance. While the ruling allows for some growth in areas violating a NAAQS if the net effect is to insure further progress toward NAAQS achievement, the Act does not allow economic growth to be accommodated at the expense of the public health." 41 Fed.Reg. 55527 (1976).

21  In January 1979, the EPA noted that the 1976 Ruling was ambiguous concerning this issue:
"A number of commenters indicated the need for a more explicit definition of 'source.' Some readers found that it was unclear under the 1976 Ruling whether a plant with a number of different processes and emission points would be considered a single source. The changes set forth below define a source as 'any structure, building, facility, equipment, installation, or operation (or combination thereof) which is located on one or more contiguous or adjacent properties and which is owned or operated by the same person (or by persons under common control.' This definition precludes a large plant from being separated into individual production lines for purposes of determining applicability of the offset requirements." 44 Fed.Reg. 3276.

22  Specifically, the controversy in these cases involves the meaning of the term "major stationary sources" in § 172(b)(6) of the Act, 42 U.S.C. § 7502(b)(6). The meaning of the term "proposed source" in § 173(2) of the Act, 42 U.S.C. § 7503(2), is not at issue.

23  Thus, among other requirements, § 172(b) provided that the SIP's shall—
"(3) require, in the interim, reasonable further progress (as defined in section 171(1)) including such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology;
"(4) include a comprehensive, accurate, current inventory of actual emissions from all sources (as provided by rule of the Administrator) of each such pollutant for each such area which is revised and resubmitted as frequently as may be necessary to assure that the requirements of paragraph (3) are met and to assess the need for additional reductions to assure attainment of each standard by the date required under paragraph (1);
"(5) expressly identify and quantify the emissions, if any, of any such pollutant which will be allowed to result from the construction and operation of major new or modified stationary sources for each such area; ...
.....
"(8) contain emission limitations, schedules of compliance and such other measures as may be necessary to meet the requirements of this section." 91 Stat. 747.
Section 171(1) provided:
"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 110(a)(2)(I) and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 172(a)." Id., at 746.

24  Section 171(3) provides:
"(3) The term 'lowest achievable emission rate' means for any source, that rate of emissions which reflects—
"(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or
"(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent. "In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance."

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

The LAER requirement is defined in terms that make it even more stringent than the applicable new source performance standard developed under § 111 of the Act, as amended by the 1970 statute.

25    During the floor debates Congressman Waxman remarked that the legislation struck

"a proper balance between environmental controls and economic growth in the dirty air areas of America.... There is no other single issue which more clearly poses the conflict between pollution control and new jobs. We have determined that neither need be compromised....

"This is a fair and balanced approach, which will not undermine our economic vitality, or impede achievement of our ultimate environmental objectives." 123 Cong.Rec. 27076 (1977).

The second "main purpose" of the provision—allowing the States "greater flexibility" than the EPA's interpretative Ruling—as well as the reference to the EPA's authority to amend its Ruling in accordance with the intent of the section, is entirely consistent with the view that Congress did not intend to freeze the definition of "source" contained in the existing regulation into a rigid statutory requirement.

26    In the same Ruling, the EPA added:

"The above exemption is permitted under the SIP because, to be approved under Part D, plan revisions due by January 1979 must contain adopted measures assuring that reasonable further progress will be made. Furthermore, in most circumstances, the measures adopted by January 1979 must be sufficient to actually provide for attainment of the standards by the dates required under the Act, and in all circumstances measures adopted by 1982 must provide for attainment. See Section 172 of the Act and 43 FR 21673–21677 (May 19, 1978). Also, Congress intended under Section 173 of the Act that States would have some latitude to depart from the strict requirements of this Ruling when the State plan is revised and is being carried out in accordance with Part D. Under a Part D plan, therefore, there is less need to subject a modification of an existing facility to LAER and other stringent requirements if the modification is accompanied by sufficient intrasource offsets so that there is no net increase in emissions." 44 Fed.Reg. 3277 (1979).

27    Id., at 51926. Later in that Ruling, the EPA added:

"However, EPA believes that complete Part D SIPs, which contain adopted and enforceable requirements sufficient to assure attainment, may apply the approach proposed above for PSD, with plant-wide review but no review of individual pieces of equipment. Use of only a plant-wide definition of source will permit plant-wide offsets for avoiding NSR of new or modified pieces of equipment. However, this is only appropriate once a SIP is adopted that will assure the reductions in existing emissions necessary for attainment. See 44 FR 3276 col. 3 (January 16, 1979). If the level of emissions allowed in the SIP is low enough to assure reasonable further progress and attainment, new construction or modifications with enough offset credit to prevent an emission increase should not jeopardize attainment." Id., at 51933.

28    In its explanation of why the use of the "bubble concept" was especially appropriate in preventing significant deterioration (PSD) in clean air areas, the EPA stated: "In addition, application of the bubble on a plant-wide basis encourages voluntary upgrading of equipment, and growth in productive capacity." Id., at 51932.

29    "The dual definition also is consistent with Alabama Power and ASARCO. Alabama Power held that EPA had broad discretion to define the consistent terms of 'source' so as best to effectuate the purposes of the statute. Different definitions of 'source' can therefore be used for different sections of the statute....

"Moreover, Alabama Power and ASARCO taken together suggest that there is a distinction between Clean Air Act programs designed to enhance air quality and those designed only to maintain air quality....

.....

"Promulgation of the dual definition follows the mandate of Alabama Power, which held that, while EPA could not define 'source' as a combination of sources, EPA had broad discretion to define 'building,' 'structure,' 'facility,' and 'installation' so as to best accomplish the purposes of the Act." 45 Fed.Reg. 52697 (1980).

30    It stated:

"5. States will remain subject to the requirement that for all nonattainment areas they demonstrate attainment of NAAQS as expeditiously as practicable and show reasonable further progress toward such attainment. Thus, the proposed change in the mandatory scope of nonattainment new source review should not interfere with the fundamental purpose of Part D of the Act.

"6. New Source Performance Standards (NSPS) will continue to apply to many new or modified facilities and will assure use of the most up-to-date pollution control techniques regardless of the applicability of nonattainment area new source review.

"7. In order to avoid nonattainment area new source review, a major plant undergoing modification must show that it will not experience a significant net increase in emissions. Where overall emissions increase significantly, review will continue to be required." 46 Fed.Reg. 16281 (1981).

104 S.Ct. 2778, 21 ERC 1049, 81 L.Ed.2d 694, 14 Envtl. L. Rep. 20,507

31   "What EPA may not do, however, is define all four terms to mean only plants. In the 1980 PSD rules, EPA did just that. EPA compounded the mistake in the 1981 rules here under review, in which it abandoned the dual definition." Brief for Respondents 29, n. 56.

32   We note that the EPA in fact adopted the language of that definition in its regulations under the permit program. 40 CFR §§ 51.18(j)(1)(i), (ii) (1983).

33   Since the regulations give the States the option to define an individual unit as a source, see 40 CFR § 51.18(j)(1) (1983), petitioners do not dispute that the terms can be read as respondents suggest.

34   The argument based on the text of § 173, which defines the permit requirements for nonattainment areas, is a classic example of circular reasoning. One of the permit requirements is that "the proposed source is required to comply with the lowest achievable emission rate" (LAER). Although a State may submit a revised SIP that provides for the waiver of another requirement—the "offset condition"—the SIP may not provide for a waiver of the LAER condition for any proposed source. Respondents argue that the plantwide definition of the term "source" makes it unnecessary for newly constructed units within the plant to satisfy the LAER requirement if their emissions are offset by the reductions achieved by the retirement of older equipment. Thus, according to respondents, the plantwide definition allows what the statute explicitly prohibits—the waiver of the LAER requirement for the newly constructed units. But this argument proves nothing because the statute does not prohibit the waiver unless the proposed new unit is indeed subject to the permit program. If it is not, the statute does not impose the LAER requirement at all and there is no need to reach any waiver question. In other words, § 173 of the statute merely deals with the consequences of the definition of the term "source" and does not define the term.

35   See supra, at 2787. We note that Senator Muskie was not critical of the EPA's use of the "bubble concept" in one NSPS program prior to the 1977 amendments. See ibid.

36   See, for example, the statement of the New York State Department of Environmental Conservation, pointing out that denying a source owner flexibility in selecting options made it "simpler and cheaper to operate old, more polluting sources than to trade up...." App. 128–129.

37   "Economists have proposed that economic incentives be substituted for the cumbersome administrative-legal framework. The objective is to make the profit and cost incentives that work so well in the marketplace work for pollution control.... [The 'bubble' or 'netting' concept] is a first attempt in this direction. By giving a plant manager flexibility to find the places and processes within a plant that control emissions most cheaply, pollution control can be achieved more quickly and cheaply." L. Lave & G. Omenn, Cleaning Air: Reforming the Clean Air Act 28 (1981) (footnote omitted).

38   Respondents point out if a brand new factory that will emit over 100 tons of pollutants is constructed in a nonattainment area, that plant must obtain a permit pursuant to § 172(b)(6) and in order to do so, it must satisfy the § 173 conditions, including the LAER requirement. Respondents argue if an old plant containing several large emitting units is to be modernized by the replacement of one or more units emitting over 100 tons of pollutant with a new unit emitting less—but still more than 100 tons—the result should be no different simply because "it happens to be built not at a new site, but within a pre-existing plant." Brief for Respondents 4.

39   See e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist., 467 U.S., at 390, 104 S.Ct., at 2480 (1984).

40   See SEC v. Sloan, 436 U.S., at 117, 98 S.Ct., at 1711; Adamo Wrecking Co. v. United States, 434 U.S. 275, 287, n. 5, 98 S.Ct. 566, 574, n. 5, 54 L.Ed.2d 538 (1978); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

41   See Capital Cities Cable, Inc. v. Crisp, 467 U.S. at 699–700, 104 S.Ct. at 2700–2701; United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

---

     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 217 of 305**

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

🏴 KeyCite Yellow Flag - Negative Treatment

Superseded by Statute as Stated in Big Time Vapes, Incorporated v. Food & Drug Administration, 5th Cir.(Miss.), June 25, 2020

120 S.Ct. 1291
Supreme Court of the United States

FOOD AND DRUG
ADMINISTRATION, et al., Petitioners,

v.

BROWN & WILLIAMSON
TOBACCO CORPORATION, et al.

No. 98–1152.
|
Argued Dec. 1, 1999.
|
Decided March 21, 2000.

**Synopsis**

Tobacco manufacturers, retailers, and advertisers brought action challenging Food and Drug Administration (FDA) regulation of tobacco products. The United States District Court for the Middle District of North Carolina, William L. Osteen, Sr., J., 966 F.Supp. 1374, granted in part and denied in part plaintiffs' motion for summary judgment, and appeals were taken. The Court of Appeals for the Fourth Circuit, 153 F.3d 155, reversed. Certiorari was granted. The Supreme Court, Justice O'Connor, held that FDA lacks authority to regulate tobacco products as customarily marketed.

Court of Appeals affirmed.

Justice Breyer filed dissenting opinion, in which Justices Stevens, Souter, and Ginsburg joined.

West Headnotes (23)

**[1]     Administrative Law and
          Procedure** 🗝️ Statutory basis and limitation

Regardless of how serious the problem an administrative agency seeks to address, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.

42 Cases that cite this headnote

**[2]     Administrative Law and
          Procedure** 🗝️ Plain, literal, or clear meaning;
          ambiguity or silence

Although agencies are generally entitled to deference in the interpretation of statutes that they administer, a reviewing court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

96 Cases that cite this headnote

**[3]     Administrative Law and
          Procedure** 🗝️ Plain, literal, or clear meaning;
          ambiguity or silence

**Administrative Law and
          Procedure** 🗝️ Permissible or reasonable
          construction

When reviewing administrative agency's construction of a statute that it administers, reviewing court must first ask whether Congress has directly spoken to the precise question at issue, and, if Congress has done so, the inquiry is at an end, and the court must give effect to the unambiguously expressed intent of Congress, but, if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible.

157 Cases that cite this headnote

**[4]     Administrative Law and
          Procedure** 🗝️ Permissible or reasonable
          construction

**Constitutional Law** 🗝️ Review of
          administrative decisions in general

Judicial deference to agency's permissible construction of a statute, when Congress has not specifically addressed the question at issue, is justified because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 218 of 305

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

with the ever-changing facts and circumstances surrounding the subjects regulated.

42 Cases that cite this headnote

[5]    **Administrative Law and**
       **Procedure** 🔑 Plain, literal, or clear meaning;
       ambiguity or silence

In determining whether Congress has specifically addressed the question at issue, for purposes of reviewing administrative agency's construction of a statute that it administers, a reviewing court should not confine itself to examining a particular statutory provision in isolation, as the meaning, or ambiguity, of certain words or phrases may only become evident when placed in context.

258 Cases that cite this headnote

[6]    **Statutes** 🔑 Context
       **Statutes** 🔑 Statutory scheme in general

Words of a statute must be read in their context and with a view to their place in the overall statutory scheme.

398 Cases that cite this headnote

[7]    **Statutes** 🔑 Design, structure, or scheme
       **Statutes** 🔑 Construing together; harmony

Court must interpret statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.

229 Cases that cite this headnote

[8]    **Statutes** 🔑 General and specific statutes
       **Statutes** 🔑 Earlier and later statutes

The meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.

41 Cases that cite this headnote

[9]    **Health** 🔑 Drugs and devices regulated

In determining whether Food and Drug Administration (FDA) had authority under Food, Drug, and Cosmetic Act (FDCA) to regulate tobacco products, Supreme Court was guided to a degree by common sense as to the manner in which Congress was likely to delegate a policy decision of such economic and political magnitude to an administrative agency. Federal Food, Drug, and Cosmetic Act, § 1 et seq., as amended, 21 U.S.C.A. § 301 et seq.

62 Cases that cite this headnote

[10]   **Health** 🔑 Drugs and devices regulated

Food and Drug Administration (FDA) regulation of tobacco products would be inconsistent with Food, Drug, and Cosmetic Act's (FDCA) core objective of ensuring that every drug or device is safe and effective, given FDA's findings that tobacco products were dangerous and unsafe; FDA's findings logically implied that, if tobacco products were "devices" under the FDCA, the FDA would be required to remove them from the market in view of FDCA's misbranding and device classification provisions. Federal Food, Drug, and Cosmetic Act, §§ 301(a), 513(b)(1), 520(e), 903(b)(2), as amended, 21 U.S.C.A. §§ 331(a), 360c(b)(1), 360j(e), 393(b)(2).

38 Cases that cite this headnote

[11]   **Health** 🔑 Safety and effectiveness in general

Food, Drug, and Cosmetic Act (FDCA) generally requires Food and Drug Administration (FDA) to prevent the marketing of any drug or device where the potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit. Federal Food, Drug, and Cosmetic Act, §§ 520(e), 903(b)(2), as amended, 21 U.S.C.A. §§ 360j(e), 393(b)(2).

4 Cases that cite this headnote

[12]   **Health** 🔑 Drugs and devices regulated

Any ban of tobacco products by Food and Drug Administration (FDA) would contradict congressional policy; Congress' decisions to

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 219 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)
120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

regulate labeling and advertising of tobacco products and to adopt the express policy of protecting commerce and the national economy to the maximum extent reveal its intent that tobacco products remain on the market. Agricultural Adjustment Act of 1938, § 311(a), 7 U.S.C.A. § 1311(a); Federal Cigarette Labeling and Advertising Act, § 2, 15 U.S.C.A. § 1331.

59 Cases that cite this headnote

[13]   **Health**   Safety and effectiveness in general

Finding that a ban on tobacco products would likely be dangerous, because of the high level of addiction among tobacco users, did not support finding that tobacco products themselves were "safe" within meaning of Food, Drug, and Cosmetic Act (FDCA); Food and Drug Administration (FDA) was required to determine that the product itself was safe as used by consumers, i.e., that the product's probable therapeutic benefits outweighed its risk of harm. Federal Food, Drug, and Cosmetic Act, §§502(j), 520(a)(2), 903(b)(2), as amended, 21 U.S.C.A. §§ 352(j), 360c(a)(2), 393(b)(2).

26 Cases that cite this headnote

[14]   **Health**   Safety and effectiveness in general

The Food and Drug Administration (FDA) may, consistent with the Food, Drug, and Cosmetic Act (FDCA), regulate many "dangerous" products without banning them, but the FDA may not conclude that a drug or device cannot be used safely for any therapeutic purpose and yet, at the same time, allow that product to remain on the market, as such regulation is incompatible with the FDCA's core objective of ensuring that every drug or device is safe and effective. Federal Food, Drug, and Cosmetic Act, §§502(j), 520, 903(b)(2), as amended, 21 U.S.C.A. §§ 352(j), 360c, 393(b)(2).

18 Cases that cite this headnote

[15]   **Health**   Drugs and devices regulated

Food and Drug Administration (FDA) does not have authority to regulate tobacco products

as customarily marketed, without manufacturer claims of therapeutic benefits, as such authority is inconsistent with the intent that Congress has expressed in the Food, Drug, and Cosmetic Act's (FDCA) overall regulatory scheme and in the tobacco-specific legislation that it has enacted subsequent to the FDCA. Federal Food, Drug, and Cosmetic Act, §§ 201, 503(g)(1), 513, 520(e), 903(b)(2), as amended, 21 U.S.C.A. §§ 321, 353(g)(1), 360c, 360j(e), 393(b)(2).

35 Cases that cite this headnote

[16]   **Health**   Safety and effectiveness in general

A fundamental precept of the Food, Drug, and Cosmetic Act (FDCA) is that any product regulated by the Food and Drug Administration (FDA), but not banned, must be safe for its intended use, and this refers to the safety of using the product to obtain its intended effects, not the public health ramifications of alternative administrative actions by the FDA; in other words, FDA must determine that there is a reasonable assurance that the product's therapeutic benefits outweigh the risk of harm to the consumer. Federal Food, Drug, and Cosmetic Act, §§ 513, 903(b)(2), as amended, 21 U.S.C.A. §§ 360c, 393(b)(2).

25 Cases that cite this headnote

[17]   **Statutes**   General and specific statutes
       **Statutes**   Earlier and later statutes

Classic judicial task of reconciling many laws enacted over time, and getting them to "make sense" in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute, and this is particularly so where scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.

42 Cases that cite this headnote

[18]   **Statutes**   General and specific statutes
       **Statutes**   Earlier and later statutes
       **Statutes**   Implied amendment

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 220 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)
120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

A specific policy embodied in a later federal statute should control court's construction of the earlier statute, even though it has not been expressly amended.

28 Cases that cite this headnote

[19]    **Health**    Drugs and devices regulated

Congress' tobacco-specific legislation effectively ratified Food and Drug Administration's (FDA) previous position that it lacked jurisdiction to regulate tobacco. Federal Cigarette Labeling and Advertising Act, §5(a), 15 U.S.C.A. § 1334(a); Comprehensive Smokeless Tobacco Health Education Act of 1986, § 7(a), 15 U.S.C.A. § 4406(a).

29 Cases that cite this headnote

[20]    **Administrative Law and Procedure**    Relationship of agency with statute in general

**Administrative Law and Procedure**    Contemporaneous or subsequent construction in general

Agency's initial interpretation of a statute that it is charged with administering is not "carved in stone," and agencies must be given ample latitude to adapt their rules and policies to the demands of changing circumstances.

4 Cases that cite this headnote

[21]    **Administrative Law and Procedure**    Plain, literal, or clear meaning; ambiguity or silence

Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.

57 Cases that cite this headnote

[22]    **Health**    Drugs and devices regulated

Supreme Court would not defer to Food and Drug Administration's (FDA) construction of

Food, Drug, and Cosmetic Act (FDCA) as giving FDA jurisdiction over tobacco products, where Congress had created a distinct regulatory scheme for tobacco products, squarely rejected proposals to give FDA jurisdiction over tobacco, and repeatedly acted to preclude any agency from exercising significant policymaking authority in the area. Federal Food, Drug, and Cosmetic Act, § 1 et seq., as amended, 21 U.S.C.A. § 301 et seq.

63 Cases that cite this headnote

[23]    **Administrative Law and Procedure**    Statutory basis and limitation

No matter how important, conspicuous, and controversial the issue, and regardless of how likely the public is to hold the Executive Branch politically accountable, an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress.

13 Cases that cite this headnote

**\*\*1294**   *Syllabus* [*]

The Food, Drug, and Cosmetic Act (FDCA or Act), 21 U.S.C. § 301 *et seq.,* grants the Food and Drug Administration (FDA), as the designee of the Secretary of Health and Human Services (HHS), the authority to regulate, among other items, "drugs" and "devices," §§ 321(g)–(h), 393. In 1996, the FDA asserted jurisdiction to regulate tobacco products, concluding that, under the FDCA, nicotine is a "drug" and cigarettes and smokeless tobacco are "devices" that deliver nicotine to the body. Pursuant to this authority, the FDA promulgated regulations governing tobacco products' promotion, labeling, and accessibility to children and adolescents. The FDA found that tobacco use is the Nation's leading cause of premature death, resulting in more than 400,000 deaths annually, and that most adult smokers begin when they are minors. The regulations therefore aim to reduce tobacco use by minors so as to substantially reduce the prevalence of addiction in future generations, and thus the incidence of tobacco-related death and disease. Respondents, a group of tobacco manufacturers, retailers, and advertisers, filed this suit challenging the FDA's

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 221 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

regulations. They moved for summary judgment on the ground, *inter alia,* that the FDA lacked jurisdiction to regulate tobacco products as customarily marketed, that is, without manufacturer claims of therapeutic benefit. The District Court upheld the FDA's authority, but the Fourth Circuit reversed, holding that Congress has not granted the FDA jurisdiction to regulate tobacco products. The court concluded that construing the FDCA to include tobacco products would lead to several internal inconsistencies in the Act. It also found that evidence external to the FDCA—that the FDA consistently stated before 1995 that it lacked jurisdiction over tobacco, that Congress has enacted several tobacco-specific statutes fully cognizant of the FDA's position, and that Congress has considered and rejected many bills that would have given the agency such authority—confirms this conclusion.

*Held:* Reading the FDCA as a whole, as well as in conjunction with Congress' subsequent tobacco-specific legislation, it is plain that Congress has not given the FDA the authority to regulate tobacco products as customarily marketed. Pp. 1300–1316.

 **\*121** a) Because this case involves an agency's construction of a statute it administers, the Court's analysis is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, under which a reviewing court must first ask whether Congress has directly spoken to the precise question at issue, *id.,* at 842, 104 S.Ct. 2778. If so, the court must give effect to Congress' unambiguously expressed intent. *E.g., id.,* at 843, 104 S.Ct. 2778. If not, the court must defer to the agency's construction of the statute so long as it is permissible. See, *e.g.,* *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590. In determining whether Congress has specifically addressed the question at issue, the court should not confine itself to examining a particular statutory provision in isolation. Rather, it must place the provision in context, interpreting the statute to create a symmetrical and coherent regulatory scheme. *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1. In addition, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand. See, *e.g., United States v. Estate of Romani,* 523 U.S. 517, 530–531, 118 S.Ct. 1478, 140 L.Ed.2d 710. Finally, the court must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and **\*\*1295** political magnitude to an administrative agency.

Cf. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.,* 512 U.S. 218, 231, 114 S.Ct. 2223, 129 L.Ed.2d 182. Pp. 1300–1301.

(b) Considering the FDCA as a whole, it is clear that Congress intended to exclude tobacco products from the FDA's jurisdiction. A fundamental precept of the FDCA is that any product regulated by the FDA that remains on the market must be safe and effective for its intended use. See, *e.g.,* § 393(b)(2). That is, the potential for inflicting death or physical injury must be offset by the possibility of therapeutic benefit. *United States v. Rutherford,* 442 U.S. 544, 556, 99 S.Ct. 2470, 61 L.Ed.2d 68. In its rulemaking proceeding, the FDA quite exhaustively documented that tobacco products are unsafe, dangerous, and cause great pain and suffering from illness. These findings logically imply that, if tobacco products were "devices" under the FDCA, the FDA would be required to remove them from the market under the FDCA's misbranding, see, *e.g.,* § 331(a), and device classification, see, *e.g.,* § 360e(d)(2)(A), provisions. In fact, based on such provisions, the FDA itself has previously asserted that if tobacco products were within its jurisdiction, they would have to be removed from the market because it would be impossible to prove they were safe for their intended use. Congress, however, has foreclosed a ban of such products, choosing instead to create a distinct regulatory scheme focusing on the labeling and advertising of cigarettes and smokeless tobacco. Its express policy is to protect commerce and the national economy while informing consumers about any adverse health effects.  **\*122** See 15 U.S.C. § 1331. Thus, an FDA ban would plainly contradict congressional intent. Apparently recognizing this dilemma, the FDA has concluded that tobacco products are actually "safe" under the FDCA because banning them would cause a greater harm to public health than leaving them on the market. But this safety determination—focusing on the relative harms caused by alternative remedial measures—is not a substitute for those required by the FDCA. Various provisions in the Act require the agency to determine that, at least for some consumers, the product's therapeutic benefits outweigh the risks of illness or serious injury. This FDA cannot do, because tobacco products are unsafe for obtaining any therapeutic benefit. The inescapable conclusion is that there is no room for tobacco products within the FDCA's regulatory scheme. If they cannot be used safely for any therapeutic purpose, and yet they cannot be banned, they simply do not fit. Pp. 1301–1306.

(c) The history of tobacco-specific legislation also demonstrates that Congress has spoken directly to the FDA's

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 222 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)
120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

authority to regulate tobacco products. Since 1965, Congress has enacted six separate statutes addressing the problem of tobacco use and human health. Those statutes, among other things, require that health warnings appear on all packaging and in all print and outdoor advertisements, see 15 U.S.C. §§ 1331, 1333, 4402; prohibit the advertisement of tobacco products through any electronic communication medium regulated by the Federal Communications Commission, see §§ 1335, 4402(f); require the Secretary of HHS to report every three years to Congress on research findings concerning tobacco's addictive property, 42 U.S.C. § 290aa–2(b)(2); and make States' receipt of certain federal block grants contingent on their prohibiting any tobacco product manufacturer, retailer, or distributor from selling or distributing any such product to individuals under age 18, § 300x–26(a)(1). This tobacco-specific legislation has created a specific regulatory scheme for addressing the problem of tobacco and health. And it was adopted against the backdrop of the FDA consistently and resolutely stating that it was without authority under the FDCA to regulate tobacco products as customarily marketed. In fact, Congress several times

**1296 considered and rejected bills that would have given the FDA such authority. Indeed, Congress' actions in this area have evidenced a clear intent to preclude a meaningful policymaking role for any administrative agency. Further, Congress' tobacco legislation prohibits any additional regulation of tobacco product labeling with respect to tobacco's health consequences, a central aspect of regulation under the FDCA. Under these circumstances, it is evident that Congress has ratified the FDA's previous, long-held position that it lacks jurisdiction to regulate tobacco products as customarily marketed. Congress has *123 created a distinct scheme for addressing the subject, and that scheme excludes any role for FDA regulation. Pp. 1306–1314.

(d) Finally, the Court's inquiry is shaped, at least in some measure, by the nature of the question presented. *Chevron* deference is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps. See 467 U.S., at 844, 104 S.Ct. 2778. In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation. This is hardly an ordinary case. Contrary to the agency's position from its inception until 1995, the FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy. In fact, the FDA contends that, were

it to determine that tobacco products provide no "reasonable assurance of safety," it would have the authority to ban cigarettes and smokeless tobacco entirely. It is highly unlikely that Congress would leave the determination as to whether the sale of tobacco products would be regulated, or even banned, to the FDA's discretion in so cryptic a fashion. See *MCI Telecommunications, supra,* at 231, 114 S.Ct. 2223. Given tobacco's unique political history, as well as the breadth of the authority that the FDA has asserted, the Court is obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the FDA this power. Pp. 1314–1315.

(e) No matter how important, conspicuous, and controversial the issue, and regardless of how likely the public is to hold the Executive Branch politically accountable, an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress. Courts must take care not to extend a statute's scope beyond the point where Congress indicated it would stop. *E.g.,* *United States v. Article of Drug ... Bacto—Unidisk,* 394 U.S. 784, 800, 89 S.Ct. 1410, 22 L.Ed.2d 726. Pp. 1315–1316.

153 F.3d 155, affirmed.

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post,* p. 1316.

**Attorneys and Law Firms**

Seth P. Waxman, Washington, DC, for petitioners.

Richard M. Cooper, Washington, DC, for respondents.

**Opinion**

*125 Justice O'CONNOR delivered the opinion of the Court.

This case involves one of the most troubling public health problems facing our Nation today: the thousands of premature deaths that occur each year because of tobacco use. In 1996, the Food and Drug Administration (FDA), after having expressly disavowed any such authority since **1297 its inception, asserted jurisdiction to regulate tobacco products. See 61 Fed.Reg. 44619–45318. The FDA concluded that nicotine is a "drug" within the meaning of the Food, Drug,

000222

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

and Cosmetic Act (FDCA or Act), 52 Stat. 1040, as amended, 21 U.S.C. § 301 *et seq.,* and that cigarettes and smokeless tobacco are "combination products" that deliver nicotine to the body. 61 Fed.Reg. 44397 (1996). Pursuant to this authority, it promulgated regulations intended to reduce tobacco consumption among children and adolescents. *Id.,* at 44615–44618. The agency believed that, because most tobacco consumers begin their use before reaching the age of 18, curbing tobacco use by minors could substantially reduce the prevalence of addiction in future generations and thus the incidence of tobacco-related death and disease. *Id.,* at 44398–44399.

**[1]   [2]**   Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority "in a manner that is inconsistent with the administrative structure that Congress enacted into law." *ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988). And although agencies are generally entitled to deference in the interpretation of statutes that they administer, a reviewing "court, as well as the agency, must give effect to the unambiguously  **\*126** expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In this case, we believe that Congress has clearly precluded the FDA from asserting jurisdiction to regulate tobacco products. Such authority is inconsistent with the intent that Congress has expressed in the FDCA's overall regulatory scheme and in the tobacco-specific legislation that it has enacted subsequent to the FDCA. In light of this clear intent, the FDA's assertion of jurisdiction is impermissible.

### I

The FDCA grants the FDA, as the designee of the Secretary of Health and Human Services (HHS), the authority to regulate, among other items, "drugs" and "devices." See 21 U.S.C. §§ 321(g)–(h), 393 (1994 ed. and Supp. III). The Act defines "drug" to include "articles (other than food) intended to affect the structure or any function of the body." 21 U.S.C. § 321(g)(1)(C). It defines "device," in part, as "an instrument, apparatus, implement, machine, contrivance, ... or other similar or related article, including any component, part, or accessory, which is ... intended to affect the structure or any function of the body." § 321(h). The Act also grants the FDA the authority to regulate so-called "combination products," which "constitute a combination of

a drug, device, or biological product." § 353(g)(1). The FDA has construed this provision as giving it the discretion to regulate combination products as drugs, as devices, or as both. See 61 Fed.Reg. 44400 (1996).

On August 11, 1995, the FDA published a proposed rule concerning the sale of cigarettes and smokeless tobacco to children and adolescents. 60 Fed.Reg. 41314–41787. The rule, which included several restrictions on the sale, distribution, and advertisement of tobacco products, was designed to reduce the availability and attractiveness of tobacco products to young people. *Id.,* at 41314. A public comment period followed, during which the FDA received over 700,000 submissions,  **\*127** more than "at any other time in its history on any other subject." 61 Fed.Reg. 44418 (1996).

On August 28, 1996, the FDA issued a final rule entitled "Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents." *Id.,* at 44396. The FDA determined that nicotine is a "drug" and that cigarettes and smokeless tobacco are "drug delivery devices," and therefore it had jurisdiction under the FDCA to regulate tobacco products as customarily  **\*\*1298** marketed—that is, without manufacturer claims of therapeutic benefit. *Id.,* at 44397, 44402. First, the FDA found that tobacco products " 'affect the structure or any function of the body' " because nicotine "has significant pharmacological effects." *Id.,* at 44631. Specifically, nicotine "exerts psychoactive, or mood-altering, effects on the brain" that cause and sustain addiction, have both tranquilizing and stimulating effects, and control weight. *Id.,* at 44631–44632. Second, the FDA determined that these effects were "intended" under the FDCA because they "are so widely known and foreseeable that [they] may be deemed to have been intended by the manufacturers," *id.,* at 44687; consumers use tobacco products "predominantly or nearly exclusively" to obtain these effects, *id.,* at 44807; and the statements, research, and actions of manufacturers revealed that they "have 'designed' cigarettes to provide pharmacologically active doses of nicotine to consumers," *id.,* at 44849. Finally, the agency concluded that cigarettes and smokeless tobacco are "combination products" because, in addition to containing nicotine, they include device components that deliver a controlled amount of nicotine to the body, *id.,* at 45208–45216.

Having resolved the jurisdictional question, the FDA next explained the policy justifications for its regulations, detailing

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 224 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

the deleterious health effects associated with tobacco use. It found that tobacco consumption was "the single leading cause of preventable death in the United States." *Id., at 44398.* According to the FDA, "[m]ore than 400,000 **\*128** people die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease." *Ibid.* The agency also determined that the only way to reduce the amount of tobacco-related illness and mortality was to reduce the level of addiction, a goal that could be accomplished only by preventing children and adolescents from starting to use tobacco. *Id., at 44398–44399.* The FDA found that 82% of adult smokers had their first cigarette before the age of 18, and more than half had already become regular smokers by that age. *Id., at 44398.* It also found that children were beginning to smoke at a younger age, that the prevalence of youth smoking had recently increased, and that similar problems existed with respect to smokeless tobacco. *Id., at 44398–44399.* The FDA accordingly concluded that if "the number of children and adolescents who begin tobacco use can be substantially diminished, tobacco-related illness can be correspondingly reduced because data suggest that anyone who does not begin smoking in childhood or adolescence is unlikely ever to begin." *Id., at 44399.*

Based on these findings, the FDA promulgated regulations concerning tobacco products' promotion, labeling, and accessibility to children and adolescents. See *id., at 44615–44618.* The access regulations prohibit the sale of cigarettes or smokeless tobacco to persons younger than 18; require retailers to verify through photo identification the age of all purchasers younger than 27; prohibit the sale of cigarettes in quantities smaller than 20; prohibit the distribution of free samples; and prohibit sales through self-service displays and vending machines except in adult-only locations. *Id., at 44616–44617.* The promotion regulations require that any print advertising appear in a black-and-white, text-only format unless the publication in which it appears is read almost exclusively by adults; prohibit outdoor advertising within 1,000 feet of any public playground or school; prohibit the distribution of any promotional items, such as T-shirts or hats, bearing the manufacturer's brand name; and prohibit a **\*129** manufacturer from sponsoring any athletic, musical, artistic, or other social or cultural event using its brand name. *Id., at 44617–44618.* The labeling regulation requires that the statement, "A Nicotine–Delivery Device for Persons 18 or Older," appear on all tobacco product packages. *Id., at 44617.*

**\*\*1299** The FDA promulgated these regulations pursuant to its authority to regulate "restricted devices." See 21 U.S.C.

§ 360j(e). The FDA construed § 353(g)(1) as giving it the discretion to regulate "combination products" using the Act's drug authorities, device authorities, or both, depending on "how the public health goals of the act can be best accomplished." 61 Fed.Reg. 44403 (1996). Given the greater flexibility in the FDCA for the regulation of devices, the FDA determined that "the device authorities provide the most appropriate basis for regulating cigarettes and smokeless tobacco." *Id., at 44404.* Under 21 U.S.C. § 360j(e), the agency may "require that a device be restricted to sale, distribution, or use ... upon such other conditions as [the FDA] may prescribe in such regulation, if, because of its potentiality for harmful effect or the collateral measures necessary to its use, [the FDA] determines that there cannot otherwise be reasonable assurance of its safety and effectiveness." The FDA reasoned that its regulations fell within the authority granted by § 360j(e) because they related to the sale or distribution of tobacco products and were necessary for providing a reasonable assurance of safety. 61 Fed.Reg. 44405–44407 (1996).

Respondents, a group of tobacco manufacturers, retailers, and advertisers, filed suit in United States District Court for the Middle District of North Carolina challenging the regulations. See *Coyne Beahm, Inc. v. FDA,* 966 F.Supp. 1374 (1997). They moved for summary judgment on the grounds that the FDA lacked jurisdiction to regulate tobacco products as customarily marketed, the regulations exceeded the FDA's authority under 21 U.S.C. § 360j(e), and the advertising **\*130** restrictions violated the First Amendment. Second Brief in Support of Plaintiffs' Motion for Summary Judgment in No. 2:95CV00591 (MDNC), in 3 Rec. in No. 97–1604(CA4), Tab No. 40; Third Brief in Support of Plaintiffs' Motion for Summary Judgment in No. 2:95CV00591 (MDNC), in 3 Rec. in No. 97–1604(CA4), Tab No. 42. The District Court granted respondents' motion in part and denied it in part. 966 F.Supp., at 1400. The court held that the FDCA authorizes the FDA to regulate tobacco products as customarily marketed and that the FDA's access and labeling regulations are permissible, but it also found that the agency's advertising and promotion restrictions exceed its authority under § 360j(e). *Id., at 1380–1400.* The court stayed implementation of the regulations it found valid (except the prohibition on the sale of tobacco products to minors) and certified its order for immediate interlocutory appeal. *Id., at 1400–1401.*

The Court of Appeals for the Fourth Circuit reversed, holding that Congress has not granted the FDA jurisdiction to regulate

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

tobacco products. See 153 F.3d 155 (1998). Examining the FDCA as a whole, the court concluded that the FDA's regulation of tobacco products would create a number of internal inconsistencies. *Id.,* at 162–167. Various provisions of the Act require the agency to determine that any regulated product is "safe" before it can be sold or allowed to remain on the market, yet the FDA found in its rulemaking proceeding that tobacco products are "dangerous" and "unsafe." *Id.,* at 164–167. Thus, the FDA would apparently have to ban tobacco products, a result the court found clearly contrary to congressional intent. *Ibid.* This apparent anomaly, the Court of Appeals concluded, demonstrates that Congress did not intend to give the FDA authority to regulate tobacco. *Id.,* at 167. The court also found that evidence external to the FDCA confirms this conclusion. Importantly, the FDA consistently stated before 1995 that it lacked jurisdiction over tobacco, and Congress has enacted **\*131** several tobacco-specific statutes fully cognizant of the FDA's position. See *id.,* at 168–176. In fact, the court reasoned, Congress has considered and rejected many bills that would have given the agency such authority. See *id.,* at 170–171. This, along with the absence of any intent by the enacting Congress in **\*\*1300** 1938 to subject tobacco products to regulation under the FDCA, demonstrates that Congress intended to withhold such authority from the FDA. *Id.,* at 167–176. Having resolved the jurisdictional question against the agency, the Court of Appeals did not address whether the regulations exceed the FDA's authority under 21 U.S.C. § 360j(e) or violate the First Amendment. See 153 F.3d, at 176, n. 29.

We granted the federal parties' petition for certiorari, 526 U.S. 1086, 119 S.Ct. 1495, 143 L.Ed.2d 650 (1999), to determine whether the FDA has authority under the FDCA to regulate tobacco products as customarily marketed.

## II

The FDA's assertion of jurisdiction to regulate tobacco products is founded on its conclusions that nicotine is a "drug" and that cigarettes and smokeless tobacco are "drug delivery devices." Again, the FDA found that tobacco products are "intended" to deliver the pharmacological effects of satisfying addiction, stimulation and tranquilization, and weight control because those effects are foreseeable to any reasonable manufacturer, consumers use tobacco products to obtain those effects, and tobacco manufacturers have designed their products to produce those effects. 61 Fed.Reg. 44632–44633 (1996). As an initial matter, respondents take issue with the

FDA's reading of "intended," arguing that it is a term of art that refers exclusively to claims made by the manufacturer or vendor about the product. See Brief for Respondent Brown & Williamson Tobacco Corp. 6. That is, a product is not a drug or device under the FDCA unless the manufacturer or vendor makes some express claim concerning the product's therapeutic benefits. See *id.,* at 6–7. We **\*132** need not resolve this question, however, because assuming, *arguendo,* that a product can be "intended to affect the structure or any function of the body" absent claims of therapeutic or medical benefit, the FDA's claim to jurisdiction contravenes the clear intent of Congress.

[3]  [4]  A threshold issue is the appropriate framework for analyzing the FDA's assertion of authority to regulate tobacco products. Because this case involves an administrative agency's construction of a statute that it administers, our analysis is governed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* a reviewing court must first ask "whether Congress has directly spoken to the precise question at issue." *Id.,* at 842, 104 S.Ct. 2778. If Congress has done so, the inquiry is at an end; the court "must give effect to the unambiguously expressed intent of Congress." *Id.,* at 843, 104 S.Ct. 2778; see also *United States v. Haggar Apparel Co.,* 526 U.S. 380, 392, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999); *Holly Farms Corp. v. NLRB,* 517 U.S. 392, 398, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996). But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. See *INS v. Aguirre– Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Auer v. Robbins,* 519 U.S. 452, 457, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Such deference is justified because "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones," *Chevron, supra,* at 866, 104 S.Ct. 2778, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated, see *Rust v. Sullivan,* 500 U.S. 173, 187, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

[5]  [6]  [7]  [8]  [9]  In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity —of certain words **\*\*1301** or phrases may only become evident when placed in context. See *Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994)

000225

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 226 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

("Ambiguity is a creature not of definitional possibilities but of statutory **\*133** context"). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand. See *United States v. Estate of Romani,* 523 U.S. 517, 530–531, 118 S.Ct. 1478, 140 L.Ed.2d 710 (1998); *United States v. Fausto,* 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). In addition, we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency. Cf. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.,* 512 U.S. 218, 231, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

With these principles in mind, we find that Congress has directly spoken to the issue here and precluded the FDA's jurisdiction to regulate tobacco products.

A

[10]   [11]   Viewing the FDCA as a whole, it is evident that one of the Act's core objectives is to ensure that any product regulated by the FDA is "safe" and "effective" for its intended use. See 21 U.S.C. § 393(b)(2) (1994 ed., Supp. III) (defining the FDA's mission); More Information for Better Patient Care: Hearing before the Senate Committee on Labor and Human Resources, 104th Cong., 2d Sess., 83 (1996) (statement of FDA Deputy Comm'r Schultz) ("A fundamental precept of drug and device regulation in this country is that these products must be proven safe and effective before they can be sold"). This essential purpose pervades the FDCA. For instance, 21 U.S.C. § 393(b)(2) (1994 ed., Supp. III) defines **\*134** the FDA's "[m]ission" to include "protect[ing] the public health by ensuring that ... drugs are safe and effective" and that "there is reasonable assurance of the safety and effectiveness of devices intended for human use." The FDCA requires premarket approval of any new drug, with some

limited exceptions, and states that the FDA "shall issue an order refusing to approve the application" of a new drug if it is not safe and effective for its intended purpose. §§ 355(d)(1)–(2), (4)–(5). If the FDA discovers after approval that a drug is unsafe or ineffective, it "shall, after due notice and opportunity for hearing to the applicant, withdraw approval" of the drug. 21 U.S.C. §§ 355(e)(1)–(3). The Act also requires the FDA to classify all devices into one of three categories. § 360c(b)(1). Regardless of which category the FDA chooses, there must be a "reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. §§ 360c(a)(1)(A)(i), (B), (C) (1994 ed. and Supp. III); 61 Fed.Reg. 44412 (1996). Even the "restricted device" provision pursuant to which the FDA promulgated the regulations at issue here authorizes the agency to place conditions on the sale or distribution of a device specifically when "there cannot otherwise be reasonable assurance of its safety and effectiveness." 21 U.S.C. § 360j(e). Thus, the Act generally requires the FDA to prevent the marketing of any drug or device where the "potential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit." *United States v. Rutherford,* 442 U.S. 544, 556, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

**\*\*1302**   In its rulemaking proceeding, the FDA quite exhaustively documented that "tobacco products are unsafe," "dangerous," and "cause great pain and suffering from illness." 61 Fed.Reg. 44412 (1996). It found that the consumption of tobacco products presents "extraordinary health risks," and that "tobacco use is the single leading cause of preventable death in the United States." *Id.,* at 44398. It stated that "[m]ore than 400,000 people die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and **\*135** heart disease, often suffering long and painful deaths," and that "[t]obacco alone kills more people each year in the United States than acquired immunodeficiency syndrome (AIDS), car accidents, alcohol, homicides, illegal drugs, suicides, and fires, combined." *Ibid.* Indeed, the FDA characterized smoking as a "pediatric disease," *id.,* at 44421, because "one out of every three young people who become regular smokers ... will die prematurely as a result," *id.,* at 44399.

These findings logically imply that, if tobacco products were "devices" under the FDCA, the FDA would be required to remove them from the market. Consider, first, the FDCA's provisions concerning the misbranding of drugs or devices. The Act prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug,

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 227 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

device, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a). In light of the FDA's findings, two distinct FDCA provisions would render cigarettes and smokeless tobacco misbranded devices. First, § 352(j) deems a drug or device misbranded "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." The FDA's findings make clear that tobacco products are "dangerous to health" when used in the manner prescribed. Second, a drug or device is misbranded under the Act "[u]nless its labeling bears ... adequate directions for use ... in such manner and form, as are necessary for the protection of users," except where such directions are "not necessary for the protection of the public health." § 352(f)(1). Given the FDA's conclusions concerning the health consequences of tobacco use, there are no directions that could adequately protect consumers. That is, there are no directions that could make tobacco products safe for obtaining their intended effects. Thus, were tobacco products within the FDA's jurisdiction, the Act would deem them misbranded devices that could not be introduced into interstate **\*136** commerce. Contrary to the dissent's contention, the Act admits no remedial discretion once it is evident that the device is misbranded.

Second, the FDCA requires the FDA to place all devices that it regulates into one of three classifications. See § 360c(b)(1). The agency relies on a device's classification in determining the degree of control and regulation necessary to ensure that there is "a reasonable assurance of safety and effectiveness." 61 Fed.Reg. 44412 (1996). The FDA has yet to classify tobacco products. Instead, the regulations at issue here represent so-called "general controls," which the Act entitles the agency to impose in advance of classification. See id., at 44404–44405. Although the FDCA prescribes no deadline for device classification, the FDA has stated that it will classify tobacco products "in a future rulemaking" as required by the Act. Id., at 44412. Given the FDA's findings regarding the health consequences of tobacco use, the agency would have to place cigarettes and smokeless tobacco in Class III because, even after the application of the Act's available controls, they would "presen[t] a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C). As Class III devices, tobacco products would be subject to the FDCA's premarket approval process. See 21 U.S.C. § 360c(a)(1)(C) (1994 ed., and Supp. III); 21 U.S.C. § 360e; 61 Fed.Reg. 44412 (1996). Under these provisions, the FDA would be **\*\*1303** prohibited from approving an application for premarket approval without "a showing of reasonable

assurance that such device is safe under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 360e(d)(2)(A). In view of the FDA's conclusions regarding the health effects of tobacco use, the agency would have no basis for finding any such reasonable assurance of safety. Thus, once the FDA fulfilled its statutory obligation to classify tobacco products, it could not allow them to be marketed.

**\*137** The FDCA's misbranding and device classification provisions therefore make evident that were the FDA to regulate cigarettes and smokeless tobacco, the Act would require the agency to ban them. In fact, based on these provisions, the FDA itself has previously taken the position that if tobacco products were within its jurisdiction, "they would have to be removed from the market because it would be impossible to prove they were safe for their intended us[e]." Public Health Cigarette Amendments of 1971: Hearings before the Commerce Subcommittee on S. 1454, 92d Cong., 2d Sess., 239 (1972) (hereinafter 1972 Hearings) (statement of FDA Comm'r Charles Edwards). See also Cigarette Labeling and Advertising: Hearings before the House Committee on Interstate and Foreign Commerce, 88th Cong., 2d Sess., 18 (1964) (hereinafter 1964 Hearings) (statement of Dept. of Health, Education, and Welfare (HEW) Secretary Anthony Celebrezze that proposed amendments to the FDCA that would have given the FDA jurisdiction over "smoking product[s]" "might well completely outlaw at least cigarettes").

**[12]** Congress, however, has foreclosed the removal of tobacco products from the market. A provision of the United States Code currently in force states that "[t]he marketing of tobacco constitutes one of the greatest basic industries of the United States with ramifying activities which directly affect interstate and foreign commerce at every point, and stable conditions therein are necessary to the general welfare." 7 U.S.C. § 1311(a). More importantly, Congress has directly addressed the problem of tobacco and health through legislation on six occasions since 1965. See Federal Cigarette Labeling and Advertising Act (FCLAA), Pub.L. 89–92, 79 Stat. 282; Public Health Cigarette Smoking Act of 1969, Pub.L. 91–222, 84 Stat. 87; Alcohol and Drug Abuse Amendments of 1983, Pub.L. 98–24, 97 Stat. 175; Comprehensive Smoking Education Act, Pub.L. 98–474, 98 Stat. 2200; Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub.L. 99–252, 100 Stat. 30; Alcohol, Drug Abuse, and Mental **\*138** Health Administration Reorganization Act, Pub.L. 102–321, § 202,

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

106 Stat. 394. When Congress enacted these statutes, the adverse health consequences of tobacco use were well known, as were nicotine's pharmacological effects. See, *e.g.,* U.S. Dept. of Health, Education, and Welfare, U.S. Surgeon General's Advisory Committee, Smoking and Health 25–40, 69–75 (1964) (hereinafter 1964 Surgeon General's Report) (concluding that cigarette smoking causes lung cancer, coronary artery disease, and chronic bronchitis and emphysema, and that nicotine has various pharmacological effects, including stimulation, tranquilization, and appetite suppression); U.S. Dept. of Health and Human Services, Public Health Service, Health Consequences of Smoking for Women 7–12 (1980) (finding that mortality rates for lung cancer, chronic lung disease, and coronary heart disease are increased for both women and men smokers, and that smoking during pregnancy is associated with significant adverse health effects on the unborn fetus and newborn child); U.S. Dept. of Health and Human Services, Public Health Service, Why People Smoke Cigarettes (1983), in Smoking Prevention Education Act, Hearings on H.R. 1824 before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce, 98th Cong., 1st **\*1304** Sess., 32–37 (1983) (hereinafter 1983 House Hearings) (stating that smoking is "the most widespread example of drug dependence in our country," and that cigarettes "affect the chemistry of the brain and nervous system"); U.S. Dept. of Health and Human Services, Public Health Service, The Health Consequences of Smoking: Nicotine Addiction 6–9, 145–239 (1988) (hereinafter 1988 Surgeon General's Report) (concluding that tobacco products are addicting in much the same way as heroin and cocaine, and that nicotine is the drug that causes addiction). Nonetheless, Congress stopped well short of ordering a ban. Instead, it has generally regulated the labeling and advertisement of tobacco products, expressly providing that it is the policy of Congress that "commerce and the national **\*139** economy may be ... protected to the maximum extent consistent with" consumers "be[ing] adequately informed about any adverse health effects." 15 U.S.C. § 1331. Congress' decisions to regulate labeling and advertising and to adopt the express policy of protecting "commerce and the national economy ... to the maximum extent" reveal its intent that tobacco products remain on the market. Indeed, the collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States. A ban of tobacco products by the FDA would therefore plainly contradict congressional policy.

[13]  The FDA apparently recognized this dilemma and concluded, somewhat ironically, that tobacco products are actually "safe" within the meaning of the FDCA. In promulgating its regulations, the agency conceded that "tobacco products are unsafe, as that term is conventionally understood." 61 Fed.Reg. 44412 (1996). Nonetheless, the FDA reasoned that, in determining whether a device is safe under the Act, it must consider "not only the risks presented by a product but also any of the countervailing effects of use of that product, including the consequences of not permitting the product to be marketed." *Id.,* at 44412–44413. Applying this standard, the FDA found that, because of the high level of addiction among tobacco users, a ban would likely be "dangerous." *Id.,* at 44413. In particular, current tobacco users could suffer from extreme withdrawal, the health care system and available pharmaceuticals might not be able to meet the treatment demands of those suffering from withdrawal, and a black market offering cigarettes even more dangerous than those currently sold legally would likely develop. *Ibid.* The FDA therefore concluded that, "while taking cigarettes and smokeless tobacco off the market could prevent some people from becoming addicted and reduce death and disease for others, the record does not establish that such a ban is the appropriate public health response under the act." *Id.,* at 44398.

 **\*140**  It may well be, as the FDA asserts, that "these factors must be considered when developing a regulatory scheme that achieves the best public health result for these products." *Id.,* at 44413. But the FDA's judgment that leaving tobacco products on the market "is more effective in achieving public health goals than a ban," *ibid.,* is no substitute for the specific safety determinations required by the FDCA's various operative provisions. Several provisions in the Act require the FDA to determine that the *product itself* is safe as used by consumers. That is, the product's probable therapeutic benefits must outweigh its risk of harm. See *United States v. Rutherford,* 442 U.S., at 555, 99 S.Ct. 2470 ("[T]he Commissioner generally considers a drug safe when the expected therapeutic gain justifies the risk entailed by its use"). In contrast, the FDA's conception of safety would allow the agency, with respect to each provision of the FDCA that requires the agency to determine a product's "safety" or "dangerousness," to compare the aggregate health effects of alternative administrative actions. This is a qualitatively different inquiry. Thus, although the FDA has concluded that a ban would be "dangerous," it **\*\*1305** has *not* concluded that tobacco products are "safe" as that term is used throughout the Act.

000228

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

Consider 21 U.S.C. § 360c(a)(2), which specifies those factors that the FDA may consider in determining the safety and effectiveness of a device for purposes of classification, performance standards, and premarket approval. For all devices regulated by the FDA, there must at least be a "reasonable assurance of the safety and effectiveness of the device." See 21 U.S.C. §§ 360c(a)(1)(A)(i), (B), (C) (1994 ed. and Supp. III); 61 Fed.Reg. 44412 (1996). Title 21 U.S.C. § 360c(a)(2) provides that

"the safety and effectiveness of a device are to be determined—

"(A) with respect to the persons for whose use the device is represented or intended,

 **\*141** "(B) with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and

"(C) weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use."

A straightforward reading of this provision dictates that the FDA must weigh the probable therapeutic benefits of the device to the consumer against the probable risk of injury. Applied to tobacco products, the inquiry is whether their purported benefits—satisfying addiction, stimulation and sedation, and weight control—outweigh the risks to health from their use. To accommodate the FDA's conception of safety, however, one must read "any probable benefit to health" to include the benefit to public health stemming from adult consumers' continued use of tobacco products, even though the *reduction* of tobacco use is the *raison d'être* of the regulations. In other words, the FDA is forced to contend that the very evil it seeks to combat is a "benefit to health." This is implausible.

The FDA's conception of safety is also incompatible with the FDCA's misbranding provision. Again, § 352(j) provides that a product is "misbranded" if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." According to the FDA's understanding, a product would be "dangerous to health," and therefore misbranded under § 352(j), when, in comparison to leaving the product on the market, a ban would not produce "adverse health consequences" in aggregate. Quite simply, these are different inquiries. Although banning a particular product might be detrimental to public health in aggregate, the product could still be "dangerous to health" when used as directed. Section 352(j) focuses on dangers to the consumer from use of the product, not those stemming from the agency's remedial measures.

 **\*142**  Consequently, the analogy made by the FDA and the dissent to highly toxic drugs used in the treatment of various cancers is unpersuasive. See 61 Fed.Reg. 44413 (1996); *post,* at 1323–1324 (opinion of BREYER, J.). Although "dangerous" in some sense, these drugs are safe within the meaning of the Act because, for certain patients, the therapeutic benefits outweigh the risk of harm. Accordingly, such drugs cannot properly be described as "dangerous to health" under 21 U.S.C. § 352(j). The same is not true for tobacco products. As the FDA has documented in great detail, cigarettes and smokeless tobacco are an unsafe means to obtaining *any* pharmacological effect.

 [14]   The dissent contends that our conclusion means that "the FDCA requires the FDA to ban outright 'dangerous' drugs or devices," *post,* at 1322, and that this is a "perverse" reading of the statute, *post,* at 1322, 1325. This misunderstands our holding. The FDA, consistent with the FDCA, may clearly regulate many "dangerous" products without banning them. Indeed, virtually every drug or device poses dangers under certain conditions. What the  **\*\*1306** FDA may not do is conclude that a drug or device cannot be used safely for any therapeutic purpose and yet, at the same time, allow that product to remain on the market. Such regulation is incompatible with the FDCA's core objective of ensuring that every drug or device is safe and effective.

 [15]   [16]   Considering the FDCA as a whole, it is clear that Congress intended to exclude tobacco products from the FDA's jurisdiction. A fundamental precept of the FDCA is that any product regulated by the FDA—but not banned—must be safe for its intended use. Various provisions of the Act make clear that this refers to the safety of using the product to obtain its intended effects, not the public health ramifications of alternative administrative actions by the FDA. That is, the FDA must determine that there is a reasonable assurance that the product's therapeutic benefits outweigh the risk of harm to the consumer. According to this standard,  **\*143**  the FDA has concluded that, although tobacco products might be effective in delivering certain pharmacological effects, they are "unsafe" and "dangerous" when used for these purposes. Consequently, if tobacco products were within the FDA's jurisdiction, the Act would require the FDA to remove

000229

them from the market entirely. But a ban would contradict Congress' clear intent as expressed in its more recent, tobacco-specific legislation. The inescapable conclusion is that there is no room for tobacco products within the FDCA's regulatory scheme. If they cannot be used safely for any therapeutic purpose, and yet they cannot be banned, they simply do not fit.

## B

**[17]** **[18]** In determining whether Congress has spoken directly to the FDA's authority to regulate tobacco, we must also consider in greater detail the tobacco-specific legislation that Congress has enacted over the past 35 years. At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto,* 484 U.S., at 453, 108 S.Ct. 668. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand. As we recognized recently in *United States v. Estate of Romani,* "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended." 523 U.S., at 530–531, 118 S.Ct. 1478.

Congress has enacted six separate pieces of legislation since 1965 addressing the problem of tobacco use and human health. See *supra,* at 1303–1304. Those statutes, among other things, require that health warnings appear on all packaging and in all print and outdoor advertisements, see **\*144** 15 U.S.C. §§ 1331, 1333, 4402; prohibit the advertisement of tobacco products through "any medium of electronic communication" subject to regulation by the Federal Communications Commission (FCC), see §§ 1335, 4402(f); require the Secretary of HHS to report every three years to Congress on research findings concerning "the addictive property of tobacco," 42 U.S.C. § 290aa–2(b)(2); and make States' receipt of certain federal block grants contingent on their making it unlawful "for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18," § 300x–26(a)(1).

In adopting each statute, Congress has acted against the backdrop of the FDA's consistent and repeated statements that

it lacked authority under the FDCA to regulate tobacco absent claims of therapeutic **\*\*1307** benefit by the manufacturer. In fact, on several occasions over this period, and after the health consequences of tobacco use and nicotine's pharmacological effects had become well known, Congress considered and rejected bills that would have granted the FDA such jurisdiction. Under these circumstances, it is evident that Congress' tobacco-specific statutes have effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products. Congress has created a distinct regulatory scheme to address the problem of tobacco and health, and that scheme, as presently constructed, precludes any role for the FDA.

On January 11, 1964, the Surgeon General released the report of the Advisory Committee on Smoking and Health. That report documented the deleterious health effects of smoking in great detail, concluding, in relevant part, "that cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate." 1964 Surgeon General's Report 31. It also identified the pharmacological effects of nicotine, including "stimulation," "tranquilization," and "suppression of appetite." *Id.,* at 74–75. Seven days after the report's release, the Federal Trade **\*145** Commission (FTC) issued a notice of proposed rulemaking, see 29 Fed.Reg. 530–532 (1964), and in June 1964, the FTC promulgated a final rule requiring cigarette manufacturers "to disclose, clearly and prominently, in all advertising and on every pack, box, carton or other container ... that cigarette smoking is dangerous to health and may cause death from cancer and other diseases," *id.,* at 8325. The rule was to become effective January 1, 1965, but, on a request from Congress, the FTC postponed enforcement for six months. See *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 513–514, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

In response to the Surgeon General's report and the FTC's proposed rule, Congress convened hearings to consider legislation addressing "the tobacco problem." 1964 Hearings 1. During those deliberations, FDA representatives testified before Congress that the agency lacked jurisdiction under the FDCA to regulate tobacco products. Surgeon General Terry was asked during hearings in 1964 whether HEW had the "authority to brand or label the packages of cigarettes or to control the advertising there." *Id.,* at 56. The Surgeon General stated that "we do not have such authority in existing laws governing the ... Food and Drug Administration." *Ibid.* Similarly, FDA Deputy Commissioner Rankin testified in 1965 that "[t]he Food and Drug Administration has no

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 231 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

jurisdiction under the Food, Drug, and Cosmetic Act over tobacco, unless it bears drug claims." Cigarette Labeling and Advertising—1965: Hearings on H.R. 2248 before the House Committee on Interstate and Foreign Commerce, 89th Cong., 1st Sess., 193 (hereinafter 1965 Hearings). See also Letter to Directors of Bureaus, Divisions and Directors of Districts from FDA Bureau of Enforcement (May 24, 1963), in 1972 Hearings 240 ("[T]obacco marketed for chewing or smoking without accompanying therapeutic claims, does not meet the definitions in the Food, Drug, and Cosmetic Act for food, drug, device or cosmetic"). In fact, HEW Secretary Celebrezze urged Congress *not* to amend the FDCA to cover **\*146** "smoking products" because, in light of the findings in the Surgeon General's report, such a "provision might well completely outlaw at least cigarettes. This would be contrary to what, we understand, is intended or what, in the light of our experience with the 18th amendment, would be acceptable to the American people." 1964 Hearings 18.

The FDA's disavowal of jurisdiction was consistent with the position that it had taken since the agency's inception. As the FDA concedes, it never asserted authority to regulate tobacco products as customarily marketed until it promulgated the regulations at issue here. See Brief for Petitioners 37; see also Brief for Appellee (FDA) in *Action on Smoking and Health* **\*\*1308** *v. Harris,* 655 F.2d 236 (C.A.D.C.1980), in 9 Rec. in No. 97–1604(CA4), Tab No. 4, pp. 14–15 ("In the 73 years since the enactment of the original Food and Drug Act, and in the 41 years since the promulgation of the modern Food, Drug, and Cosmetic Act, the FDA has repeatedly informed Congress that cigarettes are beyond the scope of the statute absent health claims establishing a therapeutic intent on behalf of the manufacturer or vendor").

The FDA's position was also consistent with Congress' specific intent when it enacted the FDCA. Before the Act's adoption in 1938, the FDA's predecessor agency, the Bureau of Chemistry, announced that it lacked authority to regulate tobacco products under the Pure Food and Drug Act of 1906, ch. 3915, 34 Stat. 768, unless they were marketed with therapeutic claims. See U.S. Dept. of Agriculture, Bureau of Chemistry, 13 Service and Regulatory Announcements 24 (Apr.1914) (Feb.1914 Announcements ¶ 13, Opinion of Chief of Bureau C.L. Alsberg). In 1929, Congress considered and rejected a bill "[t]o amend the Food and Drugs Act of June 30, 1906, by extending its provisions to tobacco and tobacco products." S. 1468, 71st Cong., 1st Sess., 1. See also 71 Cong. Rec. 2589 (1929) (remarks of Sen. Smoot). And, as the FDA admits, there is no evidence in the text of the FDCA or

its legislative history that Congress in 1938 even considered **\*147** the applicability of the Act to tobacco products. See Brief for Petitioners 22, n. 4. Given the economic and political significance of the tobacco industry at the time, it is extremely unlikely that Congress could have intended to place tobacco within the ambit of the FDCA absent any discussion of the matter. Of course, whether the Congress that enacted the FDCA specifically intended the Act to cover tobacco products is not determinative; "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); see also *TVA v. Hill,* 437 U.S. 153, 185, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("It is not for us to speculate, much less act, on whether Congress would have altered its stance had the specific events of this case been anticipated"). Nonetheless, this intent is certainly relevant to understanding the basis for the FDA's representations to Congress and the background against which Congress enacted subsequent tobacco-specific legislation.

Moreover, before enacting the FCLAA in 1965, Congress considered and rejected several proposals to give the FDA the authority to regulate tobacco. In April 1963, Representative Udall introduced a bill "[t]o amend the Federal Food, Drug, and Cosmetic Act so as to make that Act applicable to smoking products." H.R. 5973, 88th Cong., 1st Sess., 1. Two months later, Senator Moss introduced an identical bill in the Senate. S. 1682, 88th Cong., 1st Sess. (1963). In discussing his proposal on the Senate floor, Senator Moss explained that "this amendment simply places smoking products under FDA jurisdiction, along with foods, drugs, and cosmetics." 109 Cong. Rec. 10322 (1963). In December 1963, Representative Rhodes introduced another bill that would have amended the FDCA "by striking out 'food, drug, device, or cosmetic,' each place where it appears therein and inserting in lieu thereof 'food, drug, device, cosmetic, or smoking product.'" H.R. 9512, 88th Cong., 1st Sess., § 3 (1963). And in January 1965, five months before passage of **\*148** the FCLAA, Representative Udall again introduced a bill to amend the FDCA "to make that Act applicable to smoking products." H.R. 2248, 89th Cong., 1st Sess., 1. None of these proposals became law.

Congress ultimately decided in 1965 to subject tobacco products to the less extensive regulatory scheme of the FCLAA, which created a "comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health." **\*\*1309**

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 232 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

Pub.L. 89–92, § 2, 79 Stat. 282. The FCLAA rejected any regulation of advertising, but it required the warning, "Caution: Cigarette Smoking May Be Hazardous to Your Health," to appear on all cigarette packages. *Id.,* § 4, 79 Stat. 283. In the FCLAA's "Declaration of Policy," Congress stated that its objective was to balance the goals of ensuring that "the public may be adequately informed that cigarette smoking may be hazardous to health" and protecting "commerce and the national economy ... to the maximum extent." *Id.,* § 2, 79 Stat. 282 (codified at 15 U.S.C. § 1331).

Not only did Congress reject the proposals to grant the FDA jurisdiction, but it explicitly pre-empted any other regulation of cigarette labeling: "No statement relating to smoking and health, other than the statement required by ... this Act, shall be required on any cigarette package." Pub. L. 89–92, § 5(a), 79 Stat. 283. The regulation of product labeling, however, is an integral aspect of the FDCA, both as it existed in 1965 and today. The labeling requirements currently imposed by the FDCA, which are essentially identical to those in force in 1965, require the FDA to regulate the labeling of drugs and devices to protect the safety of consumers. See 21 U.S.C. § 352; 21 U.S.C. § 352 (1964 ed. and Supp. IV). As discussed earlier, the Act requires that all products bear "adequate directions for use ... as are necessary for the protection of users," 21 U.S.C. § 352(f)(1); 21 U.S.C. § 352(f)(1) (1964 ed.); requires that all products provide "adequate warnings against use in those pathological **\*149** conditions or by children where its use may be dangerous to health," 21 U.S.C. § 352(f)(2); 21 U.S.C. § 352(f)(2) (1964 ed.); and deems a product misbranded "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof," 21 U.S.C. § 352(j); 21 U.S.C. § 352(j) (1964 ed.). In this sense, the FCLAA was—and remains—incompatible with FDA regulation of tobacco products. This is not to say that the FCLAA's preemption provision by itself necessarily foreclosed FDA jurisdiction. See *Cipollone v. Liggett Group, Inc.,* 505 U.S., at 518–519, 112 S.Ct. 2608. But it is an important factor in assessing whether Congress ratified the agency's position—that is, whether Congress adopted a regulatory approach to the problem of tobacco and health that contemplated no role for the FDA.

Further, the FCLAA evidences Congress' intent to preclude *any* administrative agency from exercising significant policymaking authority on the subject of smoking and health. In addition to prohibiting any additional requirements for cigarette labeling, the FCLAA provided that "[n]o statement

relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Pub.L. 89–92, § 5(b), 79 Stat. 283. Thus, in reaction to the FTC's attempt to regulate cigarette labeling and advertising, Congress enacted a statute reserving exclusive control over both subjects to itself.

Subsequent tobacco-specific legislation followed a similar pattern. By the FCLAA's own terms, the prohibition on any additional cigarette labeling or advertising regulations relating to smoking and health was to expire July 1, 1969. See § 10, 79 Stat. 284. In anticipation of the provision's expiration, both the FCC and the FTC proposed rules governing the advertisement of cigarettes. See 34 Fed.Reg. 1959 (1969) (FCC proposed rule to "ban the broadcast of cigarette commercials by radio and television stations"); *id.,* at 7917 **\*150** FTC proposed rule requiring manufacturers to disclose on all packaging and in all print advertising " 'that cigarette smoking is dangerous to health and may cause death from cancer, coronary heart disease, chronic bronchitis, pulmonary emphysema, and other diseases' "). After debating the proper role for administrative **\*\*1310** agencies in the regulation of tobacco, see generally Cigarette Labeling and Advertising—1969: Hearings before the House Committee on Interstate and Foreign Commerce, 91st Cong., 1st Sess., pt. 2 (1969), Congress amended the FCLAA by banning cigarette advertisements "on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission" and strengthening the warning required to appear on cigarette packages. Public Health Cigarette Smoking Act of 1969, Pub.L. 91–222, §§ 4, 6, 84 Stat. 88–89. Importantly, Congress extended indefinitely the prohibition on any other regulation of cigarette labeling with respect to smoking and health (again despite the importance of labeling regulation under the FDCA). § 5(a), 84 Stat. 88 (codified at 15 U.S.C. § 1334(a)). Moreover, it expressly forbade the FTC from taking any action on its pending rule until July 1, 1971, and it required the FTC, if it decided to proceed with its rule thereafter, to notify Congress at least six months in advance of the rule's becoming effective. § 7(a), 84 Stat. 89. As the chairman of the House committee in which the bill originated stated, "the Congress—the body elected by the people—must make the policy determinations involved in this legislation—and not some agency made up of appointed officials." 116 Cong. Rec. 7920 (1970) (remarks of Rep. Staggers).

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 233 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

Four years later, after Congress had transferred the authority to regulate substances covered by the Hazardous Substances Act (HSA) from the FDA to the Consumer Products Safety Commission (CPSC), the American Public Health Association, joined by Senator Moss, petitioned the CPSC to regulate cigarettes yielding more than 21 milligrams of tar. See **\*151** *Action on Smoking and Health v. Harris,* 655 F.2d 236, 241 (C.A.D.C. 1980); R. Kluger, Ashes to Ashes 375–376 (1996). After the CPSC determined that it lacked authority under the HSA to regulate cigarettes, a District Court held that the HSA did, in fact, grant the CPSC such jurisdiction and ordered it to reexamine the petition. See *American Public Health Association v. Consumer Product Safety Commission,* [1972–1975 Transfer Binder] CCH Consumer Prod. Safety Guide ¶ 75,081 (DC 1975), vacated as moot, No. 75–1863 (CADC 1976). Before the CPSC could take any action, however, Congress mooted the issue by adopting legislation that eliminated the agency's authority to regulate "tobacco and tobacco products." Consumer Product Safety Commission Improvements Act of 1976, Pub.L. 94–284, § 3(c), 90 Stat. 503 (codified at 15 U.S.C. § 1261(f)(2)). Senator Moss acknowledged that the "legislation, in effect, reverse[d]" the District Court's decision, 121 Cong. Rec. 23563 (1975), and the FDA later observed that the episode was "particularly" "indicative of the policy of Congress to limit the regulatory authority over cigarettes by Federal Agencies," Letter to Action on Smoking and Health (ASH) Executive Director Banzhaf from FDA Comm'r Goyan (Nov. 25, 1980), App. 59. A separate statement in the Senate Report underscored that the legislation's purpose was to "unmistakably reaffirm the clear mandate of the Congress that the basic regulation of tobacco and tobacco products is governed by the legislation dealing with the subject, ... and that any further regulation in this sensitive and complex area must be reserved for specific Congressional action." S.Rep. No. 94–251, p. 43 (1975) (additional views of Sens. Hartke, Hollings, Ford, Stevens, and Beall).

Meanwhile, the FDA continued to maintain that it lacked jurisdiction under the FDCA to regulate tobacco products as customarily marketed. In 1972, FDA Commissioner Edwards testified before Congress that "cigarettes recommended for smoking pleasure are beyond the Federal Food, Drug, and Cosmetic Act." 1972 Hearings 239, 242. He further **\*152** stated that the FDA believed that the Public Health Cigarette Smoking Act "demonstrates that the regulation of cigarettes is **\*\*1311** to be the domain of Congress," and that "labeling or banning cigarettes is a step that can be take[n] only by the

Congress. Any such move by FDA would be inconsistent with the clear congressional intent." *Ibid.*

In 1977, ASH filed a citizen petition requesting that the FDA regulate cigarettes, citing many of the same grounds that motivated the FDA's rulemaking here. See Citizen Petition, No. 77P–0185 (May 26, 1977), 10 Rec. in No. 97–1604(CA4), Tab No. 22, pp. 1–10. ASH asserted that nicotine was highly addictive and had strong physiological effects on the body; that those effects were "intended" because consumers use tobacco products precisely to obtain those effects; and that tobacco causes thousands of premature deaths annually. *Ibid.* In denying ASH's petition, FDA Commissioner Kennedy stated that "[t]he interpretation of the Act by FDA consistently has been that cigarettes are not a drug unless health claims are made by the vendors." Letter to ASH Executive Director Banzhaf (Dec. 5, 1977), App. 47. After the matter proceeded to litigation, the FDA argued in its brief to the Court of Appeals that "cigarettes are not comprehended within the statutory definition of the term 'drug' absent objective evidence that vendors represent or intend that their products be used as a drug." Brief for Appellee in *Action on Smoking and Health v. Harris,* 655 F.2d 236 (C.A.D.C.1980), 9 Rec. in No. 97–1604(CA4), Tab No. 4, at 27–28. The FDA also contended that Congress had "long been aware that the FDA does not consider cigarettes to be within its regulatory authority in the absence of health claims made on behalf of the manufacturer or vendor," and that, because "Congress has never acted to disturb the agency's interpretation," it had "acquiesced in the FDA's interpretation of the statutory limits on its authority to regulate cigarettes." *Id.,* at 23, 27, n. 23. The Court of Appeals upheld the FDA's position, concluding that "[i]f the statute **\*153** requires expansion, that is the job of Congress." *Action on Smoking and Health v. Harris,* 655 F.2d, at 243. In 1980, the FDA also denied a request by ASH to commence rulemaking proceedings to establish the agency's jurisdiction to regulate cigarettes as devices. See Letter to ASH Executive Director Banzhaf from FDA Comm'r Goyan (Nov. 25, 1980), App. 50–51. The agency stated that "[i]nsofar as rulemaking would relate to cigarettes or attached filters as customarily marketed, we have concluded that FDA has no jurisdiction under section 201(h) of the Act [21 U.S.C. § 321(h) ]." *Id.,* at 67.

In 1983, Congress again considered legislation on the subject of smoking and health. HHS Assistant Secretary Brandt testified that, in addition to being "a major cause of cancer," smoking is a "major cause of heart disease" and other serious illnesses, and can result in "unfavorable pregnancy

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 234 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

outcomes." 1983 House Hearings 19–20. He also stated that it was "well-established that cigarette smoking is a drug dependence, and that smoking is addictive for many people." *Id.,* at 20. Nonetheless, Assistant Secretary Brandt maintained that "the issue of regulation of tobacco ... is something that Congress has reserved to itself, and we do not within the Department have the authority to regulate nor are we seeking such authority." *Id.,* at 74. He also testified before the Senate, stating that, despite the evidence of tobacco's health effects and addictiveness, the Department's view was that "Congress has assumed the responsibility of regulating ... cigarettes." Smoking Prevention and Education Act: Hearings on S. 772 before the Senate Committee on Labor and Human Resources, 98th Cong., 1st Sess., 56 (1983) (hereinafter 1983 Senate Hearings).

Against this backdrop, Congress enacted three additional tobacco-specific statutes over the next four years that incrementally expanded its regulatory scheme for tobacco products. In 1983, Congress adopted the Alcohol and Drug Abuse Amendments, Pub.L. 98–24, 97 Stat. 175 (codified at **\*154** 42 U.S.C. § 290aa *et seq.*), which require **\*\*1312** the Secretary of HHS to report to Congress every three years on the "addictive property of tobacco" and to include recommendations for action that the Secretary may deem appropriate. A year later, Congress enacted the Comprehensive Smoking Education Act, Pub.L. 98–474, 98 Stat. 2200, which amended the FCLAA by again modifying the prescribed warning. Notably, during debate on the Senate floor, Senator Hawkins argued that the FCLAA was necessary in part because "[u]nder the Food, Drug and Cosmetic Act, the Congress exempted tobacco products." 130 Cong. Rec. 26953 (1984). And in 1986, Congress enacted the Comprehensive Smokeless Tobacco Health Education Act of 1986 (CSTHEA), Pub.L. 99–252, 100 Stat. 30 (codified at 15 U.S.C. § 4401 *et seq.*), which essentially extended the regulatory provisions of the FCLAA to smokeless tobacco products. Like the FCLAA, the CSTHEA provided that "[n]o statement relating to the use of smokeless tobacco products and health, other than the statements required by [the Act], shall be required by any Federal agency to appear on any package ... of a smokeless tobacco product." § 7(a), 100 Stat. 34 (codified at 15 U.S.C. § 4406(a)). Thus, as with cigarettes, Congress reserved for itself an aspect of smokeless tobacco regulation that is particularly important to the FDCA's regulatory scheme.

In 1988, the Surgeon General released a report summarizing the abundant scientific literature demonstrating that

"[c]igarettes and other forms of tobacco are addicting," and that "nicotine is psychoactive" and "causes physical dependence characterized by a withdrawal syndrome that usually accompanies nicotine abstinence." 1988 Surgeon General's Report 14. The report further concluded that the "pharmacologic and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine." *Id.,* at 15. In the same year, FDA Commissioner Young stated before Congress that "it doesn't look like it is possible to regulate [tobacco] under the **\*155** Food, Drug and Cosmetic Act even though smoking, I think, has been widely recognized as being harmful to human health." Rural Development, Agriculture, and Related Agencies Appropriations for 1989: Hearings before a Subcommittee of the House Committee on Appropriations, 100th Cong., 2d Sess., 409 (1988). At the same hearing, the FDA's General Counsel testified that "what is fairly important in FDA law is whether a product has a therapeutic purpose," and "[c]igarettes themselves are not used for a therapeutic purpose as that concept is ordinarily understood." *Id.,* at 410. Between 1987 and 1989, Congress considered three more bills that would have amended the FDCA to grant the FDA jurisdiction to regulate tobacco products. See H.R. 3294, 100th Cong., 1st Sess. (1987); H.R. 1494, 101st Cong., 1st Sess. (1989); S. 769, 101st Cong., 1st Sess. (1989). As before, Congress rejected the proposals. In 1992, Congress instead adopted the Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act, Pub.L. 102–321, § 202, 106 Stat. 394 (codified at 42 U.S.C. § 300x *et seq.*), which creates incentives for States to regulate the retail sale of tobacco products by making States' receipt of certain block grants contingent on their prohibiting the sale of tobacco products to minors.

Taken together, these actions by Congress over the past 35 years preclude an interpretation of the FDCA that grants the FDA jurisdiction to regulate tobacco products. We do not rely on Congress' failure to act—its consideration and rejection of bills that would have given the FDA this authority—in reaching this conclusion. Indeed, this is not a case of simple inaction by Congress that purportedly represents its acquiescence in an agency's position. To the contrary, Congress has enacted several statutes addressing the particular subject of tobacco and health, creating a distinct regulatory scheme for **\*\*1313** cigarettes and smokeless tobacco. In doing so, Congress has been aware of tobacco's health hazards and its pharmacological effects. It has also enacted this legislation **\*156** against the background of the FDA repeatedly and consistently asserting that it lacks

000234

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 235 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

jurisdiction under the FDCA to regulate tobacco products as customarily marketed. Further, Congress has persistently acted to preclude a meaningful role for *any* administrative agency in making policy on the subject of tobacco and health. Moreover, the substance of Congress' regulatory scheme is, in an important respect, incompatible with FDA jurisdiction. Although the supervision of product labeling to protect consumer health is a substantial component of the FDA's regulation of drugs and devices, see 21 U.S.C. § 352 (1994 ed. and Supp. III), the FCLAA and the CSTHEA explicitly prohibit any federal agency from imposing any health-related labeling requirements on cigarettes or smokeless tobacco products, see 15 U.S.C. §§ 1334(a), 4406(a).

 [19]   Under these circumstances, it is clear that Congress' tobacco-specific legislation has effectively ratified the FDA's previous position that it lacks jurisdiction to regulate tobacco. As in *Bob Jones Univ. v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), "[i]t is hardly conceivable that Congress—and in this setting, any Member of Congress—was not abundantly aware of what was going on." *Id., at* 600–601, 103 S.Ct. 2017. Congress has affirmatively acted to address the issue of tobacco and health, relying on the representations of the FDA that it had no authority to regulate tobacco. It has created a distinct scheme to regulate the sale of tobacco products, focused on labeling and advertising, and premised on the belief that the FDA lacks such jurisdiction under the FDCA. As a result, Congress' tobacco-specific statutes preclude the FDA from regulating tobacco products as customarily marketed.

 [20]   Although the dissent takes issue with our discussion of the FDA's change in position, *post,* at 1328–1330, our conclusion does not rely on the fact that the FDA's assertion of jurisdiction represents a sharp break with its prior interpretation of the FDCA. Certainly, an agency's initial interpretation of a statute that it is charged with administering is not "carved **\*157** in stone." *Chevron,* 467 U.S., at 863, 104 S.Ct. 2778; see also *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). As we recognized in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.' " *Id., at* 42, 103 S.Ct. 2856 (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 784, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). The consistency of the FDA's prior position is significant in this case for a different reason: It provides important context to Congress'

enactment of its tobacco-specific legislation. When the FDA repeatedly informed Congress that the FDCA does not grant it the authority to regulate tobacco products, its statements were consistent with the agency's unwavering position since its inception, and with the position that its predecessor agency had first taken in 1914. Although not crucial, the consistency of the FDA's prior position bolsters the conclusion that when Congress created a distinct regulatory scheme addressing the subject of tobacco and health, it understood that the FDA is without jurisdiction to regulate tobacco products and ratified that position.

The dissent also argues that the proper inference to be drawn from Congress' tobacco-specific legislation is "critically ambivalent." *Post,* at 1326. We disagree. In that series of statutes, Congress crafted a specific legislative response to the problem of tobacco and health, and it did so with the understanding, based on repeated assertions by the FDA, that the agency **\*1314** has no authority under the FDCA to regulate tobacco products. Moreover, Congress expressly pre-empted any other regulation of the labeling of tobacco products concerning their health consequences, even though the oversight of labeling is central to the FDCA's regulatory scheme. And in addressing the subject, Congress consistently evidenced its intent to preclude any federal agency from exercising significant policymaking authority in the area. Under these circumstances, we believe the appropriate **\*158** inference that Congress intended to ratify the FDA's prior position that it lacks jurisdiction—is unmistakable.

The dissent alternatively argues that, even if Congress' subsequent tobacco-specific legislation did, in fact, ratify the FDA's position, that position was merely a contingent disavowal of jurisdiction. Specifically, the dissent contends that "the FDA's traditional view was largely premised on a perceived inability to prove the necessary statutory 'intent' requirement." *Post,* at 1330. A fair reading of the FDA's representations prior to 1995, however, demonstrates that the agency's position was essentially unconditional. See, *e.g.,* 1972 Hearings 239, 242 (statement of Comm'r Edwards) ("[R]egulation of cigarettes is to be the domain of Congress," and "[a]ny such move by FDA would be inconsistent with the clear congressional intent"); 1983 House Hearings 74 (statement of Assistant Secretary Brandt) ("[T]he issue of regulation of tobacco ... is something that Congress has reserved to itself"); 1983 Senate Hearings 56 (statement of Assistant Secretary Brandt) ("Congress has assumed the responsibility of regulating ... cigarettes"); Brief for Appellee in *Action on Smoking and Health v. Harris,* 655 F.2d 236

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 236 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

(C.A.D.C.1980), 9 Rec. in No. 97–1604(CA4), Tab No. 4, at 27, n. 23 (because "Congress has never acted to disturb the agency's interpretation," it "acquiesced in the FDA's interpretation"). To the extent the agency's position could be characterized as equivocal, it was only with respect to the well-established exception of when the manufacturer makes express claims of therapeutic benefit. See, *e.g.,* 1965 Hearings 193 (statement of Deputy Comm'r Rankin) ("The Food and Drug Administration has no jurisdiction under the Food, Drug, and Cosmetic Act over tobacco, unless it bears drug claims"); Letter to ASH Executive Director Banzhaf from FDA Comm'r Kennedy (Dec. 5, 1977), App. 47 ("The interpretation of the Act by FDA consistently has been that cigarettes are not a drug unless health claims are made by the vendors"); Letter to ASH Executive Director Banzhaf from **\*159** FDA Comm'r Goyan (Nov. 25, 1980), *id.,* at 67 ("Insofar as rulemaking would relate to cigarettes or attached filters as customarily marketed, we have concluded that FDA has no jurisdiction"). Thus, what Congress ratified was the FDA's plain and resolute position that the FDCA gives the agency no authority to regulate tobacco products as customarily marketed.

C

[21]  Finally, our inquiry into whether Congress has directly spoken to the precise question at issue is shaped, at least in some measure, by the nature of the question presented. Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill the statutory gaps. See *Chevron, supra,* at 844, 104 S.Ct. 2778. In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation. Cf. Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L.Rev. 363, 370 (1986) ("A court may also ask whether the legal question is an important one. Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration").

**\*\*1315**  [22]  This is hardly an ordinary case. Contrary to its representations to Congress since 1914, the FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy. In fact, the FDA contends that, were it to determine that tobacco products

provide no "reasonable assurance of safety," it would have the authority to ban cigarettes and smokeless tobacco entirely. See Brief for Petitioners 35–36; Reply Brief for Petitioners 14. Owing to its unique place in American history and society, tobacco has its own unique political history. Congress, for better or for worse, has created a distinct regulatory scheme for tobacco products, squarely rejected proposals to **\*160** give the FDA jurisdiction over tobacco, and repeatedly acted to preclude any agency from exercising significant policymaking authority in the area. Given this history and the breadth of the authority that the FDA has asserted, we are obliged to defer not to the agency's expansive construction of the statute, but to Congress' consistent judgment to deny the FDA this power.

Our decision in *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.,* 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994), is instructive. That case involved the proper construction of the term "modify" in § 203(b) of the Communications Act of 1934. The FCC contended that, because the Act gave it the discretion to "modify any requirement" imposed under the statute, it therefore possessed the authority to render voluntary the otherwise mandatory requirement that long distance carriers file their rates. *Id., at 225, 114 S.Ct. 2223.* We rejected the FCC's construction, finding "not the slightest doubt" that Congress had directly spoken to the question. *Id., at 228, 114 S.Ct. 2223.* In reasoning even more apt here, we concluded that "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." *Id., at 231, 114 S.Ct. 2223.*

As in *MCI,* we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion. To find that the FDA has the authority to regulate tobacco products, one must not only adopt an extremely strained understanding of "safety" as it is used throughout the Act—a concept central to the FDCA's regulatory scheme—but also ignore the plain implication of Congress' subsequent tobacco-specific legislation. It is therefore clear, based on the FDCA's overall regulatory scheme and the subsequent tobacco legislation, that Congress has directly spoken to the **\*161** question at issue and precluded the FDA from regulating tobacco products.

000236

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 237 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

* * *

**[23]**    By no means do we question the seriousness of the problem that the FDA has sought to address. The agency has amply demonstrated that tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States. Nonetheless, no matter how "important, conspicuous, and controversial" the issue, and regardless of how likely the public is to hold the Executive Branch politically accountable, *post,* at 1331, an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress. And " '[i]n our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.' " *United States v. Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 800, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969) (quoting *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States,* 340 U.S. 593, 600, 71 S.Ct. 515, 95 L.Ed. 566 (1951)).    **\*\*1316** Reading the FDCA as a whole, as well as in conjunction with Congress' subsequent tobacco-specific legislation, it is plain that Congress has not given the FDA the authority that it seeks to exercise here. For these reasons, the judgment of the Court of Appeals for the Fourth Circuit is affirmed.

*It is so ordered.*

Justice BREYER, with whom Justice STEVENS, Justice SOUTER, and Justice GINSBURG join, dissenting.

The Food and Drug Administration (FDA) has the authority to regulate "articles (other than food) intended to affect the structure or any function of the body ...." Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 321(g)(1)(C). Unlike the majority, I believe that tobacco products fit within this statutory language.

**\*162**  In its own interpretation, the majority nowhere denies the following two salient points. First, tobacco products (including cigarettes) fall within the scope of this statutory definition, read literally. Cigarettes achieve their mood-stabilizing effects through the interaction of the chemical nicotine and the cells of the central nervous system. Both cigarette manufacturers and smokers alike know of, and desire, that chemically induced result. Hence, cigarettes are "intended to affect" the body's "structure" and "function," in the literal sense of these words.

Second, the statute's basic purpose—the protection of public health—supports the inclusion of cigarettes within its scope. See *United States v. Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969) (FDCA "is to be given *a liberal construction consistent with [its] overriding purpose to protect the public health* " (emphasis added)). Unregulated tobacco use causes "[m]ore than 400,000 people [to] die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease." 61 Fed.Reg. 44398 (1996). Indeed, tobacco products kill more people in this country every year "than ... AIDS ..., car accidents, alcohol, homicides, illegal drugs, suicides, and fires, *combined.*" *Ibid.* (emphasis added).

Despite the FDCA's literal language and general purpose (both of which support the FDA's finding that cigarettes come within its statutory authority), the majority nonetheless reads the statute as *excluding* tobacco products for two basic reasons:

(1) the FDCA does not "fit" the case of tobacco because the statute requires the FDA to prohibit dangerous drugs or devices (like cigarettes) outright, and the agency concedes that simply banning the sale of cigarettes is not a proper remedy, *ante,* at 1304–1305; and

(2) Congress has enacted other statutes, which, when viewed in light of the FDA's long history of denying **\*163** tobacco-related jurisdiction and considered together with Congress' failure explicitly to grant the agency tobacco-specific authority, demonstrate that Congress did not intend for the FDA to exercise jurisdiction over tobacco, *ante,* at 1312–1313.

In my view, neither of these propositions is valid. Rather, the FDCA does not significantly limit the FDA's remedial alternatives. See *infra,* at 1322–1326. And the later statutes do not tell the FDA it cannot exercise jurisdiction, but simply leave FDA jurisdictional law where Congress found it. See *infra,* at 1326–1328; cf. Food and Drug Administration Modernization Act of 1997, 111 Stat. 2380 (codified at note following 21 U.S.C. § 321 (1994 ed., Supp. III)) (statute "shall" *not* "be construed to affect the question of whether" the FDA "has any authority to regulate any tobacco product").

The bulk of the opinion that follows will explain the basis for these latter conclusions. In short, I believe that the most important indicia of statutory meaning—language and purpose—along with the FDCA's legislative history

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

(described **1317 briefly in Part I) are sufficient to establish that the FDA has authority to regulate tobacco. The statute-specific arguments against jurisdiction that the tobacco companies and the majority rely upon (discussed in Part II) are based on erroneous assumptions and, thus, do not defeat the jurisdiction-supporting thrust of FDCA's language and purpose. The inferences that the majority draws from later legislative history are not persuasive, since (as I point out in Part III) one can just as easily infer from the later laws that Congress did not intend to affect the FDA's tobacco-related authority at all. And the fact that the FDA changed its mind about the scope of its own jurisdiction is legally insignificant because (as Part IV establishes) the agency's reasons for changing course are fully justified. Finally, as I explain in Part V, the degree of accountability that likely will attach to the FDA's action in this case should alleviate any concern *164 that Congress, rather than an administrative agency, ought to make this important regulatory decision.

### I

Before 1938, the federal Pure Food and Drug Act contained only two jurisdictional definitions of "drug":

> "[1] medicines and preparations recognized in the United States Pharmacopoeia or National Formulary ... and [2] any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease." Act of June 30, 1906, ch. 3915, § 6, 34 Stat. 769.

In 1938, Congress added a third definition, relevant here:

> "(3) articles (other than food) intended to affect the structure or any function of the body ...." Act of June 25, 1938, ch. 675, § 201(g), 52 Stat. 1041 (codified at 21 U.S.C. § 321(g)(1)(C)).

It also added a similar definition in respect to a "device." See § 201(h), 52 Stat. 1041 (codified at 21 U.S.C. § 321(h)). As I have mentioned, the literal language of the third definition and the FDCA's general purpose both strongly support a projurisdiction reading of the statute. See *supra*, at 1316.

The statute's history offers further support. The FDA drafted the new language, and it testified before Congress that the third definition would expand the FDCA's jurisdictional scope significantly. See Hearings on S.1944 before a Subcommittee of the Senate Committee on Commerce, 73d Cong., 2d Sess., 15–16 (1933), reprinted in 1 FDA,

Legislative History of the Federal Food, Drug, and Cosmetic Act and Its Amendments 107–108 (1979) (hereinafter Leg. Hist.). Indeed, "[t]he purpose" of the new definition was to "make possible the regulation of a great many products that have been found on the market that cannot be alleged to be treatments for diseased conditions." *Id.,* at 108. While the drafters focused specifically upon the need to give the FDA jurisdiction *165 over "slenderizing" products such as "antifat remedies," *ibid.,* they were aware that, in doing so, they had created what was "admittedly an inclusive, a wide definition," *id.,* at 107. And that broad language was included *deliberately,* so that jurisdiction could be had over "*all* substances and preparations, other than food, and *all* devices intended to affect the structure or any function of the body ...." *Ibid.* (emphasis added); see also Hearings on S. 2800 before the Senate Committee on Commerce, 73d Cong., 2d Sess., 516 (1934), reprinted in 2 Leg. Hist. 519 (statement of then-FDA Chief Walter Campbell acknowledging that "[t]his definition of 'drugs' is all-inclusive").

After studying the FDCA's history, experts have written that the statute "is a purposefully broad delegation of discretionary powers by Congress," 1 J. O'Reilly, Food and Drug Administration § 6.01, p. 6–1 (2d ed.1995) (hereinafter O'Reilly), and that, in a sense, the FDCA "must be regarded as a *constitution*" that "establish[es] general principles" and "permit[s] implementation within broad parameters" **1318 so that the FDA can "implement these objectives through the most effective and efficient controls that can be devised." Hutt, Philosophy of Regulation Under the Federal Food, Drug and Cosmetic Act, 28 Food Drug Cosm. L.J. 177, 178–179 (1973) (emphasis added). This Court, too, has said that

> "historical expansion of the definition of drug, and the creation of a parallel concept of devices, clearly show ... that Congress fully intended that the Act's coverage be as broad as its literal language indicates—and equally clearly, broader than any strict medical definition might otherwise allow." *Bacto–Unidisk,* 394 U.S., at 798, 89 S.Ct. 1410.

That Congress would grant the FDA such broad jurisdictional authority should surprise no one. In 1938, the President and much of Congress believed that federal administrative agencies needed broad authority and would exercise that authority wisely—a view embodied in much Second New *166 Deal legislation. Cf. *Gray v. Powell,* 314 U.S. 402, 411–412, 62 S.Ct. 326, 86 L.Ed. 301 (1941) (Congress "could have legislated specifically" but decided "to delegate that function to those whose experience in a particular

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 239 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

field gave promise of a better informed, more equitable" determination? Thus, at around the same time that it added the relevant language to the FDCA, Congress enacted laws granting other administrative agencies even broader powers to regulate much of the Nation's transportation and communication. See, *e.g.,* Civil Aeronautics Act of 1938, ch. 601, § 401(d)(1), 52 Stat. 987 (Civil Aeronautics Board to regulate airlines within confines of highly general "public convenience and necessity" standard); Motor Carrier Act of 1935, ch. 498, § 204(a)(1), 49 Stat. 546 (Interstate Commerce Commission to establish "reasonable requirements" for trucking); Communications Act of 1934, ch. 652, § 201(a), 48 Stat. 1070 (Federal Communications Commission (FCC) to regulate radio, later television, within confines of even broader "public interest" standard). Why would the 1938 New Deal Congress suddenly have hesitated to delegate to so well established an agency as the FDA all of the discretionary authority that a straightforward reading of the relevant statutory language implies?

Nor is it surprising that such a statutory delegation of power could lead after many years to an assertion of jurisdiction that the 1938 legislators might not have expected. Such a possibility is inherent in the very nature of a broad delegation. In 1938, it may well have seemed unlikely that the FDA would ever bring cigarette manufacturers within the FDCA's statutory language by proving that cigarettes produce chemical changes in the body and that the makers "intended" their product chemically to affect the body's "structure" or "function." Or, back then, it may have seemed unlikely that, even assuming such proof, the FDA actually would exercise its discretion to regulate so popular a product. See R. Kluger, Ashes to Ashes 105 (1997) (in the 1930's "Americans were in love with smoking ...").

 **\*167** But it should not have seemed unlikely that, assuming the FDA decided to regulate and proved the particular jurisdictional prerequisites, the courts would rule such a jurisdictional assertion fully authorized. Cf. *United States v. Southwestern Cable Co.,* 392 U.S. 157, 178, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) (reading Communications Act of 1934 as authorizing FCC jurisdiction to regulate cable systems while noting that "Congress could not in 1934 have foreseen the development of" advanced communications systems). After all, this Court has read more narrowly phrased statutes to grant what might have seemed even more unlikely assertions of agency jurisdiction. See, *e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 774–777, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (statutory authority to regulate interstate

"transportation" of natural gas includes authority to regulate "prices" charged by field producers); *Phillips Petroleum Co. v.* **\*\*1319** *Wisconsin,* 347 U.S. 672, 677–684, 74 S.Ct. 794, 98 L.Ed. 1035 (1954) (independent gas producer subject to regulation despite Natural Gas Act's express exemption of gathering and production facilities).

I shall not pursue these general matters further, for neither the companies nor the majority denies that the FDCA's literal language, its general purpose, and its particular legislative history favor the FDA's present jurisdictional view. Rather, they have made several specific arguments in support of one basic contention: Even if the statutory delegation is broad, it is not broad *enough* to include tobacco. I now turn to each of those arguments.

II

A

The tobacco companies contend that the FDCA's words cannot possibly be read to mean what they literally say. The statute defines "device," for example, as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article ... intended to affect the structure or any function of the body ...." **\*168** 21 U.S.C. § 321(h). Taken literally, this definition might include everything from room air conditioners to thermal pajamas. The companies argue that, to avoid such a result, the meaning of "drug" or "device" should be confined to *medical* or *therapeutic* products, narrowly defined. See Brief for Respondent United States Tobacco Co. 8–9.

The companies may well be right that the statute should not be read to cover room air conditioners and winter underwear. But I do not agree that we must accept their proposed limitation. For one thing, such a cramped reading contravenes the established purpose of the statutory language. See *Bacto–Unidisk,* 394 U.S., at 798, 89 S.Ct. 1410 (third definition is "clearly, broader than any strict medical definition"); 1 Leg. Hist. 108 (definition covers products "that cannot be alleged to be treatments for diseased conditions"). For another, the companies' restriction would render the other two "drug" definitions superfluous. See 21 U.S.C. §§ 321(g)(1)(A), (g)(1)(B) (covering articles in the leading pharmacology compendia and those "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease").

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 240 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

Most importantly, the statute's language itself supplies a different, more suitable, limitation: that a "drug" must be a *chemical* agent. The FDCA's "device" definition states that an article which affects the structure or function of the body is a "device" only if it "does *not* achieve its primary intended purposes through chemical action within ... the body," and "is *not* dependent upon being metabolized for the achievement of its primary intended purposes." § 321(h) (emphasis added). One can readily infer from this language that at least an article that *does* achieve its primary purpose through chemical action within the body and that *is* dependent upon being metabolized is a "drug," provided that it otherwise falls within the scope of the "drug" definition. And one need not hypothesize about air conditioners or thermal **\*169** pajamas to recognize that the chemical nicotine, an important tobacco ingredient, meets this test.

Although I now oversimplify, the FDA has determined that once nicotine enters the body, the blood carries it almost immediately to the brain. See 61 Fed.Reg. 44698–44699 (1966). Nicotine then binds to receptors on the surface of brain cells, setting off a series of chemical reactions that alter one's mood and produce feelings of sedation and stimulation. See *id.,* at 44699, 44739. Nicotine also increases the number of nicotinic receptors on the brain's surface, and alters its normal electrical activity. See *id.,* at 44739. And nicotine stimulates the transmission of a natural chemical that "rewards" the body with pleasurable sensations (dopamine), causing nicotine addiction. See *id.,* at 44700, 44721–44722. The upshot is that **\*\*1320** nicotine stabilizes mood, suppresses appetite, tranquilizes, and satisfies a physical craving that nicotine itself has helped to create—all through chemical action within the body after being metabolized.

This physiology—and not simply smoker psychology—helps to explain why as many as 75% of adult smokers believe that smoking "reduce[s] nervous irritation," 60 Fed.Reg. 41579 (1995); why 73% of young people (10– to 22–year–olds) who begin smoking say they do so for "relaxation," 61 Fed.Reg. 44814 (1996); and why less than 3% of smokers succeed in quitting each year, although 70% want to quit, *id.,* at 44704. That chemistry also helps to explain the Surgeon General's findings that smokers believe "smoking [makes them] feel better" and smoke more "in situations involving negative mood." *Id.,* at 44814. And, for present purposes, that chemistry demonstrates that nicotine affects the "structure" and "function" of the body in a manner that is quite similar to the effects of other regulated substances. See *id.,* at 44667 (FDA regulates Valium, NoDoz, weight-

loss products). Indeed, addiction, sedation, stimulation, and weight loss are *precisely* the kinds of product effects that the FDA typically reviews and controls. And, since the nicotine in cigarettes **\*170** plainly is not a "food," its chemical effects suffice to establish that it is as a "drug" (and the cigarette that delivers it a drug-delivery "device") for the purpose of the FDCA.

B

The tobacco companies' principal definitional argument focuses upon the statutory word "intended." See 21 U.S.C. § 321(g)(1)(C). The companies say that "intended" in this context is a term of art. See Brief for Respondent Brown & Williamson Tobacco Corp. 2. They assert that the statutory word "intended" means that the product's maker has made an *express claim* about the effect that its product will have on the body. *Ibid.* Indeed, according to the companies, the FDA's inability to prove that cigarette manufacturers make such claims is precisely why that agency historically has said it lacked the statutory power to regulate tobacco. See *id.,* at 19–20.

The FDCA, however, does not use the word "claimed"; it uses the word "intended." And the FDA long ago issued regulations that say the relevant "intent" can be shown not only by a manufacturer's "expressions," *but also* "by the circumstances surrounding the distribution of the article." 41 Fed.Reg. 6896 (1976) (codified at 21 CFR § 801.4 (1999)); see also 41 Fed.Reg. 6896 (1976) ("objective intent" shown if "article is, with the knowledge [of its makers], offered and used" for a particular purpose). Thus, even in the absence of express claims, the FDA has regulated products that affect the body if the manufacturer wants, and knows, that consumers so use the product. See, *e.g.,* 60 Fed.Reg. 41527–41531 (1995) (describing agency's regulation of topical hormones, sunscreens, fluoride, tanning lamps, thyroid in food supplements, novelty condoms—all marketed without express claims); see also 1 O'Reilly § 13.04, at 13–15 ("Sometimes the very nature of the material makes it a drug ...").

Courts ordinarily reverse an agency interpretation of this kind only if Congress has clearly answered the interpretive **\*171** question or if the agency's interpretation is unreasonable. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The companies, in an effort to argue the former,

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 241 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

point to language in the legislative history tying the word "intended" to a technical concept called "intended use." But nothing in Congress' discussion either of "intended" or "intended use" suggests that an express claim (which *often* shows intent) is *always* necessary. Indeed, the primary statement to which the companies direct our attention says only that a manufacturer can determine what kind of regulation applies **\*\*1321** —"food" or "drug"—because, "through his representations in connection with its sale, [the manufacturer] can determine" whether an article is to be used as a "food," as a "drug," or as "both." S.Rep. No. 361, 74th Cong., 1st Sess., 4 (1935), reprinted in 3 Leg. Hist. 696.

Nor is the FDA's "objective intent" interpretation unreasonable. It falls well within the established scope of the ordinary meaning of the word "intended." See *Agnew v. United States,* 165 U.S. 36, 53, 17 S.Ct. 235, 41 L.Ed. 624 (1897) (intent encompasses the known consequences of an act). And the companies acknowledge that the FDA can regulate a drug-like substance in the ordinary circumstance, *i.e.,* where the manufacturer makes an express claim, so it is not unreasonable to conclude that the agency retains such power where a product's effects on the body are so well known (say, like those of aspirin or calamine lotion), that there is no *need* for express representations because the product speaks for itself.

The companies also cannot deny that the evidence of their intent is sufficient to satisfy the statutory word "intended" as the FDA long has interpreted it. In the first place, there was once a time when they actually *did* make express advertising claims regarding tobacco's mood-stabilizing and weight-reducing properties—and historical representations can portend present expectations. In the late 1920's, for example, the American Tobacco Company urged weight-conscious smokers to " 'Reach for a Lucky instead of a **\*172** sweet.' " Kluger, Ashes to Ashes, at 77–78. The advertisements of R J Reynolds (RJR) emphasized mood stability by depicting a pilot remarking that " 'It Takes Steady Nerves to Fly the Mail at Night .... That's why I smoke Camels. And I smoke plenty!' " *Id.,* at 86. RJR also advertised the stimulating quality of cigarettes, stating in one instance that " 'You get a Lift with a Camel,' " and, in another, that Camels are " 'A Harmless Restoration of the Flow of Natural Body Energy.' " *Id.,* at 87. And claims of medical proof of mildness (and of other beneficial effects) once were commonplace. See, *e.g., id.,* at 93 (Brown & Williamson advertised Kool-brand mentholated cigarettes as "a tonic to hot, tired throats"); *id.,* at 101, 131 (Philip Morris contended

that " '[r]ecognized laboratory tests have conclusively proven the advantage of Phillip *[sic]* Morris' "); *id.,* at 88 (RJR proclaimed " 'For Digestion's sake, smoke Camels! ... Camels make mealtime more pleasant—digestion is stimulated—alkalinity increased' "). Although in recent decades cigarette manufacturers have stopped making express health claims in their advertising, consumers have come to understand what the companies no longer need to express—that through chemical action cigarettes stabilize mood, sedate, stimulate, and help suppress appetite.

Second, even though the companies refused to acknowledge publicly (until only very recently) that the nicotine in cigarettes has chemically induced, and habit-forming, effects, see, *e.g.,* Regulation of Tobacco Products (Part 1): Hearings before the House Subcommittee on Health and the Environment, 103d Cong., 2d Sess., 628 (1994) (hereinafter 1994 Hearings) (heads of seven major tobacco companies testified under oath that they believed "nicotine is *not* addictive" (emphasis added)), the FDA recently has gained access to solid, documentary evidence proving that cigarette manufacturers have long *known* tobacco produces these effects within the body through the metabolizing of chemicals, and that they **\*173** have long *wanted* their products to produce those effects in this way.

For example, in 1972, a tobacco-industry scientist explained that " '[s]moke is beyond question the most optimized vehicle of nicotine,' " and " 'the cigarette is the most optimized dispenser of smoke.' " 61 Fed.Reg. 44856 (1996) (emphasis deleted). That same scientist urged company executives to

" '[t]hink of the cigarette pack as a storage container for a day's supply of nico **\*\*1322** tine.... Think of the cigarette as a dispenser for a dose unit of nicotine [and][t]hink of a puff of smoke as the vehicle of nicotine.' " *Ibid.* (Philip Morris) (emphasis deleted).

That same year, other tobacco industry researchers told their superiors that

" 'in different situations and at different dose levels, nicotine appears to act as a stimulant, depressant, tranquilizer, psychic energizer, appetite reducer, anti-fatigue agent, or energizer.... Therefore, [tobacco] products may, in a sense, compete with a variety of other products with certain types of drug action.' " *Id.,* at 44669 (RJR) (emphasis deleted).

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 242 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)
120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

A draft report prepared by authorities at Philip Morris said that nicotine

> " 'is a physiologically active, nitrogen containing substance [similar to] quinine, cocaine, atropine and morphine. [And] [w]hile each of these [other] substances can be used to affect human physiology, nicotine has a particularly broad range of influence.' " *Id.,* at 44668–44669.

And a 1980 manufacturer's study stated that

> " 'the pharmacological response of smokers to nicotine is believed to be responsible for an individual's smoking **\*174** behaviour, providing the motivation for and the degree of satisfaction required by the smoker.' " *Id.,* at 44936 (Brown & Williamson).

With such evidence, the FDA has more than sufficiently established that the companies "intend" their products to "affect" the body within the meaning of the FDCA.

### C

The majority nonetheless reaches the "inescapable conclusion" that the language and structure of the FDCA as a whole "simply do not fit" the kind of public health problem that tobacco creates. *Ante,* at 1306. That is because, in the majority's view, the FDCA requires the FDA to ban outright "dangerous" drugs or devices (such as cigarettes); yet, the FDA concedes that an immediate and total cigarette-sale ban is inappropriate. *Ibid.*

This argument is curious because it leads with similarly "inescapable" force to precisely the opposite conclusion, namely, that the FDA *does* have jurisdiction but that it must ban cigarettes. More importantly, the argument fails to take into account the fact that a statute interpreted as requiring the FDA to pick a more dangerous over a less dangerous remedy would be a perverse statute, *causing,* rather than preventing, unnecessary harm whenever a total ban is likely the more dangerous response. And one can at least imagine such circumstances.

Suppose, for example, that a commonly used, mildly addictive sleeping pill (or, say, a kind of popular contact lens), plainly within the FDA's jurisdiction, turned out to pose serious health risks for certain consumers. Suppose further that many of those addicted consumers would ignore an immediate total ban, turning to a potentially more dangerous black-market substitute, while a less draconian remedy (say, adequate notice) would wean them gradually away to a safer product. Would the FDCA still *force* the FDA to impose **\*175** the more dangerous remedy? For the following reasons, I think not.

First, the statute's language does not restrict the FDA's remedial powers in this way. The FDCA permits the FDA to regulate a "combination product"—*i.e.,* a "device" (such as a cigarette) that contains a "drug" (such as nicotine) —under its "device" provisions. 21 U.S.C. § 353(g)(1). And the FDCA's "device" provisions explicitly grant the FDA wide remedial discretion. For example, where the FDA cannot "otherwise" obtain "reasonable assurance" of a device's "safety and effectiveness," the agency may restrict by regulation a product's "sale, distribution, or use" upon "*such ... conditions as the Secretary may prescribe.*" § 360j(e) (1) (emphasis added). And the statutory section that most clearly addresses the FDA's **\*\*1323** power to ban (entitled "Banned devices") says that, where a device presents "an unreasonable and substantial risk of illness or injury," the Secretary "*may*"—not *must*—"initiate a proceeding ... to make such device a banned device." § 360f(a) (emphasis added).

The Court points to other statutory subsections which it believes require the FDA to ban a drug or device entirely, even where an outright ban risks more harm than other regulatory responses. See *ante,* at 1302–1303. But the cited provisions do no such thing. It is true, as the majority contends, that "the FDCA requires the FDA to place all devices" in "one of three classifications" and that Class III devices require "premarket approval." *Ante,* at 1302. But it is not the case that the FDA *must* place cigarettes in Class III because tobacco itself "presents a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C). In fact, Class III applies *only* where *regulation* cannot otherwise "provide reasonable assurance of ... safety.*" §§ 360c(a)(1)(A), (B) (placing a device in Class I or Class II when regulation can provide that assurance). Thus, the statute plainly allows the FDA to consider the relative, overall "safety" of **\*176** a device in light of its regulatory alternatives, and where the FDA has chosen the least dangerous path, *i.e.,* the safest path, then it can—and does—provide a "reasonable assurance" of "safety" within the meaning of the statute. A good football helmet provides a reasonable assurance of safety for the player even if the sport itself is still dangerous. And the safest regulatory choice by

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 243 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

definition offers a "reasonable" assurance of safety in a world where the other alternatives are yet more dangerous.

In any event, it is not entirely clear from the statute's text that a Class III categorization would require the FDA affirmatively to *withdraw* from the market dangerous devices, such as cigarettes, which are already widely distributed. See, *e.g.,* § 360f(a) (when a device presents an "unreasonable and substantial risk of illness or injury," the Secretary "may" make it "a banned device"); § 360h(a) (when a device "presents an unreasonable risk of substantial harm to the public health," the Secretary "may" require "notification"); § 360h(b) (when a defective device creates an "unreasonable risk" of harm, the Secretary "may" order "[r]epair, replacement, or refund"); cf. 2 O'Reilly § 18.08, at 18–29 (point of Class III "premarket approval" is to allow "careful scientific review" of each "truly new" device "*before* it is exposed" to users (emphasis added)).

Noting that the FDCA requires banning a "misbranded" drug, the majority also points to 21 U.S.C. § 352(j), which deems a drug or device "misbranded" if "it is dangerous to health when used" as "prescribed, recommended, or suggested in the labeling." See *ante,* at 1302. In addition, the majority mentions § 352(f)(1), which calls a drug or device "misbranded" unless "its labeling bears ... adequate directions for use" as "are necessary for the protection of users." *Ibid.* But this "misbranding" language is not determinative, for it permits the FDA to conclude that a drug or device is *not* "dangerous to health" and that it *does* have "adequate" **\*177** directions *when regulated so as to render it as harmless as possible.* And surely the agency can determine that a substance is comparatively "safe" (*not* "dangerous") whenever it would be *less* dangerous to make the product available (subject to regulatory requirements) than suddenly to withdraw it from the market. Any other interpretation risks substantial harm of the sort that my sleeping pill example illustrates. See *supra,* at 1322 and this page. And nothing in the statute prevents the agency from adopting a view of "safety" that would avoid such harm. Indeed, the FDA already seems to have taken this position when permitting distribution of toxic drugs, such as poisons used for chemotherapy, that are dangerous for the user but **\*\*1324** are not deemed "dangerous to health" in the relevant sense. See 61 Fed.Reg. 44413 (1996).

The tobacco companies point to another statutory provision which says that if a device "would cause serious, adverse health consequences or death, the Secretary *shall* issue" a cease distribution order. 21 U.S.C. § 360h(e)(1) (emphasis

added). But that word "shall" in this context cannot mean that the Secretary must resort to the recall remedy *whenever* a device would have serious, adverse health effects. Rather, that language must mean that the Secretary "shall issue" a cease distribution order in compliance with the section's procedural requirements *if* the Secretary chooses *in her discretion* to use that particular subsection's recall remedy. Otherwise, the subsection would trump and make meaningless the same section's provision of other lesser remedies such as simple "notice" (which the Secretary similarly can impose if, but only if, she finds that the device "presents an unreasonable risk of substantial harm to the public"). § 360h(a)(1). And reading the statute to compel the FDA to "recall" every dangerous device likewise would conflict with that same subsection's statement that the recall remedy "shall be *in addition to* [the other] remedies provided" in the statute. § 360h(e)(3) (emphasis added).

**\*178** The statute's language, then, permits the agency to choose remedies consistent with its basic purpose—the overall protection of public health.

The second reason the FDCA does not require the FDA to select the more dangerous remedy, see *supra,* at 1322–1323, is that, despite the majority's assertions to the contrary, the statute does not distinguish among the kinds of health effects that the agency may take into account when assessing safety. The Court insists that the statute only permits the agency to take into account the health risks and benefits of the "*product itself*" as used by individual consumers, *ante,* at 1304, and, thus, that the FDA is prohibited from considering that a ban on smoking would lead many smokers to suffer severe withdrawal symptoms or to buy possibly stronger, more dangerous, black market cigarettes—considerations that the majority calls "the aggregate health effects of alternative administrative actions." *Ibid.* But the FDCA expressly *permits* the FDA to take account of comparative safety in precisely this manner. See, *e.g.,* 21 U.S.C. § 360h(e)(2)(B)(i)(II) (no device recall if "risk of recall[] " presents a "greater health risk than" no recall); § 360h(a) (notification "unless" notification "would present a greater danger" than "no such notification").

Moreover, one cannot distinguish in this context between a "specific" health risk incurred by an individual and an "aggregate" risk to a group. *All* relevant risk is, at bottom, risk to an individual; *all* relevant risk attaches to "the product itself"; and *all* relevant risk is "aggregate" in the sense that the agency aggregates health effects in order to determine

risk to the individual consumer. If unregulated smoking will kill 4 individuals out of a typical group of 1,000 people, if regulated smoking will kill 1 out of 1,000, and if a smoking ban (because of the black market) will kill 2 out of 1,000; then these three possibilities mean that in each group four, one, and two individuals, on average, will die respectively. And the risk to each individual consumer is 4/1,000, **\*179** 1/1,000, and 2/1,000 respectively. A "specific" risk to an individual consumer and "aggregate" risks are two sides of the same coin; each calls attention to the same set of facts. While there may be a theoretical distinction between the risk of the product itself and the risk related to the presence or absence of an intervening voluntary act (*e.g.,* the search for a replacement on the black market), the majority does not rely upon any such distinction, and the FDA's history of regulating "replacement" drugs such as methadone shows that it has long **\*\*1325** taken likely actual alternative consumer behavior into account.

I concede that, as a matter of logic, one could consider the FDA's "safety" evaluation to be different from its choice of remedies. But to read the statute to forbid the agency from taking account of the realities of consumer behavior either in assessing safety or in choosing a remedy could increase the risks of harm—doubling the risk of death to each "individual user" in my example above. Why would Congress insist that the FDA ignore such realities, even if the consequent harm would occur only unusually, say, where the FDA evaluates a product (a sleeping pill; a cigarette; a contact lens) that is already on the market, potentially habit forming, or popular? I can find no satisfactory answer to this question. And that, I imagine, is why the statute itself says nothing about any of the distinctions that the Court has tried to draw. See 21 U.S.C. § 360c(a)(2) (instructing FDA to determine the safety and effectiveness of a "device" in part by weighing "*any* probable benefit to health ... against *any* probable risk of injury or illness ..." (emphasis added)).

Third, experience counsels against an overly rigid interpretation of the FDCA that is divorced from the statute's overall health-protecting purposes. A different set of words, added to the FDCA in 1958 by the Delaney Amendment, provides that "no [food] additive shall be deemed to be safe if it is found [after appropriate tests] to induce cancer when ingested by man or animal." § 348(c)(3). The FDA **\*180** once interpreted this language as requiring it to ban any food additive, no matter how small the amount, that appeared in any food product if that additive was ever found to induce cancer in any animal, no matter how large a dose

needed to induce the appearance of a single carcinogenic cell. See H.R.Rep. No. 95–658, p. 7 (1977) (discussing agency's view). The FDA believed that the statute's ban mandate was absolute and prevented it from establishing a level of "safe use" or even to judge whether "the benefits of continued use outweigh the risks involved." *Id.,* at 5. This interpretation—which in principle could have required the ban of everything from herbal teas to mushrooms—actually led the FDA to ban saccharine, see 42 Fed.Reg. 19996 (1977), though this extremely controversial regulatory response never took effect because Congress enacted, and has continually renewed, a law postponing the ban. See Saccharin Study and Labeling Act, Pub.L. 95–203, § 3, 91 Stat. 1452; *e.g.,* Pub.L. 102–142, Tit. VI, 105 Stat. 910.

The Court's interpretation of the statutory language before us risks Delaney-type consequences with even less linguistic reason. Even worse, the view the Court advances undermines the FDCA's overall health-protecting purpose by placing the FDA in the strange dilemma of either banning completely a potentially dangerous drug or device or doing nothing at all. Saying that I have misunderstood its conclusion, the majority maintains that the FDA "may clearly regulate many 'dangerous' products without banning them." *Ante,* at 1305. But it then adds that the FDA *must* ban—rather than otherwise regulate—a drug or device that "cannot be used safely for any therapeutic purpose." *Ante,* at 1306. If I misunderstand, it is only because this linchpin of the majority's conclusion remains unexplained. *Why* must a widely used but unsafe device be withdrawn from the market when that particular remedy threatens the health of many and is thus more dangerous than another regulatory response? It is, indeed, a perverse interpretation that reads the FDCA **\*181** to require the ban of a device that has no "safe" therapeutic purpose where a ban is the most dangerous remedial alternative.

In my view, where linguistically permissible, we should interpret the FDCA in light of Congress' overall desire to protect health. That purpose requires a flexible interpretation that both permits the FDA to take into account the realities of human behavior and allows it, in appropriate **\*\*1326** cases, to choose from its arsenal of statutory remedies. A statute so interpreted easily "fit[s]" this, and other, drug- and device-related health problems.

III

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

In the majority's view, laws enacted since 1965 require us to deny jurisdiction, whatever the FDCA might mean in their absence. But why? Do those laws contain language barring FDA jurisdiction? The majority must concede that they do not. Do they contain provisions that are inconsistent with the FDA's exercise of jurisdiction? With one exception, see *infra,* at 1327, the majority points to no such provision. Do they somehow repeal the principles of law (discussed in Part II, *supra*) that otherwise would lead to the conclusion that the FDA has jurisdiction in this area? The companies themselves deny making any such claim. See Tr. of Oral Arg. 27 (denying reliance on doctrine of "partial repeal"). Perhaps the later laws "shape" and "focus" what the 1938 Congress meant a generation earlier. *Ante,* at 1306. But this Court has warned against using the views of a later Congress to construe a statute enacted many years before. See *Pension Benefit Guaranty Corporation v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (later history is a " 'hazardous basis for inferring the intent of an earlier' Congress" (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960))). And, while the majority suggests that the subsequent history "control[s] our construction" of the FDCA, see *ante,* at 1306 (citation and internal quotation marks omitted), this Court **\*182** expressly has held that such subsequent views are not "controlling." *Haynes v. United States,* 390 U.S. 85, 87–88, n. 4, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); accord, *Southwestern Cable Co.,* 392 U.S., at 170, 88 S.Ct. 1994 (such views have " 'very little, if any, significance' "); see also *Sullivan v. Finkelstein,* 496 U.S. 617, 632, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990) (SCALIA, J., concurring) ("Arguments based on subsequent legislative history ... should not be taken seriously, not even in a footnote").

Regardless, the later statutes do not support the majority's conclusion. That is because, whatever individual Members of Congress after 1964 may have assumed about the FDA's jurisdiction, the laws they enacted did not embody any such "no jurisdiction" assumption. And one cannot automatically *infer* an antijurisdiction intent, as the majority does, for the later statutes are both (and similarly) consistent with quite a different congressional desire, namely, the intent to proceed without interfering with whatever authority the FDA otherwise may have possessed. See, *e.g.,* Cigarette Labeling and Advertising—1965: Hearings on H.R. 2248 et al. before the House Committee on Interstate and Foreign Commerce, 89th Cong., 1st Sess., 19 (1965) (hereinafter 1965 Hearings) (statement of Rep. Fino that the proposed legislation would *not* "erode" agency authority). As I demonstrate below,

the subsequent legislative history is critically ambivalent, for it can be read *either* as (a) "ratif [ying]" a no-jurisdiction assumption, see *ante,* at 1313, *or* as (b) leaving the jurisdictional question just where Congress found it. And the fact that both inferences are "equally tenable," *Pension Benefit Guaranty Corp., supra,* at 650, 110 S.Ct. 2668 (citation and internal quotation marks omitted); *Johnson v. Transportation Agency, Santa Clara Cty.,* 480 U.S. 616, 672, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (SCALIA, J., dissenting), prevents the majority from drawing from the later statutes the firm, antijurisdiction implication that it needs.

Consider, for example, Congress' failure to provide the FDA with express authority to regulate tobacco—a circumstance **\*183** that the majority finds significant. See *ante,* at 1306–1307, 1308–1309, 1312–1313. But cf. *Southwestern Cable Co., supra,* at 170, 88 S.Ct. 1994 (failed requests do not prove agency "did not already possess" authority). **\*\*1327** In fact, Congress *both* failed to grant express authority to the FDA when the FDA denied it had jurisdiction over tobacco *and* failed to take that authority expressly away when the agency later asserted jurisdiction. See, *e.g.,* S. 1262, 104th Cong., 1st Sess., § 906 (1995) (failed bill seeking to amend FDCA to say that "[n]othing in this Act or any other Act shall provide the [FDA] with any authority to regulate in any manner tobacco or tobacco products"); see also H.R. 516, 105th Cong., 1st Sess., § 2 (1997) (similar); H.R. Res. 980, reprinted in 142 Cong. Rec. 5018 (1996) (Georgia legislators unsuccessfully requested that Congress "rescind any action giving the FDA authority" over tobacco); H.R. 2283, 104th Cong., 1st Sess. (1995) (failed bill "[t]o prohibit the [FDA] regulation of the sale or use of tobacco"); H.R. 2414, 104th Cong., 1st Sess., § 2(a) (1995) (similar). Consequently, the defeat of various different proposed jurisdictional changes proves nothing. This history shows only that Congress could not muster the votes necessary either to grant or to deny the FDA the relevant authority. It neither favors nor disfavors the majority's position.

The majority also mentions the speed with which Congress acted to take jurisdiction away from other agencies once they tried to assert it. See *ante,* at 1307, 1309–1310. But such a congressional response again proves nothing. On the one hand, the speedy reply might suggest that Congress somehow resented agency assertions of jurisdiction in an area it desired to reserve for itself—a consideration that supports the majority. On the other hand, Congress' quick reaction with respect to *other* agencies' regulatory efforts contrasts dramatically with its failure to enact any responsive law (at

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 246 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

any speed) after the FDA asserted jurisdiction over tobacco more than three years ago. And that contrast supports the opposite conclusion.

**\*184** In addition, at least one post–1938 statute reveals quite a different congressional intent than the majority infers. See note following 21 U.S.C. § 321 (1994 ed., Supp. III) (FDA Modernization Act of 1997) (law "shall *[not]* be construed to affect the question of whether the [FDA] has any authority to regulate any tobacco product," and "[s]uch authority, if any, shall be exercised under the [FDCA] as in effect on the day before the date of [this] enactment"). Consequently, it appears that the only interpretation that can reconcile *all* of the subsequent statutes is the inference that Congress did not intend, either explicitly or implicitly, for its later laws to answer the question of the scope of the FDA's jurisdictional authority. See 143 Cong. Rec. S8860 (Sept. 5, 1997) (the Modernization Act will "not interfere or substantially negatively affect any of the FDA tobacco authority").

The majority's historical perspective also appears to be shaped by language in the Federal Cigarette Labeling and Advertising Act (FCLAA), 79 Stat. 282, 15 U.S.C. § 1331 *et seq.* See *ante,* at 1308–1309. The FCLAA requires manufacturers to place on cigarette packages, etc., health warnings such as the following:

> "SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy." 15 U.S.C. § 1333(a).

The FCLAA has an express pre-emption provision which says that "[n]o statement relating to smoking and health, other than the statement required by [this Act], shall be required on any cigarette package." § 1334(a). This pre-emption clause plainly prohibits the FDA from requiring on "any cigarette package" any other "statement relating to smoking and health," but no one contends that the FDA has failed to abide by this prohibition. See, *e.g.,* 61 Fed.Reg. 44399 (1996) (describing the other regulatory prescriptions). Rather, the question is whether the FCLAA's pre-emption **\*185** provision does *more.* Does it forbid the FDA to regulate at all?

**\*\*1328** This Court has already answered that question expressly and in the negative. See *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). *Cipollone* held that the FCLAA's pre-emption provision does not bar state or federal regulation outside the provision's literal scope. *Id.,* at 518, 112 S.Ct. 2608. And it described

the pre-emption provision as "merely prohibit[ing] state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels ...." *Ibid.*

This negative answer is fully consistent with Congress' intentions in regard to the pre-emption language. When Congress enacted the FCLAA, it focused upon the regulatory efforts of the Federal Trade Commission (FTC), not the FDA. See 1965 Hearings 1–2. And the Public Health Cigarette Smoking Act of 1969, Pub.L. 91–222, § 7(c), 84 Stat. 89, expressly amended the FCLAA to provide that "[n]othing in this Act shall be construed to affirm or deny the [FTC's] holding that it has the authority to issue trade regulation rules" for tobacco. See also H.R. Conf. Rep. No. 91–897, p. 7 (1970), U.S. CodeCong. & Admin.News 1970, pp. 2652, 2679 (statement of House Managers) (we have "no intention to resolve the question as to whether" the FTC could regulate tobacco in a different way); see also 116 Cong. Rec. 7921 (1970) (statement of Rep. Satterfield) (same). Why would one read the FCLAA's pre-emption clause—a provision that Congress intended to limit even in respect to the agency directly at issue—so broadly that it would bar a different agency from engaging in any other cigarette regulation at all? The answer is that the Court need not, and should not, do so. And, inasmuch as the Court already has declined to view the FCLAA as pre-empting the entire field of tobacco regulation, I cannot accept that that same law bars the FDA's regulatory efforts here.

When the FCLAA's narrow pre-emption provision is set aside, the majority's conclusion that Congress clearly intended for its tobacco-related statutes to be the exclusive **\*186** "response" to "the problem of tobacco and health," *ante,* at 1313, is based on legislative silence. Notwithstanding the views voiced by various legislators, Congress itself has addressed expressly the issue of the FDA's tobacco-related authority only once—and, as I have said, its statement was that the statute was *not* to "be construed to affect the question of whether the [FDA] has any authority to regulate any tobacco product." Note following 21 U.S.C. § 321 (1994 ed., Supp. III). The proper inference to be drawn from *all* of the post–1965 statutes, then, is one that interprets Congress' general legislative silence consistently with this statement.

IV

I now turn to the final historical fact that the majority views as a factor in its interpretation of the subsequent legislative

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 247 of 305

history: the FDA's former denials of its tobacco-related authority.

Until the early 1990's, the FDA expressly maintained that the 1938 statute did not give it the power that it now seeks to assert. It then changed its mind. The majority agrees with me that the FDA's change of positions does not make a significant legal difference. See *ante,* at 1313–1314; see also *Chevron,* 467 U.S., at 863, 104 S.Ct. 2778 ("An initial agency interpretation is not instantly carved in stone"); accord, *Smiley v. Citibank (South Dakota), N. A.,* 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("[C]hange is not invalidating"). Nevertheless, it labels those denials "important context" for drawing an inference about Congress' intent. *Ante,* at 1313. In my view, the FDA's change of policy, like the subsequent statutes themselves, does nothing to advance the majority's position.

When it denied jurisdiction to regulate cigarettes, the FDA consistently stated *why* that was so. In 1963, for example, FDA administrators wrote that cigarettes did not satisfy the relevant FDCA definitions **1329 —in particular, the "intent" requirement—because cigarette makers did not sell their product with accompanying "therapeutic claims." *187 Letter to Directors of Bureaus, Divisions and Directors of Districts from FDA Bureau of Enforcement (May 24, 1963), in Public Health Cigarette Amendments of 1971: Hearings on S. 1454 before the Consumer Subcommittee of the Senate Committee on Commerce, 92d Cong., 2d Sess., 240 (1972) (hereinafter FDA Enforcement Letter). And subsequent FDA Commissioners made roughly the same assertion. One pointed to the fact that the manufacturers only "recommended" cigarettes "for smoking pleasure." Two others reiterated the evidentiary need for "health claims." Yet another stressed the importance of proving "intent," adding that "[w]e have not had sufficient evidence" of "intent with regard to nicotine." See, respectively, *id.,* at 239 (Comm'r Edwards); Letter of Dec. 5, 1977, App. 47 (Comm'r Kennedy); 1965 Hearings 193 (Comm'r Rankin); 1994 Hearings 28 (Comm'r Kessler). Tobacco company counsel also testified that the FDA lacked jurisdiction because jurisdiction "depends on ... intended use," which in turn "depends, *in general,* on the claims and representations made by the manufacturer." Health Consequences of Smoking: Nicotine Addiction, Hearing before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce, 100th Cong., 2d Sess., 288 (1988) (testimony of Richard Cooper) (emphasis added).

Other agency statements occasionally referred to additional problems. Commissioner Kessler, for example, said that the "enormous social consequences" flowing from a decision to regulate tobacco counseled in favor of obtaining specific congressional "guidance." 1994 Hearings 69; see also *ante,* at 1311 (quoting statement of Health and Human Services Secretary Brandt to the effect that Congress wanted to make the relevant jurisdictional decision). But a fair reading of the FDA's denials suggests that the overwhelming problem was one of proving the requisite manufacturer intent. See *Action on Smoking and Health v. Harris,* 655 F.2d 236, 238–239 (C.A.D.C.1980) (FDA "comments" reveal its "understanding" *188 that "the crux of FDA jurisdiction over drugs lay in manufacturers' representations as revelatory of their intent").

What changed? For one thing, the FDA obtained evidence sufficient to prove the necessary "intent" despite the absence of specific "claims." See *supra,* at 1321–1322. This evidence, which first became available in the early 1990's, permitted the agency to demonstrate that the tobacco companies *knew* nicotine achieved appetite-suppressing, mood-stabilizing, and habituating effects through chemical (not psychological) means, even at a time when the companies were publicly denying such knowledge.

Moreover, scientific evidence of adverse health effects mounted, until, in the late 1980's, a consensus on the seriousness of the matter became firm. That is not to say that concern about smoking's adverse health effects is a new phenomenon. See, *e.g.,* Higginson, A New Counterblast, in Out-door Papers 179, 194 (1863) (characterizing tobacco as " 'a narcotic poison of the most active class' "). It is to say, however, that convincing epidemiological evidence began to appear mid–20th century; that the first Surgeon General's Report documenting the adverse health effects appeared in 1964; and that the Surgeon General's Report establishing nicotine's addictive effects appeared in 1988. At each stage, the health conclusions were the subject of controversy, diminishing somewhat over time, until recently —and only recently—has it become clear that there is a wide consensus about the health problem. See 61 Fed.Reg. 44701– 44706 (1996).

Finally, administration policy changed. Earlier administrations may have hesitated to assert jurisdiction for the reasons **1330 prior Commissioners expressed. See *supra,* at 1328–1329. Commissioners of the current administration simply took a different regulatory attitude.

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 248 of 305

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000)
120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

Nothing in the law prevents the FDA from changing its policy for such reasons. By the mid–1990's, the evidence **\*189** needed to prove objective intent—even without an express claim—had been found. The emerging scientific consensus about tobacco's adverse, chemically induced, health effects may have convinced the agency that it should spend its resources on this important regulatory effort. As for the change of administrations, I agree with then-Justice REHNQUIST's statement in a different case, where he wrote:

"The agency's changed view ... seems to be related to the election of a new President of a different political party. It is readily apparent that the responsible members of one administration may consider public resistance and uncertainties to be more important than do their counterparts in a previous administration. A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations. As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 59, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (concurring in part and dissenting in part).

## V

One might nonetheless claim that, even if my interpretation of the FDCA and later statutes gets the words right, it lacks a sense of their "music." See *Helvering v. Gregory,* 69 F.2d 809, 810–811 (C.A.2 1934) (L. Hand, J.) ("[T]he meaning of a [statute] may be more than that of the separate words, as a melody is more than the notes ..."). Such a claim might rest on either of two grounds.

First, one might claim that, despite the FDA's legal right to change its mind, its original statements played a critical part in the enactment of the later statutes and now should play a critical part in their interpretation. But the FDA's **\*190** traditional view was largely premised on a perceived inability to prove the necessary statutory "intent" requirement. See, *e.g.,* FDA Enforcement Letter 240 ("The statutory basis for the exclusion of tobacco products from FDA's jurisdiction is the fact that tobacco marketed for chewing or smoking

without accompanying therapeutic claims, does not meet the definitions ... for food, drug, device or cosmetic"). The statement, "we cannot assert jurisdiction over substance X unless it is treated as a food," would not bar jurisdiction if the agency later establishes that substance X is, and is intended to be, eaten. The FDA's denials of tobacco-related authority sufficiently resemble this kind of statement that they should not make the critical interpretive difference.

Second, one might claim that courts, when interpreting statutes, should assume in close cases that a decision with "enormous social consequences," 1994 Hearings 69, should be made by democratically elected Members of Congress rather than by unelected agency administrators. Cf. *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (assuming Congress did not want to delegate the power to make rules interfering with exercise of basic human liberties). If there is such a background canon of interpretation, however, I do not believe it controls the outcome here.

Insofar as the decision to regulate tobacco reflects the policy of an administration, it is a decision for which that administration, and those politically elected officials who support it, must (and will) take responsibility. And the very importance of the decision taken here, as well as its **\*\*1331** attendant publicity, means that the public is likely to be aware of it and to hold those officials politically accountable. Presidents, just like Members of Congress, are elected by the public. Indeed, the President and Vice President are the *only* public officials whom the entire Nation elects. I do not believe that an administrative agency decision of this magnitude—one that is important, conspicuous, and controversial—can escape the kind of public scrutiny that is essential in any democracy. **\*191** And such a review will take place whether it is the Congress or the Executive Branch that makes the relevant decision.

\* \* \*

According to the FDA, only 2.5% of smokers successfully stop smoking each year, even though 70% say they want to quit and 34% actually make an attempt to do so. See 61 Fed.Reg. 44704 (1996) (citing Centers for Disease Control and Prevention, Cigarette Smoking Among Adults—United States, 1993; 43 Morbidity and Mortality Weekly Report 929 (Dec. 23, 1994)). The fact that only a handful of those who try to quit smoking actually succeed illustrates a certain

120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215...

reality—the reality that the nicotine in cigarettes creates a powerful physiological addiction flowing from chemically induced changes in the brain. The FDA has found that the makers of cigarettes "intend" these physical effects. Hence, nicotine is a "drug"; the cigarette that delivers nicotine to the body is a "device"; and the FDCA's language, read in light of its basic purpose, permits the FDA to assert the disease-preventing jurisdiction that the agency now claims.

The majority finds that cigarettes are so dangerous that the FDCA would require them to be banned (a result the majority believes Congress would not have desired); thus, it concludes that the FDA has no tobacco-related authority. I disagree that the statute would require a cigarette ban. But even if I am wrong about the ban, the statute would restrict only the agency's choice of remedies, not its jurisdiction.

The majority also believes that subsequently enacted statutes deprive the FDA of jurisdiction. But the later laws say next to nothing about the FDA's tobacco-related authority. Previous FDA disclaimers of jurisdiction may have helped to form the legislative atmosphere out of which Congress' own tobacco-specific statutes emerged. But a legislative atmosphere is not a law, unless it is embodied in a statutory word or phrase. And the relevant words and phrases here reveal **\*192** nothing more than an intent not to change the jurisdictional status quo.

The upshot is that the Court today holds that a regulatory statute aimed at unsafe drugs and devices does not authorize regulation of a drug (nicotine) and a device (a cigarette) that the Court itself finds unsafe. Far more than most, this particular drug and device risks the life-threatening harms that administrative regulation seeks to rectify. The majority's conclusion is counterintuitive. And, for the reasons set forth, I believe that the law does not require it.

Consequently, I dissent.

## All Citations

529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121, 00 Cal. Daily Op. Serv. 2215, 2000 Daily Journal D.A.R. 2987, 13 Fla. L. Weekly Fed. S 161, 13 Fla. L. Weekly Fed. S 178

Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982)

102 S.Ct. 3245, 1982 A.M.C. 2377, 73 L.Ed.2d 973

KeyCite Yellow Flag - Negative Treatment

Called into Doubt by MORI Associates, Inc. v. U.S., Fed.Cl., December 15, 2011

102 S.Ct. 3245

Supreme Court of the United States

Danny L. GRIFFIN, Petitioner

v.

OCEANIC CONTRACTORS, INC.

No. 81–614.

|

Argued April 26, 1982.

|

Decided June 30, 1982.

**Synopsis**

Seaman sued his former employer for back wages and penalties. The District Court rendered judgment for the seaman, awarding him back wages and a penalty for his period of unemployment. On the seaman's appeal, the United States Court of Appeals for the Fifth Circuit, 664 F.2d 36, affirmed, and certiorari was granted. The Supreme Court, Justice Rehnquist, held that the statute requiring certain masters and vessel owners to pay seamen promptly after their discharge and authorizing seamen to recover double wages for each day that payment is delayed without sufficient cause did not give the district court discretion to limit the period during which the wage penalty is assessed, but imposition of the penalty was mandatory for each day that payment was withheld in violation of the statute.

Reversed and remanded.

Justice Stevens filed a dissenting opinion in which Justice Blackmun joined.

West Headnotes (3)

**[1]**   **Seamen**   Extra wages

Pursuant to statute requiring certain masters and vessel owners to pay seamen promptly after their discharge and authorizing seamen to recover double wages for each day that payment is delayed without sufficient cause, district court had no discretion to limit period during which wage penalty was assessed, but imposition of penalty was mandatory for each day that payment was withheld and could not be limited to period of seaman's unemployment. 46 U.S.C.A. § 596.

70 Cases that cite this headnote

**[2]**   **Seamen**   Extra wages

Pursuant to statute requiring certain masters and vessel owners to pay seamen promptly after their discharge and authorizing seamen to recover double wages for each day that payment is delayed without sufficient cause, district court's entry of judgment for back pay will not toll running of penalty period unless delays beyond that date are explained by sufficient cause. 46 U.S.C.A. § 596.

79 Cases that cite this headnote

**[3]**   **Statutes**   Unintended or unreasonable results;  absurdity

Interpretations of statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available.

1053 Cases that cite this headnote

**\*\*3246   \*564** Syllabus [*]

Title 46 U.S.C. § 596, after obligating the master or owner of a vessel making coasting or foreign voyages to pay a seaman's unpaid wages within specified periods after his discharge, provides that a master or owner who fails to make such payment "without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods." Petitioner, who was injured while working aboard respondent's vessel in foreign waters, brought suit under the Jones Act and general maritime law in Federal District Court after respondent refused to pay his medical expenses and to furnish transportation back to the United States. In addition to damages, petitioner sought to recover penalty wages under § 596 for respondent's failure to pay $412.50 in earned wages

102 S.Ct. 3245, 1982 A.M.C. 2377, 73 L.Ed.2d 973

allegedly due upon discharge. The court found, *inter alia*, that petitioner had been discharged from respondent's employ on the day of the injury, and that respondent's failure to pay petitioner the $412.50 was "without sufficient cause." In assessing the penalty wages at $6,881.60, the court held that "[t]he period during which the penalty runs is to be determined by the sound discretion of the district court and depends on the equities of the case." It determined that the appropriate penalty period was the 34-day period from the date of discharge through the date when petitioner began work for another company. Petitioner appealed the award of damages as inadequate, but the Court of Appeals affirmed.

*Held* : The district courts have no discretion to limit the period during which the wage penalty is assessed. Imposition of **\*\*3247** the penalty is mandatory for each day that payment is withheld in violation of § 596. Pp. 3249–3253.

(a) The words chosen by Congress, given their plain meaning, leave no room for the exercise of discretion either in deciding whether to exact payment or in choosing the period of days by which the payment is to be calculated. After the District Court found that respondent had refused to pay petitioner the balance of his earned wages promptly after discharge and that its refusal was "without sufficient cause," nothing in § 596's language vested the court with discretion to limit the penalty assessment to the period of petitioner's unemployment. Pp. 3249–3250.

**\*565** (b) This is not the type of case where literal application of a statute would thwart its obvious purpose. Section 596's "evident purpose" is "to secure prompt payment of seamen's wages ... and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." *Collie v. Fergusson*, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696. Although the statute's purpose is remedial, Congress has chosen to secure that purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment. The legislative history confirms that Congress intended the statute to mean exactly what its plain language says. Pp. 3250–3252.

(c) Nor is literal application of § 596 in this case precluded on the asserted ground that it would produce an absurd and unjust result which Congress could not have intended. Even though the penalty for respondent's failure to promptly pay the $412.50 in wages—if computed on the basis of the period from petitioner's discharge until the date respondent actually paid the wages by satisfying the District Court's judgment—would be over $300,000, awards made under § 596 were not intended to be merely compensatory. Since the District Court found that respondent's refusal to pay petitioner following his discharge was without sufficient cause, and since it made no finding that respondent's continuing delay in payment beyond the period petitioner was unable to work was for sufficient cause, its decision to limit the penalty was error. *Pacific Mail S.S. Co. v. Schmidt*, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982. Pp. 3252–3253.

5th Cir., 664 F.2d 36, reversed and remanded.

**Attorneys and Law Firms**

*Robert A. Chaffin* argued the cause and filed briefs for petitioner.

*Theodore Goller* argued the cause and filed a brief for respondent.

**Opinion**

Justice REHNQUIST delivered the opinion of the Court.

This case concerns the application of 46 U.S.C. § 596, which requires certain masters and vessel owners to pay seamen promptly after their discharge and authorizes seamen to **\*566** recover double wages for each day that payment is delayed without sufficient cause. The question is whether the district courts, in the exercise of discretion, may limit the period during which this wage penalty is assessed, or whether imposition of the penalty is mandatory for each day that payment is withheld in violation of the statute.

I

On February 18, 1976, petitioner signed an employment contract with respondent in New Orleans, agreeing to work as a senior pipeline welder on board vessels operated by respondent in the North Sea. The contract specified that petitioner's employment would extend "until December 15, 1976 or until Oceanic's 1976 pipeline committal in the North Sea is fulfilled, whichever shall occur first." App. 41. The contract also provided that respondent would pay for transportation to and from the worksite, but that if petitioner quit the job prior to its termination date, or if his services were terminated for cause, he would be charged with the

cost of transportation back to the United States. Respondent reserved the **3248 right to withhold $137.50 from each of petitioner's first four paychecks "as a cash deposit for the payment of your return transportation in the event you should become obligated for its payment." *Id.*, at 47. On March 6, 1976, petitioner flew from the United States to Antwerp, Belgium, where he reported to work at respondent's vessel, the "Lay Barge 27," berthed in the Antwerp harbor for repairs.

On April 1, 1976, petitioner suffered an injury while working on the deck of the vessel readying it for sea. Two days later he underwent emergency surgery in Antwerp. On April 5, petitioner was discharged from the hospital and went to respondent's Antwerp office, where he spoke with Jesse Williams, the welding superintendent, and provided a physician's statement that he was not fit for duty. Williams refused to acknowledge that petitioner's injury was work-related *567 and denied that respondent was liable for medical and hospital expenses, maintenance, or unearned wages. Williams also refused to furnish transportation back to the United States, and continued to retain $412.50 in earned wages that had been deducted from petitioner's first three paychecks for that purpose. Petitioner returned to his home in Houston, Tex., the next day at his own expense. He was examined there by a physician who determined that he would be able to resume work on May 3, 1976. On May 5, petitioner began working as a welder for another company operating in the North Sea.

In 1978 he brought suit against respondent under the Jones Act, § 20, 38 Stat. 1185, as amended, 46 U.S.C. § 688, and under general maritime law, seeking damages for respondent's failure to pay maintenance, cure, unearned wages, repatriation expenses, and the value of certain personal effects lost on board respondent's vessel. Petitioner also sought penalty wages under Rev.Stat. § 4529, as amended, 46 U.S.C. § 596, for respondent's failure to pay over the $412.50 in earned wages allegedly due upon discharge. The District Court found for petitioner and awarded damages totalling $23,670.40.

Several findings made by that court are particularly relevant to this appeal. First, the court found that petitioner's injury was proximately caused by an unseaworthy condition of respondent's vessel. App. 17, ¶ 10; 23, ¶ 6. Second, the court found that petitioner was discharged from respondent's employ on the day of the injury, and that the termination of his employment was caused solely by that injury. *Id.*, at 18, ¶ 16; 23, ¶ 7. [1] Third, it found that respondent's failure to pay petitioner the $412.50 in earned wages was "without

sufficient *568 cause." *Id.*, at 20, ¶ 20; 25, ¶ 11. [2] Finally, the court found that petitioner had exercised due diligence in attempting to collect those wages. *Id.*, at 20, ¶ 21.

In assessing penalty wages under 46 U.S.C. § 596, the court held that "[t]he period during which the penalty runs is to be determined by the sound discretion of the district court and depends on the equities of the case." App. 25, ¶ 11. It determined that the appropriate period for imposition of the penalty was from the date of discharge, April 1, 1976, through the date of petitioner's reemployment, May 5, 1976, a period of 34 days. Applying the statute, it computed a penalty of $6,881.60. [3] Petitioner appealed the award of damages as inadequate.

**3249 The Court of Appeals for the Fifth Circuit affirmed. 664 F.2d 36 (1981). That court concluded, *inter alia*, that the District Court had not erred in limiting assessment of the penalty provided by 46 U.S.C. § 596 to the period beginning April 1 and ending May 5. The court recognized that the statute required payment of a penalty for each day during which wages were withheld until the date they were actually paid, which in this case did not occur until September 17, 1980, when respondent satisfied the judgment of the District Court. *Id.*, at 40; see App. 30. Nevertheless, the court believed itself bound by prior decisions within the Circuit, which left calculation of the penalty period to the sound discretion of the district courts. 664 F.2d, at 40. It concluded *569 that the District Court in this case had not abused its discretion by assessing a penalty only for the period during which petitioner was unemployed.

We granted certiorari to resolve a conflict among the Circuits regarding the proper application of the wage penalty statute. [4] 454 U.S. 1052, 102 S.Ct. 595, 70 L.Ed.2d 587 (1981). We reverse the judgment of the Court of Appeals as to that issue. [5]

II

A

[1] The language of the statute first obligates the master or owner of any vessel making coasting or foreign voyages to pay every seaman the balance of his unpaid wages within specified periods after his discharge. [6] It then provides:

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 (1982)

102 S.Ct. 3245, 1982 A.M.C. 2377, 73 L.Ed.2d 973

**\*570** "Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods...."

The statute in straightforward terms provides for the payment of double wages, depending upon the satisfaction of two conditions. First, the master or owner must have refused or failed to pay the seaman his wages within the periods specified. Second, this failure or refusal must be "without sufficient cause." Once these conditions are satisfied, however, the unadorned **\*\*3250** language of the statute dictates that the master or owner "*shall pay* to the seaman" the sums specified "*for each and every day*" during which payment is delayed. The words chosen by Congress, given their plain meaning, leave no room for the exercise of discretion either in deciding whether to exact payment or in choosing the period of days by which the payment is to be calculated. As this Court described the statute many years ago, it "affords a definite and reasonable procedure by which the seaman may establish his right to recover double pay where his wages are unreasonably withheld." *McCrea v. United States*, 294 U.S. 23, 32, 55 S.Ct. 291, 295, 79 L.Ed. 735 (1935). Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, "that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

**\*571** The District Court found that respondent had refused to pay petitioner the balance of his earned wages promptly after discharge, and that its refusal was "without sufficient cause." Respondent challenges neither of these findings. Although the two statutory conditions were satisfied, however, the District Court obviously did not assess double wages "for each and every day" during which payment was delayed, but instead limited the assessment to the period of petitioner's unemployment. Nothing in the language of the statute vests the courts with the discretion to set such a limitation.

B

Nevertheless, respondent urges that the legislative purpose of the statute is best served by construing it to permit some choice in determining the length of the penalty period. In respondent's view, the purpose of the statute is essentially remedial and compensatory, and thus it should not be interpreted literally to produce a monetary award that is so far in excess of any equitable remedy as to be punitive.

Respondent, however, is unable to support this view of legislative purpose by reference to the terms of the statute. "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Assns., Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). See *Caminetti v. United States*, 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917). Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. We have reserved "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning ... would thwart the obvious purpose of the statute.' " *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (quoting *Helvering v. Hammel*, 311 U.S. 504, 510–511, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941)). This, however, is not the exceptional case.

**\*572** As the Court recognized in *Collie v. Fergusson*, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930), the "evident purpose" of the statute is "to secure prompt payment of seamen's wages ... and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." *Id.*, at 55, 50 S.Ct., at 191. This was to be accomplished "by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." *Id.*, at 55–56, 50 S.Ct., at 191. Thus, although the sure purpose of the statute is remedial, Congress has chosen to secure that purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment.

The legislative history of the statute leaves little if any doubt that this understanding **\*\*3251** is correct. The law owes its origins to the Act of July 20, 1790, ch. 29, § 6, 1 Stat. 133, passed by the First Congress. Although the statute as originally enacted gave every seaman the right to collect the wages due under his contract "as soon as the voyage is ended," it did not provide for the recovery of additional sums to encourage compliance. Such a provision was added by the Shipping Commissioners Act of 1872, ch. 322, § 35, 17 Stat. 269, which provided for the payment of "a sum not exceeding the amount of two days' pay for each of the days,

000253

102 S.Ct. 3245, 1982 A.M.C. 2377, 73 L.Ed.2d 973

not exceeding ten days, during which payment is delayed." The Act of 1872 obviously established a ceiling of 10 days on the period during which the penalty could be assessed and, by use of the words "not exceeding," left the courts with discretion to choose an appropriate penalty within that period. [7]

**\*573** Congress amended the law again in 1898. As amended, it read in relevant part:

"Every master or owner who refuses or neglects to make payment in manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed beyond the respective periods." Act of Dec. 21, 1898, ch. 28, § 4, 30 Stat. 756.

The amending legislation thus effected two changes: first, it removed the discretion theretofore existing by which courts might award less than an amount calculated on the basis of each day during which payment was delayed, and, second, it removed the 10-day ceiling which theretofore limited the number of days upon which an award might be calculated. The accompanying Committee Reports identify the purpose of the legislation as "the amelioration of the condition of the American seamen," and characterize the amended wage penalty in particular as "designed to secure the promptest possible payment of wages." H.R.Rep.No.1657, 55th Cong., 2d Sess., 2, 3 (1898). See also S.Rep.No.832, 54th Cong., 1st Sess., 2 (1896). [8] Nothing in the legislative history of the **\*574** 1898 Act suggests that Congress intended to do anything other than what the Act's enacted language plainly demonstrates: to strengthen the deterrent effect of the statute by removing the courts' latitude in assessing the wage penalty. The statute was amended for the last time in 1915 to increase further the severity of the penalty by doubling the wages due for each day during which payment of earned wages was delayed. Seamen's Act of 1915, ch. 153, § 3, 38 Stat. 1164. There is no suggestion in the Committee Reports or in the floor debates that, in so doing, Congress intended to reinvest the courts with the discretion it had removed in the Act of 1898. Resort to the legislative history, therefore, merely confirms that Congress **\*\*3252** intended the statute to mean exactly what its plain language says.

III

**[2]** Respondent argues, however, that a literal construction of the statute in this case would produce an absurd and unjust result which Congress could not have intended. The District Court found that the daily wage to be used in computing the penalty was $101.20. If the statute is applied literally, petitioner would receive twice this amount for each day after his discharge until September 17, 1980, when respondent satisfied the District Court's judgment. [9] Petitioner would receive **\*575** over $300,000 simply because respondent improperly withheld $412.50 in wages. In respondent's view, Congress could not have intended seamen to receive windfalls of this nature without regard to the equities of the case.

**[3]** It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available. See *United States v. American Trucking Assns., Inc.*, 310 U.S., at 542–543, 60 S.Ct., at 1063; *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940). In refusing to nullify statutes, however hard or unexpected the particular effect, this Court has said:

"Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930).

It is highly probable that respondent is correct in its contention that a recovery in excess of $300,000 in this case greatly exceeds any actual injury suffered by petitioner as a result of respondent's delay in paying his wages. But this Court has previously recognized that awards made under this statute were not intended to be merely compensatory:

"We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." *Collie v. Fergusson*, 281 U.S., at 55–56, 50 S.Ct., at 191.

**\*576** It is in the nature of punitive remedies to authorize awards that may be out of proportion to actual injury; such remedies typically are established to deter particular conduct, and the legislature not infrequently finds that harsh

000254

consequences must be visited upon those whose conduct it would deter. It is probably true that Congress did not precisely envision the grossness of the difference in this case between the actual wages withheld and the amount of the award required by the statute. But it might equally well be said that Congress did not precisely envision the trebled amount of some damages awards in private **\*\*3253** antitrust actions, see *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344–345, 99 S.Ct. 2326, 2333–2334, 60 L.Ed.2d 931 (1979), or that, because it enacted the Endangered Species Act, "the survival of a relatively small number of three-inch fish ... would require the permanent halting of a virtually completed dam for which Congress ha[d] expended more than $1 million," *TVA v. Hill*, 437 U.S. 153, 172, 98 S.Ct. 2279, 2290, 57 L.Ed.2d 117 (1978). It is enough that Congress intended that the language it enacted would be applied as we have applied it. The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this Court. Congress may amend the statute; we may not. See *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S., at 123–124, 100 S.Ct., at 2063–2064; *Reiter v. Sonotone, supra*, at 344–345, 99 S.Ct., at 2333–2334.

Finally, we note that our holding is consistent with *Pacific Mail S. S. Co. v. Schmidt*, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982 (1916). The employer in that case challenged a decision by the Court of Appeals to apply the wage penalty to the delay after the District Court's judgment occasioned by the employer's appeal. The Court held that on the facts of that case, application of the penalty beyond the date of the District Court's judgment was error. Contrary to respondent's assertion, however, the holding does not reflect the discretionary tailoring of the penalty to the equities of the case. Instead, the Court held that the delay pending appeal was not "without sufficient cause," as required by the statute before the penalty can attach. **\*577** *Id.*, at 250, 36 S.Ct., at 582. [10] As we explained earlier, a condition to the imposition of the wage penalty is a finding that the delay in payment is "without sufficient cause." To the extent that the equities of the situation are to be considered, see *Collie v. Fergusson, supra*, they bear on that finding, and not on the calculation of the penalty period once that finding has been made.

### IV

The District Court found that respondent's refusal to pay petitioner earned wages following his discharge was without sufficient cause. It applied the wage penalty only for the period of nonpayment during which petitioner was unable

to work. It made no finding, however, that respondent's continuing delay in payment beyond that period was for sufficient cause. Under the plain language of the statute, therefore, its decision to limit the penalty period was error. The judgment of the Court of Appeals affirming that decision accordingly is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, with whom Justice BLACKMUN joins, dissenting.

In final analysis, any question of statutory construction requires the judge to decide how the legislature intended its enactment to apply to the case at hand. The language of the statute is usually sufficient to answer that question, but "the reports are full of cases" in which the will of the legislature is not reflected in a literal reading of the words it has chosen. [1] In my opinion this is such a case.

**\*578** **\*\*3254** Qualifying language in 46 U.S.C. § 596 supports a much narrower construction than the Court adopts. For over 50 years after the statute's most recent amendment in 1915, federal judges consistently construed it to avoid the absurd result the Court sanctions today. Their reading of the statute was consistent with the specific purposes achieved by the amendments in 1898 and 1915, as well as with the meaning of the statute when an award for unearned wages was first authorized.

### I

On April 1, 1976, petitioner, a welder, suffered a temporarily disabling injury aboard respondent's vessel. On April 5, 1976, petitioner met with respondent's welding superintendent, who refused to acknowledge that respondent was responsible for the injury and who also refused to pay petitioner $412.50 in earned wages. Petitioner fully recovered from the injury by May 3, 1976, and two days later obtained comparable work with another employer. He filed this action on February 3, 1978. It is now settled that respondent was responsible for petitioner's injury and that respondent wrongfully refused to pay him $412.50 on April 5, 1976.

The question of statutory construction that is before us is what "sum shall be recoverable as wages" to compensate petitioner for respondent's refusal to pay him $412.50 on April 5, 1976.

46 U.S.C. § 596.[2] The District Court computed that sum by doubling his daily wage of $101.20 and multiplying **\*579** that amount by 34—the number of days between the injury on April 1 and petitioner's reemployment on May 5, 1976. The District Court's award thus amounted to $6,881.60.[3] This Court holds that the sum recoverable as wages amounts to at least $302,790.40.[4]

## II

In pertinent part, § 596 provides as follows:

> "Every master or owner who refuses or neglects to make payment [of a seaman's earned wages within four days after the seaman's discharge] without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the [4-day period], *which sum shall be recoverable as wages* in any claim made before the court...."[5] (Emphasis added.)

The text of the statute admittedly supports the construction given it by the Court—if there was not sufficient cause for the refusal to make payment within four days of the discharge, then the seaman is entitled to double wages for the entire period between the fourth day and the date the payment is finally made. The statute, however, is susceptible of another interpretation. Indeed, for a half century following its latest amendment the federal courts, including this Court, **\*580** consistently exercised some discretion in determining the sum recoverable as wages under this section.

### A

In fixing the amount of the award of double wages, the District Court in this case may have reasoned that respondent had sufficient cause for its delay in paying the earned wages after petitioner obtained employment with another shipmaster, but **\*\*3255** that there was not sufficient cause for its failure to make payment before that time. Although this reasoning conflicts with a literal reading of § 596, it is perfectly consistent with this Court's contemporary construction of the statute in *Pacific Mail S. S. Co. v. Schmidt*, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982 (1916).. The teaching of Justice Holmes' opinion for the Court in that case is that the wrongful character of the initial refusal to pay does not mean that

all subsequent delay in payment is also "without sufficient cause" within the meaning of the statute.

The controversy in *Pacific Mail* arose in 1913, when the statute provided that the sum recoverable as wages was measured by one day's pay, rather than double that amount, for each day that the wages were withheld without sufficient cause; the statute was otherwise exactly as it is today. The seaman was discharged on October 1, 1913, but $30.33 was withheld from his wages because he was believed responsible for the loss of some silverware. He filed an action on October 20, 1913, and on November 5, 1913, obtained a judgment for his wages and an additional sum of $151.59, representing the sum recoverable as wages for the period between October 1 and November 5, 1913. The District Court's decree established the proposition that the vessel owner's defenses did not constitute sufficient cause for refusing to pay the wages and requiring the seaman to sue to recover them.

The vessel owner prosecuted an unsuccessful appeal. The Court of Appeals not only affirmed the decision of the District Court, but also added an additional recovery of daily wages for the period between the entry of the original judgment **\*581** on November 5 and the actual payment of the disputed wages. The Court of Appeals thus read the statute literally and ordered the result that the District Court's finding seemed to dictate. This Court, however, set aside the additional recovery, reaching a conclusion that cannot be reconciled with a wooden, literal reading of the statute. Concurrent findings of the District Court and the Court of Appeals established that the refusal to make the wage payment when due was without sufficient cause. Justice Holmes and his Brethren accepted that finding for purposes of decision, but reasoned that there was sufficient cause for the owner's decision to appeal and his refusal to pay while the appeal was pending.

The curious character of this Court's conclusion that reasons insufficient to justify the refusal to pay before the trial court's decision somehow became sufficient to justify a subsequent refusal to pay is not the most significant point to Justice Holmes' opinion. The case is primarily significant because its holding cannot be squared with a literal reading of the statute.[6] Even though the initial refusal is without sufficient cause, statutory wages are not necessarily recoverable for the entire period until payment is made either to the seaman or to a stakeholder.[7] A subsequent event— **\*\*3256** even **\*582** though not expressly mentioned in the statute itself—may foreshorten the recovery period.

In *Pacific Mail* the subsequent event was the vessel owner's decision to appeal. The finding that that event provided sufficient cause for the delay after November 5, 1913, was made *sua sponte* by this Court. In this case the subsequent event was the reemployment of petitioner in a comparable job on May 5, 1976. The finding that that event—coupled with the failure to make any additional demand for almost two years thereafter—was sufficient cause for the delay after May 5, 1976, was made by the District Court. It is true that the judge did not expressly frame his decision in these terms, but his actual decision fits precisely the mold established by *Pacific Mail.* Both cases give a flexible reading to the "sufficient cause" language in the statute. They differ with respect to the nature of the subsequent event but not with respect to their departure from the statutory text. [8]

### B

The second case in which this Court construed § 596, *Collie v. Ferguson*, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930), also focused on the meaning of the phrase "without sufficient cause." In that case the unpaid seamen claimed that the financial necessities of the owner could not constitute sufficient cause for delay in wage payments; that contention was surely consistent with the plain language of the statute. This Court nevertheless denied recovery, construing the statute as implicitly containing a requirement that the refusal be "in some sense arbitrary or **\*583** wilful, or at least a failure not attributable to impossibility of payment." *Id.*, at 55, 50 S.Ct., at 191. The Court adopted this nonliteral construction of the statute because it recognized the significance of the provision that a seaman's double-wage claim "shall be recoverable as wages in any claim made before the Court." See *id.*, at 54, 50 S.Ct., at 190. In any proceeding arising out of the insolvency of the vessel owner, this provision accords this type of claim priority over general creditors and various lienors who have stronger equitable claims on limited assets. The construction of the words "without sufficient cause" to narrow the protection of the statute was consistent with the intent of Congress even though it involved a rather flexible reading of the text of the statute itself. [9]

This Court's third occasion to interpret § 596 was *McCrea v. United States*, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735 (1935), and, once again, the Court construed the statute narrowly, this time by taking a literal approach. In that case

the seaman, citing specific sections of federal legislation, demanded from the shipmaster his discharge, his earned wages, and other benefits. The master was unfamiliar with the cited sections and asked the seaman to meet with him at noon the next day for an informed discussion of the demands. The seaman missed the appointment and left the country without contacting the master. After his return to the United States, the seaman filed an action in which he claimed entitlement to, *inter alia*, his earned wages and double wages for the delay in payment. The District Court, affirmed by the Court of Appeals, held that the owner of the ship, the United States, was immune from the double-wage provision of § 596 because the double wages constituted **\*584** a penalty. This Court granted the seaman's petition for certiorari, but avoided decision of the sovereign immunity question by **\*\*3257** holding that there was sufficient cause for the failure of the shipmaster to make the wage payment within four days of the seaman's discharge. The Court then rejected the seaman's rather reasonable argument that even if the shipmaster had cause to withhold payment during those four days, there was not sufficient cause for the continued refusal once the seaman filed his action and formally made his demand for earned wages. The Court, without citing *Pacific Mail*, held that if the master's failure to pay earned wages at the time specified in the statute was justified by sufficient cause, the fact that he later refused to pay pursuant to a proper demand could not give rise to statutory liability even though there was no sufficient cause for the subsequent refusal.

These early interpretations of § 596 dispel any notion that the statute means exactly what it says. The Court has construed the statute "to effect its purpose," *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952), and, as the early cases demonstrate, the purpose of the statute does not always require the award of double wages in the amount that the statute literally specifies.

### C

Flexibility also has characterized the applications of the statute rendered by the lower federal courts. For decades those courts consistently concluded that Congress intended to allow judicial discretion to play a part in determining the amount of the double-wage recovery. [10] Whether those decisions **\*585** were entirely consistent with the meaning a grammarian might have placed on the statute is less significant **\*\*3258** than the fact that they were entirely consistent with this Court's **\*586** decisions and with one another, [11] and the

fact that their holdings must have come to the attention of Congress.

It was not until 1966 that a contrary reading of the statute was adopted by the Third Circuit in *Swain v. Isthmian Lines, Inc.*, 360 F.2d 81, [12] and another eight years before that case was followed in another Circuit. [13] I cannot deny that there is wisdom in the rule of construction that mandates close adherence to literal statutory text, [14] but it is also true that a consistent course of judicial construction can become as much a part of a statute as words inserted by the legislature itself. The construction consistently followed by the federal judiciary between 1898 and 1966 was presumably acceptable to Congress, and I find this more persuasive than the literal reading on which the Court places its entire reliance. [15] Moreover, since the result that construction produces in this case is both absurd and palpably unjust, this is one of the cases in which the exercise of judgment dictates a departure from the literal text in order to be faithful to the legislative will. [16]

### *587   III

The construction permitting the district court to exercise some discretion in tailoring the double-wage award to the particular equities of the case is just as consistent with the legislative history of § 596 as the Court's new literal approach to this statute. In 1872, when Congress authorized the recovery of additional wages by seamen who were not paid within five days of their discharge, it used the word "shall" to make it clear that such a recovery must be awarded, but it allowed the district courts a limited discretion in setting the amount of such recovery. [17] The judge's discretion as to amount was limited in two ways: (1) the statutory wage rate could not be more than double the amount of the seaman's daily wage; and (2) the period for which the statutory wage could be awarded could not exceed 10 days.

**3259 Subsequent amendments to the statute did not remove the requirement that some recovery "shall" be awarded, but did modify both of the limits on the judge's discretion. With respect to the wage rate, Congress first specified that it should *588 equal the daily rate—rather than double the daily rate—and later specified that the rate should be the double rate. [18] With respect to the period for which the statutory wage was payable, the 1898 amendment simply removed the 10-day limit. This amendment is subject

to two different interpretations, one that would represent a rather unremarkable change and the other that would be both drastic and dramatic.

The unremarkable change would amount to nothing more than a removal of the narrow 10-day limit on the scope of the judge's discretion. The word "shall" would continue to do nothing more than require some recovery in an amount to be fixed by the judge, but in recognition of the reality that seamen might be stranded for more than 10 days, the recovery period could extend beyond 10 days. This sort of unremarkable change is consistent with the purpose of the statute, [19] as *589 well as with a legislative history that fails to make any comment on its significance. As Justice REHNQUIST has perceptively observed in another context, the fact that the dog did not bark can itself be significant. [20]

The Court's construction of the amendment is, however, both drastic and dramatic. Instead of effecting a modest enlargement of the judge's discretion to do justice in these cases, the Court's construction effects a complete prohibition of judicial discretion. Instead of permitting recoveries for a period somewhat longer than 10 days, the amendment is construed as a command that even when the unresolved dispute persists for two or three years without any special hardship to the seaman, an automatic recovery must be ordered for the entire period regardless of the equitable considerations that may arise after the shipmaster's initial mistake has been made. Such a major change in both the potential amount of the statutory recovery and the character of the judge's authority would normally be explained in the commitee reports or the debates if it had been intended. [21]

### *590   **3260   IV

It is ironic that the same seven Justices—who today are transfixed by a literal reading of § 596—only a few days ago blithely ignored the text of the Tax Injunction Act in order to reach the conclusion that a federal court has no jurisdiction to entertain a suit for a declaratory judgment against the United States Secretary of Labor to determine whether a federal statute violates the Federal Constitution. *California v. Grace Brethren Church*, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982). The inconsistency in the Court's approach to the task of statutory construction in these two cases is less troublesome, however, than its failure in each case to consider whether its conclusion could reasonably be

thought to represent the will of Congress. I am not persuaded that the 1898 amendment, removing the 10-day limit on the scope of the trial judge's discretion, was intended to be read as a command to award $302,790.40 to a seaman who was not paid $412.50 in wages when due.

I respectfully dissent.

**All Citations**

458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973, 1982 A.M.C. 2377

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     According to respondent, petitioner was not formally discharged until June 1, 1976, but his termination was made retroactive to April 1. Brief for Respondent 5.

2     The court also found:

      "Defendant did not begin a thorough investigation of plaintiff's claim until September 30, 1976. The investigation was not made with reasonable diligence. Defendant's failure to pay maintenance and cure, repatriation expenses, the cost of his personal effects, and earned and unearned wages to plaintiff constituted arbitrary, unreasonable, callous, and willful disregard of plaintiff's rights." App. 20, ¶ 21.

3     The court found that the daily wage rate to be used in calculating the penalty was $101.20. In accordance with the statute, the court assessed a penalty of twice this rate ($202.40) for each of the 34 days of the penalty period.

4     The Courts of Appeals for the Third and Ninth Circuits have interpreted the statute to mandate imposition of the penalty for each day until the wages are paid and to leave no room for the district court's exercise of discretion. *Swain v. Isthmian Lines, Inc.*, 360 F.2d 81 (CA3 1966); *Larkins v. Hudson Waterways Corp.*, 640 F.2d 997 (CA9 1981); *Thomas v. SS Santa Mercedes*, 572 F.2d 1331 (CA9 1978). The Courts of Appeals for the First, Second, and Fourth Circuits have adopted the interpretation followed by the Fifth Circuit. *Mavromatis v. United Greek Shipowners Corp.*, 179 F.2d 310 (CA1 1950); *Forster v. Oro Navigation Co.*, 228 F.2d 319 (CA2 1955), aff'g 128 F.Supp. 113 (SDNY 1954); *Southern Cross S.S. Co. v. Firipis*, 285 F.2d 651 (CA4 1960), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961). We noted this conflict in *American Foreign S.S. Co. v. Matise*, 423 U.S. 150, 152, n. 1, 96 S.Ct. 410, 412 n. 1, 46 L.Ed.2d 354 (1975).

5     Petitioner has not questioned the other holdings of the Court of Appeals in his case. Respondent did not appeal from the judgment of the District Court and has not cross-petitioned for certiorari here.

6     The statute reads in full:

      "The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts."

7     The Act of 1790 and the Act of 1872 provided the basis for § 4529 of the Revised Statutes, codified in 1878. Section 4529 read as follows:

> "The master or owner of every vessel making voyages from a port on the Atlantic to a port on the Pacific, or vice versa, shall pay to every seaman his wages, within two days after the termination of the agreement, or at the time such seaman is discharged, whichever first happens; and, in the case of vessels making foreign voyages, within three days after the cargo has been delivered, or within five days after the seaman's discharge, whichever first happens; and in all cases the seaman shall, at the time of his discharge, be entitled to be paid, on account, a sum equal to one-fourth part of the balance due him. Every master or owner who neglects or refuses to make payment in manner hereinbefore mentioned, without sufficient cause, shall pay to the seaman a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which payment is delayed beyond the respective periods; which sum shall be recoverable as wages in any claim made before the court. But this section shall not apply to the masters or owners of any vessel the seamen on which are entitled to share in the profits of the cruise or voyage."

8   The 1898 Act was substantially identical to legislation that had passed the House in the previous Congress, and had been favorably reported in the Senate, but had failed to come to a vote before the end of the session. Thus, the House Report of the legislation enacted in 1898 contained little more than a reproduction of the House Report of the previous Congress, and the relevant Senate Report also dates from that Congress.

9   Respondent assumes that the penalty would run until September 17, 1980, since that was the date on which it finally paid petitioner the $412.50. Brief for Respondent 17. Petitioner, on the other hand, apparently assumes that the penalty period expired on May 6, 1980, the date of the District Court's judgment. Brief for Petitioner 19. Under our construction of the statute, the District Court's entry of judgment will not toll the running of the penalty period unless delays beyond that date are explained by sufficient cause. See *Pacific Mail S.S. Co. v. Schmidt*, 241 U.S. 245, 250–251, 36 S.Ct. 581, 582–583, 60 L.Ed. 982 (1916) (holding that when an appeal is taken on reasonable grounds, the penalty should not apply to delays in payment beyond the date on which the district court's decree is entered, since those delays are supported by sufficient cause). The Court of Appeals for the Fourth Circuit, in *Southern Cross S.S. Co. v. Firipis*, 285 F.2d at 660, and the Court of Appeals for the Third Circuit in *Swain v. Isthmian Lines, Inc.*, 360 F.2d at 88, n. 26, have interpreted this Court's decision in *Pacific Mail* to permit the employer to toll the running of the penalty period by placing in the hands of the court the allegedly unlawfully withheld wages.

10   The Court found that the employer "had strong and reasonable ground for believing that the statute ought not to be held to apply," 241 U.S., at 250, 36 S.Ct., at 582, because the work for which the seaman claimed unpaid wages did not occur during a voyage and was the result of an oral contract.

1   "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." *Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

2   The statute is quoted in full, *ante*, at 3249, n. 6.

3   The Court of Appeals held that the award did not constitute an abuse of discretion. 664 F.2d 36, 40 (CA5 1981).

4   This figure is computed by reference to the period between April 1, 1976 (date of discharge), and May 6, 1980 (date of judgment). But see *ante*, at 3252, n. 9.

5   The Court omits the italicized clause of the statute when it quotes the statute in the text of its opinion. *Ante*, at 3249 and 3251. Because wage claims, unlike penalties, have consistently been accorded a high priority in insolvency proceedings against employers, it seems to me the clause is pertinent to our task of discerning the intent of Congress in authorizing an award of double wages. See also *infra*, at 3256.

6   In a petition for rehearing, after pointing out that the Court had adopted an interpretation of the statute that had not been urged in any of the briefs or in any of the opinions of the lower courts, the seaman argued:

> "According to the grammatical, natural and unambiguous meaning conveyed by the words of section 4529, R.S., Congress has limited the running of penalties only by a 'sufficient cause' for original non-payment of earned wages —a sufficient cause operating to prevent penalties from ever beginning to accrue; once these penalties begin to run,

nothing short of actual payment or tender can suffice to prevent the continuous accrual of the per diem penalties." Pet. for Rehearing, O.T. 1915, No. 323, p. 5.

7    Petitioner argues that literal application of § 596 will not yield harsh results because the shipmaster may toll the period of delay by tendering the disputed wage claim into the registry of the court. Brief for Petitioner 27. In petitioner's words, the master may make a "constructive payment of wages." *Id.*, at 28. The Court seems to accept this argument. See *ante*, at 3252, n.9. Neither petitioner nor the Court seems to recognize that acceptance of this minimal tolling rule conflicts with a literal reading of the statute. A tender of wages to the court is a "constructive payment of wages" only because a court has added that reasonable gloss to the statute.

8    If the Court today were to read *Pacific Mail* as requiring that the subsequent-event finding be made expressly, I would either follow Justice Holmes' lead by making a comparable finding in this Court or I would remand to the District Court for additional findings on this issue.

9    The District Court's finding of arbitrariness in this case—which, in view of the holding in *Collie*, was necessary if any penalty wage were to be recovered—must be read in the context of its actual award. It was not clearly erroneous to find that the refusal to pay petitioner $412.50 was arbitrary while he was unemployed; it surely was not equally arbitrary during the ensuing 2-year period when he was employed by a competitor and did not renew his demand.

10    See *Mystic S.S. Co. v. Stromland*, 20 F.2d 342, 344 (CA4) ( "The District Court, by limiting the right of recovery to 10 days after the libel was filed, in effect placed a limitation on the amount of the recovery under the statute. Was there objection to this? We think not"), rehearing denied, 21 F.2d 607 (1927), cert. denied, 276 U.S. 618, 48 S.Ct. 213, 72 L.Ed. 734 (1928); *Mavromatis v. United Greek Shipowners Corp.*, 179 F.2d 310, 316 (CA1 1950) ("The language of § 596 has been given a somewhat free reading so as to accord to the courts a considerable margin of discretion in adjusting the duration of the penalty to the equities of the particular case"); *Prindes v. S.S. African Pilgrim*, 266 F.2d 125, 128 (CA4 1959) ("The period during which the penalty accumulates is to be determined by the equities of the particular case"); *Southern Cross SS Co. v. Firipis*, 285 F.2d 651, 658 (CA4 1960) ("With regard to liability for double pay, a doctrine had developed before the McCrea case, and has continued to the present time, that the District Court has a measure of discretion through the application of equitable principles in determining the number of days for which double wages should be assessed"), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961); *Caribbean Federation Lines v. Dahl*, 315 F.2d 370, 374 (CA5) ( "The time for which the penalty provision runs rests within the sound discretion of the court and depends upon the equities of the case"), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963); *McConville v. Florida Towing Corp.*, 321 F.2d 162, 168, n. 11 (CA5 1963) ("The Court has wide equitable discretion in fixing the time for which the penalty provision runs"); *The Chester*, 25 F.2d 908, 911 (Md.1928) ("[I]n spite of the seeming rigidity of the statute, there is still left to the courts certain discretionary power to limit the penalties"); *The Victoria*, 76 F.Supp. 54, 56 (SDNY 1947) ("In spite of the seeming rigidity of the statute, the court still has discretionary power to limit the penalties"), rev'd on other grounds, 172 F.2d 434 (CA2 1949); *Forster v. Oro Navigation Co.*, 128 F.Supp. 113, 116 (SDNY 1954) ("The number of days for which the defendant must pay double wages rests in the discretion of the court and depends on the equities of the particular case"), aff'd, 228 F.2d 319 (CA2 1955); *Samad v. The Etivebank*, 134 F.Supp. 530, 542 (ED Va.1955) ( "The number of days for which respondents must pay double wages rests in the discretion of the Court and depends upon the equities of the particular case"); *Spero v. Steamship The Argodon*, 150 F.Supp. 1, 6 (ED Va.1957) ( "It is well settled that the number of days for which respondents must pay double wages rests in the discretion of the Court and depends upon the equities of the particular case"); *Kontos v. SS Sophie C.*, 236 F.Supp. 664, 674 (ED Pa.1964) ("Although the penalty is applicable, its duration seems to be committed to the discretion of the trial judge to tailor to the equities of the particular case"); *Ventiadis v. C. J. Thibodeaux & Co.*, 295 F.Supp. 135, 138 (SD Tex.1968) (" 'The time for which the penalty provision runs rests within the sound discretion of the court and depends upon the equities of the case' "); see also *Swanson v. Torry*, 25 F.2d 835 (CA4 1928); *The Lake Galewood*, 21 F.2d 987 (Md.1927), aff'd, 25 F.2d 1020 (CA4), cert. denied, 278 U.S. 637, 49 S.Ct. 33, 73 L.Ed. 553 (1928).

11    See *Southern Cross SS Co. v. Firipis, supra*, at 655–658.

12    See 360 F.2d, at 85 ("Despite this rather precise statutory directive, of those cases which we have uncovered, where the question—whether Section 596 of the statute may still be read with a measure of judicial discretion when supposed equitable considerations present themselves—was considered, all have found proper the balancing of the statutory language with a judicial sense of the equities of each case.").

13    See *Escobar v. SS Washington Trader*, 503 F.2d 271, 274 (CA9 1974), vacated and remanded on other grounds *sub nom. American Trading Transportation Co. v. Escobar*, 423 U.S. 1070, 96 S.Ct. 852, 47 L.Ed.2d 80 (1976).

14    See, most recently, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 322–335, 102 S.Ct. 1798, 1808–1815, 72 L.Ed.2d 91 (1982) (STEVENS, J., dissenting).

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 262 of 305

102 S.Ct. 3245, 1982 A.M.C. 2377, 73 L.Ed.2d 973

15    This Court based its interpretation of "sufficient cause" in *Collie v. Ferguson*, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930), in part upon "the conclusion reached with practical unanimity by the lower federal courts." *Id.*, at 56, 50 S.Ct., at 191.

16    "The Court has had several occasions within the last few years to construe statutes in which conflicts between reasonable intention and literal meaning occurred. We have refused to nullify statutes, however hard or unexpected the particular effect, where unambiguous language called for a logical and sensible result. Any other course would be properly condemned as judicial legislation. However, to construe statutes so as to avoid results glaringly absurd, has long been a judicial function. Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court to give expression to the intendment of the law." *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 332–333, 59 S.Ct. 191, 199–200, 83 L.Ed. 195 (1938) (footnotes omitted).

17    The 1872 version of § 596 provided in pertinent part:

     "[E]very master or owner who neglects or refuses to make payment [of a seaman's earned wages within five days after the seaman's discharge] without sufficient cause shall pay to the seaman a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which payment is delayed beyond the [five-day period]; and such sum shall be recoverable as wages in any claim made before the court ...." Act of June 7, 1872, ch. 322, § 35, 17 Stat. 269.

18    The 1898 version of § 596 provided in pertinent part:

     "Every master or owner who refuses or neglects to make payment [of a seaman's earned wages within four days of the seaman's discharge] without sufficient cause shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed beyond the [four-day period], which sum shall be recoverable as wages in any claim made before the court ...." Act of Dec. 21, 1898, § 4, 30 Stat. 756.

     The 1915 amendment substituted "two days' pay" for "one day's pay." See Act of Mar. 4, 1915, § 3, 38 Stat. 1164–1165.

19    Justice Cardozo, while a member of the New York Court of Appeals, explained the purpose of the statute:

     "The purpose, or at least the predominant one, was, not punishment of the master or owner, but compensation to the seaman. Delay means loss of opportunity to ship upon another vessel. It means hardship during the term of waiting, the sufferer often improvident, and stranded far from home. 'In all fairness he should recover more than the amount due him for wages earned' (*Calvin v. Huntley*, 178 Mass. 29, 32, 59 N.E. 435)." *Cox v. Lykes Brothers*, 237 N.Y. 376, 379, 143 N.E. 226, 227 (1924).

     The District Court's award in this case, tolling the period for computing the double wages on the date petitioner obtained employment with another seagoing vessel, was also perfectly consistent with the statutory purpose.

20    *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 602, 100 S.Ct. 1889, 1902, 64 L.Ed.2d 525 (1980) (dissenting opinion); cf. A. Conan Doyle, Silver Blaze, in The Complete Sherlock Holmes 383 (1938).

21    The House Report's description of the 1898 amendment was that it "increases from one-fourth to one-third the amount of balance of wages due the seaman, to which he is entitled immediately upon discharge, and, in general, provides for prompter payment of wages of seamen." H.R.Rep.No.1657, 55th Cong., 2d Sess., 3 (1898). It is noteworthy that the first change described, respecting the part of the seaman's wages to which he is entitled at the time of his discharge in every case, is rather trivial. See the full text of the statute, *ante*, at 3249, n. 6. And the description of the provision for prompter payment of wages most likely refers to the amendment of the time period during which the shipmaster had to pay the seaman his full wages in order to avoid the double-wage provision of § 596. In the cases of seamen of vessels making foreign voyages, the time period was changed from five days in 1872, see n. 17, *supra*, to four days in 1898, see n. 18, *supra*.

---

    **End of Document**            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

KeyCite Yellow Flag - Negative Treatment

Superseded by Statute as Stated in In re MF Global Holdings Ltd.,
Bankr.S.D.N.Y., April 24, 2020

132 S.Ct. 1882
Supreme Court of the United States

Lynwood D. HALL, et ux., Petitioners

v.

UNITED STATES.

No. 10–875.
|
Argued Nov. 29, 2011.
|
Decided May 14, 2012.

**Synopsis**

**Background:** Chapter 12 debtors proposed plan of
reorganization, under which they sought to pay off their
outstanding liabilities using proceeds from sale of their farm
and to pay capital gains tax obligation arising from the
postpetition sale of their farm pro rata with other general
unsecured debts. The Bankruptcy Court, Eileen W. Hollowell,
J., 376 B.R. 741, sustained Internal Revenue Service's (IRS's)
objection to plan, and debtors appealed. The United States
District Court for the District of Arizona, David C. Bury, J.,
393 B.R. 857, reversed. Government appealed. The United
States Court of Appeals for the Ninth Circuit, Diarmuid
F. O'Scannlain, Circuit Judge, 617 F.3d 1161, reversed.
Certiorari was granted.

**[Holding:]** The Supreme Court, Justice Sotomayor, held
that capital gains tax liability arising from postpetition
sale of debtors' farmland was not tax liability "incurred
by the estate," within meaning of administrative expense
provision, as required for debtors to strip federal government's
corresponding tax claim of its priority; abrogating Knudsen v.
IRS, 581 F.3d 696.

Court of Appeals affirmed.

Justice Breyer dissented and filed opinion, in which Justices
Kennedy, Ginsburg, and Kagan joined.

West Headnotes (8)

**[1]**   **Bankruptcy**  ⟜ Governmental claims; taxes,
etc

**Bankruptcy**  ⟜ Governmental Claims; Taxes

**Bankruptcy**  ⟜ Discharge

**Bankruptcy**  ⟜ Contents; pre-confirmation
modification

Capital gains tax liability arising from
postpetition sale of farmland of Chapter 12
debtors was not tax liability "incurred by
the estate," within meaning of administrative
expense provision, as required for debtors to
strip federal government's corresponding tax
claim of its priority, to pay it pro rata with
other general unsecured claims, and to discharge
any remaining obligation to government under
priority-stripping provision added to the Code by
the Bankruptcy Abuse Prevention and Consumer
Protection Act (BAPCPA); abrogating Knudsen
v. IRS, 581 F.3d 696. 11 U.S.C.A. §§ 503(b)(1)
(B)(i), 1222(a)(2)(A).

15 Cases that cite this headnote

**[2]**   **Bankruptcy**  ⟜ Governmental claims; taxes,
etc

Tax "incurred by the estate," within meaning
of administrative expense provision, is tax for
which the estate itself is liable. 11 U.S.C.A. §
503(b)(1)(B)(i).

2 Cases that cite this headnote

**[3]**   **Internal Revenue**  ⟜ Receivers, trustees in
bankruptcy or assignees

**Internal Revenue**  ⟜ Persons required to
make

Chapter 12 estates are not taxable entities;
petitioners, not estate itself, are required to file
tax return and are liable for taxes resulting from
postpetition sale of debtors' farm. 26 U.S.C.A. §
1399.

3 Cases that cite this headnote

Hall v. U.S., 566 U.S. 506 (2012)

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 264 of 305

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

**[4]**  **Statutes**  Prior or existing law in general

Court assumes that Congress is aware of existing law when it passes legislation.

13 Cases that cite this headnote

**[5]**  **Statutes**  Similarity or difference

Identical words and phrases within same statute should normally be given same meaning.

8 Cases that cite this headnote

**[6]**  **Bankruptcy**  Governmental claims; taxes, etc

**Bankruptcy**  Governmental Claims; Taxes

Phrase "incurred by the estate," as used in statute according administrative expense priority to certain tax obligations incurred by the estate, did not have merely a temporary meaning, as signifying any tax incurred postpetition, without regard to whether estate was liable therefor. 11 U.S.C.A. § 503(b)(1)(B)(i).

4 Cases that cite this headnote

**[7]**  **Bankruptcy**  Governmental claims; taxes, etc

**Bankruptcy**  Governmental Claims; Taxes

It was not enough, in order for taxes to be entitled to administrative expense priority as taxes "incurred by the estate," that Chapter 12 debtors might pay taxes using estate funds generated from postpetition sale of their farm, if tax debt, arising from sale of debtors' farm, was liability of debtors rather than of the estate. 11 U.S.C.A. § 503(b)(1)(B)(i).

12 Cases that cite this headnote

**[8]**  **Constitutional Law**  Particular Issues and Applications

While there might be compelling policy reasons for treating postpetition income tax liability arising from sale of Chapter 12 debtors' farmland as dischargeable, it was up to Congress, if it intended that result, to so provide in statute; it

was not for court to rewrite statute to accomplish that result, particularly in complex terrain of interconnected provisions and exceptions enacted over nearly three decades. 11 U.S.C.A. §§ 503(b)(1)(B)(i), 1222(a)(2)(A).

8 Cases that cite this headnote

**\*\*1883**  *Syllabus* [*]

Chapter 12 of the Bankruptcy Code allows farmer debtors with regular annual income to adjust their debts subject to a reorganization plan. The plan must provide for full payment of priority claims. 11 U.S.C. § 1222(a)(2). Under § 1222(a)(2)(A), however, certain governmental claims arising from the disposition of farm assets are stripped of priority status and downgraded to general, unsecured claims that are dischargeable after less than full payment. That exception applies only to claims "entitled to priority under [11 U.S.C. § 507]" in the first place. As relevant here, § 507(a)(2) covers "administrative expenses allowed under § 503(b)," which includes "any tax ... incurred by the estate." § 503(b)(1)(B)(i).

Petitioners filed for Chapter 12 bankruptcy and then sold their farm. They proposed a plan under which they would pay off outstanding liabilities with proceeds from the sale. The Internal Revenue Service (IRS) objected, asserting a tax on the capital gains from the sale. Petitioners then proposed treating the tax as an unsecured claim to be paid to the extent funds were available, with the unpaid balance being discharged. The Bankruptcy Court sustained an IRS objection, the District Court reversed, and the Ninth Circuit reversed the District Court. The Ninth Circuit held that because a Chapter 12 estate is not a separate taxable entity under the Internal Revenue Code (IRC), 26 U.S.C. §§ 1398, 1399, it does not "incur" postpetition federal income taxes. The Ninth Circuit concluded that because the tax was not "incurred by the estate" under § 503(b), it was not a priority claim eligible for the § 1222(a)(2)(A) exception.

*Held:* The federal income tax liability resulting from petitioners' postpetition farm sale is not "incurred by the estate" under § 503(b) of the Bankruptcy Code and thus is neither collectible nor dischargeable in the Chapter 12 plan. Pp. 1886 – 1893.

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

(a) The phrase "incurred by the estate" bears a plain and natural reading. A tax "incurred by the estate" is a tax for which the estate itself is liable. Only certain estates are liable for federal income taxes. IRC §§ 1398 and 1399 define the division of responsibilities for the payment of taxes between the estate and the debtor on a chapter-by-chapter basis. Under those provisions, a Chapter 12 estate is not a separately taxable entity. The debtor—not the trustee—is generally liable for taxes and files the only tax return. The **1884 postpetition income taxes are thus not "incurred by the estate." Pp. 1886 – 1887.

(b) Section 346 of the Bankruptcy Code and its longstanding interplay with IRC §§ 1398 and 1399 reinforce that whether an estate "incurs" taxes turns on Congress' chapter-specific guidance on which estates are separately taxable. The original § 346 established that state or local income taxes could be imposed only on the estate in an individual-debtor Chapter 7 or 11 bankruptcy, and only on the debtor in a Chapter 13 bankruptcy. Congress applied the framework of § 346 to federal taxes two years later: IRC § 1398 and 1399 established that the estate is separately taxable in individual-debtor Chapter 7 or 11 cases, and not separately taxable in Chapter 13 (and now Chapter 12) cases. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 subsequently amended § 346, expressly aligning its assignment of state or local taxes with the IRC separate taxable entity rules for federal taxes. This Court assumes that Congress is aware of existing law when it passes legislation, and the existing law at the enactment of § 1222(a)(2)(A) indicated that an estate's liability for taxes turned on separate taxable entity rules. Pp. 1887 – 1889.

(c) Chapter 13, on which Chapter 12 was modeled, further bolsters this Court's holding. Established understandings hold that postpetition income taxes are not "incurred by the [Chapter 13] estate" under § 503(b) because they are the liability of the Chapter 13 debtor alone. The Government has also long hewed to this position. Section 1305(a)(1), which gives holders of postpetition claims the option of collecting postpetition taxes within the bankruptcy case, would be superfluous if postpetition tax liabilities were automatically collectible inside the bankruptcy. It is thus clear that postpetition income taxes are not automatically collectible in a Chapter 13 plan and are not administrative expenses under § 503(b). To hold otherwise in Chapter 12 would disrupt settled practices in Chapter 13 cases. Pp. 1889 – 1891.

(d) None of the contrary arguments by petitioners and the dissent overcomes the statute's plain language, context, and structure. There is no textual basis for giving "incurred by the estate" a temporal meaning, such that it refers to all taxes "incurred postpetition." Nor does the text support deeming a tax "incurred by the estate" whenever it is paid by the debtor out of property of the estate. Section 503's legislative history is not inconsistent with this Court's holding, and the Court has cautioned against allowing ambiguous legislative history to muddy clear statutory language. See *Milner v. Department of Navy,* 562 U.S. ——, ——, 131 S.Ct. 1259, 179 L.Ed.2d 268. Meanwhile, any cases suggesting that postpetition taxes were treated as administrative expenses are inapposite because they involve corporate debtors, which Congress has singled out for responsibilities paralleling those borne by a separate taxable entity's trustee. Finally, petitioners contend that the purpose of § 1222(a)(2)(A) was to provide debtors with robust relief from tax debts. There may be compelling policy reasons for treating postpetition income tax liabilities as dischargeable. But if Congress intended petitioners' result, it did not so provide in the statute. Pp. 1891 – 1893.

617 F.3d 1161, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, THOMAS, and ALITO, JJ., joined. BREYER, J., filed a dissenting opinion, in which KENNEDY, GINSBURG, and KAGAN, JJ., joined.

## Attorneys and Law Firms

Susan M. Freeman, Phoenix, AZ, for Petitioners.

**1885 Pratik A. Shah, for Respondent.

Susan M. Freeman, Counsel of Record, Lawrence A. Kasten, Justin J. Henderson, Lewis and Roca LLP, Phoenix, AZ, Clifford B. Altfeld, Altfeld & Battaile P.C., Tucson, AZ, for Petitioners.

Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, John A. DiCicco, Principal Deputy Assistant, Attorney General, Malcolm L. Stewart, Deputy Solicitor General, Pratik A. Shah, Assistant to the Solicitor General, Bruce R. Ellisen, Patrick J. Urda, Attorneys, Department of Justice, Washington, DC, for the United States.

Hall v. U.S., 566 U.S. 506 (2012)

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 266 of 305

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

**Opinion**

Justice SOTOMAYOR delivered the opinion of the Court.

**\*508** Under Chapter 12 of the Bankruptcy Code, farmer debtors may treat certain claims owed to a governmental unit resulting from the disposition of farm assets as dischargeable, unsecured liabilities. 11 U.S.C. § 1222(a)(2)(A). One such claim is for "any tax ... incurred by the estate." § 503(b)(1)(B)(i). The question presented is whether a federal income tax liability resulting from individual debtors' sale of a farm during the pendency of a Chapter 12 bankruptcy is "incurred by the estate" and thus dischargeable. We hold that it is not.

I

A

**\*509** In 1986, Congress enacted Chapter 12 of the Bankruptcy Code, § 1201 et seq., to allow farmer debtors with regular annual income to adjust their debts. Chapter 12 was modeled on Chapter 13, § 1301 et seq., which permits individual debtors with regular annual income to preserve existing assets subject to a "court-approved plan under which they pay creditors out of their future income." Hamilton v. Lanning, 560 U.S. ——, ——, 130 S.Ct. 2464, 2469, 177 L.Ed.2d 23 (2010). Chapter 12 debtors similarly file a plan of reorganization. § 1221. To be confirmed, the plan must provide for the full payment of priority claims. § 1222(a)(2).

In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), § 1003, 119 Stat. 186, Congress created an exception to that requirement:

"**Contents of plan**

"(a) The plan shall—

\* \* \* \* \* \*

"(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless—

"(A) the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section

507, but the debt shall be treated in such manner only if the debtor receives a discharge." 11 U.S.C. § 1222.

Under § 1222(a)(2)(A), certain governmental claims resulting from the disposition of farm assets are downgraded to general, unsecured claims that are dischargeable after less than full payment. See § 1228(a). The claims are stripped of their priority status.

**\*510** That exception, however, applies only to claims in the plan that are " entitled to priority under section 507" in the first place. Section 507 lists 10 categories of such claims. Two pertain to taxes: One category, § 507(a)(8), covers prepetition **\*\*1886** taxes, and is inapplicable in this case. The other, § 507(a)(2), covers "administrative expenses allowed under section 503(b)," which in turn includes "any tax ... incurred by the estate." § 503(b)(1)(B)(i). Thus, for postpetition taxes to be entitled to priority under § 507 and eligible for the § 1222(a)(2)(A) exception, the taxes must be "incurred by the estate."

B

Petitioners Lynwood and Brenda Hall petitioned for bankruptcy under Chapter 12 and sold their farm shortly thereafter. Petitioners initially proposed a plan of reorganization under which they would pay off outstanding liabilities with proceeds from the sale. The Internal Revenue Service (IRS) objected, asserting a federal income tax of $29,000 on the capital gains from the farm sale.

Petitioners amended their proposal to treat the income tax as a general, unsecured claim to be paid to the extent funds were available, with the unpaid balance discharged. Again the IRS objected. Taxes on income from a postpetition farm sale, the IRS argued, remain the debtors' independent responsibility because they are neither collectible nor dischargeable in bankruptcy.

The Bankruptcy Court sustained the objection. The court reasoned that because a Chapter 12 estate is not a separate taxable entity under the Internal Revenue Code (IRC), see 26 U.S.C. §§ 1398, 1399, it cannot "incur" taxes for purposes of 11 U.S.C. § 503(b).

The District Court reversed, expressing doubt that IRC provisions are relevant to interpreting § 503(b). Based on its reading of legislative history, the District Court

000266

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

determined that Congress intended § 1222(a)(2)(A) to extend to petitioners' postpetition taxes.

**\*511** The Court of Appeals for the Ninth Circuit reversed. 617 F.3d 1161 (2010). The Court of Appeals held that the Chapter 12 estate does not "incur" the postpetition federal income taxes for purposes of § 503(b) because it is not a separate taxable entity under the IRC, and noted that Congress repeatedly has indicated the relevance of the IRC's taxable entity provisions to the Bankruptcy Code. Although "sympathetic" to the view that the postpetition tax liabilities should be dischargeable, the Court of Appeals held that "the operative language simply failed to make its way into the statute." *Id.,* at 1167. The Court of Appeals concluded that because the taxes do not qualify under § 503(b), they are not priority claims in the plan eligible for the § 1222(a)(2)(A) exception.

Judge Paez dissented, siding with a sister Circuit that had concluded that Congress intended § 1222(a)(2)(A) to extend to such postpetition federal income taxes. We granted certiorari to resolve the split of authority. [1] 564 U.S. ——, 131 S.Ct. 2989, 180 L.Ed.2d 820 (2011).

## II

### A

**[1]** Our resolution of this case turns on the meaning of a phrase in § 503(b) of the Bankruptcy Code: "incurred by the estate." The parties agree that § 1222(a)(2)(A) applies only to priority claims collectible in the bankruptcy plan and that postpetition federal income taxes so qualify only if they constitute a "tax ... incurred by the estate." § 503(b)(1)(B)(i).

**\*\*1887** **[2]** The phrase "incurred by the estate" bears a plain and natural reading. See *FCC v. AT & T Inc.,* 562 U.S. ——, ——, 131 S.Ct. 1177, 1182, 179 L.Ed.2d 132 (2011) ("When a statute does not define a term, we typically 'give the phrase its ordinary meaning' "). To "incur," one **\*512** must " suffer or bring on oneself (a liability or expense)." Black's Law Dictionary 836 (9th ed.2009); see also Webster's Third New International Dictionary 1146 (1976) ( "to ... become liable or subject to: bring down upon oneself"); Random House Dictionary 722 (1966) ("to become liable or subject to through one's own action; bring upon oneself"). A tax

"incurred by the estate" is a tax for which the estate itself is liable.

As the IRC makes clear, only certain estates are liable for federal income taxes. Title 26 U.S.C. §§ 1398 and 1399 address taxation in bankruptcy and define the division of responsibilities for the payment of taxes between the estate and the debtor on a chapter-by-chapter basis. Section 1398 provides that when an individual debtor files for Chapter 7 or 11 bankruptcy, the estate becomes a separate taxable entity. In such cases, the trustee files a separate return on the estate's behalf and "[t]he tax" on "the taxable income of the estate ... shall be paid by the trustee." § 1398(c)(1); see also § 6012(b)(4) ("Returns of ... an estate of an individual under chapter 7 or 11 ... shall be made by the fiduciary thereof"). Section 1399 provides that "[e]xcept in any case to which section 1398 applies, no separate taxable entity shall result from the commencement of a [bankruptcy] case." In Chapter 12 and 13 cases, then, there is no separately taxable estate. The debtor—not the trustee—is generally liable for taxes and files the only tax return. See *In re Lindsey,* 142 B.R. 447, 448 (Bkrtcy.Ct.W.D.Okla.1992) ("It is clear that, pursuant to 26 U.S.C. § 1398 and 1399, the standing Chapter 12 trustee neither files a return nor pays federal income tax"); cf. *infra,* at 1892 – 1893 (discussing special trustee duties in corporate-debtor cases).

**[3]** These provisions suffice to resolve this case: Chapter 12 estates are not taxable entities. Petitioners, not the estate itself, are required to file the tax return and are liable for the taxes resulting from their postpetition farm sale. The postpetition federal income tax liability is not "incurred by the **\*513** estate" and thus is neither collectible nor dischargeable in the Chapter 12 plan. [2]

### B

Our reading of "incurred by the estate" as informed by the IRC's separate taxable entity rules draws support from a related provision of the Bankruptcy Code, 11 U.S.C. § 346, and its longstanding interplay with 26 U.S.C. §§ 1398 and 1399. That relationship illustrates that from the inception of the current Bankruptcy Code, Congress has specified on a chapter-by-chapter basis which estates are separately taxable and therefore liable for taxes. That relationship also refutes the dissent's suggestion that applying such rules is an incongruous importation of "*tax* law" unconnected to "bankruptcy principles (as Congress understood them)."

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

*Post,* at 1897 – 1898 (opinion of BREYER, J.). And it reinforces the reasonableness of our view that whether an estate "incurs" taxes under § 503(b) turns on such chapter-by-chapter distinctions.

**\*\*1888** In the original Bankruptcy Code, Congress included a provision, § 346, that set out a chapter-specific division of tax liabilities between the estate and the debtor. Bankruptcy Reform Act of 1978, 92 Stat. 2565. Section 346(b)(1) provided that in an individual-debtor Chapter 7 or 11 bankruptcy, "any income of the estate may be taxed under a State or local law imposing a tax ... *only to the estate,* and may not be taxed to *such individual.*" 92 Stat. 2565 (emphasis added); see also 11 Collier on Bankruptcy ¶ TX12.03[5][b][i], p. TX12–21 (16th ed.2011) (hereinafter Collier) (§ 346(b) "provided that in a case under chapter 7 [or] 11 ... the estate of an individual is a taxable entity"). Section 346(d) provided, meanwhile, that in a Chapter 13 bankruptcy, "any income of the estate or the debtor may be taxed under a **\*514** State or local law imposing a tax ... *only to the debtor,* and may not be taxed to *the estate.*" 92 Stat. 2566 (emphasis added). Congress thus established that the estate in an individual-debtor Chapter 7 or 11 bankruptcy is a separate taxable entity; the estate in a Chapter 13 bankruptcy is not. [3]

Although § 346 concerned state or local taxes, [4] Congress applied its framework to federal taxes two years later. In the Bankruptcy Tax Act of 1980, 94 Stat. 3397, Congress enacted 26 U.S.C. §§ 1398 and 1399. **\*515** Section 1398 of the IRC, much like § 346(b) in the Bankruptcy Code, established that the estate is separately taxable in individual-debtor Chapter 7 or 11 cases. Section 1399 of the IRC, much like § 346(d) in the Bankruptcy Code, clarified that the estate is not separately taxable in Chapter 13 (and now Chapter 12) cases.

In 2005, Congress in BAPCPA amended § 346 and crystallized the connection between the Bankruptcy Code and the IRC. Section 346 now expressly aligns its assignment of state or local taxes with the rules for federal taxes, providing in relevant part:

> "(a) Whenever the Internal Revenue Code of 1986 provides that a separate **\*\*1889** taxable estate or entity is created in a case concerning a debtor under this title, and the income ... of such estate shall be taxed to or claimed by the estate, a separate taxable estate is also created for purposes of any State and local law imposing a tax on or measured by income and such income ... shall be taxed to or claimed by *the estate* and may not be taxed to or claimed by *the debtor.*

> "(b) Whenever the Internal Revenue Code of 1986 provides that no separate taxable estate shall be created in a case concerning a debtor under this title, and the income ... of an estate shall be taxed to or claimed by the debtor, such income ... shall be taxed to or claimed by *the debtor* under a State or local law imposing a tax on or measured by income and may not be taxed to or claimed by *the estate.*" (Emphasis added.)

Thus, whenever the estate is separately taxable under federal income tax law, that "is also" the case under state or local income tax law, § 346(a), and vice versa, § 346(b). And given that the Bankruptcy Code instructs that the assignment of state or local tax liabilities shall turn on the IRC's separate taxable entity rules, there is parity in turning to such rules in assigning federal tax liabilities.

**\*516** [4] In the same Act, Congress added § 1222(a)(2)(A). Section 1222(a)(2)(A) carves out an exception to the ordinary priority classification scheme. But § 1222(a)(2)(A) did not purport to redefine which claims are otherwise entitled to priority, much less alter the underlying division of tax liability between the estate and the debtor in Chapter 12 cases. "We assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and the existing law at the enactment of § 1222(a)(2)(A) indicated that an estate's liability for taxes turned on chapter-by-chapter separate taxable entity rules.

### C

The statutory structure further reinforces our holding that petitioners' postpetition income taxes are not "incurred by the estate." As a leading bankruptcy treatise and lower courts recognize, "[b]ecause chapter 12 was modeled on chapter 13, and because so many of the provisions are identical, chapter 13 cases construing provisions corresponding to chapter 12 provisions may be relied on as authority in chapter 12 cases." 8 Collier ¶ 1200.01[5], at 1200–10; *In re Lopez,* 372 B.R. 40, 45, n. 13 (Bkrtcy.App. Panel C.A.9 2007); *Justice v. Valley Nat. Bank,* 849 F.2d 1078, 1083 (C.A.8 1988). We agree. Section 1322(a)(2), like § 1222(a)(2), requires full payment of "all claims entitled to priority under section 507" under the plan. Both provisions cross-reference the same section of the Code, § 507, and in turn, the same subsection, § 503(b). Both are treated alike by IRC §§ 1398 and 1399. Whether postpetition taxes qualify under § 503(b) in Chapter 13 thus

000268

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

sheds light on whether they so qualify in petitioners' Chapter 12 case.

Bankruptcy courts and commentators have reasoned that postpetition income taxes are not "incurred by the estate" under § 503(b) because "a tax on postpetition income of the debtor or of the chapter 13 estate is not a liability of the chapter 13 estate; it is a liability of the debtor alone." 8 *517 Collier ¶ 1305.02[1], at 1305–5 and 1305–6. [5] For over a decade, the Government **1890 has likewise hewed to the position that "since post-petition tax liabilities are, in Chapter 13 cases, incurred by the debtor, rather than the bankruptcy estate, characterizing such liabilities as administrative expenses is inconsistent with section 503." IRS Chief Counsel Advice No. 200113027, p. 6 (Mar. 30, 2001), 2001 WL 307746, *4; see also Internal Revenue Manual § 5.9.10.9.2(3) (2006) (hereinafter IRM); IRS Litigation Guideline Memorandum GL–26, p. 9 (Dec. 16, 1996), 1996 WL 33107107, *6. We see no reason to depart from these established understandings. To " 'hold the Chapter 13 estate liable for [a] tax when it does not exist as a taxable entity defies common sense as well as Congress' intent.' " In re Whall, 391 B.R. 1, 4 (Bkrtcy.Ct.Mass.2008). The same holds true for a Chapter 12 estate.

A provision in Chapter 13 confirms that postpetition income taxes fall outside § 503(b). Section 1305(a)(1) provides that "[a] proof of claim may be filed by any entity that holds a claim against the debtor ... for taxes that become payable to a governmental unit while the case is pending." (Emphasis added.) That provision gives holders of postpetition claims the option of collecting postpetition taxes within the bankruptcy case—an option that the Government would never need to invoke if postpetition tax liabilities were already collectible inside the bankruptcy. Accordingly, lest we render § 1305 " 'inoperative or superfluous,' " Hibbs v. Winn, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004), it is clear that postpetition income taxes are not automatically collectible in a Chapter 13 plan and, a fortiori, are not administrative expenses under § 503(b).

*518 It follows that postpetition income taxes are not automatically collectible in petitioners' Chapter 12 plan. [6] Because both chapters cross-reference § 503(b) in an identical manner, see §§ 1222(a)(2), 1322(a)(2), we are cognizant that any conflicting reading of § 503(b) here could disrupt settled Chapter 13 practices. See Cohen v. de la Cruz, 523 U.S. 213, 221, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (the Court " 'will not read the Bankruptcy Code

to erode past **1891 bankruptcy practice absent a clear indication that Congress intended such a departure' "). Chapter 13 filings outnumber Chapter 12 filings six-hundred-fold. See U.S. Bankruptcy Courts—Cases Commenced During the 12–Month Period Ending September 30, 2011 (Table F–2), http://www.uscourts.gov/Statistics/Bankruptcy Statistics.aspx (estimating 676 and 417,503 annual Chapter 12 and 13 filings, respectively) (as visited May 14, 2012, and available in Clerk of Court's case file). Yet adopting petitioners' reading of § 503(b) would mean that, in every Chapter 13 case, the Government *519 could ignore § 1305 and expect priority payment of postpetition income taxes in every plan.

[5] At bottom, "identical words and phrases within the same statute should normally be given the same meaning." Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007). Absent any indication that Congress intended a conflict between two closely related chapters, we decline to create one. [7]

### III

Petitioners and the dissent advance several arguments for why the postpetition income taxes at issue should be considered "incurred by the estate," notwithstanding the IRC's separate taxable entity rules. But none provides sufficient reason to overcome the statute's plain language, context, and structure.

[6] Petitioners primarily argue that "incurred by the estate" has a temporal meaning. Petitioners emphasize that the estate only comes into existence after a bankruptcy petition is filed. Thus, they reason, taxes "incurred by the estate" refers to all taxes "incurred postpetition," regardless of whether the estate is liable for the tax and regardless of the chapter under which a case is filed. Although all taxes "incurred by the estate" are necessarily incurred postpetition, not all taxes incurred postpetition are "incurred by the *520 estate." That an estate cannot incur liability until it exists does not mean that every liability that arises after that point automatically becomes the estate's liability. And there is no textual basis to focus on when the liability is incurred, as opposed to whether the liability is incurred "by the estate."

[7] Alternately, petitioners contend that a tax should be considered "incurred by the estate" so long as it is payable out of estate assets. Income from postpetition sales of farm assets is considered property of the estate. See § 1207(a). Petitioners

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

argue that even if the debtor—and not the estate—is liable for a tax, the tax is still "incurred by the estate" because the funds the debtor uses to pay the tax are property of the estate. But that too strains the text beyond what it can bear. To concede that someone other than the estate is liable for filing the return and paying the tax, and yet maintain that the estate is the one that has "incurred" the tax, defies the ordinary meaning of "incur" as bringing a liability upon oneself.

The dissent, echoing both of these points, urges that we "simply ... consider the debtor and estate as *merged*." *Post,* **1892 at 1899. "The English language," the dissent reasons, "permits this reading" and "do[es] not require" our reading. *Post,* at 1897 – 1898. But any reading of "tax ... incurred *by the estate* " that is contingent on merging the debtor and estate—despite Congress' longstanding efforts to *distinguish* between when tax liabilities are borne by the debtor or borne by the estate—is not a natural construction of the statute as written.

Moreover, these alternative readings create a conflict between § 503(b) and § 346(b). Petitioners consider postpetition state or local income taxes, like federal income taxes, to be "incurred by the estate" under § 503(b). See Tr. of Oral Arg. 4–5. But § 346(b) requires that such taxes be borne by the Chapter 12 debtor, not the estate. It is implausible to maintain that taxes are "incurred by the estate" when § 346(b) **521 specifically prohibits such taxes from being "taxed to or claimed by the estate."

To buttress their counterintuitive readings of the text, petitioners and the dissent suggest that there is a long history of treating postpetition taxes as administrative expenses entitled to priority. Both point to two legislative Reports accompanying the 1978 enactment of § 503. But neither snippet from which they quote is inconsistent with today's holding, [8] and we have cautioned against "allowing ambiguous legislative history to muddy clear statutory language." *Milner v. Department of Navy,* 562 U.S. ——, ——, 131 S.Ct. 1259, 1266, 179 L.Ed.2d 268 (2011).

Petitioners also point to cases suggesting that postpetition taxes were treated as administrative expenses. *E.g., United States v. Noland,* 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (corporate Chapter 11 debtor); *Nicholas v. United States,* 384 U.S. 678, 687–688, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966) (corporate Chapter XI case under predecessor Bankruptcy Act). But those cases involve corporate debtors and are therefore inapposite. Among estates

that are not separately taxable, those involving corporate debtors have long been singled out by Congress for special responsibilities. [9] See H.R. Rep., at 277 (even "[i]f the estate is not *522 a separate taxable entity," administrative responsibility can "var[y] according to the nature of the debtor"). Although estates of corporate debtors are not separate taxable entities under 26 U.S.C. §§ 1398 and 1399, the IRC requires a trustee that "has possession of or holds title to all or **1893 substantially all the property or business of a corporation" to "make the return of income for such corporation." § 6012(b) (3). In effect, Congress provided that the trustee in a corporate-debtor case may shoulder responsibility that parallels that borne by the trustee of a separate taxable entity. In any event, petitioners do not deny that neither the separate taxable entity provisions nor the special provisions for corporate debtors apply to them.

Finally, petitioners and the dissent contend that the purpose of 11 U.S.C. § 1222(a)(2)(A) was to provide debtors with robust relief from tax debts, relying on statements by a single Senator on unenacted bills introduced in years preceding the enactment. See Brief for Petitioners 23–36. They argue that deeming § 1222(a)(2)(A) inapplicable to their postpetition income taxes would undermine that purpose and confine the exception to prepetition taxes. But we need not resolve here what other claims, if any, are covered by § 1222(a)(2) (A). [10] Whatever the 2005 Congress' intent with respect to § 1222(a)(2)(A), that provision merely carved out *523 an exception to the pre-existing priority classification scheme. The exception could only apply to claims "entitled to priority under section 507" in the first place. That pre-existing scheme was in turn premised on antecedent, decades-old understandings about the scope of § 503(b) and the division of tax liabilities between estates and debtors. See *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) ("When Congress amends the bankruptcy laws, it does not write 'on a clean slate' "). If Congress wished to alter these background norms, it needed to enact a provision to enable postpetition income taxes to be collected in the Chapter 12 plan in the first place.

The dissent concludes otherwise by an inverted analysis. Rather than demonstrate that such claims were treated as § 507 priority claims in the first place, the dissent begins with the single Senator's stated purpose for the exception to that priority scheme. *Post,* at 1897. It then reasons backwards from there, and in the process upsets background norms in both Chapters 12 and 13.

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

**[8]**   Certainly, there may be compelling policy reasons for treating postpetition income tax liabilities as dischargeable. But if Congress intended that result, it did not so provide in the statute. Given the statute's plain language, context, and structure, it is not for us to rewrite the statute, particularly in this complex terrain of interconnected provisions and exceptions enacted over nearly three decades. Petitioners' position threatens ripple effects beyond this individual case for debtors in Chapter 13 and the broader bankruptcy scheme that we need not invite. As the Court of Appeals noted, "Congress is entirely free to change the law by amending the text." 617 F.3d, at 1167.

*  *  *

We hold that the federal income tax liability resulting from petitioners' postpetition farm sale is not "incurred by the  **\*524**  estate" under § 503(b) and is thus neither collectible nor dischargeable in the Chapter 12 plan. We therefore affirm the judgment of the Court of Appeals for the Ninth Circuit.

*It is so ordered.*

**\*\*1894**   Justice BREYER, with whom Justice KENNEDY, Justice GINSBURG, and Justice KAGAN join, dissenting. Chapter 12 of the Bankruptcy Code helps family farmers in economic difficulty reorganize their debts without losing their farms. Consistent with the chapter's purposes, Congress amended § 1222(a) of the Code to enable the debtor to treat certain capital gains tax claims as ordinary unsecured claims. 11 U.S.C. § 1222(a)(2)(A). The Court's holding prevents the Amendment from carrying out this basic objective. I would read the statute differently, interpreting it in a way that, in my view, both is consistent with its language and allows the Amendment better to achieve its purposes.

I

A

Chapter 12 of the Bankruptcy Code helps indebted family farmers (and fishermen) keep their farms by making commitments to pay those debts (in part) out of future income. An eligible farmer whose debts exceed his assets may enter Chapter 12 bankruptcy, at which point he must develop a

detailed Plan setting forth how he will pay his debts. That Plan must satisfy certain statutory criteria. §§ 1221, 1222, 1225.

A brief overview of these requirements helps to illuminate what is at stake in this case. Roughly speaking, the chapter requires that a holder of a *secured claim* receive the full amount of that claim up to the value of the collateral securing the loan. The claim may be paid over an extended period. If the claim exceeds the value of the collateral, the creditor is given an unsecured claim in the remainder. §§ 506(a), 1225(a)(5).

**\*525**   The holder of a *§ 507 priority claim* (a category that includes, among other things, domestic support obligations, debts for taxes incurred before filing the bankruptcy petition, and administrative expenses) must receive the full amount of the priority claim in deferred cash payments paid over the life of the Plan. § 1222(a)(2).

The holder of an *ordinary unsecured claim—i.e.,* an unsecured claim of a kind not listed in § 507—may receive at least a partial payment from the amount left over after the payment of the secured and § 507 priority claims. This amount may well be more than zero, for the Plan must provide that the farmer will devote all "disposable income" (as defined by § 1225(b)(2)) or property of equivalent value to the repayment of his debts over the next three years (sometimes extended to five years). §§ 1222(c), 1225(b)(1). And that amount must prove sufficient to provide the unsecured creditor with no less than that creditor would receive in a Chapter 7 liquidation. § 1225(a)(4).

Once the farmer completes his Plan payments, he will receive a discharge even if his payments did not *fully* satisfy all unsecured claims. The Code does not, however, permit all debts to be discharged. There are categories of *nondischargeable* debts (including, for example, secured claims), which creditors can pursue after bankruptcy. § 1228(a).

For present purposes, it is important to understand that if the debtor owes too much money to his § 507 priority creditors, he may not have sufficient assets or future income to pay all his secured creditors and his § 507 priority creditors while leaving enough funds over to guarantee unsecured creditors the minimum amounts that Chapter 12 requires. If so, the farmer may not be able to proceed under Chapter 12. See §§ 1225(a)(1), (6) (bankruptcy court will not confirm Plan unless

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Hall v. U.S., 566 U.S. 506 (2012)

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 272 of 305

it satisfies statutory criteria and debtor will be **\*\*1895** able to make good on his commitments under the Plan).

It is also important to understand that the same kind of insufficient-assets-and-income problem might occur where **\*526** the debtor owes the Government a large *post*-petition tax debt. In general, postpetition claims are not part of the bankruptcy proceedings. See 7 Norton Bankruptcy Law and Practice § 135:14 (3d ed.2011) (hereinafter Norton). Unless the Government's debt falls within an exception to this general rule, bankruptcy law would leave the Government to collect its postpetition claim outside of bankruptcy as best it could. Again, the result will be to leave the farmer with fewer assets and income to devote to his Chapter 12 Plan—perhaps to the point where he cannot proceed under Chapter 12 at all.

### B

With this general summary in mind, it is easier to understand the significance of the question this case presents. The question arises out of an amendment to a Chapter 12 provision. The provision as amended says:

"**Contents of plan**

"(a) The plan shall—

\* \* \* \* \* \*

"(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless—

"(A) the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, *in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507,* but the debt shall be treated in such manner only if the debtor receives a discharge; or

"(B) the holder of a particular claim agrees to a different treatment of that claim." § 1222(a) (emphasis added).

The Amendment consists of subparagraph (A).

**\*527** At first blush, the Amendment seems to relegate the capital gains tax collector to the status of an ordinary unsecured creditor. See *ibid.* (exception applies to claims "owed to a governmental unit that arises as a result of the sale ... of any farm asset"). If, as petitioners claim, that is so, then it is unlikely that such a debt could stop a farmer from proceeding under Chapter 12, since its treatment as an ordinary unsecured claim means that the farmer will not necessarily have to pay the debt in full.

But if the Government and the majority are right, then the capital gains tax falls outside the category of § 507 priority claims—and therefore falls outside the scope of the Amendment; in fact, it falls outside the bankruptcy proceeding altogether. And the Government then might well be able to collect the debt in full outside the bankruptcy proceeding—even if doing so would reduce the farmer's assets and future income to the point where the farmer would not be able to proceed under Chapter 12. The question before us is whether we must interpret the Amendment in a way that could bring about this result.

### C

### 1

Congress did not intend this result. In a significant number of instances a Chapter 12 farmer, in order to have enough money to pay his creditors, might have to sell farmland or other farm assets at a price that would give rise to considerable capital gains taxes (particularly if the family has held the land or assets for many **\*\*1896** years). If the resulting tax debt were treated as a § 507 priority claim, then it might well absorb much of the money raised to the point where (depending upon the size of his other debts) the farmer might be unable to proceed under Chapter 12. The Amendment accordingly seeks to place the tax authorities farther back in the creditor queue, requiring them, like ordinary unsecured **\*528** creditors, to seek payment from the funds that remain after the § 507 priority creditors (and secured claim holders) have been paid.

The Amendment's chief legislative sponsor, Senator Charles Grassley, explained this well when he told the Senate:

"Under current law, farmers often face a crushing tax liability if they need to sell livestock or land in order to reorganize their business affairs.... [H]igh taxes have caused farmers to lose their farms. Under the bankruptcy code, the I.R.S. must be paid in full for any tax liabilities generated during a bankruptcy reorganization. If the farmer can't pay the I.R.S. in full, then he can't keep his farm.

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

This isn't sound policy. Why should the I.R.S. be allowed to veto a farmer's reorganization plan? [The Amendment] takes this power away from the I.R.S. by reducing the priority of taxes during proceedings. This will free up capital for investment in the farm, and help farmers stay in the business of farming." 145 Cong. Rec. 1113 (1999).

See also 14A J. Mertens, Law of Federal Income Taxation § 54:61, p. 11 (Oct.2011 Supp.) ("This provision attempts to mitigate the tax expense often incurred by farmers who have significant taxable capital gains or depreciation recapture when their low basis farm assets are foreclosed, sold, or otherwise disposed of by their creditors").

2

The majority, following the Government's suggestion, interprets the relevant language in a way that denies the Amendment its intended effect. It holds that the only income tax claims to which § 507 accords priority are claims for taxes due for the taxable year in which the farmer filed for bankruptcy. (We shall call these "prepetition tax claims.") In the majority's view, § 507 does not **529 cover income tax liabilities that arise during the year of filing or during the Chapter 12 proceedings. (We shall call these "postpetition tax claims.") Ante, at 1886 – 1887; see Brief for United States 8 (the Amendment "provides farmers relief from [only] those tax claims that are otherwise entitled to priority under 11 U.S.C. 507(a)(8), namely pre-petition claims arising from the sale of farm assets"); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 705(1)(A), 119 Stat. 126 (amending § 507(a)(8) to clarify that it only covers income tax claims for taxable years that end on or before the date of the filing of the bankruptcy petition).

The majority then observes that the Amendment creates an exception only in respect to § 507 priority claims. § 1222(a) ("The plan shall ... provide for the full payment ... of all claims entitled to priority under section 507, unless ....". (Emphasis added).). Ante, at 1885. Thus, if (without the Amendment) § 507 would not cover postpetition capital gains taxes in the first place, the Amendment (creating only a § 507 exception) cannot affect postpetition tax claims. An exception from nothing amounts to nothing.

Consequently, the majority concludes that postpetition tax claims fall outside the bankruptcy proceeding entirely; the tax authorities can collect them as if they were ordinary tax debts;

and the Government's efforts to collect them can lead to the very **1897 results (blocking the use of Chapter 12) that the Amendment sought to avoid.

Therein lies the problem. These results are the very opposite of what Congress intended. Congress did not want to relegate to ordinary-unsecured-claim status only prepetition tax claims, i.e., tax claims that accrued well before the Chapter 12 proceedings began. Rather, Congress was concerned about the effect on the farmer of collecting capital gains tax debts that arose during (and were connected with) the Chapter 12 proceedings themselves. See 145 Cong. Rec. 1113 (the Amendment will have the effect of "reducing the priority of taxes during proceedings" (emphasis added) (statement of Sen. *530 Grassley during a failed attempt to enact the Amendment)); Hearing on the Bankruptcy Reform Act of 2001 before the Senate Committee on the Judiciary, 107th Cong., 1st Sess., 121 (statement of Sen. Grassley) ("[The Amendment] also reduces the priority of capital gains tax liabilities for farm assets sold as a part of a reorganization plan " (emphasis added)). The majority does not deny the importance of Congress' objective. Rather, it feels compelled to hold that Congress put the Amendment in the wrong place.

II

Unlike the majority, I believe the relevant Bankruptcy Code language can be and is better interpreted in a way that would give full effect to the Amendment. In particular, the relevant language is better interpreted so that in the absence of the Amendment § 507 would cover these postpetition tax claims. Hence the Amendment creates an exception from what otherwise would amount to a § 507 priority claim. And it can take effect as written.

It is common ground that subsection (a)(2) of § 507 covers, and gives § 507 priority to, "administrative expenses allowed under section 503(b)." § 507(a)(2) (2006 ed., Supp. IV). It is also common ground that the relevant definitional section, namely § 503(b), defines allowed "administrative expenses" as "including ... any tax ... incurred by the estate." § 503(b)(1)(B)(i) (2006 ed.). But after this point, we part company.

The majority believes that the words any tax "incurred by the estate" cannot include postpetition taxes. It emphasizes that tax law does not treat a Chapter 12 bankruptcy estate as a "separate taxable entity," i.e., as separate from the farmer-debtor for federal income tax purposes. 26 U.S.C. §§ 1398,

000273

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

1399. This means that there is just one entity—the debtor—for these purposes. And § 346 of the Bankruptcy Code makes clear that any state and local income tax liabilities incurred by a Chapter 12 estate must also be taxed to **531 the *debtor*. The majority says that these provisions mean that only the debtor, and not the estate, can " ' incu[r]' " taxes within the meaning of 11 U.S.C. § 503(b)(1)(B)(i). *Ante,* at 1886 – 1887.

In my view, however, these tax law circumstances do not require the majority's narrow reading of this Bankruptcy Code provision. That is to say, the phrase tax "incurred by the [bankruptcy] estate" can include a tax incurred by the farmer while managing his estate in the midst of his bankruptcy proceedings, *i.e.,* between the time the farmer files for Chapter 12 bankruptcy and the time the bankruptcy court confirms the farmer's Chapter 12 Plan.

The bankruptcy estate is in existence during this time. Cf. § 1227(b) (property of the estate vests in the debtor at confirmation unless the Plan provides otherwise). The bankruptcy court has jurisdiction over the farmer's assets during this time. See §§ 541, 1207; 4 Norton § 61:1, at 61–2 (§ 541's "broad definition of estate **1898 property ... centralizes all of the estate's assets under the jurisdiction of the bankruptcy court"). And, as a matter of both the English language and bankruptcy principles, one can consider a tax liability that the farmer incurs during this period (such as a capital gains tax arising from a sale of a portion of his farm assets to raise funds for creditors) as a liability that, in a bankruptcy sense, the estate incurs.

The English language permits this reading of the phrase tax "incurred by the estate." When the farmer, in the midst of Chapter 12 proceedings, sells a portion of his farm to raise money to help pay his creditors, one can say, as a matter of English, that the bankruptcy estate has "incurred" the associated tax, even if it is ultimately taxed to the farmer, just as one can say that an employee who makes purchases using a company credit card "incurs costs" for which his employer is liable.

As a matter of general bankruptcy principles (as Congress understood them), the history of the 1978 Bankruptcy Code **532 revision is replete with statements to the effect that "*[t]axes arising from the operation of the estate after confirmation are entitled to priority as administrative expenses.*" H.R.Rep. No. 95–595, p. 193 (1977), 1978 U.S.C.C.A.N. 5963, 6153 (emphasis added). See S.Rep. No. 95–1106, p. 13 (1978) (administrative expenses

include "[t]axes incurred *during the administration of the estate* " (emphasis added)); S.Rep. No. 95–989, p. 66 (1978), 1978 U.S.C.C.A.N. 5787, 5852 ("In general, administrative expenses include taxes which the trustee *incurs in administering the debtor's estate,* including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate *during the case* " (emphasis added)); 124 Cong. Rec. 32415 (1978) ("The amendment generally follows the Senate amendment in providing expressly that taxes incurred *during the administration of the estate* share the first priority given to administrative expenses generally" (emphasis added)); *id.,* at 34014 (Senate version of the joint floor statement saying exactly the same).

And importantly, as the majority concedes, *ante,* at 1892 – 1893, bankruptcy law treats taxes incurred by corporate debtors while they are in bankruptcy proceedings as "tax[es] incurred by the estate," even though the Tax Code does *not* treat the bankruptcy estate of a corporate debtor as a "separate taxable entity." See, *e.g., United States v. Noland,* 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (treating Chapter 11 corporate debtor's postpetition taxes as administrative expenses); *In re Pacific–Atlantic Trading Co.,* 64 F.3d 1292, 1298 (C.A.9 1995) (same); *In re L.J. O'Neill Shoe Co.,* 64 F.3d 1146, 1151–1152 (C.A.8 1995) (same); *In re Hillsborough Holdings Corp.,* 156 B.R. 318, 320 (Bkrtcy.Ct.M.D.Fla.1993) ("[A]dministrative expenses should include taxes which the trustee, and, in Chapter 11 cases, the Debtor–in–Possession, incurs in administering the estate, including taxes based on capital gains from sales of property and taxes on income earned by the estate during the case post-petition").

**533 Even though, as the majority says, corporate bankruptcies have some special features (in particular, a trustee in a corporate bankruptcy is required to file the estate's income tax return), it is unclear why these features should have any bearing on the definition of administrative expenses. See *ante,* at 1892 – 1893 (discussing 26 U.S.C. § 6012(b) (3)). Indeed, in many corporate Chapter 11 bankruptcies, there is no trustee, in which case the debtor-in-possession, just like an individual Chapter 12 debtor, must file the tax return. See 11 U.S.C. §§ 1104, 1107 (2006 ed. and Supp. IV); 5 Norton §§ 91:3, 93:1 **1899 (typically, no trustee is appointed in a Chapter 11 bankruptcy, and the debtor-in-possession assumes most of the duties and powers of a trustee, continuing in possession and managing the business until the court determines, upon request of a party in interest, that grounds exist for the appointment of a trustee); *Holywell*

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

*Corp. v. Smith,* 503 U.S. 47, 54, 112 S.Ct. 1021, 117 L.Ed.2d 196 (1992) ("As the assignee of 'all' or 'substantially all' of the property of the corporate debtors, the trustee must file *the returns that the corporate debtors would have filed had the plan not assigned their property to the trustee* " (emphasis added)).

Consequently, I can find no strong bankruptcy law reason for treating taxes incurred by a corporate debtor differently from those incurred by an individual Chapter 12 debtor. To the contrary, since corporations can file for bankruptcy under Chapter 12, the majority's argument implies that the treatment of postpetition taxes in Chapter 12 proceedings turns on whether the debtor happens to be a corporation. See § 101(18)(B) (2006 ed.) (defining "family farmer" to include certain corporations); § 109(f) ("Only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12"); Brief for United States 26, n. 9 ("[T]he estate of a corporate (as opposed to individual) Chapter 12 debtor ... could be viewed as incurring post-petition income taxes ... collectible as administrative expenses ... rather **\*534** than outside the bankruptcy case as required for an individual Chapter 12 debtor").

The majority does not point to any adverse consequences that might arise were bankruptcy law to treat taxes incurred in administering the bankruptcy estate (*i.e.,* taxes incurred after filing and before Plan confirmation) as administrative expenses. The effect of doing so would simply be to consider the debtor and estate as *merged* for purposes of determining which taxes fall within the Bankruptcy Code's definition of "administrative expenses," *i.e.,* determining for that purpose that the estate may "incur" tax liabilities on behalf of the whole (with the ultimate liability assigned to the debtor), much like a married couple filing jointly, 26 U.S.C. § 6013(a), or an affiliated group of corporations filing a consolidated tax return, § 1501. Cf. *In re Lumara Foods of America, Inc.,* 50 B.R. 809, 815 (Bkrtcy.Ct.N.D.Ohio 1985) (describing the history of § 503(b)(1)(B)(i) and concluding that "the elevation [of a tax] to an administrative priority is dependent upon when the tax accrued"). In fact, the very tax provisions that separate the estate from the individual debtor in Chapter 7 and Chapter 11 proceedings, §§ 1398 and 1399, say that the Chapter 12 estate is *not separate* from the debtor for tax purposes—a concept consistent, not at odds, with merging the two for this bankruptcy purpose.

Nor is the majority's reading free of conceptual problems. If we read the phrase tax "incurred by the estate" as *excluding*

tax liabilities incurred while the farmer is in Chapter 12 bankruptcy, we must read it as excluding not only capital gains taxes but also other kinds of taxes, such as an employer's share of Social Security taxes, Medicare taxes, or other employee taxes. But no one claims that *all* of these taxes fall outside the scope of the term "administrative expenses." See *In re Ryan,* 228 B.R. 746 (Bkrtcy.Ct.Ore.1999) (treating postpetition employment taxes as administrative expenses in a Chapter 12 proceeding); IRS Chief Counsel Advice No. 200518002 (May 6, 2005), 2005 WL 1060956 **\*535** (assuming that some postpetition federal taxes can be treated as administrative expenses in a Chapter 12 bankruptcy).

**\*\*1900** In fact, the Government, realizing it cannot go this far, concedes that many of these other (*e.g.,* employer) taxes are "administrative expenses," but only, it suggests, because they fall within a different part of the "administrative expenses" definition, namely 11 U.S.C. § 503(b)(1)(A), which says that "administrative expenses" include "the actual, *necessary costs and expenses of preserving the estate* including ... wages, salaries, and commissions for services rendered after the commencement of the case." (Emphasis added.) See Brief for United States 27–28, n. 11. Employment taxes, however, do not fit easily within the rubric "wages, salaries, and commissions." They may well be "necessary costs and expenses of preserving the estate." But then so are the capital gains taxes at issue here.

Finally, the majority makes what I believe to be its strongest argument. *Ante,* at 1889 – 1891. Chapter 13, it points out, allows individuals (typically those who are not farmers or fishermen) to reorganize their debts in much the same way as does Chapter 12. And there is authority holding that taxes on income earned between the time the Chapter 13 debtor files for bankruptcy and the time the bankruptcy Plan is confirmed are not "tax [es] incurred by the estate." See *In re Whall,* 391 B.R. 1, 5–6 (Bkrtcy.Ct.Mass.2008); *In re Brown,* No. 05–41071, 2006 WL 3370867, \*3 (Bkrtcy.Ct.Mass.2006); *In re Jagours,* 236 B.R. 616, 620, n. 4 (Bkrtcy.Ct.E.D.Tex.1999); *In re Gyulafia,* 65 B.R. 913, 916 (Bkrtcy.Ct.Kan.1986). Why, asks the majority, should the law treat Chapter 12 taxes differently?

For one thing, the issue is less important in a Chapter 13 case, for the relevant time period—between filing and Plan confirmation—is typically very short. Compare H.R.Rep. No. 95–595, at 276 ("most chapter 13 estates will only remain open for 1 or 2 months until confirmation of the plan"), with **\*536** Brief for Neil E. Harl et al. as *Amici Curiae* 32–33

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

(survey of Chapter 12 bankruptcies found the average time from filing to confirmation in a district ranged from nearly five months to over three years). See also 7 Norton § 122:14, at 122–27 ("In Chapter 13, the plan must be filed within 15 days after the filing of the petition, unless the time is extended for cause. A Chapter 12 Plan must be filed no later than 90 days after the order for relief, unless the court finds that an extension is substantially justified" (footnote omitted)).

For another, the issue arises differently in a Chapter 13 case. That chapter, unlike Chapter 12, contains a special provision that permits the Government to seek § 507 priority treatment of all taxes incurred while the bankruptcy case is pending. § 1305 (Government can file proof of claim to have postpetition taxes treated as if they had arisen before the petition was filed).

Finally, if uniformity of interpretation between these two chapters is critical, I do not see the serious harm in treating the relevant taxes as "administrative expenses" in *both* Chapter 12 and Chapter 13 cases rather than in neither. The majority apparently believes that this would render § 1305 (the provision permitting the Government to seek § 507 priority treatment) superfluous. *Ante,* at 1889 – 1891. But that is not so. This interpretation would simply limit the scope of operation of § 1305 to the period of time *after* the Chapter 13 Plan is confirmed but while the Chapter 13 case is still pending. And that is likely to be a significant period of time relative to the preconfirmation period. See H.R.Rep. No. 95–595, at 276 ("[M]ost chapter 13 estates will only remain open for 1 or 2 months until confirmation of the plan"); §§ 1325(b)(1), (4) **1901 (debtor must commit all his projected disposable income over a 3–year period (sometimes extended to five) to the Plan, unless all unsecured claims can be paid off over a shorter period). The greatest Chapter 13 harm this interpretation could cause is to require the Government to pursue those tax liabilities as § 507 priority administrative *537 expense claims (rather than allow it to choose between § 507 priority treatment and pursuing those claims outside bankruptcy) during the relatively brief period of time between the filing of a petition and the Plan's confirmation.

In sum, I would treat a postpetition/preconfirmation tax liability as a tax "incurred by the estate," hence as an "administrative expense," hence as a "clai[m] entitled to priority under section 507, unless ...," hence as a claim falling within the scope of the Amendment. Doing so would allow the Amendment to take effect as Congress intended.

III

The Government argues that, even if tax liabilities arising during the bankruptcy proceedings are "administrative expenses," they still do not fall within the Amendment's scope. It says that neither the Amendment nor anything else in § 1222(a) provides for the payment of administrative expenses. Rather, that section and its Amendment provide only for the payment of "claims." § 1222(a)(2) ("The plan shall ... provide for the full payment ... of all *claims* entitled to priority under section 507, unless ..." (emphasis added)). And administrative expenses, the Government says, like all debts that are incurred postpetition, are not "claims."

The Government finds support for its view in the fact that that § 1222 deals with the contents of a "plan," while a later section, § 1227(a), says that the provisions of a "confirmed plan bind the debtor, each *creditor,* [and certain others of no relevance here]." (Emphasis added.) This is because the Code defines "*creditor* " to include only holders of *pre*-petition claims, thus excluding holders of *post*-petition claims, such as administrative expenses. § 101(10).

The Government points out that a *different* Code section, namely § 1226(b)(1), provides for the payment of administrative expenses. That section says that "[b]efore or at the time of each payment to creditors under the plan, there shall **538 be paid ... any unpaid claim of the kind specified in section 507(a)(2)," namely "administrative expenses." And Congress did not amend § 1226(b)(1); it amended the earlier section, § 1222(a).

In short, the Government says, the Plan only covers those § 507 priority "expenses and claims" that are described as "claims" and can be held by "creditors." Section 1226(b)(1), not § 1222, deals with administrative expenses. The bottom line of the Government's chain of logic is, once again, that Congress put the Amendment in the wrong place.

I concede that there is some text and legislative history that supports the Government's view that the word "claim" in § 1222(a) does not include "administrative expenses." See, *e.g.,* § 507(a) (referring to "expenses and claims" as if they are separate categories); S.Rep. No. 95–1106, at 20 ("The committee amendments contain several changes designed to clarify the distinction between a 'claim' (which generally relates to a debt incurred before the bankruptcy petition is

filed) and an administrative expense (which is an expense incurred by the trustee after the filing of the petition)").

But the language does not demand the Government's reading. For the Code also uses the word "claim" to cover *both* prepetition **1902 and postpetition claims (such as administrative expenses). *E.g.,* § 101(5)(A) (defining a claim as a "right to payment"); § 726(b) (2006 ed., Supp. IV) (referring to "claims" that include administrative expenses). Indeed, the very section that the Government says permits separate collection of administrative expenses, namely § 1226(b)(1), refers to "any unpaid *claim*" for administrative expenses. (Emphasis added.) And one can easily read that section as setting forth *when,* not *whether,* administrative expenses will be paid under the Plan (*i.e.,* as specifying that the Plan must provide for the payment of administrative expenses before payments to other creditors are made). Thus, reading **539 § 1222(a)(2)'s reference to "claims" as including administrative expenses need not render § 1226(b)(1) surplusage.

What about § 1227(a), which refers only to "creditor[s]"? One must read it in conjunction with § 1228(a), which provides that once the debtor has completed all payments under the Plan, "the court shall grant the debtor a discharge of [1] all debts provided for by the plan[,] [2] *allowed under section 503 of this title [which describes 'administrative expenses']* or [3] disallowed under section 502 of this title...." (Emphasis added.) (The first few words of § 1227(a)—"[e]xcept as provided in section 1228(a)"—explain why I say "must"; the comma comes from 7 Norton § 137:2, at 137–3, n. 1, which says that its omission was a typographical error.) Thus, by here referring to "administrative expenses" (through its reference to § 503), Chapter 12 makes clear that at least *some* postpetition claims are to be discharged once the debtor has completed his payments under the Plan. That fact, in turn, suggests that the Plan may provide for their payment and that the holders of such claims may be bound by the terms of a confirmed Plan.

The upshot is that the Government's second argument presents a plausible, but not the *only* plausible, interpretation of the Code's language. And the Government's second argument, like the majority's argument, has a problem, namely that it reduces Congress' Amendment to rubble. For that reason I believe it does not offer the better interpretation of the relevant language.

### IV

In sum the phrase tax "incurred by the estate" in § 503(b) (the "administrative expense" section) and the word "claim" in § 1222(a) are open to different interpretations. Each of the narrower interpretations advanced by the Government or adopted by the Court would either exclude postpetition taxes from the phrase taxes "incurred by the estate" or exclude all postpetition debts, including administrative **540 expenses, from the word "claim." In these ways, these interpretations would, as I have said, prevent the Amendment from accomplishing its basic purpose.

A broader interpretation of the word "claim" may allow the Plan to include certain postpetition debts. This, taken together with a broader interpretation of the phrase tax "incurred by the estate," prevents the Government from collecting postpetition/preconfirmation tax debts outside of Chapter 12, requiring it to assume a place in the creditor queue. Together these broader interpretations permit the Amendment to take effect as intended.

I find this last-mentioned consideration determinative. It seems to me unlikely that Congress, having worked on revisions of the Code for many years with the help of Bankruptcy experts, and having considered the Amendment several times over a period of years, would have made the drafting mistake that the Government and **1903 the majority necessarily imply that it made. Moreover, I believe it important that courts interpreting statutes make significant efforts to allow the provisions of congressional statutes to function in the ways that the elected branch of Government likely intended and for which it can be held democratically accountable.

For these reasons, with respect, I dissent.

### All Citations

566 U.S. 506, 132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357, 2012-1 USTC P 50,345, 67 Collier Bankr.Cas.2d 459, 56 Bankr.Ct.Dec. 122, Bankr. L. Rep. P 82,212, 12 Cal. Daily Op. Serv. 5189, 2012 Daily Journal D.A.R. 6225, 23 Fla. L. Weekly Fed. S 293

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    Compare *In re Dawes,* 652 F.3d 1236 (C.A.10 2011), and 617 F.3d 1161 (C.A.9 2010) (case below), with *Knudsen v. IRS,* 581 F.3d 696 (C.A.8 2009) (postpetition federal taxes are eligible for the § 1222(a)(2)(A) exception and thus dischargeable).

2    Because we hold that the postpetition federal income taxes at issue are not collectible in the plan because they are not "incurred by the estate," we need not address the Government's broader alternative argument that Chapter 12 plans are exclusively limited to prepetition claims.

3    For those of us for whom it is relevant, the legislative history confirms that Congress viewed § 346 as defining which estates were separate taxable entities. See H.R.Rep. No. 95–595, p. 275 (1977), 1978 U.S.C.C.A.N. 5963 at 6232 (hereinafter H.R. Rep.) ("A threshold issue to be considered when a debtor files a petition under title 11 is whether the estate created ... should be treated as a separate taxable entity"); *id.,* at 334 ("Subsection (d) indicates that the estate in a chapter 13 case is not a separate taxable entity"); accord, S.Rep. No. 95–989, p. 45 (1978), 1978 U.S.C.C.A.N. 5963 at 6291 (hereinafter S. Rep.); H.R. Rep., at 335 (noting "the creation of the estate of an individual under chapters 7 or 11 of title 11 as a separate taxable entity"); accord, S. Rep., at 46.

    The Reports also tie separate taxable entity status to the responsibility to file returns and pay taxes. See H.R. Rep., at 277 ("If the estate is a separate taxable entity, then the representative of the estate is responsible for filing any income tax returns and paying any taxes due by the estate"); *id.,* at 278 ("When the estate is not a separate taxable entity, then taxation of the debtor should be conducted on the same basis as if no petition were filed").

4    A dispute over Committee jurisdiction led to the insertion of "State or local" before each mention of "law imposing a tax." Compare H.R. 8200, 95th Cong., 1st Sess., § 346 (1977), with § 346, 92 Stat. 2565. Nonetheless, the House Report underscored that the policy behind § 346 applied equally to federal taxes:

    "[T]here is a strong bankruptcy policy that these provisions apply equally to Federal, State, and local taxes. However, in order to avoid any possible jurisdictional conflict with the Ways and Means Committee over the applicability of these provisions to Federal taxes, H.R. 8200 has been amended to make the sections inapplicable to Federal taxes. The amendment ... will obviate the need for a sequential referral of the bill to Ways and Means, which will be considering these provisions and other bankruptcy-related tax law later in this Congress." H.R. Rep., at 275.

5    See, *e.g., In re Maxfield,* No. 04–60355, 2009 WL 2105953, \*5–\*6 (Bkrtcy.Ct.N.D.Ind.2009); *In re Jagours,* 236 B.R. 616, 620 (Bkrtcy.Ct.E.D.Tex.1999); *In re Whall,* 391 B.R. 1, 5–6 (Bkrtcy.Ct.Mass.2008); *In re Brown,* No. 05–41071, 2006 WL 3370867, \*3 (Bkrtcy.Ct.Mass.2006); *In re Gyulafia,* 65 B.R. 913, 916 (Bkrtcy.Ct.Kan.1986).

6    The dissent suggests that Chapter 12 can be distinguished from Chapter 13 because Chapter 12 bankruptcies tend to be longer, such that the treatment of taxes is more "important." *Post,* at 1900. As a practical matter, it is not clear that Chapter 12 bankruptcies are substantially longer. Compare Brief for Neil E. Harl. et al. as *Amici Curiae* 33 (median Chapter 12 case duration is under 8 months) with Tr. of Oral Arg. 49 ("on average we're talking about 4 months in a chapter 13 case"). In any event, there is no indication that Congress intended any difference in duration—if it anticipated a difference at all —to flip the characterization of postpetition income taxes from one chapter to the other. Nor does the absence of a § 1305 equivalent in Chapter 12 justify shoehorning postpetition taxes into § 503(b), as the dissent argues. That Chapter 12 lacks a provision allowing such taxes to be brought inside the plan only clarifies that such taxes fall outside of the plan. The dissent alternatively suggests that it "do[es] not see the serious harm in treating the relevant taxes as 'administrative expenses' in *both* Chapter 12 and Chapter 13 cases." *Post,* at 1900. The "harm" is to settled understandings in Chapter 13 to the contrary. The "harm" is also to § 1305; to avoid rendering § 1305 a nullity, the dissent recasts the provision as applicable not to all "taxes that become payable ... while the case is pending," but only those payable "*after* the Chapter 13 Plan is confirmed." *Post,* at 1900. The dissent does not claim, however, that this was Congress' intent for § 1305, as Congress' choice of words would be exceedingly overbroad if it were. And the dissent's novel reading contravenes ample Chapter 13 authority recognizing no such limitation on § 1305's scope. *E.g.,* 8 Collier ¶ 1305.02 (citing cases).

7    IRS manuals dating back to 1998 indicate that the Government did not view postpetition federal income taxes as collectible in an individual debtor's Chapter 12 plan, even when that view was adverse to its interests. See IRM § 25.17.12.9.3 (2004); *id.,* § 25.17.12.9.3(1) (2002); *id.,* § 5.9, ch. 10.8(4) (1999); *id.,* § 5.9, ch. 10.8(4) (1998). Until the enactment of 11 U.S.C. § 1222(a)(2)(A), treating such taxes as priority claims in the plan would have assured the Government of full payment before or at the time of the plan.

132 S.Ct. 1882, 182 L.Ed.2d 840, 109 A.F.T.R.2d 2012-2020, 80 USLW 4357...

**8**    The House Report stated—after noting that, in addition to prepetition taxes, "certain other taxes are entitled to priority"—that "[t]axes arising from the operation of the estate after bankruptcy are entitled to priority as administrative expenses." H.R. Rep., at 193. That is still true. Many taxes arising after bankruptcy, as in individual-debtor Chapter 7 or 11 cases, remain entitled to priority as administrative expenses. The Senate Report, meanwhile, stated: "*In general,* administrative expenses include taxes which the trustee incurs in administering the debtor's estate, including taxes on capital gains from sales of property *by the trustee* and taxes on income earned by the estate during the case." S. Rep., at 66 (emphasis added). That likewise remains true. Administrative expenses still include income taxes that "the trustee," as opposed to the debtor, has incurred—again, as in individual-debtor Chapter 7 or 11 cases.

**9**    The original § 346 established that the estate of a corporate debtor is not a separate taxable entity, but nonetheless provided that "the trustee shall make any [State or local] tax return otherwise required ... to be filed by or on behalf of such ... corporation." §§ 346(c)(1)–(2), 92 Stat. 2565, 2566. The current § 346 similarly states, in the same provision deeming the debtor taxable when there is no separate taxable estate, that "[t]he trustee shall make such tax returns of income of corporations.... The estate shall be liable for any [State or local] tax imposed on such corporation." § 346(b).

**10**    The dissent opines that employment taxes must be administrative expenses "incurred by the estate" because, in its view, they "do not fit easily" within the category of administrative expenses under § 503(b)(1)(A)(i), notwithstanding the Government's contrary representations on both points. *Post,* at 1899 – 1900. Because employment taxes are not at issue in this case, we offer no opinion on either question.

---

**End of Document**                     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Beck Chevrolet Co., Inc. v. General Motors LLC,
S.D.N.Y., August 23, 2012

127 S.Ct. 2411
Supreme Court of the United States

POWEREX CORP., Petitioner,
v.
RELIANT ENERGY SERVICES, INC., et al.

No. 05–85.
|
Argued April 16, 2007.
|
Decided June 18, 2007.

**Synopsis**

**Background:** State of California brought state-court actions against wholesale energy suppliers, alleging price-fixing conspiracy. Suppliers cross-claimed seeking indemnification from federal and Canadian government agencies, as well as Canadian agency's wholly owned subsidiary. Agencies removed actions. The United States District Court for the Southern District of California, Robert H. Whaley, J., granted state's motion to remand, ruling that agencies enjoyed sovereign immunity, and that subsidiary was not foreign state under Foreign Sovereign Immunities Act (FSIA). The United States Court of Appeals for the Ninth Circuit, 391 F.3d 1011, ruled that it could review substantive issues of law preceding remand order, and affirmed ruling as to subsidiary's status. Certiorari was issued.

**Holdings:** The United States Supreme Court, Justice Scalia, held that:

[1] statutory bar on appellate review of subject matter jurisdiction-based remand is not conditioned on absence of jurisdiction at time of removal;

[2] Court of Appeals was barred from reviewing remand order in instant case, given District Court's colorable characterization of remand as resting on lack of subject matter jurisdiction;

[3] statutory bar on review of remand order does not permit review of substantive issues that may have preceded remand order, absent separate order; and

[4] statutory bar on review of remand order is applicable to suit removed under FSIA.

Vacated in part and remanded with instructions.

Justice Kennedy filed concurring opinion joined by Justice Alito.

Justice Breyer filed dissenting opinion joined by Justice Stevens.

West Headnotes (6)

**[1]**    **Removal of Cases**    Review

Statutory bar on appellate review of federal district court's remand order is limited to remands based on lack of subject matter jurisdiction and defects in removal procedure. 28 U.S.C.A. § 1447(c-d).

89 Cases that cite this headnote

**[2]**    **Removal of Cases**    Review

Statutory bar on appellate review of federal district court's subject matter jurisdiction-based remand is not conditioned on absence of jurisdiction at time of removal; case can be properly removed, yet suffer from failing in subject matter jurisdiction that requires remand, and in such case appellate review is prohibited. 28 U.S.C.A. § 1447(c-d).

159 Cases that cite this headnote

**[3]**    **Removal of Cases**    Review

Court of Appeals was barred from reviewing federal district court's remand of action brought by state against wholesale energy suppliers, alleging price-fixing conspiracy, in which suppliers cross-claimed seeking indemnification from federal and Canadian government agencies and Canadian agency's wholly owned subsidiary, and agencies and subsidiary removed as "foreign states"; district court's characterization

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 281 of 305

**Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)**
127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

of remand as resting on lack of subject matter jurisdiction, arising from sovereign immunity enjoyed by agencies and from subsidiary's non-foreign-state status, was at least colorable. 28 U.S.C.A. §§ 1447(d), 1603(b)(2).

31 Cases that cite this headnote

**[4]**  **Removal of Cases** 👉 Review

When, in remanding removed action, federal district court relies upon ground that is colorably characterized as subject matter jurisdiction, appellate review is barred by statute. 28 U.S.C.A. § 1447(d).

59 Cases that cite this headnote

**[5]**  **Removal of Cases** 👉 Review

Removal statute barring review of federal district court's subject matter jurisdiction-based remand order does not permit review of substantive issues of law that may have preceded remand order, absent order separate from unreviewable remand order. 28 U.S.C.A. § 1447(d).

41 Cases that cite this headnote

**[6]**  **Removal of Cases** 👉 Review

Removal statute barring review of federal district court's subject matter jurisdiction-based remand order is applicable to suit removed under Foreign Sovereign Immunities Act (FSIA). 28 U.S.C.A. §§ 1447(d), 1603(b)(2).

67 Cases that cite this headnote

**\*\*2412   \*224** *Syllabus* [*]

Plaintiffs-respondents filed state-court suits alleging that various companies in California's energy market had conspired to fix prices in violation of state law. Some of the defendants filed cross-claims seeking indemnity from, *inter alios,* two United States Government agencies (BPA and WAPA); a Canadian corporation (BC Hydro) wholly owned by British Columbia and thus a "foreign state" under

the Foreign Sovereign Immunities Act of 1976 (FSIA); and petitioner Powerex, a wholly owned subsidiary of BC Hydro. The cross-defendants removed the entire case to federal court, with BC Hydro and petitioner relying on the FSIA. Plaintiffs-respondents moved to remand, arguing that petitioner was not a foreign state and that the cross-claims against BPA, WAPA, and BC Hydro were barred by sovereign immunity. The District Court agreed and remanded. As relevant here, petitioner appealed, arguing that it was a foreign sovereign under the FSIA, but plaintiffs-respondents rejoined that the appeal was jurisdictionally barred by 28 U.S.C. § 1447(d), which provides that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." The Ninth Circuit held that § 1447(d) did not preclude it from reviewing substantive issues of law that preceded the remand order, but affirmed the holding as to petitioner's foreign-state status.

*Held:* Section 1447(d) bars appellate consideration of petitioner's claim that it is a foreign state for FSIA purposes. Pp. 2415 – 2421.

(a) Appellate courts' authority to review district-court orders remanding removed cases to state court is substantially limited by statute. Section 1447(d) is read *in pari materia* with § 1447(c), so that only remands based on the grounds specified in the latter are shielded by the review bar mandated by the former. *Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 345–346, 96 S.Ct. 584, 46 L.Ed.2d 542. For purposes of this case, it is assumed that the grounds specified in § 1447(c) are lack of subject-matter jurisdiction and defects in removal procedure. Cf. *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 711–712, 116 S.Ct. 1712, 135 L.Ed.2d 1. Given the proceedings below, review of the remand order is barred only if it was based on lack of subject-matter jurisdiction. Pp. 2415 – 2416.

**\*225** b) Nothing in § 1447(c)'s text supports the claim that a case cannot be remanded **\*\*2413** for lack of subject-matter jurisdiction within the meaning of that provision if the case was properly removed in the first instance. Indeed, statutory history conclusively refutes the argument that § 1447(c) is implicitly limited in such a manner. When a district court remands a properly removed case because it nonetheless lacks subject-matter jurisdiction, the remand is covered by § 1447(c) and shielded from review by § 1447(d). Pp. 2416 – 2417.

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 282 of 305

Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)
127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

(c) The District Court relied upon a ground that is colorably characterized as subject-matter jurisdiction and so § 1447(d) bars appellate review. As an initial matter, it is clear from the record that the court was purporting to remand for lack of subject-matter jurisdiction. Even assuming that § 1447(d) permits appellate courts to look behind a district court's characterization of the basis for the remand, such review is hereby limited to ascertaining whether the characterization was colorable. In this case, the only plausible explanation of the District Court's remand was that it believed that it lacked the power to adjudicate the claims against petitioner once it had determined that petitioner was not a foreign state and that the other cross-defendants had sovereign immunity. It is unnecessary to determine whether that belief was correct; it was at least debatable. Petitioner contends instead that the District Court was actually remanding based on *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720, which authorizes remand when a district court declines to exercise supplemental jurisdiction. This is implausible. The District Court never mentioned the possibility of supplemental jurisdiction, and petitioner does not appear to have argued that the claims against it could be retained based on supplemental jurisdiction. Pp. 2417 – 2419.

(d) The Ninth Circuit held that § 1447(d) does not preclude reviewing a district court's substantive determinations that precede a remand order, a holding that appears to be premised on *Waco v. United States Fidelity & Guaranty Co.,* 293 U.S. 140, 55 S.Ct. 6, 79 L.Ed. 244. *Waco,* however, does not permit an appeal when, as here, there is no order separate from the unreviewable remand order. Pp. 2418 – 2419.

(e) Petitioner's contention that Congress did not intend § 1447(d) to govern suits removed under the FSIA is flatly refuted by this Court's longstanding precedent that "[a]bsent a clear statutory command to the contrary, [the Court] assume[s] that Congress is 'aware of the universality of th[e] practice' of denying appellate review of remand orders when Congress creates a new ground for removal." *Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 128, 116 S.Ct. 494, 133 L.Ed.2d 461. Pp. 2419 – 2420.

391 F.3d 1011, vacated in part and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, SOUTER, THOMAS, GINSBURG, and ALITO, JJ., joined. KENNEDY, J., filed a concurring opinion, in which ALITO, J., joined, *post,* p. 2421.

BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, *post,* p. 2421.

**Attorneys and Law Firms**

David C. Frederick, Washington, D.C., for petitioner.

Douglas Hallward–Driemeier for United States as amicus curiae, by special leave of the Court, supporting petitioner.

Leonard B. Simon, San Diego, CA, for respondents.

David C. Frederick, Counsel of Record, Scott H. Angstreich, **2414 Brennan J. Crimmins, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for Powerex Corp.

William Bernstein, Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, CA, Leonard B. Simon, Counsel of Record, Pamela M. Parker, Frank J. Janecek, Jr., Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, for Plaintiffs–Respondents.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

**\*226** We granted certiorari to decide whether, under the Foreign Sovereign Immunities Act of 1976 (FSIA), petitioner is an "organ of a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). When we granted certiorari, however, we asked the parties also to address whether the Ninth Circuit had appellate jurisdiction in light of 28 U.S.C. § 1447(d).

I

The procedural history of this case is long and complicated; we recount only what is necessary to resolve the writ before us. The State of California, along with some private and corporate citizens (hereinafter collectively referred to as plaintiffs-respondents), filed suits in California state courts against various companies in the California energy market, **\*227** alleging that they had conspired to fix prices in violation of California law. Some of those defendants, in turn, filed cross-claims seeking indemnity from, *inter alios,* the Bonneville Power Administration (BPA), the Western Area Power Administration (WAPA), the British Columbia Hydro and Power Authority (BC Hydro), and petitioner Powerex. (We shall sometimes refer to these entities collectively as the cross-defendants.) BPA and WAPA are agencies of the United

000282

127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

States Government. BC Hydro is a crown corporation of the Canadian Province of British Columbia that is wholly owned by the Province and that all parties agree constitutes a "foreign state" for purposes of the FSIA. See § 1603. Petitioner, also a Canadian corporation, is a wholly owned subsidiary of BC Hydro.

The cross-defendants removed the entire case to federal court. BC Hydro and petitioner both relied on § 1441(d), which permits a "foreign state," as defined by the FSIA, see § 1603(a), to remove civil actions brought against it in state court. BPA and WAPA invoked § 1442(a), authorizing removal by federal agencies. Plaintiffs-respondents moved to remand, arguing that petitioner was not a foreign state, and that the cross-claims against BPA, WAPA, and BC Hydro were barred by sovereign immunity. Petitioner opposed remand on the ground that it was a foreign state under the FSIA; the other cross-defendants opposed remand on the ground that their sovereign immunity entitled them to be dismissed from the action outright.

The District Court initially concluded (we assume correctly) that § 1442(a) entitled BPA and WAPA to remove the *entire* case and that BC Hydro was similarly entitled under § 1441(d). App. to Pet. for Cert. 20a. It thus believed that whether the case should be remanded "hinge[d on its] jurisdictional authority to hear the removed claims, not whether the actions were properly removed in the first instance." *Ibid.* The District Court held that petitioner did not qualify as a foreign sovereign under the FSIA. *Id.,* at 33a–38a. It **\*228** also decided that BC Hydro enjoyed sovereign immunity under the FSIA. *Id.,* at 21a–33a. And it concluded that BPA **\*\*2415** and WAPA were immune from suit in state court, which the court believed deprived it of jurisdiction over the claims against those agencies. *Id.,* at 38a–44a. Having reached these conclusions, the District Court remanded the entire case. *Id.,* at 44a.

Petitioner appealed to the Court of Appeals for the Ninth Circuit, arguing that it was a foreign sovereign under the FSIA. BPA and WAPA (but not BC Hydro) also appealed, asserting that the District Court, before remanding the case, should have dismissed them from the action in light of their sovereign immunity. Plaintiffs-respondents, for their part, rejoined that both appeals were jurisdictionally barred by § 1447(d) and that the District Court had not erred in any event. The Ninth Circuit rejected the invocation of § 1447(d), holding that that provision did not preclude it from reviewing substantive issues of law that preceded the remand order.

*California v. NRG Energy Inc.,* 391 F.3d 1011, 1022–1023 (2004). It also found that the District Court had jurisdiction over the case because BPA, WAPA, and BC Hydro properly removed the entire action. *Id.,* at 1023. Turning to the merits, the Ninth Circuit affirmed the holding that petitioner was not a "foreign state" for purposes of the FSIA. *Id.,* at 1025–1026. It also upheld the District Court's conclusion that BPA, WAPA, and BC Hydro retained sovereign immunity, *id.,* at 1023–1025, but reversed its decision not to dismiss BPA and WAPA before remanding, *id.,* at 1026–1027.

Petitioner sought certiorari review of the Ninth Circuit's determination that it was not an "organ of a foreign state or political subdivision thereof" under § 1603(b)(2). We granted certiorari on this question, but asked the parties to address in addition whether the Ninth Circuit had jurisdiction over petitioner's appeal notwithstanding § 1447(d). 549 U.S. 1178, 127 S.Ct. 1144, 166 L.Ed.2d 910 (2007).

## *229 II

**[1]** The authority of appellate courts to review district-court orders remanding removed cases to state court is substantially limited by statute. Title 28 U.S.C. § 1447(d) provides (with an exception for certain civil rights cases) that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." Determining whether the Ninth Circuit was permitted to review the District Court's remand is, alas, not as easy as one would expect from a mere reading of this text, for we have interpreted § 1447(d) to cover less than its words suggest. In *Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 345–346, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976), we held that § 1447(d) should be read *in pari materia* with § 1447(c), so that only remands based on the grounds specified in the latter are shielded by the bar on review mandated by the former. At the time of *Thermtron*, § 1447(c) stated in relevant part:

" 'If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case.' " *Id.,* at 342, 96 S.Ct. 584.

Consequently, *Thermtron* limited § 1447(d)'s application to such remands. *Id.,* at 346, 96 S.Ct. 584. In 1988, Congress amended § 1447(c) in relevant part as follows:

Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)

127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

"A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under [28 U.S.C. §] 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, **2416 the case shall be remanded." § 1016(c)(1), 102 Stat. 4670.

When that version of § 1447(c) was in effect, we thus interpreted § 1447(d) to preclude review only of remands for lack of subject-matter jurisdiction and for defects in removal procedure. *230 See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 711–712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996); Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 127–128, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995).

Although § 1447(c) was amended yet again in 1996, 110 Stat. 3022, we will assume for purposes of this case that the amendment was immaterial to Thermtron's gloss on § 1447(d), so that the prohibition on appellate review remains limited to remands based on the grounds specified in Quackenbush. We agree with petitioner that the remand order was not based on a defect in removal procedure, so on the foregoing interpretation of Thermtron the remand is immunized from review only if it was based on a lack of subject-matter jurisdiction.

## A

[2]   The principal submission of the Solicitor General and petitioner is that the District Court's remand order was not based on a lack of "subject matter jurisdiction" within the meaning of § 1447(c) because that term is properly interpreted to cover *only* "a defect in subject matter jurisdiction *at the time of removal* that rendered *the removal itself* jurisdictionally improper." Brief for United States as *Amicus Curiae* 8; see also *id.,* at 8–11; Brief for Petitioner 42–45. Under this interpretation, the District Court's remand order was not based on a defect in subject-matter jurisdiction for purposes of § 1447(c), since the cross-defendants other than petitioner were statutorily authorized to remove the case in light of their sovereign status. The Ninth Circuit appears to have relied, at least in part, on this rationale. See 391 F.3d, at 1023.

We reject this narrowing construction of § 1447(c)'s unqualified authorization of remands for lack of "subject matter jurisdiction." Nothing in the text of § 1447(c) supports the proposition that a remand for lack of subject-matter jurisdiction is not covered so long as the case was properly

removed in the first instance. Petitioner and the Solicitor General do not seriously dispute the absence of an explicit textual *231 limitation. Instead, relying on the statutory history of § 1447(c), they make a three-step argument why the provision is implicitly limited in this manner. First, they note that the pre–1988 version of § 1447(c) mandated remand "[i]f at any time before final judgment it appear[ed] that the case was removed improvidently and without jurisdiction," 28 U.S.C. § 1447(c) (1982 ed.). That version, obviously, authorized remand only for cases that were *removed* improperly. Second, they contend that the purpose of the 1988 amendment was to impose a time limit for raising nonjurisdictional objections to removal, a contention that is certainly plausible in light of the structure of the amended provision:

"A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." § 1447(c) (1988 ed.).

Finally, they conclude that since the purpose of the amendment was to alter the timing rules, there is no reason to think that Congress broadened the scope of § 1447(c) to authorize the remand of cases that had been properly removed. The language "lacks subject matter jurisdiction," **2417 which was newly added to § 1447(c), must be construed to cover only cases in which *removal* was jurisdictionally improper at the outset.

But the very statutory history upon which this creative argument relies conclusively refutes it. The same section of the public law that amended § 1447(c) to include the phrase "subject matter jurisdiction" also created a new § 1447(e). See § 1016(c), 102 Stat. 4670. Section 1447(e), which remains on the books, states:

"If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter *232 jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court."

000284

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 285 of 305

Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)

127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

This unambiguously demonstrates that a case can be properly removed and yet suffer from a failing in *subject-matter jurisdiction* that requires remand. A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning. See, *e.g., IBP, Inc. v. Alvarez,* 546 U.S. 21, 34, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005). That maxim is doubly appropriate here, since the phrase "subject matter jurisdiction" was inserted into § 1447(c) and § 1447(e) at the same time. There is no reason to believe that the new language in the former provision, unlike the new language simultaneously inserted two subsections later, covers *only* cases in which removal itself was jurisdictionally improper. We hold that when a district court remands a properly removed case because it nonetheless lacks subject-matter jurisdiction, the remand is covered by § 1447(c) and thus shielded from review by § 1447(d). [1]

### B

**[3]** That holding requires us to determine whether the ground for the District Court's remand in the present case was lack of subject-matter jurisdiction. As an initial matter, it is quite clear that the District Court was *purporting* to remand on that ground. The heading of the discussion section of the remand order is entitled "Subject Matter Jurisdiction Over the Removed Actions." App. to Pet. for Cert. 20a. And **\*233** the District Court explicitly stated that the remand "issue hinges ... on the Court's jurisdictional authority to hear the removed claims." *Ibid.* Were any doubt remaining, it is surely eliminated by the District Court's order denying a stay of the remand, which repeatedly stated that a lack of subject-matter jurisdiction required remand pursuant to § 1447(c). See App. 281–286.

**[4]** For some Members of this Court, the foregoing conclusion that the District Court purported to remand for lack of subject-matter jurisdiction is alone enough to bar review under § 1447(d). See *Osborn v. Haley,* 549 U.S. 225, 264, 127 S.Ct. 881, 166 L.Ed.2d 819 (2007) (SCALIA, J., joined by THOMAS, J., dissenting). Even assuming, however, that § 1447(d) permits appellate review to look behind the district court's characterization, see *Kircher v. Putnam Funds Trust,* 547 U.S. 633, 641, n. 9, 126 S.Ct. 2145, n. 9, 165 L.Ed.2d 92 (2006) (reserving the question), we conclude **\*\*2418** that appellate review is barred in this case. [2] There is only one *plausible* explanation of what

legal ground the District Court actually relied upon for its remand in the present case. As contended by plaintiffs-respondents, it was the court's lack of *power* to adjudicate the claims against petitioner once it concluded both that petitioner was not a foreign state capable of independently removing and that the claims against the other removing cross-defendants were barred by sovereign immunity. Brief for Plaintiffs–Respondents 17–21, 25–26. Though we have not passed on the question whether, when sovereign immunity bars the claims against the only parties capable of removing the case, subject-matter jurisdiction exists to entertain the remaining claims, cf. n. 3, *infra,* the point is **\*234** certainly debatable. And we conclude that review of the District Court's characterization of its remand as resting upon lack of subject-matter jurisdiction, to the extent it is permissible at all, should be limited to confirming that that characterization was colorable. Lengthy appellate disputes about whether an arguable jurisdictional ground invoked by the district court was properly such would frustrate the purpose of § 1447(d) quite as much as determining whether the factfinding underlying that invocation was correct. See *Kircher, supra,* at 649 – 650, 126 S.Ct. 2145 (SCALIA, J., concurring in part and concurring in judgment). Moreover, the line between misclassifying a ground as subject-matter jurisdiction and misapplying a proper ground of subject-matter jurisdiction is sometimes elusively thin. To decide the present case, we need not pass on whether § 1447(d) permits appellate review of a district-court remand order that dresses in jurisdictional clothing a patently nonjurisdictional ground (such as the docket congestion invoked by the District Court in *Thermtron,* 423 U.S., at 344, 96 S.Ct. 584). We hold that when, as here, the District Court relied upon a ground that is colorably characterized as subject-matter jurisdiction, appellate review is barred by § 1447(d).

Petitioner puts forward another explanation for the remand, which we find implausible. Petitioner claims that, because the entire case was properly removed, the District Court had the discretion to invoke a form of *supplemental jurisdiction* to hear the claims against it, and that its remand rested upon the decision not to exercise that discretion. In short, petitioner contends that the District Court was actually relying on *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), which authorized district courts to remand removed state claims when they decide not to exercise supplemental jurisdiction. Brief for Petitioner 45–48; Reply Brief for Petitioner 16–20. It is far from clear, to begin with, (1) that supplemental jurisdiction was even available **\*235** in the circumstances of this case; [3]

and (2) that when discretionary supplemental jurisdiction is declined the remand is not based on lack of subject- **\*\*2419** matter jurisdiction for purposes of § 1447(c) and § 1447(d).[4] Assuming those points, however, there is no reason to believe that the District Court's remand was actually based on this unexplained discretionary decision. The District Court itself *never mentioned* the possibility of supplemental jurisdiction, neither in its original decision, see App. to Pet. for Cert. 20a–44a, nor in its order denying petitioner's motion to stay the remand pending appeal, App. 281–286. To the contrary, as described above, it relied upon lack of subject-matter jurisdiction—which, in petitioner's view of things (but see n. 4, this page) would not include a *Cohill* remand. Moreover, it does not appear from the record that petitioner ever even argued to the District Court that supplemental jurisdiction was a basis for retaining the claims against it. There is, in short, no reason to believe that an unmentioned nonexercise of *Cohill* discretion was the basis for the remand.

C

**[5]** Part of the reason why the Ninth Circuit concluded it had appellate jurisdiction is a legal theory quite different from those discussed and rejected above. Petitioner, along with the other appellants, convinced the court to apply Circuit precedent holding that § 1447(d) does not preclude review of a district court's merits determinations that precede the remand. **\*236** See 391 F.3d, at 1023 (citing, *inter alia, Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.,* 741 F.2d 273, 276–277 (C.A.9 1984)). Petitioner has not completely abandoned this argument before us, see Brief for Petitioner 50, and it is in any event desirable to address this aspect of the Ninth Circuit's judgment.

The line of Ninth Circuit jurisprudence upon which petitioner relied appears to be invoking our decision in *Waco v. United States Fidelity & Guaranty Co.,* 293 U.S. 140, 55 S.Ct. 6, 79 L.Ed. 244 (1934). There the District Court, in a single decree, had entered one order dismissing a cross-complaint against one party, and another order remanding because there was no diversity of citizenship in light of the dismissal. *Id.,* at 142, 55 S.Ct. 6. We held that appellate jurisdiction existed to review the order of dismissal, although we repeatedly cautioned that the remand order itself could not be set aside. *Id.,* at 143–144, 55 S.Ct. 6. The Ninth Circuit's application of *Waco* to petitioner's appeal was mistaken. As we reiterated in *Kircher,* see 547 U.S., at 645 – 646, n. 13, 126 S.Ct. 2145, *Waco* does not permit an appeal when there is no *order* separate from the

unreviewable remand order. Here petitioner can point to no District Court order, separate from the remand, to which it objects and to which the issue of its foreign sovereign status is material. Thus, petitioner's invocation of *Waco* amounts to a request for one of two impermissible outcomes: an advisory opinion as to its FSIA status that will not affect any order of the District Court, or a reversal of the remand order. *Waco* did not, and could not, authorize either form of judicial relief.

D

**[6]** Finally, petitioner contends, with no textual support, that § 1447(d) is simply inapplicable to a suit removed under the FSIA. It asserts that "§ 1447(d) must yield because Congress could not have intended **\*\*2420** to grant district judges irrevocable authority to decide questions with such sensitive foreign-relations implications." Brief for Petitioner 49. **\*237** We will not ignore a clear jurisdictional statute in reliance upon supposition of what Congress *really* wanted. See *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Petitioner's divination of congressional intent is flatly refuted by longstanding precedent:

> "Section 1447(d) applies 'not only to remand orders made in suits removed under [the general removal statute], but to orders of remand made in cases removed under any other statutes, as well.' ... Absent a clear statutory command to the contrary, we assume that Congress is 'aware of the universality of th[e] practice' of denying appellate review of remand orders when Congress creates a new ground for removal." *Things Remembered,* 516 U.S., at 128, 116 S.Ct. 940 (quoting *United States v. Rice,* 327 U.S. 742, 752, 66 S.Ct. 835, 90 L.Ed. 982 (1946); emphasis deleted and alterations in original).

Congress has repeatedly demonstrated its readiness to exempt particular classes of remand orders from § 1447(d) when it wishes—both within the text of § 1447(d) itself (which exempts civil rights cases removed pursuant to 28 U.S.C. § 1443), and in separate statutes, see, *e.g.,* 12 U.S.C. § 1441a(*l* )(3)(C), § 1819(b)(2)(C); 25 U.S.C. § 487(d).

We are well aware that § 1447(d)'s immunization of erroneous remands has undesirable consequences in the FSIA context. A foreign sovereign defendant whose case is wrongly remanded is denied not only the federal forum to which it is entitled (as befalls all remanded parties with meritorious appeals barred by § 1447(d)), but also certain procedural rights that the FSIA

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 287 of 305

Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)
127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

specifically provides foreign sovereigns only in federal court (such as the right to a bench trial, see 28 U.S.C. § 1330(a); § 1441(d)). But whether that special concern outweighs § 1447(d)'s general interest in avoiding prolonged litigation on threshold nonmerits questions, see *Kircher, supra,* at 640, 126 S.Ct. 2145, is a policy debate that belongs in the halls of Congress, not in the hearing room of this Court. As **\*238** far as the Third Branch is concerned, what the text of § 1447(d) indisputably does prevails over what it ought to have done. [5]

**\*\*2421** \* \* \*

Section 1447(d) reflects Congress's longstanding "policy of not permitting interruption of the litigation of the merits of a removed case by prolonged litigation of questions of jurisdiction of the district court to which the cause is removed." *Rice, supra,* at 751, 66 S.Ct. 835. Appellate courts must take that jurisdictional prescription seriously, however pressing the merits **\*239** of the appeal might seem. We hold that § 1447(d) bars appellate consideration of petitioner's claim that it is a foreign state for purposes of the FSIA. We therefore vacate in part the judgment of the Ninth Circuit and remand the case with instructions to dismiss petitioner's appeal for want of jurisdiction.

*It is so ordered.*

Justice KENNEDY, with whom Justice ALITO joins, concurring.
When Congress acted through the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* (2000 ed. and Supp. IV), to codify certain protections and immunities for foreign sovereigns and the entities of those sovereigns, it no doubt considered its action to be of importance for maintaining a proper relationship with other nations. And so it is troubling to be required to issue a decision that might well frustrate a policy of importance to our own Government.

As the Court explains, however, the structure and wording of § 1447(d) (2000 ed.) leave us no other choice. There is no latitude for us to reach a different result. If it is true that the statute as written and the judgment we issue today are inconsistent with the intent and purpose Congress wanted to express, then the immediate jeopardy that foreign sovereign entities will now face should justify urgent legislative action to enact the necessary statutory revisions.

Justice BREYER, with whom Justice STEVENS, joins, dissenting.
Unlike the Court, I believe the District Court's remand order is reviewable on appeal. And, reviewing the decision below, I would hold that Powerex is an organ of the Government of British Columbia.

I

The majority concludes that 28 U.S.C. § 1447(d) took from the Ninth Circuit the power to review the District Court's **\*240** remand decision. The statutory argument is a strong one. Section 1447(c) says that, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded" to state court; and § 1447(d), referring to subsection (c), adds that a district court "order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." *Thermtron Products, Inc. v. Hermansdorfer,* 423 U.S. 336, 345–346, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976).

Nonetheless this Court has found exceptions to § 1447's seemingly blanket prohibition. See, *e.g., id.,* at 350–352, 96 S.Ct. 584; *Osborn v. Haley,* 549 U.S. 225, 240 − 244, 127 S.Ct. 881, 893−896, 166 L.Ed.2d 819 (2007). In doing so, the Court has recognized that even a statute silent on the subject can create an important conflict with § 1447(d)'s "no appellate review" instruction. And where that is so, we have, **\*\*2422** in fact, resolved the conflict by reading a later more specific statute as creating an implicit exception to § 1447(d) (though *Osborn* did not say as much). *Id.,* at 243 − 244, 127 S.Ct. 881.

The subject matter of the Foreign Sovereign Immunity Act of 1976's (FSIA) removal provision, foreign sovereigns, is special. And the FSIA creates serious conflicts with § 1447(d)'s "no appellate review" instruction. The FSIA is later enacted and subject-matter specific. Consequently, I would read into the FSIA a similar exception to § 1447(d), applicable here.

*Osborn* illustrates my starting point: a conflict with § 1447(d). The Westfall Act, the specific statute at issue in that case, provides for removal to federal court of a state-court lawsuit brought against a federal employee where the state-court lawsuit attacks employee actions within the scope of federal employment. 28 U.S.C. §§ 2679(d)(2)-(3). The Westfall Act authorizes the Attorney General to certify that the employee's

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 288 of 305

Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)
127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

actions at issue fall within the scope of federal employment. And the Westfall Act says that the certification "conclusively establish[es]" that fact for removal purposes. §§ 2679(d)(1)-(2). In *Osborn,* we pointed out **\*241** that § 1447(d) would permit a district court, without appellate review, to remand in the face of a contrary Attorney General certification. 549 U.S., at 240 – 243, 127 S.Ct. 881. Doing so, without appellate review, would thereby permit the district court to substitute its own judgment (as to whether the employee's actions were within the federal "scope of employment") for that of the Attorney General. And the district court would thereby have the unreviewable power to make the Attorney General's determination *non*-conclusive, contrary to what the statute says. Because § 1447(d), if applied, would render this statutory instruction "weightless," we found a conflict with § 1447(d). *Ibid.* And we resolved the conflict in favor of the later enacted, more specific Westfall Act. *Id.,* at 243, 127 S.Ct. 881.

A similarly strong conflict exists here, albeit not with a separate removal provision, but rather with a comprehensive statutory scheme. To understand how that is so, imagine a case not now before us. Imagine that a private plaintiff brings a lawsuit in state court against a noncommercial division of a foreign nation's government, say, a branch of that nation's defense ministry or, for that matter, against the foreign nation itself. The FSIA provides a specific guarantee that such a suit cannot continue (except in certain instances that, for purposes of my example, are not relevant). 28 U.S.C. §§ 1602–1605. It achieves this objective by authorizing the foreign government to remove the case to federal court where a federal judge will determine if the defendant is indeed a foreign government and, if so, dismiss the case. § 1441(d).

What happens if the foreign sovereign removes the case to federal court only to have the federal judge mistakenly remand the case to state court? As in an ordinary case, the lawsuit may well continue in the state tribunal. But, if so, *unlike the ordinary case* (say, a wrongly remanded diversity or "arising under" case) but like *Osborn,* the removing party will have lost considerably more than a choice of forum. The removing party will have lost that which a *different* **\*242** portion of the special statute sought to provide, namely, the immunity from suit that the FSIA sought to ensure.

That assurance forms a separate and central FSIA objective. The very purpose of sovereign immunity is to avoid subjecting a foreign sovereign to the rigors and "inconvenience of suit." **\*\*2423** *Dole Food Co. v.*

*Patrickson,* 538 U.S. 468, 479, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003). In such a case, a state court likely will feel bound by the federal court's prior judgment on the lack of immunity (under state law-of-the-case doctrine) and this Court's review (of an adverse state-court judgment) will come too late. In such a case, the FSIA's basic objective (unrelated to choice of forum) will have become "weightless." *Osborn, supra,* at 242, 127 S.Ct. 881.

It is difficult to see how this conflict between the FSIA's basic objective and § 1447(d) is any less serious than the conflict at issue in *Osborn.* The statutory objective here, harmonious relations with foreign sovereigns, is more, not less, important. See *Ex parte Peru,* 318 U.S. 578, 587, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) (exercising original writ to protect sovereign from erroneous District Court conclusion that it was not immune from suit). See also, *e.g., Republic of Mexico v. Hoffman,* 324 U.S. 30, 35, 65 S.Ct. 530, 89 L.Ed. 729 (1945); *Schooner Exchange v. McFaddon,* 7 Cranch 116, 3 L.Ed. 287 (1812); H.R.Rep. No. 94–1487, p. 13 (1976) (hereinafter H.R. Rep.) (FSIA intended to avoid "adverse foreign relations consequences").

Neither is a § 1447(d) exception here likely to undermine § 1447(d)'s basic purpose: avoiding the procedural delay that an added federal appeal would create. Avoiding that delay is important in a typical case where only choice of forum is at issue. But that same delay is necessary, indeed, crucial, in the special case where a foreign sovereign's immunity from suit is at issue. At the same time, foreign affairs is itself an exceptional topic, with special risks, special expertise, and special federal authority; hence, our finding a § 1447(d) exception in the FSIA is unlikely to lead courts to create a series of exceptions affecting more typical cases. **\*243** See, *e.g., Kircher v. Putnam Funds Trust,* 547 U.S. 633, 640 – 641, 126 S.Ct. 2145, 165 L.Ed.2d 92 (2006) (avoidance of delay is § 1447(d)'s basic purpose).

Finally, as in *Osborn,* the FSIA is a specific, later enacted statute. Cf. 549 U.S., at 243, 127 S.Ct. 881; see generally *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170, 127 S.Ct. 2339, 168 L.Ed.2d 54, 2007 WL 1661472 (where statutory provisions are inconsistent, "normally the specific governs the general"); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384–385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978).

000288

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 289 of 305

**Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)**
127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

Taken together, these considerations lead me to believe that, were a foreign *non*–commercial government entity's immunity from suit at issue, the FSIA would conflict with § 1447(d), leading a court properly to read the FSIA as implicitly creating an exception to § 1447(d), and thereby protecting the sovereign's right to appeal a wrongful remand order.

The removing defendant in this case, of course, is not a foreign sovereign immune from suit. It is a foreign governmental entity that acts in a commercial capacity and consequently is subject to suit. 28 U.S.C. § 1605(a)(2). But the FSIA nonetheless creates an important, though different, conflict. That conflict arises because a different FSIA provision says, "[u]pon removal the action shall be tried by the court *without jury*." § 1441(d) (emphasis added); see H.R. Rep., at 33 ("[O]ne effect of removing an action under the new section 1441(d) will be to extinguish a demand for a jury trial made in the state court"); S.Rep. No. 94–1310, p. 32 (1976) (hereinafter S. Rep.) (same). A wrongful remand would destroy this statutory right. The state-court trial would proceed *with* a jury; and it is questionable whether even this Court could **2424 later set aside an adverse state-court judgment for that reason—at least Congress seems to have thought as much. See H.R. Rep., at 33 ("Because the *judicial power of the United States* specifically encompasses actions between a State, or the Citizens thereof, *244 and foreign States, this preemption of State court [jury trial] procedures in cases involving foreign sovereigns is clearly constitutional" (emphasis added; citations and internal quotation marks omitted)); S. Rep., at 32 (same).

The conflict is important, this case is special, and we should resolve it by reading the FSIA as implicitly pre-empting the general application of § 1447(d). Indeed, I do not see how we could read the FSIA differently in this respect depending upon whether commercial or noncommercial sovereign activity is at issue. For these reasons, I believe that the Ninth Circuit correctly determined that it possessed legal authority to review the case.

It is true, as the majority states, that Congress has in other contexts carved out certain removal orders as being specifically reviewable on appeal. *Ante,* at 2419 – 2420. The majority reads these specific statutes to suggest that had Congress intended § 1447(d) not to apply in FSIA cases, it could simply have said so. *Ibid.* However, in fact, for the reasons articulated above, I believe that Congress must have assumed the FSIA overrode § 1447. Congress

enacted the FSIA soon after the Court's decision in *Thermtron Products,* 423 U.S., at 345, 96 S.Ct. 584, held that implicit § 1447(d) exceptions might exist. Cf. *Osborn,* 549 U.S., at 241 – 243, 127 S.Ct., at 894–895 (despite statutory silence, reading Westfall Act as overriding § 1447(d)). And, as I have said, the FSIA would otherwise fail to achieve Congress' basic objectives. Context and purpose make clear that few if any Members of Congress could have wanted to block appellate review here. Were the Court to pay greater attention to statutory objectives and purposes and less attention to a technical parsing of language, it might agree. Were it to agree, we would exercise our *interpretive obligation,* not "lawmaking power," *ante,* at 2420 – 2421, n. 5, with increased fidelity to the intention of those to whom our Constitution delegates that lawmaking power, namely, the Congress of the United States. And, law in this democracy would be all the better for it.

### *245 II

I part company with the Ninth Circuit on the merits. The Circuit held that the District Court's remand was proper because, in its view, Powerex is not "*an organ of a ... political subdivision"* of a "foreign state." 28 U.S.C. § 1603(b)(2) (emphasis added). Hence, it is not an "agency or instrumentality" of a foreign government and falls outside the scope of the FSIA's provision authorizing removal. § 1603(a); see generally *California v. NRG Energy Inc.,* 391 F.3d 1011, 1025–1026 (2004).

In my view, however, Powerex is "an organ" of the Province of British Columbia, a "political subdivision" of Canada. The record makes clear that Powerex is a government-owned and government-operated electric power distribution company, not meaningfully different from ordinary municipal electricity distributors, the Tennessee Valley Authority, or any foreign "nationalized" power producers and distributors, such as Britain's former Central Electricity Generating Board or Electricité de France. See generally C. Harris, Electricity Markets: Pricing, Structures, and Economics 15–20 (2006) (summarizing features of electricity companies in United States and Europe, among others); J. Nelson, Marginal Cost Pricing in Practice 3–6, 32, 37 (1964) (summarizing features of **2425 France hydropower industry). See also http://tva.com/ abouttva/index.htm (summarizing general features of Tennessee Valley Authority) (all Internet materials as visited June 8, 2007, and available in Clerk of Court's case file); Government Corporation Control Act, § 101, 59

**Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)**

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 290 of 305

127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

Stat. 597–598 (describing Tennessee Valley Authority as " 'wholly owned Government corporation' "); *Lebron v. National Railroad Passenger Corporation,* 513 U.S. 374, 388–389, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (noting that corporate entities in Government Corporation Control Act were incorporated by other government-owned corporations); Dept. of Labor, Bureau of Labor Statistics, Career Guide to Industries, Utilities, online at http://www.bls.gov/oco/cg/cgs018.htm (describing features of public run utilities); **\*246** G. Rothwell & T. G & oacute;mez, Electricity Economics: Regulation and Deregulation 129–241 (2003) (comparing electricity markets and industries in California and various foreign nations).

Powerex is itself owned and operated by BC Hydro, an entity that all apparently concede is governmental in nature. Brief for Plaintiffs–Respondents 38–40, 42. British Columbia's statutes create BC Hydro as a kind of government agency to produce water-generated electric power. Power Measures Act, S.B. C., ch. 40 (1964); App. to Pet. for Cert. 52a, 118a, 163a–169a. BC Hydro has a board of directors, all of whom are appointed by British Columbia's government. *Id.,* at 58a–59a. It is an "agent of the [provincial] government and its powers may be exercised only as an agent of the government." Hydro Power Authority Act, R.S.B.C., ch. 212, § 3(1) (1996). The District Court concluded that BC Hydro is, in fact, a foreign sovereign entity entitled to immunity. 391 F.3d, at 1024.

British Columbia's Minister of Energy issued a written directive ordering that BC Hydro create a subsidiary, Powerex, to carry out the specialized tasks of exporting hydro-generated electric power and of importing power, which it is then to distribute to British Columbia residents. App. 235–239, 250–251, 267. Powerex specifically carries out these obligations in accordance with various treaties between Canada and the United States. *Id.,* at 133–155; App. to Pet. for Cert. 55a; see Treaty Between the United States of America and Canada Relating to Cooperative Development of the Water Resources of the Columbia River Basin, Jan. 17, 1961, [1964] 15 U.S.T. 1555, T.I.A.S. No. 5638, App. to Pet. for Cert. 61a–82a; Treaty Between Canada and the United States of America Relating to the Skagit River and Ross Lake, and the Seven Mile Reservoir on the Pend d'Oreille River, Apr. 2, 1984, 1469 U.N.T.S. 309, T.I.A.S. No. 11088, App. to **\*247** Pet. for Cert. 138a–145a; British Columbia–Seattle Agreement (Mar. 30, 1984), App. 160–171.

Powerex's board members consist of some of BC Hydro's board members and other members whom those members appoint. App. 233–235. The government's comptroller general reviews Powerex's financial operations and regulates the terms under which it conducts business. Financial Administration Act, R.S.B. C., ch. 138, §§ 4.1, 8(2)(c)(i), 75, 79.3 (1996) (FAA), Addendum to Brief for Petitioner 34–36, 40–42 (hereinafter Addendum). British Columbia's fiscal control statute refers to Powerex as a " 'government body.' " FAA § 1, Addendum 31, 33. And other British Columbia laws refer to its employees as " 'public office holders.' " Lobbyists Registration Act, S.B.C., ch. 42, § 1 (2001), Addendum 50. Powerex pays no income taxes. See Income Tax Amendments Act, 1997, S.C. 1998, ch. 19, § 178 (to be codified at R.S.C., ch. 1, §§ 149(1)(*d*), (*d.*2)), **\*\*2426** Addendum 45; App. to Pet. for Cert. 58a; Brief for Petitioner 31. The British Columbian government, through BC Hydro, has sole beneficial ownership and control of Powerex. App. 267. If Powerex earns a profit, that profit must be rebated directly or indirectly to British Columbia's residents. *Id.,* at 215, 238. I can find no significant difference between Powerex and the classical government entities to which I previously referred. *Supra,* at 2424 – 2425.

The Ninth Circuit noted that Powerex may earn a profit and that the government of British Columbia does not provide financial support. And the Ninth Circuit thought these facts made a critical difference. But a well-run nationalized firm *should* make a reasonable profit; nor should it have to borrow from the government itself. See, *e.g.,* Nelson, *supra,* at 8–12; Harris, *supra,* at 125, 130–132; Rothwell & Gómez, *supra,* at 3–4. The relevant question is not *whether* Powerex earns a profit but where does that profit go? Here it does not go to private shareholders; it goes to the benefit **\*248** of the public in payments to the province and reduced electricity prices. App. 215, 238.

The Ninth Circuit also pointed out that certain provincial regulations that apply to other governmental departments do not apply to Powerex. That fact proves little. The Tennessee Valley Authority, which is "perhaps the best known of the American public corporations," *First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 625, n. 15, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), is not subject to certain federal regulations regarding hiring that apply to other governmental departments. See, *e.g.,* 16 U.S.C. § 831b.

In sum, Powerex is the kind of government entity that Congress had in mind when it wrote the FSIA's "commercial

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 291 of 305

Powerex Corp. v. Reliant Energy Services, Inc., 551 U.S. 224 (2007)

127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746...

activit[y]" provisions. See generally 28 U.S.C. § 1602 *et seq.;* H.R. Rep., at 15; S. Rep., at 14; *Banco, supra,* at 624–625, 103 S.Ct. 2591.

For these reasons, I believe we should consider, and reverse the Ninth Circuit's determination. With respect, I dissent.

**All Citations**

551 U.S. 224, 127 S.Ct. 2411, 168 L.Ed.2d 112, 75 USLW 4437, 2007-1 Trade Cases P 75,746, 07 Cal. Daily Op. Serv. 6916, 2007 Daily Journal D.A.R. 8887, 20 Fla. L. Weekly Fed. S 368

## Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      To be clear, we do not suggest that the question whether removal is proper is *always* different from the question whether the district court has subject-matter jurisdiction, for the two are often identical in light of the general rule that postremoval events do not deprive federal courts of subject-matter jurisdiction. See, *e.g., Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381, 391, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998). We merely hold that when there is a divergence, such that a district court lacks subject-matter jurisdiction to hear a claim that was properly removed, the consequent remand is authorized by § 1447(c) and appellate review is barred by § 1447(d).

2      The Court's opinion in *Osborn v. Haley,* 549 U.S. 225, 127 S.Ct. 881, 166 L.Ed.2d 819 (2007), had nothing to say about the scope of review that is permissible under § 1447(d), since it held that § 1447(d) was displaced in its entirety by 28 U.S.C. § 2679(d)(2). See 549 U.S., at 243 – 244, 127 S.Ct., at 895 (reasoning that, of the two forum-determining provisions—§ 1447(d), the generally applicable section, and § 2679(d)(2), a special prescription governing Westfall Act cases—"only one can prevail").

3      Petitioner provides no authority from this Court supporting the proposition that a district court presiding over a multiparty removed case can invoke supplemental jurisdiction to hear claims against a party that cannot independently remove when the claims against the only parties capable of removal are barred by *sovereign immunity.*

4      We have never passed on whether *Cohill* remands are subject-matter jurisdictional for purposes of post–1988 versions of § 1447(c) and § 1447(d). See *Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 129–130, 116 S.Ct. 494, 133 L.Ed.2d 461 (1995) (KENNEDY, J., concurring) (noting that the question is open); cf. *Cohill,* 484 U.S., at 355, n. 11, 108 S.Ct. 614 (discussing the pre–1988 version of § 1447(c)).

5      The dissent's belief that there is an implicit FSIA exception to § 1447(d), see *post,* at 2421 – 2424 (opinion of BREYER, J.), rests almost exclusively on our recent decision in *Osborn.* The dissent reads *Osborn* to stand for the proposition that any "conflict" between a specific, later-enacted statute and § 1447(d) should be resolved in favor of the former. *Post,* at 2422 – 2423. The reason why the dissent is forced to the parenthetical admission that "*Osborn* did not say as much," *post,* at 2422, is because the dissent drastically overreads the case. *Osborn* held only that § 1447(d) was trumped by the Westfall Act's explicit provision that removal was conclusive upon the Attorney General's certification: As between "the two antishuttling commands," the Court said, "only one can prevail." 549 U.S., at 244, 127 S.Ct. 881. The opinion was quite clear that the *only* statutory rivalry with which it was concerned was dueling "antishuttling commands": "Only in the extraordinary case in which Congress has ordered the intercourt shuttle to travel just one way—from state to federal court—does today's decision hold sway." *Ibid.* That is why *Osborn* repeatedly emphasized that Westfall Act certification is " ' conclusiv[e] ... *for purposes of removal,*' " *id.,* at 242, 243, 127 S.Ct., 881, an emphasis that the dissent essentially ignores, *post,* at 2422 – 2423.

       *Osborn* is no license for courts to assume the legislative role by characterizing the *consequences* of § 1447(d)'s bar on appellate review as creating a *conflict,* leaving it to judges to suppress that provision when they think Congress undervalued or overlooked those consequences. The dissent renders a quintessential policy judgment in concluding that appellate "delay is necessary, indeed, crucial," *post,* at 2423, when the rights of a foreign sovereign are at stake. We have no idea whether this is a wise balancing of the various values at issue here. We are confident, however, that the dissent is wrong to think that it would improve the "law in this democracy," *post,* at 2424, for judges to accept the lawmaking power that the dissent dangles before them.

---

**End of Document**                                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta In re Senior Care Properties, Inc., Bankr.N.D.Fla., February 25, 1992

108 S.Ct. 626
Supreme Court of the United States

UNITED SAVINGS ASSOCIATION
OF TEXAS, Petitioner

v.

TIMBERS OF INWOOD

FOREST ASSOCIATES, LTD.

No. 86-1602.
|
Argued Dec. 1, 1987.
|
Decided Jan. 20, 1988.

**Synopsis**

Undersecured creditor moved for relief from automatic stay or for adequate protection. The Bankruptcy Court, Wesley W. Steen, J., sitting by temporary assignment, 49 B.R. 454, required debtor to make monthly payments for adequate protection, and appeal was taken. The United States District Court for the Southern District of Texas, James DeAnda, J., affirmed, and further appeal was taken. The Court of Appeals for the Fifth Circuit, 793 F.2d 1380, reversed and remanded. On rehearing en banc, the Court of Appeals, 808 F.2d 363, again held for debtor, and creditor petitioned for certiorari. The Supreme Court, Justice Scalia, held that "interest in property," protected by Bankruptcy Code provision allowing undersecured creditor relief from stay on ground of lack of adequate protection, does not include creditor's right to immediate foreclosure, and thus Chapter 11 debtor's undersecured creditor was not entitled to interest on its collateral as compensation for delay caused by automatic stay in foreclosing on collateral.

Affirmed.

West Headnotes (1)

[1]    **Bankruptcy**    Interest

"Interest in property," protected by Bankruptcy Code provision allowing undersecured creditor relief from stay on ground of lack of adequate

protection, does not include creditor's right to immediate foreclosure, and thus Chapter 11 debtor's undersecured creditor was not entitled to interest on its collateral as compensation for delay caused by automatic stay in foreclosing on collateral. Bankr.Code, 11 U.S.C.A. § 362(d)(1).

1352 Cases that cite this headnote

**627** *Syllabus* [*]

***365** When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of actions taken to realize the value of collateral given by the debtor. Section 362(d) authorizes the bankruptcy court to grant relief from the stay "(1) for cause, including the lack of adequate protection of an interest in property of ... [a] party in interest," or "(2) with respect to a stay of an act against property," if the debtor does not have an equity in such property (*i.e.,* the creditor is undersecured) and the property is "not necessary to an effective reorganization." Section 361 provides that adequate protection of an entity's interest in property may be provided by granting such relief "as will result in the realization by such entity of the indubitable equivalent of its interest." After respondent filed a petition for reorganization under Chapter 11 of the Code, petitioner, an undersecured creditor, moved the Bankruptcy Court for relief from the § 362(a) stay on the ground that there was a lack of "adequate protection" of its interest within the meaning of § 362(d)(1). The court granted relief, conditioning continuance of the stay on monthly payments by respondent on the estimated amount realizable on the foreclosure that the stay prevented. The District Court affirmed, but the Court of Appeals reversed.

*Held:* Undersecured creditors are not entitled to compensation under § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral. Pp. 629-635.

(a) The language of other Code provisions that deal with the rights of secured creditors, and the substantive dispositions that those provisions effect, establish that the "interest in property" protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure. First, petitioner's contrary interpretation contradicts the carefully drawn substantive disposition effected by § 506(b), which codifies the pre-Code rule denying undersecured creditors postpetition interest on their *claims.* Had Congress

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

nevertheless meant to give undersecured creditors interest on the value of their *collateral,* it would have said so plainly in § 506(b). Moreover, the meaning of § 362(d)(1)'s "interest in property" phrase is clarified by the use of similar terminology in § 506(a), where it must be interpreted to mean only the creditor's security interest **366** in the property without regard to his right to immediate possession on default. Second, § 552(b), which makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfy the secured creditor's claim ahead of the claims of unsecured creditors, is inconsistent with petitioner's interpretation of § 362(d) (1), under which the undersecured creditor who lacks such a perfected security interest in effect could achieve the same result by demanding the "use value" of his collateral. Third, petitioner's interpretation of § 362(d)(1) makes a practical nullity of § 362(d)(2), which on petitioner's theory would be of use only to a secured creditor who was fully protected both as to **628** the value of, and interest on, its collateral, but nonetheless wanted to foreclose. Petitioner's contention that undersecured creditors will face inordinate and extortionate delay if they are denied compensation under § 362(d)(1) is also belied by § 362(d)(2), which requires relief from the stay unless the *debtor* establishes a reasonable possibility of a successful reorganization within a reasonable time, and under which numerous cases have provided relief within less than a year from the filing of the bankruptcy petition. Pp. 629-633.

(b) Denying petitioner compensation under § 362(d)(1) is not inconsistent with § 361(3)'s use of the phrase "indubitable equivalent." Although the same phrase appears in § 1129(b), under which section, as a condition for confirmation of a reorganization plan, a secured claimant has a right to receive the present value of his collateral (including interest if the claim is to be paid over time), the source of the right in § 1129 is not the "indubitable equivalent" language but the provision guaranteeing payments of a value, "*as of the effective date of the plan,*" equal to the value of the collateral. Similarly, petitioner's contention that, since general administrative expenses do not have priority over secured claims, see §§ 506(c), 507(a), the Code embodies a principle prohibiting secured creditors from bearing any of the costs of reorganization, is without merit. Congress could not have intended that its readoption of the pre-Code administrative expenses rule would work a change in the also readopted pre-Code rule denying undersecured creditors post-petition interest. Finally, although failure to interpret § 362(d)(1) to require compensation for undersecured creditors appears inconsistent with § 726(a)(5), which allows postpetition

interest on unsecured claims when the debtor proves solvent, this anomaly pertains to such a rare occurrence that it is likely the product of congressional inadvertence, and, in any case, its inequitable effects are entirely avoidable. Pp. 632-634.

(c) General statements in the legislative history of §§ 361 and 362(d)(1) that "[s]ecured creditors should not be deprived of the benefit of their bargain" are inadequate to overcome the plain textual indication in **367** §§ 506 and 362(d)(2) of Congress' intent, as discussed above. It is most improbable that Congress would have made a major change entitling undersecured creditors to postpetition interest without specifically mentioning it in the legislative history. Petitioner's argument that pre-Code Chapter XI gave undersecured creditors the absolute right to foreclose, and that the silence of the Code's legislative history as to the withdrawal of that right indicates a congressional intent to provide interest on the collateral during the stay as a substitute, is flawed. The authorities are far from clear that there was a distinctive Chapter XI rule of absolute entitlement to foreclose, but, even assuming there was, § 362(d)(2) indicates that, in enacting Chapter 11 of the current Code, Congress adopted the approach of pre-Code Chapters X and XII, under which the undersecured creditor did not have such an absolute right. Pp. 634-635.

808 F.2d 363, affirmed.

## Attorneys and Law Firms

*H. Miles Cohn* argued the cause and filed briefs for petitioner.

*Leonard H. Simon* argued the cause for respondent. With him on the brief were *Daphne Levey* and *Timothy J. Henderson.**

* Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard,* and *Deputy Solicitor General Cohen;* for the California League of Savings Institutions et al. by *John A. Graham;* for the National Commercial Finance Association by *A. Bruce Schimberg, Rex E. Lee, J. Ronald Trost, Shalom L. Kohn,* and *Frank R. Kennedy;* and for Thomas H. Jackson, *pro se.*

Briefs of *amici curiae* urging affirmance were filed for Global Marine Inc. by *Harvey R. Miller, D.J. Baker,* and *Martin J. Bienenstock;* and for the National Association of Credit Management et al. by *Richard Levin* and *Kenneth N. Klee.*

000293

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

*Raymond T. Nimmer, pro se,* and *Edward L. Ripley, pro se,* filed a brief for themselves as *amici curiae.*

**Opinion**

Justice SCALIA delivered the opinion of the Court.

Petitioner United Savings Association of Texas seeks review of an en banc decision of the United States Court of Appeals for the Fifth Circuit, holding that petitioner was not entitled to receive from respondent debtor, which is undergoing **\*368** reorganization in bankruptcy, monthly payments for the use value of the loan collateral which the bankruptcy stay prevented it from possessing. *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363 (1987). We **\*\*629** granted certiorari, 481 U.S. 1068, 107 S.Ct. 2459, 95 L.Ed.2d 868 (1987), to resolve a conflict in the Courts of Appeals regarding application of §§ 361 and 362(d)(1) of the Bankruptcy Code, 11 U.S.C. §§ 361 and 362(d)(1) (1982 ed. and Supp. IV). Compare *Grundy Nat. Bank v. Tandem Mining Corp.,* 754 F.2d 1436, 1440-1441 (CA4 1985); *In re American Mariner Industries, Inc.,* 734 F.2d 426, 432-435 (CA9 1984); see also *In re Briggs Transp. Co.,* 780 F.2d 1339, 1348-1351 (CA8 1985).

I

On June 29, 1982, respondent Timbers of Inwood Forest Associates, Ltd., executed a note in the principal amount of $4,100,000. Petitioner is the holder of the note as well as of a security interest created the same day in an apartment project owned by respondent in Houston, Texas. The security interest included an assignment of rents from the project. On March 4, 1985, respondent filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (1982 ed. and Supp. IV), in the United States Bankruptcy Court for the Southern District of Texas.

On March 18, 1985, petitioner moved for relief from the automatic stay of enforcement of liens triggered by the petition, see 11 U.S.C. § 362(a), on the ground that there was lack of "adequate protection" of its interest within the meaning of 11 U.S.C. § 362(d)(1). At a hearing before the Bankruptcy Court, it was established that respondent owed petitioner $4,366,388.77, and evidence was presented that the value of the collateral was somewhere between $2,650,000 and $4,250,000. The collateral was appreciating in value, but only very slightly. It was therefore undisputed

that petitioner was an undersecured creditor. Respondent had agreed to pay petitioner the postpetition rents from the **\*369** apartment project (covered by the after-acquired property clause in the security agreement), minus operating expenses. Petitioner contended, however, that it was entitled to additional compensation. The Bankruptcy Court agreed and on April 19, 1985, it conditioned continuance of the stay on monthly payments by respondent, at the market rate of 12% per annum, on the estimated amount realizable on foreclosure, $4,250,000-commencing six months after the filing of the bankruptcy petition, to reflect the normal foreclosure delays. *In re Bear Creek Ministorage, Inc.,* 49 B.R. 454 (1985) (editorial revision of earlier decision). The court held that the postpetition rents could be applied to these payments. See *id., at 460.* Respondent appealed to the District Court and petitioner cross-appealed on the amount of the adequate protection payments. The District Court affirmed but the Fifth Circuit en banc reversed.

We granted certiorari to determine whether undersecured creditors are entitled to compensation under 11 U.S.C. § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral.

II

When a bankruptcy petition is filed, § 362(a) of the Bankruptcy Code provides an automatic stay of, among other things, actions taken to realize the value of collateral given by the debtor. The provision of the Code central to the decision of this case is § 362(d), which reads as follows:

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

"(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

"(2) with respect to a stay of an act against property under subsection (a) of this section, if-

**\*370** "(A) the debtor does not have an equity in such property; and

"(B) such property is not necessary to an effective reorganization."

**\*\*630** The phrase "adequate protection" in paragraph (1) of the foregoing provision is given further content by § 361 of the Code, which reads in relevant part as follows:

"When adequate protection is required under section 362 ... of this title of an interest of an entity in property, such adequate protection may be provided by-

"(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title ... results in a decrease in the value of such entity's interest in such property;

"(2) providing to such entity an additional or replacement lien to the extent that such stay ... results in a decrease in the value of such entity's interest in such property; or

"(3) granting such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."

It is common ground that the "interest in property" referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay. Thus, it is agreed that if the apartment project in this case had been declining in value petitioner would have been entitled, under § 362(d)(1), to cash payments or additional security in the amount of the decline, as § 361 describes. The crux of the present dispute is that petitioner asserts, and respondent denies, that the phrase "interest in property" also includes the secured party's right (suspended by the stay) to take immediate possession of the defaulted **\*371** security, and apply it in payment of the debt. If that right is embraced by the term, it is obviously not adequately protected unless the secured party is reimbursed for the use of the proceeds he is deprived of during the term of the stay.

The term "interest in property" certainly summons up such concepts as "fee ownership," "life estate," "co-ownership," and "security interest" more readily than it does the notion of "right to immediate foreclosure." Nonetheless, viewed in the isolated context of § 362(d)(1), the phrase could reasonably be given the meaning petitioner asserts. Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear, see, *e.g., Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860, 106

S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986), or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law, see, *e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987); *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631-632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307-308, 81 S.Ct. 1579, 1582-83, 6 L.Ed.2d 859 (1961). That is the case here. Section 362(d)(1) is only one of a series of provisions in the Bankruptcy Code dealing with the rights of secured creditors. The language in those other provisions, and the substantive dispositions that they effect, persuade us that the "interest in property" protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure.

Section 506 of the Code defines the amount of the secured creditor's allowed secured claim and the conditions of his receiving postpetition interest. In relevant part it reads as follows:

"(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and **\*372** is an unsecured claim to the extent that the value **\*\*631** of such creditor's interest ... is less than the amount of such allowed claim....

"(b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

In subsection (a) of this provision the creditor's "interest in property" obviously means his security interest without taking account of his right to immediate possession of the collateral on default. If the latter were included, the "value of such creditor's interest" would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues-since the value of the entitlement to use the collateral from the date of bankruptcy would rise with the passage of time. No one suggests this was intended. The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral." H.R.Rep. No. 95-595, pp. 181, 356 (1977); see also S.Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5854, 6141, 6312. We think the phrase "value of such entity's interest" in

Case 4:20-cv-03215-YGR  Document 52-3  Filed 09/23/20  Page 296 of 305

United Sav. Ass'n of Texas v. Timbers of Inwood Forest..., 484 U.S. 365 (1988)

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

§ 361(1) and (2), when applied to secured creditors, means the same.

Even more important for our purposes than § 506's use of terminology is its substantive effect of denying undersecured creditors postpetition interest on their claims-just as it denies *over* secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral. Section 506(b) provides that "*[t]o the extent that* an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim." (Emphasis added.) Since this provision permits postpetition interest to be paid only out of the "security cushion," the undersecured creditor, **\*373** who has no such cushion, falls within the general rule disallowing postpetition interest. See 11 U.S.C. § 502(b)(2). If the Code had meant to give the undersecured creditor, who is thus denied interest on his *claim,* interest on the value of his *collateral,* surely this is where that disposition would have been set forth, and not obscured within the "adequate protection" provision of § 362(d)(1). Instead of the intricate phraseology set forth above, § 506(b) would simply have said that the secured creditor is entitled to interest "on his allowed claim, or on the value of the property securing his allowed claim, whichever is lesser." Petitioner's interpretation of § 362(d)(1) must be regarded as contradicting the carefully drawn disposition of § 506(b).

Petitioner seeks to avoid this conclusion by characterizing § 506(b) as merely an alternative method for compensating oversecured creditors, which does not imply that no compensation is available to undersecured creditors. This theory of duplicate protection for oversecured creditors is implausible even in the abstract, but even more so in light of the historical principles of bankruptcy law. Section 506(b)'s denial of postpetition interest to undersecured creditors merely codified pre-Code bankruptcy law, in which that denial was part of the conscious allocation of reorganization benefits and losses between undersecured and unsecured creditors. "To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors." *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946). It was considered unfair to allow an undersecured creditor to recover interest from the estate's unencumbered assets before unsecured creditors had recovered any principal. See *id.,* at 164, 166, 67 S.Ct. at 240, 241; *Ticonic Nat. Bank v. Sprague,* 303 U.S.

406, 412, 58 S.Ct. 612, 615, 82 L.Ed. 926 (1938). We think it unlikely that § 506(b) codified the pre-Code rule with the **\*\*632** intent, not of achieving the principal purpose and function of that rule, but of providing over-secured creditors an alternative method of compensation. **\*374** Moreover, it is incomprehensible why Congress would want to favor undersecured creditors with interest if they move for it under § 362(d)(1) at the inception of the reorganization process-thereby probably pushing the estate into liquidation-but not if they forbear and seek it only at the completion of the reorganization.

Second, petitioner's interpretation of § 362(d)(1) is structurally inconsistent with 11 U.S.C. § 552. Section 552(a) states the general rule that a prepetition security interest does not reach property acquired by the estate or debtor postpetition. Section 552(b) sets forth an exception, allowing postpetition "proceeds, product, offspring, rents, or profits" of the collateral to be covered only if the security agreement expressly provides for an interest in such property, and the interest has been perfected under "applicable nonbankruptcy law." See, *e.g., In re Casbeer,* 793 F.2d 1436, 1442-1444 (CA5 1986); *In re Johnson,* 62 B.R. 24, 28-30 (CA9 Bkrtcy.App. Panel 1986); cf. *Butner v. United States,* 440 U.S. 48, 54-56, 99 S.Ct. 914, 917-18, 59 L.Ed.2d 136 (1979) (same rule under former Bankruptcy Act). Section 552(b) therefore makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors. Under petitioner's interpretation, however, the undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the "use value" of his collateral under § 362. It is true that § 506(b) gives the *over* secured creditor, despite lack of compliance with the conditions of § 552, a similar priority over unsecured creditors; but that does not compromise the principle of § 552, since the interest payments come only out of the "cushion" in which the oversecured creditor *does have* a perfected security interest.

Third, petitioner's interpretation of § 362(d)(1) makes nonsense of § 362(d)(2). On petitioner's theory, the undersecured creditor's inability to take immediate possession of **\*375** his collateral is always "cause" for conditioning the stay (upon the payment of market rate interest) under § 362(d)(1), since there is, within the meaning of that paragraph, "lack of adequate protection of an interest in property." But § 362(d)(2) expressly provides a different standard for relief from a stay "of an act against property," which of

Case 4:20-cv-03215-YGR Document 52-3 Filed 09/23/20 Page 297 of 305

United Sav. Ass'n of Texas v. Timbers of Inwood Forest..., 484 U.S. 365 (1988)

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

course includes taking possession of collateral. It provides that the court shall grant relief "if ... (A) the debtor does not have an equity in such property [*i.e.,* the creditor is undersecured]; *and* (B) such property is not necessary to an effective reorganization." (Emphasis added.) By applying the "adequate protection of an interest in property" provision of § 362(d)(1) to the alleged "interest" in the earning power of collateral, petitioner creates the strange consequence that § 362 entitles the secured creditor to relief from the stay (1) if he is undersecured (and thus not eligible for interest under § 506(b)), *or* (2) if he is undersecured *and* his collateral "is not necessary to an effective reorganization." This renders § 362(d)(2) a practical nullity and a theoretical absurdity. If § 362(d)(1) is interpreted in this fashion, an undersecured creditor would seek relief under § 362(d)(2) only if his collateral was not depreciating (or he was being compensated for depreciation) and it was receiving market rate interest on his collateral, but nonetheless wanted to foreclose. Petitioner offers no reason why Congress would want to provide relief for such an obstreperous and thoroughly unharmed creditor.

Section 362(d)(2) also belies petitioner's contention that undersecured creditors will face inordinate and extortionate delay if they are denied compensation for interest lost during the stay as part of "adequate protection" under § 362(d)(1). Once the movant under § 362(d)(2) establishes that **633 he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but *376 that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time." 808 F.2d, at 370-371, and nn. 12-13, and cases cited therein. The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. [1] And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief. [2]

**377** III

A

Petitioner contends that denying it compensation under § 362(d)(1) is inconsistent with sections of the Code other than those just discussed. Petitioner principally relies on the phrase "indubitable equivalent" in § 361(3), which also appears in 11 U.S.C. § 1129(b)(2)(A)(iii). Petitioner contends that in the latter context, which sets forth the standards for confirming a reorganization plan, the phrase has developed a well-settled meaning connoting the right of a secured creditor to receive present value of his security-thus requiring interest if the claim is to be paid over time. It is true that under § 1129(b) a secured claimant has a right to receive under a plan the present value of his collateral. This entitlement arises, however, not from the phrase "indubitable equivalent" in § 1129(b)(2)(A)(iii), but from the provision of § 1129(b)(2)(A)(i)(II) that guarantees the secured creditor "deferred cash payments ... of a value, *as of the effective date of the plan,* of at least the value of such [secured claimant's] interest in the estate's interest in such property." (Emphasis added.) Under this formulation, even though the undersecured creditor's "interest" is regarded (properly) as solely the value of the collateral, he must be rendered payments that assure him that value *as of the effective date of the plan.* In § 361(3), by contrast, the relief pending the stay need only be such "*as will result in the realization* ... of the indubitable equivalent" of the collateral. (Emphasis added.) It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to immediate payment of the principal of his collateral) **634 that this "realization" is to "result" not at once, but only upon completion of the reorganization. It is *then* that he must be assured "realization ... of the indubitable equivalent" of his collateral. To put the point differently: similarity of outcome between § 361(3) and § 1129 would be demanded only if the former read "such other relief ... as *378 will give such entity, *as of the date of the relief,* the indubitable equivalent of such entity's interest in such property."

Nor is there merit in petitioner's suggestion that "indubitable equivalent" in § 361(3) connotes reimbursement for the use value of collateral because the phrase is derived from *In re Murel Holding Corp.,* 75 F.2d 941 (CA2 1935), where it bore that meaning. *Murel* involved a proposed reorganization plan that gave the secured creditor interest on his collateral for 10 years, with full payment of the secured principal due at the end of that term; the plan made no provision, however, for amortization of principal or maintenance of the collateral's value during the term. In rejecting the plan, *Murel* used

Case 4:20-cv-03215-YGR   Document 52-3   Filed 09/23/20   Page 298 of 305

United Sav. Ass'n of Texas v. Timbers of Inwood Forest..., 484 U.S. 365 (1988)

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

the words "indubitable equivalence" with specific reference not to interest (which was assured), but to the jeopardized principal of the loan:

> "Interest is indeed the common measure of the difference [between payment now and payment 10 years hence], but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence." *Id.,* at 942.

Of course *Murel,* like § 1129, proceeds from the premise that in the confirmation context the secured creditor is entitled to present value. But no more from *Murel* than from § 1129 can it be inferred that a similar requirement exists as of the time of the bankruptcy stay. The reorganized debtor is supposed to stand on his own two feet. The debtor in process of reorganization, by contrast, is given many temporary protections against the normal operation of the law.

Petitioner also contends that the Code embodies a principle that secured creditors do not bear the costs of reorganization. It derives this from the rule that general administrative expenses do not have priority over secured claims. See §§ 506(c), 507(a). But the general principle does not follow **\*379** from the particular rule. That secured creditors do not bear one kind of reorganization cost hardly means that they bear none of them. The Code rule on administrative expenses merely continues pre-Code law. But it was also pre-Code law that undersecured creditors were not entitled to postpetition interest as compensation for the delay of reorganization. See *supra,* at 631; see also *infra,* at 635. Congress could hardly have understood that the readoption of the rule on administrative expenses would work a change in the rule on postpetition interest, which it also readopted.

Finally, petitioner contends that failure to interpret § 362(d)(1) to require compensation of undersecured creditors for delay will create an inconsistency in the Code in the (admittedly rare) case when the debtor proves solvent. When that occurs, 11 U.S.C. § 726(a)(5) provides that postpetition interest is allowed on unsecured claims. Petitioner contends it would be absurd to allow postpetition interest on unsecured claims but not on the secured portion of undersecured creditors' claims. It would be disingenuous to deny that this is an apparent anomaly, but it will occur so rarely that it is more likely the product of inadvertence than are the blatant inconsistencies petitioner's interpretation would produce. Its

inequitable effects, moreover, are entirely avoidable, since an undersecured creditor is entitled to "surrender or waive his security and prove his entire claim as an unsecured one." **\*\*635** *United States Nat. Bank v. Chase Nat. Bank,* 331 U.S. 28, 34, 67 S.Ct. 1041, 1044, 91 L.Ed. 1320 (1947). Section 726(a)(5) therefore requires no more than that undersecured creditors receive postpetition interest from a solvent debtor on equal terms with unsecured creditors rather than ahead of them-which, where the debtor is solvent, involves no hardship.

### B

Petitioner contends that its interpretation is supported by the legislative history of §§ 361 and 362(d)(1), relying almost entirely on statements that "[s]ecured creditors should not **\*380** be deprived of the benefit of their bargain." H.R.Rep. No. 95-595, at 339; S.Rep. No. 95-989, at 53, U.S. Code Cong. & Admin. News 1978, pp. 5839, 6295. Such generalizations are inadequate to overcome the plain textual indication in §§ 506 and 362(d)(2) of the Code that Congress did not wish the undersecured creditor to receive interest on his collateral during the term of the stay. If it is at all relevant, the legislative history tends to subvert rather than support petitioner's thesis, since it contains not a hint that § 362(d)(1) entitles the undersecured creditor to postpetition interest. Such a major change in the existing rules would not likely have been made without specific provision in the text of the statute, cf. *Kelly v. Robinson,* 479 U.S. 36, 47, 107 S.Ct. 353, 359-360, 93 L.Ed.2d 216 (1986); it is most improbable that it would have been made without even any mention in the legislative history.

Petitioner makes another argument based upon what the legislative history does *not* contain. It contends that the pre-Code law gave the undersecured creditor relief from the automatic stay by permitting him to foreclose; and that Congress would not have withdrawn this entitlement to relief without any indication of intent to do so in the legislative history, unless it was providing an adequate substitute, to wit, interest on the collateral during the stay.

The premise of this argument is flawed. As petitioner itself concedes, Brief for Petitioner 20, the undersecured creditor had no absolute entitlement to foreclosure in a Chapter X or XII case; he could not foreclose if there was a reasonable prospect for a successful rehabilitation within a reasonable time. See, *e.g., In re Yale Express System,*

United Sav. Ass'n of Texas v. Timbers of Inwood Forest..., 484 U.S. 365 (1988)

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

*Inc.,* 384 F.2d 990, 991-992 (CA2 1967) (Chapter X); *In re Nevada Towers Associates,* 14 Collier Bankr. Cas. (MB) 146, 151-156 (Bkrtcy.Ct.SDNY 1977) (Chapter XII); *In re Consolidated Motor Inns,* 6 Collier Bankr. Cas. (MB) 18, 31-32 (Bkrtcy.Ct.ND Ga.1975) (same). Thus, even assuming petitioner is correct that the undersecured creditor had an absolute entitlement to relief under Chapter XI, Congress would have been faced with the choice between adopting the rule from **\*381** Chapters X and XII or the asserted alternative rule from Chapter XI, because Chapter 11 of the current Code "replaces chapters X, XI and XII of the Bankruptcy Act" with a "single chapter for all business reorganizations." S.Rep. No. 95-989, at 9; see also H.R.Rep. No. 95-595, at 223-224, U.S. Code Cong. & Admin. News 1978, pp. 5795, 6182, 6183. We think § 362(d)(2) indicates that Congress adopted the approach of Chapters X and XII. In any event, as far as the silence of the legislative history on the point is concerned, that would be no more strange with respect to alteration of the asserted Chapter XI rule than it would be with respect to alteration of the Chapters X and XII rule.

Petitioner's argument is further weakened by the fact that it is far from clear that there was a distinctive Chapter XI rule of absolute entitlement to foreclosure. At least one leading commentator concluded that "a Chapter XI court's power to stay lien enforcement is as broad as that of a Chapter X or XII court and that the automatic stay rules properly make no distinctions between the Chapters." Countryman, Real Estate Liens in Business Rehabilitation Cases, 50 Am.Bankr.L.J. 303, 315 (1976). Petitioner cites dicta in some Chapter XI cases suggesting that the undersecured creditor was automatically entitled to **\*\*636** relief from the stay, but the courts in those cases uniformly found in addition that reorganization was not sufficiently likely or was being unduly delayed. See, *e.g., In re Bric of America, Inc.,* 4 Collier Bankr. Cas. (MB) 34, 39-40 (Bkrtcy.Ct.MD Fla.1975); *In re O.K. Motels,* 1 Collier Bankr. Cas. (MB) 416, 419-420 (Bkrtcy.Ct.MD Fla.1974). Moreover, other Chapter XI cases held undersecured creditors not entitled to foreclosure under reasoning very similar to that used in Chapters X and XII cases. See *In re Coolspring Estates, Inc.,* 12 Collier Bankr. Cas. (MB) 55, 60-61 (Bkrtcy.Ct.ND Ind.1977); *In re The Royal Scot, Ltd.,* 2 Bankr.Ct. Dec. (CRR) 374, 376-377 (Bkrtcy.Ct.WD Mich.1976); *In re Mesker Steel, Inc.,* 1 Bankr.Ct. Dec. (CRR) 235, 236-237 (Bkrtcy.Ct.SD Ind.1974). The at best divided authority under Chapter XI removes **\*382** all cause for wonder that the alleged departure from it should not have been commented upon in the legislative history.

The Fifth Circuit correctly held that the undersecured petitioner is not entitled to interest on its collateral during the stay to assure adequate protection under 11 U.S.C. § 362(d)(1). Petitioner has never sought relief from the stay under § 362(d)(2) or on any ground other than lack of adequate protection. Accordingly, the judgment of the Fifth Circuit is

*Affirmed.*

**All Citations**

484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368, 16 Bankr.Ct.Dec. 1369, Bankr. L. Rep. P 72,113

---

Footnotes

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  See, *e.g., In re Findley,* 76 B.R. 547, 555 (Bkrtcy.Ct.N.D.Miss.1987) (6½ months); *In re Efcor, Inc.,* 74 B.R. 837, 843-845 (Bkrtcy.Ct.M.D.Pa.1987) (4½ months); *In re Belton Inns, Inc.,* 71 B.R. 811, 818 (Bkrtcy.Ct.SD Iowa 1987) (1 year); *In re Louden,* 69 B.R. 723, 725-726 (Bkrtcy.Ct.ED Mo.1987) (10 months); *In re Playa Development Corp.,* 68 B.R. 549, 556 (Bkrtcy.Ct.WD Tex.1986) (7½ months); *In re Cablehouse, Ltd.,* 68 B.R. 309, 313 (Bkrtcy.Ct.SD Ohio 1986) (11½ months); *In re Pacific Tuna Corp.,* 48 B.R. 74, 78 (Bkrtcy.Ct.WD Tex.1985) (9 months); *In re Development, Inc.,* 36 B.R. 998, 1005-1006 (Bkrtcy.Ct.Haw.1984) (6 months); *In re Boca Development Associates, Ltd.,* 21 B.R. 624, 630 (Bkrtcy.Ct.SDNY 1982) (7½ months); *In re Sundale Associates,* 11 B.R. 978, 980-981 (Bkrtcy.Ct.SD Fla.1981) (5 months); *In re Clark Technical Associates, Ltd.,* 9 B.R. 738, 740-741 (Bkrtcy.Ct.Conn.1981) (9 months).

2  See, *e.g., In re Anderson Oaks (Phase I) Limited Partnership,* 77 B.R. 108, 109, 110-113 (Bkrtcy.Ct.WD Tex.1987) ("immediately after the bankruptcy filings"); *In re New American Food Concepts, Inc.,* 70 B.R. 254, 262 (Bkrtcy.Ct.ND Ohio 1987) (3 months); *In re 6200 Ridge, Inc.,* 69 B.R. 837, 843-844 (Bkrtcy.Ct.ED Pa.1987) (3 months); *In re Park Timbers, Inc.,* 58 B.R. 647, 651 (Bkrtcy.Ct.Del.1985) (2 months); *In re Bellina's Restaurants II, Inc.,* 52 B.R. 509, 512

000299

108 S.Ct. 626, 98 L.Ed.2d 740, 56 USLW 4107, 17 Collier Bankr.Cas.2d 1368...

(Bkrtcy.Ct.SD Fla.1985) (1 month); *In re Anchorage Boat Sales, Inc.,* 4 B.R. 635, 641 (Bkrtcy.Ct. EDNY 1980) (4 months); *In re Terra Mar Associates,* 3 B.R. 462, 466 (Bkrtcy.Ct.Conn.1980) (2 months).

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# New York Times

## *Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment Systems*

Investigators see evidence of a sophisticated international attack they said could siphon hundreds of millions of dollars that were intended for the unemployed.





The attack has exploited state unemployment systems at a time when they are straining to process a crush of claims.Credit...Patrick Semansky/Associated Press



**By Mike Baker**

- Published May 16, 2020Updated May 22, 2020
- 
  - 
  - 
  - 
  - 
  - 

SEATTLE — A group of international fraudsters appears to have mounted an immense, sophisticated attack on U.S. unemployment systems, creating a network that has already siphoned millions of dollars in payments that were intended to avert an economic collapse, according to federal authorities.

The attackers have used detailed information about U.S. citizens, such as social security numbers that may have been obtained from cyber hacks of years past, to file claims on behalf of people who have not been laid off, officials said. The attack has exploited state unemployment systems at a time when they are straining to process a crush of claims from an employment crisis unmatched since the Great Depression.
With many states rushing to pay claims, payments have gone straight to direct-deposit accounts. In Washington State, the agency tasked with managing unemployment claims there began realizing the extent of the problem in recent days when still-employed people called to question why they had received confirmation paperwork in the mail.

"This is a gut punch," said Suzi LeVine, the commissioner of Washington State's Employment Security Department.

In a memo obtained by The New York Times, investigators from the U.S. Secret Service said they had information suggesting that the scheme was coming from a well-organized Nigerian fraud ring and could result in "potential losses in the hundreds of millions of dollars." Roy Dotson, a special agent who specializes in financial fraud at the Secret Service, said in an interview investigators were still working to pinpoint who was involved and exactly where they were.

"We are actively running down every lead we are getting," Mr. Dotson said.

Mr. Dotson said it appeared the fraud was being aided by a substantial number of "mules" — people, often in the United States, who were used as intermediaries for money laundering after making connections with fraudsters online. He warned people to be wary of quick-money job offers or other suspicious financial arrangements.

The Secret Service memo said Washington State had emerged as the primary target thus far, but there was also evidence of attacks in Florida, Massachusetts, North Carolina, Oklahoma, Rhode Island and Wyoming. The agency warned that every state was vulnerable and could be targeted, noting that the attackers appeared to have extensive records of personally identifiable information, or P.I.I.

"It is assumed the fraud ring behind this possess a substantial P.I.I. database to submit the volume of applications observed thus far," the memo said.

Rhode Island State Police reported on Monday that it had received "numerous reports of suspected fraud" related to unemployment benefits.

Scott Jensen, the director of Rhode Island Department of Labor and Training, said Saturday that it could be hard to distinguish between a legitimate claim and a fraudulent one when impostors provided the proper information. He said the fraudulent cases that were emerging seemed to have their paperwork in order without the hallmarks of other times when claims might have mistakes or other indicators that they were not genuine.

"Whoever it is seems to be fairly sophisticated and good at what they are doing," Mr. Jensen said. He did not know whether it was a group of international actors but was

hopeful investigators would get to the bottom of the fraud. In the meantime, he said, the state is clamping down and taking a closer look at claims surrounding specific banks.

Ms. LeVine said she did not want to put a number on the losses so far in Washington State but believed it was in the millions of dollars. The state is working with law enforcement agencies to try and reclaim some of the funds.

Some workplaces have been hit particularly hard. At Western Washington University in Bellingham, Wash., more than 400 out of about 2,500 total employees have been targeted with fraudulent claims, Paul Cocke, the university's spokesman, said.

The state has been inundated with calls from people and businesses asking about unemployment notifications that have been sent to them. They have flooded a hotline and have forced the state to hire more people to answer the phones.

One of those who filed a complaint, Anna Zivarts, a Seattle resident who works at the nonprofit Disability Rights Washington, said she found a series of official envelopes from the government in her mail on May 8. At first, she worried that she might owe taxes. Then, when she opened the mail, she had another worry.

"I called my boss and said, 'Am I getting laid off and I just don't know about it?'" Ms. Zivarts said. But her boss assured her that she was still employed.

Ms. Zivarts said she called and emailed to flag the issue for the state but did not hear back. Her employer has also notified the state.

More than one million people in Washington State have filed unemployment claims amid the economic turmoil brought by the coronavirus pandemic. Around the country, the numbers have reached more than 36 million in the past two months.

Unemployment programs have delivered billions of dollars in payments.

States may be particularly vulnerable as they work to rush payments to people who have lost their jobs. Many states have long built in lengthy reviews to help weed out fraudulent claims, but as more people have suddenly become eligible and the need for speedy payments becomes urgent, some states have tried to eliminate those delays.

As with many other states, Washington's typical weeklong waiting period before unemployment payments are paid has been reduced. Federal funding has expanded unemployment benefits to workers who were not previously qualified.

"There's a dire need to get money out quickly," Ms. LeVine said. "This makes us an attractive target for fraudsters."

People who need jobless benefits have reported delays and challenges in getting their applications approved. Ms. LeVine said the state was working to resolve delayed claims while trying to strike a balance between scrutiny and streamlining.

Washington State has some of the highest weekly benefit amounts. Federal law has provided an additional $600 a week for the next few months. Unemployed workers can also get retroactive payments.

U.S. Attorney Brian T. Moran in Seattle said his office was working with other agencies to track down and prosecute the people submitting false claims. But he also said the state needed to "address and fix vulnerabilities in their system."

Ms. LeVine said the unemployment agency was monitoring trends and using them to try and identify suspicious cases before payments were issued. The state has also implemented a two-day delay in payments to give workers more time to vet the claims.