XAVIER BECERRA
Attorney General of California
CHERYL FEINER
MICHAEL NEWMAN
Senior Assistant Attorneys General
CHRISTINE CHUANG
Supervising Deputy Attorney General
JULIA HARUMI MASS
JASLEEN SINGH
SHUBHRA SHIVPURI
JOSHUA SONDHEIMER
LEE I. SHERMAN (SBN 272271)
Deputy Attorneys General
 300 S. Spring St., Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6404
 Fax: (213) 897-7605
 E-mail: Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiffs Eloy Ortiz Oakley and Board of
Governors of the California Community Colleges*

(List of other Plaintiffs' counsel continued on next page)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **ELOY ORTIZ OAKLEY, in his official capacity as Chancellor of California Community Colleges; BOARD OF GOVERNORS OF THE CALIFORNIA COMMUNITY COLLEGES; FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT; LOS RIOS COMMUNITY COLLEGE DISTRICT; LOS ANGELES COMMUNITY COLLEGE DISTRICT; STATE CENTER COMMUNITY COLLEGE DISTRICT; SAN DIEGO COMMUNITY COLLEGE DISTRICT,** | Civil Case No. 20-cv-3215-YGR<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**<br><br>Judge:    Honorable Yvonne Gonzalez Rogers<br>Trial Date:  None Set<br>Action Filed:  May 11, 2020 |
| Plaintiffs, | |
| v. | |
| **BETSY DEVOS, in her official capacity as the United States Secretary of Education; U.S. DEPARTMENT OF EDUCATION,** | |
| Defendants. | |

1   JOHN SHUPE
    Lynch and Shupe, LLP
2     316 Mid Valley Center # 180
      Carmel, CA 93923-8516
3     Telephone: (650) 579-5950
      Fax: (650) 579-0300
4     E-mail: jshupe@lynchshupelaw.com
    *Attorney for Plaintiff Foothill-De Anza Community College District*
5
    JEFFREY M. PRIETO
6   General Counsel
    Los Angeles Community College District
7     770 Wilshire Boulevard
      Los Angeles, CA 90017
8     Telephone: (213) 891-2188
      Fax: (213) 891-2138
9     E-mail: prietojm@laccd.edu
    *Attorney for Plaintiff Los Angeles Community College District*
10
    JACOB KNAPP
11  Acting General Counsel
    Los Rios Community College District
12    1919 Spanos Court
      Sacramento, CA 95825
13    Telephone: (916) 568-3116
      E-mail: knappj@losrios.edu
14  *Attorney for Plaintiff Los Rios Community College District*

15  MATTHEW T. BESMER
    General Counsel
16  State Center Community College District
      1171 Fulton Street
17    Fresno, CA 93721
      Telephone: (559) 243-7121
18    E-mail: matthew.besmer@scccd.edu
    *Attorney for Plaintiff State Center Community College District*
19
    LJUBISA KOSTIC
20  Director, Legal Services & EEO
    San Diego Community College District
21    3375 Camino del Rio South, Room 385
      San Diego, CA 92108
22    Telephone: (619) 388-6877
      Fax: (619) 388-6898
23    E-mail: lkostic@sdccd.edu
    *Attorney for Plaintiff San Diego Community College District*
24
25

26

27

28

1.      Plaintiffs Chancellor Eloy Ortiz Oakley, the Board of Governors of the California Community Colleges, Foothill-De Anza Community College District, Los Rios Community College District, Los Angeles Community College District, State Center Community College District, and San Diego Community College District (Plaintiffs) have brought this lawsuit to stop the U.S. Department of Education (DoE) from arbitrarily placing eligibility restrictions on emergency relief funds that Congress intended to help students defray additional educational costs resulting from the COVID-19 pandemic.  On March 27, 2020, in response to the unprecedented worldwide pandemic that has disrupted every aspect of the economy and everyday life, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020) was signed into law.  In the CARES Act, Congress created a $14 billion Higher Education Emergency Relief Fund (HEERF) from which the DoE Secretary is required to disburse approximately $12.56 billion, by a precise formula set by Congress, to institutions of higher education to prevent, prepare for, and respond specifically to the coronavirus.  Pursuant to the statutory formula, approximately $580 million was allocated to community colleges throughout California.[1]

2.      Congress authorized higher education institutions to use these grants to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus (HEERF Assistance).  Congress required that at least half of each institution's allocation be used to provide emergency relief to students for expenses related to campus disruptions (Student Assistance), with the remaining portion of funds to be used at the institution's discretion (Institution Assistance).  In doing so, for both the HEERF Student and Institution Assistance, Congress provided higher education institutions with unfettered flexibility to distribute the relief to affected students as they deemed appropriate, imposing no eligibility limitations on this emergency relief for students.

3.      Indeed, DoE at first recognized Congress's intent and acknowledged in an April 9,

---

[1] California Community Colleges Allocations for Section 18004(a)(1) of the CARES Act, California Community Colleges (Apr. 9, 2020), https://tinyurl.com/y8lskhzg; *see also* Allocations for Section 18004(a)(1) of the CARES Act, U.S. Dep't of Educ., https://tinyurl.com/rt8hdze (last visited Nov. 5, 2020).

2020 letter to colleges and universities that HEERF Assistance is available to all students. Likewise, in the Recipient's Funding Certification and Agreement that higher education institutions were required to sign in order to receive their Student Assistance funding allocations (Certification), DoE confirmed that HEERF Assistance funds do not constitute financial aid under Title IV of the Higher Education Act (Title IV).  Applying Title IV's eligibility restrictions would exclude not only certain categories of residents who are not U.S. citizens from receiving HEERF Assistance, but also citizens who do not meet other eligibility criteria unrelated to immigration status.

4.       On or about April 21, 2020, after a number of colleges within the Plaintiff Districts submitted the required Certifications[2] acknowledging and certifying that they would comply with the terms and conditions of funding, DoE suddenly and inexplicably changed its position.  In guidance documents directed to higher education institutions (April 21 Guidances), DoE said that HEERF Assistance is subject to Title IV's eligibility limitations, and specifically stated that higher education institutions cannot use these funds for non-citizens who are ineligible to receive aid under Title IV.  Under these eligibility restrictions, hundreds of thousands of California community college students who may be most in need of relief would be deprived of assistance during this public health crisis, including non-citizen students who are Deferred Action for Childhood Arrival (DACA) recipients, Temporary Protected Status recipients, and asylum applicants, as well as substantial numbers of U.S. citizens in the California community college system.  DoE's changed position would have likely excluded more than *half* of all students in the California community college system, including many identified as economically disadvantaged, from eligibility to receive HEERF Assistance.

5.       In a May 21 CARES Act Update (May 21 Update)[3] on its website and an Interim Final Rule (IFR), 85 Fed. Reg. 36,494 (June 17, 2020), DoE reaffirmed its position that only

---

[2] The term "Certifications" refers collectively to the Certification for Student Assistance and a similar certification for receipt of the colleges' Institution Assistance allocations.

[3] The May 21 Update is available at https://www2.ed.gov/about/offices/list/ope/heerfupdates.html.  The May 21 Update, with the April 21 Guidances, are referred to throughout as the HEERF Assistance Guidances.

students eligible for financial aid under Title IV may receive emergency HEERF Assistance, while also asserting that students who are ineligible to receive federal public benefits under 8 U.S.C. § 1611 (§ 1611) are precluded from receiving HEERF Assistance.

6.   As this Court held in preliminarily enjoining DoE's eligibility requirements, Congress did not authorize the imposition of these requirements.   *See generally* Order Granting Pls.' Mot. for Prelim. Inj. at 13-19 (June 17, 2020), ECF No. 44 (PI Order).   There is no provision of the CARES Act that limits the eligibility of students who may receive HEERF Assistance, that incorporates Title IV's eligibility requirements into the HEERF, or that confers discretion to the DoE Secretary to set eligibility requirements.   Rather, by not placing any limitations on student eligibility for HEERF Assistance, by leaving to the discretion of each institution how to distribute HEERF Assistance to students, and by requiring that the DoE Secretary allocate HEERF Assistance pursuant to a specific formula that accounts for *all* students who were not previously enrolled in distance (online) learning before the COVID-19 related shutdowns, Congress restricted DoE's authority to set eligibility requirements on that funding.   Although Congress imposed Title IV limitations and set other eligibility limitations on some funding sources described in the CARES Act, it did not do so with respect to HEERF Assistance.   Moreover, as this Court also ruled, § 1611's general restrictions on who may receive federal public benefits do not apply to "the specific, one-time emergency disbursement of HEERF Assistance in the CARES Act," and even if they did, HEERF Assistance is not a federal public benefit under § 1611.   PI Order at 23-24.

7.   Accordingly, DoE's imposition of eligibility requirements on HEERF Assistance, including through the IFR, violates separation of powers principles, is *ultra vires*, and is in excess of statutory authority in violation of the Administrative Procedure Act (APA).   DoE's unexplained and inconsistent interpretations, disregard of congressional intent, reliance on unsupported assumptions, flawed costs and benefits analysis, justifications that are contrary to the evidence available to DoE at the time it issued the IFR, and failure to consider significant ramifications of its eligibility limitations (or *any* of the public comments submitted in response to the IFR) also violate the APA's prohibition on arbitrary and capricious agency action.   Finally,

3

DoE's HEERF eligibility requirements violate the Spending Clause of the U.S. Constitution as they: (a) are not related to Congress's purpose for HEERF Assistance; (b) were not unambiguously imposed by Congress; (c) have not provided recipients with a knowing choice based on what is required to comply with the conditions; and (d) were imposed by DoE after a number of colleges in the Plaintiff Districts accepted the terms and conditions of the funding in the Certifications.

8.      These eligibility requirements would irreparably harm Plaintiffs and their students at a time when emergency relief is needed immediately.  Under HEERF's formula, Plaintiff Districts have collectively been allocated approximately $114 million, with at least $57 million of that amount allocated for students.  Students at community colleges throughout California have incurred and are continuing to incur increased costs as a result of the sudden and disruptive shift to distance learning systems adopted to keep students, staff, and faculty safe during the pandemic. If Plaintiffs were subject to DoE's eligibility requirements, Plaintiffs' already strained resources would further be challenged by the burdens of finding alternative sources of assistance, not subject to DoE's unlawful preclusions, and distributing much needed assistance to its students consistent with its principles of equity and inclusivity.  DoE's restrictions would only serve to increase the likelihood of student dis-enrollment, which not only would harm Plaintiffs' classrooms in the short term, but also their budgets in the long term—undermining their academic missions.

9.      For these reasons, and those discussed below, the Court should declare that DoE's eligibility requirements set forth in DoE's HEERF Assistance Guidances and its IFR are unlawful and unconstitutional and permanently enjoin their imposition and enforcement.

**JURISDICTION AND VENUE**

10.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises under the Constitution and the laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal government founded upon the U.S. Constitution and acts of Congress.  Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706.  An actual controversy exists between the parties within the

4

1   meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory injunctive, mandamus, and

2   other relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (Declaratory

3   Judgment Act), the Mandamus Statute, 28 U.S.C. § 1361, and the APA.

4       11.     Under 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of

5   California because Plaintiff Foothill-De Anza Community College District has a business address

6   at 12345 El Monte Road., Los Altos Hills, CA 94022.

7                        **INTRADISTRICT ASSIGNMENT**

8       12.     Assignment to the San Francisco or Oakland Divisions of this District is proper

9   pursuant to Civil Local Rule 3-2(c)-(d) because Defendant DoE maintains an office in the San

10  Francisco Division located at 50 United Nations Plaza, San Francisco, CA 94102.

11                              **PARTIES**

12      13.     The California Community Colleges system is the largest postsecondary education

13  system in the United States, with more than 2.1 million students attending one of 114 college

14  campuses annually, and 1.5 million students who enrolled in the Spring 2020 semester.  With low

15  tuition and a longstanding policy of full and open access, California's community colleges were

16  established around the principle that higher education should be available to everyone.  The

17  community colleges are the most common entry point into collegiate degree programs in

18  California; the primary system for delivering career technical education and workforce training; a

19  major provider of adult education, apprenticeship, and English as a Second Language courses;

20  and a source of lifelong learning opportunities for California's diverse communities.

21      14.     The principle of free public education is enshrined in the Constitution of

22  California, which mandates a system of free public schools. Cal. Const. art. IX, § 5.  The

23  California Constitution also sets a minimum funding level for "the moneys to be applied by the

24  state for the support of school districts and community college districts." *Id.* art. XVI, § 8(b); *see*

25  *also* Cal. Educ. Code § 84750.4 (establishing process for calculating a community college

26  district's base and supplemental allocations).  The California Community Colleges are

27  "postsecondary schools" and are "part of the public school system" of California.  Cal. Educ.

28  Code § 66700.

15.     Further, the California Equity in Higher Education Act establishes the policy of the State of California to afford all persons equal rights and opportunities in postsecondary educational institutions, including the California Community Colleges.  *Id.* § 66251.

### Plaintiffs Chancellor Eloy Ortiz Oakley and Board of Governors of the California Community Colleges

16.     The Board of Governors of the California Community Colleges (Board) sets policy and provides guidance for the 73 districts that constitute the postsecondary education system of community colleges.  *Id.* § 70900.  Board members are appointed by the Governor and formally interact with state and federal officials, and other state organizations.  The Board has legislatively-granted authority to develop and implement standards for classes, student academic requirements, and employment of academic and administrative staff.  *Id.* §§ 70900; 70901(b).

17.     The Board appoints a chief executive officer, known as the Chancellor, who exercises the duties and responsibilities that are delegated to him by the Board.  *Id.* § 71090(b). Plaintiff Eloy Ortiz Oakley has served as Chancellor since December 2016.

18.     The Chancellor's Office is responsible for carrying out the policies of the Board, including the development of fiscal plans, a legislative agenda, a budget for the community college system, and the execution of grants to community college districts to carry out statewide programs in furtherance of the Board's policies.  The Chancellor's delegated authority includes authority to enter into contracts and grants of up to $100,000 and three years duration without Board approval.  If there are exigent circumstances, the Chancellor may enter contracts or grants that exceed these limitations without prior Board approval.

19.     The Board exercises oversight and fiscal affairs leadership over the California Community Colleges, including: providing general supervision over community college districts; providing representation, advocacy, and accountability for the community colleges before state and national legislative and executive agencies; and administering state and federal support programs.  *Id.* § 70901(b), (b)(4)(A), & (b)(5)(A).  The Board is responsible for approving the system's budget, identifying total revenue needs in order to properly serve the educational system, and identifying expenditures for the state general apportionment and for categorical

6

programs, new programs, and budget improvements.  *Id.* § 70901(b)(5)(A)(i)(I).  The Board also advises and assists governing boards of community college districts on the implementation and interpretation of state and federal laws affecting community colleges.  *Id.* § 70901(b)(14).

20.     The Board's strategic mission states in part: "All people have the opportunity to reach their full educational potential . . . . The Colleges embrace diversity in all its forms . . . . All people have the right to access quality higher education."[4]  It is the objective of the California Community Colleges to "mak[e] sure students from all backgrounds succeed in reaching their goals and improving their families and communities."[5]  In furtherance of these missions, the Chancellor's Office has reassured students and colleges that its campuses will remain safe, welcoming places for students of all backgrounds to learn and has defended the right of all students to obtain a higher education in California.

21.     Before the Court issued its PI Order, the Board and the Chancellor's Office had to devote significant time and resources to address the DoE's imposition of the eligibility requirements on HEERF Assistance.  The Chancellor's Office executive team, research team, Government Relations Division, College Finance and Facilities Planning Division, and Communications Division all were required to respond to the DoE's actions by analyzing the impact of the DoE's restrictions; providing technical assistance and guidance to community colleges, policy-makers, and stakeholders; and conducting research and analysis to develop mechanisms to assist the hundreds of thousands of students deprived of the possibility of receiving federal assistance under the DoE's eligibility restrictions.  Staff time was diverted from other organizational responsibilities to develop responses to DoE's eligibility requirements.

22.     The Board and the Chancellor's Office worked with community college districts to alter their disbursement plans in response to the DoE's eligibility requirements and to determine alternative funding for emergency student aid for those students deemed ineligible by DoE.  As an example, the Chancellor's Office College Finance and Facilities Planning Division consulted

---

[4] Resolution of the Board of Governors No. 2017-01 (Jan. 2017) https://tinyurl.com/yc8bw6z9 (quoting from strategic plan).

[5] *Vision for Success*, California Community Colleges, https://tinyurl.com/y7dqtcnz (last visited Nov. 4, 2020).

with one college district that was forced, after release of the April 21 Guidances, to divert portions of its Student Equity and Achievement (SEA) Program funds from other uses in order to keep commitments it had already made to students based on the text of the CARES Act.

23.     Because the mission and mandate of the California Community Colleges is to support and provide low-cost postsecondary education to all, many of its students are among the most financially vulnerable in California.  In light of this, the Legislature enacted the SEA Program, the funding for which the Board administers and distributes.  In administering SEA Program funding, the Board provides local districts with the vast majority of the appropriations to utilize at their discretion, consistent with the Program's conditions.  The Legislature sets aside five percent of SEA Program funds for discretionary use by the Chancellor's Office to promote system-wide initiatives to achieve the goals of the California Community Colleges.[6]  These goals include reducing achievement gaps across various demographics and increasing the percentage of students who succeed in graduating, transferring to four-year colleges, or obtaining certificates.[7]

24.     The purpose of the SEA Program in particular is to ensure funding to eliminate achievement gaps for students from traditionally underrepresented groups to meet the goals set out in California Community Colleges' Vision for Success.  *See id.*; Cal. Educ. Code § 78222(a)(2).  In implementing the SEA Program, the California Community Colleges must: ensure students complete their educational goals and a defined course of study; provide quality curriculum, instruction, and support services to students who enter college deficient in English or math; and provide student matriculation services and assistance in developing an education plan, among other requirements.  *Id.* § 78222(a) & (b).  The Legislature's intent in creating the SEA Program was to prioritize funding for high-need and disadvantaged students enrolled in the California Community College system.  *Id.* § 78222(c).

---

[6] The California Legislature appropriated $475,220,000 for the SEA Program in 2019. 2019 Cal. Legis. Serv. Ch. 53 (S.B. 77) (West).  Under California Education Code, section 78222(c)(5)(A), "[t]he chancellor may allocate up to 5 percent of the total funds appropriated for the purpose of this program for state administrative operations to carry out the intent of this section."

[7] *See Vision for Success*, Foundation for California Community Colleges, https://vision.foundationccc.org/ (last visited Nov. 4, 2020).

8

25.     Funding for the SEA Program may be used for emergency student financial assistance to help eligible students overcome unforeseen financial challenges that would directly impact students' ability to persist in their course of study. *Id.* § 78220(e)(1). Emergency student financial assistance includes direct aid in the form of emergency grants, as well as housing and food assistance, textbook grants, and transportation assistance. *Id.* This assistance is available to any student who has experienced an unforeseen financial challenge, who is making satisfactory academic progress (as defined by the college the student attends), and who is at risk of not persisting in the student's course of study due to the unforeseen financial challenge. *Id.* § 78220(e)(3)(A).

26.     If permitted to take effect, DoE's eligibility restrictions would bar hundreds of thousands of California's community college students from receiving emergency HEERF Assistance. The Board, as the entity tasked with administering the SEA Program, expects that local districts would need to access SEA Program funds to fill this gap in emergency assistance, resulting in depletion of SEA Program funds and preventing their use for other critical educational and strategic missions. Before the April 21 Guidances, the Chancellor's Office, with Board approval, had designated these funds toward other priorities, including reducing equity gaps in achievement among traditionally underrepresented student groups, reducing regional achievement gaps among colleges located in regions with the lowest educational attainment of adults, and increasing the percentage of exiting students who are able to find employment in their field of study. Before the issuance of the PI Order, however, the Chancellor's Office had to assess whether there were set-aside funds available to provide support to community college districts in response to DoE's eligibility requirements on HEERF Assistance. The Chancellor's Office Division of Educational Services and Support also evaluated whether to re-scope grants to community college districts to alleviate some of the impacts of college district diversions of SEA and other funds to provide direct emergency aid to non-Title IV or § 1611 eligible students impacted by COVID-19 to cover the gap in funding caused by DoE's unlawful interpretation of the CARES Act.

27.     Since the issuance of the PI Order, community colleges across the State have used

9

HEERF Assistance to provide support for students who are facing substantial needs as a result of the pandemic, without regard to whether those students are eligible under Title IV or § 1611.  In addition to distributing Student Assistance, colleges throughout the State have used their Institution Assistance to provide both cash and in-kind support for students in the form of laptops, Chromebooks, WiFi connections, and hotspots to access remote learning, as well as mental health services.  Without an injunction preventing the enforcement of DoE's eligibility requirements, the Board, Chancellor's Office, and community college districts and colleges throughout the State will be prevented from disbursing HEERF Assistance to students that need it, undermining their educational mission and requiring diversion of resources to assist excluded students.  Even if the Board, Chancellor's Office, or districts were to use alternative sources of funding, like the SEA Program funds, to provide emergency relief to students not eligible under DoE's restrictions, including to meet basic housing and food needs that have arisen during this global health pandemic, these funds would not be enough to cover the gap caused by DoE's HEERF eligibility restrictions.  Moreover, use of the SEA Program funds will undermine California Community Colleges' Vision for Success objectives, which is what prompted the creation of the SEA Program.

### Plaintiff Foothill-De Anza Community College District

28.     Foothill-De Anza Community College District (FDCCD) has provided education for students in the South Bay area for over 50 years.  Each year, approximately 64,000 students are enrolled at FDCCD's two colleges: Foothill College and De Anza Community College.  FDCCD is committed to student success through equity, inclusion, and innovation.  Approximately 80 percent of students at FDCCD are non-white, and almost 25 percent of students receive financial aid.

29.     Based on the statutory formula, $9.6 million in HEERF Assistance funding was allocated to FDCCD's colleges, with a minimum allocation of $4.8 million for students.  Specifically, $2.4 million in HEERF Assistance funding was allocated to Foothill College, with a minimum allocation of $1.2 million for students; $7.2 million in HEERF Assistance funding was allocated to De Anza College, with a minimum allocation of $3.6 million for students.

10

30.     In accordance with the text of the CARES Act, the initial letter guidance issued by the DoE on April 9, and the Certification that all higher education institutions were required to complete in order to access Student Assistance funds, Foothill College developed a plan to ensure that its entire student body was eligible to receive assistance.  Foothill College created a short questionnaire asking students to identify their needs.  Foothill College planned to award amounts based on students' identified needs.

31.     On April 18, before DoE issued its April 21 Guidances, Foothill College accepted the Certifications required to access HEERF Assistance funds in reliance of the plain text of the CARES Act, the representations made in DoE's April 9 letter, and the language of the Certifications, with the expectation that it would be broadly distributing Student Assistance funds to its students.

32.     Once the eligibility restrictions were imposed and before the Court issued its PI Order, Foothill College was limited to providing HEERF Assistance to under 500 students, although it had received over 2,400 questionnaires from students.  The eligibility restrictions excluded the majority of students who had completed Foothill College's simple application, but did not have a Free Application for Student Aid (FAFSA) on file, or because they were strictly enrolled in online classes.

33.     Foothill College did not award any HEERF Assistance to students ineligible under DoE's eligibility requirements before the issuance of the PI Order.  After the Court's issuance of the PI Order, and in reliance thereof, Foothill College was able to distribute Student Assistance to students that were excluded under DoE's eligibility restrictions, and is expeditiously continuing to do so until it exhausts its Student Assistance funding.

34.     Before the issuance of the PI Order, Foothill College used other sources of state funding and fundraising efforts to provide some relief for students excluded by DoE's eligibility criteria.  Foothill College would have to renew those efforts if it was once again subject to DoE's eligibility restrictions.  These alternative funding sources, however, may not be sufficient to meet the needs of excluded students.

35.     In accordance with the text of the CARES Act, the initial letter guidance issued by

11

the DoE on April 9, and the Certification that all higher education institutions were required to complete in order to access Student Assistance funds, De Anza College developed a plan to distribute Student Assistance to all students who were affected by disruption to campus operations because of the coronavirus.  De Anza College created a short application asking students to identify their needs.  De Anza College planned to award amounts based on students' identified needs.

36.   De Anza College completed the Certifications required of all higher education institutions to access HEERF Assistance.

37.   Once the eligibility restrictions were imposed and before the Court issued its PI Order, De Anza College was limited to providing Student Assistance to only those students who had submitted an application and had a FAFSA on file.  During this time period, De Anza College conducted a manual review of eligibility for all other students who had completed the application. Based on its manual review of applications during this time period, De Anza College estimates that it took staff approximately fifteen minutes to review each application in order to verify all of the information necessary under DoE's eligibility requirements,

38.   De Anza College did not award any HEERF Assistance to students ineligible under DoE's eligibility requirements before the issuance of the PI Order.  After the Court's issuance of the PI Order, and in reliance thereof, De Anza College was able to distribute Student Assistance to students that were excluded under DoE's eligibility restrictions, and is expeditiously continuing to do so until it exhausts its Student Assistance funding.  De Anza College estimates that it took staff five minutes to review each application without having to verify all of the information necessary under DoE's eligibility requirements.

39.   De Anza College is considering using a portion of its Institution Assistance to provide assistance to students.  If it provides Institution Assistance to students, De Anza College plans to do so without regard to whether those students are eligible under Title IV or § 1611.

40.   Before the issuance of the PI Order, De Anza College used other sources of state funding and fundraising efforts to provide some relief for students excluded by the DoE's eligibility criteria.  De Anza College would have to renew those efforts if it was once again

12

1    subject to DoE's eligibility restrictions.  These alternative sources of funding, however, would not

2    be sufficient to meet the needs of excluded students.

3        41.    Both of FDCCD's colleges have a continued interest in disbursing HEERF

4    Assistance equitably among its student body, so that its students may continue their education and

5    FDCCD may continue to fulfill its academic mission.

6                    **Plaintiff Los Angeles Community College District**

7        42.    Los Angeles Community College District (LACCD) has provided an education to

8    more than three million students over the past 77 years and is affordable and accessible to all.

9    LACCD includes nine colleges: Los Angeles Mission College, Pierce College, Los Angeles

10   Valley College, Los Angeles City College, East Los Angeles College, West Los Angeles College,

11   Los Angeles Southwest College, Los Angeles Trade-Technical College, and Los Angeles Harbor

12   College.  LACCD welcomes a diverse student population and provides them with the skills,

13   knowledge, and upward mobility to succeed.  Over 55 percent of students enrolled in LACCD are

14   Hispanic and nearly 10 percent of students are African American.  Eighty percent of LACCD

15   students are from underserved populations.  Over half of students enrolled in LACCD are either

16   low income or below the poverty line and a 2016 survey indicated that 55 percent of students are

17   experiencing housing insecurity and 63 percent face food insecurity.

18       43.    Based on the statutory formula, $45.2 million in HEERF Assistance funding was

19   allocated to LACCD's colleges, with a minimum allocation of $22.6 million for students.  In

20   accordance with the text of the CARES Act and the initial letter guidance issued by the DoE on

21   April 9, LACCD developed a plan for its nine colleges to distribute Student Assistance grants to

22   all recipients of the California Promise Grant (CPG) enrollment fee waiver.  Cal. Educ. Code

23   § 76300(g).

24       44.    All of LACCD's colleges completed the Certifications required of all higher

25   education institutions to access HEERF Assistance.

26       45.    Once the eligibility restrictions were imposed and before the Court issued its PI

27   Order, LACCD shifted its eligibility model from CPG recipients to FAFSA-eligible students

28   under Title IV, which reduced the number of low-income students eligible for HEERF Assistance

13

by 9,000.

46.     LACCD did not award any HEERF Assistance to students ineligible under DoE's eligibility requirements before the issuance of the PI Order.  After the Court's issuance of the PI Order, and in reliance thereof, LACCD was able to distribute millions in Student Assistance to students who were previously excluded under DoE's eligibility restrictions and is expeditiously continuing to do so until it exhausts its Student Assistance funding.

47.     LACCD's colleges have used and plan to continue to use their Institution Assistance to provide assistance to students.  For example, LACCD's colleges have used Institution Assistance to purchase Chromebooks or laptops for hundreds of students, without regard to whether those students are eligible under Title IV or § 1611.

48.     Before the issuance of the PI Order, LACCD and its nine colleges used private fundraising efforts to provide some relief for students excluded by the DoE's eligibility criteria.  LACCD would have to renew those efforts if it was once again subject to DoE's eligibility restrictions.  These alternative funding sources, however, are not predictable revenue streams and would not be sufficient to meet the needs of excluded students.

49.     LACCD continues to have an interest in disbursing HEERF Assistance equitably among its student body, so that its students may continue their education and LACCD may continue to fulfill its academic mission.

**Plaintiff Los Rios Community College District**

50.     Los Rios Community College District (LRCCD) is the second-largest community college district in California, serving nearly 75,000 students throughout the Sacramento region. LRCCD consists of American River College, Cosumnes River College, Folsom Lake College, and Sacramento City College.  LRCCD offers a wide array of degree, transfer, and certificate programs at its four colleges and six resource centers.  Nearly two-thirds of LRCCD's student body is non-white and qualify as either low income or below the poverty line.

51.     Based on the statutory formula, approximately $27 million in HEERF Assistance funding was allocated to LRCCD's colleges, with a minimum allocation of $13.5 million for students.  In accordance with the text of the CARES Act, the initial letter guidance issued by the

14

DoE on April 9, and the Certification that all higher education institutions were required to complete in order to access Student Assistance funds, LRCCD developed an initial plan for its four colleges to distribute Student Assistance grants to all recipients of the CPG enrollment fee waiver.  This plan was intended to provide support to approximately 58,000 students, about 70 percent of the district's total student enrollment, and focused on those with demonstrated financial need.  This group of students included undocumented students, DACA recipients, foster youth, single parents, veterans, and students who were not able to meet academic progress metrics, among others.

52.     In order to serve these students, following DoE's direction in the April 9 letter, all of LRCCD's colleges completed the required Certifications as soon as possible, before DoE issued its April 21 Student Assistance Guidance.  Each of the colleges accepted the Certifications required to access HEERF Assistance funds in reliance of the plain text of the CARES Act, representations made in DoE's April 9 letter and the language of the Certifications, with the expectation that the colleges would follow LRCCD's plan for broadly distributing HEERF Assistance funds to its students, without regard to Title IV's or § 1611's eligibility limitations.

53.     Once DoE's HEERF eligibility restrictions were imposed, and before the Court issued its PI Order, LRCCD shifted its eligibility model from CPG recipients to only FAFSA recipients.  Under this model, LRCCD was limited to providing Student Assistance to approximately 21,000 students.

54.     LRCCD did not award any HEERF Assistance to students ineligible under DoE's eligibility requirements before the issuance of the PI Order.  After the Court's issuance of the PI Order, and in reliance thereof, LRCCD was able to distribute Student Assistance to students previously excluded by DoE's eligibility restrictions and is expeditiously continuing to do so until it exhausts its Student Assistance funding.

55.     LRCCD's colleges have used and plan to continue using their Institution Assistance to provide assistance to students.  After the Court's issuance of the PI Order, and in reliance thereof, LRCCD's colleges used their Institution Assistance portions to provide thousands of students with internet and laptops to support them in participating in remote

1    learning, without regard to whether those students are eligible under Title IV or § 1611.

2          56.    Before the issuance of the PI Order, LRCCD used other sources of state funding

3    and philanthropic fundraising efforts to provide some relief for students excluded by the DoE's

4    eligibility criteria.  LRCCD would have to renew those efforts if it was once again subject to

5    DoE's eligibility restrictions.  These alternative funding sources, however, would not be sufficient

6    to meet the needs of excluded students.

7          57.    LRCCD has a continued interest in disbursing HEERF Assistance equitably

8    among its student body, so that its students may continue their education and LRCCD may

9    continue to fulfill its academic mission.

10                      **Plaintiff State Center Community College District**

11         58.    State Center Community College District (SCCCD) serves more than 5,743 square

12   miles of urban and rural communities, including most of Fresno and Madera counties, and

13   portions of Kings and Tulare counties.  SCCCD currently includes four colleges: Fresno City

14   College, Reedley College, Madera Community College, and Clovis Community College. On July

15   20, 2020, Madera Community College was awarded full college status and approved to operate as

16   California's newest community college.  Prior to July 20, Madera Community College had

17   operated as an extension of Reedley College as a community college center.  Over 67,000

18   students are enrolled in SCCCD and approximately 78 percent of the SCCCD student population

19   is non-white.  Over 59 percent of SCCCD's student population is Hispanic and 10 percent of the

20   student population is Asian/Pacific Islander.  The four counties in SCCCD's service area include

21   a higher percentage of low income population than statewide.  The SCCCD's mission is to

22   provide safe, inclusive, and supporting learning environments that is accessible to all students

23   within the region.  SCCCD is committed to providing an environment that cultivates, embraces,

24   and celebrates diversity.

25         59.    Based on the statutory formula, $18.33 million in HEERF Assistance funding was

26   allocated to SCCCD's then-three colleges, with a minimum allocation of $9.167 million for

27   students.  Specifically, $11.22 million in HEERF Assistance funding was allocated to Fresno City

28   College, with a minimum allocation of $5.61 million for students; $4.24 million in HEERF

Assistance funding was allocated to Reedley College and Madera Community College, with a minimum allocation of $2.12 million for students; $2.87 million in HEERF Assistance funding was allocated to Clovis Community College, with a minimum allocation of $1.435 million for students.

60.     SCCCD directed its colleges to create their own criteria to administer the Student Assistance funding.  In accordance with the text of the CARES Act, the initial letter guidance issued by the DoE on April 9, and the Certifications that all higher education institutions were required to complete in order to access Student Assistance funds, Fresno City College, Reedley College (including Madera Community College), and Clovis Community College created extensive plans for distributing Student Assistance grants in an equitable manner.

61.     Fresno City College initially identified 16,457 students to whom it would provide Student Assistance after conducting extensive research that took into account whether a student received Pell grants or is otherwise Pell-grant eligible, family income, student income, and impact based on zip code.  Indeed, Fresno City College prepared reports on how best to distribute funds to the most needful students.

62.     On April 14, before DoE issued its April 21 Guidances, Fresno City College accepted the Certifications required to access HEERF Assistance funds in reliance of the plain language in the CARES Act, representations made in DoE's April 9 letter, and the language of the Certifications, with the expectation that it would follow this plan for broadly distributing HEERF Assistance funds to its students, without regard to Title IV's or § 1611's eligibility limitations.  Once DoE's HEERF eligibility restrictions were imposed and before the Court issued its PI Order, Fresno City College was limited to providing Student Assistance to only 8,090 students.

63.     Fresno City College did not award any HEERF Assistance to students ineligible under DoE's eligibility requirements before the issuance of the PI Order.  After the Court's issuance of the PI Order, and in reliance thereof, Fresno City College was able to distribute Student Assistance to students that were excluded under DoE's eligibility restrictions, and is expeditiously continuing to do so until it exhausts its Student Assistance funding.

64. Fresno City College has used and plans to continue using its Institution Assistance to provide assistance to students. After the Court's issuance of the PI Order, and in reliance thereof, Fresno City College used a portion of its Institution Assistance to provide hundreds of students with cash assistance, internet and laptops to support them in participating in remote learning, without regard to whether those students are eligible under Title IV or § 1611.

65. Before the issuance of the PI Order, Fresno City College used fundraising efforts to provide some relief for students excluded by the DoE's eligibility criteria. Fresno City College would have to renew those efforts if it was once again subject to DoE's eligibility restrictions. These alternative funding sources, however, would not be sufficient to meet the needs of excluded students.

66. Reedley College initially identified 7,100 students attending Reedley College and Madera Community College Center to whom it would provide Student Assistance grants without regard to whether they qualify for Title IV or § 1611. On April 13, before DoE issued its April 21 Guidances, Reedley College accepted the Certifications required to access HEERF Assistance funds in reliance of the plain language in the CARES Act, representations made in DoE's April 9 letter, and the language of the Certifications, with the expectation that it would follow this plan for broadly distributing HEERF Assistance funds to its students, without regard to Title IV's or § 1611's eligibility limitations.

67. Once the eligibility restrictions were imposed and before the Court issued its PI Order, Reedley College was not only delayed by approximately two weeks in disbursing Student Assistance grants, but was limited to providing Student Assistance to only 3,775 students. It additionally conducted a manual review of all other students for FAFSA-eligibility in an attempt to assist more students, which proved to be time-consuming and resource intensive.

68. Reedley College did not award any HEERF Assistance to students ineligible under DoE's eligibility requirements before the issuance of the PI Order. After the Court's issuance of the PI Order, and in reliance thereof, Reedley College was able to distribute Student Assistance to students attending Reedley College that were excluded under DoE's eligibility restrictions. Reedley College completed its distribution of its portion of Student Assistance as of October

1    2020.

2         69.    Reedley College has used and plans to continue using its Institution Assistance to

3    provide assistance to students.  After the Court's issuance of the PI Order, and in reliance thereof,

4    Reedley used a portion of its Institution Assistance to provide hundreds of students with internet

5    and laptops to support them in participating in remote learning, without regard to whether those

6    students are eligible under Title IV or § 1611.  Additionally, Reedley College intends to set aside

7    Institutional Assistance to provide cash grants to Reedley College students.

8         70.    Reedley College used fundraising efforts to provide some relief for students

9    excluded by the DoE's eligibility criteria.  Reedley College would have to renew those efforts if it

10   was once again subject to DoE's eligibility restrictions.  The alternative funding sources,

11   however, would not be sufficient to meet the needs of excluded students.

12        71.    Because Madera Community College operated as a center and an extension of

13   Reedley College until July of 2020, Reedley College distributed Student Assistance funds to

14   students attending Madera Community College.  In reliance upon and in accordance with the

15   terms of the PI Order, Reedley College distributed Student Assistance funds to Madera

16   Community College students who had been excluded under DoE's eligibility restrictions.

17   Reedley College completed its distribution of Student Assistance to Madera Community College

18   students as of October 2020.

19        72.    In contrast to Student Assistance funds, Institutional Assistance funds were

20   allocated directly to, and distributed by, Madera Community College.  After the Court's issuance

21   of the PI Order, and in reliance thereof, Madera Community College has used a portion of its

22   Institution Assistance to provide hundreds of students with cash assistance, internet, and laptops

23   to support them in participating in remote learning, without regard to whether those students are

24   eligible under Title IV or § 1611.  Madera Community College intends to continue using

25   Institutional Assistance to assist students.

26        73.    Clovis Community College initially developed a three-tier plan through which it

27   identified approximately 6,500 students to whom it would provide Student Assistance grants.

28   This plan would have provided support to all students without regard to whether they would

19

1  qualify under Title IV or § 1611.

2      74.     On April 16, before DoE issued its April 21 Guidances, Clovis Community

3  College accepted the Certifications required to access HEERF Assistance in reliance of the plain

4  language in the CARES Act, representations made in DoE's April 9 letter, and the language of

5  the Certifications, with the expectation that it would follow this plan for broadly distributing

6  HEERF Assistance funds to its students, without regard to Title IV's or § 1611's eligibility

7  limitations.

8      75.     Once DoE's HEERF eligibility restrictions were imposed and before the Court

9  issued its PI Order, Clovis Community College was limited to providing Student Assistance to

10  only 1,975 students.

11      76.     Clovis Community College did not award any HEERF Assistance to students

12  ineligible under DoE's eligibility requirements before the issuance of the PI Order.  After the

13  Court's issuance of the PI Order, and in reliance thereof, Clovis Community College was able to

14  distribute Student Assistance to students that were excluded under DoE's eligibility restrictions.

15  Clovis completed its distribution of its portion of Student Assistance as of October 2020.

16      77.     Clovis Community College has used and plans to continue using its Institution

17  Assistance to provide assistance to students.  After the Court's issuance of the PI Order, and in

18  reliance thereof, Clovis used a portion of its Institution Assistance to provide students with cash

19  assistance as well as internet and laptops to support them in participating in remote learning,

20  without regard to whether those students are eligible under Title IV or § 1611.

21      78.     Before the issuance of the PI Order, Clovis Community College used fundraising

22  efforts to provide some relief for students excluded by the DoE's eligibility criteria.  Clovis

23  Community College would have to renew those efforts if it was once again subject to DoE's

24  eligibility restrictions.  These alternative funding sources, however, would not be sufficient to

25  meet the needs of excluded students.

26      79.     SCCCD's colleges have a continued interest in disbursing HEERF Assistance

27  equitably among its student body, so that its students may continue their education and SCCCD

28  may continue to fulfill its academic mission.

1

**San Diego Community College District**

2   80.   San Diego Community College District (SDCCD) serves approximately 100,000

3   students annually.  SDCCD is a multicultural institution committed to access and success for all

4   students.  SDCCD includes three colleges: San Diego City College, Mesa College, and Miramar

5   College, and has seven campuses that provide Continuing Education.  SDCCD offers associate

6   degrees and career technical certificates, as well as a bachelor's degree in Health Information

7   Management.  SDCCD and its graduates have a combined economic benefit to its region of $5.5

8   billion annually and 98 percent of the District's students remain in the region after completing

9   their education.  Within SDCCD's colleges, approximately 69 percent of students enrolled in

10   SDCCD are non-white; 39 percent are Latinx.  Twenty-eight percent are first generation college

11   students.  Over half of SDCCD's students report income of less than $33,000 a year, with at least

12   17 percent reporting less than $3,000 a year.  In the Continuing Education program,

13   approximately 61 percent are non-white; 25 percent identified as Latinx or Mexican; and 34

14   percent have a primary language other than English.  Seventy-six percent of Continuing

15   Education students report income less than $33,000, 46 percent report less than $3,000, and 37

16   percent record an income of zero.

17   81.   Based on the statutory formula, $13.7 million in HEERF Assistance funding was

18   allocated to SDCCD's colleges, with a minimum allocation of $6.87 million for students.  In

19   accordance with the text of the CARES Act and the initial letter guidance issued by the DoE on

20   April 9, SDCCD developed a plan for its three colleges and Continuing Education program to

21   distribute Student Assistance grants to a range of students, specifically including students enrolled

22   in no-credit continuing education programs, as well as undocumented and DACA students.

23   82.   After SDCCD decided on an allocation plan for HEERF Assistance, SDCCD

24   became aware of DoE's April 21 Guidances imposing new eligibility restrictions on students'

25   access to Student Assistance, which caused confusion in the District.  As a result of this change

26   and before the Court issued its PI Order, SDCCD colleges were unable to disburse HEERF

27   student emergency assistance to many of its most impacted students.

28   83.   SDCCD's colleges submitted the Certifications required to obtain their shares of

21

1   HEERF Assistance funds while attempting to understand the impact of DoE's April 21 Guidances

2   on their plans for disbursing student emergency assistance.

3          84.    SDCCD did not award any HEERF Assistance to students ineligible under DoE's

4   eligibility requirements before the issuance of the PI Order.  After the Court's issuance of the PI

5   Order, and in reliance thereof, SDCCD was able to distribute Student Assistance to students that

6   were excluded under DoE's eligibility restrictions, and is expeditiously continuing to do so until it

7   exhausts its Student Assistance funding

8          85.    SDCCD's colleges have used and plan to continue using their Institutional

9   Assistance to provide assistance to students.  For example, SDCCD's colleges have used

10  Institutional Assistance to purchase course materials, docking stations, internet access, web

11  cameras, laptops, and monitors for thousands of students without regard to whether those students

12  are eligible under Title IV or § 1611.

13         86.    Before the issuance of the PI Order, SDCCD and its colleges used fundraising

14  efforts to provide some relief for students excluded by the DoE's eligibility criteria.  SDCCD

15  would have to renew those efforts if it was once again subject to DoE's eligibility restrictions.

16  These alternative funding sources, however, would not be sufficient to meet the needs of

17  excluded students.

18         87.    Conditions related to the novel coronavirus have negatively impacted students'

19  ability to participate in their courses.  SDCCD's colleges and programs have seen increased

20  withdrawals compared to last year.  SDCCD fears that its inability to assist all of its students if

21  subject to DoE's eligibility requirements would result in more of its students dis-enrolling, which

22  will in turn impact SDCCD's revenues.

23         88.    SDCCD continues to have an interest in disbursing HEERF Assistance equitably

24  among its student body, so that its students may continue their education and SDCCD may

25  continue to fulfill its academic mission.

26                                    **Defendants**

27         89.    Defendant DoE is an executive department of the United States of America

28  pursuant to 5 U.S.C. § 101, a federal agency within the meaning of 28 U.S.C. § 2671, and has

1    engaged in agency action within the meaning of 5 U.S.C. § 702.  DoE is responsible for

2    administering the HEERF.

3          90.    Defendant Betsy DeVos is the Secretary of the Department of Education.  She is

4    sued in her official capacity pursuant to 5 U.S.C. § 702.  Secretary DeVos is required to distribute

5    HEERF Assistance in accordance with the CARES Act.

6                                    **FACTUAL ALLEGATIONS**

7    **I.    THE COVID-19 PANDEMIC HAS CAUSED AN IMMEDIATE NEED FOR ADDITIONAL
          FINANCIAL ASSISTANCE FOR THE DISTRICTS' DIVERSE STUDENT BODIES**
8

9          91.    The COVID-19 pandemic is a public health emergency that has disrupted nearly

10   every facet of daily American life.  Our country's educational institutions have had to respond

11   urgently to the crisis and take far-reaching measures to protect the health and safety of their

12   students and staff.  Many colleges and universities throughout the country, including in

13   California, closed their campuses and shifted primarily to remote learning.  As of May 2020,

14   more than 4,000 institutions of higher education nationwide were impacted and over 25 million

15   students affected by COVID-19.[8]

16         92.    Like other educational institutions, all of the California community colleges

17   transitioned to online instruction and implemented social distancing and other safety protocols for

18   necessary in-person services.  The Chancellor's Office and the community colleges have made

19   significant efforts to address the severe disruptions experienced by students to enable them to

20   meaningfully participate in online instruction.  For instance, the Chancellor's Office has worked

21   with the telecommunications industry to provide internet services at no, or reduced, cost and

22   computers for students who need them.  Unmet technology needs remain, however.

23         93.    The uncertainty and economic stress caused by COVID-19 has impacted

24   California's community college students particularly acutely.  Because of the California

25   Community College system's commitment to free and low cost tuition, many of its students do

26   not have adequate resources to adapt to the changes the crisis has wrought.  Pandemic-induced

27   _____

     [8] *COVID-19: Higher Education Resource Center*, Entangled Solutions,
28   https://tinyurl.com/y8wazqw2 (last visited Nov. 2, 2020).

1   conditions hinder students' efforts to continue their education and put them at higher risk for dis-

2   enrollment.

3       94.     Because of campus closures, students find themselves in remote learning

4   environments that are overcrowded or otherwise not conducive to attending class, such as shared

5   bedrooms or family kitchens.  The shift to remote learning also presents additional costs,

6   beginning with access to robust internet connections and laptop computers, and extending to day-

7   to-day costs resulting from increased time at home.

8       95.     Away from their college communities, students are struggling to receive the

9   instructional support they need to learn while also grappling with significant economic struggles.

10  Negotiating these challenges can be overwhelming for students.

11      96.     The sudden closures separated students from their communities—friends, faculty,

12  and advisors who have been part of their support network.  These experiences compound the

13  already difficult circumstances faced by low-income students as they lose access to mental health

14  resources they might have had on their campuses, without access to extra finances to afford

15  outside mental health treatment.

16      97.     If not for the Court's preliminary injunction, DoE's actions would have prevented

17  students in dire need from accessing funds that help them bridge the gap of unforeseen expenses

18  caused by the pandemic so that they may continue their education despite significant obstacles.  If

19  California's community colleges were once again subject to DoE's eligibility requirements,

20  community college students in the State who could not bridge the gap themselves would have to

21  withdraw or dis-enroll from college altogether.  These students (and their families) have invested

22  effort and financial resources into building their lives and potential futures.  Without emergency

23  HEERF Assistance, they would be forced into momentous and premature decisions about their

24  educational and professional paths that would have a lasting effect on their lives.

25  **II.    CONGRESS CREATED THE HEERF IN THE CARES ACT AS A FORMULA GRANT FOR
        HIGHER EDUCATION INSTITUTIONS TO ASSIST STUDENTS WITH EMERGENCY COSTS
26      INCURRED DURING THIS PUBLIC HEALTH CRISIS**

27      98.     To respond to these needs, Congress appropriated $30.75 billion in the CARES

28  Act toward the Education Stabilization Fund "to prevent, prepare for, and respond to coronavirus,

24

domestically or internationally."  134 Stat. at 564.  These funds were designated as "emergency requirement[s]" under section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.  *Id.*

99.     Within the Education Stabilization Fund, Congress created a new program: the Higher Education Emergency Relief Fund (HEERF).  Congress reserved 90 percent of HEERF, approximately $12.56 billion, to be allocated to colleges and universities in accordance with a specific funding formula.  *Id.* at 564, § 18001 & 567, § 18004(a)(1).  The HEERF Assistance funding formula requires the Secretary to allocate funds to each higher education institution as follows: 75 percent based on its relative share of the full-time equivalent (FTE) enrollment of Federal Pell Grant recipients and 25 percent based on its relative share of FTE enrollment of all other students, excluding in both categories students enrolled only in distance learning before the coronavirus emergency.  *Id.* at 567, § 18004(a)(1).  Thus, the latter part of the formula accounts for *all* students not previously enrolled in online learning, including those students who are not eligible for financial aid under Title IV of the Higher Education Act or § 1611.  Congress directed that the DoE Secretary "shall allocate" this $12.56 billion to "each institution of higher education to prevent, prepare for, and respond to coronavirus" based on this formula.  *Id*. at 567, § 18004(a)(1).

100.     The CARES Act broadly allows higher education institutions to use HEERF Assistance "to cover *any* costs associated with significant changes to the delivery of instruction due to the coronavirus."  *Id.* at 568, § 18004(c) (emphasis added).  As Senator Lamar Alexander (R-TN) explained, the funding in the CARES Act for higher education institutions is structured in the form of a "block grant."  166 Cong. Rec. S1895 (Mar. 22, 2020).  This "permits the states to administer the program[] with minimal federal involvement and few procedural requirements." *Rural Alaska Cmty. Action Program v. Smith*, 847 F.2d 535, 536 (9th Cir. 1988).

101.     The CARES Act subjects higher education institution recipients of HEERF Assistance to only two conditions.  First, the funds cannot be used for "payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship."  134 Stat. at 564,

§ 18004(c).  Second, at least 50 percent of the funds must be used "to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)"—referred to here as Student Assistance.  *Id.*  A higher education institution may use the remaining funds for any purpose associated with the "significant changes to the delivery of instruction due to the coronavirus," which could include reimbursement for expenses incurred by the institution or additional assistance to students—referred to here as Institution Assistance.  *Id.*

102.    Other than those provisions, the CARES Act does not set out any requirements on how each institution must allocate HEERF Assistance funds.  Congress spoke clearly when it intended to set eligibility criteria for other programs in the CARES Act.  *See, e.g.*, *id.* at 335, § 6428(d) (excluding "nonresident alien[s]" and other enumerated individuals from receiving rebates).  In contrast, no provision of the CARES Act limits the eligibility of students who may receive HEERF Assistance, including with respect to immigration status or Title IV financial aid eligibility.  The only HEERF provision mentioning Title IV refers just to utilization of DoE's existing grant management system to distribute aid.  *Id.* at 567, § 18004(b).  Moreover, Congress treated Student Assistance differently from other student financial aid funding sources in the CARES Act, which are subject to Title IV's eligibility requirements.  *See id.* at 396-97, § 3504 (permitting the use of an institution's allotment under Title IV to issue emergency financial aid grants to students); *see also id.* at 397, § 3505 (authorizing higher education institutions to use Title IV funds to make payments to affected work-study students).

**III.    DOE ISSUED CONFLICTING INTERPRETATIONS ON HEERF ASSISTANCE ELIGIBILITY, AND ULTIMATELY RESTRICTED ELIGIBILITY IN A MANNER NOT INTENDED BY CONGRESS**

103.    At first, after the CARES Act became law, DoE implemented the HEERF consistent with Congress's intent.  On April 9, 2020, DoE announced the availability of $12.56 billion in HEERF Assistance funds, including $6.28 billion for Student Assistance formula

grants.[9]  DoE announced that the formula allocations were based on data from the Integrated

Postsecondary Education System (IPEDS) and Federal Student Aid (FSA).[10]  In determining

allocations pursuant to the portion of the formula involving non-Federal Pell Grant recipients,

DoE correctly utilized enrollment data that did not exclude students who are ineligible for Title

IV financial aid or federal public benefits under § 1611.[11]

104.  On that same day, the DoE Secretary wrote a letter to colleges and universities

explaining that the institutions have "significant discretion" on how to allocate the Student

Assistance to students, and that "each institution may develop its own system and process for

determining how to allocate these funds, which may include distributing the funds to *all* students

or only to students who demonstrate significant need."[12]  Relying directly on the text of the

CARES Act, the Secretary stated that "[t]he only statutory requirement is that the funds be used

to cover expenses related to the disruption of campus operations due to coronavirus (including

eligible expenses under a student's cost of attendance, such as food, housing, course materials,

technology, health care, and child care)."  *Id.*

105.  According to the letter, in order to access both the Student and Institution

Assistance funds, each higher education institution would be required to sign and return

Certifications acknowledging and certifying that the institution will comply with the terms and

conditions of funding.  *Id.*  The Certifications also made available on April 9, 2020, provide that

recipient institutions must allocate the funding in a manner "consistent with all applicable laws"

and also may be subject to penalties for failure to comply with the CARES Act "or any other

---

[9] *Secretary DeVos Rapidly Delivers More Than $6 Billion in Emergency Cash Grants for College Students Impacted by Coronavirus Outbreak*, U.S. Dep't of Educ. (Apr. 9, 2020), https://tinyurl.com/y73bnxd4.

[10] *Id.*; *see also* Allocations for Section 18004(a)(1) of the CARES Act, U.S. Dep't of Educ., https://tinyurl.com/rt8hdze (last visited Nov. 2, 2020).

[11] *See* Methodology for Calculating Allocations per Section 18004(a)(1) of the CARES Act, U.S. Dep't of Educ., https://tinyurl.com/ybvxuzu8 (identifying use of data from Integrated Postsecondary Education Data System (IPEDS) system) (last visited Nov. 2, 2020); IPEDS Data Explorer, Nat'l Ctr. for Educ. Statistics, https://tinyurl.com/yaonr6cq (aggregate IPEDS data, including category for "nonresident alien" students) (last visited Nov. 2, 2020).

[12] Secretary DeVos Letter to College and University Presidents, U.S. Dep't of Educ. (Apr. 9, 2020), https://tinyurl.com/y7f9tlrk (emphasis added).

27

applicable law."[13]  The Certification for Student Assistance additionally and explicitly states, consistent with Congress's intent and the Secretary's April 9 letter, that the "Secretary does not consider these individual emergency financial aid grants to constitute Federal financial aid under Title IV of the HEA."  *Id.*  By distinguishing Student Assistance from regular federal financial aid, the Certification indicates that requirements under Title IV are inapplicable to Student Assistance.

106.    On or about April 21, 2020, DoE drastically changed its interpretation of the CARES Act without acknowledging its prior position.  DoE published a Frequently Asked Questions document on HEERF Student Assistance Guidance.[14]  This April 21 Student Assistance Guidance imposes a limitation on eligibility for Student Assistance, stating, "[o]nly students who are or could be eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965, as amended (HEA), may receive emergency financial aid grants."  *Id.* at 4.  The April 21 Student Assistance Guidance expressly mentions that only U.S. citizens or "eligible noncitizens" may receive funding.  *Id.*  A similar guidance for the Institution Assistance funds issued on or about the same date (April 21 Institution Assistance Guidance, with April 21 Student Assistance Guidance, the April 21 Guidances defined *supra* at 2), contains the same limitations on eligibility for emergency financial assistance grants to students.[15]

107.    DoE reaffirmed this new position after April 21.  A spokesperson for DoE insisted that "the CARES Act makes clear that this taxpayer funded relief should be targeted to U.S. citizens."[16]  On April 27, the DoE Secretary said that DACA recipients are not eligible for

---

[13] Recipient's Funding Certification and Agreement: Emergency Financial Aid Grants to Students under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, U.S. Dep't of Educ., https://tinyurl.com/y8j7m8t3 (last visited Nov. 2, 2020).

[14] *Higher Education Emergency Relief Fund*, Frequently Asked Questions about the Emergency Financial Aid Grants to Students under Section 18004 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, U.S. Dep't of Educ., https://tinyurl.com/yajnjpr2 (last visited Nov. 2, 2020).

[15] *Higher Education Emergency Relief Fund*, Frequently Asked Questions about the Institutional Portion of the Higher Education Emergency Relief Funds under Section 18004(a)(1) and 18004(c) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, U.S. Dep't of Educ., https://tinyurl.com/ya25f2k7 (last visited Nov. 2, 2020).

[16] Brendan Cole, *Who Is Eligible for the Emergency Financial Aid Grant From the*

28

1    Student Assistance because they are not eligible for financial aid under Title IV.[17]

2         108.    On or about May 21, 2020, after Plaintiffs filed the instant action and their motion

3    for preliminary injunction, DoE published an "updated statement" on its website about its

4    eligibility requirements (May 21 Update).[18]  Although DoE claimed in that statement that it "will

5    not initiate any enforcement action based solely" on the statements in the April 21 HEERF

6    Guidances, it also "reiterate[d]" its position that Student Assistance "may *only*" be given to

7    students eligible under Title IV, and that "the underlying statutory terms in the CARES Act are

8    legally binding." *Id.*

9         109.    Moreover, in the May 21 Update, DoE asserted, for the first time, that § 1611 was

10   applicable law as to HEERF Assistance and that its restrictions apply.  Section 1611 provides that

11   certain non-citizens are "not eligible for any Federal public benefit," subject to exceptions.

12        110.    On June 17, 2020, DoE issued the IFR that confirmed the imposition of the

13   Title IV and § 1611 eligibility requirements on HEERF Assistance.[19]  While the May 21 Update

14   indicated that Title IV's eligibility requirements do not apply to the Institution Assistance portion

15   of the funds, no such distinction was made in the IFR.  At no point since May 21 has DoE

16   indicated that § 1611's eligibility restrictions only apply to Student Assistance.  During the course

17   of briefing and oral arguments in this litigation, DoE has indicated that it takes the position that

18   § 1611's restrictions apply to all HEERF Assistance.

19        111.    DoE issued the IFR without first publishing a proposed rule for public comment,

20   and made it effective immediately upon issuance.  85 Fed. Reg. at 36,495.  The IFR asserts that

21   DoE had "good cause" for issuing the IFR without public comments due to the "urgent economic

22   challenges facing many students as a result of the crisis."  *Id.* at 36,498.  The IFR invited the

23   public to submit comments in response, which were due on July 17, 2020.  *See id.* at 36,494.

---

24   *Department of Education?*, Newsweek (Apr. 24, 2020), https://tinyurl.com/y86qn83j.

25        [17] *Education Secretary Betsy DeVos says CARES Act funding will go to students*, Full
     Court Press (Apr. 27, 2020), https://tinyurl.com/yaaawjtz.

26        [18] May 21, 2020 CARES Act: Higher Education Emergency Relief Fund Updated
     Statement, U.S. Dep't of Educ., https://tinyurl.com/y4mnboee (last visited Nov. 2, 2020).

27        [19] Defendants presented the IFR to this Court on June 11, 2020, before it was published in
28   the Federal Registrar, and it was considered as part of this Court's PI Order.

29

112.    DoE's eligibility requirements, as communicated through DoE's HEERF Assistance Guidances, public representations, the IFR, and its representations during this litigation, cannot be reconciled with, among other things: (a) the prior DoE April 9 letter guidance stating that higher education institutions had the discretion to distribute HEERF Assistance to *all* students, (b) the Certification regarding Student Assistance; (c) DoE's HEERF formula methodology; or (d) congressional intent reflected in the CARES Act.

113.    By seeking to impose Title IV's and § 1611's eligibility requirements, DoE would exclude, among other non-citizens, students who are DACA recipients, Temporary Protected Status recipients, and asylum applicants.  *See* 20 U.S.C. § 1091 (Title IV's eligibility requirements); 8 U.S.C. §§ 1611(a), 1641(b) (describing the only non-citizens who are eligible for receipt of "Federal public benefits").  DoE's eligibility requirements would also exclude, among others, students who are citizens or non-citizens who otherwise would be eligible for assistance, but who: (a) are still completing high school (dual-enrollment); (b) do not have a high school diploma, General Educational Development (GED) certification or recognized equivalent or exception; (c) already have a bachelor's degree; (d) are enrolled exclusively as non-credit students; (e) do not meet academic progress standards; or (f) are in default on a federal student loan or owe any refund relating to a federal student grant.

114.    These limitations would likely have excluded from HEERF Assistance eligibility over 800,000 of the 1.5 million California Community College students enrolled when the pandemic struck, and similarly, would likely exclude more than half (over 750,000) of the approximately 1.4 million students enrolled in the current Fall 2020 semester.  These would include many students identified as economically disadvantaged, almost 40 percent of the colleges' students with disabilities, half of those students who are veterans or training to be first responders, and over 40 percent of those students training for health services careers.  In numbers, for the Fall 2020 semester, the California Community College students that DoE would render ineligible are estimated to include: more than 115,000 economically disadvantaged students; more than 25,000 students with disabilities; over 11,000 veterans—and nearly 2,000 active duty service members; approximately 107,000 students training for essential work in health services;

1   and an estimated 80,000 students training to be first responders.

2   **IV.   DoE's Imposition of the Eligibility Restrictions Through the IFR
          Compounds the Agency's Unlawful Conduct**

3

4         115.    On June 17, 2020, this Court preliminarily enjoined the imposition and

5   enforcement of DoE's Title IV and § 1611 eligibility requirements on HEERF Assistance for

6   community colleges throughout California.  PI Order at 28.  In that Order, the Court determined

7   that Plaintiffs were likely to succeed on their claims that DoE's eligibility requirements violate

8   separation of powers principles, the Spending Clause, and the APA.  *Id.* at 18-19, 24.  The

9   preliminary injunction enjoined the enforcement of the requirements in the April 21 Guidances,

10  the May 21 Update, and the IFR.

11        116.    As this Court already ruled, the IFR fails to establish that DoE possesses the

12  statutory authority to impose the eligibility restrictions.  Separately, the policy justifications for

13  the eligibility restrictions in the IFR are based on unsupported assumptions and a flawed cost-

14  benefit analysis, and reflect a failure to consider important aspects of the problem and evidence

15  before the agency at the time the IFR was issued, all in violation of the APA's prohibition on

16  arbitrary and capricious conduct.  DoE has compounded its APA violation by failing to consider

17  approximately 4,150 public comments that were submitted in response to DoE's call for

18  comments, which predominantly opposed the IFR.

19        **A.   The IFR Provides No Persuasive Justification for Imposing the Eligibility
                 Restrictions on HEERF Assistance**

20

21        117.    The IFR's contention that the eligibility restrictions are statutorily authorized is

22  predicated on two incorrect legal premises: that the DoE Secretary possesses the statutory

23  authority to promulgate a rule imposing eligibility restrictions on HEERF Assistance and that the

24  term "students" in the CARES Act is ambiguous.  85 Fed. Reg. at 36,495-96.  First, the IFR does

25  not identify any delegation from Congress to issue rules arising from the CARES Act itself.

26  Instead, the IFR invokes the DoE Secretary's general statutory authority to issue rules in

27  connection with her functions.  *Id.* at 36,495-96 (citing 20 U.S.C. §§ 1221e-3, 3474).  Such

28  authority for regulating administrative functions, however, does not authorize the imposition of

31

1    substantive requirements or funding conditions. *See Gonzalez v. Oregon*, 565 U.S. 243, 259,

2    264-65 (2006); *City of Chicago v. Sessions*, 888 F.3d 272, 287 (7th Cir. 2018) (imposing grant

3    conditions "is a tremendous power of widespread impact" and "not the type of authority that

4    would be hidden in a clause without explanation, and without any reference or acknowledgement

5    of that authority in the statute that actually contains the grant itself").

6       118.    Second, the term students is not ambiguous. "[T]he statutory formula expressly

7    provides for the inclusion of [full time enrollment] students who were not Federal Pell Grant

8    recipients, *i.e.*, students who would be ineligible for title IV aid." PI Order at 17-18. Defendants'

9    interpretation of the CARES Act would give two different meanings to the term "students" within

10   § 18004, where subsection (a), governing the formula, would include students not eligible under

11   Title IV or § 1611, but subsection (c), governing the distribution of HEERF Student Assistance,

12   would exclude students not eligible under Title IV or § 1611. This Court already concluded that

13   "[s]uch an interpretation makes little sense and violates fundamental tenants of statutory

14   interpretation." *Id.* at 18 (citing *City of Los Angeles v. Barr*, 941 F.3d 931, 941 (9th Cir. 2019)).

15      119.    The IFR, additionally, makes a critical concession that dooms the Title IV

16   eligibility restrictions. The IFR acknowledges that the "emergency financial aid grants" that are a

17   part of HEERF Assistance "by definition, do not constitute Federal financial student aid under the

18   HEA, including title IV of the HEA." 85 Fed. Reg. at 36,496. This necessarily means that

19   HEERF Assistance cannot be subject to Title IV's restrictions because Title IV's restrictions only

20   apply to grants "*under* [Title IV]." 20 U.S.C. § 1091(a) (emphasis added). The IFR's discussion

21   that grants authorized by 20 U.S.C. § 1138(d) are subject to Title IV's eligibility restrictions only

22   further underscores that Title IV's restrictions do not apply to HEERF. 85 Fed. Reg. at 36,496.

23   Congress *explicitly* incorporated Title IV's eligibility requirements in 20 U.S.C. § 1138(d) by

24   providing that "students who do not meet the requirements of section 1091(a) of this title" are

25   ineligible for that funding source. No such language appears in § 18004 of the CARES Act.

26      120.    The IFR discusses instances in which the CARES Act incorporates certain

27   elements of Title IV, but the IFR fails to identify—nor can it—where Congress incorporated Title

28   IV's eligibility requirements into the provisions surrounding HEERF Assistance. 85 Fed. Reg. at

32

36,496-97.  Congress's incorporation of some elements of Title IV with "surgical precision," but not Title IV's eligibility requirements, demonstrates that Congress consciously declined to adopt such requirements for HEERF Assistance.  *Navajo Nation v. HHS*, 325 F.3d 1133, 1139-40 (9th Cir. 2003).

121.    Finally, the IFR provides only a cursory explanation for the § 1611 eligibility restrictions.  85 Fed. Reg. at 36,496.  The IFR reflects no consideration of the legal analysis relevant to this Court's conclusion that HEERF Assistance is not a federal public benefit, the CARES Act's more specific provisions govern over the general prohibition in § 1611, and § 1611's purposes are not furthered by application of that statute to HEERF Assistance.  PI Order at 22-24.

**B.    The IFR Demonstrates that DoE's Eligibility Restrictions on HEERF Assistance Violate the APA**

122.    Even if DoE was statutorily permitted to impose the eligibility restrictions, the IFR confirms that they were imposed in an arbitrary and capricious manner because: (1) the IFR does not resolve the DoE's internal inconsistencies; (2) the IFR's policy justifications are premised on flawed assumptions; (3) the IFR altogether fails to consider important aspects of the problem; and (4) the DoE does not consider any of the public comments it solicited as part of the IFR.

123.    The IFR does not resolve the internal inconsistencies with the DoE's imposition of the eligibility requirements discussed *supra* at 26-30.  Moreover, while the IFR contends that its restrictive definition of "students" would provide "the most efficient, effective, and expedient way possible" to award HEERF Assistance, it simultaneously suggests that institutions of higher education develop an alternative system to determine Title IV eligibility for those students who have not submitted a FAFSA.  85 Fed. Reg. at 36,497, 36,500-01.  Such a process defeats any efficiency purportedly gained by the IFR.  The IFR also ignores the obvious, more efficient alternative: if no eligibility restrictions were imposed, higher education institutions would not have to "wade through a litany of specific questions," as the institutions would only have to determine whether the grant to a particular student cover "expenses related to the disruption of campus operations due to coronavirus," as directed in the statute and originally contemplated by

33

1    the agency.  *Id*. at 36,497; 134 Stat. at 568, § 18004(c).[20]

2       124.    Furthermore, the IFR's policy justification rests on three defective assumptions.

3    First, it claims that the eligibility requirements are necessary because "the potential for waste,

4    fraud, and abuse is significant when institutions of higher education are given the opportunity to

5    quickly make cash awards to students," which DoE posits will incentivize institutions "to further

6    their bottom lines" and increase enrollment.  85 Fed. Reg. at 36,497-98.  But the IFR does not

7    explain how limiting HEERF Assistance to Title IV and § 1611 eligible students prevents "waste,

8    fraud, and abuse."  To support DoE's concern about fraud, DoE cites to one report claiming that

9    "[a] group of international fraudsters" have used information obtained from cyber hacks to file

10   unemployment claims about U.S. citizens.  *Id*. at 36,497.[21]  These allegations are unrelated to the

11   HEERF eligibility restrictions, and rather than support the restriction, they show that claims on

12   behalf of individuals who are eligible for financial aid under Title IV, such as U.S. citizens, are as

13   or more likely to be susceptible to fraud than claims made on behalf of individuals who are in-

14   eligible under Title IV.

15      125.    Relatedly, DoE provides no support for the speculative assumption that without

16   the eligibility restrictions, "unscrupulous institutions could create cheap classes and programming

17   that provides little or no educational value and then use the HEERF grant funding to incentivize

18   individuals not qualified under Title IV to enroll as paying students in those classes and

19   programs, thereby qualifying for a grant."  85 Fed. Reg. at 36,498.  Conversely, the agency failed

20   to consider how the eligibility restrictions hinder the ability of higher education institutions "to

21   ensure that their currently enrolled students have the resources they need to continue their

22   studies" at a time when institutions face dwindling resources to address their students' increased

23   needs as a result of the pandemic.[22]  While the eligibility restrictions in no way guard against

24   ───────────────

          [20] *See also* Secretary DeVos Letter to College and University Presidents, U.S. Dep't of
25   Educ. (April 9, 2020), https://tinyurl.com/y7f9tlrk ("The only statutory requirement is that the
     funds be used to cover expenses related to the disruption of campus operations due to
26   coronavirus.").

27        [21] Citing Mike Baker, *Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment
     Systems*, New York Times (May 16, 2020), https://tinyurl.com/ycshl3kr.

28        [22] California Community Colleges, Comment on Interim Final Rule *Eligibility of Students*

                                                     34

1   waste, fraud, and abuse, they undermine the very purpose of the CARES Act, which, as DoE

2   previously acknowledged, was to "provide[] institutions with significant discretion" on allocating

3   funds to students "as quickly as possible."[23]

4          126.    Second, the cost-benefit analysis conducted by the agency in the IFR is

5   fundamentally flawed.  The IFR "evaluate[d] the costs and benefits of the IFR compared to a pre-

6   statutory baseline," *i.e.*, the situation that existed before the CARES Act was enacted.  85 Fed.

7   Reg. at 36,499.  Contrary to the IFR's assertion, this baseline is *not* "[i]n accordance with OMB

8   Circular A-4," *id.*, which directs that the "baseline should be the best assessment of the way the

9   world would look absent the proposed action."[24]  Without the IFR, DoE would still be required by

10  the CARES Act to allocate funds to higher education institutions.  Instead, the correct baseline is

11  to compare the costs and benefits of imposing the eligibility requirements against not imposing

12  them, as that is the "best assessment of the way the world would look absent the proposed

13  action."  *Id*.  By relying on a flawed baseline, DoE inappropriately takes credit for the funding

14  that was appropriated by Congress, while neglecting to consider the costs associated with

15  restricting 4.6 million students from receiving this emergency assistance.  *See* 85 Fed. Reg. at

16  36,498-502; *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)

17  ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious

18  flaw undermining that analysis can render the rule unreasonable.").

19         127.    Third, the agency relies on grossly inaccurate estimates of the burden on higher

20  education institutions and students to comply with these eligibility restrictions.  85 Fed. Reg. at

21  36,503.  The IFR asserts, without support, that each higher education institution which receives a

22

23  *at Institutions of Higher Education for Funds Under the Coronavirus Aid, Relief, and Economic*
    *Security (CARES) Act*, 85 Fed. Reg. 36,494 (June 17, 2020), RIN: 1840-ZA04 (hereinafter

24  Comment on IFR), ID No. ED-2020-OPE-0078-2928 (Attachment 1), 13*, (July 17, 2020)
    (California Community Colleges Comment); *see also* State Attorneys General, Comment on IFR,

25  ID No. ED-2020-OPE-0078-2873 (Attachment 1), 11-13 (July 17, 2020) (State AGs Comment)
    (noting projected $765 billion cuts to state budgets over the next 3 years).

26         [23] Secretary DeVos Letter to College and University Presidents, U.S. Dep't of Educ. (Apr.
    9, 2020), https://tinyurl.com/y7f9tlrk.

27
           [24] Office of Mgmt. & Budget, Circular A-4 (Sept. 17, 2003),
28  https://tinyurl.com/y3v8wzjp.

HEERF Assistance allocation will only require five hours to implement these eligibility requirements, which the IFR describes as consisting of "set[ting] up any new form for students to complete" and "establish[ing] review and recordkeeping procedures." *Id.* Even if that estimate was accurate for those particular tasks—which higher education institutions in California and across the country represent it is not—the IFR does not account for the numerous other tasks that are implicated by the eligibility requirements such as: (1) manually reviewing each application and verifying that the student is eligible under each of the criteria for receipt of financial aid under Title IV; (2) following up with students for additional information required under the eligibility requirements; (3) handling appeals associated with the eligibility requirements; and (4) instructing students seeking to establish Title IV eligibility on how to complete the FAFSA or any alternative application form that an institution may create to determine eligibility.[25]

128.    The IFR's estimate that it would take students twenty minutes to complete the request for assistance under DoE's eligibility requirements is also inaccurate and contrary to the evidence before the agency at the time of the IFR. 85 Fed. Reg. at 36,503. The IFR cites claims that one of the benefits of the Title IV eligibility requirement is that it allows for the "leveraging [of] existing processes and procedures," so "students who currently do not receive title IV aid [could] submit the [FAFSA] in order to determine title IV eligibility." *Id.* at 36,497. The IFR acknowledges, though, that students "may lack the necessary information or familiarity with the financial aid process" to submit the FAFSA. *Id.* at 36,500. The IFR continues that the "complexity" of FAFSA and "lack of counseling" pose "particular[] challenge[es] for low-income, minority, and first-generation students." *Id.* According to DoE's own data, nearly three million undergraduates did not fill out a FAFSA in 2015-16, including hundreds of thousands of Black students, Latino students, and low-income veteran students.[26]

---

[25] California Community Colleges Comment at 13-15; State AGs Comment at 10-11; San Jose State University, Comment on IFR, ID No. ED-2020-OPE-0078-2868 (Attachment 1), 6-7, (July 17, 2020) (San Jose State Comment); National Association of Student Financial Aid Administrators, Comment on IFR, ID No. ED-2020-OPE-0078-2990 (Attachment 1), 4, (July 17, 2020) (NASFAA Comment).

[26] The Institute for College Access & Success, Comment on IFR, ID No. ED-2020-OPE-0078-2608 (Attachment 1), 2-3 (July 8, 2020) (ICAS Comment) (compiling DoE data).

129.    In fact, the FAFSA form itself estimates that it will take students an average of 1.5 hours to complete the form, far exceeding the twenty minute estimate in the IFR.[27]  The IFR's alternative suggestion for higher education institutions to create a separate form and procedure for students not willing or able to submit a FAFSA to attest to their Title IV eligibility under penalty of perjury, is no alternative at all.  85 Fed. Reg. at 36,500.  Students would still have to familiarize themselves with the "complex" financial process before undertaking the serious step of verifying eligibility under penalty of perjury, a process that will take more than twenty minutes.[28]  Because of the burden and the prospect of making an unnecessary certification, many students who are *eligible* for financial aid under Title IV will likely not apply for this emergency assistance, an outcome that the IFR fails to consider.[29]

130.    In addition to the above, the IFR fails entirely to consider other significant problems:

- The groups of students who are excluded from receiving HEERF Assistance by DoE's eligibility requirements are suffering the disproportionate health and economic effects as a result of the pandemic, while also being less likely to have access to health insurance, and thus, would likely benefit most from HEERF Assistance;[30]
- The eligibility restrictions will exacerbate already existing gaps in equity and

---

[27] FAFSA, Free Application for Federal Student Aid, July 1, 2020 – June 30, 2021 2, U.S. Dep't of Educ., https://tinyurl.com/y6z5u2lm (last visited Nov. 2, 2020).

[28] NASFAA Comment at 4; San Jose State Comment at 5; The Century Foundation Comment on IFR, ID No. ED-2020-OPE-0078-2927 (Attachment 1), 1 (July 17, 2020) (Century Foundation Comment).

[29] San Jose State Comment at 4-5; Coalition for Humane Immigrant Rights, Comment on IFR,  ID No. ED-2020-OPE-0078-0055 (Attachment 1), 7-10 (July 17, 2020) (CHIRLA Comment); Student Veterans of America, Comment on IFR, ID No. ED-2020-OPE-0078-2874 (Attachment 1), 3-4 (July 17, 2020) (SVA Comment); Leadership Conference on Civil and Human Rights, Comment on IFR, ID No. ED-2020-OPE-0078-2907 (Attachment 1), 2-3 (July 17, 2020) (LCCHR Comment).

[30] *E.g.*, CHIRLA Comment at 2-7; ICAS Comment at 3-4; San Jose State Comment at 2-3; LCCHR Comment at 1-2; County of Los Angeles, Comment on IFR, ID No. ED-2020-OPE-0078-2549, 10 (July 17, 2020) (LA County Comment); University of California, Comment on IFR, ID ED-2020-OPE-00078-1091 (Attachment 1), 2 (July 17, 2020) (UC Comment).

37

achievement, making it more likely that traditionally underrepresented student groups will dis-enroll;[31]

- The eligibility restrictions, and the dis-enrollment of ineligible students that would likely follow, will deprive higher education institutions of valuable members of their communities, undermine the institutions' missions of promoting diversity, and hinder institutions' efforts to prepare all students for a diverse workforce and society;[32] and

- The dis-enrollment of ineligible students that would likely follow the eligibility restrictions will have a devastating effect on national and local economies, significantly diminishing productivity capacity, decreasing the eligible tax base, and harming the country's international competitiveness at a time when a highly skilled workforce is needed to support an economic recovery.[33]

131.    Finally, DoE violates the APA for another independent reason.  There were a total of approximately 4,150 public comments, which overwhelmingly opposed the IFR.  Although DoE invited public comments and represented that it would "consider these comments in determining whether to revise the rule," 85 Fed. Reg. at 36,495, DoE failed to consider any of the public comments that were submitted in response to the IFR, evident by their exclusion from the administrative record, *see* ECF No. 52-3.

**V.      DOE'S UNLAWFUL RESTRICTIONS ON HEERF ASSISTANCE ELIGIBILITY WOULD IRREPARABLY HARM PLAINTIFFS AND STUDENTS ATTENDING COMMUNITY COLLEGES THROUGHOUT CALIFORNIA**

132.    DoE's unlawful eligibility requirements would unfairly and erroneously limit which students may receive emergency assistance during a global pandemic, inflicting irreparable harm on Plaintiffs and their students by damaging students' access to education, with

---

[31] *E.g.*, California Community Colleges Comment at 5; San Jose State Comment at 8; State AGs Comment at 16.

[32] *E.g.*, California Community Colleges Comment at 13; CHIRLA Comment at 11-12; San Jose State Comment at 7-8; State AGs Comment at 16.

[33] *E.g.*, California Community Colleges Comment at 5; LA County Comment at 11-13; Century Foundation Comment at 1; SEIU, Comment on IFR, ID No. ED-2020-OPE-0078-0723 (Attachment 1) (SEIU Comment)

consequential effects on their well-being and futures. To mitigate this damage, Plaintiffs would be required to identify immediate additional resources to determine how to disburse funding to the many students rendered ineligible for HEERF Assistance, depleting Plaintiffs' resources intended for other programs and services. DoE's limitations would also serve to place students already in need at a higher risk of dis-enrolling, which would threaten Plaintiffs' budgets and revenues, and undermine their academic missions and the character and diversity of their student bodies. Failure to follow DoE's eligibility requirements conveyed most recently in its IFR would subject Plaintiff Districts to the threat of suspension or debarment, and the attendant loss of unrelated federal funding.

133.    The DoE's confusing and conflicting guidances regarding student eligibility placed a significant administrative burden on Plaintiff Districts' financial aid offices at a time when staff were working remotely and without access to resources available in their offices—a burden that would re-emerge if Plaintiffs were once again subject to DoE's eligibility requirements. Before the Court issued its PI Order, Plaintiff Districts had to re-direct staff or revise plans to disburse HEERF Assistance in as equitable and expedient a manner as possible despite DoE's eligibility restrictions, which entailed long hours and substantial resources. Imposing the same requirements as federal student aid entails the consideration of a long list of conditions, from not having defaulted on student loan payments to making sufficient satisfactory academic progress. While the FAFSA application contains information regarding Title IV eligibility, many students, including low-income students, have not filled out a FAFSA. That means a manual review of each student's records is the only way to ensure that assistance is distributed to the greatest number of students possible while complying with DoE's restrictive eligibility requirements. Many colleges do not have the time and resources to undertake this review. This extra burden would come at a time when Plaintiffs are already devoting considerable resources to support their students' needs during this crisis, including increased demand for academic counseling, mental health services, and food services.

134.    Because the HEERF Assistance eligibility restrictions imposed by DoE would leave thousands of students enrolled in Plaintiff Districts' institutions without relief, Plaintiffs

39

1    would be required, absent an injunction, to consider re-directing funds from other grants or

2    programs (such as the SEA Program, discussed *supra* at 8-10) to cover the costs.  These

3    alternative sources, however, would not provide enough funds to bridge the gap caused by DoE's

4    HEERF eligibility requirements, and would decrease the amount of funding available to Plaintiffs

5    for educational programs and services overall.

6          135.    DoE's eligibility restrictions would also increase the risk of student dis-enrollment

7    that Plaintiffs face as a result of the COVID-19 pandemic.  And dis-enrollment has both short and

8    long term deleterious effects.  The immediate impact of dis-enrollment would be felt in

9    allocations of funds to community college districts for categorical programs, which total hundreds

10   of millions of dollars and are apportioned based solely upon fulltime equivalent attendance

11   (FTE).  General apportionment funding is based upon a recently-enacted funding formula that

12   includes FTE and other metrics of success.  Dis-enrollments would adversely impact college

13   district revenues under this formula by decreasing three-year average attendance figures and

14   lowering college success metrics which are weighted toward vulnerable student populations who

15   are most likely in need of the CARES Act emergency relief to stay enrolled.  Student drop-outs

16   also affect the diversity of the student population, the robustness and quality of classroom

17   participation, and the overall academic climate.

18         136.    Because Plaintiff Districts' budgets are determined, in large part, by the number of

19   students enrolled, decreases in enrollment have a significant effect on the types of academic

20   courses Plaintiffs are able to provide, the staff they are able to hire, and the educational programs

21   and services they are able to offer.  It also affects the level of financial assistance Plaintiff

22   Districts are able to provide students in the future.

23         137.    Before the April 21 Guidances, the four colleges in Plaintiff LRCCD, Clovis,

24   Reedley, and Fresno City Colleges in Plaintiff SCCCD, and Foothill College in FDCCD executed

25   the required Certifications agreeing to comply with all terms and conditions of funding, in

26   reliance on the plain text of the CARES Act, the representations made in DoE's April 9 letter, and

27   the language of the Certifications.  These colleges signed the Certifications with the intention and

28   plan of using HEERF Assistance to be available across their entire student population, without

40

regard to Title IV's eligibility requirements.  None of these colleges had any knowledge that they would be required to exclude HEERF Assistance from non-Title IV eligible students when they executed the Certifications.

138.    If DoE's eligibility requirements do not remain enjoined, all of the Plaintiff Districts would risk prospective penalties and liabilities if they were to continue implementing their HEERF Assistance distribution plans.  The Certifications that all educational institutions were required to sign as a condition of receiving CARES Act funding incorporate federal regulations concerning suspension and debarment, among other legal authorities.  These regulations threaten the recipient with loss of not just DoE funding, but all federal funding, if they are found to have willfully failed to comply with the terms of the Certifications.  2 C.F.R. § 180.800.  Thus, Plaintiff Districts, if subject to the eligibility requirements, would be faced with an impossible choice: deny thousands of students needed assistance in order to comply with eligibility requirements (requirements that were imposed *after* some of their colleges signed the Certifications), or risk their federal funding in its entirety.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF SEPARATION OF POWERS PRINCIPLES

139.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

140.    Article I, Section I of the U.S. Constitution enumerates that "[a]ll legislative Powers here granted shall be vested in [the] Congress."

141.    Article I, Section VIII of the U.S. Constitution vests exclusively in Congress the spending power to "provide for . . . the general Welfare of the United States."

142.    The executive branch's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

143.    By imposing eligibility requirements on HEERF Assistance despite Congress delegating no authority for Defendants to impose such restrictions on these funds, Defendants have violated constitutional separation of powers principles.  "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in

41

order to effectuate its own policy goals." *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  Nor may it impose conditions on funds appropriated by Congress without authorization by Congress.  *See id.* at 1233-34.

144.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the Title IV and § 1611 eligibility requirements set forth in DoE's HEERF Assistance Guidances and IFR are unconstitutional, and thus, should be set aside under 28 U.S.C. § 2201; and (b) a permanent injunction prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandate under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts without such funds being subject to the eligibility requirements set forth in the HEERF Assistance Guidances and IFR.

## SECOND CLAIM FOR RELIEF

### ULTRA VIRES

145.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

146.    An agency acts *ultra vires* when it exceeds its statutory authority conferred by Congress.

147.    There is no provision of the CARES Act that imposes eligibility requirements on the students who may receive HEERF Assistance.  Further, Congress has not delegated to Defendants the authority to impose such eligibility requirements.

148.    No provision in the CARES Act imposes Title IV's or § 1611's limitations on HEERF Assistance.  Moreover, Congress did explicitly limit eligibility for other forms of assistance in the CARES Act, while not doing the same for HEERF Assistance.

149.    The CARES Act requires Defendants to issue HEERF Assistance funds to Plaintiff Districts based on a funding formula and without conditioning funding on Plaintiffs' agreement to impose Title IV or § 1611 eligibility requirements.  Indeed, the formula described in subsection (a) of § 18004 of the CARES Act encompasses those "students" "who were *not* Federal Pell Grant recipients," therefore including students who are not eligible to receive financial aid under Title IV or eligible to receive federal public benefits under § 1611.  Subsection (c) of § 18004

42

then authorizes institutions to use HEERF Assistance to cover the costs of instruction associated with the coronavirus and mandates that institutions "shall use no less than 50 percent" of the funds "for emergency financial aid grants *to students*" for eligible expenses related to the coronavirus.

150.    DoE's exclusion of students who are ineligible under Title IV or § 1611 from receiving the emergency assistance provided under subsection (c) would give two different meanings to the term "students" found in subsections (a) and (c), leading to illogical and unintended results.  *See Los Angeles*, 941 F.3d at 941 ("Under the normal rule of statutory construction, we presume that identical words used in different parts of the same act are intended to have the same meaning.") (internal quotation marks omitted).

151.    Section 1611's general restrictions on the receipt of federal public benefits also do not apply to the specific one-time emergency funding disbursement in the CARES Act.  The formula's inclusion of students, irrespective of § 1611's restrictions, is strong evidence that Congress intended that § 1611's restrictions not apply to HEERF Assistance.  Section 1611's objectives to "remove the incentive for illegal immigration provided by the availability of public benefits," 8 U.S.C. § 1601(6) and "limit[] lifetime welfare benefits," H.R. Rep. No. 104-651 at 3 (1996), is not furthered by its application to HEERF Assistance.  HEERF Assistance is also not a federal public benefit under § 1611, which is particularly evident from a review of the Institution Assistance, because § 1611 does not encompass "block grants" or funding sources that are "generally targeted to communities."  63 Fed. Reg. 41,658, 41,659 (Aug. 4, 1998).

152.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the Title IV and § 1611 eligibility requirements set forth in DOE's HEERF Assistance Guidances and IFR are *ultra vires* under the CARES Act, and thus, should be set aside under 28 U.S.C. § 2201; and (b) a permanent injunction prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandate under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts without such funds being subject to the eligibility requirements set forth in the HEERF Assistance Guidances and IFR.

43

## THIRD CLAIM FOR RELIEF

### SPENDING CLAUSE

153.   Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

154.   The Constitution affords the spending power to Congress.  U.S. Const., art. I, § 8, cl. 1.  Congress's spending power is not unlimited.  When "Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation," and by placing conditions that are related '"to the federal interest in particular national projects or programs."'  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal citations omitted, brackets in original).

155.   To the extent that Congress delegated its authority to DoE to impose its own eligibility conditions on HEERF Assistance (which it has not), the eligibility requirements set forth in the DoE's HEERF Assistance Guidances and IFR violate the Spending Clause of the U.S. Constitution.

156.   The eligibility requirements set in DoE's HEERF Assistance Guidances and the IFR violate the relatedness requirement under the Spending Clause because they are contrary to Congress's intent in the CARES Act to confer maximum flexibility on higher education institutions to provide financial assistance in the manner that best serves each of their respective student populations during this public health crisis.

157.   The eligibility requirements set forth in DoE's HEERF Assistance Guidances and the IFR, and the required Certifications, violate the unambiguous requirement under the Spending Clause for three reasons.  First, Congress has not "unambiguously" imposed the eligibility requirements.  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Second, DoE's conflicting interpretations fail to provide the Districts with the requisite notice enabling them to "knowingly decide" how to use HEERF Assistance funds.  *Id.* at 24.  Third, as to at least eight colleges in Plaintiff Districts, Defendants have surprised them with "post acceptance . . . conditions" by imposing the Title IV eligibility requirements *after* those colleges executed the required Certifications.  *Id.* at 25.

44

158.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the Title IV and § 1611 eligibility requirements set forth in DOE's HEERF Assistance Guidances and IFR violate the Spending Clause, and thus, should be set aside under 28 U.S.C. § 2201; and (b) a permanent injunction prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandate under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts without such funds being subject to the eligibility requirements set forth in the HEERF Assistance Guidances and IFR.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

**(Constitutional Violations and Excess of Statutory Authority)**

159.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

160.    Defendant DoE is an "agency" under the APA, 5 U.S.C. § 551(1), and the HEERF Assistance Guidances, the IFR, and the imposition of HEERF eligibility requirements set forth therein are "agency action[s]" under the APA, *id.* § 551(13).

161.    The imposition of the eligibility requirements in the HEERF Assistance Guidances and the IFR constitute "[a]gency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.

162.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusion found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right."  *Id.* § 706(2)(B)-(C).

163.    As explained above, the eligibility requirements set in the HEERF Assistance Guidances and IFR: (a) are unconstitutional because Defendants overstepped their powers by imposing funding conditions without any authority to do so; (b) are in excess of statutory authority under the CARES Act; and (c) violate the Spending Clause because they are unrelated to the federal purpose of the CARES Act and/or fail the Clause's unambiguous requirement.

164.    For the reasons stated herein, because Defendants acted in excess of their statutory

45

1   authority and unconstitutionally, Plaintiffs are entitled to: (a) a declaration that the Title IV and

2   § 1611 eligibility requirements set forth in DOE's HEERF Assistance Guidances and IFR are

3   unlawful, and thus, should be set aside under 5 U.S.C. § 706; and (b) a permanent injunction

4   prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the

5   Plaintiff Districts are entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel

6   Defendants to issue HEERF Assistance funds to the Plaintiff Districts without such funds being

7   subject to the eligibility requirements set forth in the HEERF Assistance Guidances and IFR.

8                              **FIFTH CAUSE OF ACTION**

9                    **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

10                              **(Arbitrary and Capricious)**

11          165.    Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

12          166.    Defendant DoE is an "agency" under the APA, 5 U.S.C. § 551(1), and the HEERF

13   Assistance Guidances, the IFR, and the imposition of HEERF eligibility requirements set forth

14   therein are "agency action[s]" under the APA, *id.* § 551(13).

15          167.    The imposition of eligibility requirements in the HEERF Assistance Guidances

16   and the IFR constitute "[a]gency action[s] made reviewable by statute and final agency action for

17   which there is no other adequate remedy in a court."  *Id.* § 704.

18          168.    The APA requires that a court "hold unlawful and set aside agency action,

19   findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

20   otherwise not in accordance with law."  *Id.* § 706(2)(A).

21          169.    The eligibility requirements set forth in the HEERF Assistance Guidances are

22   arbitrary and capricious and an abuse of discretion.  As discussed *supra*, Defendants have acted in

23   an arbitrary and capricious manner by relying on factors that Congress did not intend, failing to

24   consider important aspects of the problem, and failing to provide an explanation for the April 21

25   HEERF Assistance Guidances that is consistent with the evidence that is before the agency.  *See*

26   *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm. Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

27          170.    Defendants have engaged in "[u]nexplained inconsistency" in first stating that

28   HEERF Assistance is available to all students, to only change their view without showing any

                                                46

1  awareness of its changed position.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

2  545 U.S. 967, 981 (2005).

3      171.    The IFR is arbitrary and capricious because it is premised on speculative claims of

4  fraud and an unsupported assessment of burden on higher education institutions that is contrary to

5  the evidence before the agency.  *See State Farm.*, 463 U.S. at 43 ("[T]he agency must examine

6  the relevant data and articulate a satisfactory explanation for its action."); *Nat'l Lifetime Ass'n v.*

7  *FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (agency action premised on "speculative"

8  conclusions is arbitrary and capricious).

9      172.    The cost-benefit analysis in the IFR is arbitrary and capricious for this reason and

10  because it is predicated on flawed assumptions, including an incorrect baseline in which it fails to

11  consider the costs of imposing the eligibility requirements compared to not imposing the

12  eligibility requirements.  *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1039-40.

13      173.    The IFR is also arbitrary and capricious because it fails to consider the harms of

14  the eligibility requirements, both monetary and non-monetary, to: (a) students not eligible under

15  Title IV or § 1611; (b) higher education institutions' academic missions of equity and diversity;

16  and (c) national, state, and local economies due to the reduction in productivity that would likely

17  follow as a result of the eligibility restrictions' impact on college graduation rates.  *See, e.g.*, *State*

18  *Farm*, 463 U.S. at 43; *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 854 (9th Cir. 2020).

19      174.    For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the

20  Title IV and § 1611 eligibility requirements set forth in DOE's HEERF Assistance Guidances and

21  IFR are unlawful, and thus, should be set aside under 5 U.S.C. § 706; and (b) a permanent

22  injunction prohibiting the imposition and enforcement of those eligibility requirements.

23  Additionally, the Plaintiff Districts are entitled to a writ of mandamus under 28 U.S.C. § 1361 to

24  compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts without such funds

25  being subject to the eligibility requirements set forth in the HEERF Assistance Guidances and

26  IFR.

27  ///

28  ///

1

## SIXTH CAUSE OF ACTION

2

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

3

**(Arbitrary and Capricious and Without Observance of Procedure Required by Law –**

4

**Failure to Consider Public Comments)**

5

175.   Plaintiffs incorporate the allegations of the preceding paragraphs by reference.

6

176.   Defendant DoE is an "agency" under the APA, 5 U.S.C. § 551(1), and the HEERF

7

Assistance Guidances, the IFR, and the imposition of HEERF eligibility requirements set forth

8

therein are "agency action[s]" under the APA, *id.* § 551(13).

9

177.   The imposition of eligibility requirements in the HEERF Assistance Guidances

10

and the IFR constitute "[a]gency action[s] made reviewable by statute and final agency action for

11

which there is no other adequate remedy in a court." *Id.* § 704.

12

178.   The APA requires that a court "hold unlawful and set aside agency action,

13

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

14

otherwise not in accordance with law." *Id.* § 706(2)(A).  "The requirement that agency action not

15

be arbitrary or capricious includes a requirement that the agency adequately . . . respond to

16

'relevant' and 'significant' public comments." *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197

17

(D.C. Cir. 1993) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)).

18

179.   The APA also requires that a court set aside agency actions that are done "without

19

observance of procedure required by law." 5 U.S.C. § 706(2)(D).  Even if an agency possesses

20

"good cause" to promulgate an interim final rule that is effective before the consideration of

21

public comments, the agency is not excused from ultimately completing the rulemaking process

22

before the rule is "chiseled into bureaucratic stone." *Am. Fed. of Gov't Employees, AFL-CIO v.*

23

*Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981).  "[I]t is crucial that the comprehensive permanent

24

regulations which follow emerge as a result of the promulgation of the congressionally-mandated

25

policy of affording public participation that is embodied in [the APA]." *Id.* at 1158.

26

180.   The DoE requested that the public comment on the IFR.  There were

27

approximately 4,150 public comments that were submitted in response to the IFR, which

28

overwhelming opposed the IFR.  The agency has shown no consideration of *any* of these public

48

comments.

181.   The deadline for submission of the public comments was July 17, 2020.  Although over three and a half months have passed since the deadline, the agency has taken no action to consider the validity of the IFR in light of the public comments.

182.   For the reasons stated herein, Plaintiffs are entitled to: (a) a declaration that the Title IV and § 1611 eligibility requirements set forth in the IFR, which have been imposed without consideration of any of the public comments that were submitted in response to the IFR's solicitation of those comments, are unlawful, and thus, should be set aside under 5 U.S.C. § 706; and (b) a permanent injunction prohibiting the imposition and enforcement of those eligibility requirements.  Additionally, the Plaintiff Districts are entitled to a writ of mandamus under 28 U.S.C. § 1361 to compel Defendants to issue HEERF Assistance funds to the Plaintiff Districts without such funds being subject to the eligibility requirements set forth in the IFR.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, and grant the following relief:

1.   Issue a declaration that the Title IV and § 1611 eligibility requirements set forth in DOE's HEERF Assistance Guidances and IFR are unlawful and/or unconstitutional because they: (a) violate the separation of powers; (b) exceed congressional authority conferred to the executive branch and is ultra vires; (c) violate the Spending Clause; and (d) violate the APA;

2.   Set aside the Title IV and § 1611 eligibility requirements set forth in the HEERF Assistance Guidances and IFR under 28 U.S.C. § 2201 and 5 U.S.C. § 706;

3.   Permanently enjoin Defendants from imposing and enforcing the Title IV and § 1611 eligibility requirements set forth in the HEERF Assistance Guidances and IFR, or otherwise restricting eligibility for HEERF Assistance to only those who are eligible under Title IV of the Higher Education Act of 1965 or § 1611;

4.   Permanently enjoin Defendants from penalizing Plaintiff Districts for distributing assistance to students who are not eligible under Title IV of the Higher Education Act of 1965 or § 1611;

1          5.       Issue a writ of mandate compelling Defendants to issue the Plaintiff Districts'

2    HEERF Assistance funds without such funds being subject to the Title IV or § 1611 eligibility

3    requirements set forth in the HEERF Assistance Guidances or IFR; and

4          6.       Grant such other relief as the Court may deem just and proper.

Dated:  November 6, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
CHERYL FEINER
MICHAEL NEWMAN
Senior Assistant Attorneys General
CHRISTINE CHUANG
Supervising Deputy Attorney General
JULIA HARUMI MASS
JASLEEN SINGH
SHUBHRA SHIVPURI
JOSHUA SONDHEIMER

*/s/ Lee I. Sherman*

LEE I. SHERMAN
Deputy Attorneys General
*Attorneys for Plaintiffs Eloy Ortiz Oakley
and Board of Governors of the California
Community Colleges*

*/s/ John Shupe*

JOHN SHUPE
Lynch and Shupe, LLP
*Attorney for Plaintiff Foothill-De Anza
Community College District*

*/s/ Jeffrey M. Prieto*

JEFFREY M. PRIETO
General Counsel
*Attorney for Plaintiff Los Angeles
Community College District*

*/s/ Ljubisa Kostic*

LJUBISA KOSTIC
Director, Legal Services & EEO
*Attorney for Plaintiff San Diego
Community College District*

*/s/ JP Sherry*

JP SHERRY
General Counsel
*Attorney for Plaintiff Los Rios
Community College District*

*/s/ Matthew T. Besmer*

MATTHEW T. BESMER
General Counsel
*Attorney for Plaintiff State Center
Community College District*

51

1

**ATTESTATION OF SIGNATURES**

2

I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

3

District of California that concurrence in the filing of this document has been obtained from each

4

signatory hereto.

5

*/s/ Lee I. Sherman*

6

LEE I. SHERMAN
Deputy Attorney General

7

*Attorney for Plaintiffs Eloy Ortiz*

8

*Oakley and Board of Governors of*
*the California Community Colleges*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28